UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

STATE OF TEXAS, *et al.*,

        Plaintiffs,

    v.

BLACKROCK, INC.,
STATE STREET CORP.,
THE VANGUARD GROUP, INC.,

        Defendants.

CIVIL ACTION NO. 6:24-cv-437-JDK

**ORAL ARGUMENT REQUESTED**

DEFENDANTS' JOINT MOTION TO DISMISS COUNTS I–XIV AND XVIII
OF THE AMENDED COMPLAINT AND REQUEST FOR ORAL ARGUMENT

## **TABLE OF CONTENTS**

Introduction ........................................................................................................... 1

Statement of Issues ............................................................................................... 3

Background ............................................................................................................ 4

Legal Standard ...................................................................................................... 8

Argument ............................................................................................................... 8

I.      Plaintiffs Fail to State a Claim Under Section 1 of the Sherman Act (Count II) ............... 9

        A.      Plaintiffs Have Not Plausibly Alleged an Agreement ............................................. 9

                1.      There are no direct allegations of an agreement ....................................... 10

                2.      The circumstantial evidence refutes the existence of a conspiracy .......... 12

        B.      Plaintiffs Have Not Alleged Anticompetitive Harm .............................................. 19

II.     Plaintiffs Do Not Plausibly Allege an Anticompetitive Information-Sharing
        Scheme (Count III) ................................................................................................... 23

III.    Plaintiffs Fail to State a Claim Under Section 7 of the Clayton Act (Count I) ................ 24

        A.      The Section 7 Safe Harbor Squarely Forecloses the Claim .................................. 25

                1.      Defendants purchase their shares solely for investment ........................... 25

                2.      Plaintiffs fail to identify any "uses" of Defendants' shares that
                        reduced coal output or lessened competition ............................................ 28

        B.      Plaintiffs Have Failed to Identify Any Acquisitions During the Relevant
                Period that Substantially Reduced Competition .................................................... 30

IV.     Plaintiffs' State-Law Antitrust Claims Fall with the Federal Claims (Counts IV-
        XIV) ........................................................................................................................ 33

V.      Louisiana's Unfair Trade Practices Act Claim Fails (Count XVII) ................................. 35

Conclusion ............................................................................................................ 36

i

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*American Crystal Sugar Co. v. Cuban-American Sugar Co.*, 152 F. Supp. 387
    (S.D.N.Y. 1957), *aff'd*, 259 F.2d 524 (2d Cir. 1958) .......................................29

*Anaconda Co. v. Crane Co.*, 411 F. Supp. 1210 (S.D.N.Y. 1975) ...............................26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................8

*B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419 (Fed. Cir. 1997).........................22

*Basic Capital Management Inc. v. Dynex Capital, Inc.*, 976 F.3d 585 (5th Cir.
    2020) ........................................................................................................................5, 6

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................4, 8, 10, 13, 18, 23, 24

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) .....................................14

*Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 35 So. 3d 1053 (La.
    2010) .......................................................................................................................35

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities
    Corp.*, 92 F.4th 381 (2d Cir. 2024) .........................................................9, 10, 14

*Clean Water Opportunities, Inc. v. Willamette Valley Co.*, 759 F. App'x. 244 (5th
    Cir. 2019) .................................................................................................................34

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000)............................4

*Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284
    (5th Cir. 1988)..........................................................................................................24

*David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459 (S.D.
    Miss. 2022), *aff'd sub nom. New England Construction, LLC v. Weyerhae-
    user Co.*, 2023 WL 2401587 (5th Cir. 2023) ....................................................30

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc*. 732 F.2d 480 (5th Cir. 1984) .........................32

*Duncan v. Walker*, 533 U.S. 167 (2001).....................................................................26

*In re Electronic Books Antitrust Litigation*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012).....................18

*EuroTec Vertical Flight Solutions, LLC v. Safran Helicopter Engines S.A.A.*, 2019
WL 3503240 (N.D. Tex. 2019)...........................................................................34

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 832 F.3d 1 (1st Cir. 2016)...........................12

*Federal Trade Commission v. Peabody Energy Corp.,* 492 F. Supp. 3d 865 (E.D.
Mo. 2020)...................................................................................6, 7, 15, 16, 21, 31

*Felder's Collision Parts, Inc. v. General Motors Co.*, 2014 WL 1652719 (M.D.
La. 2014), aff'd, 777 F.3d 756 (5th Cir. 2015) ...............................................35

*Federal Trade Commission v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020).....................32

*In re Franchise Services of Northern America, Inc.*, 891 F.3d 198 (5th Cir. 2018) ...................27

*Golden Bridge Technology, Inc. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008).......................19

*Gulf & West Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687
(2d Cir. 1973)................................................................................................29

*Healow v. Anesthesia Partners, Inc.*, 92 F.3d 1192 (9th Cir. 1996)..............................................33

*Holmes v. SIPC*, 503 U.S. 258 (1992) .........................................................................................33

*Illumina Inc. v. Federal Trade Commission*, 88 F. 4th 1036 (5th Cir. 2024)...............................32

*Impax Laboratories, Inc. v. Federal Trade Commission*, 994 F.3d 484 (5th Cir.
2021) ...............................................................................................................20

*In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010) ............................14

*JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585 (S.D. Tex. 2022) .............................13

*Kanne v. Visa USA Inc.*, 723 N.W.2d 293 (Neb. 2006)................................................................34

*Kendall v. Visa USA, Inc.*, 518 F.3d 1042 (9th Cir. 2008) ...........................................................23

*Kerns v. Range Resources - Appalachia, LLC*, 2011 WL 3753117 (N.D. W. Va.
2011) ...............................................................................................................34

*Leegin Creative Leather Productions, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)....................19, 22

*Leocal v. Ashcroft*, 543 U.S. 1 (2004)..........................................................................................28

*Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054 (S.D. Iowa 2017)........................33

*Marucci Sports, LLC v. NCAA*, 751 F.3d 368 (5th Cir. 2014)............................................9, 19, 22

iii

*In re McCormick & Co., Inc., Pepper Productions Marketing & Sales Practices Litigation*, 275 F. Supp. 3d 218 (D.D.C. 2017) ................................................21

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209 (W.D.N.Y. 2024) ....................................................................................................................14

*NCAA v. Alston*, 594 U.S. 69 (2021) ........................................................................22

*Nola Fine Art, Inc. v. Ducks Unlimited, Inc.*, 88 F. Supp. 3d 602 (E.D. La. 2015) .....................35

*In re Online Travel Co. Hotel Booking Antitrust Litigation*, 997 F. Supp. 2d 526 (N.D. Tex. 2014) ............................................................................10, 13, 19

*Owens v. Jastrow*, 789 F.3d 529 (5th Cir. 2015) ........................................................36

*Pacific Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893 (9th Cir. 2021) .............................................................................................15

*In re Passenger Vehicle Replacement Tires Antitrust Litigation*, 2025 WL 606533 (N.D. Ohio 2025) .............................................................................................21

*In re Pool Products Distribution Market Antitrust Litigation*, 158 F. Supp. 3d 544 (E.D. La. 2016) ..............................................................................................10

*Perry v. Hartz Mountain Corp.*, 537 F. Supp. 1387 (S.D. Ind. 1982) ........................33

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*, 917 F.3d 1249 (11th Cir. 2019) .......................................................................19

*Rahman v. Allstate Insurance Co.*, 644 F. Supp. 3d 231 (E.D. La. 2022) ..................35

*Salem Grain Co., Inc. v. Consolidated Grain & Barge Co.*, 900 N.W.2d 909 (Neb. 2017) ...................................................................................................34

*Taylor v. Christus St. Joseph Health Systems*, 216 F. App'x 410 (5th Cir. 2007) ........20

*Texas Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503 (5th Cir. 2005) ...........33

*TKO Energy Services., LLC v. M-I LLC*, 2013 WL 789458 (N.D. Okla. 2013) ...........34

*In re Tyson Foods, Inc. Securities Litigation*, 275 F. Supp. 3d 970 (W.D. Ark. 2017) .................................................................................................18

*United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242 (8th Cir. 1988) ............32

*United States v. Black & Decker Manufacturing Co.*, 430 F. Supp. 729 (D. Md. 1976) .................................................................................................27

*United States v. Brewbaker*, 87 F.4th 563 (4th Cir. 2023)............................................................22

*United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586 (1957) ......................................27

*United States v. Tracinda Investment Corp.*, 477 F. Supp. 1093 (C.D. Cal. 1979)......................26

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) .............................................................24

*Utesch v. Dittmer*, 947 F.2d 321 (8th Cir. 1991) .......................................................................14

*Viazis v. American Association of Orthodontists*, 314 F.3d 758 (5th Cir. 2002)....................10, 12

*Walker v. Beaumont Independent School District*, 938 F.3d 724 (5th Cir. 2019) ..........................8

*In re Zinc Antitrust Litigation*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016) .........................................15

## STATUTES, RULES, AND REGULATIONS

17 C.F.R. 270.30b1–4 ................................................................................................................234

17 C.F.R. 276.IA-5238 ................................................................................................................26

17 C.F.R. § 275.206(4)-6 .............................................................................................................11

15 U.S.C. § 1 ................................................................................................................................9

15 U.S.C. § 18 ..................................................................................................................25, 27, 30

15 U.S.C. § 80a-2(a)(9).............................................................................................................5, 27

15 U.S.C. § 80a-29......................................................................................................................24

Commission Guidance Regarding Proxy Voting Responsibilities of Investment
    Advisers, Investment Advisers Act Release No. 5325, Investment
    Company Act Release No. 33605 (Aug. 21, 2019) .....................................................4, 26

La. Stat. Ann. § 51:1405 .............................................................................................................35

Neb. Rev. Stat. § 59-829 .............................................................................................................34

## OTHER AUTHORITIES

*2022 TCFD Report*, BlackRock (2022), https://bit.ly/4hWgNQO ..................................................5

Arch Coal, Inc., Annual Report (Form 10-K) (2014), https://bit.ly/4kscQ7D ...............................5

*BlackRock's 2030 Net Zero Statement*, BlackRock, https://bit.ly/40WjA6p (last
    visited Mar. 14, 2025)...................................................................................................5, 11

v

Brief for the State of Wyoming as *Amicus Curiae* in *FTC v. Peabody Energy Corp.*, 2020 WL 5015593 (E.D. Mo. Jul. 7, 2020) ...................................................6

*Commitment*, Net Zero Asset Managers Initiative, https://bit.ly/3ZgqVMU (last visited Mar. 14, 2025).............................................................................................11

*Invest*, *Black's Law Dictionary* (2d ed. 1910) ......................................................26

*Investor Expectations for Diversified Mining¸* Climate Action 100+, https://bit.ly/3zqi1SR (last visited Mar. 14, 2025).......................................11, 12

*iShares Russell 2000 ETF*, BlackRock, https://bit.ly/3B6PaUj (last visited Mar. 14, 2025) ......................................................................................................................4

NACCO Industries, Current Report (Form 8-K) (May 16, 2023), http://bit.ly/4hcsTDU ............................................................................................6

NACCO Industries, Current Report (Form 8-K) (May 18, 2022), https://bit.ly/3DKjIg2.............................................................................................6

Peabody Energy Corp., Annual Report (Form 10-K) (2018), https://bit.ly/41sJU6W ............................................................................................5

*SEC & Regulatory Filings*, Black Hills Corp., https://bit.ly/4bSXfKl (last visited Mar. 15, 2025)........................................................................................................16

*State Street Global Advisors*, Net Zero Asset Managers Initiative, http://bit.ly/4ixmWm1 (last visited Mar. 14, 2025)..........................................5, 11

*Sustainability Report*, Arch Coal (2022), https://bit.ly/41RHlv9 .............................7

*Vanguard Investment Stewardship Insights*, Vanguard (Dec. 2021), https://bit.ly/3TzJ9Wr ...........................................................................................15

*Vanguard*, Net Zero Asset Managers Initiative, https://bit.ly/3ZvO3ro (last visited Mar. 14, 2025)....................................................................................................5, 11

Warrior Met Coal, Inc., Current Report (Form 8-K) (April 25, 2023), https://bit.ly/4kUoCb1 .............................................................................................6

To the Honorable Jeremy D. Kernodle, United States District Judge:

Defendants BlackRock, Inc., State Street Corporation, and The Vanguard Group respect-fully move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss claims brought by Plaintiff States of Texas et al. under Section 7 of the Clayton Act (Count I); Section 1 of the Sherman Act (Counts II-III); Texas, Montana, Indiana, Iowa, Kansas, Louisiana, Nebraska, Oklahoma, and West Virginia antitrust laws (Counts IV-XIV); and the Louisiana Unfair Trade Practices Act (Count XVIII).

## INTRODUCTION

This case spins a farfetched theory: three asset managers conspired (without speaking with each other) to decrease coal output (which increased) by controlling the production decisions of coal companies (in which they each never held more than small minority stakes). To find that Plaintiffs have stated an antitrust claim on these alleged facts requires contorting the law in a way that would hurt both coal companies and individual investors. The Court should reject this adven-turous attempt to rewrite antitrust law.

Plaintiffs allege that BlackRock, Inc., State Street Corporation, and The Vanguard Group, Inc. conspired to cut U.S. coal production through investments in coal companies, violating Sec-tion 1 of the Sherman Act. The Amended Complaint ("Complaint" or "AC") offers no plausible facts that any step in this attenuated conspiracy theory happened—no agreement, no coordinated actions, and no communication among Defendants about reducing coal output (much less their investment strategies), nor any alleged act taken to effectuate such a reduction. Meanwhile, the Complaint fails to allege any details regarding the decision making of the coal companies which actually control output, let alone that their decisions were coordinated. Lacking these basic facts,

1

the Complaint attempts to recast as sinister routine (and SEC-mandated) proxy voting determinations by each Defendant—despite quietly acknowledging that Defendants cast their votes differently from one another. Worse still, the Complaint concedes that coal output *increased* during the period of the supposed "output reduction scheme." *Compare* AC ¶ 240, *with id.* ¶ 6. The implausibility, indeed, downright illogic, of Plaintiffs' conspiracy claim is reminiscent of the failings of the antitrust claim that the Supreme Court adopted the *Twombly* standard to weed out.

Plaintiffs double down on their empty conspiracy claims by asserting that Defendants agreed to exchange competitively sensitive information in violation of Section 1. But Plaintiffs never explain what information was exchanged, who exchanged it, or how the supposed exchange affected coal production. This fact-free assertion thumbs its nose at the *Twombly* standard.

Plaintiffs' last federal antitrust claim is asserted under Section 7 of the Clayton Act advancing a theory that no court has ever accepted. Section 7 prohibits acquisitions that substantially lessen competition. Plaintiffs advance the unprecedented theory that each Defendant somehow reduced competition simply by acquiring small minority stakes in coal companies. This theory fails for multiple reasons. The Clayton Act expressly exempts the acquisitions at issue—acquisitions made solely for investment—placing Defendants' conduct outside the scope of Section 7 and defeating Plaintiffs' claim from the start. And even without this statutory safe harbor, the Complaint alleges no connection between Defendants' separate investments and the intervening output decisions at each coal company—an unsurprising failure given that each Defendant's minority interest provided no plausible mechanism for controlling coal company output decisions.

That is where this case should end. Commonplace activities like offering index funds that may invest in multiple companies in the same industry, voting in corporate elections, or meet with corporations to understand their governance practices are not evidence of an anticompetitive

scheme—they are the core ingredients allowing asset managers to provide the low-cost funds that millions of Americans rely on to save for retirement and other purposes. That business model benefits both American consumers and the companies they invest in. The Court should not chill this conduct based on half-baked and untested theories. The antitrust claims should be dismissed in their entirety and with prejudice.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Whether the Complaint fails to state a Sherman Act Section 1 claim when Plaintiffs do not plead facts directly showing an agreement among the Defendants, or facts allowing a plausible inference of an agreement, to reduce U.S. coal production in a relevant coal market.

2.    Whether the Complaint fails to allege that any agreement among Defendants harmed competition in a relevant coal market, when the Complaint does not allege the Defendants are participants in coal markets or that coal production was reduced.

3.    Whether the Complaint fails to allege that Defendants entered into an anticompetitive agreement to share information, when it does not plead what information was exchanged or that an exchange of information reduced coal output.

4.    Whether the investment-only exception to Section 7 of the Clayton Act applies to Defendants' acquisitions of minority stakes in coal companies when the Complaint does not allege any use of coal company stock by the Defendants to substantially lessen competition.

5.    Whether the Complaint fails to allege a violation of Section 7 of the Clayton Act, when it does not allege facts plausibly showing an acquisition of coal company stock by a Defendant that substantially lessened competition.

6.    Whether the Complaint fails to adequately allege that Defendants violated Texas, Montana, Indiana, Iowa, Kansas, Louisiana, Nebraska, Oklahoma, and West Virginia antitrust laws, when

those States follow the principles of federal antitrust law, under which Plaintiffs fail to state a claim.

7.  Whether the Complaint fails to adequately allege that Defendants violated the Louisiana Unfair Trade Practices Act when it does not plead how the act was violated.

## BACKGROUND

Defendants are investment advisors who offer low-cost, diversified index or mutual funds where millions of Americans invest their savings.[1] Defendants' funds own shares in thousands of publicly traded companies across all industries.[2] Defendants have a fiduciary duty to "make voting determinations that are in the best interest of [their] client[s]" and to stay abreast of corporate affairs.[3] Defendants also engage (meet) with management of some of the companies in which their funds own shares. *E.g.*, AC ¶ 139. Among Defendants' holdings are noncontrolling stakes in a handful of publicly traded coal companies. *Id.* ¶ 20.

Some of Defendants' votes and meetings touch upon the financial risks to "long-term value" that certain companies face in an evolving energy sector. *Id*. ¶ 156. Although Defendants believe that "carbon-intensive companies … play crucial roles in the economy," they also recognize that global efforts to "transition to a lower carbon economy," such as "net zero" targets

---

[1] *E.g.*, *iShares Russell 2000 ETF*, BlackRock, https://bit.ly/3B6PaUj(last visited Mar. 14, 2025) (cited in AC ¶ 193); *see Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (the court may consider "[d]ocuments … if they are referred to in the plaintiff's complaint and are central to her claim"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (explaining that when a complaint "quoted a reported statement" in a "published article[]," the "District Court was entitled to take notice of the full contents" of the article).

[2] *iShares Russell 2000 ETF*, BlackRock, https://bit.ly/3B6PaUj (last visited Mar. 14, 2025) (cited in AC ¶ 193).

[3] *See* Comm'n Guidance Regarding Proxy Voting Resps. of Inv. Advisers, Investment Advisers Act Release No. 5325, Investment Company Act Release No. 33605, 4 (Aug. 21, 2019).

4

adopted by various "corporate and sovereign" bodies, may pose risks for those companies' long-term financial performance.[4] *See also*, *e.g.*, Peabody Energy Corp., Annual Report (Form 10-K) 23, 34 (2018), https://bit.ly/41sJU6W (coal company named in Complaint explaining as a "risk factor[]" "[c]oncerns about the impacts of coal combustion on global climate [that] are increasingly leading to … increased regulation"); Arch Coal, Inc., Annual Report (Form 10-K) 36-37 (2014), https://bit.ly/4kscQ7D (coal company named in Complaint admitting that "[c]oal prices are subject to change based on a number of factors" and recognizing coal industry "risk factors" to include "competition for production of electricity from non-coal sources … [and] climatic or other natural conditions").[5] In that connection, each Defendant is alleged to have either occasionally met with coal companies in which their funds were invested or occasionally voted against directors who, in its view, did not adequately disclose or manage these risks. *E.g.*, AC ¶¶ 157, 169.

Under federal securities law, a controlling stake presumptively requires owning at least 25% of a company. 15 U.S.C. § 80a-2(a)(9). But at issue in this case are nine companies in which each Defendant allegedly holds roughly 1% to 15% stakes. AC ¶ 20. Over the period relevant to this case (2020–present), each Defendant's stakes, as well as their collective shares, fluctuated up and down, with no obvious pattern. *Id.* ¶¶ 21–56. Defendants did not hold or control any seats on

---

[4] *See*, *e.g.*, *BlackRock's 2030 Net Zero Statement*, BlackRock, https://bit.ly/40WjA6p (last visited Mar. 14, 2025) (cited in AC ¶ 214); *2022 TCFD Report* 5–6, BlackRock (2022), (cited in AC ¶ 199), https://bit.ly/4hWgNQO; *State Street Global Advisors*, Net Zero Asset Managers Initiative, http://bit.ly/4ixmWm1 (last visited Mar. 14, 2025) (cited in AC ¶ 144); *Vanguard*, Net Zero Asset Managers Initiative, https://bit.ly/3ZvO3ro (last visited Mar. 14, 2025) (cited in AC ¶ 138).

[5] *See Basic Cap. Mgmt. Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (holding that a district court may take judicial notice of securities filings in resolving a motion to dismiss).

these companies' boards of directors. A few times, BlackRock or State Street voted against reelect-ing a director, but these Defendants never voted as a block, on each occasion the director was reelected anyway, and Vanguard never voted against coal company management or directors.[6]

The nine coal companies referenced in the Complaint also compete against privately owned companies with which Defendants are not alleged to have any relationship at all. *Id.* ¶ 5. The nine companies account for less than half of U.S. output of "thermal" coal, and only about 60% of the output of South Powder River Basin ("SPRB") coal. *Id.* ¶¶ 100, 105.

The last two decades have not been good to the coal industry. As explained by the court in *Federal Trade Commission v. Peabody Energy Corporation*—a case Plaintiffs rely on heavily for its description of the coal market (*see id.* ¶¶ 75, 77–78, 83)—coal "has steadily ceded ground to natural gas and renewables over the past twenty years" following the "remarkable decline in the cost of producing natural gas." 492 F. Supp. 3d 865, 873, 878 (E.D. Mo. 2020). Plaintiff Wyoming put the issue this way in an amicus brief in *Peabody*:

> Demand for Wyoming coal is declining, and that decline will only continue as in-vestment in renewable electricity increases while domestic coal-fired plants near the end of their established depreciable lives and are not replaced with new coal-fired facilities. As a result of reduced demand, Wyoming mines have significant excess capacity and coal producers have struggled in recent years to stay econom-ically viable.. … While there will be coal production in Wyoming for the foreseea-ble future, it will be on a significantly reduced scale. The industry must contract and consolidate to survive.[7]

---

[6] *See* AC ¶¶ 168, 172, 177 (alleging that BlackRock and State Street, but not Vanguard, voted against (different) nominated directors at Warrior Met Coal and NACCO). In both cases, the nom-inees were elected anyway. *See* Warrior Met Coal, Inc., Current Report (Form 8-K) 2 (April 25, 2023), https://bit.ly/4kUoCb1; NACCO Industries, Current Report (Form 8-K) 2 (May 18, 2022), https://bit.ly/3DKjIg2; NACCO Industries, Current Report (Form 8-K) 2 (May 16, 2023), http://bit.ly/4hcsTDU.

[7] Brief for the State of Wyoming as *Amicus Curiae* in *FTC v. Peabody Energy Corp.*, 2020 WL 5015593, at *1 (E.D. Mo. Jul. 7, 2020); *see Basic*, 976 F.3d at 589 (holding that a district court may take judicial notice of court filings in resolving a motion to dismiss).

And the coal industry faces headwinds beyond stiff competition: coal mines are expensive to run, coal companies must comply with strict environmental regulations and permitting requirements, and the shipping rates to transport coal can be exorbitant, sometimes costing more than the coal itself. AC ¶¶ 66, 68, 70, 73, 75. Reflecting these decades-long trends, Arch, one of the coal companies named in the Complaint, reported a 60% decline in thermal coal production from 2010 to 2022.[8] And "Peabody's production at its three SPRB mines … declined by nearly 30%" from 2011 to 2019. *Peabody*, 492 F. Supp. 3d at 880.

Despite these long-term trends of declining production, coal production has recently increased. Plaintiffs point in their Complaint to data covering only 2019–2022, AC ¶¶ 228–29, 240, although this case concerns conduct from late 2020 to the present. *Id.* ¶¶ 21–56, 255. The limited data included show that coal production plummeted between 2019 and 2020, a trend the Complaint attributes to "the COVID-19 pandemic." *Id.* ¶ 241. But from 2020 to 2022, coal output increased 6%. *Id.* ¶ 240.

Thirteen States filed this lawsuit alleging that Defendants violated the antitrust laws by allegedly inducing nine coal companies to lower output. Count I alleges that Defendants' acquisitions of coal stocks since December 2020 have harmed competition in violation of Section 7 of the Clayton Act (15 U.S.C. § 18). Count II alleges that starting in 2021, Defendants conspired to coerce the companies to lower output, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Count III alleges that Defendants formed an agreement to share competitively sensitive information, also in violation of Section 1. Counts IV–XIV allege state-law antitrust claims that mirror the federal ones. For all these claims, Plaintiffs allege that competition was harmed in two distinct

---

[8] *See 2022 Sustainability Report* 2, Arch Coal (2022), https://bit.ly/41RHlv9 (quoted in AC ¶ 187).

markets: the market for coal from the SPRB (in Wyoming and Montana) and the market for thermal coal (coal burned to generate steam for electricity production).[9] One of the nine coal companies discussed in the Complaint, Warrior Met Coal, does not participate in either of these markets. *Id.* ¶ 105 n.37.

## LEGAL STANDARD

Under Rule 12(b)(6), the Court may dismiss claims "on the basis of a dispositive issue of law" or if the plaintiff fails to plead sufficient facts to "state a claim to relief that is plausible on its face." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (citation omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must plead "factual matter" that is "enough to raise a right to relief above the speculative level" and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555-56. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" do not render a claim plausible. *Iqbal*, 556 U.S. at 665, 678.

## ARGUMENT

Plaintiffs' primary Sherman Act claim fails because Plaintiffs do not allege any direct evidence of an agreement to restrain coal competition and the circumstantial evidence contradicts such an agreement. There is also no plausible allegation of harm to competition. The information-sharing claim fails because the Complaint does not identify what information supposedly was shared, much less any agreement to share it or harm to competition. The Clayton Act claim fails

---

[9] Counts XV–XXI allege state consumer-protection law claims. All but one are against BlackRock only, and the BlackRock-specific claims are addressed in a companion motion. Louisiana brings a consumer-protection claim against all three companies, addressed in this motion.

because it falls squarely within the Act's categorical exception for passive investment activity, and because the Complaint does not plausibly allege harm to competition in the relevant coal markets. The state-law antitrust claims fall along with the federal claims, and the Louisiana consumer-protection claim must be dismissed because the Complaint does not even explain how state law purportedly was violated.

## I.    Plaintiffs Fail to State a Claim Under Section 1 of the Sherman Act (Count II)

The Sherman Act prohibits "conspirac[ies] in restraint of trade," 15 U.S.C. § 1, but here there is no plausible allegation of a conspiracy and no plausible allegation that trade was restrained. Plaintiffs' conspiracy theory posits an agreement between investment firms to coordinate their investments to reduce coal output that are not alleged to have ever communicated with each other, even once, about coal or their investment strategies. The Complaint offers not one example of a Defendant ever telling a coal company to reduce output or do anything else. It provides no reason why any Defendant required the cooperation of the others for its conduct to be economically rational. And during this purported agreement to reduce output, coal production *rose,* contradicting any allegations of anticompetitive harm.

### A.    Plaintiffs Have Not Plausibly Alleged an Agreement

The "pivotal question" in a Section 1 case is whether the plaintiffs have adequately alleged an agreement. *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 375 (5th Cir. 2014). "Plaintiffs can allege such an agreement in two ways: by direct evidence, and by indirect or circumstantial evidence." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024). Put another way, Section 1 plaintiffs either may plead facts "directly showing" the alleged agreement or may plead "circumstantial facts" that raise a plausible inference of such an

9

agreement. *In re Online Travel Co. Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 534 (N.D. Tex. 2014). Plaintiffs have done neither.

### 1. There are no direct allegations of an agreement

Plaintiffs have failed to plead "direct evidence" of an agreement to suppress coal production. Direct evidence "explicitly refers to an understanding between the alleged conspirators." *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002). It is evidence that requires no "additional inference." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 551 (E.D. La. 2016). For example, "a recorded phone call in which two competitors agreed to fix prices at a certain level," or an "admission … that officials of the defendants had met and agreed explicitly on the terms of a conspiracy." *City of Pontiac*, 92 F.4th at 391. The Complaint pleads nothing of the sort. It does not identify any time Defendants communicated with each other on any topic, much less a time they agreed to suppress coal output. Nor does the Complaint allege a single "time, place, or person involved" in the alleged agreement. *Twombly*, 550 U.S. at 565 n.10.

Although the Complaint states that Defendants belonged at times to one or both of two trade associations focused on climate change—Climate Action 100+ and the Net Zero Asset Managers Initiative (NZAM)—it correctly stops short of asserting that merely joining these organizations was itself an agreement to suppress coal output. According to the Complaint, in 2020, BlackRock and State Street joined Climate Action 100+ and all three Defendants joined NZAM in 2021. AC ¶¶ 115–16, 127–28. But the Complaint does not allege that either organization was itself the venue of an illegal agreement; the most the Complaint ever alleges is that Defendants' membership in these two groups is indirect "evidence" of some sort of unobserved agreement to suppress coal production that supposedly was struck at some other unknown time. *Id.* ¶¶ 115-17, 129. And the climate organizations themselves cannot be the agreement among the three Defendants,

since Defendants joined and left those organizations at different times. For example, Vanguard never even joined CA100+ and withdrew from NZAM in 2022. *Id.* ¶ 151.

The express terms on which Defendants joined the two organizations are also incompatible with any suggestion that membership was itself an agreement to suppress output. The CA100+ documentation incorporated by reference in the Complaint states that CA100+ "does not require or seek collective decision-making or action with respect to acquiring, holding, disposing and/or voting of securities"; and that "[s]ignatories are independent fiduciaries responsible for their own investment and voting decisions and must always act completely independently."[10] The NZAM signing statement likewise describes lowering emissions as an "ambition" subordinate to an asset manager's "legal duties to clients,"[11] which in the United States can include a fiduciary duty to "vote client securities in the best interest of clients." 17 C.F.R. § 275.206(4)-6. And to drive the point home, each Defendant issued a statement emphasizing that it would continue to act independently according to its fiduciary duties and the preferences of its clients.[12] *See also* BlackRock's Mot. to Dismiss Consumer Protection Claims. There is no allegation, meanwhile,

---

[10] *Investor Expectations for Diversified Mining* 3¸ Climate Action 100+, https://bit.ly/3zqi1SR (last visited. Mar. 14, 2025) (cited in AC ¶ 115).

[11] *Commitment*, Net Zero Asset Managers Initiative, https://bit.ly/3ZgqVMU (last visited Mar. 14, 2025) (cited in AC ¶ 197).

[12] *State Street Global Advisors*, Net Zero Asset Managers Initiative, http://bit.ly/4ixmWm1 (last visited Mar. 14, 2025) (cited in AC ¶ 144) (stating that State Street would reduce its carbon exposure only to the extent "our clients … instruct us to achieve that objective in the portfolios we manage for them"); *See, e.g., BlackRock's 2030 Net Zero Statement*, BlackRock, https://bit.ly/40WjA6p (last visited Mar. 14, 2025) (cited in AC ¶ 214) (stating BlackRock is a fiduciary to its clients and its role to help them "navigate investment risk and opportunities, not to engineer a specific decarbonization outcome in the real economy"); *Vanguard*, Net Zero Asset Managers Initiative, https://bit.ly/3ZvO3ro (last visited Mar. 14, 2025) (cited in AC ¶ 138),(stating that Vanguard's commitment to NZAM covered only assets already being invested "in a net zero aligned manner," either from "net zero commitments as part of the product design," or from an "existing philosophy and process used by the investment managers").

that any Defendant's decision to join a climate organization depended on another Defendant's agreeing to do the same.

And while the Complaint cites a CA100+-authored document stating that achieving net-zero emissions would require a decrease in coal production, Defendants did not join this statement. No author of it is affiliated with any Defendant, and the publication contains a "[d]isclaimer" saying that "[t]he use of particular engagement tools … including the scope of participation in Climate Action 100+ engagements, is at the discretion of individual signatories."[13] Even if any Defendant *had* followed a CA100+ recommendation (although no Defendant is alleged to have ever asked a coal company to lower production), this still would not bespeak an agreement. "[A]ntitrust laws allow trade associations to make nonbinding recommendations about businesses and products." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 9 (1st Cir. 2016).

No wonder then, that Plaintiffs cannot equate membership in these organizations with an illegal restraint of trade. *See generally Viazis*, 314 F.3d at 764 ("a trade organization … is not by its nature a 'walking conspiracy'").

### 2.     The circumstantial evidence refutes the existence of a conspiracy

Unable to plead direct evidence of conspiracy, Plaintiffs must allege one through circumstantial evidence. This effort fails as a matter of law, and the Complaint's allegations disprove the plausibility of a conspiracy rather than support it. "[C]ircumstantial evidence" of a Section 1 conspiracy generally takes the form of parallel conduct by the defendants, supported by "plus factors" indicating that this parallel behavior "would probably not result absent an agreement." *In re OTC*, 997 F. Supp. 2d at 536 & n.13. For a plaintiff taking this route, plausibly alleging the plus factors

---

[13] *Investor Expectations for Diversified Mining*, *supra* note 10, at 3.

12

is essential; parallel conduct by itself is insufficient. Parallel conduct, after all, often results from "chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 553–54, 556 n.4. "An allegation of parallel conduct" "without some further factual enhancement" thus has too many possible innocent explanations and so "stops short of the line between possibility and plausibility." *Id.* at 556. "[T]he most important 'plus factor'" for alleging a conspiracy is that the defendants took "actions that would be against [their] self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert." *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022). And a circumstantial case of agreement must also be plausible in light of "common economic experience." *Twombly*, 550 U.S. at 565.

The circumstantial evidence here cuts against the existence of a conspiracy in every way.

**Lack of parallelism**. The claim that Defendants conspired to influence companies through voting or engagement meetings does not square with the facts Plaintiffs allege: that Defendants did not coordinate either votes or engagements. The Complaint alleges that Vanguard, though not State Street or BlackRock, had routine meetings with four of the coal companies in the relevant markets. AC ¶¶ 157–58.[14] It alleges that State Street and BlackRock, though not Vanguard, either withheld votes from or voted against reelecting some directors. *Id.* ¶¶ 168–77. Although Plaintiffs identify thirteen votes against directors at thermal coal or SPRB producers, in ten of those cases, only one Defendant voted against (or withheld) a vote, and in the other three cases, the votes differed as to the directors covered. *See Id.* ¶¶ 168–72, 174, 177. Defendants' fractured and inconsistent actions belie any notion of parallelism, which is a necessary but insufficient predicate for

---

[14] The Complaint alleges that BlackRock engaged with one other (different) coal company, but not a company that sells coal in the relevant markets. AC ¶¶ 105 n.37, 173.

circumstantial evidence of the existence of any conspiracy to pressure coal companies. *Cf. Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (finding that a conspiracy claim fell "far short" when the defendants "were choosing to decline, decrease, and even increase credit to [the plaintiff] at different time periods"); *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209, 220 (W.D.N.Y. 2024) (dismissing conspiracy claim partly because "the alleged conspirators engaged in divergent conduct"). This lack of parallelism "preclud[es] [Plaintiffs] from demonstrating an agreement based on indirect evidence." *City of Pontiac*, 92 F.4th at 415 n.17.

To the extent the Complaint can be read to suggest that Defendants' interactions with the climate organizations are the necessary parallel conduct, the conduct was not parallel, *see supra* Section I(a)(1), and more importantly it is not relevant. Parallel conduct may be suggestive of an illegal agreement when the alleged parallel behavior is "precisely the concerted action that is the conspiracy's object." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010). For example, "setting prices at the same level." *Id.* Here, Plaintiffs allege an agreement to suppress coal output, not an agreement to participate in climate organizations (which would not be illegal even if proven).

**Lack of economic plausibility**. The conspiracy allegation is also doomed because Plaintiffs fail to explain how a coal output-suppressing conspiracy could have happened given the economic reality that Defendants are not coal companies. In a typical Section 1 conspiracy claim, Defendants have the ability to suppress output because they participate in the relevant market. *See Utesch v. Dittmer*, 947 F.2d 321, 330 (8th Cir. 1991). But here, despite being accused of suppressing coal output, Defendants are not coal producers. They are asset managers who do not run coal mines. To plead a conspiracy on these odd facts, Plaintiffs must plausibly explain how Defendants influenced the coal companies' behavior. The Complaint fails to do so.

14

The Complaint's discussion of the coal companies' decision making is "sparse to the point of near non-existence." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016). It does not allege that any Defendant ever told any company to mine less coal. It does not allege that any Defendant installed a new board member who favored less production. It does not explain how Defendants' rare, unsuccessful votes against different directors led to a reduction in coal production. Even assuming that a Defendant did find a way to influence a coal director's thinking, the Complaint does not attempt to explain how that influence over a director translated into any decision by a coal company's management. *See Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 900 (9th Cir. 2021) ("it is not … uncommon that the board of directors is not involved in … the day-to-day operations of the business") (internal quotation marks omitted).[15] Absent even a hint of a causal mechanism, Plaintiffs have not shown that the conspiracy existed.[16]

To make matters worse, when the Complaint discusses specific decisions by certain companies to reduce coal production, those details largely confirm that the decisions could not possibly be attributed to Defendants, much less to an alleged conspiracy. The Complaint alleges that "[i]n its 2022 *Arch Sustainability Report*, Arch Coal stated that, since 2020, 'Arch subsidiaries have reduced their annual thermal coal production by nearly 60%.'" AC ¶ 187. This allegation is entirely reliant on a typo. The Arch report actually says: "Since *2010*, Arch subsidiaries have reduced …

---

[15] To the contrary, the fact that the same directors were reappointed year after year suggests that these votes had little impact on coal company management's decision making. AC ¶¶ 168, 170–72, 177.

[16] Although Plaintiffs assert that Vanguard had a strategy of asking unnamed companies "to shutter or divest their coal assets," AC ¶ 150, that assertion relies on an egregious misrepresentation of the cited document. Far from suggesting that Vanguard had any such strategy, the cited document observes that third-party "activist groups"—not Vanguard—were asking coal companies to divest assets. *See Vanguard Investment Stewardship Insights* 1, Vanguard (Dec. 2021), https://bit.ly/3TzJ9Wr.

production by nearly 60 percent."[17] So the reductions on which Plaintiffs premise their conspiracy claim began more than a decade before the alleged conspiracy. *See also Peabody*, 492 F. Supp. at 910, 912 (finding, in 2020, that Arch had decided to move away from SPRB coal production and that "no other producer has the desire or wherewithal to expand production" to a meaningful extent). The Complaint likewise quotes the Black Hills President and CEO as claiming that ESG initiatives "have *always* been a key focus for us." AC ¶ 185 (emphasis added). Black Hills has been in business since at least 2000.[18]

It is also impossible to square Plaintiffs' allegation that Defendants put systematic pressure on the coal companies with the Complaint's output tables showing that coal output *rose* after the alleged conspiracy purportedly began in 2021 and that output varied idiosyncratically across each of the eight coal producers at issue. While output rose overall, some companies produced considerably more coal from 2020 to 2022; other companies' production was flat or fell slightly. AC ¶ 240. Some companies produced more in 2021 than in 2020, only for their production to fall the next year; other companies' production fell before rising. *Id.*

---

[17] *See* Arch Coal, *supra* note 8.

[18] *SEC & Regulatory Filings*, Black Hills Corp., https://bit.ly/4bSXfKl (last visited Mar. 15, 2025).



AC ¶ 240 (normalized to 2020 production levels).

Worse still for Plaintiffs' theory, no Defendant's actions correlate with the coal companies' production decisions. If BlackRock and State Street really were using their votes to induce companies to produce less coal, for example, then they would have voted *against* directors whose companies had increased production of late, and *for* directors whose companies had decreased production. Instead, they voted several times against directors whose companies cut production.[19] And they often did not vote against directors whose companies produced more coal.[20] Similarly, of the two companies with which Vanguard met in 2021, one increased production in both 2021 and 2022, *id.* ¶¶ 157, 228–29; the company Vanguard met in 2022 increased its production that

---

[19] *See*, *e.g.*, AC ¶¶ 170–72, 177 (documenting votes cast by BlackRock and State Street against or withheld from Peabody, CONSOL, and Warrior directors in early 2021); *Id.* ¶ 240 (documenting that these companies had reduced production in 2020).

[20] *See*, *e.g.*, *Id.* ¶ 240 (alleging that Hallador's production increased during every year of the alleged conspiracy, even though no Defendant is alleged to have voted against a Hallador director).

year, *id.* ¶¶ 158, 229; and the company Vanguard met in 2023 had then been out of the relevant market for more than a year, *id.* ¶¶ 160, 229.

There is not the slightest indication that *any* Defendant was prodding the coal companies to reduce output, much less that all of them were doing so in collaboration.

**Lack of actions against self-interest.** The hallmark of an antitrust conspiracy is that each conspirator behaves in a way that would be irrational unless it was part of a secretly coordinated effort. In the classic example, a seller in a price-fixing case would be unwilling to lower output or raise prices "without any assurance of 'similar behavior by rivals,'" because without that assurance it would "los[e] market share." *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 683 (S.D.N.Y. 2012); *see also In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 977 (W.D. Ark. 2017) (explaining that the "[c]rucial" feature of a typical successful Section 1 conspiracy is that the defendants needed to cooperate, rather than act unilaterally, "else rogue participants 'cheat' by increasing supply"). No such dynamic exists here. Even supposing that any Defendant individually hoped to discourage coal production, the Complaint provides no plausible explanation why it would be against its interest to seek that outcome absent an agreement. Similarly, to the extent Defendants allegedly met with companies in which their funds had made substantial investments, such meetings were "routine market conduct" that raise no inference of conspiracy. *Twombly*, 550 U.S. at 566.

Ditto for joining the climate organizations: the Complaint never alleges that joining such an organization was contrary to any Defendant's unilateral self-interest, nor does it allege that any Defendant's decision to join a climate organization was contingent on the other Defendant's doing likewise. The conduct alleged in the Complaint is thus "at least as consistent with permissible

competition, and with independent action, as with unlawful conspiracy." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008).

**Lack of any other plus factor**. Against all this, Plaintiffs have failed to allege any "unexpected," "idiosyncratic," or otherwise suspicious conduct that would be unlikely absent a conspiracy. *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1272 (11th Cir. 2019). The activities they focus on—buying stock in companies, occasionally meeting with those companies to inform voting, and voting their proxies in corporate elections—are the bread and butter of what passive investment advisors do. Even if Defendants had, contrary to fact, gone about these activities in a parallel way, that would have been easily explained by their common incentive to invest their clients' funds and deliver strong returns. In the absence of any unexpected conduct constituting a plus factor, the Complaint does not state a conspiracy claim and should be dismissed. *See In re OTC,* 997 F. Supp. 2d at 539 (dismissing complaint for failure to allege viable plus factors).

## B.     Plaintiffs Have Not Alleged Anticompetitive Harm

To state a Section 1 claim, Plaintiffs must also plausibly allege that any agreement by Defendants harmed competition. *Marucci Sports*, 751 F.3d at 375. They cannot, because even during the cherrypicked years for which Plaintiffs have presented data, coal production *rose* during the supposed conspiracy to suppress output. *See supra* Section I(a)(2).

"[T]he accepted standard for testing whether a practice restrains trade in violation of § 1" is "the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* "In its design and function the rule [identifies] restraints with anticompetitive effect."

19

*Id.* at 886. "Think increased prices, decreased output, or lower quality goods." *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 493 (5th Cir. 2021). "In order to plead a Sherman Act claim" under the rule of reason, then, Plaintiffs must allege "that there was a rise in the price [of the product] above a competitive level, a decrease in the supply …, or a decrease in the quality." *Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x 410, 412 (5th Cir. 2007).

The Complaint alleges the opposite: that coal production has *risen* since the "scheme of coordinated output reductions" allegedly began in 2021 in both markets alleged in the Complaint. AC ¶ 255.

| Coal Output, Millions of Tons | | | |
|---|---|---|---|
| | **2020** | **2022** | **2020–2022 Change** |
| SPRB | 209.9 | 237.8 | +27.9 |
| Thermal | 223.0 | 238.5 | +15.5 |

AC ¶¶ 228–29.[21]

In an effort to deflect from these case-ending trendlines, Plaintiffs manipulate the relevant period, using 2019 production levels as their baseline for measuring coal output even though the conspiracy allegedly began in 2021. Because production fell considerably from 2019 to 2020, output was down overall from 2019 to 2022. *Id.* ¶¶ 228–229. But the 2019–2020 data only underscores the absence of a connection between the alleged conspiracy among Defendants and any decrease in output. It shows that the decline in production happened before the alleged conspiracy period (2021–present), meaning that it could not have been due to the conspiracy. And in any event, as

---

[21] The Complaint describes total output by both public and private companies of "SPRB coal" and output by public companies of "thermal coal." The Complaint acknowledges production increases in each of the public SPRB, private SPRB, and thermal segments.

the Complaint acknowledges, there is an obvious reason why coal production fell from 2019 to 2020 that has nothing to do with anticompetitive conduct: the 2020 COVID pandemic, of course, which caused a "rapid" plunge in demand for coal. *Id.* ¶ 241. *In re Passenger Vehicle Replacement Tires Antitrust Litigation*, 2025 WL 606533, *16 (N.D. Ohio 2025) (dismissing Section 1 claim where "Plaintiffs have not offered any compelling reason why the COVID-19 pandemic should not be … treated as an obvious alternative and lawful explanation.").

Even if 2019 to 2022 was the right time window to consider, the decrease during that period still would not suggest any harm to competition. The Complaint and the sources on which it relies demonstrate that coal production has been on the decline for decades before the conspiracy allegedly began due to increased competition from natural gas and renewables, regulatory constraints, and independent decisions by coal companies long predating the alleged conspiracy. See supra Section I(a)(2). The Complaint offers no facts plausibly showing that the decline in production from 2019 to 2022 was anything other than a continuation of the "steep decline in coal generation" over the last two decades, *Peabody*, 492 F. Supp. 3d at 878, combined with the shock to demand from the COVID pandemic. AC ¶ 241.

The Complaint also asserts that it is suspicious that prices rose at the same time production was falling, but this assertion is belied by the factual allegations. From 2019 to 2020, when output fell, prices also fell on net. AC ¶¶ 228–29 (showing that SPRB coal prices rose 4% while thermal coal prices fell 10%). After that prices rose—but output did too. *Id.* So contrary to the Complaint's assertions, never did the companies "respon[d] to [a] rise in the price for … coal" by decreasing production. *Id.* ¶ 229.

Plaintiffs are left only with their conclusory assertions that output fell and prices were above the competitive level. But this is not enough. *See In re McCormick & Co., Inc., Pepper*

21

*Prods. Mktg. & Sales Pracs. Litig.*, 275 F. Supp. 3d 218, 225 (D.D.C. 2017) ("Conclusory allegations of supracompetitive prices are not sufficient."). Because Plaintiffs' assertions of market injury are "completely speculative," they fail to state a viable Section 1 claim. *Marucci Sports*, 751 F.3d at 376.

Plaintiffs' failure to allege competitive harm cannot be saved by a theory of "*per se*" liability. *See* AC ¶ 254 (mentioning this theory in passing). Although "the Sherman Act 'presumptively' calls for … a 'rule of reason analysis,'" the Supreme Court has declared that a narrow class of restraints on trade are *per se* illegal, even without a showing of harm to competition. *NCAA v. Alston*, 594 U.S. 69, 81, 88 (2021). The "*per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) (citations omitted). "The *per se* rule[] thus has "narrow confines," and extends "only … to certain categories of horizontal restraints, including agreements between competitors to fix prices or divide markets." *United States v. Brewbaker*, 87 F.4th 563, 575, 575 n.9 (4th Cir. 2023); *see also e.g.*, *B. Braun Med., Inc. v. Abbott Lab'ys*, 124 F.3d 1419, 1427 n.4 (Fed. Cir. 1997) ("[T]he restriction imposed by Braun is not a *per se* illegal horizontal restraint because Braun and Abbott are not horizontal competitors in the relevant markets.").

Here, the only competitors in the alleged markets are the coal companies, and the Complaint does not allege an agreement among them to reduce output. Thus, far from alleging a purely "horizontal" agreement between competitors, Plaintiffs allege a scheme that could not function without extensive "vertical" agreements between firms at different levels of the market—Defendant investors and the coal companies in which each invested. *See Leegin*, 551 U.S. at 882 (vertical

restraints are not *per se* illegal). The actions at the heart of the conspiracy, moreover—assembling diversified index funds, making voting determinations in corporate elections, and engaging with management—are generally procompetitive, economically beneficial, and part of Defendants' fiduciary duties, making it impossible for a court to say that the activity challenged here will "be invalidated in all or almost all cases." And not only do courts have little experience adjudicating Plaintiffs' unusual theory—that three institutional investors colluded to restrain trade in a market they do not participate in—they have *no* experience. This case is the first of its kind. It is the paradigm of a case unsuited for *per se* treatment. This means Plaintiffs cannot bypass the rule of reason. They must show a harm to competition rather than have the Court assume it, and their failure plausibly to allege such harm dooms the Complaint.

## II.    Plaintiffs Do Not Plausibly Allege an Anticompetitive Information-Sharing Scheme (Count III)

Plaintiffs tack an information-sharing claim onto their primary Section 1 claim, alleging in Count III that the "Defendants have engaged in a continuing agreement to share timely, competitive[ly]-sensitive information." AC ¶ 259. Plaintiffs have not provided even the barest of details to support Count III. Not only do they fail to allege any *agreement* to share information, but they have not even alleged that confidential information was shared.

The Complaint contains none of the who, what, when or why of any single supposed exchange of information between the parties. *See Twombly*, 550 U.S. at 556 (a Section 1 plaintiff must state "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," and "[a]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice"); *see also Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (a plaintiff "must allege facts such as a 'specific time, place or person involved in the alleged conspiracies' to

23

give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin" (quoting *Twombly*, 127 S. Ct. at 1970 n.10)). Here, there are no such allegations—there are simply broad conclusions that exchanges happened. AC ¶ 259. The allegations regarding Defendants' "annual proxy reports," *id.* ¶ 260, do not fill that requirement. That is apparently a reference to SEC Form N-PX, a filing required by the SEC which discloses after the fact how an asset manager has voted in corporate elections. *See* 15 U.S.C. § 80a-29; 17 C.F.R. 270.30b1–4. The Complaint does not explain what competitively sensitive information these forms contained or how Defendants could be liable for publishing disclosures required under federal securities law. And it lacks any allegation that they *agreed with each other* to publish this information, a fatal omission given that "[t]he mere exchange of information … is insufficient to establish a conspiracy under section 1"; "section 1 requires an actual agreement." *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 294 n.30 (5th Cir. 1988).

Finally, because an agreement to exchange information does not "invariably have anticompetitive effects," even if there were such an agreement it would be evaluated under the rule of reason. *United States v. U.S. Gypsum Co.*, 438 U.S. 422 n.16 (1978). Count III thus also fails because, as discussed, Plaintiffs have not plausibly alleged any harm to competition. *See supra* Section I(b).

## III.    Plaintiffs Fail to State a Claim Under Section 7 of the Clayton Act (Count I)

Lacking evidence of collusion, Plaintiffs press the more outlandish claim that each Defendant individually violated Section 7 of the Clayton Act simply by buying shares of multiple companies in the same industry—a natural and unremarkable result of index investing. This theory is a nonstarter under Section 7's text, which contains an explicit safe harbor exactly to protect acquisitions "solely for investment." No court has ever adopted Plaintiffs' theory.  Doing so would not

only read Section 7's safe harbor out of the statute, it would threaten the viability of index-based investing. The Court should not give air to this legally defective theory.

Section 7 of the Clayton Act prohibits businesses from "acquir[ing], directly or indirectly, the whole or part of the stock … of another [business] … [when] the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. Count I of the Complaint alleges that Defendants violated Section 7 because (as all index-fund operators do) they purchased shares in multiple companies in the same industry, here coal, and the coal companies supposedly competed less vigorously as a result. AC ¶¶ 152–91, 250–52.

Applying Section 7 to these investment advisors fails on two grounds. First, Section 7 has an express safe harbor for stock purchased "solely for investment," as all the stock here was. Second, Plaintiffs have not alleged the requisite "lessen[ing of ] competition" in the coal market at all, *see supra* Section I(b), let alone tied that lessening to the acquisitions of stock challenged here.

## A.    The Section 7 Safe Harbor Squarely Forecloses the Claim

The claim is doomed from the outset because Defendants' investment activity falls under an express statutory exception. Section 7 "shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." 15 U.S.C. § 18. This safe harbor gives bright-line protection to passive minority investors, without subjecting them to further analysis. The index investing activity challenged here fits squarely within the exception.

### 1.    Defendants purchase their shares solely for investment

A business acquires a company's shares "solely for investment" when it seeks to earn a financial return from dividends or appreciation, rather than to control the company's day-to-day affairs. When the Clayton Act was passed, "invest" meant, as it does today, "to place [money] in

25

business ventures … so that it may produce a revenue or income." *Invest*, *Black's Law Dictionary* (2d ed. 1910). An investor that buys stock only to earn a profit in the marketplace and not to manage a company has bought the stock "solely for investment." As one court thus explained, "[t]he ultimate definitive factor the courts have looked to … is whether the stock was purchased for the purpose of taking over the active management and control of the acquired company." *United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093, 1099 (C.D. Cal. 1979); *see also*, *e.g.*, *Anaconda Co. v. Crane Co.*, 411 F. Supp. 1210, 1216 (S.D.N.Y. 1975) (explaining that a Section 7 claim was "in large part based on the assumption that [the defendant] by the exchange offer is seeking actual control of [the plaintiff]"). Or as Plaintiffs admit: "[A] central part of the analysis of partial ownership [under Section 7] is an assessment of which owners have what type of control over the corporation." AC ¶ 98.

An investor does not leave the safe harbor merely because it votes in a corporate election or occasionally speaks with the corporation's executives to inform voting—unexceptional activities incidental to normal investment. Investment advisors have a fiduciary duty to "make voting determinations that are in the best interest of [their] client[s]" and to stay abreast of corporate affairs. *See* Comm'n Guidance Regarding Proxy Voting Resps. of Inv. Advisers, Investment Advisers Act Release No. 5325, Investment Company Act Release No. 33605, 4 (Aug. 21, 2019). A contrary reading would render the safe harbor a near nullity. *See Tracinda*, 477 F. Supp. at 1101 (explaining that a contractual provision requiring a company to "consult[]" with an investor before making certain decisions did not take the investor out of the safe harbor, because "[a]ny substantial investor, acting reasonably, would want to be kept informed" in that way); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts should "give effect, if possible, to every clause and word of a statute").

Where courts have found that a shareholder has held stock for more than investment purposes under Section 7, the shareholder had substantially more involvement in the company's affairs than alleged here. The textbook example is *United States v. E. I. du Pont de Nemours & Co.*, where du Pont's stake in General Motors was not solely for investment because du Pont bought the shares explicitly to secure GM as a customer; to further this aim, it installed its former vice president as a GM executive; and at an earlier time, Mr. du Pont himself was the chair of GM's board. 353 U.S. 586, 601 (1957); *see also United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729 n.87  (D. Md. 1976) (Black & Decker "did not acquire [a business] solely for the purpose of investment" when "[r]ather," it "ha[d] taken an active role in controlling [the business]" by "installing a former Black & Decker executive as its president").

Defendants' investments are nothing like du Pont's and fall squarely within the exception. Defendants beneficially own shares in coal companies for the same reason they hold shares in thousands of other public companies: to earn returns for their clients through dividends and appreciation. The Complaint does not (and cannot) allege that Defendants go beyond that to control the coal companies' internal affairs. Their stakes in the coal companies range from roughly 1% to 15%, far less than what would establish control. *See* 15 U.S.C. § 80a-2(a)(9) (under federal securities law, stakes under 25% are presumptively noncontrolling); *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 212 (5th Cir. 2018) (under Delaware corporate law, 50%). Nor is any Defendant alleged to have seats on any of the coal companies' boards, or to have ever nominated a board member. The Complaint asserts only that one Defendant had a few routine meetings with coal companies in which it had invested and that other Defendants voted in corporate elections. Even then, the Complaint does not (and cannot) allege that any time a Defendant has voted against the recommendation of corporate management, the Defendant's position ever *won*. If the right to cast

27

unsuccessful votes on corporate affairs counts as "control," then every investor controls every public company in America.

### 2. Plaintiffs fail to identify any "uses" of Defendants' shares that reduced coal output or lessened competition

To fall within the exception, Defendants also must not have been "using [their shares] by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." 15 U.S.C. § 18. The key word in this provision is "*using*." The substantive prohibition in Section 7 covers stock acquisitions whose "effect" "may be substantially to lessen competition." If every investment that had such an effect fell outside the safe harbor, then it would be a nullity—it would apply only when there is no liability in the first place. But Congress did not add a meaningless exception to the law. It avoided doing so by including in the safe harbor the key word "*using*." The term here means, as it typically does, "active employment." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). So it is not enough for Plaintiffs to allege a loss to competition in the abstract: they must plausibly allege that each Defendant affirmatively deployed its shares in a way that harmed competition.

Plaintiffs have not alleged even one such actual example. While the Complaint continually repeats that Defendants used their stockholdings to "induce [the coal companies] to implement a common policy concerning price or output," it is devoid of any specific instance to support this bare conclusion. The Complaint fails to allege that Vanguard *ever* voted against a coal-company director or the recommendation of coal-company management. AC ¶¶ 178–81. And while Plaintiffs point to a few times when BlackRock and State Street voted—unsuccessfully—against the reelection of a coal-company board member, those votes invariably were based on concerns about the company's *disclosures* or lack of *any* emissions-reduction target. *See, e.g.*, AC ¶ 168

28

(BlackRock voting against NACCO board members because the companies lacked "adequate climate risk disclosures," "metrics," and "targets"); *id.* ¶¶ 169–74 (same); *id.* ¶ 177 (same for State Street). The Complaint also alleges that Vanguard, but not State Street or BlackRock, had meetings with four of the coal companies, but provides no description of what happened at those meetings, let alone any well-pled allegation that the meetings suppressed coal production. *Id.* ¶¶ 157–58.

When courts have determined that a partial shareholder of a company used its stake to lessen competition, it was because the shareholder had endangered competition by exerting incomparably greater influence on a competitor, customer or supplier. In *American Crystal Sugar Co. v. Cuban-American Sugar Co.* (cited in AC ¶ 96 n.30), the court found that the defendant was "using" its shares in a rival to harm competition when it "repeatedly demanded representation on the board of directors," "persuad[ed] officers of the [rival] to furnish to it interim financial statements not generally made available to the public," and threatened to buy even more shares to install its own slate of directors. 152 F. Supp. 387, 394 (S.D.N.Y. 1957), *aff'd,* 259 F.2d 524 (2d Cir. 1958). In *Gulf & West Industries, Inc. v. Great Atlantic & Pacific Tea Co.* (cited in AC ¶ 96 n.30), the defendant planned to use its partial stake in a potential customer to seize that customer's business, and also had a "well-established practice of eventually acquiring firms in which it initially purchased only a small percentage of the outstanding shares." 476 F.2d 687, 695–97 (2d Cir. 1973). The other cases cited by Plaintiffs are of the same piece—as are, to our knowledge, every case finding Section 7's safe harbor to be inapplicable. There is no precedent for applying Section 7 here.

Plaintiffs, apparently recognizing their burden to allege the requisite high degree of influence, cite six examples of more muscular shareholder activism—except none has anything to do with this case. Examples of how "activist investor[s]" like Carl Icahn and Nelson Peltz tried to use

29

minority stakes to install directors on companies like Proctor & Gamble and "a gene-sequencing giant" are irrelevant.[22] AC ¶¶ 90a–e, 91. The only significance of these allegations is that they highlight that the Complaint makes no allegation that BlackRock, State Street, or Vanguard engaged in any conduct of that sort. In bringing a Section 7 claim against the quintessential passive investors, Plaintiffs embrace a theory incompatible with the law Congress enacted. Because Congress chose to affirmatively protect passive investment and under the safe harbor provision, the claims fail.

**B.    Plaintiffs Have Failed to Identify Any Acquisitions During the Relevant Period that Substantially Reduced Competition**

The Section 7 claim fails for a second reason: Plaintiffs have failed to plausibly allege any harm to competition resulting from the challenged acquisitions. To start with, as discussed, they have not plausibly alleged any harm to competition at all, because the only time output fell more sharply than its decades-long secular decline was when demand cratered during the pandemic from 2019 to 2020, before the challenged acquisitions. *See supra* Section I(b).

Nor have Plaintiffs met their more specific burden under Section 7 to connect any purported harm to the coal market to the particular stock "acquisitions" they are challenging. Section 7 proscribes not harm to competition generally, but "acquisition[s]" whose "effect … may be to substantially lessen competition." 15 U.S.C. § 18. Plaintiffs challenge certain acquisitions that occurred between 2020 and 2024. *See*, *e.g.*, AC ¶ 31 ("BlackRock thus acquired 71,765 shares of NACCO's common stock between December 2020 and June 2024."). To plausibly allege that these acquisitions violated Section 7, Plaintiffs must link them to competitive harm. *See David B. Turner*

---

[22] For example, Icahn "succeeded in getting a nominee elected to the board of directors" and "knocking the company's chairman off the board." AC ¶ 90a. "Nelson Peltz's Trian Fund won a seat on the board of directors of Proctor & Gamble." *Id.* ¶ 90c.

*Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 466 (S.D. Miss. 2022), *aff'd sub nom. New England Constr., LLC v. Weyerhaeuser Co.*, 2023 WL 2401587 (5th Cir. 2023) ("anticompetitive results" must "flow[] from the challenged … acquisition"); *see*, *e.g.*, *Peabody*, 492 F. Supp. 3d at 902–05 (finding that a joint venture combining coal mining assets would "eliminat[e] head-to-head competition").

The Complaint makes no attempt to establish this link. From 2020 to 2024, Defendants' respective stockholdings in the coal companies went up and down with no discernible patterns. The Complaint fails to connect those variations to any lessening of competition. Of the 27 stock positions that it discusses (3 Defendants each with shares in 9 featured coal companies), Defendants reduced 8 of those positions between 2020 and 2024. AC ¶¶ 28, 30, 32, 35, 42, 43, 52, 56. In those eight instances, no "acquisition" occurred at all. Other times, the number of shares acquired was insubstantial. *E.g.*, *id.* ¶ 51 (BlackRock increased its stake in Warrior Met Coal by 2%). And in no instance does the Complaint explain how any incremental investment between 2020 and 2024 changed the competitive landscape. In fact, the Complaint fails to even identify the date of the acquisitions. As far as one can tell reading the Complaint, every challenged stock purchase could have happened *after* 2022—the point after which the Complaint alleges nothing at all about price, output, or competition in the coal market. Even if every challenged acquisition happened between 2020 and 2022, that was a period when output was *increasing*. *See supra* Section I(a)(2). The Complaint contains no plausible allegation that any of the nine coal companies chose to reduce production during the period alleged, let alone facts connecting any such action to Defendants' acquisitions of stock. *See supra* Section I(b), III(a)(2).

These pleading failures defeat the claim. "The lawfulness of an acquisition [under Section 7] turns on the purchaser's potential for creating, enhancing, or facilitating the exercise of market

power" by a market participant. *U.S. v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988). Section 7 precedent establishes that a transaction can create or enhance market power by eliminating competition directly when one competitor purchases another outright. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc*. 732 F.2d 480, 491–93 (5th Cir. 1984). It can also harm competition in the market indirectly, for example, when one competitor buys a supplier of a critical input to foreclose competitors' access to that input. *See, e.g.*, *Illumina Inc. v. FTC*, 88 F. 4th 1036, 1053–54 (5th Cir. 2024). Or because reducing the number of competitors in the market increases the potential for coordination among the remaining competitors. *See, e.g.*, *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 313 (D.D.C. 2020) (Section 7 prohibits mergers that facilitate the remaining firms' ability "to coordinate their behavior"). But Plaintiffs allege no facts supporting any theory that Defendants' challenged acquisitions increased the market power of any coal company, or lessened the ability or incentive of any coal company to compete.

Instead of alleging facts that support a plausible Section 7 claim, the Complaint cites a handful of "partial acquisition" cases. AC ¶ 96. But those cases hold only that a company in the relevant market may increase its market power through a partial acquisition of a competitor or supplier. By contrast Plaintiffs do not allege that any coal company gained market power, or could gain market power, because of the challenged acquisitions. The Complaint does not allege that Defendants somehow caused any coal companies to merge, caused one coal company to deprive another of a critical input, or that Defendants' incremental acquisitions enabled coordination among the coal companies by reducing their numbers. Indeed, Plaintiffs do not rely on such a theory because the Complaint does not allege, and could not allege, that any Defendant either is a participant in a relevant coal market or controls any company that does participate. *Supra* Section III(a)(1).

32

Absent facts establishing a causal harm, the Section 7 claim fails. *See generally Holmes v. SIPC*, 503 U.S. 258, 268 (1992) (a plaintiff's "right to sue [under the Clayton Act] require[s] a showing that the defendant's violation" was the "but for" and "proximate cause" of the plaintiff's injury).

## IV.    Plaintiffs' State-Law Antitrust Claims Fall with the Federal Claims (Counts IV-XIV)

Plaintiffs' claims under the state antitrust laws of Texas, Montana, Indiana, Iowa, Kansas, Louisiana, Nebraska, Oklahoma, and West Virginia (Counts IV–XIV) fail for the same reasons the federal antitrust claims fail. Courts interpret these States' antitrust laws in parallel with federal antitrust law and routinely dismiss the state antitrust claims when the related federal claims fail.

**Texas.** "[S]tate antitrust claims do not need to be addressed separately because [the Texas Free Enterprise and Antitrust Act] explicitly mandates that its provisions be interpreted in harmony with federal antitrust law." *Texas Com. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 509 (5th Cir. 2005) (citation and quotations marks omitted).

**Montana**. Courts "evaluate … state and federal antitrust claims under the applicable federal case law." *Healow v. Anesthesia Partners, Inc.*, 92 F.3d 1192, 4 (9th Cir. 1996).

**Indiana**. State and federal antitrust claims fail "for the same reasons" because "[t]he Indiana Antitrust Act, particularly I.C. 24-1-2-1 and 24-1-2-2, is patterned after the Sherman Act." *Perry v. Hartz Mountain Corp.*, 537 F. Supp. 1387, 1390 (S.D. Ind. 1982).

**Iowa**. "[T]o the extent [Plaintiff]'s allegations fail to state a claim under federal antitrust law, as discussed above, they also fail to state a claim under the Iowa Competition Law." *Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1080 (S.D. Iowa 2017).

33

**Kansas**. "The same analysis conducted in conjunction with Plaintiff's Sherman Act claims governs Plaintiff's . . . Kansas Restraint of Trade Act claims." *EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240, at *19 (N.D. Tex. 2019).

**Louisiana**. "[T]he Louisiana antitrust claim similarly rises and falls with the claims discussed above." *Clean Water Opportunities, Inc. v. Willamette Valley Co.*, 759 F. App'x. 244, 248 (5th Cir. 2019).

**Nebraska**. The Nebraska Consumer Protection Act "is the state version of the Sherman Antitrust Act" and is "construed … in accordance with the U.S. Supreme Court's interpretation of 15 U.S.C. § 1." *Salem Grain Co., Inc. v. Consol. Grain & Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017). "The Junkin Act mandates that when its provisions are "similar to the language of a federal antitrust law, the courts of this state in construing such [provisions] shall follow the construction given to the federal law by the federal courts." *Kanne v. Visa USA Inc.*, 723 N.W.2d 293, 297 (Neb. 2006) (quoting NEB. REV. STAT. § 59-829).

**Oklahoma**. "The Oklahoma Antitrust Reform Act must be 'interpreted in a manner consistent with Federal Antitrust Law,'" so "[b]ecause plaintiff failed to state a federal antitrust claim, it cannot state a state antitrust claim."). *TKO Energy Servs., LLC v. M-I LLC*, 2013 WL 789458, at *11 (N.D. Okla. 2013) (quotation omitted).

**West Virginia**. Because "[t]he Supreme Court of Appeals of West Virginia has clarified that courts should analyze the WVATA 'under the guidance provided by federal law,'" the "adequacy of the plaintiffs' [West Virginia Antitrust Act] claim rises or falls on the viability of their federal antitrust claims." *Kerns v. Range Res. - Appalachia, LLC*, 2011 WL 3753117, at *5 (N.D. W. Va. 2011) (quotation omitted).

34

## V.    Louisiana's Unfair Trade Practices Act Claim Fails (Count XVII)

Louisiana's Unfair Trade Practices Act (LUTPA) claim (Count XVII) should be dismissed because Plaintiffs allege no facts giving rise to a LUTPA claim. La. Stat. Ann. § 51:1405. "[T]he range of prohibited practices under LUTPA is extremely narrow." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1060 (La. 2010). "[O]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned." *Id.* "This 'egregiousness' often involves the breach of a special relationship of trust." *Nola Fine Art, Inc. v. Ducks Unlimited, Inc.*, 88 F. Supp. 3d 602, 613 (E.D. La. 2015) No such claim is alleged here.

The three sentences in the Complaint devoted to the LUTPA claim give no hint of what is challenged at all. AC ¶¶ 325–27; *see also* BlackRock's Motion to Dismiss Consumer-Protection Claims; State Street's Motion to Dismiss the Amended Complaint. It identifies no acts of fraud, misrepresentation, deception, or similar conduct, let alone "egregious" ones. Nor has it alleged that Defendants breached a special relationship of trust. To the contrary, the Complaint alleges the "Defendants each publicly announced" their goals. AC ¶ 4. And Plaintiffs' antitrust allegations do not help because a plaintiff's "failure to sufficiently allege an antitrust violation prevent[s] it from being able to sufficiently plead a violation of LUTPA" based on the same allegations. *Felder's Collision Parts, Inc. v. Gen. Motors Co.*, 2014 WL 1652719, at *5 (M.D. La. 2014), *aff'd*, 777 F.3d 756 (5th Cir. 2015). Having failed to explain any nexus between LUTPA and Defendants' conduct, the claim should be dismissed.[23]

---

[23] Louisiana does not explicitly accuse Vanguard or State Street of fraud, but to the extent that it meant to, the claim also would fail under Federal Rule of Civil Procedure 9(b). *See*, *e.g.*, *Rahman* (continued…)

## CONCLUSION

For the foregoing reasons, the Plaintiffs' federal and state antitrust claims and Louisiana's LUTPA claim, Counts I–XIV and XVIII, should be dismissed with prejudice.  Defendants respectfully request oral argument on this motion.

Dated: March 17, 2025                    */s/ Gregg Costa*

Gregg Costa
  State Bar No. 24028160
  GCosta@gibsondunn.com
Prerak Shah
  State Bar No. 24075053
  PShah@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
811 Main St., Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600

Rachel Brass (*pro hac vice*)
  RBrass@gibsondunn.com
  California Bar No. 219301
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Ste 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8306

---

*v. Allstate Ins. Co.*, 644 F. Supp. 3d 231, 241 (E.D. La. 2022) (unless a court can "conclude that [a] [p]laintiff's LUTPA claim does not raise the issue of fraud," the "LUTPA claim must meet the heightened pleading standard of Rule 9(b)"). Under Rule 9(b), a plaintiff must plead "with particularity by identifying the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (quotation omitted). There is no attempt whatsoever to meet that standard.

Thomas Mueller (*pro hac vice*)
  DC Bar No. 434459
  Thomas.mueller@wilmerhale.com
Jennifer Milici (*pro hac vice*)
  DC Bar No. 987096
  Jennifer.milici@wilmerhale.com
Perry Lange (*pro hac vice*)
  DC Bar No. 494339
  Perry.lange@wilmerhale.com
John O'Toole (*pro hac vice*)
  DC Bar No. 241862
  John.o'toole@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

David Gringer (*pro hac vice*)
  New York Bar No. 4879029
  David.gringer@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Lauren Ige (*pro hac vice*)
  California Bar No. 343644
  Lauren.ige@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Telephone: (213) 443-5395
Facsimile: (213) 443-5400

*Attorneys for Defendant BlackRock, Inc.*

*/s/ Jason M. Powers*

Jason M. Powers
  Texas Bar No. 24007867
  jpowers@velaw.com
Stacey Neumann Vu
  Texas Bar No. 24047047
  svu@velaw.com
VINSON & ELKINS LLP
845 Texas Avenue
Suite 4700
Houston, TX 77002
Phone: (713) 758-2222

George M. Kryder
  Texas Bar No. 11742900
  gkryder@velaw.com
Megan Cloud
  Texas Bar No. 24116207
  mcloud@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, TX  75201-2975
Phone (214) 220-7719

Stephen M. Medlock (*pro hac vice*)
  DC Bar No. 995636
  smedlock@velaw.com
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone: (202) 639-6578

Mackenzie G. Newman (*pro hac vice*)
  NY Bar No. 5710785
  mnewman@velaw.com
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0000

*Attorneys for Defendant State Street Corporation*

38

*/s/ Robert D. Wick*

Robert D. Wick (*pro hac vice*)
 DC Bar No. 440817
 rwick@cov.com
John S. Playforth (*pro hac vice*)
 MA Bar No. 675766
 jplayforth@cov.com
Shadman Zaman (*pro hac vice*)
 NY Bar No. 5418199
 szaman@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000

Bradley C. Weber
 State Bar No. 21042470
 brad.weber@troutman.com
Chase T. Cobb
 State Bar No. 24116208
 chase.cobb@troutman.com
TROUTMAN PEPPER LOCKE LLP
2200 Ross Avenue, Suite 280
Dallas, Texas 75201
Tel: (214) 740-8497
Fax: (214) 756-8497

*Attorneys for Defendant The Vanguard Group, Inc.*

39

## __CERTIFICATE OF SERVICE__

I certify that the foregoing document was filed electronically and served on all counsel of record by the Court's CM/ECF system on March 17, 2025.


Dated: March 17, 2025            _/s/ Gregg Costa_

Gregg Costa