UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

STATE OF TEXAS, et al.,

               Plaintiffs,

    v.

BLACKROCK, INC., et al.,

               Defendants.

CIVIL ACTION NO. 6:24-cv-437-JDK

**ORAL ARGUMENT REQUESTED**

**Defendant BlackRock Inc.'s Motion to Dismiss the
<u>Consumer-Protection Counts (XV–XXI) of the Amended Complaint</u>**

TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Statement of Issues to Be Decided ........................................................................... 4

Background ............................................................................................................... 5

Standard of Review ................................................................................................... 10

Argument .................................................................................................................. 10

   I.   BlackRock's Statements Were Not Deceptive or Material ................................. 11

     A.   BlackRock's statements about "investment strategy" were not deceptive ................... 12

       1. The two sentences concern BlackRock's investment-selection criteria and nothing else ................................................................................................................. 14

       2. Plaintiffs' theory of deception is at odds with federal securities enforcement ............. 18

       3. BlackRock's voting and engagement activities were thoroughly disclosed ................ 20

     B.   BlackRock's other statements were not deceptive .......................................... 23

       1. The statements in BlackRock's Statements of Additional Information are not actionable ..................................................................................................... 23

       2. The remaining statements on BlackRock's website are not actionable ...................... 27

     C.   BlackRock's statements were not material .................................................. 28

   II.   None of the State Laws Applies to the Marketing of Securities ....................................... 30

   III.   Louisiana Failed to Allege "Egregious" Conduct ............................................... 32

Conclusion ................................................................................................................ 33

<u>T<small>ABLE OF</small> A<small>UTHORITIES</small></u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................................10

*Balthazar v. Hensley R. Lee Contracting, Inc.,*
    214 So.3d 1032 (La. App. 4 Cir. 2017) ................................................................33

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................5, 10

*Boswell v. Bimbo Bakeries USA, Inc.,*
    570 F. Supp. 3d 89 (S.D.N.Y. 2021)......................................................................17

*Bott v. Vistaprint USA Inc.,*
    392 F. App'x 327 (5th Cir. 2010) ..........................................................................12

*Britton v. Farmers Ins. Grp.,*
    721 P.2d 303 (Mont. 1986) ....................................................................................11

*Cardan v. New York Life Ins. Co.,*
    2016 WL 5921065 (D. Mont. 2016) ......................................................................31

*Matter of Cliffdale Associates, Inc.,*
    103 F.T.C. 110, 1984 WL 565319 .........................................................................12

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ...................................................................................5

*D & J Tire, Inc. v. Hercules Tire & Rubber Co.,*
    598 F.3d 200 (5th Cir. 2010) .................................................................................28

*Doe v. Boys Clubs of Greater Dallas, Inc.,*
    907 S.W.2d 472 (Tex. 1995)..................................................................................12

*In re Fannie Mae 2008 Sec. Litig.,*
    742 F. Supp. 2d 382 (S.D.N.Y. 2010)....................................................................21

*Feiber v. Cassidy,*
    723 So.2d 1101 (La. App. 1 Cir. 1998) .................................................................31

*FTC v. Affiliate Strategies, Inc.,*
    849 F. Supp. 2d 1085 (D. Kan. 2011)....................................................................11

*Gonzalez v. Kay*,
577 F.3d 600 (5th Cir. 2009) ........................................................................12

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995)...........................................................................................8

*Hobbs v. Wells Fargo Bank, N.A.*,
2024 WL 5212969 (D. Mont. Dec. 23, 2024) .........................................17

*Klein v. TD Ameritrade Holding Corp.*,
2015 WL 13215666 (D. Neb. Oct. 23, 2015) ...........................................31

*Little v. Gillette*,
354 N.W.2d 147 (1984) ................................................................................31

*Lovelace v. Software Spectrum Inc.*,
78 F.3d 1015 (5th Cir. 1996) ......................................................................12

*Mall Real Est., L.L.C. v. City of Hamburg*,
818 N.W.2d 190 (Iowa 2012) ..............................................................19, 21

*Martinez v. Martinez*,
2020 WL 5887587 (Tex. Ct. App. – Corpus Christi, Oct 1, 2020)........11

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
751 F.3d 368 (5th Cir. 2014) ......................................................................33

*McFadden v. Import One, Inc.*,
56 So.3d 1212 (La. App. 3 Cir. 2011) ......................................................33

*McGinity v. Procter & Gamble Co.*,
69 F.4th 1093 (9th Cir. 2023) ....................................................................17

*Metcalfe & Sons Investments, Inc. v. Multiquip, Inc.*,
2011 WL 4527432 (M.D. La. 2011) ..........................................................17

*State ex rel. Miller v. Vertrue, Inc.*,
834 N.W.2d 12 (Iowa 2013) ..................................................................11, 12

*Moeller v. Samsung Elecs. Am., Inc.*,
623 F. Supp. 3d 978 (S.D. Iowa 2022) ....................................................28

*Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*,
393 S.W.3d 379 (Tex. App. – Dallas 2012, no pet.)................................16

*Pate v. Fun Town RV San Angelo, LP*,
2024 WL 3995413 (Tex. App.—Austin Aug. 30, 2024, no pet.) ............17

iv

*Pennington v. Singleton,*
606 S.W.2d 682 (Tex. 1980) ................................................................28

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.,*
784 F.2d 674 (5th Cir. 1986) ..............................................................24

*Quality Env't Processes, Inc. v. I.P. Petroleum Co.,*
144 So.3d 1011 (La. 2014) .............................................................32, 33

*Russell v. Dean Witter Reynolds, Inc.,*
510 A.2d 972 (Conn. 1986) .................................................................32

*Salem Grain Co., Inc. v. Consol. Grain & Barge Co.,*
900 N.W.2d 909 (Neb. 2017) ..............................................................11

*SIMFA v. Ashcroft,*
No. 23-cv-4154, ECF No. 39 (W.D. Mo. Jan 5, 2024) ...........................9

*Smith v. Cooper/T. Smith Corp.,*
846 F. 2d 325 (5th Cir. 1988) .............................................................30

*Stephenson v. Paine Webber Jackson & Curtis, Inc.,*
839 F.2d 1095 (5th Cir. 1988) ............................................................32

*Tolbert ex rel. Tolbert v. Nat'l Union Fire Ins. Co.,*
657 F.3d 262 (5th Cir. 2011) ..............................................................16

*Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp.,*
292 F.3d 471 (5th Cir. 2002) ..............................................................32

*Walker v. Beaumont Indep. Sch. Dist.,*
938 F.3d 724 (5th Cir. 2019) ..............................................................10

**Statutes**

15 U.S.C. § 77r(a)(2)(A) ...........................................................................9

Iowa Code 714.16 .....................................................................................11

La. R.S. § 51:1403 ....................................................................................11

La. Stat. § 51:1406 ..............................................................................11, 30

Mont. Code 30-14-103 ..............................................................................11

Mont. Code § 30-14-105(1) .......................................................................31

Neb. Rev. Stat. § 59-1602 .........................................................................11

Neb. Rev. Stat. § 59-1617 ...................................................................................31

Neb. Rev. Stat. § 87-302 .............................................................................11, 32

Neb. Rev. Stat. § 87-304 ...................................................................................31

Neb. Rev. Stat. § 81-2402 .................................................................................32

Tex Bus. & Com. Code § 17.46 .........................................................................11

**Codes and Regulations**

17 C.F.R. § 275.206(4)-6(a).................................................................................22

74 Fed. Reg. 4546 (Jan. 26, 2009) .......................................................................8

88 Fed. Reg. 70436 (Oct. 11, 2023).............................................................18, 19

To the Honorable Jeremy D. Kernodle, United States District Judge:

Pursuant to Federal Rule of Civil Procedure 12(b)(6), BlackRock, Inc. moves to dismiss Counts XV–XXI of the Amended Complaint. In support, BlackRock respectfully states the matters set forth below.

## INTRODUCTION

Five States are suing BlackRock based on two sentences that appear on webpages providing high-level information about four of Blackrock's successful index funds. In making their case, Plaintiffs necessarily ignore not only the language that appears before and after the allegedly misleading sentences, but also the numerous voluminous and detailed SEC-mandated disclosures that BlackRock makes to each and every investor in those funds. The truth is that in order for any reasonable investors to have been misled as to the nature of BlackRock's funds, they would essentially have to—like Plaintiffs here—have turned a blind eye to the disclosure that BlackRock provides. As the Complaint itself shows, BlackRock is completely transparent about how it selects its investments, how it engages with portfolio companies, and how it votes proxies. All an investor must do to understand these matters is to refer to the disclosure that BlackRock provides.

Index-based investment funds have revolutionized and democratized investment by making available to investors of all types and sizes, from the smallest first-time investor to the largest pension fund, thousands of low-cost funds that track many different parts of the economy. BlackRock is one of the largest providers of index funds, currently offering several hundred in the United States. At issue in the various consumer-protection claims brought by Plaintiffs are four of BlackRock's broad equity index funds, funds which invest in hundreds or even thousands of companies selected by third-party index providers.

The fund disclosures at issue here are complete, transparent, and accurate, and fully comply with the vast regulatory regime that governs such disclosures. Yet five State Plaintiffs claim that

BlackRock misled investors by describing the four funds as not following an "ESG investment strategy" because this description supposedly conflicts, not with how it selects securities in those funds, but with how BlackRock votes and engages with the companies that make up part of those funds' portfolios. But as the Complaint admits, BlackRock fully discloses the investment approach of each of the funds and also fully discloses its voting and engagement strategy. Indeed, these *public* disclosures are the ironic basis for Plaintiff's claimed conflict. In other words, Plaintiffs' state-law deception claims are *not* based on BlackRock's allegedly saying one thing to its customers while doing another. Instead, the claims of deception are based on BlackRock's *accurate* public disclosure—mandated by the federal securities laws—of two separate sets of activities: (i) determining the stocks in which the funds are invested (the "investment strategy") and (ii) how BlackRock approaches its duties to vote proxies and engage with the companies in which the funds invest. There is no conflict and there is no deception.

The Complaint admits that BlackRock does not determine and does not claim to determine the companies that make up the underlying indexes that the four funds at issue—the iShares Russell 2000 ETF, the iShares Russell 3000 ETF, the iShares Core S&P Mid-Cap ETF, and the iShares Total U.S. Stock Market Index Fund—are required to track. As BlackRock discloses both in the main offering document of those funds (the prospectus) and on the webpages cited in the Complaint, these are index funds that seek to track the performance of broad-based indexes sponsored, constructed, and overseen by Russell or S&P. The Complaint focuses on a disclaimer BlackRock includes on these webpages, which among other things report sustainability statistics for the companies held by these funds, that tells investors that these metrics do not affect which stocks the fund buys. The Complaint nowhere alleges that this disclaimer is not true—*i.e.*, that the funds in question do pick stocks based on their ESG characteristics—not even a conclusory assertion of

falsity.

Instead, Plaintiffs assert that the disclaimer that the funds do not follow an "ESG investment strategy" is a lie because BlackRock engages with public companies and votes proxies over a broad range of financial and business risks, including climate risk. The Complaint never explains how voting and engagement constitute an "investment strategy"; it just asserts that they are. Leaving aside that the BlackRock disclosures for each of the funds clearly defines "investment strategy" as the strategy by which those funds select securities (not how to vote shares or engage with companies), BlackRock also clearly discloses that, as part of its stewardship activities, it may consider environmental risks to a company, alongside other risks, in pursuit of maximizing shareholder returns. Thus even if a reasonable investor could agree with Plaintiffs' interpretation of "ESG investment strategy," the activities that supposedly make it "ESG" are fully disclosed. Here again, no deception. There is no allegation that BlackRock's actual proxy-voting and engagement conduct (which is also publicly disclosed) deviated in any way from the practices described in its fund disclosures. No wonder the Complaint does not identify a single real consumer who was ever tricked into buying a BlackRock fund.

At bottom, Plaintiffs' real complaint is not about BlackRock's disclosures but instead a broadside attack on BlackRock's approach to how it votes proxies and engages with companies, which does not align with the States' philosophy. The States may think that no investor should be permitted to follow BlackRock's fully disclosed approach to taking environmental risks into account (as one of many disclosed risks) when conducting stewardship activities, but that is not the law. Nor is it the States' role to displace BlackRock's professional judgment with their own.

These deficiencies and more doom Plaintiffs' claims under five States' consumer-protection laws. First, BlackRock's statements, considered in the full context that the Complaint

3

conspicuously omits, were wholly truthful. The very same documents, from which Plaintiffs pluck their supposedly false statements, disclose the very activity that Plaintiffs claim is somehow being obscured. Any prospective investor is, and has been, fully aware of BlackRock's approach and there accordingly can be no false statements or deception as a matter of law.

Second, the Complaint fails to allege that any of these statements was material: whatever a consumer thought of the isolated snippets reprinted in the Complaint, they do not alter the "total mix" of information available to the consumer, which includes numerous other BlackRock disclosures that speak far more directly to its approach to proxy voting.

Third, finding deception or materiality on these facts would be at odds with the extensive federal regulations governing how investment advisors market their products, and which warn them against *overstating* their funds' ESG status.

Finally, even setting aside these basic elements, the Complaint has other fundamental errors. Plaintiffs invoke consumer-protection laws that do not even apply to securities transactions, and a Louisiana law that has an intent requirement the State does not even pretend to meet.

The Court should dismiss these baseless claims.

### STATEMENT OF ISSUES TO BE DECIDED

1. Whether BlackRock's statements—including the statement that its industry-agnostic index funds, whose investment decisions mechanically track an index designed by a third party, do not use an "ESG investment strategy"—were deceptive or material.

2. Whether the state consumer-protection laws—consistent with the FTC Act after which these laws were modeled—exclude claims based on the marketing of securities.

3. Whether the Complaint states a claim under the Louisiana Unfair Trade Practices Act, when it does not purport to allege the "egregious" conduct necessary to state a claim under that law.

## BACKGROUND

BlackRock offers funds that enable customers to invest efficiently and cheaply in a diversified pool of assets. *E.g.*, ¶ 193.[1] The BlackRock funds at issue in this case are index funds. *Id.* "Index funds generally use a passive investing strategy"[2]—that is, BlackRock does not pick stocks for these funds based on how it thinks the company will perform in the future; its only objective is to buy stocks to match the returns of an index created and operated by an unaffiliated third party.[3] Because BlackRock does not design the index, it has limited discretion when purchasing stocks for the fund. For example, one of the funds at issue simply "track[s] the investment results" of an "index of the approximately 2,949 largest public [companies] domiciled in the U.S. and its territories."[4] The other funds at issue are likewise based on indices that are defined only by a particular region and company size, not specific industries. Separately, BlackRock also offers "ESG"-branded funds that explicitly pick investments based on their environmental or sustainability characteristics—but none of the funds here is branded as an ESG fund. ¶ 192.

Because BlackRock, in operating its funds, comes to beneficially own stakes in many public corporations, it is required to vote on certain matters related to those companies. ¶¶ 3, 6. Most of

---

[1] *See* Ex. A, *iShares Russell 2000 ETF*, BlackRock, https://bit.ly/3B6PaUj (cited in ¶ 193); Ex. B, *iShares Russell 3000 ETF*, BlackRock, https://bit.ly/41mA6wX (cited in ¶ 193); Ex. C, *iShares Total U.S. Stock Market Index Fund*, BlackRock, https://bit.ly/4gsGXtE (cited in ¶ 194); Ex. D, *iShares Core S&P Mid-Cap ETF*, BlackRock, https://bit.ly/4gouEP7 (cited in ¶ 195).

[2] *Index Funds*, Securities and Exchange Commission, https://www.investor.gov/introduction-investing/investing-basics/investment-products/mutual-funds-and-exchange-traded-4.

[3] *See*, *e.g.*, *2024 iShares Russell 2000 ETF Prospectus* at S-2, BlackRock, https://bit.ly/3B6PaUj (cited in ¶ 193) [click "Prospectus"]; *see Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (the court may consider "[d]ocuments that a defendant attaches to a motion to dismiss … if they are referred to in the plaintiff's complaint and are central to her claim"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (explaining that when a complaint "quoted a reported statement" in a "published article[]," the "District Court was entitled to take notice of the full contents" of the article; and relying on other statements from the article for their truth).

[4] *2024 iShares Russell 3000 ETF Prospectus* at S-2, BlackRock, https://bit.ly/41mA6wX (cited in ¶ 193) [click "Prospectus"].

these matters are teed up for a vote by corporate management. But, in some jurisdictions, outside shareholders also have the right to nominate directors or submit nonbinding proposals for a vote, some of which concern a company's handling and disclosure of environmental risk.[5] These environmental proposals are a de minimis fraction of the proxy voting BlackRock handles—as the Complaint admits, just 0.1% of votes in the most recent reporting year.[6] When BlackRock votes, it does so as a fiduciary for its clients, and must act consistent with its clients' interests and investment objectives.[7]

In numerous public documents, including over a dozen cited in the Complaint, BlackRock explains how it approaches voting on environmental matters, including shareholder proposals.[8] BlackRock believes that "carbon-intensive companies … play crucial roles in the economy."[9] It thus repeatedly rejects what it views as "prescriptive" proposals, such as those urging insurers to

---

[5] *See Statement of Additional Information* at A-11, iShares Trust (2024), https://bit.ly/3ATzljY (cited in ¶ 206). BlackRock is not alleged to have ever submitted a proposal; rather, the votes at issue here concern proposals submitted by management or a third party.

[6] *See 2024 Global Voting Spotlight: Voting in our clients' long-term financial interests* at 18, 66–67, BlackRock (2024), https://bit.ly/3Z1M0sW (cited in ¶ 206).

[7] *See BlackRock's 2030 Net Zero Statement*, BlackRock, https://bit.ly/40WjA6p (cited in ¶ 214).

[8] *See, e.g.*, *2024 Global Voting Spotlight*, *supra* note 6, at 57–58; *2024 iShares Trust Statement of Additional Information*, *supra* note 5, at A-9–A-10; *2021 TCFD Report* at 6, BlackRock (2021), https://bit.ly/3V1XLyJ (cited in ¶ 198); *2023 TCFD Report* at 5–6, BlackRock (2023), https://bit.ly/4hWgNQO (cited in ¶ 199); *Investment Stewardship Annual Report* at 37–46, BlackRock (2020), https://bit.ly/4fYfz5A (cited in ¶ 204); *Pursuing long-term value for our clients: BlackRock Investment Stewardship* at 13–14, BlackRock (2021), https://bit.ly/3ZdDbxJ (cited in ¶ 204); *2023 Global Voting Spotlight* at 51–54, BlackRock (2023), https://bit.ly/3Z0rdWH (cited in ¶ 206); *Statement of Additional Information* at B9–B10, BlackRock (2023), https://bit.ly/4eHrTX4 (cited in ¶ 208); *Statement of Additional Information* at A9–A11, iShares Trust (2023), https://bit.ly/4fCY0Z4 (cited in ¶ 210); *BlackRock's 2030 Net Zero Statement*, *supra* note 7 (cited in ¶ 214); *Energy Investing: Setting the Record Straight*, BlackRock, https://bit.ly/4i0Aff2 (cited in ¶ 217); Dalia Blass, BlackRock Senior Managing Director, Letter to Attorneys General of the States re Attorneys General Letter (Aug. 4, 2022), https://bit.ly/4eB2oq9 (cited in ¶ 218); *BlackRock Investment Stewardship: Climate Focus Universe*, BlackRock (2023), https://bit.ly/3AQSQto (cited in ¶ 220).

[9] *2030 Net Zero Statement*, *supra* note 7.

stop underwriting energy companies, or oil companies to set hard emissions targets.[10] In fact, upon judging most shareholder proposals to be "poor quality" and "not consistent … with [its] clients' long-term financial interests," BlackRock has in recent years voted against the overwhelming majority of them.[11] While the Complaint cherry-picks one year (2020–2021) in which BlackRock voted in favor of over half the environmental shareholder proposals it considered (¶ 204), the documents incorporated into the Complaint demonstrate that in the years surrounding that year, BlackRock rejected over 85% of the environmental proposals before it, including 98% of those it considered in the 2023–2024 reporting year.[12] In at least the last three years, BlackRock has supported environmental proposals at a rate consistent with the rest of the market.[13]

In materials cited in the Complaint, BlackRock has explained why it does and why it does not cast votes in favor of particular environmental shareholder proposals. BlackRock may support "[p]ublic disclosures" by its portfolio companies on all sorts of topics, because this "allow[s] investors to evaluate how a company considers risks and opportunities material to [its] business model and to track progress against management's stated goals."[14] And for some companies—especially those heavily reliant on fossil fuels—one critical "material risk" they may face is the global trend to "transition to a lower carbon economy."[15] When BlackRock is concerned that there are "gaps in a company's management of" this risk, it will sometimes "support shareholder

---

[10] *2023 Global Voting Spotlight*, *supra* note 8, at 52.
[11] *2024 Global Voting Spotlight*, *supra* note 6, at 15, 57.
[12] *Investment Stewardship Annual Report*, *supra* note 8, at 69–70 (13% approval rate in 2018–2019 proxy voting season and 11% in 2019–2020); *2023 Global Voting Spotlight*, *supra* note 8, at 18 (9% in 2022–2023); *2024 Global Voting Spotlight*, *supra* note 6, at 19 (2% in 2023–2024). The documents cited in the Complaint do not appear to contain data from the 2021–2022 period, but for the sake of completeness, BlackRock represents that the figure was 27%.
[13] *2024 Global Voting Spotlight*, *supra* note 6, at 50.
[14] *2023 TCFD Report*, *supra* note 8, at 6.
[15] *Id.*

proposals that request disclosures that help [it] … better understand [decarbonization] risks."[16] BlackRock also sometimes "engages" (meets) with companies to understand how they anticipate managing those risks and to inform its voting decisions. Last year, BlackRock discussed climate issues in a third of its engagements with corporations, usually as one of many topics; in the other two-thirds of engagements, climate risk did not come up.[17] Again, because the relevant funds are index funds, none of these interactions ever impacted the fund's investment process.

BlackRock's disclosures to investors are heavily regulated by federal securities law. For each fund it offers, federal law requires BlackRock to publish a prospectus, the formal "document soliciting the public to acquire securities." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). A fund prospectus educates investors on the fund's objectives, fees, performance, and material risks. *See* SEC Form N-1A. The SEC dictates the contents of prospectuses in granular detail; certain information must appear in a certain sequence. *Id.* The SEC also regulates what details must be included in the mandatory "Statement of Additional Information" (a prospectus supplement), in SEC filings, and even on the fund's website.[18] BlackRock must also publicly disclose its proxy-voting policies, down to how it voted on every shareholder proposal before it. *See* SEC Form N-PX. BlackRock has also voluntarily given additional details to interested clients about its funds' characteristics, including the "Sustainability Characteristics" that are at the center of Plaintiffs' claims.

The flipside of this comprehensive federal regulation is that *state* regulation of investment companies' securities disclosures is largely preempted. The National Securities Market

---

[16] *2023 Global Voting Spotlight*, *supra* note 8, at 42, 51.
[17] *2024 Global Voting Spotlight* at 17, *supra* note 6.
[18] Enhanced Disclosure & New Prospectus Delivery Option for Registered Open-End Mgmt. Inv. Companies, 74 Fed. Reg. 4546, 4546–4574 (Jan. 26, 2009).

Improvement Act expressly prohibits states from "impos[ing] any conditions" on "any offering document," like a prospectus or prospectus supplement, prepared by a covered investment advisor (such as BlackRock). 15 U.S.C. § 77r(a)(2)(A). Although NSMIA has an exception for state-law deception claims, § 77r(c)(1), States are prohibited from requiring an investment advisor to include particular statements in a prospectus. *See SIMFA v. Ashcroft*, No. 23-cv-4154, ECF No. 39, at 12–13 (W.D. Mo. Jan 5, 2024) (explaining that a rule "regulat[ing] what investment adviser representatives must disclose to their clients" is "distinct from the areas of state regulation permitted by NSMIA" and would be preempted). And a State cannot get around this federal statutory prohibition and require affirmative disclosure of certain information by claiming that it is deceptive to omit that information.

*    *    *

Five states—Texas, Iowa, Louisiana, Montana, and Nebraska—have now sued BlackRock under consumer-protection laws, alleging that some of BlackRock's public statements about climate risk were deceptive. Nebraska brings three Counts under two different consumer-protection laws; the other States bring one Count each under a single law. ¶¶ 310–342 (Counts XV–XXI). To support these claims, the Complaint excerpts twelve sentences from the hundreds of pages of disclosures discussed above and cited in the Complaint. It focuses specifically on two of those sentences found on a website disclaimer, which, after presenting certain sustainability metrics related to the portfolio of four BlackRock index funds, clarify that these funds do not use an "ESG investment strategy"; that is, that the metrics do not impact the way in which those funds select securities. The Complaint asserts those sentences are deceptive because the funds really *do* use an ESG strategy in light of BlackRock's votes and engagement on climate issues. ¶¶ 192–207. The Complaint further accuses BlackRock of misstating its motives for engaging with companies on climate risk,

9

and even for overstating the level of climate risk faced by the companies in which it beneficially owns shares. ¶¶ 208–224.

#### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes the Court to dismiss claims for "failure to state a claim upon which relief can be granted." The Court may dismiss claims "on the basis of a dispositive issue of law" or if the plaintiff fails to plead sufficient facts to "state a claim to relief that is plausible on its face." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (citation omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the Court must accept all well-pleaded facts in the complaint as true, the "allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

#### ARGUMENT

The consumer-protection Counts against BlackRock (XV–XXI) are baseless. The Court should dismiss them for failure to state a claim because: (1) they do not plausibly allege that BlackRock made any false or deceptive statements, let alone any material ones; (2) none of the consumer-protection laws even applies to the marketing of securities; and (3) Louisiana fails to allege the "egregious" conduct necessary to sustain a claim under its consumer-protection law.[19]

Although these claims all invoke state law, the analysis that follows relies partly on decisions

---

[19] Vanguard and State Street have filed motions citing individual reasons to dismiss Plaintiffs' antitrust claims. The Complaint's particular factual allegations as to BlackRock likewise demonstrate the failings of Plaintiffs' antitrust theories. Because (as explained in the joint motion) BlackRock's voting alone cannot give rise to a Clayton Act violation, and because no other engagement with the coal companies is alleged as to BlackRock, the claims necessarily fall short. *See* Dkt. 64, at 25–30. And more generally, the individual motions demonstrate the sharp differences among each Defendant's alleged conduct regarding the coal companies. The Complaint's straining to tie together the three asset managers through scattershot, inconsistent, and even contradictory allegations only shows that Defendants did not act in consort—and so undermines the claims as to all of them.

interpreting the Federal Trade Commission Act. This is because the Texas, Montana, and Louisiana statutes are expressly harmonized with the FTC Act.[20] Courts also often rely on FTC decisions when interpreting Iowa's and Nebraska's consumer-protection laws.[21]

## I. BlackRock's Statements Were Not Deceptive or Material

Each consumer-protection Count requires Plaintiffs to prove at least two basic elements: (1) BlackRock made a false or deceptive statement;[22] and (2) the deceptive statement was material, that is, "a reasonable person would attach importance to [it] and would be induced to act on [it when] determining his choice of action," *Martinez v. Martinez*, 2020 WL 5887587, at *8 (Tex. Ct. App. – Corpus Christi, Oct. 1, 2020) (citation omitted). Plaintiffs have not plausibly alleged either element.

The Court's review for deception and materiality is not limited to the sentences selectively reprinted in the body of the Complaint: it can and must consider the broader documents in which

---

[20] Mont. Code § 30-14-104 (in interpreting the Montana law, "due consideration and weight shall be given to the interpretations of the federal trade commission and the federal courts relating to [the FTC Act]"); *Britton v. Farmers Ins. Grp.*, 721 P.2d 303, 323 (Mont. 1986)) ("No interpretation of the Unfair Trade Practices and Consumer Protection Act can be inconsistent with the rules, regulations and decisions of the Federal Trade Commission Act."); Tex. Bus. & Com. Code § 17.46(c)(1) ("[T]he courts to the extent possible will be guided by … the interpretations given by the Federal Trade Commission and federal courts to [the FTC Act]."); La. Stat. § 51:1406 ("The provisions of this Chapter shall not apply to: … [a]ny conduct which complies with [the FTC Act].").

[21] *See, e.g.*, *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34–37 (Iowa 2013) (relying heavily on the FTC Act); *Salem Grain Co., Inc. v. Consol. Grain & Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) (stating that the Nebraska Consumer Protection act "is modeled" on the FTC Act); *FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1111–12 (D. Kan. 2011) (interpreting the Minnesota Uniform Deceptive Trade Practices Act, which is materially identical to the Nebraska Uniform Act, in parallel with the FTC Act).

[22] Although the state laws at issue generally cover both deceptive and "unfair" conduct, each State—with one exception—couches its count solely in terms of deception. *See* ¶¶ 310–342; *see also* Tex. Bus. & Com. Code 17.46; Mont. Code 30-14-103; Iowa Code 714.16; La. R.S. § 51:1403; Neb. Rev. Stat. §§ 59-1602, 87-302(a). The exception is Louisiana (¶¶ 325–327), which appears to also bring a standalone "unfairness" charge against Defendants. To the extent Louisiana alleges more than deception, we address it in the companion motion.

those sentences were written. It can because the Complaint relies on these documents and so incorporates them. *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996). It must because "in analyzing whether a claim is deceptive," what matters is "the entire document" and "the juxtaposition of various phrases in [it]." *Matter of Cliffdale Associates, Inc.*, 103 F.T.C. 110, 1984 WL 565319, at *37 (Mar. 23, 2984).[23] If courts ignored this context at the motion-to-dismiss stage, then "complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements." *Lovelace*, 78 F.3d at 1018 n.1. Courts routinely find that certain statements, when put in broader context, are "not deceptive" "as a matter of law" and so dismiss complaints alleging otherwise. *Gonzalez v. Kay*, 577 F.3d 600, 606 (5th Cir. 2009); *see also Bott v. Vistaprint USA Inc.*, 392 F. App'x 327 (5th Cir. 2010) (affirming dismissal because certain "webpages were not deceptive as a matter of law," as revealed by "the webpages themselves").

Ignoring essential context is only one fatal defect. The Complaint also conflicts with federal securities-law standards about what is deceptive. And it fails because BlackRock's public disclosures contain all the information that was supposedly "deceptively" omitted—the "evidence" the States identify in the Complaint all comes from BlackRock's own public statements to investors.

**A. BlackRock's statements about "investment strategy" were not deceptive**

The primary offering document for each of the four funds is its prospectus. Each prospectus leads off with the fund's investment objective—for example, "to track the investment results of a

---

[23] *See also*, *e.g.*, *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 480 (Tex. 1995) (a statement should be "put in context" to determine whether it was "false"); *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 33 (Iowa 2013) ("in the consumer protection context, courts typically evaluate the overall or 'net impression' created by the representation" (citing several FTC cases)).

broad-based index composed of U.S. equities."[24] The prospectus then has sections on the fund's investment strategy, fees, and material risks.[25] Plaintiffs do not allege, as a typical securities-fraud claimant might, that BlackRock included any deceptive statement in any prospectus. There is no allegation that a BlackRock fund failed to adhere to its stated investment objective, or that any prospectus's comprehensive discussion of investment strategy contained a false statement.

Plaintiffs' lead theory instead concerns two sentences that appear on informational webpages associated with each fund. ¶¶ 193–207. The webpage for each fund states, among many other details, that the fund "does not seek to follow a sustainable, impact or ESG investment strategy"; and that environmental sustainability "metrics do not change the fund's investment objective or constrain the fund's investable universe, and there is no indication that a sustainable, impact or ESG investment strategy will be adopted by the fund." ¶ 193. In Plaintiffs' view, these statements are misleading because, although BlackRock undisputedly did not use ESG criteria to select the funds' holdings, a "reasonable consumer would understand that an 'investment strategy' includes things like engagements and proxy voting." ¶ 196.

These claims fail as a matter of law for three reasons. First, no reasonable consumer who saw BlackRock's statement, which clearly related to the funds' holdings, would think BlackRock was talking about its votes or engagements. Second, Plaintiffs' contrary assertion would conflict with federal securities regulations specifying what it means for a fund to be "ESG," regulations that state consumer-protection laws should not be interpreted to undermine. And third, because BlackRock comprehensively discloses its approach to investment stewardship—including that it may consider environmental risks to a company as one of many in furtherance of its clients' long-

---

[24] *2024 IWV iShares Russell 3000 ETF Prospectus*, *supra* note 4, at S-1.
[25] *E.g.*, *id.* at S-1–S-6.

term financial interests—and there is no daylight between those disclosures and BlackRock's voting and engagement activity, any investor who did think BlackRock was talking about its votes or engagements was not misled.

1. ***The two sentences concern BlackRock's investment-selection criteria and nothing else.***

Plaintiffs complain about two sentences on four largely identical webpages, which on their faces conclusively rebut Plaintiffs' allegations. Consider the webpage for the iShares Russell 2000 ETF (ticker: IWM).[26] ¶ 193. The page states that IWM's "investment objective" is "to track the investment results of an index composed of small-capitalization U.S. equities." It states that IWM provides "access to 2000 small-cap domestic stocks in a single fund" and is "use[d] to diversify a U.S. stock allocation and seek long term growth in your portfolio." It then lists information about the fund's price and performance. And following that are a series of panels with more details about the fund's holdings that may be of interest to potential investors: basic information, like the number of companies in the fund; financial information, like those companies' average price-to-earnings ratio; the fund's "sustainability characteristics," *i.e.*, various metrics concerning those companies' fossil-fuel usage (which is "provided for transparency and for information purposes only"); and information about any sensitive industries, like nuclear weapons, that the fund is invested in.[27] In the middle of these panels, in the "sustainability" section, come the two sentences at the heart of the Complaint.

Contrary to how the Complaint presents them, they are not two separate thoughts, but rather consecutive halves of a single point. Here is the whole paragraph, in context:

---

[26] Ex. A, *iShares Russell 2000 ETF*, *supra* note 1.

[27] Plaintiffs also cite a "facts sheet" for one of the four ETFs, which contains much of the same information in a different order. But they do not quote any specific language on that sheet that they allege to be misleading. *See* ¶ 193 n.137.

# Sustainability Characteristics

Sustainability Characteristics provide investors with specific non-traditional metrics. Alongside other metrics and information, these enable investors to evaluate funds on certain environmental, social and governance characteristics. Sustainability Characteristics do not provide an indication of current or future performance nor do they represent the potential risk and reward profile of a fund. They are provided for transparency and for information purposes only. Sustainability Characteristics should not be considered solely or in isolation, but instead are one type of information that investors may wish to consider when assessing a fund. **Learn more**

**This fund does not seek to follow a sustainable, impact or ESG investment strategy.** The metrics do not change the fund's investment objective or constrain the fund's investable universe, and there is no indication that a sustainable, impact or ESG investment strategy will be adopted by the fund. For more information regarding the fund's investment strategy, please see the fund's prospectus.

Review the MSCI methodologies behind Sustainability Characteristics using the links **below.**

| | | | |
|---|---|---|---|
| MSCI ESG Fund Rating (AAA-CCC) ⓘ as of Jan 20, 2025 | BBB | MSCI ESG % Coverage ⓘ as of Jan 20, 2025 | 86.56% |
| MSCI ESG Quality Score (0-10) ⓘ as of Jan 20, 2025 | 5.4 | MSCI ESG Quality Score – Peer Percentile ⓘ as of Jan 20, 2025 | 11.82% |
| Fund Lipper Global Classification as of Jan 20, 2025 | Equity US Sm&Mid Cap | Funds in Peer Group ⓘ as of Jan 20, 2025 | 1,438 |
| MSCI Weighted Average Carbon Intensity (Tons CO2E/$M SALES) ⓘ as of Jan 20, 2025 | 119.37 | MSCI Weighted Average Carbon Intensity % Coverage ⓘ as of Jan 20, 2025 | 87.64% |
| MSCI Implied Temperature Rise (0-3.0+ °C) ⓘ as of Jan 20, 2025 | > 2.5° - 3.0° C | MSCI Implied Temperature Rise % Coverage ⓘ as of Jan 20, 2025 | 83.41% |

There is only one plausible way to interpret this paragraph. The bolded topic sentence disclaims using an "ESG investment strategy." The next sentence then explains precisely what BlackRock's disclaimer means: it means that ESG metrics do not change the fund's "investable universe" or "investment objective" (a phrase defined earlier on the webpage in reference to what types of companies the fund holds).[28] Having explained BlackRock's definition of "ESG strategy," the sentence concludes by confirming that BlackRock's rejection of this strategy is not expected to change. So BlackRock is saying, loud and clear, that the fund does not pick stocks based on environmental considerations. It is thus obvious what the disclaimer means and why it is there: It emphasizes that the sustainability metrics BlackRock discloses do not influence investment decisions.

The instruction (omitted in the Complaint) immediately following the two sentences further

---

[28] One of the four pages uses the term "investment approach" earlier on, rather than "investment objective." *See* Ex. C, *iShares Total U.S. Stock Market Index Fund*, *supra* note 1.

defeats the suggestion of ambiguity: "For more information regarding the fund's investment strategy, please see the fund's prospectus." When a document points to another in this way, it incorporates the second document, which must thus be considered in the analysis of whether the former is misleading. *See Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 396 (Tex. App. – Dallas 2012, no pet.) (finding no deception because any "lack of clarity" in one set of writings was dispelled when the writings "pointed beyond themselves" and "referred the reader" to clarifying information); *Tolbert ex rel. Tolbert v. Nat'l Union Fire Ins. Co.*, 657 F.3d 262, 269–70 (5th Cir. 2011) (finding that an ambiguity did not "rise to the level of a misrepresentation" when it "reference[d]" an unambiguous and controlling insurance policy).

BlackRock's prospectuses pointed to by the four webpages—which are also linked on those webpages—confirm yet again what "investment strategy" means. Each prospectus (again using IWM as an exemplar) includes a more detailed discussion of the fund's "investment strategy." This discussion is couched exclusively in terms of the fund's composition.[29] And throughout, the prospectus uses the term "investment strategy" to refer only to the fund's holdings (*e.g.*: "Because [BlackRock] uses a representative sampling indexing strategy, the Fund will not fully replicate its Underlying Index … [and] is subject to the risk that [its] investment strategy … may not produce the intended results.").[30] No person, after reading this document, could credibly think that BlackRock was making any claim about its voting or engagement policies. And the Complaint does not allege that any BlackRock fund failed to follow the investment objectives or strategies described in the fund websites or prospectuses.

Because "investment strategy" in the webpage cited by Plaintiffs does not include engagement

---

[29] *See 2024 iShares Russell 2000 ETF Prospectus*, *supra* note 3, at S-2–S-3, BlackRock, https://bit.ly/3XOdAL2 (cited in ¶ 193).
[30] *Id.* at 6.

or proxy voting, and because BlackRock invested the funds' assets as described, BlackRock's statements regarding its investment strategy are true. That, of course, means they are not actionable. *See*, *e.g.*, *Pate v. Fun Town RV San Angelo, LP,* 2024 WL 3995413, at *5 (Tex. App.—Austin Aug. 30, 2024, no pet.) (under Texas law, plaintiffs must "produce evidence of [] statements or representations that were false"); *Hobbs v. Wells Fargo Bank, N.A.*, 2024 WL 5212969, at *6 (D. Mont. Dec. 23, 2024) (under Montana consumer law, statement must be "untrue when made" to be actionable); *Metcalfe & Sons Investments, Inc. v. Multiquip, Inc.*, 2011 WL 4527432, at *5 (M.D. La. 2011) ("true" statement not actionable under Louisiana Unfair Trade Practices Act).

It is no answer that Plaintiffs identify a handful of examples from *other* contexts where people have referred to voting and engagement as types of an "investment strategy." ¶ 196. Because "investment strategy" more naturally refers to a fund's composition,[31] Plaintiffs' soundbites show only that, in different contexts, the phrase can have multiple meanings. Yet a business does not commit fraud every time it uses a phrase that can have multiple meanings: "ambiguous" is not the same as "misleading." *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1098–1099 (9th Cir. 2023). When any "ambiguity can be resolved by reference to" the company's other representations, then a phrase is not misleading. *Id.* at 1099 (finding so on a motion to dismiss); *Boswell v. Bimbo Bakeries USA, Inc.*, 570 F. Supp. 3d 89, 96–97 (S.D.N.Y. 2021) (same). Naturally, none of Plaintiffs' examples includes the context that illuminates what "investment strategy" means *here*. They

---

[31] For example, when young parents invest in Louisiana's College Savings Plan, the Louisiana government's Office of Student Financial Assistance informs them that the "investment strategy" of a certain Vanguard fund is to "employ[] an indexing investment approach," with no mention of any environmental strategy. *Investment Selection Form*, Louisiana Office of Student Financial Assistance, https://www.startsaving.la.gov/Common/Docs/Investment_Selection.pdf (Feb. 26, 2024). Although Louisiana, per the Complaint, apparently believes that Vanguard relies on ESG considerations, it presumably does not think it is misleading its own citizens about the funds it is asking them to invest in.

reveal nothing about how BlackRock uses the term in its fund disclosures. Moreover, lest any investor be left unclear, BlackRock has publicly disclosed how it defines "sustainable, impact, or ESG investment strategy"; it means a strategy in which ESG considerations are used "as a *primary* means for *selecting* investment."[32] This is plainly not the investment strategy of any of the four funds at issue.

The suggestion that BlackRock, in the two sentences on its webpages, made any claim about its voting and engagement, should be rejected as a matter of law.

**2. *Plaintiffs' theory of deception is at odds with federal securities enforcement.*** BlackRock's practice of describing a fund's strategy based on how the fund selects its stocks is consistent with the plain-language resources the SEC has provided to the investing public. For example, the SEC explains that the "principal strategy" section of a prospectus "indicate[s] the approach the fund's adviser takes in deciding which securities to buy and sell."[33]

By contrast, if BlackRock labeled any of the four funds with the phrase "ESG" simply due to its investment stewardship activities, it would raise serious regulatory concerns. Under the SEC's recent amendments to its "Names Rule," BlackRock could not call a fund an "ESG" fund unless 80% of the fund's investment decisions were based on ESG considerations. *See* Investment Company Names, 88 Fed. Reg. 70436, 70437–70440 (Oct. 11, 2023). In justifying this rule, the SEC reasoned that "ESG terms in fund names communicate to investors that the fund will invest in issuers that have particular characteristics." *Id.* at 70450. *Zero* percent of the companies in the four

---

[32] *Sustainable and Transition Investing*, BlackRock, https://www.blackrock.com/sg/en/invest-ment-strategies/sustainable-transition-investing (last visited Mar. 15, 2024) (emphasis added).

[33] *How to Read a Mutual Fund Prospectus*, Securities and Exchange Commission, https://www.in-vestor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulle-tins/how-read-2 (June 13, 2016) (last visited Mar. 16, 2025).

funds here were chosen for their ESG characteristics.[34] Since using "ESG" branding for these funds would, in the SEC's view, communicate otherwise, BlackRock was prudent not to do so.

In fact, the SEC, concerned that investment advisors have been overstating their ESG bona fides, has recently prosecuted firms for making statements like those Plaintiffs demand of BlackRock here. In November 2024, the SEC charged an investment advisor with fraud because it counted certain passive funds when tallying up the "ESG integrated" assets under its management.[35] The SEC alleged this was fraudulent because—although the funds did sometimes incorporate ESG criteria into their votes—the "passive ETFs" nonetheless "*did not follow an ESG strategy.*"[36] If BlackRock had, as Plaintiffs insist, advertised its similar funds as "following an ESG investment strategy" merely because it may consider ESG factors when conducting its stewardship activity, it might have risked similar scrutiny.

State consumer-protection laws—many of which explicitly track federal law (and all of which, as described more below, do not even apply to securities transactions)—do not put BlackRock between the Scylla and Charybdis of federal and state enforcement. *See generally Mall Real Est., L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 200 (Iowa 2012) ("[O]rdinar[ily] … a court construes statutes to avoid preemption."). But even setting aside the prospect of an explicit federalism problem, the SEC's expert conclusions about what is fraudulent in the securities context bolster what common sense and context make clear: describing a broad index fund containing hundreds or thousands of public companies (ranging from tech companies to banks to electric vehicle manufacturers to coal companies) as "not adopting an ESG strategy" is not misleading.

---

[34] While the SEC requires BlackRock to disclose its stock-picking strategy in the prospectus, it leaves the proxy-voting policy for a supplement. See SEC Form N-1A at 16–17, 28, 40–41.

[35] See Order Instituting Administrative and Cease-and-Desist Proceedings, *In re Invesco Advisers, Inc.*, IAA Release No. 6770, ¶ 10 (Nov. 8, 2024).

[36] *Id.* ¶¶ 16, 18 (emphasis added).

**3.** ***BlackRock's voting and engagement activities were thoroughly disclosed.*** Even if "invest-ment strategy" could be read in that context to include BlackRock's voting and engagement activi-ties, BlackRock's numerous clear, transparent and accurate statements about those practices could not have misled any consumer.

As detailed above, BlackRock's public statements disclosing its stewardship strategy are ex-plicit and direct. In over a dozen public-facing documents cited in the Complaint, it explains that, in BlackRock's professional judgment, it has determined that environmental concerns are one of many risk factors it must consider when conducting its stewardship activities to maximize its cli-ents' financial returns. BlackRock's conclusion aligns it with the companies it invests in. *See* Mo-tion to Dismiss Antitrust Claims, Dkt. 64, at 5–6 (noting that the Wyoming Attorney General has explained that coal companies face "excess capacity" "as investment in renewable electricity in-creases"). Specifically, BlackRock "look[s] to companies to disclose how they plan to deliver long-term financial returns through the low-carbon transition … focus[ing its] conversations where the transition is most likely to materially impact a company's long-term financial performance."[37] Fully consistent with those disclosures, BlackRock engages with companies about climate risk and, on occasion, casts votes in favor of shareholder environmental proposals when it believes doing so is consistent with its clients' long-term financial interests. *See supra* at 7–8.

BlackRock publicly discloses all this activity down to the individual vote. As noted, BlackRock must disclose annually how the shares it beneficially owns were voted. See SEC Form N-PX. This SEC filing—which is published on the SEC's website—must include, for every vote, the company name; a description of the proposal; whether the proposal was made by management or sharehold-ers; and whether the fund's shares were voted (including if the fund's shares were voted differently

---

[37] *BlackRock Investment Stewardship: Climate Focus Universe*, BlackRock (2023), *supra* note 8.

from how company management recommended voting). *Id.* Each vote must be categorized using specific, listed topics, including whether a vote implicated any "[e]nvironment or climate" issues. *Id*. at 15. These records reveal that BlackRock acted exactly as it described: it considered environmental issues in a fraction of the proposals before it and voted to support those proposals a minority of the time. *See supra* at 6–8. It cannot be misleading to act in a manner consistent with one's disclosures.

And after all, how have Plaintiffs uncovered this supposed fraud? Not, as you might expect in a deception case, from subpoenaed records or a whistleblower. The reason Plaintiffs know anything about BlackRock's stewardship strategy, including its views on climate risk, is that BlackRock has announced them on its webpages and in SEC filings among other places. *See*, *e.g.*, ¶ 198 ("Blackrock[] … admits" to considering environmental factors); ¶ 199 ("Blackrock[] … admits"); ¶ 205 ("BlackRock's own publicly available voting records confirm …"). The very materials Plaintiffs reference show that in fact, nobody was deceived. *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 400 (S.D.N.Y. 2010) (dismissing complaint because the plaintiff had "concede[d] the existence of statements that disclose the information that" were the basis for plaintiff's claims).

BlackRock's former participation in certain climate organizations (which itself was fully disclosed in multiple places) does not change this calculus. BlackRock used to be a member of the Net Zero Asset Managers Initiative and Climate Action 100+, a fact that was public (and thus could not be the basis of a misstatement). And moreover, the Complaint draws no plausible connection between BlackRock's affiliation with these organizations and its interactions with portfolio companies, let alone the companies in the four funds. *See* ¶¶ 197–207. Rather, the public terms on which BlackRock participated in those organizations are fully consistent with BlackRock's

representations. The NZAM statement admits that reducing carbon emissions is an "ambition" subordinate to an asset manager's "legal duties to clients," [38] which in the United States include the fiduciary duty to "vote client securities in the best interest of clients." 17 C.F.R. § 275.206(4)-6(a). And BlackRock's statements made in connection with its participation in that organization confirm that "BlackRock's role in the transition is as a fiduciary to [its] clients."[39] The CA100+ document is even more explicit: it reveals that BlackRock refused to make any commitment about its "proxy voting and engagement" in light of its "fiduciary and contractual duties."[40] In any case, it is implausible that every fund administered by the numerous other asset managers who joined the same climate organizations is an "ESG" fund devoted to the "net-zero agenda."

Indeed, Plaintiffs allege no facts linking BlackRock's votes or engagements to its memberships in the climate organizations. Plaintiffs, who have access to every vote BlackRock has cast in the last decade, have identified a grand total of *five* over hundreds of thousands cast the last five years that supposedly were not motivated by financial reasons, but allegedly to advance the "net zero agenda." ¶ 205. As BlackRock clearly disclosed that its investment view is that climate issues can be financially material, BlackRock's five votes can be the basis of a deception claim only if BlackRock *did not believe* they were in the best financial interests of its clients. Plaintiffs have not made that allegation. And to the extent Plaintiffs simply disagree with BlackRock's fiduciary judgments, nothing in the state laws Plaintiffs invoke here allows them to displace Blackrock's professional judgment with their own.

Finally, even if Plaintiffs were able to present allegations that BlackRock did not believe such

---

[38] The Net Zero Asset Managers Initiative Commitment, Net Zero Asset Managers, https://bit.ly/3ZgqVMU (cited in ¶ 197).
[39] *2030 Net Zero Statement*, *supra* note 7.
[40] Letter from BlackRock to Climate Action 100+ Steering Committee, https://bit.ly/4hU3MqN (cited in ¶ 202).

votes were in clients' financial interest, five votes out of the hundreds of thousands BlackRock has cast are not sufficient to adduce a "net zero agenda." Indeed, one of the four funds does not actually own any of the five companies that the Complaint highlights[41]; a second of the funds owns just one (accounting for 0.15% of the fund's holdings).[42]

### B. BlackRock's other statements were not deceptive

The back half of the deception allegations lists a shotgun spray of other statements from BlackRock's prospectus supplements and website to object to the particulars of how BlackRock describes its voting and engagement philosophy. ¶¶ 208–223. Plaintiffs snip these statements out of broader, more nuanced discussions of BlackRock's stewardship strategy.

### 1. *The statements in BlackRock's Statements of Additional Information are not actionable.*

In an appendix to the Statement of Additional Information for the four funds, BlackRock makes the following statement when describing the funds' investment stewardship activity: "We seek to understand, from company disclosures and engagement, the strategies companies have in place to **manage material risks to, and opportunities for, their long-term business model** associated with a range of climate-related scenarios, including a scenario in which global warming is limited to well below 2°C, considering global ambitions to achieve a limit of 1.5°C. As one of many shareholders, and typically a minority one, **BlackRock does not tell companies what to do**." ¶ 208 (bolding added by Complaint).

Plaintiffs claim that this statement is misleading, "because by joining CA100+ and NZAM, BlackRock pledged to force companies to disclose targets for net zero emissions for environmental and political reasons." ¶ 209. But BlackRock never made that pledge. As detailed above and

---

[41] *iShares Russell 2000 ETF*, *supra* note 1 [Go to the "Holdings" panel and type each of the five companies cited in ¶ 205 into the search bar.].

[42] *iShares Core S&P Mid-Cap ETF*, *supra* note 1 [Go to the "Holdings" panel and type each of the five companies cited in ¶ 205 into the search bar.].

documented in the materials cited by the Complaint, BlackRock refused to change how it voted when it joined the organizations. Nor *could* BlackRock have pledged to "require" anything: it had, so far as the Complaint reveals, at most around a 15% stake in any company, and no board seat or other position through which to exercise control. ¶ 20. Plaintiffs insinuate that BlackRock has claimed climate risk is *always* material for companies, but that is not true. In the sentence immediately before the quoted ones, BlackRock explains that "[w]hile companies in various sectors and geographies *may be* affected differently by climate-related risks and opportunities, the low-carbon transition is an investment factor that *can be material* for many companies and economies around the globe."[43] That measured statement is not misleading.

Plaintiffs next object that the "'scenario in which global warming is limited to well below 2°C, considering global ambitions to achieve a limit of 1.5°C' is highly unlikely based on present commitments of countries." ¶ 209. This claim gets Plaintiffs nowhere because BlackRock's statements barely say anything different. BlackRock too presents a "<2°C scenario" as the low end of a "range of climate-related scenarios," calling it only an "ambition." ¶ 208. In no way does BlackRock imply that this ambition is the most likely outcome. Though Plaintiffs would go a hair further and say that the scenario is "*highly* unlikely," this quibble over degree cannot support a deception claim. *See Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 678–80 (5th Cir. 1986) ("A prediction, or statement about the future, is essentially an expression of opinion" and thus "not actionable.").

Finally, Plaintiffs object to the statement that as a minority shareholder, "BlackRock does not tell companies what to do." ¶ 208. Again, Plaintiffs do not allege this statement is false on its face: nowhere do they allege that BlackRock holds controlling interests in any of the companies in

---

[43] *Statement of Additional Information*, *supra* note 5, at A-9.

question. To the extent Plaintiffs' objection is that BlackRock tries to encourage disclosure through voting and engagement, there is no deception because BlackRock repeatedly discloses these interactions in the surrounding sentences. (*E.g.*: "[W]e encourage companies to produce climate and other sustainability-related disclosures sufficiently in advance of their annual meeting"; "[W]e encourage companies to publicly disclose, consistent with their business model and sector, how they intend to deliver long-term financial performance through the transition to a low-carbon economy"; "We will express any concerns through our voting."[44]) If the objection is that BlackRock somehow influences companies in ways other than votes and engagements, the Complaint includes no allegations that even attempt to substantiate it.

Plaintiffs next discuss BlackRock's statement, in a footnote on page 202 of an old version of an appendix to the Statement of Additional Information, that: "The global aspiration to achieve a net-zero global economy by 2050 **is reflective of aggregated efforts; governments representing over 90% of GDP have committed to move to net-zero over the coming decades**. In determining how to vote on behalf of clients who have authorized us to do so, we look to companies only to address issues within their control and **do not anticipate that they will address matters that are the domain of public policy**." ¶ 210 (bolding added by Complaint). Plaintiffs say the first bolded statement is misleading because the relevant commitments (like the Paris Agreement) are "nonbinding" and unlikely to be followed. ¶ 211. But BlackRock has never said that any commitment was binding; in fact, it described the global commitments as no more than an "aspiration." Plaintiffs then claim the second bolded statement is misleading because it omits that BlackRock once "voted in favor of a shareholder proposal for Chevron Corporation to report on climate lobbying." ¶ 212. Set aside that during that same 2020 election at Chevron, BlackRock voted down

---

[44] *Statement of Additional Information*, *supra* note 5, at A-9–A-10.

six other ESG shareholder proposals.[45] A proposal asking a company to disclose its own lobbying is not inconsistent with declining to assess companies on the basis of matters outside "their control," such as public policy. And in any case, BlackRock openly discloses that it votes on shareholder proposals related to lobbying.[46]

Finding liability based on these meager statements would not only misapply state law, but also, as with the "ESG Strategy" allegations, run headlong into federal securities law. As noted, the National Securities Market Improvement Act prohibits states from requiring covered investment companies to include specific statements in their offering documents like a Statement of Additional Information. *See supra* at 8–9. Although NSMIA has an exception for fraud, quibbles over the exact probability of different climate scenarios, or how binding the Paris Agreement is, are not the stuff of a misrepresentation claim. The real apparent objective of this lawsuit is to compel BlackRock to print one set of opinions about the role that climate risk should play in its stewardship activities, as opposed to another. But requiring such disclosures is exactly what States may not do. Telling BlackRock what to say when selling funds is (so far as the First Amendment allows) the SEC's domain. The SEC has indeed adopted fine-grained rules for what a prospectus and the other parts of a fund's registration statement must and must not contain. *See* SEC Form N-1A, Item 9 (listing which "investment strategies" and "principal risks" a prospectus must disclose, and what material the prospectus must omit); General Instructions § C.1(c) (warning investment advisors not to include too much information). The States have no leeway to install themselves as a second content regulator of BlackRock's securities disclosures.

---

[45] *Proxy Voting Search*, BlackRock, https://vdsdashboard.issgovernance.com/vdsDashboard/?c=MTAyMjg%3D (cited in ¶ 212) [Search "Chevron."].

[46] *See Statement of Additional Information*, *supra* note 5, at 6.

**2. *The remaining statements on BlackRock's website are not actionable.***

First, Plaintiffs challenge BlackRock's assertion in its "2030 Net Zero Statement" that its "role in the transition [to net-zero carbon emissions] is as a fiduciary to our clients … to help them navigate investment risks and opportunities, **not to engineer a specific decarbonization outcome in the real economy**." ¶ 214 (bolding added by Complaint). Plaintiffs point to an NZAM document to say this statement is misleading, contending that BlackRock elsewhere "committed to 'an ambition to reach net zero emissions by 2050.'" ¶ 215. But as described above, that document does not state that BlackRock made such a commitment. In fact, NZAM's terms expressly disclaimed that any member was taking on a commitment to vote or engage in a particular way (hence the term "aspiration"). Moreover, BlackRock has consistently, including in its 2030 Net Zero Statement, explained that it could not, and was not making such a commitment, including because "[t]he money we manage is not our own—it belongs to our clients, many of whom make their own asset allocation and portfolio construction decisions."[47] BlackRock has "committed" only to aim to maximize its clients' returns and to manage their assets in the way they want.

Finally, Plaintiffs challenge statements that BlackRock made in a letter to state Attorneys General and on the website where it is posted. The website repeats the "decarbonization outcome" statement we have just addressed and adds two other claims Plaintiffs seize on: that BlackRock's "engagement and voting around climate risk does not require that companies meet specific emissions standards"; and that BlackRock does not "dictate to companies what specific emission targets they should meet or what type of political lobbying they should pursue." ¶ 218. But by the Complaint's own telling, these statements are true: BlackRock has not, in fact, dictated that a company adopt a specific emissions target or lobbying program. The best Plaintiffs can come up with are

---

[47] *2030 Net Zero Statement*, *supra* note 7.

times when BlackRock asked companies "to *set* … targets for greenhouse gas reductions." ¶ 219 (emphasis added). But the Complaint does not allege that BlackRock told those companies *what* targets to set.

### C. BlackRock's statements were not material

Yet another hurdle Plaintiffs fail to clear is materiality. *See*, *e.g.*, *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex. 1980) (only "material" misrepresentations are actionable); *Moeller v. Samsung Elecs. Am., Inc.*, 623 F. Supp. 3d 978, 985 (S.D. Iowa 2022) (the Iowa Consumer Fraud Act requires "that the prohibited practice related to a material fact or facts"). In the investment context, "[i]nformation is material only if its disclosure would alter the 'total mix' of facts available to the investor and if there is a substantial likelihood that a reasonable shareholder would consider it important to the investment decision." *D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 208 (5th Cir. 2010) (citation omitted).

Plaintiffs' only allegation of materiality is a conclusory half-sentence related to the "ESG strategy" statement: "[C]onsumers … invested their savings into non-ESG funds because they do *not* wish to support ESG causes, do *not* believe that promoting climate causes enhances shareholder value, or do *not* believe that investment decisions should be driven by social policy or ideology." ¶ 224. Even if that is the case, Plaintiffs have alleged no facts that suggest that the particular statements that they mischaracterize or misleadingly quote altered the "total mix" of information available. But, as explained in detail above, the total mix is also far broader than just those statements. Take Plaintiffs' cherry-picked statements on BlackRock's website: they are surrounded by statements that not only provide critical context but direct investors to the numerous public sources that detail BlackRock's approach to voting on climate issues. *See supra* at 14–16. Thus the isolated statements did not plausibly alter the "mix of facts" available to any investor.

Plaintiffs do not even purport to allege that any of the other statements was material, and they

would be hard pressed to do so. One category of statements they focus on concerns those made in a letter to State attorneys general—for example, that BlackRock does not require companies to meet specific emissions standards. ¶ 218. But these statements were not marketing statements at all. They do not relate to any particular investment offering, nor were they plausibly written to sell anything. Plaintiffs do not allege that any potential investors would have even seen them, rather than rely on the extensive disclosures that specifically describe each fund's holdings and voting activity.

Other statements named in the Complaint come from the Statement of Additional Information—for example, BlackRock's statement that it does "not anticipate that [companies] will address matters that are the domain of public policy." ¶ 213. Here too the total mix of information defeats any hint of materiality, because the information that Plaintiffs say is necessary to make these statements nondeceptive—for instance, that BlackRock votes on proposals relating to lobbying initiatives—is disclosed in multiple places, including in the Statement of Additional Information.

Finally, Plaintiffs point to statements that turn on subjective differences of degree or future predictions, such as BlackRock's statement that "governments representing over 90% of GDP have committed to move to net-zero over the coming decades," and that reaching net-zero is an "aspiration" of these countries. ¶ 210. These statements could not plausibly be material because, for instance, it defies reason to think that someone's decision whether to invest in a passive index fund would turn on whether the publicly available Paris Agreement is better characterized in a footnote as "ambitious" rather than "highly unlikely." ¶ 209. So too for whether a "commitment" is the same thing as a "pledge." ¶ 211.

All of this puts into relief the rather peculiar consumer the Complaint posits: someone so

adamantly opposed to environmental proposals that he would decide where he invests his life sav-ings because of how a fund casts a fraction of a percent of its votes, yet who nonetheless confines his research on this question to two sentences on a website that do not directly address the issue. It is not plausible that there are investors for whom BlackRock's climate votes are so important that they would drive investment decisions but who would not take the small amount of extra time to consult the numerous publicly available BlackRock materials on the topic (as identified in the Complaint). Perhaps that is why no actual person is alleged to have complained that these sentences or anything else misled them.

The materiality element exposes the flaw in Plaintiffs' strategy of excerpting a hodgepodge of scattered sentences and footnotes from hundreds of pages of documents. None of those statements was misleading standing alone, but regardless, no investor would look at, and the court cannot consider, those statements standing alone. The totality of the information clearly describes how BlackRock approaches environmental disclosure and risk, and the snipped sentences do not mate-rially alter the mix of information.

## II. None of the State Laws Applies to the Marketing of Securities

A separate case-ending problem is that the States are seeking to use *consumer-protection* laws to police the sale of *securities*. Just as the federal government splits these domains between two agencies (the FTC and SEC), so too do most States—including the five suing here. None of the consumer laws they invoke extends to securities-fraud claims.

The laws in three States say so explicitly. The **Louisiana** Unfair Trade Practices Act exempts from its coverage "actions or transactions subject to … the commissioner of financial institutions." La. R. S. § 51:1406. Under Louisiana law, "the commissioner of financial institutions … has the authority to regulate securities transactions." *Smith v. Cooper/T. Smith Corp.*, 846 F.2d 325, 328 (5th Cir. 1988). LUTPA thus "specifically exempts securities transactions." *Id.* at 328–29; *see also*

*Feiber v. Cassidy*, 723 So.2d 1101, 1106–107 (La. App. 1 Cir. 1998) ("LUTPA does not apply to securities transactions.").

The **Montana** Consumer Protection Act exempts from its coverage "actions or transactions permitted under laws administered by … the state auditor." Mont. Code § 30-14-105(1). In Montana, the auditor is also the "securities commissioner" and enforces Montana's laws against securities fraud. *See id.* §§ 30-10-107, -301, -305. So MCPA does not apply. *Cf. Cardan v. New York Life Ins. Co.*, 2016 WL 5921065, at *3 (D. Mont. 2016) (explaining that because insurers are also regulated by the Montana auditor, "it is well-settled that … [MCPA] 'may not be applied with respect to insurance company practices'" (quoting *Britton v. Farmers Ins. Group*, 721 P.2d 303, 323–324 (Mont. 1986))).

The same is true of the **Nebraska** laws. The Consumer Protection Act "shall not apply to actions or transactions otherwise permitted, prohibited, or regulated under laws administered by … any … regulatory body or officer acting under any statutory authority of this state." Neb. Rev. Stat. § 59-1617. In Nebraska, the Director of Banking and Finance enforces a separate body of securities laws. *See id.* § 8-1101, -1102, -1116. So the NCPA claim does not cover securities transactions. *Cf. Little v. Gillette*, 354 N.W.2d 147, 152 (1984) (holding that NCPA could not be enforced against a bank because "[t]he Bank is regulated by the Nebraska Department of Banking and Finance"). Likewise, the Nebraska Uniform Deceptive Trade Practices Act excludes "[c]onduct in compliance with … a statute administered by[] a federal, state, or local government agency." Neb. Rev. Stat. § 87-304. This language means that "the purchase or sale of [] securities … [is] excluded from coverage under the UDTPA." *Klein v. TD Ameritrade Holding Corp.*, 2015 WL 13215666, at *12 (D. Neb. Oct. 23, 2015), *report and recommendation adopted in part on alternative grounds*, 172 F. Supp. 3d 1055 (D. Neb. 2016). Moreover, NUDPTA outlaws only deception in

the sale of "goods" or "services," *see* Neb. Rev. Stat. § 87-302, ¶ 342—and Nebraska law makes

clear that an investment fund is neither of those.[48]

Finally, although the **Texas** and **Iowa** high courts have yet to confront this issue, each likely

excludes securities transactions. Texas and Iowa peg their consumer-protection laws to the FTC

Act, which "has been interpreted to preclude coverage of securities claims." *Stephenson v. Paine*

*Webber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1101 (5th Cir. 1988); *see supra* notes 20–21. In

other States, this analogy to the FTC Act has been dispositive. *See*, *e.g.*, *Russell v. Dean Witter*

*Reynolds, Inc.*, 510 A.2d 972, 977 (Conn. 1986) (explaining that it "must construe CUTPA as not

purporting to cover transactions for the purchase and sale of securities" considering "guidance

from the FTC," despite no explicit exception for securities).

So while BlackRock can easily show that it did not say anything misleading in marketing its

funds, there is no basis under any of these laws for the Court to even reach the issue.

### III. Louisiana Failed to Allege "Egregious" Conduct

Louisiana misses another basic element of its consumer-protection law. "[T]he range of pro-

hibited practices under LUTPA is extremely narrow." *Quality Env't Processes, Inc. v. I.P. Petro-*

*leum Co.*, 144 So.3d 1011, 1025 (La. 2014). The law prohibits only conduct that "is immoral,

unethical, oppressive, unscrupulous, or substantially injurious."—"[o]nly egregious actions" qual-

ify. *Id.* A typical application of LUTPA occurred when a producer of steel pipes rented an ad-

vanced manufacturing device, ripped out the device's proprietary circuit board, copied it, and re-

turned the device damaged and full of "reproduced and replacement parts." *Tubos de Acero de*

---

[48] *See* Nebraska Prompt Payment Act, Neb. Rev. Stat. § 81-2402 ("Goods shall mean any goods, supplies, materials, equipment, or other personal property but shall not mean any real property; and … Services shall mean any contractual services, including, but not limited to, architectural, engineering, medical, financial consulting, or other professional services, any construction ser- vices, and any other personal services but shall not mean any services performed as an officer or employee of any agency.")

*Mexico, S.A. v. Am. Int'l Inv. Corp.*, 292 F.3d 471 (5th Cir. 2002). Or when a car dealer held a customer's "vehicle hostage in an attempt to coerce a sale from her." *McFadden v. Import One, Inc.*, 56 So.3d 1212, 1221 (La. App. 3 Cir. 2011). The common thread behind successful LUTPA cases is egregious conduct, a bad "motivation," and a specific "purpose[] of harming the competition." *Balthazar v. Hensley R. Lee Contracting, Inc.*, 214 So.3d 1032, 1041 (La. App. 4 Cir. 2017).

Whatever else can be extracted from the Complaint, it does not allege *that*. There are no allegations that BlackRock had an ill intent or a purpose to harm its competition—which is another reason why the Louisiana claim must fail.

## **CONCLUSION**

For these reasons, Counts XV–XXI should be dismissed for failure to state a claim. A complaint may be dismissed with prejudice when further amendment would be futile. *See Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014). Nothing Plaintiffs could add in amendment would turn BlackRock's nondeceptive public statements into deceptive ones or make securities nonexempt from state consumer-protection laws. All of Plaintiffs' consumer-protection claims, therefore, should be dismissed with prejudice.

Dated: March 14, 2025                     Respectfully submitted,

                                          */s/ Gregg Costa*

                                          Gregg Costa
                                            Texas Bar No. 24028160
                                            GCosta@gibsondunn.com
                                          Prerak Shah
                                            Texas Bar No. 24075053
                                            PShah@gibsondunn.com
                                          GIBSON, DUNN & CRUTCHER LLP
                                          811 Main St., Suite 3000
                                          Houston, TX 77002
                                          Telephone: (346) 718-6600

33

Rachel Brass (*pro hac vice*)
  RBrass@gibsondunn.com
  California Bar No. 219301
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: (415) 393-8306

Thomas Mueller (*pro hac vice*)
  DC Bar No. 434459
  Thomas.mueller@wilmerhale.com
Jennifer Milici (*pro hac vice*)
  DC Bar No. 987096
  Jennifer.milici@wilmerhale.com
Perry Lange (*pro hac vice*)
  DC Bar No. 494339
  Perry.lange@wilmerhale.com
John O'Toole (*pro hac vice*)
  DC Bar No. 241862
  John.O'toole@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

David Gringer (*pro hac vice*)
  New York Bar No. 4879029
  David.gringer@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Lauren Ige (*pro hac vice*)
  California Bar No. 343644
  Lauren.ige@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Telephone: (213) 443-5395
Facsimile: (213) 443-5400

*Attorneys for Defendant BlackRock, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically and served on all counsel of

record by the Court's CM/ECF system on March 17, 2025.


Dated: March 17, 2025          */s/ Gregg Costa*_____

                              Gregg Costa