# EXHIBIT 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

## Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2024**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from             to

Commission File No. 001-07511

# STATE STREET CORPORATION
(Exact name of Registrant as Specified in its Charter)

| MA | 04-2456637 |
|---|---|
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |
| **One Congress Street** | |
| **Boston, MA** | **02114** |
| (Address of principal executive offices) | (Zip Code) |

**(617) 786-3000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $1 par value per share | STT | New York Stock Exchange |
| Depositary Shares, each representing a 1/4,000th ownership interest in a share of Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, Series G, without par value per share | STT.PRG | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
|---|---|---|---|---|---|---|---|
| | | | | | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ Yes ☒ No

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the per share price ($74.00) at which the common equity was last sold as of the last business day of the registrant's most recently completed second fiscal quarter (June 28, 2024) was approximately $22.09 billion.

The number of shares of the registrant's common stock outstanding as of January 31, 2025 was 288,469,096.

Portions of the following documents are incorporated by reference into Parts of this Report on Form 10-K, to the extent noted in such Parts, as indicated below:

(1) The registrant's definitive Proxy Statement for the 2025 Annual Meeting of Shareholders to be filed pursuant to Regulation 14A on or before April 30, 2025 (Part III).

extent of its available resources and consistent with the support agreement; and (4) the Parent Company would be expected to commence Chapter 11 proceedings under the U.S. Bankruptcy Code. No person or entity, other than a party to the support agreement, should rely on any of our affiliates being or remaining a Beneficiary Entity or receiving capital or liquidity support pursuant to the support agreement, including in evaluating any of our entities from a creditor's perspective or determining whether to enter into a contractual relationship with any of our entities.

State Street Bank is also required to submit to the FDIC a plan for resolution in the event of its failure, referred to as an IDI plan. We submitted our last IDI plan by December 1, 2023. Following the notice of proposed rulemaking from August 2023, the FDIC amended and restated its rule on IDI plans in June 2024. The final rule became effective on October 1, 2024 and requires IDI subsidiaries of U.S. G-SIBs, such as State Street Bank, to file their IDI plans on a biennial basis, with the first IDI plan submission under the final rule due by July 1, 2026.

Additionally, we are required to submit a recovery plan periodically to the Federal Reserve. This plan includes strategies designed to respond to stress factors at an early stage and stabilize and maintain operational continuity and market confidence. Our recovery strategies are intended to be implemented before our resolution plan is triggered. We are also engaged in recovery planning requirements in certain international jurisdictions where we operate.

**Orderly Liquidation Authority**

Under the Dodd-Frank Act, certain financial companies, including bank holding companies such as the Parent Company, and certain covered subsidiaries, can be subjected to the orderly liquidation authority. For the FDIC to be appointed as our receiver, two-thirds of the FDIC Board and two-thirds of the Federal Reserve Board must recommend appointment, and the U.S. Treasury Secretary, in consultation with the U.S. President, must then make certain extraordinary financial distress and systemic risk determinations. Absent such actions, we, as a bank holding company, would remain subject to the U.S. Bankruptcy Code.

If the FDIC were appointed as the receiver of the Parent Company pursuant to the orderly liquidation authority, the FDIC would have considerable powers to resolve the Parent Company, including: (1) the power to remove officers and directors responsible for the Parent Company's failure and to appoint new directors and officers; (2) the power to assign assets and liabilities to a third party or bridge financial company without the need for creditor consent or prior court review; (3) the ability to differentiate among similarly situated creditors, subject to a minimum recovery right to receive at least what they would have received in bankruptcy liquidation; and (4) broad powers to administer the claims process to determine distributions from the assets of the receivership to creditors not transferred to a third party or bridge financial institution.

Although the orderly liquidation authority went into effect in 2010, rulemaking is proceeding incrementally, with some regulations finalized and others planned but not yet proposed. The FDIC released its proposed SPOE strategy for resolution of a SIFI under the orderly liquidation authority in December 2013 and a comprehensive report on the orderly resolution of a U.S. G-SIB using SPOE as the presumptive strategy in April 2024. The FDIC's releases outline how it would likely use its powers under the orderly liquidation authority to resolve a SIFI by placing its top-tier U.S. holding company in receivership and keeping its operating subsidiaries open and out of insolvency proceedings by transferring the operating subsidiaries to a new bridge holding company, recapitalizing the operating subsidiaries and imposing losses on the shareholders and creditors of the holding company in receivership according to their statutory order of priority.

**Derivatives**

Title VII of the Dodd-Frank Act imposed a comprehensive regulatory structure on the OTC derivatives market, including requirements for clearing, exchange trading, capital, margin, reporting and record-keeping. Title VII also requires certain persons to register as a major swap participant, a swap dealer or a securities-based swap dealer. The CFTC, the SEC, and other U.S. regulators have largely completed the implementation of key provisions of Title VII.

State Street Bank has registered with the CFTC as a swap dealer. As a registered swap dealer, State Street Bank is subject to significant regulatory obligations regarding its swap activity and the supervision, examination and enforcement powers of the CFTC and other regulators. The CFTC has granted State Street Bank a limited-purpose swap dealer designation. Under this limited-purpose designation, interest rate swap activity conducted by State Street Bank's Global Treasury group is not subject to certain of the swap regulatory requirements otherwise applicable to swaps entered into by a registered swap dealer, subject to a number of conditions. For all other swap transactions, our swap activities remain subject to all applicable swap dealer regulations.

**Subsidiaries**

The Federal Reserve is the primary federal banking agency responsible for regulating us and our subsidiaries, including State Street Bank, with respect

to both our U.S. and non-U.S. operations. Our banking subsidiaries are subject to supervision and examination by various regulatory authorities and have regulatory requirements that may differ from the Parent Company.

*State Street Bank*

State Street Bank is a member of the Federal Reserve System, its deposits are insured by the FDIC and it is subject to applicable federal and state banking laws and to supervision and examination by the Federal Reserve, the Massachusetts Commissioner of Banks, as well as the FDIC and the regulatory authorities of those states and countries in which State Street Bank operates a branch.

As with the Parent Company, State Street Bank is subject to the Basel III framework in the United States and the market risk capital rule jointly issued by U.S. Agencies. As required by the Dodd-Frank Act, State Street Bank, as an advanced approaches banking organization, is subject to a "capital floor," also referred to as the Collins Amendment, in the assessment of its regulatory capital adequacy described above in this "Supervision and Regulation" section.

Under the Basel III rule, State Street Bank's regulatory capital calculations, including any additions or deductions from capital for regulatory purposes, are consistent with the calculations of the Parent Company. For additional information about the 2023 Basel III Endgame Proposal, refer to "Basel III Rule" above in this "Supervision and Regulation" section.

Similar to our Parent Company, State Street Bank is subject to the Tier 1 leverage ratio and the SLR. However, as State Street Bank is an IDI subsidiary of a U.S. G-SIB, it is required to maintain a minimum Tier 1 leverage ratio of 5% and a minimum SLR of 6% to be considered well capitalized.

For the purposes of calculating the SLR, State Street Bank is similarly subject to the U.S. Agencies' final rule that excludes qualifying central bank deposits from a custodial banking organization's total leverage exposure. For the quarter ended December 31, 2024, State Street Bank excluded $87.5 billion of average balances held on deposit at central banks from the denominator used in the calculation of our SLR based on this custodial banking exclusion.

Pursuant to the U.S. Agencies' LCR and NSFR final rules, as a subsidiary of a U.S. G-SIB, State Street Bank is similarly required to maintain an LCR and NSFR, respectively, equal to or greater than 100%.

We and our subsidiaries that are not subsidiaries of State Street Bank are affiliates of State Street Bank under federal banking laws, which impose restrictions on various types of transactions, including loans, extensions of credit, investments or asset purchases by or from State Street Bank, on the one hand, to us and those of our subsidiaries, on the other. Transactions of this kind between State Street Bank and its affiliates generally are limited with respect to each affiliate to 10% of State Street Bank's capital and surplus, as defined by the aforementioned banking laws, are limited in the aggregate for all affiliates to 20% of State Street Bank's capital and surplus, and in some cases are also subject to strict collateral requirements. Derivatives, securities borrowing and securities lending transactions between State Street Bank and its affiliates became subject to these restrictions pursuant to the Dodd-Frank Act. The Dodd-Frank Act also expanded the scope of transactions required to be collateralized. In addition, the Volcker Rule generally prohibits similar transactions between the Parent Company or any of its affiliates and covered funds for which we or any of our affiliates serve as the investment manager, investment adviser, commodity trading advisor or sponsor and other covered funds organized and offered pursuant to specific exemptions in the Volcker Rule regulations.

Federal law also requires that certain transactions by a bank with affiliates be on terms and under circumstances, including credit standards, that are substantially the same, or at least as favorable to the bank, as those prevailing at the time for comparable transactions involving other non-affiliated companies. Alternatively, in the absence of comparable transactions, the transactions must be on terms and under circumstances, including credit standards, that in good faith would be offered to, or would apply to, non-affiliated companies.

State Street Bank is also prohibited from engaging in certain tie-in arrangements in connection with any extension of credit or lease or sale of property or furnishing of services. Federal law provides for a depositor preference on amounts realized from the liquidation or other resolution of any depository institution insured by the FDIC.

*Other Subsidiaries*

Our other subsidiary trust companies are subject to supervision and examination by the OCC, the Federal Reserve or by the appropriate state banking regulatory authorities of the states in which they are organized and operate. Our continental European banking subsidiary, State Street Bank International GmbH is a significant entity in accordance with European banking regulations and accordingly is supervised directly by the European Central Bank. State Street Bank International GmbH operates in several countries including Germany, Luxembourg, Italy, France and Switzerland. In the United Kingdom, the branch of State Street Bank is dually regulated by the Prudential Regulatory Authority and the Financial Conduct Authority, in Ireland our depositary and fund administration companies are regulated by the Central Bank of Ireland and in Canada our trust company is regulated by the Office of the

Superintendent of Financial Institutions. Our other subsidiaries internationally engaged in our investment servicing activities are regulated by applicable authorities in the jurisdictions of their activities. Our subsidiaries involved in our investment management and securities and markets businesses are regulated by governments, securities exchanges, self-regulatory organizations, central banks and regulatory bodies in U.S. federal and state and non-U.S. jurisdictions, especially in those jurisdictions in which we maintain an office.

Many aspects of our investment management activities are subject to U.S. federal and state, as well as non-U.S., laws and regulations primarily intended to benefit the investment holder, rather than our shareholders. These laws and regulations generally grant supervisory agencies and bodies broad administrative powers, including the power to limit or restrict us from conducting our investment management activities in the event that we fail to comply with such laws and regulations, and examination authority. Our business related to investment management and trusteeship of collective trust funds and separate accounts offered to employee benefit plans is subject to the Employee Retirement Income Security Act (ERISA), and is regulated by the U.S. Department of Labor (DOL).

The majority of our non-U.S. asset servicing operations are conducted pursuant to the Federal Reserve's Regulation K through State Street Bank's Edge Act subsidiary or through international branches of State Street Bank. An Edge Act corporation is a corporation organized under federal law that conducts foreign business activities. In general, banks may not make investments in their Edge Act corporations (and similar state law corporations) that exceed 20% of their capital and surplus, as defined in the relevant banking regulations, and the investment of any amount in excess of 10% of capital and surplus requires the prior approval of the Federal Reserve.

In addition to our non-U.S. operations conducted pursuant to Regulation K, we also make new investments abroad directly (through us or through our non-banking subsidiaries) pursuant to the Federal Reserve's Regulation Y, or through international bank branch expansion, neither of which is subject to the investment limitations applicable to Edge Act subsidiaries.

Additionally, Massachusetts has its own bank holding company statute, under which we, among other things, may be required to obtain prior approval by the Massachusetts Board of Bank Incorporation for an acquisition of more than 5% of any additional bank's voting shares, or for other forms of bank acquisitions.

**Anti-Money Laundering and Financial Transparency**

Certain of our subsidiaries are subject to the Bank Secrecy Act of 1970, as amended by the USA PATRIOT Act of 2001, and related regulations, which contain AML and financial transparency provisions and which require implementation of an AML compliance program, including processes for verifying client identification and monitoring client transactions and detecting and reporting suspicious activities. AML laws outside the United States contain similar requirements. State Street Corporation and its subsidiaries are also required to comply with sanctions laws and regulations administered and imposed by the U.S. government, including the U.S. Treasury Department's OFAC and the Department of State, as well as comparable sanctions programs imposed by foreign governments and multilateral bodies. We have implemented an enterprise-wide AML and sanctions compliance program, including policies, procedures and internal controls that are designed to promote compliance with applicable AML laws and regulations and sanctions. AML laws and regulations applicable to our operations may be more stringent than similar requirements applicable to our non-regulated competitors or financial institutions principally operating in other jurisdictions.

Compliance with applicable AML and related requirements is a common area of review for financial regulators, and any failure by us to comply with these requirements could result in fines, penalties, lawsuits, regulatory sanctions, difficulties in obtaining governmental approvals, restrictions on our business activities or harm to our reputation. As an example, In June 2024, we entered into a settlement agreement with the U.S. Department of Treasury's OFAC to resolve its investigation into apparent violations of OFAC's Ukraine-/Russia-Related Sanctions Regulations. In connection with the settlement, we paid a civil monetary penalty of $7.45 million and made certain compliance commitments.

**Deposit Insurance**

The Dodd-Frank Act made permanent the general $250,000 deposit insurance limit for insured deposits. The FDIC's Deposit Insurance Fund (DIF) is funded by assessments on FDIC IDIs. The FDIC assesses DIF premiums based on an IDI's average consolidated total assets, less the average tangible equity of the IDI during the assessment period. For larger institutions, such as State Street Bank, assessments are determined based on regulatory ratings and forward-looking financial measures to calculate the assessment rate, which is subject to adjustments by the FDIC, and the assessment base.

The FDIC is required to determine whether and to what extent adjustments to the assessment base are appropriate for "custody banks" that satisfy