## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS,<br>By Attorney General Ken Paxton, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BLACKROCK, INC., *et al.*,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 6:24-cv-00437-JDK |

## BRIEF OF AMICUS CURIAE INVESTMENT COMPANY INSTITUTE
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF AMICUS CURIAE .................................................................... 1

INTRODUCTION ................................................................................................ 2

ARGUMENT ........................................................................................................ 4

I.     The Court Should Dismiss Plaintiffs' Section 7 Claim ..................................... 4

        A.     Plaintiffs' Section 7 Claim Depends on a Novel "Common Ownership" Hypothesis with No Legal Support ................................... 4

        B.     Plaintiffs' Section 7 Claim Is an Unprecedented Overreach ................. 6

        C.     Plaintiffs' Common Ownership Hypothesis is Implausible Given Commercial Realities and Legal Requirements in the Retail Asset Management Industry ................................................................ 11

        D.     Plaintiffs' Common Ownership Hypothesis Would Have Significant Undesirable and Anticompetitive Consequences .............. 15

CONCLUSION .................................................................................................... 19

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................................. 11

*City of Clinton v. Pilgrim's Pride Corp.,*
   632 F.3d 148 (5th Cir. 2010) ................................................................... 12

*FTC v. U.S. Anesthesia Partners* (*Welsh Carson*),
   2024 WL 2137649 (S.D. Tex. May 13, 2024) ...................................... 10, 11

*Illumina, Inc. v. FTC,*
   88 F.4th 1036 (5th Cir. 2023) ..................................................................... 5

*Jones v. Harris Assocs. L.P.,*
   559 U.S. 335 (2010) .................................................................................. 12

*SEC v. Cap. Gains Rsch. Bureau, Inc.,*
   375 U.S. 180 (1963) .................................................................................. 13

**Statutes**

15 U.S.C. § 18 .............................................................................................. 2, 5, 10

15 U.S.C. § 77k .................................................................................................. 18

15 U.S.C. § 77*l*(a)(2) ......................................................................................... 18

15 U.S.C. § 77q .................................................................................................. 18

15 U.S.C. § 78j(b) .............................................................................................. 18

15 U.S.C. § 80a-33(b) ........................................................................................ 18

**Regulations**

17 C.F.R. § 240.10b-5 ........................................................................................ 18

**Other Authorities**

Azar, José & Xavier Vives,
   *Revisiting the Anticompetitive Effects of Common Ownership*
   (European Corp. Governance Inst., Fin. Working Paper No. 827, 2022) ................ 9

Azar, José, et al.,
   *Anticompetitive Effects of Common Ownership*, 73 J. Fin. 1513 (2018) .................. 7

Azar, José, et al.,
*Ultimate Ownership and Bank Competition*, 51 Fin. Mgmt. 227 (2022) ................ 7

Backus, Matthew, et al.,
*Common Ownership in America: 1980–2017*,
13 Am. Econ. J.: Microeconomics 273 (2021) ......................................................... 8, 9

Buckberg, Elaine, et al.,
*Proposal to Remedy Horizontal Shareholding Is Flawed*,
Law360 (July 17, 2017), https://tinyurl.com/4wvxsfex ........................................... 16

Commission Guidance Regarding Proxy Voting Responsibilities of
Investment Advisers, Exchange Act Release Nos. IA-5325, IC-33505
(Sept. 10, 2019) ....................................................................................................... 14

Dennis, Patrick, et al.,
*Common Ownership Does Not Have*
*Anticompetitive Effects in the Airline Industry*, 77 J. Fin. 2765 (2022) .................. 8

Elhauge, Einer
*How Horizontal Shareholding Harms Our Economy—And Why Antitrust*
*Law Can Fix It*, 10 Harv. Bus. L. Rev. 207 (2020) .................................................... 5

Fox, Merritt B. & Menesh S. Patel,
*Common Ownership: Do Managers Really Compete Less?*,
39 Yale J. on Reg. 136 (2022) ................................................................................... 7

Gerardi, Kristopher, et al.,
Abstract, *A Critical Review of the Common*
*Ownership Literature, European Corporate Governance Institute*
(Fed. Rsrv. Bank of Atl. Working Paper No. 2023-17, 2023) .................................... 8

Ginsburg, Douglas H. & Keith Klovers,
*Common Sense About Common Ownership*,
Concurrences Rev. No. 2-2018 (2018) ....................................................................... 7

Gramlich, Jacob & Serafin Grundl,
*Testing for Competitive Effects of Common Ownership*
(Fin. & Econ. Discussion Series Working Paper No. 2017-029, 2017) ..................... 8

Hemphill, C. Scott & Marcel Kahan,
*The Strategies of Anticompetitive Common Ownership*,
129 Yale L. J.1392 (2020) ........................................................................................... 8

ICI Research Perspective,
   Ownership of Mutual Funds and Shareholder Sentiment, 2024
   (Oct. 2024), https://tinyurl.com/38dked76 ........................................................... 2, 16

ICI,
   2024 Investment Company Fact Book (2024),
   https://tinyurl.com/c4a8d44h .................................................................................. 1

Kennedy, Pauline, et al.,
   *The Competitive Effects of Common Ownership: Economic Foundations and
   Empirical Evidence* (2017), *available at* https://tinyurl.com/y46nbvta ................... 8

Koch, Andrew, et al.,
   *Common Ownership and Competition in Product Markets*,
   139 J. Fin. Econ. 109 (2021) ...................................................................................... 8

Lambert, Thomas A.
   *Mere Common Ownership & the Antitrust Laws*,
   61 B.C. L. Rev. 2913 (2020) ................................................................................ 8, 17

Lambert, Thomas A. & Michael E. Sykuta,
   *The Case for Doing Nothing About Institutional Investors'
   Common Ownership of Small Stakes in Competing Firms*,
   13 Va. L. & Bus. Rev. 213 (2019) ............................................................................. 7

Lewellen, Katherine & Michelle Lowry,
   *Does Common Ownership Really Increase Firm Coordination?*,
   141 J. Fin. Econ. 322 (2021) ...................................................................................... 7

Meriani, Mariana
   *The Fascinating Theory of Common Ownership Under the Lens of
   Competition Law Practitioners: Any Needs to Rethink the Antitrust
   Toolbox?*, 2022 Eur. J. Privacy L. & Tech. 237 (2022) ............................................. 8

O'Brien, Daniel P. & Keith Waehrer,
   *The Competitive Effects of Common Ownership:
   We Know Less than We Think*, 81 Antitrust L. J. 729 (2017) ............................... 8, 15

Phillips, Noah Joshua, Comm'r, FTC,
   Taking Stock: Assessing Common Ownership, Remarks Before the
   Concurrences Review and NYU Stern at the Global Antitrust Economics
   Conference (June 1, 2018), https://tinyurl.com/ycykch5y ......................................... 6

iv

Press Release,
   ICI, Active and Index Combined Long-Term Mutual Funds
   and Exchange-Traded Funds (ETFs): January 2025
   (Feb. 28, 2025), https://tinyurl.com/yh84f2dz........................................................... 2

Rock, Edward B. & Daniel L. Rubenfeld,
   *Does Common Ownership Explain Higher Oligopolistic Profits?*,
   Intersections Between Corporate and Antitrust Law
   (Marco Corradi & Julian Nowag eds., 2023) ........................................................... 7

Rock, Edward B. & Daniel L. Rubinfeld,
   *Antitrust for Institutional Investors*, 82 Antitrust L. J. 221 (2018)....................... 15

United States,
   Note, No. DAF/COMP/WD(2017)86, Hearing on Common Ownership by
   Institutional Investors & Its Impact on Competition Before the Directorate
   for Fin. & Enter. Affairs Competition Comm., Org. for Econ. Co-op. & Dev.
   (Dec. 6, 2017), https://tinyurl.com/prut6awz ................................................. *passim*

The Investment Company Institute ("ICI"), as amicus curiae,[1] respectfully submits this brief in support of the Joint Motion to Dismiss (ECF No. 64) filed by Defendants BlackRock, Inc., State Street Corporation, and The Vanguard Group, Inc. (together, "Defendants").

## INTEREST OF AMICUS CURIAE

ICI is the leading association representing regulated funds (or "funds") globally, including mutual funds, exchange-traded funds ("ETFs"), closed-end funds, and unit investment trusts.  ICI seeks to strengthen the foundation of the asset management industry for the ultimate benefit of the long-term individual investor. ICI's members manage $39.1 trillion invested in funds registered under the Investment Company Act of 1940 ("1940 Act"), serving more than 126 million United States investors.  ICI works to protect and advance the interests of fund shareholders through advocacy directed at ensuring a sound legal and regulatory framework.  ICI's extensive research enhances its advocacy, and its regular research reports include, for example, an annual empirical review of trends and activities in the fund industry. *See* ICI, 2024 Investment Company Fact Book (2024), https://tinyurl.com/c4a8d44h. ICI also submits amicus curiae briefs in cases significant to funds and investors generally to ensure that courts appreciate the impact of their decisions.

In this action, Plaintiffs seek to impose antitrust liability on Defendants based on their clients' collective ownership of minority equity interests in a number of

---

[1] ICI has no parent corporation, and no publicly held company owns 10% or more of its stock. Counsel for BlackRock, State Street, and Vanguard consented to the motion for leave to file this amicus brief, as did counsel for Texas on behalf of all Plaintiffs.

domestic coal producers.  Plaintiffs contend, *inter alia*, that Defendants' "common ownership" of minority stakes in competing coal companies violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and seek sweeping injunctive relief, including "divestiture" and an order "restrain[ing] Defendants from using the stock they have acquired in the Coal Companies by the voting or granting of proxies otherwise to restrain output and limit competition in the relevant markets … or from engaging in any other practices with the same purpose and effect."  ECF No. 50 at 107.

Plaintiffs' "common ownership" hypothesis is misguided as a matter of fact and a matter of law.  Moreover, the relief Plaintiffs request would cause significant harm to funds and their tens of millions of investors.  ICI urges the Court to reject Plaintiffs' claim under Section 7 of the Clayton Act.

## INTRODUCTION

This litigation threatens to disrupt an industry that offers tangible benefits to millions of Americans and to our national economy.  Approximately 74 million American households across all income levels (a majority of all households) invest in regulated funds like those offered by Defendants.[2]  Assets in regulated funds include $16.1 trillion in actively managed mutual funds and ETFs, and $16.7 trillion in indexed mutual funds and ETFs, as of December 2024.[3]  These funds—essentially separate entities that pool money from shareholders and invest in portfolios of

---

[2] *See* ICI Research Perspective, Ownership of Mutual Funds and Shareholder Sentiment, 2024 (Oct. 2024), https://tinyurl.com/38dked76.

[3] *See* Press Release, ICI, Active and Index Combined Long-Term Mutual Funds and Exchange-Traded Funds (ETFs): January 2025 (Feb. 28, 2025), https://tinyurl.com/yh84f2dz.

securities (*e.g.*, stocks and bonds) as directed by their managers—democratize investing by providing their shareholders with professionally managed, diversified portfolios at low cost. And they supply much-needed capital to American businesses, facilitating economic growth, job creation, and creative innovation.

Plaintiffs seek to undermine these significant achievements. Plaintiffs posit that Defendants' common ownership of equity interests across competing firms in a single industry violates the antitrust laws. *See* ECF No. 50 ¶ 3 ("Considered alone and in isolation, each Defendant's acquisition and use of shareholdings in the domestic coal producers has violated Section 7 of the Clayton Act."). But this novel academic hypothesis conflicts with the plain text of the Clayton Act and has not been adopted by courts. And Plaintiffs' conclusory accusations are based on a series of factually inaccurate assumptions, *e.g.*, that Defendants' "ownership" of substantial minority shares in the coal companies gives Defendants coercive power over those companies' management. *See, e.g., id.* ¶¶ 3, 94. Funds—not their managers—own equity interests in companies for the benefit of the funds' investors and do not invest in companies with either the purpose or effect of controlling them. And fund managers are constrained by their contracts with and fiduciary duties of care and loyalty owed to each of their clients, whose investment objectives, strategies, and policies vary.

While the competitive concerns Plaintiffs assert are speculative at best, the harms that would result from their requested relief are very real and would be immediate. Ordering divestment of portfolio investments or prohibiting funds from

voting their shares and (through their managers) engaging with portfolio companies simply because they have holdings in multiple companies in the same industry would raise the costs and risks of saving and investing and constrain investors' ability to select from different investment vehicles and strategies to suit their financial needs. The requested relief would also restrict portfolio companies' ability to obtain capital.

This Court should reject Plaintiffs' invitation to expand Section 7 liability.

## ARGUMENT

## I.    The Court Should Dismiss Plaintiffs' Section 7 Claim.

Plaintiffs' effort to persuade the Court that Defendants' shareholdings across multiple competing firms violate Section 7 of the Clayton Act is legally unfounded and factually implausible.    Moreover, the relief Plaintiffs seek would have devastating consequences that not only are inconsistent with the Clayton Act but also are themselves anticompetitive.

### A.    Plaintiffs' Section 7 Claim Depends on a Novel "Common Ownership" Hypothesis with No Legal Support.

"[C]ommon ownership" is a term used to describe "simultaneous ownership of stock in competing companies by a single investor, where none of the stock holdings is large enough to give the owner control over any of those companies." United States, Note, No. DAF/COMP/WD(2017)86, Hearing on Common Ownership by Institutional Investors & Its Impact on Competition Before the Directorate for Fin. & Enter. Affairs Competition Comm., Org. for Econ. Co-op. & Dev. 2 (Dec. 6, 2017), https://tinyurl.com/prut6awz ("Hearing Note").    Antitrust enforcement under Section 7 of the Clayton Act, which prohibits "acquisition[s]" that "may … substantially …

lessen competition," 15 U.S.C. § 18, has traditionally focused on horizontal mergers and other instances of cross-ownership in which a company holds an interest in a competitor. *See, e.g., Illumina, Inc. v. FTC*, 88 F.4th 1036, 1061–62 (5th Cir. 2023). Although a few academics and legal commentators have proposed expanding Section 7 to enjoin institutional investors' ownership of minority stakes in multiple competing firms, that unconventional theory has never been endorsed by any court. *See, e.g.*, Einer Elhauge, *How Horizontal Shareholding Harms Our Economy—And Why Antitrust Law Can Fix It*, 10 Harv. Bus. L. Rev. 207, 256–58 (2020).

Plaintiffs nonetheless ask this Court to hold Defendants liable under Section 7 based on their allegation that Defendants have acquired minority "stockholdings in every significant publicly held coal producer in the United States." ECF No. 50 ¶ 3. Plaintiffs go a step further than most proponents of the common ownership hypothesis, asking the Court to assess the competitive impact of Defendants' shareholdings by aggregating the holdings of multiple institutional investors across multiple companies, and not just the holdings of a single institutional investor. *See id.* ¶¶ 97–110 & tbls. 2–3. Plaintiffs claim that Defendants "used th[eir] collective power—by proxy voting and otherwise—to pressure the major coal producers to reduce production of coal" to "align with net-zero [carbon emissions] goals." *Id.* ¶¶ 4, 5. And Plaintiffs argue that this supposed "output reduction scheme" violates Section 7 of the Clayton Act and warrants sweeping injunctive relief, including forced divestiture and an order preventing Defendants from voting proxies or taking similar actions to influence the coal companies in which they invest. *Id.* ¶ 6; *see id.* at 107.

Plaintiffs' view of Section 7 liability is unprecedented and unjustified.  And the relief that Plaintiffs request would have crippling consequences that extend far beyond this litigation.

## B.    Plaintiffs' Section 7 Claim Is an Unprecedented Overreach.

In arguing that Defendants' common ownership of minority stakes in competing coal producers violates the Clayton Act, Plaintiffs ask the Court to endorse an extreme and unfounded expansion of Section 7 that conflicts with the statute's text and with recent case law.

No American regulator has ever asserted common ownership as the basis for antitrust liability in enforcement proceedings.  *See* Hearing Note at 2 (stating that as of 2017, "U.S. antitrust agencies have not litigated a case involving common ownership by a single institutional investor"); *see also* Noah Joshua Phillips, Comm'r, FTC, Taking Stock: Assessing Common Ownership, Remarks Before the Concurrences Review and NYU Stern at the Global Antitrust Economics Conference 6, 14 (June 1, 2018), https://tinyurl.com/ycykch5y (statement by then-FTC Commissioner that "there has not been a clear showing of how [common ownership] causes anticompetitive harm").

Federal regulators' reluctance to bring an antitrust action based on common ownership is well warranted.  Judges have criticized the common ownership hypothesis as lacking empirical support and deriving from dubious assumptions about how institutional investors and corporate managers operate.  For example, Judge Douglas Ginsburg has described the "economic evidence that common ownership causes anticompetitive harm" as "rather thin," observing that "[f]or every

study finding anticompetitive effects, there are three refuting it." Douglas H. Ginsburg & Keith Klovers, *Common Sense About Common Ownership*, Concurrences Rev. No. 2-2018, at 6 (2018) ("Common Sense"). Judge Ginsburg also recognized that "[a]ll the [common-ownership] proponents' further analysis flows from the twin assumptions that the investment manager owns the shares it holds and that it acts monolithically," *id.* at 5, but both assumptions are mistaken, as explained *infra*. Many commentators have echoed these criticisms.[4] The two studies that many proponents invoke as support for the common ownership hypothesis—of the markets for airline tickets and retail bank accounts[5]—have been hotly contested by other scholars who have noted theoretical concerns, methodological issues, data problems,

---

[4] *See, e.g.*, Edward B. Rock & Daniel L. Rubenfeld, *Does Common Ownership Explain Higher Oligopolistic Profits?*, Intersections Between Corporate and Antitrust Law 252 (Marco Corradi & Julian Nowag eds., 2023) (evidence of common ownership as a "driving force" of increasing oligopoly profits is "unconvincing"); Merritt B. Fox & Menesh S. Patel, *Common Ownership: Do Managers Really Compete Less?*, 39 Yale J. on Reg. 136, 186 (2022) (common ownership likely does not have a "meaningful effect" on managerial incentives in a way that would affect competition); Katherine Lewellen & Michelle Lowry, *Does Common Ownership Really Increase Firm Coordination?*, 141 J. Fin. Econ. 322 (2021) (finding "little robust evidence" that common ownership affects firm profitability or investment); Thomas A. Lambert & Michael E. Sykuta, *The Case for Doing Nothing About Institutional Investors' Common Ownership of Small Stakes in Competing Firms*, 13 Va. L. & Bus. Rev. 213, 243 (2019) (empirical studies in support of common ownership are "deficient").

[5] *See* José Azar et al., *Anticompetitive Effects of Common Ownership*, 73 J. Fin. 1513 (2018) ("Airline Paper"); José Azar et al., *Ultimate Ownership and Bank Competition*, 51 Fin. Mgmt. 227 (2022).

and weak statistical results.[6]  A recent survey of the literature concludes that there

is little evidence that common ownership lowers competition.[7]

---

[6] *See, e.g.*, Daniel P. O'Brien & Keith Waehrer, *The Competitive Effects of Common Ownership: We Know Less than We Think*, 81 Antitrust L. J. 729, 733–34, 768 (2017) (highlighting the flaws in prior work purporting to establish that common ownership raises prices); Pauline Kennedy et al., *The Competitive Effects of Common Ownership: Economic Foundations and Empirical Evidence* (2017), *available at* https://tinyurl.com/y46nbvta  (in a fully articulated model of the oligopolistic structure of the airline industry, finding no evidence that common ownership raises airline prices); C. Scott Hemphill & Marcel Kahan, *The Strategies of Anticompetitive Common Ownership*, 129 Yale L. J.1392, 1440–41 (2020) (finding no strong theoretical basis for believing that common institutional investors employ potential mechanisms for reducing competition); Thomas A. Lambert, *Mere Common Ownership & the Antitrust Laws*, 61 B.C. L. Rev. 2913, 2920 (2020) (concluding that "[t]here are strong reasons to question" key assumptions made by proponents of common ownership theory); Matthew Backus et al., *Common Ownership in America: 1980–2017*, 13 Am. Econ. J.: Microeconomics 273, 274 (2021) (observing that "there are myriad empirical gaps in the argument [regarding common ownership theory] left to fill"); Patrick Dennis et al., *Common Ownership Does Not Have Anticompetitive Effects in the Airline Industry*, 77 J. Fin. 2765 (2022) (showing that the Airline Paper's purported findings are driven not by any economics of common ownership but instead by a mechanical link in how the Airline Paper calculated measures of common ownership); Mariana Meriani, *The Fascinating Theory of Common Ownership Under the Lens of Competition Law Practitioners: Any Needs to Rethink the Antitrust Toolbox?*, 2022 Eur. J. Privacy L. & Tech. 237 (2022) (highlighting the difficulty in identifying a causal relationship between common minority shareholders and "claimed" anticompetitive effects); Andrew Koch et al., *Common Ownership and Competition in Product Markets*, 139 J. Fin. Econ. 109 (2021) (showing that contrary to the common ownership hypothesis, measures of common ownership are neither robustly positively related to industry profits or output prices nor robustly negatively related with measures of non-price competition); Kristopher Gerardi et al., Abstract, *A Critical Review of the Common Ownership Literature, European Corporate Governance Institute* (Fed. Rsrv. Bank of Atl. Working Paper No. 2023-17, 2023) ("Across the newest papers employing the most credible identification techniques, there is relatively little evidence that common ownership causes lower competition"); Jacob Gramlich & Serafin Grundl, *Testing for Competitive Effects of Common Ownership* 11–12 (Fin. & Econ. Discussion Series Working Paper No. 2017-029, 2017) (showing that supposed competitive effects of common ownership in the banking industry are "muted").

[7] *See* Gerardi Working Paper No. 2023-17, *supra* note 6.

Moreover, in a startling reversal, one of the authors of the Airline Paper recently coauthored a paper that uses a new statistical technique and finds that although common ownership by asset managers is associated with higher airline ticket prices on some routes, it is also associated with lower ticket prices on other routes.  Significantly, this new paper also finds that common ownership specifically by the largest institutional asset managers, BlackRock, Vanguard, and State Street, is associated with *lower* overall airline ticket prices: "[T]he overall effect of the Big Three on prices is negative."[8]  In other words, the evidence does not support Plaintiffs' allegations that competition is depressed when multiple fund advisers  manage large holdings in a given industry.

Other recent academic studies similarly do not support Plaintiffs' hypothesis.[9] One study examines price markups across a range of industries, finding that a significant rise in prices since 1980 is inconsistent with measured increases in common ownership by asset managers because it predates the rise of the large asset management firms.[10]

The common ownership hypothesis is not just conceptually flawed; it is also legally problematic.  Its premise that an investor's equity ownership can give rise to legal exposure under federal antitrust laws is in serious tension with the text of the Clayton Act.   Section 7, which generally applies to any "acquisition" that may

---

[8] *See* José Azar & Xavier Vives, *Revisiting the Anticompetitive Effects of Common Ownership* 2 (European Corp. Governance Inst., Fin. Working Paper No. 827, 2022).

[9] *See, e.g.,* Backus, 13 Am. Econ. J.: Microeconomics 273, *supra* note 6.

[10] *See id.*

"substantially … lessen competition," contains an express exception for acquisitions made "solely for investment."  15 U.S.C. § 18 ("This section shall not apply to persons purchasing such stock solely for investment … .").  As the United States government has acknowledged, this exception embodies the Clayton Act's "underlying policy of broad support for investment through stock purchases."  Hearing Note at 3–4.  The Clayton Act thus recognizes that the acquisition of minority equity stakes for investment in competing firms is not anticompetitive and does not give rise to Section 7 liability.

Another court in this Circuit recently reached a similar conclusion.  In *Federal Trade Commission v. U.S. Anesthesia Partners* (*Welsh Carson*), 2024 WL 2137649, at *4–6 (S.D. Tex. May 13, 2024), the court flatly rejected the FTC's attempt to hinge antitrust liability on ownership of a minority interest alone.  The FTC had sought to obtain injunctive relief against a private equity firm, Welsh Carson, based on its ownership of a minority interest in another entity, U.S. Anesthesia Partners, Inc. ("USAP"), that had completed a series of acquisitions of anesthesia practices across Texas.  *Id.* at *1–3.  The FTC "argue[d] that Welsh Carson commits ongoing antitrust violations by continuing to hold stock in USAP," which had itself allegedly violated Section 7 via serial acquisitions that substantially lessened competition in Texas's hospital anesthesia market.  *Id.* at *4.  The court disagreed, observing that "[i]t is not clear how owning a minority share in a company that reduces competition satisfies the statute" and that the "FTC ha[d] not cited a case in which a minority, noncontrolling investor—however hands on—is liable … because the company it

10

partially owned" took allegedly "anticompetitive" actions. *Id.* at *4–5. The court therefore rebuffed the FTC's "novel interpretation" of Section 7, concluding that a contrary holding would "expand the FTC's reach further than any court has yet seen fit." *Id.*

So too here. Allowing Plaintiffs to hinge Section 7 liability on Defendants' clients' aggregate ownership of minority interests in coal companies that allegedly reduced output and raised prices would contradict the statute's exception for investment-based acquisitions. *Id.* This is true with respect to Section 7 liability regardless of Plaintiffs' conclusory allegation that Defendants were "hands on" with respect to the coal companies' management via proxy voting. *Id.*; *see, e.g.*, ECF No. 50 ¶ 152.

### C. Plaintiffs' Common Ownership Hypothesis is Implausible Given Commercial Realities and Legal Requirements in the Retail Asset Management Industry.

Plaintiffs' conclusory allegation of "hands on" engagement for anticompetitive purposes is inconsistent with how the retail asset management industry works. These commercial realities render Plaintiffs' allegations implausible and further warrant dismissal of their Section 7 claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007) (holding that plaintiffs failed to plead viable Sherman Act claims when an "obvious alternative explanation" for the conduct at issue rendered allegations of conspiracy implausible); *City of Clinton v. Pilgrim's Pride Corp.*, 632

11

F.3d 148, 153, 157 (5th Cir. 2010) (affirming dismissal for failure to state a claim when there were "equally plausible" explanations for the alleged conduct).

First, and most critically, asset *management* is distinct from asset *ownership*. Plaintiffs unreasonably speculate that Defendants control the competing coal companies because they "own" substantial minority stakes in those companies. *See, e.g.*, ECF No. 50 ¶¶ 4, 20–57 & tbl. 1. But as investment advisers, Defendants do not own the companies; rather, they manage investments beneficially owned by their clients, such as pooled investment vehicles like mutual funds and ETFs, or client-owned separate accounts. The Supreme Court has recognized that "[a] mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and *belonging to the individual investors* holding shares in the fund." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010) (second and third alterations in original) (emphasis added) (internal quotation marks omitted). The assets under management belong to Defendants' clients, including funds.

Relying on the incorrect assumption that Defendants "own" the shares they manage and may vote those shares in their own interest instead of their clients' best interest, Plaintiffs ask this Court to aggregate those holdings at the investment adviser level, creating a second misimpression: that Defendants and their clients uniformly desire reduced competition in the coal industry. *See, e.g.*, ECF No. 50 ¶ 154 ("Defendants have leveraged the stock they acquired in the Coal Companies to engage with management behind closed doors and bring about a policy of reducing coal production … ."). Here, too, Plaintiffs are mistaken. Asset managers act on behalf of

12

numerous, diverse clients, including various funds that are separate legal entities with unique investment objectives and strategies. For instance, the same asset manager may manage an index fund with passive equity exposure to hundreds or even thousands of publicly traded companies (including energy companies), a separate actively managed fund focusing on energy companies that the manager believes have promising long-term financial prospects, and yet another fund with no exposure to energy companies. And of course, most asset managers and their clients invest not only in energy producers, but also many more energy *consumers*, which seriously undermines any assumption that encouraging anticompetitive conduct to decrease output and raise prices in a sector like energy would produce a net aggregate benefit to an asset manager and its clients. Because asset managers serve a diverse array of clients, it cannot be inferred, as Plaintiffs ask the Court to do, that Defendants have used client assets to pursue a coordinated strategy to reduce coal output.

Similarly, in accusing Defendants of maintaining a sweeping "output reduction scheme," ECF No. 50 ¶ 6, Plaintiffs ignore the significant practical and legal constraints on asset managers. Asset managers' actions are limited by their contractual relationships with and fiduciary obligations to their clients, as well as the comprehensive body of laws and regulations governing investors, advisers, funds, and portfolio companies. *See, e.g., SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191 (1963) (recognizing "the delicate fiduciary nature of an investment advisory relationship" that is regulated under the Investment Advisers Act of 1940 (internal

quotation marks omitted)).  Unlike "activist" investors who seek transformational change in the companies in which they invest and may solicit proxies or seek representation on a company's board, mutual funds and ETFs typically invest in companies' equity securities solely for investment exposure to those companies—not to control them.

Asset managers' status as passive investors who only seek investment exposure and not control of the companies in which they invest is completely consistent with seeking to maximize clients' investment returns, including through proxy voting.  Plaintiffs' conclusory allegations of uniform, anticompetitive proxy voting on behalf of all clients ignore that asset managers vote their clients' proxies consistent with contractual mandates and fiduciary obligations that require voting in each client's best interest.  An asset manager and its client first must agree on the services that the former will provide, which may or may not include discretionary proxy voting.  An asset manager with discretion to vote a client's proxies remains bound by fiduciary duties to that client, including both a duty of care and a duty of loyalty, which compel the manager to vote the client's shares to further that *client's* best interest.  *See, e.g.*, Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Exchange Act Release Nos. IA-5325, IC-33505, at 3 (Sept. 10, 2019).

In sum, asset managers manage—not own—the shareholdings of diverse clients and must act in their best interests, including with respect to proxy voting. These "disparate incentives and frictions … complicate the analysis of institutional

14

ownership and its effects on operating companies," rendering implausible Plaintiffs' assumption that Defendants would leverage their clients' minority equity interests to coerce coal companies to reduce output.  Hearing Note at 8.

### D.    Plaintiffs' Common Ownership Hypothesis Would Have Significant Undesirable and Anticompetitive Consequences.

Plaintiffs' view of Section 7 liability is incompatible with the law and with industry practices.  Furthermore, imposing legal liability and granting sweeping equitable relief based on institutional investors' common ownership of minority stakes in competing companies could harm millions of American investors, companies, and capital markets, causing crippling effects beyond this lawsuit.

First, and critically, recognizing common ownership liability would increase the cost of saving and investing.  Holding equity interests across multiple companies within an industry allows asset managers' clients to maintain "diversif[ied] portfolios at low transaction costs."  Daniel P. O'Brien and Keith Waehrer, *The Competitive Effects of Common Ownership: We Know Less than We Think*, 81 Antitrust L. J. 729, 731 (2017).  Restricting investors (either directly or through their managers) from holding stock in competing firms would upend this paradigm to the detriment of both institutional and individual investors.  *See* Edward B. Rock & Daniel L. Rubinfeld, *Antitrust for Institutional Investors*, 82 Antitrust L. J. 221, 264 (2018) ("We have little doubt that [restricting common ownership] will substantially increase the cost of operating index funds—a cost that will undoubtedly be borne by the investors in these funds.").

This potential harm is particularly acute for the more than 126 million Americans—in *more than half of U.S. households*—who rely on mutual funds and ETFs to save for retirement, education, home ownership, or other financial goals.  *See* ICI Research Perspective, Ownership of Mutual Funds and Shareholder Sentiment, 2024 (Oct. 2024), https://tinyurl.com/38dked76.  If asset managers are forced to divest their clients' investments in energy companies (or companies in any other industry), that sell-off would generate transaction costs and tax liability borne by these millions of individuals.  *See* Elaine Buckberg et al., *Proposal to Remedy Horizontal Shareholding Is Flawed*, Law360 (July 17, 2017), https://tinyurl.com/4wvxsfex (explaining how "[c]hanging the mutual fund landscape [by restricting common ownership] would be costly for investors and companies running 401(k) plans, both in the transition and over time").

Additionally, restricting common ownership would cause both funds and client accounts to become less diversified, reducing efficiency and increasing economic risk. Funds manage risk through diversification, including by holding investments in multiple competitors in any given industry, which would be difficult or even impossible for individual investors to achieve on their own in a cost-effective way. Requiring asset managers to divest these horizontal shareholdings would hamstring their ability to mitigate risk by diversifying clients' assets.  *See id.* ("[R]estriction [on common ownership] limits the ability of a fund complex to offer investors diversified industry exposure, either as a way of managing volatility or expressing a view that a particular industry is likely to outperform the market generally.").

16

This result would effectively foreclose broad index funds, which in accordance with their stated investment strategies and policies typically invest in all companies within a given index without regard to the performance of individual companies or their relationships to one another. *See* Thomas A. Lambert, *Mere Common Ownership & the Antitrust Laws*, 61 B.C. L. Rev. 2913, 2960–61 (2020) ("[D]riving institutional investors to refrain from intra-industry diversification would eliminate true index funds" because "[n]early all significant stock indexes include more than one firm from some concentrated industry [like the energy sector], so fund managers could not simply invest in all the firms included in an index.").

Actively managed funds also would suffer. These funds, unlike index funds, may take a bullish view of an individual sector, such as energy, and invest disproportionately in multiple promising sector companies at the same time. If active funds could not diversify their investments within the sector, their risk would increase and their returns could decline (*e.g.*, if they choose the wrong individual company). *See id.* at 2961 (restricting common ownership would mean that "institutional investors could not offer a diverse range of actively managed mutual funds … that bet on an industry as a whole but limit[] fund investors' exposure to company-specific risks [by diversifying] within that industry"). The relief Plaintiffs seek would, ironically, increase costs for millions of retail investors and restrict their ability to work with a single asset manager and choose from diverse investment vehicles and strategies.

In addition to these direct harms, requiring divestiture of or otherwise limiting investments in competing firms would also require asset managers to rewrite their prospectuses and other investor disclosures to reflect these significant new portfolio management constraints.  Asset managers are required to invest fund assets in accordance with the fund's investment objectives, strategies, and policies set forth in its prospectus and other disclosures to investors.  If a fund can no longer invest accordingly, it must either change its investment portfolio, existing policies, and all related disclosures—a disruptive, costly outcome that also may even require the fund to change its name—or risk liability under various provisions of the securities laws, including Sections 11, 12(a)(2), and 17(a) of the 1933 Act,  Section 10(b) of the 1934 Act and Rule 10b-5 thereunder, and Section 34(b) of the 1940 Act.  *See* 15 U.S.C. §§ 77k, 77*l*(a)(2), 77q, 78j(b), 80a-33(b); 17 C.F.R. § 240.10b-5.

Finally, a ruling limiting common ownership by funds would harm not only fund investors, but also operating companies and their existing shareholders.  Requiring asset managers to divest would increase the cost of capital for companies that raise funds by issuing stock.  Companies benefit from the capital that Defendants and other institutional investors provide in new offerings to grow their businesses, create jobs, and innovate.  If "three of the largest institutional investors in the world," ECF No. 50 ¶ 3, are sidelined and precluded from investing their clients' money in certain companies or industries, those companies and industries will suffer.  *See* Hearing Note at 2 (because "[i]nstitutional investors hold trillions of

dollars in assets, … requiring [them] to divest holdings could have a significant effect on capital markets").

## CONCLUSION

For all these reasons, the Court should reject Plaintiffs' novel attempt to hold Defendants liable under Section 7 of the Clayton Act.

Dated: March 24, 2025

Respectfully submitted,

*/s/ Rod J. Rosenstein*
Rod J. Rosenstein (*pro hac vice*)
Jeffrey S. Bucholtz (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
Tel: (202) 737-0500
Fax: (202) 626-3737
rrosenstein@kslaw.com
jbucholtz@kslaw.com

M. Sean Royall (*pro hac vice*)
KING & SPALDING LLP
2601 Olive Street
Suite 2300
Dallas, TX 75201
Tel: (214) 764-4600
Fax: (214) 764-4601
sroyall@kslaw.com

Martha Banner Banks
  (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
Tel: (404) 572-4600
Fax: (404) 572-5100
bbanks@kslaw.com

*Counsel for Amicus Curiae*
*Investment Company Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of March, 2025, I caused a true and correct copy of the foregoing document to be electronically filed via the Court's CM/ECF system, which will provide electronic mail service to all counsel of record.

*/s/ Rod J. Rosenstein*
Rod J. Rosenstein (*pro hac vice*)

*Counsel for Amicus Curiae*
*Investment Company Institute*