IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | No.: 6:24-cv-00437-JDK |
| BLACKROCK, INC., STATE STREET CORPORATION, and THE VANGUARD GROUP, INC., | § § § § § § | |
| Defendants. | § | |

**BRIEF OF *AMICUS CURIAE*
THE SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION
<u>IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

Page

I. INTERESTS OF AMICUS CURIAE ................................................................................. 1

II. BACKGROUND ............................................................................................................... 2

III. ARGUMENT ..................................................................................................................... 5

    A. The Clayton Act Allows Noncontrolling Shareholders To Exercise Their Right To Vote Their Stock And Engage With Issuers. ........................................... 5

    B. Accepting Plaintiffs' Common Ownership Hypothesis Would Have Adverse Impacts on the American Economy and Impair the Competitiveness of U.S. Capital Markets ............................................................... 9

IV. CONCLUSION ............................................................................................................... 13

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Am. Crystal Sugar Co. v. Cuban-American Sugar Co.*,
  259 F.2d 524 (1958) ............................................................................................................. 6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................... 10

*Dunn v. CFTC*,
  519 U.S. 465 (1997) ............................................................................................................. 8

*Food Mktg. Inst. v. Argus Leader Media*,
  588 U.S. 427 (2019) ............................................................................................................. 5

*FTC v. Peabody Energy Corp.*,
  492 F. Supp. 3d 865 (E.D. Mo. 2020) ................................................................................. 6

*Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co., Inc.*,
  476 F.2d 687 (2d Cir. 1973) ............................................................................................ 6, 7

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ............................................................................................................. 5

*United States v. Amax, Inc.*,
  402 F. Supp. 956 (D. Conn. 1975) ...................................................................................... 9

*United States v. E. I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957) ........................................................................................................ 6, 7

*United States v. Philadelphia Nat'l Bank*,
  374 U.S. 321 (1963) ............................................................................................................. 6

*United States v. Tracinda Inv. Corp.*,
  477 F. Supp. 1093 (C.D. Cal. 1979) .................................................................................... 9

**STATUTES**

15 U.S.C. § 18 ....................................................................................................................... passim

**OTHER AUTHORITIES**

51 CONG. REC. 14,466 (1914) (statement of Sen. Norris) ........................................................ 8

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Daniel P. O'Brien and Keith Waehrer, *The Competitive Effects of Common Ownership: We Know Less than We Think,* 81 Antitrust L.J. 729 (2017) ............................................................. 11

Edward B. Rock & Daniel L. Rubinfeld, *Antitrust for Institutional Investors,* 82 Antitrust L.J. 221 (2018) ................................................................................................................................ 11

Federal Reserve Bank of St. Louis, *Introduction to Capital Markets* (last visited Mar. 21, 2025) . 2

Hon. Douglas H. Ginsburg & Keith Klovers, *Common Sense about Common Ownership*, May 2018, Concurrences No. 2-2018, Art. No. 86847 ........................................................................ 9

Hon. Douglas H. Ginsburg, *Why Common Ownership Is Not an Antitrust Problem*, Harv. L. S. Forum on Corp. Governance (Dec. 4, 2018) ............................................................................ 7

Merritt B. Fox & Menesh S. Patel, *Common Ownership: Do Managers Really Compete Less?,* 39 Yale J. Reg. 136 (2022) ................................................................................................ 12, 13

Note to the Organisation for Economic Co-operation and Development (OECD) by the United States, Hearing on Common Ownership by Institutional Investors and Its Impact on Competition, OECD DAF/COMP/WD(2017)86 (Dec. 6, 2017) .............................................. 11

Pauline Kennedy, Daniel P. O'Brien, Minjae Song, & Keith Waehrer, *The Competitive Effects of Common Ownership: Economic Foundations and Empirical Evidence,* (July 2017) ............. 11

Thomas A. Lambert, *Mere Common Ownership and the Antitrust Laws*, 61 B.C. L. Rev. 2913 (Nov. 2020) ............................................................................................................................... 7

William M. Lafferty, Lisa A. Schmidt & Donald J. Wolfe, Jr., *A Brief Introduction to the Fiduciary Duties of Directors Under Delaware Law*, 116 Penn. St. L. Rev. 837 (2012) ....... 13

The Securities Industry and Financial Markets Association ("SIFMA") respectfully submits this brief as *amicus curiae* in support of Defendants' Joint Motion to Dismiss the Amended Complaint (ECF No. 64).

## I.     INTERESTS OF AMICUS CURIAE

With its mission to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency, SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. SIFMA represents the broker dealers, banks and asset managers whose one million employees provide access to the capital markets, raising over $2.5 trillion for businesses and municipalities in the United States, serving clients with over $18.5 trillion in assets and managing more than $67 trillion in assets for individual and institutional clients including mutual funds and retirement plans.[1]

Plaintiffs bring a Clayton Act Section 7 claim under the theory that an investor owning and voting its noncontrolling shares in rival firms can, "alone and in isolation," lessen competition. Am. Compl. ¶ 3. They seek a "divestiture" to restrain Defendants "from using the stock they have acquired" to vote that stock. *Id.* at 107 (Prayer for Relief, ¶ (c)).  But **a finding that an investor "alone and in isolation" could violate Section 7 solely because it owned and voted noncontrolling securities in competing companies would be unprecedented, contrary to the plain language of the statute, and result in massive disruption to capital markets in the**

---

[1] SIFMA's Asset Management Group ("AMG") represents asset management firms which serve millions of individual and institutional investors saving for retirement, education, and emergencies, and other investment goals.  The AMG's members have combined assets under management exceeding $45 trillion and serve tens of millions of individual investors, registered investment companies, endowments, and pension funds.

1

**United States.**[2]

SIFMA has a significant interest in this case given the harmful chilling effects that Plaintiffs' common ownership hypothesis would have on the efficient allocation of capital for businesses in the United States, and the far-ranging impacts that a departure from existing law would have on capital markets and the businesses and investors they serve. SIFMA files this brief to provide its unique perspective on these issues to the Court.

## II.     BACKGROUND

The United States has long had the world's deepest, fairest, and most liquid capital markets, due in large part to a strong regulatory structure that fosters innovation and competition while protecting investors. Plaintiffs' common ownership hypothesis, upon which their Clayton Act Section 7 claim is based, would materially disrupt those markets with potentially profound and adverse impacts on the U.S. and global economies.

Capital markets exist to allocate resources (*i.e.*, capital) to entities that may be able to make good and efficient use of that capital. Firms raise capital in primary capital markets through the issuance of stock (ownership) or bonds (loans).[3] Investors who own stocks and bonds are able to trade them in secondary capital markets, such as the New York Stock Exchange. At a very basic level, when an investor purchases stock, it becomes a fractional owner of the firm with attendant voting rights in the governance of the firm; when an investor purchases debt in the form of a bond, it becomes a lender to the firm. If a firm successfully uses the capital it raises to turn a profit, the

---

[2] This brief addresses Plaintiffs' claim that each Defendant "alone and in isolation" violated Section 7 as asserted in Count 1 of the Amended Complaint. This brief does not address Counts II - XXI or any of the allegations relevant only to whether the Plaintiffs have plausibly stated an antitrust conspiracy claim under Section 1 of the Sherman Act.

[3] *See generally* Federal Reserve Bank of St. Louis, *Introduction to Capital Markets* (last visited Mar. 21, 2025), https://www.econlowdown.org/sifma_cap_mrkt?module_uid=195&p=yes&page_num=17634&section_uid=365.

investor may be rewarded (*e.g.*, interest on debt or appreciation of share value). If the firm is unsuccessful, the investor may lose the value of its investment.

From individual retail investors with 401(k) retirement plans to sophisticated hedge funds, investors routinely diversify their investments to manage the risk that some investments will be successful but others may fail. One common, low-cost way for investors to diversity their investments is to purchase shares in a mutual fund or exchange traded fund ("ETF"). Index funds are a type of mutual fund or ETF that seeks to track the returns of a particular market index, such as the S&P 500. Index and other funds (such as actively managed mutual funds), as well as the portfolios held by both individual and institutional investors (such as pension funds, hedge funds, or private equity firms), can and frequently do include shares in firms that compete with one another.

Plaintiffs here assert that each of the Defendants, "alone and in isolation," violated Section 7 of the Clayton Act because, like untold millions of other investors, they hold securities in competing companies. Am. Compl. ¶ 3. In claiming that such common ownership "substantially lessened competition" in violation of Section 7, Plaintiffs allege only that Defendants voted against or withheld votes for certain directors and made various public statements regarding their respective investment views. *See, e.g.*, *id.* ¶¶ 155-212. Plaintiffs make no allegations that any Defendant mandated in any way that an issuer take any particular action; nor do they allege that any Defendant controlled an issuer's management (or that of any other company), or that any Defendant could, or did, force an issuer to take any steps that could substantially lessen competition. Rather, Plaintiffs identify a number of discrete votes and statements by the Defendants and then make the conclusory assertion that publicly held coal companies decreased

output—purportedly as a result of Defendants' votes and general public statements.[4] But the Complaint makes no allegation that any of the issuers in which Defendants invested took any steps to reduce competition, either individually or in collusion with each other, let alone any allegation that plausibly could show that any shareholder vote or engagement by a noncontrolling shareholder caused the issuers to take such steps.

If, as Plaintiffs assert, noncontrolling investors could violate Section 7 of the Clayton Act by having portfolios that include shares in competing firms, exercising their attendant voting rights, or interacting with management, then investment costs and risks would increase substantially, and the important role investors play in the efficient allocation of capital in the United States would be diminished.

Indeed, capital markets touch nearly every aspect of the U.S. economy. As discussed below, the unprecedented limitations on common ownership that Plaintiffs seek would create uncertainty and risk for institutional and individual investors that hold and vote securities in competing companies, deter direct investment by private equity and venture capital firms in startups and undercapitalized firms, impair the viability and stability of Initial Public Offerings ("IPOs"), increase costs for debt and equity financing, and reduce overall market liquidity.[5]

---

[4] Even this allegation is facially specious as the Complaint itself acknowledges that some publicly held companies *increased* output and some privately held companies (for which Defendants had no alleged involvement) *decreased* output, thereby undermining any plausible inference of causation. *See* Am. Compl. ¶ 228, Table 4.

[5] The impact of Plaintiffs' position on investment risk and costs associated with the mutual fund industry in particular is discussed in more detail in the brief of *amicus curiae* Investment Company Institute ("ICI"). *See* ICI Br. at 16-18. This brief seeks to emphasize that those increased risks and costs would also impact capital markets more broadly in ways that extend far beyond mutual fund investing.

## III. ARGUMENT

### A. The Clayton Act Allows Noncontrolling Shareholders To Exercise Their Right To Vote Their Stock And Engage With Issuers.

Section 7 of the Clayton Act, 15 U.S.C. § 18, provides in pertinent part that, "No person shall acquire … the stock or other share capital … where … the effect of such acquisition … or of the use of such stock by the voting or granting of proxies … may be substantially to lessen competition, or to tend to create a monopoly." In other words, where (1) purchase of stock or (2) use of the shares to vote may "substantially" lessen competition (or create a monopoly), it is unlawful under Section 7.

Section 7, however, includes a critical safeguard that has profound implications for the functioning of U.S. capital markets. By its plain terms, Section 7 "***shall not apply*** to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." 15 U.S.C. § 18 (emphasis added). This mandatory "investment" exemption thus expressly allows common ownership of firms (even if they are competitors) unless the ownership or voting rights are used "to bring about" or, attempt to bring about, "the substantial lessening of competition." *Id.*[6] Where an investor with shares in competing firms does not exercise shareholder voting rights to substantially lessen competition or otherwise bring about a substantial lessening of competition, Section 7 by its plain terms "shall not apply."

When a statute is unambiguous, interpretation both begins and ends with the statutory text. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Here, the Court need go no further than the statute itself to conclude, consistent with all existing precedent, that allegations

---

[6] *See also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310-11 (2020) (noting that use of the term "shall" in a statute generally imposes a mandatory duty).

that an investor with a noncontrolling interest cannot violate Section 7 when it merely votes its noncontrolling shares. The same is true where a noncontrolling investor makes non-binding recommendations to management—which Plaintiffs do not even allege here.[7]

*First*, Section 7 addresses mergers and *de facto* mergers where the mere acquisition of stock may substantially lessen competition. 15 U.S.C. § 18 ("No person shall acquire … stock … where … the effect of such acquisition … may be substantially to lessen competition …."). The cases cited in Plaintiffs' Complaint bear this out. Each case involved an acquisition of securities by one competitor in another competitor (a horizontal acquisition), or by a supplier in a critical customer (a vertical acquisition) to the detriment of free and fair competition.[8] Here, by contrast, there can be no such lessening of competition solely by reason of the Defendants' individual, noncontrolling stock acquisitions because none of the Defendants are alleged to be in the relevant line of commerce or have any managerial control over operations in the relevant line of commerce.

*Second*, Section 7 also addresses "use of … stock by … voting" that may substantially lessen competition. 15 U.S.C. § 18 ("No person shall acquire … stock … where … the use of such stock by the voting or granting of proxies … may be substantially to lessen competition …."). The statute by its plain terms thus allows investors in competing companies to exercise their right to vote unless a plaintiff can demonstrate how an investor "used" its vote to substantially lessen

---

[7] *See* Defs.' Joint Mem. ISO Mot. to Dismiss at 13-14 & 28-29.

[8] *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) (involving a proposed merger between competing banks); *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) (assessing a supplier's acquisition of a customer and the effects on competing suppliers); *Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co., Inc.*, 476 F.2d 687 (2d Cir. 1973) (involving tender offer for operator of retail supermarkets by company whose chairman and CEO was also the largest shareholder in competitor); *Am. Crystal Sugar Co. v. Cuban-American Sugar Co.*, 259 F.2d 524 (1958) (evaluating potential combination of two producers of refined sugar); *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) (assessing joint venture between two largest coal producers in the United States).

competition. Plaintiffs have identified no such votes.[9] Nor could they: an extensive body of case law in various contexts establishes that "voting a non-controlling interest, standing alone, is not the sort of management that transforms the purchase and ownership of the interest into something beyond investment."[10] And none of the cases Plaintiffs cite in their Complaint establish otherwise. Each case involved well-pleaded allegations that the acquisitions had the effect of "substantially lessening competition" by, for example, leading to control over the board or day-to-day management of the acquired company.[11]

*Third*, although the Court need not go beyond the statutory text to conclude that Plaintiffs' theory is inconsistent with the plain text of Section 7 of the Clayton Act, the statute's legislative history confirms this reading of the investment exemption: "Nobody wants to prohibit a savings bank or individual or an institution investing their funds in the stock of corporations, whether they

---

[9] Instead, Plaintiffs identify a handful of public statements regarding ordinary corporate engagement as well as instances in which Defendants individually voted shares against particular directors. *See, e.g.*, Am. Compl. ¶¶ 155-212. Because no Defendant held a controlling interest, or anything near a controlling interest, Plaintiffs have not alleged facts that plausibly suggest that any Defendant's actions, "[c]onsidered alone and in isolation," actually caused a lessening of competition in violation of Section 7. *Id.* ¶ 3.

[10] Thomas A. Lambert, *Mere Common Ownership and the Antitrust Laws*, 61 B.C. L. Rev. 2913, 2939-40 & nn. 135-39 (Nov. 2020) (collecting cases). Moreover, as explained in the ICI *amicus* brief, Defendants are not the owners of the assets they manage; they instead act at the direction of investors in the various funds with different portfolio strategies. *See* ICI Br. at 11-12; *see also* Hon. Douglas H. Ginsburg, *Why Common Ownership Is Not an Antitrust Problem*, Harv. L. S. Forum on Corp. Governance (Dec. 4, 2018), https://corpgov.law.harvard.edu/2018/12/04/why-common-ownership-is-not-an-antitrust-problem/ ("[I]t is important to distinguish between investment management and economic ownership. The proponents conflate the two, thereby wrongly attributing to 'owners' conduct undertaken by others. The investment manager is only the nominal owner, acting as a fiduciary for the investors, who are the real parties in interest.").

[11] *See, e.g.*, *DuPont*, 353 U.S. at 604 (noting that Pierre S. du Pont served as chairman of both du Pont and General Motors); *Gulf & Western Indus., Inc.*, 476 F.2d at 697 (concluding that plaintiff had "probability of success" in proving that defendant had "intention to obtain control of [plaintiff] or to influence substantially its management" as a result of the acquirer's history of similar takeover acquisitions and the acquirer's suggestion of replacing management).

are competing or not, if they do not use that method for ***controlling*** the corporations." 51 CONG. REC. 14,466 (1914) (statement of Sen. Norris) (emphasis added) (attached hereto as Ex. 1).

Consistent with the statutory text and legislative history, no court has ever held "that merely voting one's shares or making any effort, however slight, to influence management is inconsistent with purchasing or holding stock solely for investment."[12] This is because a vote by an investor that neither binds nor controls management does not, and cannot, causally "bring about" the substantial lessening of competition. *See id.*[13] To hold otherwise would render the investment exemption, on which investors have relied for more than 100 years since the enactment of the statute, a nullity.

Rather than offer well-pleaded allegations showing control or a lessening of competition that would implicate either Section 7 or the investor exemption thereto, Plaintiffs rely instead on recent academic literature that attempts to cast doubt on whether the statute should retain its investment exemption and suggests that courts should, instead, presume that mere shareholding in competing companies may substantially lessen competition. *See* Am. Compl. ¶ 109 n.38. This literature, which advocates for an interpretation of Section 7 that would forbid ordinary shareholders from exercising voting rights, argues that the "investment exemption" adds nothing to Section 7's prohibition on stock acquisitions that substantially lessen competition. SIFMA, however, respectfully submits that this Court should apply the exemption to Section 7 as it is written, rather than credit academic literature that would read out the investment exemption to Section 7 as "mere surplusage." *See, e.g.*, *Dunn v. CFTC*, 519 U.S. 465, 472 (1997) ("legislative

---

[12] Lambert, *supra* n. 11 at 2934 (collecting cases).

[13] None of the cases cited in Plaintiffs' Complaint involved a noncontrolling investor merely exercising its right to vote its shares or engage with the issuer on non-binding matters. *See supra* at 6 & n. 8.

enactments should not be construed to render their provisions mere surplusage").

In assessing whether the investment exemption applies, "the ultimate definitive factor the courts have looked to[], is whether the stock was purchased for the purpose of taking over the active management and control of the acquired company." *United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093, 1099 (C.D. Cal. 1979). But here, there are no allegations that Defendants sought to overtake active management of any of the companies in which they or their customers owned stock, including by nominating any candidates for the board of directors, holding a board seat or serving as an officer, proposing corporate actions that required shareholder approval, or soliciting proxies.[14]

In essence, Plaintiffs' hypothesis is that the exemption only applies to shareholders who never vote their stock or interact with company management. That construction would be a drastic departure from the statutory text, legislative history, and existing case law.[15] Doing so would deprive shareholders of their ownership rights, and it would have a drastic and unlegislated chilling effect on the important role that individual and institutional investors play in the efficient allocation of capital in the United States.

B. **Accepting Plaintiffs' Common Ownership Hypothesis Would Have Adverse Impacts on the American Economy and Impair the Competitiveness of U.S. Capital Markets**

Through this litigation, Plaintiffs seek to circumvent the statutory exemption for

---

[14] *See, e.g., United States v. Amax, Inc.*, 402 F. Supp. 956, 974 (D. Conn. 1975) (denying injunction where 20 percent common ownership did not evidence control or a *de facto* merger where there were no common directors, officers or employees).

[15] *See* Hon. Douglas H. Ginsburg & Keith Klovers, *Common Sense about Common Ownership*, May 2018, Concurrences No. 2-2018, Art. No. 86847 at 16-27, https://www.concurrences.com/en/review/issues/no-2-2018/articles/common-sense-about-common-ownership-86847-en. Judge Ginsberg, addressing the handful of academics who have debated whether Section 7 should apply to common ownership, concluded that neither the plain meaning of the statute nor the relevant case law supports such an application. *See id.*

9

investments under Section 7 of the Clayton Act. Plaintiffs would instead impose their own preferred policy that would require institutional investors to divest non-controlling holdings in competing companies or be foreclosed from voting their shares or interacting with management of those companies—even when there exists no plausible risk that such conduct may cause a "substantial lessening of competition." 15 U.S.C. § 18; *see also* Am. Compl. at 107 (seeking, among other things, "divestiture" to "restrain Defendants from using the stock they have acquired" to vote that stock). Such a policy would have immediate adverse effects on capital markets in the United States, and on the U.S. economy more broadly. Reading out the investment exemption could subject investors and investment firms to the threat of costly antitrust liability, which in turn would have a chilling effect on capital. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007) (noting the burdensome costs of antitrust litigation). This will raise costs for pension funds and retail investors, deter investment by private equity and venture capital firms, chill IPOs and a variety of other transactions, increase costs for debt and equity financing, and reduce market liquidity.

The substantial harm that such an unprecedented interpretation of Section 7 would cause is as unnecessary as it is avoidable. Any risk of incipient harm to competition from common ownership is already addressed and mitigated by the very antitrust laws on which Plaintiffs seek to ground their claims, and in the policies of the federal agencies that are charged with enforcing those laws.

Indeed, the U.S. government has already recognized the significant risk of harm to capital markets posed by exactly the sort of unsubstantiated theory asserted here. With institutional investors holding "trillions of dollars in assets," an enforcement policy that would require those

"institutional investors to divest holdings could have a significant effect on capital markets."[16] It is for that reason that "any antitrust enforcement or policy effort in this area should be pursued only if an inquiry reveals *compelling evidence* of the anticompetitive effects of common ownership by institutional investors in concentrated industries."[17]  Claims that are "predicated on general relationships suggested by academic papers," and unsupported by any such compelling evidence, will themselves harm competition by "unnecessarily chill[ing] procompetitive investment."[18]

The academic literature advocating for a reinterpretation of Section 7's investment exemption purports to identify potential harm to competition in isolated case studies involving common institutional ownership of non-controlling positions in competing companies in a single industry (*e.g.*, commercial airlines).  But this theory is not supported by reliable, empirical evidence or by sound economic principles, and it has been criticized by antitrust scholars.[19]  The harm to investors and to U.S. capital markets that would result from the claims asserted here, by contrast, are clear.

---

[16] Note to the Organisation for Economic Co-operation and Development (OECD) by the United States, Hearing on Common Ownership by Institutional Investors and Its Impact on Competition, OECD DAF/COMP/WD(2017)86 (Dec. 6, 2017) (hereinafter "U.S. Note to OECD") at 2, ¶ 3, https://one.oecd.org/document/DAF/COMP/WD(2017)86/en/pdf.

[17] *Id.* at 2-3, ¶ 3 (emphasis added).

[18] *Id.* at 3, ¶ 4. As explained in the U.S. Note to the OECD, the empirical literature on the competitive effects of common ownership is in the early stages of development, and conclusions have been based largely on correlation between common ownership and economic outcomes. *Id.* at 7-8, ¶¶ 12, 13.

[19] *See* Edward B. Rock & Daniel L. Rubinfeld, *Antitrust for Institutional Investors,* 82 Antitrust L.J. 221, 241-51 (2018) (criticizing empirical and theoretical arguments in the academic literature purporting to show risk of harm to competition stemming from common ownership); *see also* Daniel P. O'Brien and Keith Waehrer, *The Competitive Effects of Common Ownership: We Know Less than We Think,* 81 Antitrust L.J. 729 (2017) (same); Pauline Kennedy, Daniel P. O'Brien, Minjae Song, & Keith Waehrer, *The Competitive Effects of Common Ownership: Economic Foundations and Empirical Evidence,* (July 2017) (same) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3008331.

As an initial matter, the prospect of antitrust exposure based on investment activity that until now has been recognized as exempt from Section 7 of the Clayton Act would introduce significant uncertainty into U.S. capital markets. How are institutional investors to determine which companies are competitors in a given market? What is the rule for investments in multi-product companies? Is antitrust exposure limited only to investments in concentrated markets that have been determined to be oligopolies? If so, who makes that determination?[20] The significant uncertainty that would accompany the elimination of the investment exemption to Section 7 would send shockwaves through U.S. capital markets. Investors suddenly faced with potential Section 7 liability for what was previously ordinary course investment activity would inevitably chill investment, IPOs, and M&A transactions, which in turn would reduce market liquidity.

Efforts by institutional investors to reduce exposure to these new risks would also increase operating costs for their funds by making it more difficult and more expensive to achieve both diversification and accurate index tracking.[21] Those increased costs would then be passed on to the investors in those funds—harming the very consumers that the antitrust laws are intended to protect.[22]

Institutional investors may also seek to reduce exposure by changing their voting practices ("put the shares in a drawer"), which would raise other risks and also create uncertainty.[23] Large institutional investors may feel compelled to change their voting practices in ways that may not be

---

[20] *See* Rock & Rubinfeld, *supra* n. 20 at 263-64 (discussing uncertainty that would result from claims under Section 7 based on common ownership and unsupported by compelling evidence of substantial lessening of competition).

[21] *Id.*

[22] *Id.; see also* Merritt B. Fox & Menesh S. Patel, *Common Ownership: Do Managers Really Compete Less?,* 39 Yale J. Reg. 136, 212-14 (2022) (discussing increased operating costs and pass-through to consumers).

[23] Rock & Rubinfeld, *supra* n. 20 at 265-66.

in their clients' best interest, or, ultimately, that of the companies themselves.[24] These approaches would significantly enhance the influence of either proxy advisors (companies that make voting recommendations) who do not own shares of a company or *activist* shareholders who do *not* hold shares "solely for investment"—a result that may have particularly significant (and unpredictable) unintended consequences in concentrated markets, including the coal industry that is the subject of this lawsuit.[25] As explained by Profs. Rock and Rubinfeld, "[f]or those concerned that activist shareholders already produce a short-term bias, eliminating the paradigmatic long-term holders from concentrated markets would exacerbate what some already view as a serious problem."[26] Fund managers with discretionary proxy voting responsibility also have fiduciary duties under ERISA and the Investment Advisers Act of 1940 to vote clients' shares in the best interests of those clients; reading out the investment exemption of the Clayton Act risks putting those managers in a Catch-22 between exercising their fiduciary duties and avoiding antitrust liability.[27]

## IV.   CONCLUSION

For the reasons set forth above, SIFMA as *amicus curiae* respectfully submits that this Court should dismiss Plaintiffs' Clayton Act Section 7 claim.

---

[24] *Id.*

[25] *Id.*

[26] *Id.* at 267.

[27] *See* O'Brien & Waehrer, *supra* n. 20, at 734; *see also* William M. Lafferty, Lisa A. Schmidt & Donald J. Wolfe, Jr., *A Brief Introduction to the Fiduciary Duties of Directors Under Delaware Law*, 116 Penn. St. L. Rev. 837, 841 (2012).

13

                              Respectfully submitted,

Dated: March 24, 2025                **MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Jon R. Roellke*
Jon R. Roellke[†]
  DC Bar No. 422864
  jon.roellke@morganlewis.com
William S.D. Cravens[†]
  DC Bar No. 476563
  william.cravens@morganlewis.com
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Telephone: (202) 739-3000

William T. McEnroe[†]
  PA Bar No. 308821
  william.mcenroe@morganlewis.com
Zachary M. Johns[†]
  PA Bar No. 313507
  zachary.johns@morganlewis.com
2222 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-5000

David I. Monteiro
  Texas Bar No. 24079020
  david.monteiro@morganlewis.com
1717 Main Street, Suite 3200
Dallas, TX 75201
Telephone: (214) 466-4000

Stephen LaBrecque[†]
  MA Bar No. 711319
  stephen.labrecque@morganlewis.com
1 Federal Street
Boston, Massachusetts 02110
Telephone: (617) 341-7700

*Attorneys for Amicus Curiae the Securities Industry and Financial Markets Association*

[†] *Pro hac vice forthcoming*

14

**CERTIFICATE OF SERVICE**

I hereby certify on this 26th day of March 2025, a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's ECF System. Notice of this filing will be sent to all counsel of record by operation of the ECF System.

/s/ *Jon R. Roellke*
Jon R. Roellke