IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| *v.* | § | No. 6:24-cv-00437-JDK |
| | § | |
| BLACKROCK, INC., | § | |
| STATE STREET CORPORATION, | § | |
| AND THE VANGUARD GROUP, INC., | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES..................................................................................................... iii

INTRODUCTION ....................................................................................................................1

STATEMENT OF ISSUES TO BE DECIDED .............................................................................2

BACKGROUND......................................................................................................................3

    A.  Defendants Own Massive Amounts of Coal Stock and Have Wielded it to Reduce
    Output. .....................................................................................................................4

        1.  Each Defendant Pledged "All Assets Under Management" to Fight Climate
        Change. .................................................................................................................5

        2.  Defendants Communicated to Coal-Company Boards that Production Must
        Fall. ......................................................................................................................8

        3.  Defendants Took Action to Ensure Coal Output is Reduced. .....................10

    B.  Defendants' Output-Reduction Efforts Have Borne Fruit. ...............................11

    C.  Blackrock Falsely Promised that Some ETFs do not Consider ESG Factors...............14

LEGAL STANDARD .............................................................................................................14

ARGUMENT ........................................................................................................................15

    I.  Plaintiffs have Stated a Claim Under Section 7 of the Clayton Act. .................................15

        A.  Plaintiffs Adequately Plead a Violation of Section 7's Substantive Provision. ......16

            1.  Defendants' Acquisitions of Stock May (And Did) Substantially Lessen
            Competition...........................................................................................17

        B.  Defendants' Actions Do Not Fall Within Section 7's Safe Harbor. ...................27

            1.  All Shares Purchased After Defendants Joined Climate Groups Were Not
            Purchased "Solely for Investment."....................................................28

            2.  Defendants Used All of Their Shares to Bring About a Substantial
            Lessening of Competition. ..........................................................................32

            3.  Vanguard's Disjunctive Interpretation of the Safe-Harbor Provision Has
            No Support. ...............................................................................................36

        C.  Plaintiffs Were Not Required to Identify Specific Acquisitions During the
        Relevant Period That Substantially Reduced Competition....................................36

    II.  Defendants' Scheme Violates Section 1 of the Sherman Act......................................38

        A.  The Amended Complaint Adequately Pleads a Conspiracy........................................39

            1.  The Amended Complaint Provides Direct Evidence of a Conspiracy. ...........39

    2.  The Amended Complaint Contains Sufficient Indirect Evidence to Plausibly Plead a Conspiracy...........................................................................................44

        a.  Parallel Conduct.................................................................................44

        b.  Additional Plus Factors.....................................................................46

  B. Plaintiffs Have Alleged a Competitive Harm.......................................................48

    1.  The Amended Complaint Adequately Pleaded a *Per Se* Unlawful Scheme. .........49

    2.  Defendants' Restraint of Trade is Unreasonable.................................................50

III.     Plaintiffs Have Adequately Pleaded an Information-Sharing Claim. .........................51

IV.    Defendants have Violated State Antitrust Laws..................................................................54

V.     Plaintiffs' State Valid Consumer-Protection Claims. ...................................................54

  A. The States Have Alleged That BlackRock's "Investment Strategy" Statements Are Unfair and Deceptive. ........................................................................................54

    1.  BlackRock's Statements are Misleading in Context. ....................................55

    2.  BlackRock Can Accurately Describe its Funds Consistent with Federal Securities Law..................................................................................................57

    3.  Disclosures Elsewhere Do Not Cure BlackRock's Alleged Deceptive and Unfair Misrepresentations. ..............................................................................58

  B. BlackRock's Other Statements Were Also Unfair and Deceptive. ............................60

  C. The States Need Not But Have Alleged That BlackRock's Misleading Statements Were Material...........................................................................................................61

  D. The States' Laws Apply to BlackRock's Conduct. ......................................................63

  E. Louisiana Has Alleged a Consumer Protection Violation............................................66

CONCLUSION.........................................................................................................................67

**TABLE OF AUTHORITIES**

**CASES**                                                                     **PAGE(S)**

*American Crystal Sugar Co. v. Cuban-American Sugar Co.*,
    152 F. Supp. 387 (S.D.N.Y. 1957) ...............................................................33, 34

*American Crystal Sugar Co. v. Cuban-American Sugar Co.*,
    259 F.2d 524 (2d Cir. 1958) .......................................................................33, 34

*Anaconda Co. v. Crane Co.*,
    411 F. Supp. 1210 (S.D.N.Y. 1975) ..................................................................34

*Apani Sw., Inc. v. Coca–Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002) ...........................................................................38

*Arizona v. Maricopa Cnty. Med. Soc'y*,
    457 U.S. 332 (1982) .........................................................................................38

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................24, 60

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................18, 38, 44, 46

*City of Pontiac Pol. & Fire Retirement Sys. v. BNP Paribas Secs. Corp.*,
    92 F.4th 381 (2d Cir. 2024) ......................................................................39, 44

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
    846 F.2d 284 (5th Cir. 1988) ......................................................................42, 43

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984) .........................................................................................50

*Crane Co. v. Harsco Corp.*,
    509 F. Supp. 115 (D. Del. 1981) .......................................................................29

*Denver & Rio Grande W. R.R. Co. v. United States*,
    387 U.S. 485 (1967) ...............................................................................15, 29, 30

*Duncan v. Walker*,
    533 U.S. 167 (2001) .........................................................................................34

*Frizzell v. Cook*,
    790 S.W.2d 41 (Tex. Ct. App.1990) .............................................................63, 64

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys, Inc.*,
    386 F.3d 486 (2nd Cir. 2004) ...........................................................................25

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
    547 F.3d 266 (5th Cir. 2008) ............................................................................38

*Green v. Garcia-Victor*,
    2017-0695 (La. App. 4 Cir. 5/16/18), 248 So.3d 449 ......................................66

*Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*,
    476 F.2d 687 (2d Cir. 1973) .............................................................................29

iii

*Impax Lab'ys, Inc. v. FTC*,
    994 F.3d 484 (5th Cir. 2021) ..................................................................49

*In re Golden Grain Macaroni Co.*,
    78 F.T.C. 63 (1971) ..............................................................................35

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ...................................................................46

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    158 F. Supp. 3d 544 (E.D. La. 2016) ......................................................47

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ..................................................................47

*In the Matter of Cliffdale Assocs., Inc.*,
    103 F.T.C. 110, 1994 WL 565319 (Mar. 23, 1984) ................................59

*In the Matter of Int'l Harvester Co.*,
    104 F.T.C. 949 (1984) .......................................................................62, 63

*In the Matter of Invesco Advisers, Inc.*,
    IAA Release No. 6770 (Nov. 8, 2024) ................................................58, 63

*In the Matter of Removatron Int'l Corp.*,
    11 F.T.C. 206, 1988 WL 1025512 (1988) ...........................................58, 59

*Interstate Circuit v. United States*,
    306 U.S. 208 (1939) ..........................................................................39, 45

*JSW Steel (USA) Inc. v. Nucor Corp.*,
    586 F. Supp. 3d 585 (S.D. Tex. 2022) ...............................................44, 48

*Klein v. TD Ameritrade Holding Corp.*,
    No. 14-cv-0396, 2015 WL 13215666 (D. Neb. Oct. 23, 2015) ...........65, 66

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) .............................................................38, 39, 48, 49

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) .................................................................................32

*Martinez v. Martinez*,
    No. 19-cv-00518, 2020 WL 5887587 (Tex. Ct. App. Oct. 1, 2020) ...........61, 62

*Marucci Sports, LLC v. NCAA*,
    751 F.3d 368 (5th Cir. 2014) ........................................................14, 15, 48

*NCAA v. Alston*,
    594 U.S. 69 (2021) ......................................................................39, 48, 49, 50

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ...............................................................................49

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) .........................................................................17, 50

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ........................................................................59

*Quality Env't Processes, Inc. v. I.P. Petroleum Co.*,
    144 So.3d 1011 (La. 2014) ......................................................................66, 67

*State ex rel. Miller v. Pace*,
    677 N.W.2d 761 (Iowa 2004) ..................................................................64, 65

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..............................................................51, 52, 53

*United States v. Citizens & S. Nat'l Bank*,
    422 U.S. 86 (1975)......................................................................................51

*United States v. E.I. DuPont de Nemours.*
    353 U.S. 586 (1957)...................................16, 17, 22, 25, 27, 30, 32, 36, 37

*United States v. Philadelphia Nat'l Bank*,
    374 U.S. 321 (1963).....................................................................................48

*United States v. Tracinda Inv. Corp.*,
    477 F. Supp. 1093 (C.D. Cal. 1979).............................................................30, 31

*United States v. United States Gypsum Co.*,
    438 U.S. 422 (1978)...........................................................................51, 52, 53

*Viazis v. Am. Ass'n of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002) .........................................................................39

*Zola v. TD Ameritrade Holding Corp.*,
    172 F. Supp. 3d 1055 (D. Neb. 2016) ......................................................65, 66

**CONSTITUTIONAL PROVISIONS, CODES, REGULATIONS AND LAWS**

15 U.S.C.
    § 1.........................................................................................................38, 51
    § 8.........................................1, 15, 16, 17, 18, 20, 25, 26, 27, 28, 30, 32, 33, 34, 35, 36

IOWA CODE
    § 714.16(1)(e) ..............................................................................................64
    § 714.16(2)(a) ........................................................................................61, 64

LA. REV. STAT.
    § 51:1405 ..............................................................................................61, 66
    § 51:1405(A) .................................................................................................66
    § 51:1406 ..............................................................................................58, 59
    § 51:1406(1) .................................................................................................66

MONT. CODE ANN.
    § 30-10-301 ..................................................................................................65
    § 30-14-103 ..................................................................................................61
    § 30-14-104 ..................................................................................................58
    § 30-14-105(1) ..............................................................................................65

NEB. REV. STAT.
    § 59-1617 ...........................................................................................65
    § 87-304 ............................................................................................65

TEX. BUS. & COM. CODE
    § 17.43 ..............................................................................................64
    § 17.44 ..............................................................................................64
    § 17.46 ..............................................................................................61
    § 17.46(b)(5) ...............................................................................55, 61
    § 17.46(b)(24) ....................................................................................62
    § 17.46(c)(1) ......................................................................................58
    § 17.49 ..............................................................................................64
    § 17.49(b)(24) ..............................................................................55, 62

17 C.F.R. § 240.13d-1(b)(1)(i) ...............................................................26

Investment Company Names, 88 Fed. Reg. 70,436 (Oct. 11, 2023) ......................................57, 63

H. Rep. No. 627, 63d Cong., 2d Sess. (1914) ...............................................15

S. Rep. No. 698, 63d Cong., 2d Sess. (1914) ...........................................26, 27

**OTHER AUTHORITIES**

2 NOAH WEBSTER, A DICTIONARY OF THE ENGLISH LANGUAGE (1900)........................................28

ABA SECTION OF ANTITRUST LAW, PROOF OF CONSPIRACY UNDER FEDERAL ANTITRUST LAWS (2010) ...............................................................................................47

*BlackRock's 2020 Letter to Clients: Sustainability as BlackRock's New Standard for Investing*, BLACKROCK (2020), https://perma.cc/YDW6-76U4 ...........................................9

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ...............................................................................................35

*CEO's Letter on our 2020 Proxy Agenda*, STATE ST. GLOB. ADVISORS (Jan. 28, 2020), https://perma.cc/V578-RPM4 ...............................................................8, 18

Fiona Scott Morton & Herbert Hovenkamp, *Horizontal Shareholding and Antitrust Policy,* 127 YALE L. J. 2026 (2018) ...............................................................35

*Investor Expectations for Diversified Mining*, CLIMATE ACTION 100+ (last visited Nov. 20, 2024), https://perma.cc/6PWY-DJKP ...........................................................7, 8, 19

*Invest*, BLACK'S LAW DICTIONARY (2d ed. 1910) ...............................................29

PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (4th ed. Cum. Supp. 2020)..............28, 30, 31, 32, 35

*Solely*, MERRIAM WEBSTER'S DICTIONARY ONLINE, https://perma.cc/J9Z2-LN49 ......................18

*Vanguard Investment Stewardship Insights: Vanguard's expectations for companies with significant coal exposure*, VANGUARD (Dec. 2021), https://perma.cc/L9WJ-QCWH .......9

Will Kenton, *Social License to Operate (SLO): Definition and Standards*, INVESTOPEDIA (Aug. 31, 2024), https://perma.cc/L5KA-MBSG...............................................9, 10

INTRODUCTION

Blackrock, Vanguard, and State Street have used their substantial stakes in every publicly traded coal company to reduce output below competitive levels and line their pockets while doing so. Instead of hiding their efforts, they have trumpeted the conspiracy. Defendants openly joined climate organizations on the condition of "[i]mplement[ing] a[n] . . . engagement strategy" to reduce coal output from companies they own through thinly veiled public threats, behind-the-scenes meetings, and proxy voting. Amended Compl., Doc. 50 ¶ 115 (Jan. 16, 2025) ("AC").

The effort to reduce output was wildly successful. Between 2019 and 2022, the production of Southern Powder River Basin (SPRB) coal by publicly traded coal companies *fell* by 33.9 million tons, while private output *grew* by 4.9 million tons. *See* AC ¶ 228 (tbl. 4).  Because privately owned mines lacked the capacity to make up for the publicly owned mines' cuts, coal prices predictably ballooned by twenty to thirty percent. *See id.* The result was cartel-level profits for the coal companies where Blackrock, Vanguard, and State Street were the largest shareholders. *Id.* ¶ 240 (tbl. 6).

Defendants' output-reduction scheme was illegal in a myriad of ways. Section 7 of the Clayton Act prohibits the acquisition of stock when it "***may*** . . . substantially . . . lessen competition." 15 U.S.C. § 18 (emphasis added). There can be no doubt that the acquisitions here "may" substantially reduce competition because the evidence in the Amended Complaint demonstrates that Defendants' acquisitions have *already* resulted in reduced competition to produce coal. Defendants claim that they fall within Section 7's "safe harbor" provision, which protects stock acquisitions made "solely" for investment. But their intent to influence the coal companies and active use of the stock, among other things, render that defense inapplicable. *Id.* In addition to individually and collectively violating the Clayton Act, Defendants' agreement to

1

coerce publicly traded coal companies into reducing their output is a classic violation of Section 1 of the Sherman Act and State-law equivalents.

Not content with limiting output, Blackrock went further and misrepresented its use of so-called "Environmental, Social, Governance" factors in its management decisions. Although Blackrock labelled certain investments as "non-ESG funds," it nonetheless committed to using "all assets under management" to achieve carbon-reduction goals. AC ¶ 197. When Blackrock then followed through on using these non-ESG funds for ESG purposes, it violated various State consumer-protection laws.

Blackrock, Vanguard, and State Street may have strongly held feelings about what good climate policy may consist of, but that gives them no right to violate antitrust and consumer-protection laws. This Court should deny the motions to dismiss.

### STATEMENT OF ISSUES TO BE DECIDED

1. Whether Section 7 of the Clayton Act prohibits asset managers from owning significant shares of stock across an entire industry while committed to using that stock to reduce output in the industry.

2. Whether Section 1 of the Sherman Act prohibits asset managers from entering an agreement to pressure the companies they own into restricting industry-wide output.

3. Whether Section 1 of the Sherman Act prohibits an agreement to exchange information as part of a scheme to restrict output.

4. Whether various State antitrust laws prohibit asset managers from entering an agreement to pressure the companies they own into restricting industry-wide output.

**5.** Whether disclaiming that a fund "follow[s] a sustainable, impact or ESG investment strategy" yet still using the fund to further ESG initiatives violates State consumer-protection laws.

<h3 style="text-align:center">BACKGROUND</h3>

Defendants Blackrock, Vanguard, and State Street are three of the largest asset managers in the world. Broadly speaking, their investment strategies are the same. They invest their trillions of dollars under management in practically all large, publicly owned companies as a way to diversify their holdings and guarantee their clients stable returns.

Although not normally outright majority shareholders in the companies they own, significant "minority shareholders" like Defendants can be extremely influential, especially when they are the largest shareholders and act in concert with other large shareholders. AC ¶ 153 (quoting *Annex 5 to the Commission Decision, Assessment of the Effects of Common Shareholding on Market Shares and Concentration Measures* at 7, § 3 in MERGER PROCEDURE REGULATIONS (EC) 139/2004, EUROPEAN COMM'N (Mar. 27, 2017)). They can exert significant influence without resorting to the cudgel of proxy voting, especially when the entity is a sophisticated investor—like Defendants—who can set the tone for other investors. When the Chairman of Blackrock, Vanguard, or State Street "speaks, the investment world tends to listen." *Id.* ¶ 93 (quoting Anderson Lee & Hayden Higgins, *3 Ways BlackRock Can Do Better on Sustainable Finance*, WORLD RES. INST. (Mar. 3, 2022), https://perma.cc/LP66-PDVH).

Defendants routinely use their substantial shares as leverage to gain meetings with directors and enact change at the companies in which they are invested. In the words of Glenn H. Booraem, controller of the Vanguard Group's funds, Vanguard "believe[s] that engagement" with management, not simply voting shares, "is where the action is." *Id.* ¶ 156 (quoting *Passive*

3

*investors, not passive owners*, VANGUARD (June 20, 2013), https://perma.cc/VB4Z-Q2Z8).

Although ostensibly labelled as "passive" investors, each Defendant disclaims being a "passive

owner[]" of its companies. *Id.* As Blackrock Chairman Larry Fink has explained, "[w]e are an

**active voice**, we work with companies" to achieve our goals. *Id.* ¶ 161 (David Benoit, *BlackRock's

Larry Fink: typical activists are too short-term*, WALL ST. J.   (Jan. 16, 2014),

https://perma.cc/8C9U-VSXC) (emphasis added). Rakhi Kumar, former head of corporate

governance at State Street, has explained that its shares grant it "sufficient leverage" to have its

views implemented without having to usually vote against directors. *Id.* ¶ 163 (quoting Mike Scott,

*Passive investment, active ownership*, FIN. TIMES (Apr. 6, 2014), https://perma.cc/K4SV-FLPN).

Normally, Defendants' subtle (or not subtle) pushing, nudging, and incentivizing do the trick, and

they have no need to affirmatively vote against directors to influence policy. *See id.* ¶ 162 n.109

(citing Fiona M. Scott Morton, *Horizontal Shareholding: A Summary of the Argument*,

COMPETITION POL'Y INT'L ANTITRUST CHRON. (Jan. 2018), https://perma.cc/RGS3-LXZT).

Defendants' efforts to press companies into taking some sort of action are usually

innocuous in the eyes of antitrust laws. Their goals often relate to "corporate governance

improvements that they feel will improve management effort and therefore performance." Scott

Morton, *supra*, at 3. In other words, the pressure placed on companies by Defendants usually

relates to *internal* changes that promise to maximize competitiveness in the market.

## A. Defendants Own Massive Amounts of Coal Stock and Have Wielded it to Reduce Output.

As part of their mammoth portfolios, Defendants are the largest investors in every single

publicly traded coal company in the United States. Each has invested tens or hundreds of billions

of dollars in the nine[1] publicly traded coal companies. These companies produce 46% of our nation's thermal coal and 60% of our nation's SPRB coal. AC ¶ 18. As of the start of this lawsuit, Blackrock had invested $108.787 billion in the stock of public coal companies, Vanguard had invested $101.119 billion, and State Street had invested $35.736 billion. *Id.* ¶¶19, 20 & tbl. 1. Blackrock is the largest shareholder in six of the nine companies, and the second-largest in the remaining three. *Id.* Vanguard is the largest shareholder of Vistra Energy, the second largest shareholder of six public coal companies, and the third and fifth holder of, respectively, NACCO Industries and Hallador. *Id.* ¶ 20. State Street is smaller, but only in relation to its co-Defendants; it is among the top five shareholders of all but two of the publicly owned coal companies. *Id.*

Up until recently, Defendants' holdings in the coal sector were just as innocuous as their holdings in a variety of industries. But that changed in 2020 when Defendants initiated a different kind of pressure campaign. Instead of independently using their shares (and corresponding influence) to improve the internal governance of the companies they own, Defendants joined forces to coerce publicly owned coal companies into reducing coal output, with the stated goal of curbing global carbon emissions. The unstated goal, and actual result, of the scheme was to line their own pockets with increased commissions when the companies they were manipulating raked in cartel-level profits and saw their stock prices jump.

### 1. Each Defendant Pledged "All Assets Under Management" to Fight Climate Change.

Each Defendant joined at least one climate-change pact. These organizations required Defendants to commit to using all assets under their management to reduce carbon emissions to

---

[1] These companies are, Peabody Energy (Defendants own 30.43%), Arch Resources (Defendants own 34.19%), NACCO Industries (Defendants own 10.85%), CONSOL Energy (Defendants own 28.97%), Alpha Metallurgical Resources (Defendants own 29.7%), Vistra Energy (Defendants own 24.94%), Hallador Energy (Defendants own 8.3%), Warrior Met Coal (Defendants own 31.62%), and Black Hills Corporation (Defendants own 32.87%). AC ¶ 20 & tbl. 1.

"net zero" by 2050. AC ¶¶ 115, 120. And because coal is one of the most emission-heavy sectors of the economy, they took a special interest in the reduction of coal output.

In the Spring of 2021, BlackRock, Vanguard, and State Street all joined the Net Zero Asset Managers Initiative. *Id.* ¶ 116. Signatories to the Initiative committed to the goal of achieving global net zero greenhouse-gas emissions by 2050 and achieving "decarbonisation goals" consistent with that commitment across "all assets under management," which obviously includes coal companies. *Id.* ¶ 130 (quoting *The Net Zero Asset Managers Commitment*, THE NET ZERO ASSET MANAGERS INITIATIVE, https://perma.cc/AB39-QL5S (last visited Sept. 17, 2024)). Signatories to the Net Zero Asset Managers Initiative also committed to setting interim reduction targets for the companies they own to be achieved by 2030. *See id.* ¶ 131 (quoting *Net Zero Asset Managers initiative: Network Partner's expectation of signatories with regard to fossil fuel investment policy*, THE NET ZERO ASSET MANAGERS INITIATIVE, https://perma.cc/T235-DX9T (last visited Sept. 17, 2024)).

Targets and goals are not all that the Initiative demanded. It also required signatories, such as Defendants, to create a "stewardship and engagement strategy" with "a clear escalation and voting policy" to ensure that companies under management did not stand in the way of "achiev[ing] net zero emissions by 2050 or sooner." *Id.* ¶ 115 (quoting *The Net Zero Asset Managers Commitment*, THE NET ZERO ASSET MANAGERS INITIATIVE (last visited Nov. 20, 2024), https://perma.cc/4QQM-845Q). Reducing coal output is a key part of this mission. As other Initiative documents explain, there was an "expectation" that members would "immediately ceas[e] all financial or other support to coal companies* [sic] that are building new coal infrastructure or investing in new or additional thermal coal expansion, mining, production, utilization (i.e., combustion), retrofitting, or acquiring of coal assets." *Id.* ¶ 131 (quoting *Net Zero*

6

*Asset Managers initiative: Network Partner's expectation of signatories with regard to fossil fuel investment policy*, *supra*).

Blackrock and State Street also joined Climate Action 100+,[2] which is "an unprecedented global investor engagement initiative" that targets companies in the energy industry to ensure they "take necessary action on climate change." *Id.* ¶ 117 (quoting *Black Rock Joins Clime Action 100+ to Ensure Largest Corporate Emitters Act on Climate Crisis*, CLIMATE ACTION 100+ (Jan. 9, 2020), https://perma.cc/RSD3-KBS7). Climate Action 100+ has not been coy about its intentions for the coal industry. As explained in Climate Action 100+'s "Investor Expectations for Diversified Mining," as "the most emission-intensive fossil fuel, [coal's] reduction is prioritised in climate modelling" with the models "requiring a reduction of 50% in thermal coal production by 2030 versus 2021, and 91% by 2050." *Id.* ¶ 118 (quoting *Investor Expectations for Diversified Mining* at 37, CLIMATE ACTION 100+ (last visited Nov. 20, 2024), https://perma.cc/6PWY-DJKP). These benchmark reductions are aligned with limiting global temperature increases to 1.5ºC, just like the Net Zero Asset Managers Initiative. *Id.*

Climate Action 100+ and its members openly committed to working together to induce these dramatic reductions in the production of coal. Because Climate Action 100+ believed that "the mining sector and its value chains will also need to decarbonize," *id.* ¶ 120 (*quoting Investor Expectations for Diversified Mining* at 2, CLIMATE ACTION 100+ (Sept. 2023), https://perma.cc/2ZJL-5LLG), Climate Action 100+ members agreed to work with the coal companies in which they had invested to obtain commitments to disclose their "planned thermal coal production" and "short, medium, and long-term targets" for reducing it, *id.* ¶ 121 (*quoting*

---

[2] Although Vanguard did not join Climate Action 100+, the commitments it made in the Net Zero Asset Managers Initiative were more than enough to conclude that it 1) intended to reduce coal output, and 2) was part of the output-reduction conspiracy.

*Investor Expectations for Diversified Mining, supra*, at 38). Disclosure was necessary to ensure that no entity was cheating on its reduction goals. The big-picture plan was that "coal production" would "decline[] towards zero, with thermal coal declining faster than metallurgical coal." *Id.* ¶ 120. As the Climate Action 100+ investor representative for North America explained, "[w]e're not going to get to net zero by just bringing down the supply of oil, gas and *coal*." *Id.* (quoting *To Drive Meaningful Corporate Decarbonisation*, CLIMATE ACTION 100+ (Oct. 27, 2021), https://perma.cc/Y4UN-SAD3) (emphasis added).

## 2. Defendants Communicated to Coal-Company Boards that Production Must Fall.

In addition to joining groups that required pledges to use their assets to decarbonize, Defendants made statements of their own that communicated to boards of the coal companies that coal production had to drop, or else. In January of 2020, State Street announced that it would "proxy vote to press companies that are falling behind" on State Street's newly adopted environmental metrics. *CEO's Letter on our 2020 Proxy Agenda*, STATE ST. GLOB. ADVISORS (Jan. 28, 2020), https://perma.cc/V578-RPM4 (cited in AC ¶ 166). At the same time, State Street launched a metric called the "R-Factor," which created a sustainability score that would allow State Street to compare "both regional and global industry peers" on their efforts to reduce carbon emissions. AC ¶ 166 (quoting *CEO's Letter on our 2020 Proxy Agenda*, *supra*). This "R-Factor," which compared the carbon outputs amongst different members of the industries (including coal), would be used to "inform [State Street's] . . . investment decisions." *Id.* A bad "R-Factor" that did not improve could result in votes against board members or divestment, tanking the company's

stock price. The only way for coal companies to maintain their "R-factor" was to either cut coal production or refuse to increase it when demand rose.

Blackrock was even more direct in its threats to the boards of the public coal companies. In Chairman Fink's 2020 annual letter to corporate boards, he declared Blackrock did "not believe that the long-term economic or investment rationale justifies continued investment in [the thermal coal] sector." *BlackRock's 2020 Letter to Clients: Sustainability as BlackRock's New Standard for Investing*, BLACKROCK (2020), https://perma.cc/YDW6-76U4 (cited in AC ¶ 167). Blackrock's announcement that it would no longer invest in thermal coal put the boards of publicly owned coal companies on notice that Blackrock, like State Street, may take the next step and divest if its demands were not followed. One of those demands was for "companies to set short-, medium-, and long-term targets for greenhouse gas reductions." AC ¶ 168 (quoting *Larry Fink's 2022 Letter to CEOs: The Power of Capitalism*, BLACKROCK (2022), https://perma.cc/M4N6-XZJY). The "ask" to set "reduction[]" targets and publish them so that competitors could see, of course, was not truly optional, as BlackRock is the first or second largest shareholder in every publicly traded coal company. *See id.* ¶ 20.

Vanguard too started to pressure public coal companies into reducing output around 2020. Although it had largely stayed quiet in the public eye, Vanguard admitted in December of 2021 that to "address[] coal-specific risks," it had been "engaged with companies in carbon-intensive industries," like coal mining, over the "last several years." *Vanguard Investment Stewardship Insights: Vanguard's expectations for companies with significant coal exposure* at 2, VANGUARD (Dec. 2021), https://perma.cc/L9WJ-QCWH) (cited in AC ¶ 139). At the same time, Vanguard stated that coal "companies should provide clear disclosures on" a handful of topics, including "transition plans for coal mines" as a way to, among other things, "preserve social license to

operate," *id* at 2–3.—i.e. shut down coal mines because of activist pressure. *See* Will Kenton, *Social License to Operate (SLO): Definition and Standards*, INVESTOPEDIA (Aug. 31, 2024), https://perma.cc/L5KA-MBSG (defining the term "social license"). Vanguard also acknowledged that the coal companies it invests in would need to "reduce thermal coal production" to meet international climate goals and recommended "that companies should disclose their plans" to do so. *Vanguard Investment Stewardship Insights*, *supra*, at 3.[3]

For a handful of coal companies, it appears that the public threats were not enough. Defendants therefore made an undetermined number of "engagements," which are direct meetings, with management. For example, Vanguard disclosed that in 2021 and 2022 it met with Directors from Arch Resources, Vista Corp., and CONSOL Energy. AC ¶¶ 157–58. Although it did not disclose the topics of those "engagements," it has previously admitted that in other "engagements" with foreign coal companies it has "obtained assurances from company leaders that they expected to reduce the company's exposure to thermal coal." *Id.* ¶ 157 (cleaned up). Although the other Defendants did not disclose one-on-one engagements with the coal companies, the fact that they promised such action when they joined the Net Zero Asset Managers Initiative gives rise to the reasonable inference that such engagements took place. *Id.* ¶ 115.

### 3. Defendants Took Action to Ensure Coal Output was Reduced.

Defendants took additional concrete steps aimed at reducing the companies' coal output. For example, they voted against directors who failed to sufficiently cut coal production or failed to make disclosures that verified that they cut production.

---

[3]The Amended Complaint quotes Vanguard itself as "ask[ing] companies to shutter or divest their coal assets." AC ¶ 150 (quoting *Vanguard Investment Stewardship Insights, supra*, at 1). It appears that Vanguard was referencing other entities making such demands, not Vanguard itself in that sentence, so Plaintiffs do not rely on it here. That said, Vanguard's other statements make it clear that it *was* attempting to force reduction in coal output.

Blackrock voted against board members of companies that did "not meet [its] aspirations of having adequate climate risk disclosures against all 4 pillars of [the Task Force on Climate-related Financial Disclosures]" and "d[id] not meet [its] aspirations of having adequate climate-related metrics and targets." AC ¶ 168. Blackrock's votes based on the failure to disclose the results of the output-reduction scheme or sufficiently reduce output were relatively frequent. It voted against certain directors of NACCO, Arch Resources, Peabody Energy, CONSOL, Warrior Met Coal, and Black Hills Corporation. *Id.* ¶¶ 168–74.

State Street made a series of similar votes. Claiming that companies did not sufficiently disclose their efforts to reduce output, State Street voted against directors at Peabody Energy, Warrior Met Coal, NACCO, and Alpha Metallurgical Resources. *Id.* ¶ 177. It also voted against the executive-compensation package for CONSOL Energy. *Id.* Although unknown to Plaintiffs at the time the complaint was filed, Defendants' exhibits have helpfully demonstrated that Vanguard voted against five directors at Peabody Energy in 2022. Ex. 2 to Resp. in Support of Mot. to Dismiss, Doc. 66-3 at 7 (Mar. 17, 2025) ("Ex. 2").

**B. Defendants' Output-Reduction Efforts Have Borne Fruit.**

Defendants' scheme to reduce coal output proved wildly successful. As they badgered coal companies to decrease output, prices increased, and profits at the coal companies owned by Defendants skyrocketed by up to 1,448.2 percent. AC ¶ 240 (tbl. 6). To understand exactly how successful Defendants' scheme was, one must begin by looking at how the thermal and SPRB coal markets functioned in 2019, which was the last year that coal markets operated without interference by the COVID-19 demand shock or Defendants' scheme. Thermal coal is the coal that is burned to generate steam to produce electricity. *Id.* ¶ 80. SPRB coal is a class of thermal coal that has a lower sulfur and sodium content than other forms of coal, making it particularly valuable

11

to power-plant operators who need to comply with EPA regulations. *Id.* ¶ 66. As explained in the Amended Complaint, thermal coal and SPRB coal constitute a relevant market for antitrust purposes.

In 2019, publicly traded coal companies—those owned by Defendants—produced 186.2 million tons of SPRB coal. *Id.* ¶ 228 (tbl. 4). After the onset of the COVID-19 pandemic devastated coal demand in 2020, these companies dropped production down to 143.2 million tons of SPRB coal. *Id.* But as the world returned to (some sense of) normalcy, the SPRB market did not. Publicly owned coal companies never ramped production back up to where it was before the pandemic. By the end of 2022, only 152.3 million tons of SPRB coal were extracted by publicly owned coal companies. *Id.* That is a drop of 33.9 million tons, or 18.2 percent, from the 2019 pre-COVID baseline. *Id.*

While production remained low, prices had rapidly increased. Between 2020 and the end of 2022, demand for coal increased. When demand went up, so did the price of SPRB coal. In 2019, it was $12.48 per ton. *Id.* In 2020, it rose slightly to $12.94 per ton. *Id.* In 2021, it remained essentially unchanged at $12.84 per ton. *Id.* But in 2022, it jumped to $15.13 per ton. *Id.* That is a 21.2 percent increase in price between 2019 and 2022. *Id.*

One would expect publicly owned coal companies to increase SPRB output to capture the much higher price of SPRB coal. At a minimum, the publicly traded coal companies should have been able to reach their 2019 production numbers, as those numbers demonstrate their capacity when coal was much less valuable. Yet each publicly owned coal company that mined SPRB coal remained below—often far below—its 2019 levels of production. *Id.*

The story was different concerning privately owned coal producers, whom Blackrock, Vanguard, and State Street could not directly influence. In 2019, private producers of SPRB coal

mined 80.6 million tons of coal. *Id.* In 2020, after the onset of the COVID pandemic, they mined 66.4 tons. *Id.* Unlike publicly owned companies, private coal producers responded to price signals after the markets went back to normal, increasing production back up to 2019 levels by 2022. Indeed, by 2022, private producers of SPRB mined 85.5 million tons of SPRB coal, *id.*, which is 4.9 million *more* tons than they did in 2019. In short, when prices went up by over 20%, the private coal producers followed suit by increasing output. The publicly held companies did not. Because the privately owned mines did not have the capacity to make up for the cuts to the publicly owned mines, prices remained higher than they should have been in a competitive market, and the publicly owned mines earned cartel-like profits from the artificially high prices. *See id.* ¶ 82.

Similar events transpired in the thermal-coal market more broadly. In 2019, the publicly owned coal companies produced 295.2 million tons of thermal coal, which dropped to 223 million tons in 2020. *Id.* ¶ 229 (tbl. 5). In 2021, it rebounded slightly to 230.9 million tons before creeping up to 238.5 million tons in 2022 for a total drop of 19.2% over the period. *Id.*

Once again, the publicly owned coal companies' actions did not match up with price indicators. In 2019, the price per ton of thermal coal was at a baseline of $27.54. *Id.* In 2020, it fell to $24.93 before inching up to $25.85 in 2021. *Id.* Then, in 2022, it skyrocketed to $34.57 per ton. *Id.* Yet the public coal companies' production in 2022 was 19.2% less than in 2019, before prices jumped by 25.5%. *Id.*

While prices rose and production remained below the 2019 baseline, the profits at the companies that Defendants manipulated rose dramatically. For example, Peabody Energy's production of thermal coal fell by 34.7 million tons or 25.5%. *Id.* During the same period, its revenues rose by $358.5 million, and its profits soared by $1.593 billion, or 853.9%. *Id.* ¶ 233. Over the same period, Arch Resources' production of thermal coal fell by 9.4 million tons, or

11.7%,[4] while its revenues rose by $1.448 billion, and its profits soared by $1.097 billion, or 469.2%. *Id.* ¶ 234. The other publicly traded coal companies saw booming profits as production fell, often well over 200%. *See id.* ¶ 240 (tbl. 6).

## C.  Blackrock Falsely Promised that Some ETFs do not Consider ESG Factors.

While Blackrock, Vanguard, and State Street were working together to reduce coal output, Blackrock was claiming that four ETFs that it offers were "not seek[ing] to follow a sustainable, impact or ESG investment strategy." *Id*. ¶¶ 193–95. Yet these ETFs owned significant shares in the publicly traded coal companies, *id.* (detailing the portfolio of each ETF), and Blackrock never purported to exempt these ETFs from its commitment to using "all assets under management" to further the goals of the Net Zero Asset Managers Initiative or Climate Action 100+, *id.* ¶ 197 (quoting *Commitment*, NET ZERO ASSET MANAGERS (last visited Nov. 20, 2024), https://perma.cc/7MAX-HUAT). Nor did Blackrock vote these shares in a different manner than their ETFs that did not disclaim an ESG strategy. *Id.* ¶¶ 196–97. In short, Blackrock failed to differentiate between its ESG and non-ESG funds while attempting to bring about a reduction in coal output.

## LEGAL STANDARD

"In order to survive a motion to dismiss, the pleader must submit a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 373 (5th Cir. 2014) (quoting FED. R. CIV. P. 8(a)(2)). "Antitrust claims do not necessitate a higher pleading standard and a plaintiff 'need only plead enough facts to state a

---

[4] Defendants make much ado about a typo in Plaintiffs' complaint referencing Arch's reduction in coal production. MTD, *infra*, at 15. The Amended Complaint stated that Arch has reduced thermal-coal output by 60% since 2020, AC ¶ 187, but they have actually reduced thermal-coal output by 60% since *2010*. This typo was not reflected in any of the tables in the Amended Complaint and was not relied upon by Plaintiffs. Defendants' repeated invocation of it is nothing more than a distraction.

claim to relief that is plausible on its face.'" *Id.* (quoting *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010)).

ARGUMENT

## I.    Plaintiffs have Stated a Claim Under Section 7 of the Clayton Act.

Passed in 1914, Congress enacted the Clayton Act to stop the "old-fashioned trust[s]" that were the target of the Sherman Act in their incipiency. H. Rep. No. 627, 63d Cong., 2d Sess. 17 (1914). Section 7 of the Clayton Act prohibits any person from "acquir[ing], directly or indirectly, the whole or any part of the stock" if "the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Because Congress wanted to blot out the possibility of competitive harm through subtle manipulation, the allegedly anticompetitive acquisition need not result in "control of another company in order to violate the Clayton Act." *Denver & Rio Grande W. R.R. v. United States*, 387 U.S. 485, 501 (1967). At the same time, Congress recognized that purely passive investors—those who lacked any desire to influence business decisions—did not risk reconstituting the trusts of old, so Section 7 included a safe-harbor provision that exempted "persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." *Id.*

Defendants' acquisition and use of their stocks in each publicly traded coal company not only "*may* . . . substantially . . . lessen competition" but already *has* substantially lessened competition in the thermal and SPRB coal markets. *Id.* (emphasis added). Defendants argue that they fall into the safe harbor because they have been simply "buying shares of multiple companies in the same industry—a natural and unremarkable result of index investing."  Defs.' Joint Mot. to Dismiss, Doc 64 at 24 (Mar. 17, 2025) ("MTD").  But as the Amended Complaint painstakingly

15

details, Defendants are not mere passive actors, buying and holding shares "solely for investment." 15 U.S.C. § 18. The stock Defendants purchased before they began their output-reduction scheme is also not exempt because, "[e]ven when the purchase is solely for investment, the plain language of § 7 contemplates an action at any time the stock is used to bring about, or in attempting to bring about, the substantial lessening of competition." *United States v. E.I. DuPont de Nemours*, 353 U.S. 586, 597–98 (1957).

### A.    Plaintiffs Adequately Plead a Violation of Section 7's Substantive Provision.

The substantive provision in Section 7 prohibits the acquisition of "any part of the stock" in one or more companies when the "effect of such acquisition, of such stocks or assets, or the use of such stock . . . may be substantially to lessen competition." 15 U.S.C. § 18. Applying this language, the Supreme Court has explained that "any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of the section whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce." *DuPont*, 353 U.S. at 592. The relevant time to determine whether the acquisition "may . . . substantially . . . lessen competition" is "at the time of the suit," not the time of the acquisition. *Id.* at 591, 598. Thus, it is no excuse that an acquisition did not have the potential to substantially lessen commerce when made, if such a potential arises even decades later. *Id.* at 591–92.

Plaintiffs have stated a claim for relief under Section 7. As the Amended Complaint sets forth, (1) Defendants committed to use the shares of stock they acquired—and the power and influence they confer—to pressure the publicly traded coal companies to reduce their output of coal and to make disclosures confirming such reductions; and (2) this effort succeeded in bringing about an industry-wide reduction in output that resulted in supra-competitive profits. In other words, Plaintiffs have adequately alleged that at the time this suit was filed, the effect of

Defendants acquiring their shares was that competition "may be"—and actually has been—"substantially . . . lessen[ed]." 15 U.S.C. § 18. That *a fortiori* states a Section 7 claim.

### 1.    Defendants' Acquisitions of Stock May (And Did) Substantially Lessen Competition.

The plain language of Section 7 establishes that "any" acquisition of shares is prohibited if the "effect" of that acquisition "may be substantially to lessen competition." *Id.* All parties agree that this is an "effects" test and not an "intent" test. *DuPont*, 353 U.S. at 607. All parties also agree that the standard is not whether the stock ownership will certainly harm competition, but whether a "reasonable likelihood" exists that it will. *Id.* at 592.

The Amended Complaint plausibly alleges that Defendants' acquisition of stock,[5] at the time the complaint was filed, *id.* at 589, risked substantially reducing competition in the thermal and SPRB coal markets, *see* 15 U.S.C. § 18. The best evidence of this "reasonable likelihood," *DuPont*, 353 U.S. at 592, is the evidence that competition was *actually* harmed after Defendants began leveraging their stock ownership to pressure coal companies to reduce output. Because this lawsuit was initiated after the "evil" of substantial reduction in competition came to fruition, *id.* at 597, there is no need to speculate on whether such reduction "may" be possible, 15 U.S.C. § 18; *see Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("[P]laintiffs can" demonstrate anticompetitive effects "directly or indirectly. Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition." (cleaned up)). If a plaintiff shows that a defendant or group of defendants has already substantially lessened competition by "reduc[ing] output, increas[ing] prices, or decreas[ing] quality in the relevant market," *id.*, then there is necessarily a "reasonable likelihood" that such lessening "may" happen. *DuPont*, 353 U.S. at 592.

---

[5] To see the exact percentages of stock owned by each Defendant, *see* AC ¶ 20 & tbl. 1.

The evidence that Defendants' significant ownership in every publicly traded coal company substantially lessened competition with respect to output of coal is overwhelming. All one needs to do is connect their coal-related actions with the inexplicable activity from the entities they own to determine that it is "plausible" that Defendants' ownership may have caused a substantial lessening of competition. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); 15 U.S.C. § 18.

Start with each Defendant's actions that incentivized coal companies to reduce output. Even if no conspiracy amongst them existed, each Defendant undisputedly used its shares in a manner that would tend to limit coal output across the entire market. Membership in the climate organizations is dispositive on this point. The Net Zero Asset Managers Initiative required members to pledge to utilize "all assets under management" as part of an "engagement strategy" to force a reduction in carbon output. AC ¶ 115 (quoting *The Net Zero Asset Managers Commitment, supra*). And, in the words of an investor representative for Climate Action 100+, members agreed to use their shares to "bring[] down the supply of oil, gas, *and coal*," *Id.* ¶ 120 (quoting *To Drive Meaningful Corporate Decarbonisation, supra* (emphasis added)). Defendants dispute whether their membership was part of a conspiracy, as compared to independent action, but there can be no doubt that their membership sends an explicit message to coal companies that they need to reduce their carbon output, and the only way a coal company can do so is by reducing the amount of coal it mines.

State Street's decision in early 2021 to use an "R-factor" to "inform [State Street's] . . . investment decisions," which penalizes companies for carbon emissions, further demonstrates how its ownership substantially lessened competition in the coal industry. *Id.* ¶ 166 (quoting *CEO's Letter on our 2020 Proxy Agenda, supra*). The more coal produced, the higher chance that an

adverse "investment decision" would be taken against that company. *Id.* Likewise, Blackrock's demand that coal companies "set short-, medium-, and long-term targets for greenhouse gas reductions" demonstrates its intent to reduce the amount of coal being mined. *Id.* ¶ 168 (quoting *Larry Fink's 2022 Letter to CEOs: The Power of Capitalism*, *supra*). And Vanguard's statement that coal companies will need to "reduce thermal coal production" to meet international climate goals and recommendation "that companies should disclose their plans" to do so speak for themselves. *Id.* ¶ 121 (cleaned up); *Investor Expectations for Diversified Mining, supra*. In short, each Defendant both signed a public agreement with the goal of reducing coal output and signaled its intention to follow through.

Defendants also created "engagement strateg[ies]" to deal with coal companies and then "escalat[ed]" by meeting directly with directors, voting shares against directors, and threatening divestment. AC ¶ 115 (quoting *The Net Zero Asset Managers Commitment*, *supra*). The purpose of this engagement was to convince, persuade, or coerce the board into reducing output and then disclose the reductions so others could follow suit. *Cf. id.* ¶ 168. Turning to the voting of their shares, State Street, *id.* ¶¶ 175–77, and BlackRock, *id.* ¶¶ 167–174, both voted against the management at several of the publicly traded coal companies when they had refused to comply with all the demands set by Climate Action 100+ and the Net Zero Asset Managers Initiative, which included reducing coal output and disclosing past, present, and future output targets. Importantly, these votes do *not* mean that the coal companies or their directors had necessarily refused to cut production. Cutting production was only one part of the directive; the other was disclosing cuts so that other industry members could verify that they were not being taken advantage of. AC ¶¶ 94, 117, 181.[6] Either ground would have been reason to vote against the

---

[6] Defendants dismiss the allegations establishing that they used proxy voting to discipline management that refused to adopt output reduction targets and disclosures on the ground that that these

directors. State Street's contention that there are no allegations that it specifically used its shares to support the effort to reduce output is thus inaccurate. The exhibits submitted by Vanguard reveal that it too voted against the management of Peabody Energy, one of the coal companies, and in support of setting "emission reduction targets" at another. *See* Ex. 2 at 7.

The "effect" of each Defendant's shareholder campaign was substantially lessened competition. 15 U.S.C. § 18. In response to the pressure from Defendants, publicly owned coal companies reduced output, either causing prices to rise or keeping them higher than a competitive market would otherwise allow. The result was billions of dollars in supra-competitive profits for companies owned by Defendants. AC ¶¶ 233–240. This fact is confirmed by the predictable response to rising prices of the *privately* held coal producers who, in the case of SPRB coal, increased their production while the publicly held coal companies were cutting their output. *Id.* ¶¶ 228, 242. Defendants' use of their shares and the corresponding harm to competition are sufficient to establish a violation of Section 7's substantive provision.

Defendants' main response to the data showing a drop in production from the coal companies owned by Blackrock, Vanguard, and State Street is one they repeat often at different places in their brief. They object to the Amended Complaint's use of output data for the period from 2019 through 2022 to demonstrate the effect of their shareholder campaign. The year 2020, Defendants believe, is the proper start time to analyze if direct evidence exists of whether their conduct "may" have "substantially . . . lessen[ed] . . . competition." MTD at 19–22; 15 U.S.C. § 18. But the Amended Complaint correctly begins the analysis of the coal markets in 2019 because

---

"votes invariably were based on concerns about the company's *disclosures* or lack of *any* emissions-reduction target." MTD at 28 (emphasis in original).  This argument contradicts the Amended Complaint, which alleges not that these votes were based on vague "concerns" about disclosures or the lack of "any" emissions targets, but on companies not "meet[ing] our aspirations of having adequate climate risk disclosures against all 4 pillars of TCFD," and "of having adequate climate-related metrics and targets." *E.g.*, AC ¶¶ 168–69.

doing so filters out the distorting effects that the COVID-19 pandemic had on demand, output, and global economic activity in 2020 and 2021. AC ¶ 241. And a proper baseline is obviously necessary to understand how the coal markets functioned.

2019 is the appropriate baseline to analyze coal production because it was the last year not affected by either the once-in-a-century demand shock of the COVID-19 pandemic or Defendants' unlawful scheme. *Id.* It thus serves as the proper baseline for how much coal publicly owned companies normally extract at market price. In other words, to determine whether Defendants' stock ownership and corresponding attempts to reduce competition influenced the market, it is extremely useful to know how the market normally functioned.

Plaintiffs' explanation of the output fluctuations must, of course, account for the 2020 drop in production caused by the COVID-19 pandemic, and it clearly does. After the pandemic drop in demand, publicly traded coal companies either continued to reduce their output from the already-depressed 2020 numbers or inched output up much slower than their private counterparts, remaining below the 2019 well-functioning-market baseline. AC ¶ 228–29 (tbls. 4 & 5). Plaintiffs thus include data from 2019 through 2022 because it is necessary to tell the complete story.

Defendants pick up the story partway through and thus miss important context. They use 2020 as their baseline and argue that there can be no inference that their holding and use of stock may have substantially harmed competition because total thermal-coal production is slightly up since 2020. MTD at 19–22. But this argument is deeply flawed.

First, starting the analysis in 2020 means that the baseline is set during the COVID-altered year. As Defendants readily admit, coal output was unnaturally low during 2020 because the pandemic drastically reduced demand. *Id.* at 20–21; AC ¶ 241. A country in lockdown needs much less energy, and much less coal, than a functioning one. Because Defendants set their baseline in

21

2020, their calculation that the output of coal has increased necessarily relies on a comparison to an artificially low period of demand. With 2021 and 2022 not having coal demand reduced by the COVID pandemic to the same extent, it is obvious that output would be higher in those years than in 2020. But Defendants' theory provides no explanation for why output amongst publicly owned SPRB and thermal coal producers never reached 2019 levels, especially as the *private* coal companies brought production back in line with pre-pandemic levels. *See* AC ¶ 228 (tbl. 4). The public coal companies never attempted to increase their production after COVID, which was economically inexplicable because SPRB and thermal-coal prices were between 20 and 30 percent *higher* in 2022. *Id.* ¶¶ 228–29 (tbls. 4 & 5). The Amended Complaint, by examining the last year *before* the pandemic, 2019, shows that coal output is substantially down from where it would be in a competitive market. Without including the 2019 data, the Amended Complaint would have only painted half of the picture.

Defendants' excuses for why prices rose and production dropped are even less convincing. In 2020, the price of thermal coal fell by about 10%, and the production of thermal coal by publicly owned companies fell by about 24%. *Id.* ¶ 229 (tbl. 5). But when the price of thermal coal later increased by 25.52%, the output of thermal coal amongst the publicly traded companies was still 19.2% lower than before the increase. *Id.* The increase in price while publicly owned coal companies continue to keep output far below their capacity (as demonstrated by their 2019 production) is clear evidence that Defendants' strategy of reducing output harmed competition and hurt consumers.

Even the data from 2020 to 2022, considered in isolation and pretending that COVID-19 did not lower the demand for coal in 2020, would still establish that Defendants' conduct had a "reasonable likelihood" of substantially reducing competition. *DuPont*, 353 U.S. at 592. The effect

22

of the output-reduction scheme on competition remains evident in the supra-competitive level of profits that the coal companies generated as they either cut or slowed their increases in output in response to surging prices. The price per metric ton of thermal coal first declined from $27.54 in 2019 to $24.93 in 2020, then rose to $25.85 in 2021, before finally surpassing its 2019 price in 2022, when it sharply rose to $34.57. AC ¶ 229 (tbl. 5). Even ignoring the 2019 data, as Defendants requested, the publicly traded coal companies responded to a 38% increase in thermal-coal prices between 2020 and 2022 with a paltry 5.6% increase in production. *Id.* In a rational market, that increase would have been significantly higher. Defendants offer no explanation whatsoever for why their coal companies lacked the capacity to respond rationally to price indicators.

Instead of seeing increased output to capture gains from significantly higher prices, the data shows sky-high *profits* despite this otherwise-inexplicable behavior. The obvious inference here is that Defendants were reaping the benefits of this massive price jump while continuing to suppress output. In other words, they were not competing. If one takes the proper start date as 2020, as Defendants claim, the profit spikes are even more drastic:

| Firm | 2020 | | 2022 | | 2020-2022 Change in output (millions of dollars and percentage | 2020-2022 Change in profits (millions of dollars and percentage |
|------|------|------|------|------|------|------|
| | Output (millions of tons) | Profits (millions of dollars) | Output (millions of tons) | Profits (millions of dollars) | | |
| Peabody Energy | 104 | ($211.3) | 101.2 | $1,381.6 | -2.8 -2.76% | +$1,592.9 +753.86% |
| Arch Resources | 54.8 | ($344.6) | 70.8 | $1330.9 | 16 29.20 | +$1,675.5 +486.21% |
| NACCO Nat. Res. | 31.0 | $25.44 | 28.5 | $38.31 | -2.5 -8.07% | +12.9 +50.59% |
| Consol Energy | 18.8 | $16.2 | 24.1 | $620.2 | +5.3 +28.19% | +604.0 +3,728.40% |
| Alpha Met. Resources | 13.9 | ($170.7) | 15.9 | $1,580.9 | +2 +14.39% | +1,751.6 +1,026.12% |
| Hallador Energy | 5.6 | ($8.9) | 6.5 | $30.4 | +.9 +16.07% | +39.3 +441.57% |

| Warrior Met Coal | 7.1 | ($27.1) | 5.7 | $801.4 | -1.4 -19.72% | +305.72 8,556.00% |
|---|---|---|---|---|---|---|

Given the astonishing profits that could have been earned selling at the 2022 price for coal, firms freely operating in a competitive market would have responded by increasing their output dramatically to capture as much of the market as they could. Yet the firms did not.

At an absolute minimum, what year is the proper starting point to analyze whether an anticompetitive effect took place is a question of disputed fact not fit for resolution in a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If Defendants wish to marshal expert-witness testimony regarding the nature of the coal markets and their relation with the COVID-19 pandemic, they may attempt to do so at the summary-judgment stage. But for now, it is Plaintiffs whose allegations must be credited, and Plaintiffs plausibly allege that 2019 is the correct baseline.

As a final attempt to argue that their actions could not substantially harm competition, Vanguard, Resp. in Supp. of Mot. to Dismiss, Doc. 66 at 4 (Mar. 17, 2025) ("Vanguard Resp."), and State Street, Resp. in Supp. of Mot. to Dismiss, Doc. 67 at 4 (Mar. 17, 2025) ("State Street Resp."), but not Blackrock, seek to downplay the scale of their influence by claiming that only a small percentage of their total assets under management were "managed in a net-zero aligned manner." This argument is a complete red herring, and the documents they cite show the extent of their pledge; they committed to use "all assets under management" to fulfill their goals. AC ¶ 115 (quoting *The Net Zero Asset Managers Commitment*, *supra*).

Start with the Net Zero Asset Managers Initiative. In State Street's separate motion, it states that "only 14% of State Street's assets" were managed in a net-zero fashion under the Initiative. State Street Resp. at 4. Vanguard's separate motion claims that only 4% of its assets under management were pledged to be managed in a "net-zero" fashion. Vanguard Resp. at 4. But if one looks at the "Net Zero Asset Managers Commitment" that all Defendants agreed to, it is

24

immediately clear that it requires "all assets under management" to be wielded in service of reducing carbon output, and not just those specifically dedicated to achieving net zero carbon emissions by 2050. AC ¶ 115 (quoting *The Net Zero Asset Managers Commitment*, *supra*). Included in the "all assets" section of the Net Zero Asset Managers pledge was a requirement to "[i]mplement a stewardship and engagement strategy, with a clear escalation and voting policy, that is consistent with our ambition for all assets under management to achieve net zero emissions by 2050 or sooner." *Id*. Defendants thus made a promise to use "all" of their assets to further a "clear escalation . . . policy" with respect to reducing carbon emissions. *Id.* The fact that a small percentage of assets were also pledged to be governed in a more stringent "net zero" manner that subjects those assets to *additional* requirements is irrelevant.

The direct evidence that Defendants' acquisitions harmed competition obviates the need for the Court to dig into whether Defendants' ownership alone "may" create a "reasonable likelihood" that competition in the coal sector would be substantially lessened. *DuPont*, 353 U.S. at 592; *see, e.g., Geneva Pharms. Tech. Corp. v. Barr Lab'ys, Inc.*, 386 F.3d 486, 500 (2nd Cir. 2004) (explaining that "[w]here direct evidence is *unavailable or inconclusive*, … power may be inferred from high market share." (emphasis added)). When Defendants' conduct demonstrates a real effect on competition by decreasing output and increasing prices, there is no need to conduct a theoretical inquiry into whether such substantial effects on commerce create a "reasonable probability" that markets may suffer. *DuPont*, 353 U.S. at 597.

If this Court nonetheless looks to "indirect" evidence, plenty exists to conclude that Defendants' stock ownership creates the prospect that they "may" substantially lessen competition. 15 U.S.C. § 18. The most important indirect evidence of the potential to substantially reduce competition is the Defendants' position as the largest shareholders in these coal companies.

25

BlackRock and Vanguard are among the top five, and often the top two, shareholders of nearly every publicly listed corporation in the United States. Indeed, Blackrock is the largest or second largest shareholder of every single publicly owned coal company, AC ¶ 20, while Vanguard is the largest or second largest for all but two, NACCO, where it is the third largest, and Hallador, where it is the fifth, *id.* Observing that the defendant in *du Pont* held sufficient sway to lessen competition with 23% of General Motors' stock, the Supreme Court relied in part on its relationship to other shareholders. Although 23% is not close to a majority, the other 77% of shareholders in that case were too diffused to fight against a large, sophisticated shareholder. *See DuPont*, 353 U.S. at 607 n.36. Thus, du Pont's position was likely to carry more weight than the 23% of stock it owned. Because Defendants own significant amounts of stock and are the largest shareholders in every single publicly traded coal company, the same logic applies here. Defendants' position as the largest shareholders grants them an extraordinary amount of influence over the publicly traded coal companies when compared to the remaining unorganized small-percentage shareholders. That authority "may" be used to reduce competition. 15 U.S.C. § 18.

If this Court looks for a minimum ownership threshold for purposes of assessing power under Section 7—which it need not do—it should adopt the 5% beneficial ownership level that the Securities and Exchange Commission has set as the threshold at which a shareholder must file either Schedule 13D or, if the purchase was made in the ordinary course of business with neither "the purpose nor the effect of changing or influencing the control of the issuer," 17 C.F.R. § 240.13d-1(b)(1)(i), Schedule 13G. This is the threshold at which the SEC has determined in other contexts that an acquisition has potential to result in the acquisition of influence of which the public should be made aware. Because Section 7 was enacted "to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation," S. Rep. No. 698, 63d Cong., 2d

Sess. 1, the level at which the SEC has determined that an investor can first exercise a power to influence a corporation would constitute an appropriate threshold for purposes of the Section 7 analysis.

If the Court concludes that Defendants have adequately pleaded a conspiracy between Defendants, instead of separate campaigns to reduce coal output, all of Defendants' shares should be added together because they are acting as one common entity. In such a case, Defendants' ownership in most of the publicly owned companies would be around 30% and thus easily satisfy the requirement that it may substantially reduce competition. *See DuPont*, 353 U.S. at 607 (stating that 23% ownership in that case was sufficient to exercise anticompetitive influence).

Finally, when analyzing the indirect evidence of the potential to harm competition, the Court need not blind itself to the fact that Defendants intended to do so. A purchase made by an entity that harbors an intent to lessen competition is more likely to substantially lessen competition than a purchase made by an entity that, for example, desires only to improve corporate management. In other words, the inquiry into indirect evidence is not limited to the percentage of shareholding but also to the context in which the shares are held. *Cf. id.* at 598–99. And that context demonstrates a much higher risk to competition than if Defendants had simply purchased these shares and kept quiet.

### B.    Defendants' Actions Do Not Fall Within Section 7's Safe Harbor.

Section 7 contains a safe-harbor provision where conduct that would otherwise violate Section 7 may be immunized from liability, and Defendants claim that they fall within it. MTD at 24. The safe harbor states that Section 7 "shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." 15 U.S.C. § 18. Section 7 thus applies to conduct that "may . . . substantially . . . lessen competition" unless two other conditions are

satisfied. *Id.* First, the stock was purchased "solely for investment." *Id.* Second, the stock was not thereafter "us[ed]" "by voting or otherwise" to either bring about or attempt to bring about "the substantial lessening of competition." *Id.*

The Amended Complaint alleges that Defendants do not satisfy the "solely for investment" requirement for any purchase of stock made after they joined the climate organizations. And they do not satisfy the "use" requirement for *any* of the stock because they employed all their holdings, "by voting or otherwise," in a way that substantially lessened competition. *Id.* Thus, they cannot use the safe-harbor provision to shield themselves from liability.

### 1.    All Shares Purchased After Defendants Joined Climate Groups Were Not Purchased "Solely for Investment."

Defendants fail to satisfy the first requirement of the safe-harbor analysis because they continued to acquire shares in the relevant coal companies after they joined Climate Action 100+, Net Zero Asset Managers Initiative, or both. The shares purchased after that point were no longer intended "solely" for investment. 15 U.S.C. § 18. Thus, Defendants cannot meet their burden to escape liability under the safe-harbor provision. *See* PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1204b & n.8 (4th ed. Cum. Supp. 2020) (explaining that the burden of proof to establish safe-harbor protection should "rest on the party claiming that its acquisition is for investment only").

Two words require defining. The first term is "solely." As one would expect, it meant the same thing in the early 1900s as it does today; "[s]ingly; alone; only; without another." 2 NOAH WEBSTER, A DICTIONARY OF THE ENGLISH LANGUAGE 1061 (1900); *see also Solely*, MERRIAM WEBSTER'S DICTIONARY ONLINE, https://perma.cc/J9Z2-LN49 ("to the exclusion of all else; without another"). To take advantage of the safe harbor, a Defendant must have purchased the stock "only" for investment "without another" purpose.

Saying that "investment" must be the "sole[]" goal necessarily raises the question of what the Clayton Act means by "investment." In the early 20th Century, to "invest" meant to outlay money with the goal of earning "revenue or income." *Invest*, BLACK'S LAW DICTIONARY (2d ed. 1910). Notably, courts interpreting the Clayton Act have held that "investment" in the Section 7 context excludes outlaying money with the intent to exercise "influence or control over the firm whose stock is purchased," *Crane Co. v. Harsco Corp.*, 509 F. Supp. 115, 123 (D. Del. 1981), on issues such as "buying" or "selling practices," Areeda & Hovenkamp, *supra*, ¶1204c; *see also DuPont*, 353 U.S. at 602. In other words, when "investment" is used in the Clayton Act, it does not include the exercise "influence *or* control" over the company. *Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 695–97 (2d Cir. 1973) (emphasis added) (contrasting these concepts).

Combining "solely" and "investment," the solely-for-investment prong requires that the "only" reason that the Defendant purchased the stock was to achieve passive growth while the Defendant does not "influence significantly" actions of the target firm. *Crane Co.*, 509 F. Supp. at 123. Thus, the Supreme Court has held that "[a] company need not acquire control of another company in order to violate the Clayton Act." *Denver & Rio Grande W. R.R.*, 387 U.S. at 501 (1967). Because actual control is not required, the solely-for investment requirement is a "quite stringent" standard for a Defendant to satisfy. Areeda & Hovenkamp, *supra*, ¶ 1204c; *see also Crane Co.*, 509 F. Supp. at 123 ("[T]he Court will not exempt from antitrust scrutiny an acquisition which may give the offeror the power to influence the target's management.").

Any acquisition of stock in a publicly traded coal company by Defendants after they joined either Climate Action 100+ or the Net Zero Asset Managers Initiative fails the investment-only test. Defendants had committed in writing that they intended to influence policy at the carbon-

29

intensive companies that they owned, such as coal companies. AC ¶ 115. When an owner buys stock after creating an "engagement strategy," *id.*, to reduce output at the company it owns, the owner cannot be said to have purchased the stock "solely" for investment purposes, 15 U.S.C. § 18. The purchaser has literally pledged that it will attempt to exercise influence over some operations. Further, because persons are generally "presumed to intend to probable consequences" of their actions, Defendants bear a significant burden to demonstrate that their intent was an innocent investment and not the exercise of influence. Areeda & Hovenkamp, *supra*, ¶ 1204b.

Defendants argue that a desire for "control" over "day-to-day affairs" is required to fall outside of the solely-for-investment clause. MTD at 25. Therefore, the argument goes, voting shares against production, publicly demanding coal companies drop output for climate-change reasons, and directly meeting with the directors as part of their "engagement strategy" does not take them outside of it. AC ¶ 115. But "[a] company need not acquire control of another company in order to violate the Clayton Act." *Denver & Rio Grande W. R.R.*, 387 U.S. at 501; Areeda & Hovenkamp, *supra*, ¶ 1204c ("[T]he fact that control is unlikely will not in itself suffice to demonstrate an investment purpose where, for example, the acquirer seeks to influence" things like "buying decisions."); *see also DuPont*, 353 U.S. at 607 (violation of Section 7 with under a 25% stake). And the idea that some types of influence are permissible and other kinds are forbidden is not written into the statute, which declares that a purchase must be "solely" for investment for the safe harbor to apply. 15 U.S.C. § 18.

Tellingly, the principal case Defendants attempt to rely on to draw this distinction involved nothing like the kind of influence Defendants pledged to exert here. In *United States v. Tracinda Inv. Corp.*, the purchasers in a challenged acquisition argued that their acquisition fell within the investment-only provision because they "voluntarily restricted themselves," through a contract,

"in the extent to which they may utilize their stock to vote for directors." 477 F. Supp. 1093, 1099–100 (C.D. Cal. 1979). The government nonetheless contended that a provision in the contract requiring the target company to "consult" with the purchaser showed that the purchase of stock was not solely for investment and the purchaser intended to influence the target through these meetings. *Id.* at 1101. The district court disagreed because the voting restriction and other independence guarantees in the contract made it clear that the purchaser was not able to use his shares to materially alter the target company's decision-making process.

Defendants' actions in this Amended Complaint are wholly different than those in *Tracinda*. Defendants did not sign a contract or otherwise impair their ability to influence corporate policy. The exact opposite is true. They affirmatively pledged to use their holdings to influence corporate policy through their commitment to the climate groups. AC ¶¶ 115, 117, 129. And given these commitments and their other public statements, it is perfectly reasonable to infer that their meetings with management were for the purpose of cajoling output reductions and disclosures, not merely getting updates on the companies' activities. It would fly in the face of reality to conclude, as Defendants assert, that they were simply "stay[ing] abreast of corporate affairs" when meeting with coal-company executives. MTD at 26.

Defendants' argument that the safe harbor applies absent day-to-day control, as evidenced by at least a 25% stake in the company, *id.* at 25–26, would also immunize significant anticompetitive behavior from the reach of Section 7. Under Defendants' theory, an asset manager could acquire substantial minority stakes in every company in an industry for the stated purpose of demanding that management raise prices and reduce output or face a proxy war. Under Defendants' interpretation, so long as the asset manager was exercising influence and not day-to-day control, there would be no violation of Section 7 if he succeeded in his plan. The antitrust laws

31

should not be interpreted to allow for such blatantly anticompetitive behavior. *See* Areeda & Hovenkamp, *supra*, 1204b ("[P]ermitting anticompetitive investment is directly contrary to the central purpose of the Clayton Act"). When an "institutional investor" makes an acquisition that "is deemed to threaten sufficient anticompetitive results to satisfy the statutory effects clause, it should be illegal under § 7." *Id.*

### 2.    Defendants Used All of Their Shares to Bring About a Substantial Lessening of Competition.

Even if Defendants had purchased all of their shares "solely for investment," they would still not qualify for the safe harbor because they later used those shares to bring about, or attempted to bring about, a substantial lessening of competition. *Id*. The Supreme Court has made clear that "[a]cquisitions solely for investment are excepted, *but only if, and so long as*, the stock is not used by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." *DuPont*, 353 U.S. at 589 (emphasis added). Therefore, if an acquisition of stock "may" threaten competition but was acquired "solely for investment," then the acquisition is not illegal under Section 7 unless actually "us[ed] . . . by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." 15 U.S.C. § 18.

Defendants clearly "us[ed]" all of their shares in a way that harmed competition. To "use" means to "active[ly] employ[]." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). On that point, Defendants and Plaintiffs are in agreement. MTD at 28 (same definition). Defendants actively employed their shares to substantially reduce competition in a variety of ways. They used those shares to vote against directors when their companies were either insufficiently cutting production or refusing to disclose production cuts. AC ¶¶ 168–74, 177. They used those shares to secure meetings with management to cajole them into cutting output. *Id.* ¶¶ 157, 162, 164, 175. And they used those shares as leverage, with threats of divestment, to hold over managements' heads if they did not go

along with the scheme. The actions described throughout the Amended Complaint and explained here all constitute the active employment of Defendants' shares through "voting or otherwise." 15 U.S.C. § 18.

Defendants' claim that they did not "us[e]" their shares within the meaning of Section 7. Although not explicitly stated, Defendants' position seems to be that the actions described above, outside of proxy voting, do not constitute "using" the shares within the meaning of Section 7. But that intimation is wrong. Section 7 explicitly contemplates that more than simply voting precludes use of the safe-harbor provision by including a catchall phrase, "or otherwise," in its prohibition on "attempt[ing] to bring about[] the substantial lessening of competition." *Id.* Defendants' actions of pledging their shares to an output-reduction scheme, using those shares to gain access to boards, and threatening to divest those shares are all ways to "otherwise" bring about "the substantial lessening of competition" discussed throughout the complaint. *Id.*[7]

No case Defendants cite identifies a necessary condition on what it means to "us[e]" a stock. For example, in *American Crystal Sugar Co. v. Cuban-American Sugar Co.*, a district court in the Southern District of New York observed that a stock acquisition was used "to bring about . . . a substantial lessening of competition" when the defendant repeatedly demanded seats on the target company's board and obtained "interim financial statements not generally made available to the

---

[7] Defendants' brief emphasizes that the safe-harbor provision protects acquisitions of stock so long as they are not "us[ed]" to reduce competition, 15 U.S.C. § 18, requiring an action by Defendants instead of simply an anticompetitive effect (like the substantive provision requires). But this is a response to an argument that nobody is making. Plaintiffs allege that Defendants violated the substantive provision of Section 7 because, after they committed to pursuing the aims of Climate Action 100+ and the Net Zero Asset Managers Initiative, a reasonable probability arose (and quickly came to fruition) that their ownership in the coal companies could have the effect of substantially lessening competition. The existence of a substantial probability triggered the substantive provision of Section 7. And it was when Defendants actually used their shares that their acquisitions ceased to enjoy any protection that they may have enjoyed under the safe-harbor provision.

public or other stockholders." 152 F. Supp. 387, 394 (S.D.N.Y. 1957), *aff'd*, 259 F.2d 524 (2d Cir. 1958). Plaintiffs wholeheartedly agree that seeking board seats and leveraging stock to obtain private information count as "using" stock. 15 U.S.C. § 18. But the fact that these activities are sufficient to establish the use of stock does not mean they are *necessary* to do so.

Defendants' final argument relies on the surplusage canon. Unless the Court adopts a broad interpretation of the safe-harbor provision, they believe that provision would be superfluous and essentially reach conduct that would not have violated Section 7's substantive provision in the first place. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (surplusage canon). But they are wrong. The safe-harbor provision does meaningful work under Plaintiffs' plain-text reading. For example, under Plaintiffs' reading, the safe-harbor provision protects a purchaser of stock who initially intended to use it "solely for investment" purposes but later decides to actively employ those shares to influence company decisions. 15 U.S.C. § 18. So long as the purchaser does not bring about (or attempt to bring about) a substantial lessening of competition through his actions, he is protected. In other words, the safe-harbor provision requires actual reduction in competition—as compared to the substantive provision's "may" standard—for stocks bought solely for investment purposes. *See Anaconda Co. v. Crane Co*, 411 F. Supp. 1210, 1219 (S.D.N.Y. 1975) ("Once it is established to the satisfaction of the Court that the acquisition is 'solely for investment,' the statute requires a showing that the defendant is 'using the (stock) by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition."). The safe-harbor provision thus plays an important role in raising the burden to demonstrate harm to competition when stocks are purchased solely for investment. The fact that it does not do more does not make it "a near nullity." MTD at 26.

34

Even if a plain-text reading of the safe-harbor provision meant that it has no independent force, that would not be a reason to stray from the text of the statute. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174–76 (2012) (explaining that the surplusage canon "cannot always be dispositive"). Indeed, Professors Areeda and Hovenkamp take the position that the solely-for-investment carveout is not a true "exception" to Section 7's substantive provision but a belt-and-suspenders guarantee of noninterference to bona fide passive investors (who would not violate Section 7 in the first place). *See* Areeda & Hovenkamp, *supra*, ¶ 1204b & n.8; *see also* Fiona Scott Morton & Herbert Hovenkamp*, Horizontal Shareholding and Antitrust Policy,* 127 YALE L. J. 2026, 2042–44 (2018) (asserting that the safe-harbor provision "was meant as little more than an assurance to purely passive investors rather than as a limitation on the Clayton Act's coverage"). If the presumption that a person intends the natural consequences of his actions is sufficiently robust, then "a court's finding that the acquisition would probably tend substantially to lessen competition would necessarily mean that the acquirer so intended, objectively speaking. Consequently, its acquisition could not be solely for investment." Areeda & Hovenkamp*, supra*, ¶ 1204b; *see also In re Golden Grain Macaroni Co.*, 78 F.T.C. 63, 72 (1971) ("[W]hen an acquisition will necessarily affect the competitive behavior of the two involved firms, it cannot be said that the *sole* purpose of the acquisition was for investment." (emphasis in original)). In other words, the safe-harbor provision merely restates the substantive provision to provide additional clarity for purely passive investors.

Ultimately, there is no need to decide the precise scope of the safe-harbor provision. Under any reasonable interpretation of the phrase "solely for investment," Defendants' goal of using their shares as a vehicle to drive down coal output through a mix of threats, engagements, and votes excludes them from the safe-harbor provision. 15 U.S.C. § 18.

### 3.   Vanguard's Disjunctive Interpretation of the Safe-Harbor Provision Has No Support.

Vanguard, but not Blackrock or State Street, claims that the safe-harbor provision necessarily protects acquirers unless the stocks are actually "use[d]" to substantially lessen competition. State Street Resp. at 8. That interpretation is not plausible and reads out the "solely for investment" requirement. 15 U.S.C. § 18. The safe-harbor provision plainly requires that the stock both be purchased "solely for investment *and*" that acquirors "not us[e] the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." *Id.* (emphasis added). The provision is conjunctive. If the acquisition that may substantially lessen competition is made for a goal other than purely "investment," the acquisition can be enjoined even before the stock has been "use[d]" to substantially lessen competition. *Id.* The entire point of Section 7 is to stop these acquisitions in their "incipiency," and Vanguard's atextual reading would do the opposite. *DuPont*, 353 U.S. at 597–98.

### C.    Plaintiffs Were Not Required to Identify Specific Acquisitions During the Relevant Period That Substantially Reduced Competition.

Defendants' final attempt to evade Section 7 liability also fails. They contend that a plaintiff alleging a violation of Section 7 must plead that specific acquisitions of shares made within a given period had the effect of substantially lessening competition.[8] MTD at 30–33; *see also* State Street Resp. at 2–4.

But the Supreme Court rejected the argument that Section 7 contains such a requirement in *United States v. E.I. DuPont de Nemours.* 353 U.S. 586 (1957).  In *DuPont,* a case brought by

---

[8] Plaintiffs note that the specific allegations related to acquisitions made since 2021 were included in the complaint because, as discussed below, those shares were purchased after Defendants had become signatories to Climate Action 100+ and the Net Zero Asset Managers Initiative, and thereby committed themselves to using shares to achieve non-investment purposes, were not purchased "solely for investment" and thus did not satisfy either prong of the safe-harbor analysis.

the United States in 1949, Defendants' acquisitions of shares had all taken place between 1917 and 1919. *Id*. at 588. Defendants argued that "because § 7 is applicable only to the acquisition of stock and not to the holding or subsequent use of the stock," the suit could not be brought in 1949. *Id.* at 596–97.

In rejecting this argument, the Supreme Court explained why Section 7 does not merely focus on individual acquisitions. The "objective toward which § 7 is directed" is stopping the "creation of trusts, conspiracies, and monopolies in their incipiency and before consummation." *Id*. at 597. To accomplish that objective, Section 7 reaches acquisitions, regardless of when they were made, at any time they threaten to ripen into an arrangement that may substantially lessen commerce:

> 'Incipiency' in this context denotes not the time the stock was acquired, but any time when the acquisition threatens to ripen into a prohibited effect.  To accomplish the congressional aim, [a plaintiff] may proceed at any time that an acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce or tend to create a monopoly of a line of commerce.

*Id.* (*citing Transamerica Corp. v. Bd. of Governors*, 206 F.2d 163, 166 (3rd Cir. 1953)). In other words, the Supreme Court held that Section 7's substantive provision is not concerned with the "time the stock was acquired" at all; it is only concerned with when the ownership of such stock becomes a threat to competition. *Id.* Thus, the proper time to analyze is "the time of the suit." *Id.* at 598 (emphasis added). And if the possibility of lessening competition at the time of the suit is all that matters for the substantive provision, then the plaintiff has no reason to plead the date and time of each acquisition.

Here, that threat to competition arose in 2021 (at the very latest), with respect to every share in the publicly owned coal companies that Defendants held, regardless of when that share was first acquired. By alleging that Defendants committed to use the shares they have acquired,

37

now hold, and will acquire in the future, to obtain industry-wide commitments to reduce output, Plaintiffs have more than satisfied that pleading standard.[9]

## II.    Defendants' Scheme Violates Section 1 of the Sherman Act.

The Amended Complaint also properly pleads a violation of the Sherman Act. While Section 7 of the Clayton Act does not require an agreement between the Defendants, Section 1 of the Sherman Act only prohibits "conspirac[ies] in restraint of trade." 15 U.S.C. § 1; *see Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 342 (1982). To establish a violation of Section 1, a plaintiff must allege "that: (1) the [Defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Apani Sw., Inc. v. Coca–Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002). Defendants do not contest that the relevant markets are SPRB coal and thermal coal, so only the first two requirements are in dispute.

To allege that a conspiracy existed, a plaintiff must properly contend "that the defendants engaged in concerted action, defined as having a conscious commitment to a common scheme designed to achieve an unlawful objective." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (internal quotation marks omitted). An agreement that violates the Sherman Act can be explicit, such as an affirmative agreement to set a price floor or output limit. Or it may be implicit, where multiple actors enter a "tacit" agreement to do the same. *See Twombly*, 550 U.S. at 553. To determine whether the conspiracy constituted an unlawful restraint of trade, the Court will either determine that the agreement is *per se* unlawful, *Leegin Creative Leather*

---

[9] Defendants and their amici's misguided arguments based on novelty and policy have no bearing on the meaning of Section 7. They assert that no claim like this has ever been brought under Section 7, but to the extent this case is atypical, Defendants' own unprecedented actions are to blame. Nobody before them had violated Section 7 in this way, so there was no reason to sue. Likewise, the policy concerns here can be obviated by Defendants stopping their pressure campaign and taking steps to ensure compliance with the safe-harbor provision.

*Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) or determine whether it fails the Sherman Act's "rule of reason," *NCAA v. Alston*, 594 U.S. 69, 81, 88 (2021).

### A.  The Amended Complaint Adequately Pleads a Conspiracy.

The existence of a conspiracy or scheme can be shown through "direct" or "circumstantial" evidence. "Direct" evidence is that which "explicitly refers to an understanding" between defendants. *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002). For example, a recording of a phone call where parties enter an agreement or a document signed by the conspirators that contains an "explicit reference to an agreement." *Id.*; *City of Pontiac Pol. & Fire Retirement Sys. v. BNP Paribas Secs. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024). "[I]ndirect . . . evidence" consists of circumstantial facts that make it plausible that the defendants entered a conspiracy. *City of Pontiac*, 92 F.4th at 391. It usually consists of parallel conduct accompanied by additional indicia that show the parallel conduct was not the result of independent acts. *See id.*

### 1.  The Amended Complaint Provides Direct Evidence of a Conspiracy.

The Amended Complaint provides evidence that "explicitly refers to an understanding" between Defendants to conspire. *Viazis*, 314 F.3d at 762 (cleaned up). Defendants each signed agreements that explicitly sought to reduce coal output through a pressure campaign. As the Supreme Court has explained, "[a]cceptance by competitors . . . of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act*." Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939).

Start with Net Zero Asset Managers Initiative. Each Defendant signed onto the initiative in 2021. AC ¶ 129. Blackrock and Vanguard joined on *the exact same day*, March 29, 2021, and State Street joined on April 20, 2021, approximately three weeks later. *Id.* ¶¶ 132, 137, 143. Joinder in

the Initiative required Defendants to "commit[] to support the goal of net zero greenhouse gas ('GHG') emissions by 2050" using "all assets under management." *Id.* ¶ 130 (quoting *The Net Zero Asset Managers Commitment*, *supra*). More specifically, they all agreed to "[i]mplement a stewardship and engagement strategy, with a clear escalation and voting policy, that is consistent with our ambition for all assets under management to achieve net zero emissions by 2050 or sooner" for "all assets under management. *Id.* ¶ 115. A main goal of the Net Zero Asset Managers Initiative is phasing out coal investments, as the organization "expect[ed] members to "immediately ceas[e] all financial or other support to coal companies* [sic] that are building new coal infrastructure or investing in new or additional thermal coal expansion, mining, production, utilization (i.e., combustion), retrofitting, or acquiring of coal assets." *Id.* ¶ 131 (*quoting Net Zero Asset Managers initiative: Network Partner's expectation of signatories with regard to fossil fuel investment policy*, *supra*). This policy is especially probative because it requires signatories to make direct threats toward coal companies. If companies "build[] new coal infrastructure or invest[] in new or additional thermal coal expansion," then signatories to the Net Zero Asset Managers Initiative are directed to "immediately ceas[e] all financial or other support" to those companies. *Id.* In other words, members of the Net Zero Asset Managers Initiative have agreed to tell coal companies not to invest in increasing capacity or they will pay the price.

Blackrock and State Street's joinder in Climate Action 100+ is also direct evidence of a conspiracy to restrict coal production. Signatories to the Climate Action 100+ "commit[ed]" to one another that they would engage with companies and "seek[] to ensure they . . . [t]ake action to reduce greenhouse gas emissions" and "[p]rovide enhanced corporate disclosure" of their greenhouse-gas emissions. AC ¶ 117 (full quotations in *Black Rock Joins Clime Action 100+ to Ensure Largest Corporate Emitters Act on Climate Crisis*, CLIMATE ACTION 100+ (Jan. 9, 2020),

https://perma.cc/ZGY5-W8DY). Climate Action 100+ has not been shy about the goals it has for members when it comes to coal. As explained in Climate Action 100+'s "Investor Expectations for Diversified Mining," "the most emission-intensive fossil fuel, [coal's] reduction is prioritised in climate modelling . . . requiring a reduction of 50% in thermal coal production by 2030 versus 2021, and 91% by 2050." *Id.* ¶ 118 (quoting *Investor Expectations for Diversified Mining*, *supra*, at 37). As Climate Action 100+'s investor network representative for North America threatened, "[i]f companies aren't willing or able to respond to the challenge of moving towards a net zero transition, we will look for new leadership." *Id.* ¶ 124 (quoting *To Drive Meaningful Corporate Decarbonisation*, *supra*).

It should be obvious that companies targeted by Climate Action 100+ members could not hit their emissions targets without cutting coal production. As Climate Action 100+ explicitly stated "the mining sector and its value chains will also need to decarbonise. For some commodities, this means reducing production. In net zero scenarios, coal production declines towards zero, with thermal coal declining faster than metallurgical coal." *Id.* ¶ 120 (*quoting Investor Expectations for Diversified Mining*, *supra*, at 2).

Climate Action 100+ also directed its members to disclose Scope 3, category 11 emissions. *Id.* ¶ 122. In the context of coal, Scope 3, category 11 emissions are the emissions released by the end-use consumption of coal. Thus, if a company releases its anticipated Scope 3, category 11 emissions, it tells competitors its future coal output. *See id.* Making such disclosures allows for competitors to monitor the other members of the agreement and ensure that they are not increasing output to the detriment of the other members.

41

Defendants' decision to sign up for these organizations constitutes direct evidence of a conspiracy. Defendants joined together with each other and other entities to reduce the output of coal in the companies they owned.

Defendants respond to their explicit joinder in groups that collectively seek to reduce coal output by arguing that the mere existence of trade associations is not a "walking conspiracy." *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293 (5th Cir. 1988). Even if these organizations were properly classified as "trade associations," there is no get-out-of-antitrust-free card when trade organizations turn into the venue for an illegal conspiracy. True, the existence of a trade association that sets industry standards without attempting to "constrain[] others to follow its recommendations" does not necessarily establish a conspiracy to restrain trade, *id.* at 292, but that is not what happened here. The entire point of joining the Net Zero Asset Managers Initiative and Climate Action 100+ was to bind Defendants to make their best efforts to reduce carbon output, especially through the burning of coal. Defendants were not simply members in a group that made recommendations to them. Simply joining these groups requires non-optional commitments to artificially constrain trade.

The requirements of Climate Action 100+ and Net Zero Managers Initiative are thus far afield from an industry group being sued under the Sherman Act for providing nonbinding advice regarding products and services. In the cases where trade associations were held not to violate Section 1 of the Sherman Act, it was highly relevant that membership in the trade associations came with no strings attached, unlike membership in climate organizations which was premised on competition-reducing promises made upon admittance. Perhaps the best example of a trade-association case in the Fifth Circuit is *Consolidated Metal Products*. There, the American Petroleum Institute (API), a trade association, would grant (or deny) a license to display an API

monogram, demonstrating that API viewed the equipment as satisfying certain quality standards. *Id.* at 286. A manufacturer who was denied a right to use the monogram sued, alleging that the arrangement violated the Sherman Act. The Fifth Circuit held that the monogram-licensing program did not violate the Sherman Act because API did not "coerce[] or "otherwise constrain[]" its members or the general public to only buy "monogrammed products." *Id.* at 296. The same cannot be said of the climate organizations relevant to this case. Their entire purpose was to serve as a place to coordinate efforts to coerce publicly owned companies into reducing carbon output, including coal.

The fine print in a single Climate Action 100+ document and various half-hearted public statements from Defendants about their fiduciary duties do not diminish the direct evidentiary value of membership in these groups. Defendants note that the "disclaimer" section of the Climate Action 100+ "Expectations for Diversified Mining" paper states that Climate Action 100+ "does not require or seek collective decision-making." MTD at 11. Similarly, Defendants released statements at various points affirming that they would "act independently according to its fiduciary duties and the preferences of its clients." *Id.* at 11 & n.12.

These disclaimers are plainly insufficient to escape liability for two reasons. First, Defendants only point to a single document that contains an explicit disclaimer of collective decision-making. *Id.* at 11. The existence of a disclaimer of "collective decision-making" on that document does not somehow negate the probative value of every other document where Defendants promised to engage in collective decision-making. And this disclaimer, which was not included in the Amended Complaint, is also insufficient in its own right to negate the statements made in the Expectations for Diversified Mining document. If an organization enters a blatant cartel but adds a disclaimer that it is following the law, there is a violation of the law all the same;

what matters is the substance of the agreement. For these same reasons, the handful of statements released by Defendants that they act independently and are fiduciaries for their clients are plainly self-serving and insufficient to prevail at the motion-to-dismiss stage. What matters is the agreements they entered into, not how they tried to publicly spin them.

### 2. The Amended Complaint Contains Sufficient Indirect Evidence to Plausibly Plead a Conspiracy

Much of the same evidence that could be considered "direct" is also overwhelmingly persuasive as "indirect" or "circumstantial" evidence. Circumstantial evidence of a conspiracy usually takes the form of parallel conduct of the conspirators plus some sort of "factual enhancement" or "plus factor" to move the complaint from possible to plausible. *See Twombly*, 550 U.S. at 557; *see also City of Pontiac*, 92 F.4th at 391. These enhancements can include, but are not limited to, actions that would otherwise be against defendants' financial interests, possessing "a motive" or "opportunities to conspire," "sharing of pricing information," "signaling among competitors, and other traditional facts suggestive of conspiracy." *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022); *see also* Areeda & Hovenkamp, *supra*, ¶ 307 (listing nonexhaustive factors). The Amended Complaint alleges such actions in droves.

### a. Parallel Conduct.

The Amended Complaint is replete with parallel conduct. Most prominently, Defendants all engaged in parallel campaigns to force coal companies to reduce their output of coal. Each Defendant signed an agreement to develop an "engagement" and "voting" strategy with respect to carbon output and then followed through on that plan by making public threats to coal companies that produced too much coal, engaging with directors, and voting against directors. AC ¶ 115. Perhaps most prominently, Defendants all joined the Net Zero Asset Managers Initiative within

one month of each other in Spring of 2021, with Blackrock and State Street joining on the same day. *Id.* ¶ 132, 137.

Defendants highlight the fact that not every single action they took during the conspiracy was also undertaken by the other Defendants. MTD at 13–14. For instance, they note that only Vanguard disclosed specific meetings with coal companies about their output. *Id.* They also note that Blackrock and State Street voted against directors who were insufficiently solicitous of their coal-reduction goals, whereas Vanguard did not.[10] *Id.* They also dispute that joining the climate organizations was parallel conduct because Vanguard did not join Climate Action 100+, and Defendants did not all join at the exact same time.

These arguments fail for two reasons. First, there are multiple allegations that identical conduct took place. For instance, joining the Net Zero Asset Managers Initiative within one month of each other is about as parallel as an activity can be, especially with respect to Blackrock and Vanguard, which joined on the same day. AC ¶ 132, 137, 143. It is hard to believe that was coincidental. Second, Defendants' claim that the allegations in the Amended Complaint are insufficiently "parallel" is wrong because it analyses whether conduct is "parallel" at far too specific level of generality. The Supreme Court has acknowledged that "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227. What matters is that each Defendant took actions with the same goal, coercing the coal companies to reduce output. It is not relevant that Defendants' attempts to coerce occasionally took different forms or were not "simultaneous," *id.*, so long as their actions reflected commitment to the same strategy. At its core, the parallel

_____

[10] Defendants' own exhibits reveal that Vanguard did vote its proxies against board members because of their failure to sufficiently disclose their emissions. *See* Ex 2 at 7.

conduct here is that each waged a campaign to cut coal output. The fact that the campaigns occasionally involved slightly different tactics is irrelevant.

The cases relied upon by Defendants are inapposite. For instance, they cite *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010), for the proposition that "[p]arallel conduct may be suggestive of an illegal agreement when the alleged parallel behavior is 'precisely the concerted action that is the conspiracy's object.'" MTD at 14. Essentially, their position is that only parallel reduction of price or output can serve as evidence of a conspiracy. But *In re Insurance Brokerage Antitrust Litigation* does not stand for the proposition that parallel behavior must be "precisely the concerted action that is the conspiracy's object." *Id.* Indeed, the full quote reads "*in many cases* where an agreement exists, parallel conduct—such as setting prices at the same level—is precisely the concerted action that is the conspiracy's object." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 321 (emphasis added). The fact that the parallel action is often the precise goal of the conspiracy does not mean that the Third Circuit was creating such a requirement. Indeed, the fact that it stated "in many cases" implies that this is not a universal rule, and parallel conduct need not simply be the raising of prices or reduction of output.[11] *Id.*

### b. Additional Plus Factors.

In addition to alleging parallel conduct by Defendants, the Amended Complaint alleges "plus" factors that move the allegations of a conspiracy from possible to plausible. *See Twombly*, 550 U.S. at 553–54, 556 n.4. Most obvious are the economically irrational actions that the scheme persuaded the publicly owned coal companies to take. As explained throughout this brief, the publicly traded coal companies either reduced output or failed to increase output in the face of

---

[11] Although not conduct by Defendants, the refusal of the publicly traded coal companies to hit their 2019 baseline is also parallel conduct that serves as evidence that a conspiracy is afoot. Defendants point to no requirement that the parallel conduct must be conduct by them, rather than conduct by the parties they are manipulating.

huge price spikes. In a well-functioning market, these coal companies would have attempted to increase output to capture the gains from the increased prices. As the largest owners of the publicly traded coal companies, it would likewise be economically irrational for Defendants to advocate for such cuts unless they were made across the board.

Defendants contend that no such economically irrational actions existed, but their assertions rely on the same misunderstandings that defeat their argument relating to the alleged lack of an injury under the Clayton Act. Defendants had the capacity and motivation to increase output, yet unlike the privately owned companies, they chose not to do so.

The fact that Defendants influenced the publicly traded coal companies to take actions not in their best economic interest, when added to the parallel conduct described above, is enough to get over the motion-to-dismiss line. "A plausible allegation that the parallel conduct was not in the alleged conspirators' independent self-interest absent an agreement is generally considered the most important "'plus factor.'" *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544 (E.D. La. 2016) (quoting ABA SECTION OF ANTITRUST LAW, PROOF OF CONSPIRACY UNDER FEDERAL ANTITRUST LAWS 70 (2010)) (collecting cases); *see also In re Travel Agent Comm'n Antitrust Litig.,* 583 F.3d 896, 907–08 (6th Cir. 2009).

In addition to the economically incoherent actions of the Defendant-owned coal companies, other plus factors indicate the existence of a conspiracy. Most prominently, Defendants openly pushed the coal companies to disclose their intended future output (in addition to their past output). AC ¶ 121–22, 128, 140, 168. This kind of disclosure is a classic sign of an illicit agreement. *See* ABA SECTION OF ANTITRUST LAW, *supra*, at 69–91. For an output cartel to function, each producer must disclose its past output and planned future output to assure other members that it is living up to its end of the bargain. Otherwise, members could cheat, and a

collective-action problem could tank the whole enterprise. It is thus no surprise that Climate Action 100+ made "enhanced corporate disclosure in line with the recommendations of the Task Force on Climate-related Financial Disclosures" one of its key goals. AC ¶ 117.

Perhaps the most-important remaining plus factor is the fact that Defendants all had a "motive to conspire." *JSW Steel (USA) Inc.*, 586 F. Supp. 3d at 596. The economic motive here is obvious. Defendants own hundreds of billions of dollars in coal-company stock, and the companies' profits went through the roof during this scheme. *See* AC ¶ 240 (tbl. 6). Just as obvious is Defendants' belief that climate change is a serious threat to the Earth, and the ends here justify the means. But dealing with climate change is the province of legislation and international agreements. And the Supreme Court has explicitly stated that Section 7 makes no exceptions when a prohibited transaction may, by "some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 371 (1963).

### B. Plaintiffs Have Alleged a Competitive Harm

The Amended Complaint also alleges that Defendants' scheme caused a competitive harm. *See Marucci Sports*, 751 F.3d at 374–75. There are two ways to demonstrate that a scheme caused this kind of harm. "[S]ome agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se* or rejected after only a quick look." *Alston*, 594 U.S. at 89. This *per se* rule is appropriate "if courts can predict with confidence that" the agreement between Defendants "would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods.*, 551 U.S. at 886–87 (citations omitted). If the agreement at issue falls outside the categories of *per se* violations, it is subjected to a "rule of reason" test. *Id.* at 887. That test "generally requires a court to 'conduct a fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on

competition.'" *Alston*, 594 U.S. at 81 (quoting *Am. Express Co.*, 585 U.S. at 541). The goal is to determine whether the agreement results in "increased prices, decreased output, or lower quality goods." *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021).

### 1.  The Amended Complaint Adequately Pleaded a *Per Se* Unlawful Scheme.

The inquiry into whether Defendants' scheme inflicted a competitive harm can be a short one. "[W]hen there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 (1984) (internal quotation marks omitted). The entire purpose of the arrangement between Defendants was to bully the publicly traded coal companies into not "compet[ing]" on "output." *Id.* An output-reduction scheme is a classic *per se* violation of the Sherman Act. *See Leegin Creative Leather Prods.*, 551 U.S. at 893 ("A horizontal cartel . . . that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful."). Given the obvious anticompetitive harms of artificial limits on output, there is no need for this Court to expend significant energy to determine whether the benefits of restricting competition in the coal sector outweigh the harms.

Defendants argue that the *per se* rule is inappropriate here because Plaintiffs' claim is the "first of its kind." MTD at 23. But it is not unique in any material way. Although the particular method by which Defendants have organized their output-reduction scheme is atypical, the end goal of creating an output cartel is an obvious *per se* violation. Defendants' argument relies on little more than the kind of "formalistic line drawing" that the Supreme Court has rejected when determining whether the *per se* rule or the rule of reason applies. *Leegin Creative Leather Prods.*, 551 U.S. at 887 (quoting *Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58–59 (1977)).

What matters is the "demonstrable economic effect" of the scheme, which is obvious in an output cartel. *Id.*

### 2. Defendants' Restraint of Trade is Unreasonable.

Even if the Court decides that Defendants' conspiracy is not *per se* unlawful, Defendants' conduct created an unreasonable restraint on trade. "The goal" of the rule of reason "is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Am. Express Co.*, 585 U.S. at 541 (cleaned up). If an agreement results in "increased prices, decreased output, or lower quality goods," it is unreasonable under the Sherman Act. *Impax Lab'ys, Inc.*, 994 F.3d at 493.[12]

As the complaint painstakingly details, since before the start of Defendants' scheme, the output of coal has gone down and the price has skyrocketed. AC ¶ 228–29 (tbls. 4 & 5). Coal prices increased between 2019 and 2022 by 20 to 30 percent, depending on the type of coal. *Id*. At the same time, coal production by publicly owned companies dropped by either 18.2% percent for SPRB coal or 19.2 percent for thermal coal. *Id.* Production in privately owned companies increased by 6.07 percent for SPRB coal. *Id.* Because privately owned mines are smaller and lack access to capital like the publicly owned mines, they could not pick up the slack left by Defendants' output-reduction scheme, resulting in sustained supra-competitive prices. *Id.* ¶ 82.

Defendants' only defense to the fact that coal prices skyrocketed while production dropped or stagnated is to argue that the baseline to determine production should be 2020 and not 2019. But as explained above, 2019 is the necessary baseline because it shows what a fully functioning

---

[12] Determining whether a scheme, agreement, or conspiracy imposes a competitive harm will sometimes require an analysis of the relevant market and whether the relevant market actors have sufficient power to increase prices or lower output. *See Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768 (1984). Defendants do not challenge the market definition or market power of either themselves or the publicly owned coal companies, so Plaintiffs' response concentrates on the harms demonstrated by their scheme.

coal market looks like and also demonstrates the output capacity of Defendants' coal companies. Notably, Defendants do not argue that the coal companies lacked capacity to take advantage of the price surge in 2022. They simply chose not to—as Defendants would tell the story—for no reason whatsoever. In any event, as also explained above, even starting the analysis with 2020 still shows that output decreased and prices increased relative to what would have happened in a well-functioning market, as shown by the activities of the private coal producers.

### III.    Plaintiffs Have Adequately Pleaded an Information-Sharing Claim.

The Sherman Act outlaws agreements to share competitively sensitive information, such as price or output. "[T]he Supreme Court [has] held that information exchange itself could constitute a § 1 violation." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001). If parties agree to share competitively sensitive information, even if they have not taken the next step and agreed to conspire on price or output, they have satisfied Section 1's requirement of a "contract, combination, . . . or conspiracy." 15 U.S.C. § 1; *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113–14 (1975). Once the agreement is established, the question then becomes whether it has "anticompetitive effects," which is generally determined by the nature of the information being shared. *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

Defendants' agreement to 1) compel the publicly traded coal companies to disclose output information and 2) publicize the results of their pressure through climate-organization disclosures constitutes an illegal information-sharing scheme. As the Amended Complaint sets forth, Climate Action 100+ members agreed to work with each other and the coal companies in which they had invested to obtain commitments to disclose "planned thermal coal production" in terms of "short, medium, and long-term targets." AC ¶ 121 (quoting *Investor Expectations for Diversified Mining* at 38, *supra*). Although Vanguard did not join the Climate Action 100+, it demanded disclosure of

"[g]oals for target-setting for relevant greenhouse gas emissions." *Id.* ¶ 180–81 (quoting *Proxy voting policy for U.S. portfolio companies* at 11, VANGUARD (Mar. 1, 2022), https://perma.cc/797P-USYE). Additionally, the Net Zero Asset Managers Initiative required all members to submit "disclosures" that tracked their success in forcing the companies they own to reduce carbon output. *See id.* ¶¶ 133, 142, 144.

Defendants took steps to enforce the disclosure scheme. For example, Blackrock and State Street explicitly voted against directors because they failed to disclose their planned emissions for the upcoming years. *Id.* ¶ 168 (BlackRock voting against NACCO board members because the companies lacked "adequate climate risk disclosures," "metrics," and "targets"); *id.* ¶¶ 169–74 (same); *id.* ¶ 177 (same for State Street). While Vanguard did not explicitly vote against directors based on the failure to disclose targets, it did admit to meeting with directors to engage about setting targets. *Id.* ¶ 139. Defendants also published their own commitment disclosures with the Net Zero Asset Managers Initiative on May 1, 2022, which listed each member's policy for engagements on climate issues. *See id.* ¶¶ 133, 142, 144. The explicit commitment to force disclosure, the promise of Defendants to disclose their own efforts, and the follow-on actions attempting to enforce the disclosure regime are sufficient evidence of an agreement.

The agreement to share information was anything but innocuous and fails to satisfy the Sherman Act's rule of reason.[13] *See United States Gypsum Co.*, 438 U.S. at 441 n.16. The main inquiry a court makes when determining if an information-sharing agreement is reasonable is into the nature of the information being shared. *See Todd*, 275 F.3d at 211. "Exchanges of current . . . information, of course, have the greatest potential for generating anti-competitive effects and

---

[13] Defendants accused of participating in an elicit information-sharing scheme will often challenge the relevant market definition, *see Todd*, 275 F.3d at 199–200, but Defendants have not challenged the definitions of the SPRB and thermal coal markets, so this brief does not address that issue.

although not *per se* unlawful have consistently been held to violate the Sherman Act." *United States Gypsum Co.*, 438 U.S. at 441 n.16. As one would guess, "exchanges of *future . . .* information are considered especially anticompetitive" because they allow for competitors to set their prices or output jointly. *Todd*, 275 F.3d at 211 (emphasis added).

Defendants' scheme explicitly involved the disclosure of future output plans. Their demand for "short, medium, and long-term [coal-reduction] targets" is obviously forward-looking. AC ¶ 121 (quoting *Investor Expectations for Diversified Mining* at 38, *supra*). So too were the demands for the disclosure of so-called Scope 3 emissions. *Id.* ¶¶ 122, 180. Those emissions "reflect the total lifetime carbon emissions that would be generated by the consumption of that coal." *Id.* (Climate Action 100+ and Vanguard requiring Scope 3 disclosure). Scope 3 emissions thus allow coal output to be easily calculated by determining how much coal it would require to emit that amount of carbon dioxide. *Id.* ¶ 122. By disclosing its Scope 3 emissions, a company has disclosed its planned output targets. The other coal companies then knew how much their competitors would be mining and could adhere to the output-reduction scheme accordingly.

The specificity of the data shared is also indicative of a competition-harming conspiracy. If data is anonymized, aggregated, or otherwise difficult to trace back to an individual company, then it is much less useful "to police a secret or tacit conspiracy." *Todd*, 275 F.3d at 212. The emissions data here was company-specific and not anonymized. AC ¶ 261. The entire point, after all, was to monitor compliance with carbon-reduction goals. Thus, it provided a perfect mechanism to ensure that no coal companies intended to bail on the conspiracy.

Defendants' main defense to the information-sharing count is to argue that the complaint failed to allege what information was being shared. MTD at 23–24. But as explained above, with

voluminous citations, the Amended Complaint makes clear that output and emission projections were the subject of the conspiracy.

### IV.    Defendants have Violated State Antitrust Laws.

In addition to violating Section 7 of the Clayton Act and Section 1 of the Sherman Act, Defendants have also violated the antitrust laws of Texas, Montana, Indiana, Iowa, Kansas, Louisiana, Nebraska, Oklahoma, and West Virginia. Each of these States has an antitrust law analogous to Section 1 of the Sherman Act, Section 7 of the Clayton Act, or both. *See* AC ¶¶ Counts IV-XIV. Additionally, each State law is interpreted in harmony with the relevant federal law. *See* MTD at 33-34 (citing statutes and caselaw). Thus, Defendants' above violations also constitute State antitrust violations as well.

### V.    Plaintiffs' State Valid Consumer-Protection Claims.

#### A.    The States Have Alleged That BlackRock's "Investment Strategy" Statements Are Unfair and Deceptive.

Five Plaintiff states have alleged that BlackRock has engaged in unfair and deceptive consumer practices by marketing certain funds as *not* engaged in ESG investment strategies when, in fact, BlackRock uses the holdings in those funds to advance its ESG priorities. AC ¶¶ 192–224. As the Amended Complaint describes, BlackRock markets four ETFs to consumers with the explicit disclaimer that each "fund does not seek to follow a sustainable, impact or ESG investment strategy." *Id*. ¶¶ 193–95 (cleaned up). In fact, BlackRock conducts ESG engagements by leveraging the power of its shares, including shares held by these purportedly non-ESG funds. *Id*. at ¶ 196. BlackRock's climate commitments to the Net Zero Asset Managers Initiative and Climate Action 100+, its ESG engagement, and its persistent use of proxy votes are inconsistent with the statement that these ETFs are not engaged in any "ESG investment strategy." *Id*. ¶¶ 197–207.

These allegations are sufficient to state a claim under the consumer-protection laws of Texas, Louisiana, Iowa, Nebraska, and Montana. *Id*. ¶¶ 310–342 (Counts XV– XXI). Each of these States' laws prohibits misrepresenting the characteristics or qualities of a product—here, a financial product—in the conduct of any trade or commerce. *See id*. As the Amended Complaint alleges, BlackRock engaged in unfair and deceptive trade practices when it misrepresented its four, passive ETFs, whether by (for example) affirmatively misrepresenting that these products have "characteristics … which they do not have" or by "failing to disclose information" about them that was relevant to consumers. Tex. Bus. & Com. Code § 17.46(b)(5) & (24); *see* AC ¶¶ 310–342 (Counts XV– XXI).

BlackRock contends that these allegations do not state a claim and should be dismissed, but none of its arguments shows the States have failed to state a claim. BlackRock's arguments only show its intent to muster other facts and analyses to refute the States' claims. That is the stuff of a future motion for summary judgment, perhaps, but it is not a reason to dismiss any of the States' claims at this early stage of the case.

### 1. BlackRock's Statements are Misleading in Context.

BlackRock's primary argument is that its statements about its ETFs' investment strategies "concern BlackRock's investment-selection criteria and nothing else," Def. BlackRock's Mot. to Dismiss, Doc. 65 at 14–18 (Mar. 17, 2025) ("BlackRock MTD"), but that is not the *only* plausible interpretation of those statements, nor is it the most reasonable interpretation. The States are entitled to proceed on their claims that reasonable consumers would not understand the investment-strategy statements in the way that BlackRock now claims to have intended.

An "investment strategy" is not inherently limited to "pick[ing] stocks," despite BlackRock's self-serving assurances in its motion. *Id.* at 15. As the Complaint describes, "a

reasonable consumer would understand that an 'investment strategy' includes things like engagements and proxy voting," and the Complaint further provides examples of industry usage (including BlackRock's own usage) that are consistent with that interpretation. AC ¶ 196. As these examples demonstrate, voting proxies is *part of* an investment strategy: no less than deciding which stocks to invest in, voting is a means to influence the future return of an investment.

To counter this, BlackRock relies on the context surrounding its investment-strategy statements, both on the website where the statements appear and in the prospectus that the statements reference. But nothing BlackRock cites excludes ESG engagement or proxy voting from the definition of investment strategy. The phrase "investment strategy" reasonably encompasses not just the purchase of stocks, but also the way those stocks are engaged and their proxy voting. *See id*. Even if the use of "investment strategy" in these documents *could* be consistent with a definition limited to the purchase of stocks, it is *also* consistent with the broader use of the term to encompass engagement and proxy voting. *See* Prospectus (describing "[p]ortfolio managers" as "implementing investment strategy," and stating that the fund "is subject to the risk that the investment strategy … may not produce the intended results"). This is not a circumstance where the "lack of clarity" in one writing was dispelled by "refer[ring] the reader" to clarifying information. BlackRock MTD at 16 (quoting *Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 396 (Tex. App. – Dallas 2012, no pet.)). Nor is it a case where an ambiguity is not a misrepresentation because it "references" another unambiguous source. *Id*. (quoting *Tolbert ex rel. Tolbert v. Nat'l Union Fire Ins. Co.*, 657 F.3d 262, 269–70 (5th Cir. 2011)). Rather, the States have alleged that BlackRock's investment-strategy statement is misleading, and the prospectus to which it points does not dispel that original, misleading representation. That is sufficient to state a claim for an unfair and deceptive consumer practice.

56

### 2. BlackRock Can Accurately Describe its Funds Consistent with Federal Securities Law.

BlackRock next claims that the States' theory "is at odds with federal securities law," but that is not correct. BlackRock can accurately describe its funds while fully complying with its obligations under federal law.

BlackRock points to an SEC regulation that pertains to "Investment Company Names," and claims that if it "labeled any of the four [passive ETF] funds with the phrase 'ESG' … it would raise serious regulatory concerns." BlackRock MTD at 18. But the Amended Complaint does not allege that BlackRock should have *named* any of its funds "ESG" funds, and that is all that the regulation prohibits. The regulation that BlackRock cites requires that "at least 80 percent of the value of [the] assets" in a fund be consistent "with the investment focus that the fund's name suggests." Investment Company Names, 88 Fed. Reg. 70436, 70443, 70509 (Oct. 11, 2023) (describing how the regulation "expand[s] the rule's 80% investment policy requirement … to apply to any fund name with terms suggesting that the fund focuses on investments that have … particular characteristics," including "one or more ESG factors"). The States, however, do not claim that BlackRock should have *named* its passive ETFs with "ESG" terminology, only that BlackRock should not have explicitly stated that these funds *do not* pursue any ESG investment strategy when, in fact, the investments in the funds *were* engaged for ESG purposes and BlackRock voted the fund's proxies according to ESG priorities. *See*, *e.g.*, AC ¶ 207. BlackRock's choice was not between naming or not naming a fund with "ESG" terminology. BlackRock could have accurately described its passive ETFs' engagement and use of ESG proxy voting without running afoul of SEC regulations about using ESG terminology in fund names.

BlackRock also points to an SEC order about firms that overstate their ESG activities, but the States do not claim that BlackRock should have overstated the ESG activities of its passive

ETFs—only that it should not have denied that those funds were engaged in ESG investment strategies when they were. *See* BlackRock MTD at 19. The SEC order in *In the Matter of Invesco Advisers, Inc.*, IAA Release No. 6770 (Nov. 8, 2024), concerned an investment company that had described the total number of its funds that were "ESG integrated" to consumers, and had included in that number any funds that used ESG proxy voting policies. AC ¶ 18. In reality, however, securities held in the company's passive funds did *not* vote proxies according to ESG priorities, so it was improper for the company to have included the passive funds in its definition of ESG integrated funds. This actually *supports* the States' claims: the SEC has required that investment companies accurately describe whether a particular fund engages in ESG proxy voting or not. BlackRock could have accurately described the ways its passive ETFs undertake ESG engagement and proxy voting *while* complying with SEC requirements.

There is no conflict between the States' claims and federal securities law.

### 3. Disclosures Elsewhere Do Not Cure BlackRock's Alleged Deceptive and Unfair Misrepresentations.

BlackRock next points to disclosures elsewhere about its voting and engagement activities, but these distant sources do not change the impression that its investment-strategy statements leave with consumers.

The FTC has long recognized that alleged misrepresentations can be either "express" or "implied." *In the Matter of Removatron Int'l Corp.*, 11 F.T.C. 206, 1988 WL 1025512, at *4 (1988).[14] "Express claims directly state the representation," while "implied" claims may depend

---

[14] Because the States' consumer-protection statutes are generally modeled after the Federal Trade Commission Act, courts often rely on FTC opinions for interpretive guidance, whether explicitly endorsed in state statute or not. The States' consumer-protection laws endorse Federal Trade Commission authorities as persuasive for interpretive purposes. TEX. BUS. & COM. CODE § 17.46(c)(1) ("It is the intent of the legislature that … courts to the extent possible will be guided by … the interpretations given by the Federal Trade Commission."). *See also* MONT. CODE ANN. § 30-14-104 ("due consideration and weight shall be

on "a number of factors" for context, "including the contents of the advertisement, the juxtaposition of various phrases therein, the nature of the claim and surrounding circumstances" and even "[e]xtrinsic evidence." *Id*. at \*5. Here, BlackRock's straightforward, unequivocal assertion that the passive ETFs do "not seek to follow a[n] … ESG investment strategy" is an express assertion about the qualities and attributes of BlackRock's funds. That easily overcomes the threshold for stating a claim of an unfair or deceptive misrepresentation. *See In the Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1994 WL 565319, at \*37 (Mar. 23, 1984) ("When the advertisement contains an express claim, the representation itself establishes its meaning."). Other than the prospectus, which has been addressed *supra* at 56, the investment-strategy statement does not point the consumer to any other documents necessary to understand it properly. A consumer would be left with a misimpression about the ETFs' use of ESG engagement and proxy voting, regardless if other contradictory information exists elsewhere.

To avoid the express meaning of its statement, BlackRock points to the public record of its voting and engagement activities, but these documents are far afield from the misrepresentations the States allege and would require significant time and expertise for a consumer to locate and understand. Courts have held that statements are misleading *even when they are accompanied by disclaimers in the same document* if the overall impression to the consumer is nonetheless misleading. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697–98 (5th Cir. 2005) (holding that even where "standard warnings about the risks and uncertainties facing" a company appeared in a press release, they did "not dispel[]" false impressions created elsewhere in the same document). Here, the fact that consumers could have researched BlackRock's proxy voting record and compared votes to the

---

given to the interpretations of the federal trade commission"); LA. REV. STAT. § 51:1406 ("The provisions of this Chapter shall not apply to: … [a]ny conduct which complies with [the FTC Act].").

specific holdings in a given fund does not negate the express misrepresentations that BlackRock included in materials marketed directly to consumers.

BlackRock is also wrong when it claims the States have identified only five proxy votes not motivated by financial reasons, BlackRock MTD at 22, because as the Complaint makes clear, these five are merely *examples* in the larger category of BlackRock's ESG-motivated proxy votes, AC ¶ 205 (listing proxy votes "[f]or example"). These examples are sufficient to defeat BlackRock's motion to dismiss because at this stage of the litigation, the States need only state their claim, not prove it conclusively. *Ashcroft*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." (citation omitted)).

### B. BlackRock's Other Statements Were Also Unfair and Deceptive.

BlackRock next attempts to parse the rest of the statements detailed in the Amended Complaint, claiming that each one is not misleading, but these arguments preview only the merits of BlackRock's responses to the States' claims and do not indicate that the States have failed to state a claim. *See* BlackRock MTD at 23–28. For each of these statements, the Amended Complaint lays out not only the statement and where it appeared, but also *what makes it misleading*, all of which clearly puts BlackRock on notice about the nature of the States' claims.  The common thread throughout these allegations is that BlackRock tells the public that it does *not* require companies to adhere to net-zero targets or "address matters that are the domain of public policy," when in fact, BlackRock has obligated itself to require these commitments from the companies in which it invests. *See* AC ¶¶ 208–224. For example, BlackRock has represented in a public letter to Attorneys General that it does *not* require companies to "meet specific emissions standards" or "engineer a specific decarbonization outcome in the real economy," when in fact, BlackRock was

demanding that companies "set short-, medium-, and long-term targets for greenhouse gas reductions." *Id.* ¶¶ 218–19 (emphasis omitted).

### C.  The States Need Not But Have Alleged That BlackRock's Misleading Statements Were Material.

BlackRock's motion to dismiss brief assumes that the States must prove materiality as an element of their claims, but under the consumer-protection statutes of Texas, Montana, Iowa, and Louisiana, materiality is not an element of an unfair or deceptive trade practice. In Montana, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful," with no mention of materiality. MONT. CODE ANN. § 30-14-103. Louisiana law is the same. LA. REV. STAT. § 51:1405. In Iowa, there is no materiality element specified for a "misrepresentation." IOWA CODE § 714.16(2)(a).[15] In Texas, materiality is not included as an element for "[f]alse, misleading, or deceptive acts or practices." TEX. BUS. & COM. CODE § 17.46. For example, "representing that goods or services have … characteristics … which they do not have" does not contain a materiality element. *Id.* at (b)(5).

Some state statutes require a materiality element for a particular means of proving a deceptive practice—for example, a requirement that an *omission* be of a "material fact," IOWA CODE ANN. § 714.16(2)(a)—but the absence of such a requirement for *other* means of proving a deceptive practice supports the conclusion that materiality is not otherwise an element of a deceptive practice. Texas law provides just such an example. BlackRock cites *Martinez v. Martinez*, No. 19-cv-00518, 2020 WL 5887587, at *8 (Tex. Ct. App. Oct. 1, 2020), for the purported requirement that a deceptive statement be material, but that case is about a specific exemption from Texas's Deceptive Trade Practices Act, which is not at issue here. *Martinez* was

---

[15] Although the definition of "deception" and the description of an "omission" include materiality, other methods of proving an unfair or deceptive trade practice—such as by proving a "misrepresentation"— do not refer to materiality.

applying the "DTPA exemption for real estate brokers and sellers," which applies to a broker's "express misrepresentation *of a material fact*." *Id*. at \*5, 8 (quoting TEX. BUS. & COM. CODE ANN. § 17.46(i)(1) (emphasis added)). That particular provision of the DTPA does not apply here, and the provisions that *are* at issue do not contain materiality language. AC ¶ 313 (quoting TEX. BUS. & COM. CODE ANN. § 17.46(b)(5), (7), and (9)). [16]

Nonetheless, *even if* the States are required to prove materiality, the States have alleged that BlackRock's misleading statements were material to consumers. AC ¶ 224 ("Defendant BlackRock has thus materially misrepresented the characteristics of the exchange trade funds, mutual funds, and other financial products that it marketed to investors as not being governed by ESG principles …"). BlackRock cannot plausibly claim that its assertions about the ESG attributes of its products are not material to investors. Passive ETFs are essentially a commodity, with numerous similarly priced options available and little to distinguish among them. It is easy to imagine a particular investor choosing *not* to purchase a BlackRock ETF knowing that BlackRock would use any shares purchased to advance an ESG agenda. An investor may do so because of a political disagreement with ESG investment priorities or because of a belief that ESG priorities will diminish the fund's performance, or both. Such an investor would have plenty of other passive ETFs to turn to instead, with similar prices and without ESG-prioritized engagement and proxy voting. Additionally, the FTC "presumes that all express claims are material" to consumers and "that implied claims are material if they pertain to the central characteristics of a product" because "the seller is in the best position to assess the effects of his ads, and if he finds it beneficial to make such claims it must be because they are likely to have an influence on consumers." *In the Matter*

---

[16] The Amended Complaint also relies on TEX. BUS. & COM. CODE ANN. § 17.49(b)(24), which pertains to omissions and does include a materiality element, requiring that "the consumer would not have entered [the transaction] had the [omitted] information been disclosed."

*of Int'l Harvester Co.*, 104 F.T.C. 949, 1057 (1984). If BlackRock thought these statements were immaterial to consumers, it presumably would not make them.

Moreover, BlackRock's own cited materials describe that investors care about ESG investment criteria. In promulgating its final rule on investment company names, the SEC described how "there is no[] principled basis to treat ESG terms differently than other terms that have the potential to be materially deceptive and misleading" and that "concerns regarding materially deceptive and misleading fund names are particularly important for funds that incorporate ESG factors in their investment decisions." 88 Fed. Reg. 70436, 70450. The SEC also noted that commenters on the proposed rule noted the risk that investors could believe that "funds do not consider ESG factors when they actually do," depending on the words describing those funds—exactly the type of deception that the States allege here. *Id*. at 70441. Similarly, in the *In the Matter of Invesco* opinion, the SEC held that an investment company had made an "untrue statement of material fact" when it included funds in a list of "ESG-integrated" funds despite not voting those funds' shares according to ESG criteria. IAA Release No. 6770 at ¶ 23.

ESG-related statements are material to consumers, and the States have adequately alleged as much.

### D.  The States' Laws Apply to BlackRock's Conduct.

BlackRock claims that the consumer-protection statutes of Texas, Iowa, Nebraska, Montana, and Louisiana do not apply to their statements, but this is wrong.

*Texas*. BlackRock admits that no Texas case has held that claims related to securities fall outside the Texas Deceptive Trade Practices-Consumer Protection Act. BlackRock MTD at 31–32. In fact, although a "predecessor statute to the DTPA … contained specific language that would have exempted securities transactions," that "*exemption was repealed*" when the DTPA was

63

passed. *Frizzell v. Cook*, 790 S.W.2d 41, 44 (Tex. Ct. App.1990) (emphasis in original). Today, "[t]he DTPA no longer contains any exemptions for securities transactions," and "[t]he only exemptions intended by the Legislature are those delineated in section 17.49, which *do not* exempt securities transactions." *Id*. (emphasis in original). Additionally, the DTPA specifically provides that its remedies "are in addition to any other procedures or remedies provided for in any other law," and that its provisions "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices [and] unconscionable actions." TEX. BUS. & COM. CODE §§ 17.43, 17.44. The only relevant exemption in Texas's Act is an exemption for "acts or practices *authorized under specific rules or regulations promulgated by the Federal Trade Commission*," but no FTC regulation *authorizes* statements like the ones at issue in this case. BlackRock provides no statutory or case support for the idea that Texas's Act is "pegged" to the FTC Act in such a way as to be *limited* to what the FTC Act covers. *Id*. § 17.49. That limitation is unfounded, and this Court should reject it. The Texas Deceptive Trade Practices-Consumer Protection Act applies to BlackRock's conduct as the States have alleged in the Amended Complaint.

*Iowa*. Similarly, BlackRock admits that no Iowa court has held that the Iowa Consumer Fraud Act excludes misrepresentations related to securities or other financial products. Nor does Iowa's law contain such an exclusion on its face. In fact, Iowa's Act defines "merchandise" to *include* "securities, bonds, debentures, [and] stocks," and prohibits any "unfair practice, deception, fraud, false pretense, false promise, or misrepresentation … in connection with the lease, sale, or advertisement of any merchandise." IOWA CODE § 714.16(1)(e), (2)(a); *see State ex rel. Miller v. Pace*, 677 N.W.2d 761, 772 (Iowa 2004) (holding that the Iowa Consumer Fraud Act applies to "false" representations and "fail[ing] to share material information with potential investors").

64

Iowa's consumer-protection law thus explicitly *covers* advertisements of securities and other financial products and applies to BlackRock's conduct as alleged in the Amended Complaint.

*Montana*. BlackRock claims that Montana's Consumer Protection Act does not apply to its conduct, but that is wrong. The exemption BlackRock cites applies only to "actions or transactions *permitted* under laws administered by the Montana … state auditor," MONT. CODE ANN, § 30-14-105(1), and no Montana state securities law permits deception or false statements in the sale or marketing of securities. To the contrary, Montana law prohibits "any untrue statement of a material fact" "in connection with the offer, sale, or purchase of any security." *Id*. § 30-10-301. BlackRock relies on a case about a different state law governing insurance policies, but this case does not concern the insurance industry. Montana's Consumer Protection Act applies to BlackRock's conduct as alleged in the Amended Complaint, and this Court should not artificially constrain the application of Montana law as written.

*Nebraska*. The Nebraska Consumer Protection Act exempts transactions "regulated under laws administered by … any other regulatory body or officer," NEB. REV. STAT. § 59-1617, but not all of BlackRock's alleged misrepresentations pertain to securities regulated by another entity. At this stage, it is premature to dismiss Nebraska's claims under its Consumer Protection Act. Nor would it be proper to dismiss Nebraska's claim under its Uniform Deceptive Trade Practices Act. That Act excludes "[c]onduct in compliance with … a statute administered by[] a federal, state, or local government agency," *Id*. § 87-304, but here, BlackRock is alleged to have engaged in misrepresentation that would *not* comply with other applicable securities laws. The only authority BlackRock musters for its interpretation of the UDTPA here is a magistrate's report and recommendation, which was *not* accepted on this point of law. *Klein v. TD Ameritrade Holding*

*Corp.*, No. 14-cv-0396, 2015 WL 13215666, at *12 (D. Neb. Oct. 23, 2015), *report & recommendation adopted in part on alternative grounds*, 172 F. Supp. 3d 1055 (D. Neb. 2016).

*Louisiana*. Although Louisiana's Unfair Trade Practices Act does not apply to "actions or transactions subject to the jurisdiction of … the commissioner of financial institutions," LA. REV. STAT. § 51:1406(1), it would be premature to dismiss Louisiana's UTPA claim in its entirety, given that some of BlackRock's misrepresentations may not be governed by state securities laws directly. For example, the Amended Complaint details misleading BlackRock statements that pertain to its business as a whole, rather than in relation to the sale of a particular security. *See*, *e.g.*, AC ¶¶ 217–24. Louisiana's Unfair Trade Practices Act also forbids anticompetitive behavior ("[u]nfair methods of competition," LA. REV. STAT. § 51:1405(A)), and BlackRock does not contend that anticompetitive behavior is exempted from its coverage. Louisiana's consumer-protection claim should not be dismissed.

The States' consumer-protection law claims should not be dismissed.

**E.  Louisiana Has Alleged a Consumer Protection Violation.**

BlackRock contends that Louisiana's consumer-protection law applies to only the most egregious behavior, but that is an artificial construction applied to Louisiana law. In fact, Louisiana's Unfair Trade Practices Act provides a cause of action both for trade practices which are unfair and those which are deceptive: an act is not required to be *both* unfair and deceptive. *Green v. Garcia-Victor*, 2017-0695 (La. App. 4 Cir. 5/16/18), 248 So.3d 449, 454 (citing *Jefferson v. Chevron U.S.A., Inc.,* 97-2436 (La. App. 4 Cir. 5/20/98), 713 So.2d 785, 792). And Louisiana's law further provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are … unlawful"—full stop. LA. REV. STAT. § 51:1405. In light of that broad statutory

66

command, "Louisiana courts determine what is a LUTPA violation on a case-by-case basis." *Quality Env't Processes, Inc. v. I.P. Petroleum Co.*, 144 So.3d 1011, 1025 (La. 2014).

The Amended Complaint alleges facts that are, at minimum, deceptive in nature, with a specific intent to harm competition in the coal output and production markets. It alleges that Defendants engaged in a "pressure campaign" resulting in an "intended effect" to harm competition in coal output. AC ¶¶ 183–191. It particularly alleges BlackRock's intentional consumer deceit in pursuit of its unlawful attempts to reduce coal output in Louisiana and National markets. *Id*. ¶¶ 192–224. It also clearly illustrates the manner in which all named Defendants intentionally and unlawfully acquired stock to achieve their anticompetitive and unfair market goals within Louisiana and the United States as a whole. *Id*. ¶¶ 225–231.

BlackRock urges the Court to dismiss Louisiana's consumer-protection claim because it contends that its behavior is not as egregious as other Louisiana cases in which consumer-protection violations were held to have occurred, *see* BlackRock MTD at 32–33, but that is an inappropriate use of a motion to dismiss. Louisiana is entitled to demonstrate the nature of BlackRock's deception. At this stage in the litigation, Louisiana has stated a claim under its consumer-protection law, and that is all it needs to do.

## CONCLUSION

The motions to dismiss should be denied.

Dated: May 1, 2025                          Respectfully submitted,


*/s/ David H. Thompson*                     KEN PAXTON
David H. Thompson                           Attorney General of Texas
D.C. Bar No. 450503
Brian W. Barnes                             BRENT WEBSTER
    (Pro hac vice)                          First Assistant Attorney General
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.               RALPH MOLINA
Washington, D.C., 20036                     Deputy First Assistant Attorney General
Telephone: (202) 220-9600
Facsimile: (202) 220-9601                   AUSTIN KINGHORN
dthompson@cooperkirk.com                    Deputy Attorney General for Civil Litigation
bbarnes@cooperkirk.com
                                            */s/ Austin Kinghorn*
                                            Austin Kinghorn
*Counsel for Plaintiffs States of*          Deputy Attorney General for Civil Litigation
*Texas and Montana*                         Texas Bar No.: 24072184


The Buzbee Law Firm                         OFFICE OF THE ATTORNEY GENERAL OF
                                            TEXAS
By: */s/ Anthony G. Buzbee*                 P.O. Box 12548, MC-066
    Anthony G. Buzbee                       Austin, Texas 78711-2548
    State Bar No. 24001820                  Telephone: (512) 463-2012
    Christopher J. Leavitt                  Fax: (512) 320-0911
    State Bar No. 24053318                  Austin.Kinghorn@oag.texas.gov
                                            Ryan.Baasch@oag.texas.gov
    JP Morgan Chase Tower
    600 Travis Street, Suite 7500           *Counsel for Plaintiff State of Texas*
    Houston, Texas 77002
    Tel: (713) 223-5393
    Fax: (713) 223-5909
    tbuzbee@txattorneys.com
    cleavitt@txattorneys.com
    www.txattorneys.com


*Counsel for Plaintiff State of Texas*


68

**FOR PLAINTIFF STATE OF ALABAMA**

STEVE MARSHALL
Attorney General of Alabama

*/s/ Robert M. Overing*
ROBERT M. OVERING
Deputy Solicitor General
   (Pro hac vice)

OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Robert.Overing@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

**FOR PLAINTIFF STATE OF ARKANSAS**

TIM GRIFFIN
Arkansas Attorney General

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson
Solicitor General

OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-2007
autumn.patterson@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

**FOR PLAINTIFF STATE OF INDIANA**

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA
    Attorney No. 18857-49


/s/ *Scott L. Barnhart*
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Complex Litigation
    (Pro hac vice)

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-6309
Fax: (317) 232-7979
Email:  Scott.Barnhart@atg.in.gov

/s/ *Jessee Moore*
Jessee Moore, Atty. No. 37654-49
Deputy Attorney General
    (Pro hac vice)

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956
Fax: (317) 232-7979
Email:  Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

**FOR PLAINTIFF STATE OF IOWA**

BRENNA BIRD
Attorney General of Iowa

*/s/ Eric H. Wessan*
ERIC H. WESSAN
Solicitor General

PATRICK C. VALENCIA
Deputy Solicitor General
    (Pro hac vice)

OFFICE OF THE ATTORNEY GENERAL OF IOWA
1305 E. Walnut Street
Des Moines, Iowa 50319
Telephone: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**FOR PLAINTIFF STATE OF KANSAS**

*/s/ Kris W. Kobach*
KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS
Anthony J. Powell
Solicitor General
Erin B. Gaide
Assistant Attorney General
120 SW 10th Avenue
Topeka, KS 66612-1597
Tel: (785) 296-7109
abhishek.kambli@ag.ks.gov
anthony.powell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

71

**FOR PLAINTIFF STATE OF LOUISIANA**

LIZ MURRILL
ATTORNEY GENERAL

/s/ Patrick Voelker
Patrick Voelker, LA Bar #38926
      (Pro hac vice forthcoming)
John Kelley, LA Bar #35506
      (Pro hac vice forthcoming)
Michael Dupree, LA Bar #26870
      (Pro hac vice forthcoming)
Assistant Attorneys General
Public Protection Division
Complex Litigation Section
1885 North 3rd Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
voelkerp@ag.louisiana.gov
kelleyj@ag.louisiana.gov
dupreem@ag.louisiana.gov


**FOR PLAINTIFF STATE OF MISSOURI**

/s/ Andrew Bailey
ANDREW BAILEY
Attorney General of Missouri
Missouri Attorney General's Office
815 Olive St. Suite 200
St. Louis, MO 63101
Tel: (573) 751-1800
Fax. (573) 751-0774
Email: DianaHaines@ago.mo.gov

Caleb Rutledge
Office of The Missouri Attorney General
    (Pro hac vice)
207 West High Street
Jefferson City, MO 65102
573-751-0812
Email: caleb.rutledge@ago.mo.gov


*Attorneys for Plaintiff State of Missouri*

**FOR PLAINTIFF STATE OF MONTANA**

AUSTIN KNUDSEN
Montana Attorney General

*/s/ Brent Mead*
Brent Mead
    (Pro hac vice)
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894
Brent.Mead2@mt.gov
Anna.Schneider@mt.gov

*Counsel for Plaintiff State of Montana*


**FOR PLAINTIFF STATE OF NEBRASKA**

MICHAEL T. HILGERS
Attorney General of Nebraska

ERIC J. HAMILTON
Solicitor General

*/s/ Zachary B. Pohlman*
ZACHARY B. POHLMAN
Assistant Solicitor General
    (Pro hac vice)

NEBRASKA DEPARTMENT OF JUSTICE
2115 State Capitol
Lincoln, Nebraska 68509
Telephone: (402) 471-2683
Fax: (402) 471-3297
eric.hamilton@nebraska.gov
zachary.pohlman@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

73

**FOR PLAINTIFF STATE OF OKLAHOMA**

GENTNER DRUMMOND
   ATTORNEY GENERAL

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II
Solicitor General
   (Pro hac vice forthcoming)
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

**FOR PLAINTIFF STATE OF WEST VIRGINIA**

JOHN B. MCCUSKY
Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS
Solicitor General
   (Pro hac vice)
OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25301
Telephone: (304) 558-2021
michael.r.williams@wvago.gov

Douglas L Davis
WV Attorney General's Office
   (Pro hac vice)
P.O. Box 1789
State Capitol, Building 6
1900 Kanawha Blvd. East, Ste 401
Charleston, WV 25326
304-558-8986
Fax: 304-558-0184
Email: douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

**FOR PLAINTIFF STATE OF WYOMING**

BRIDGET HILL
Wyoming Attorney General

*/s/ Ryan Schelhaas*
RYAN SCHELHAAS
Chief Deputy Attorney General
    (Pro hac vice)
109 State Capitol
Cheyenne, Wyoming 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify on this 1st day of May 2025, a true and correct copy of the foregoing was

filed electronically and is available for viewing and downloading from the Court's ECF System.

Notice of this filing will be sent to all counsel of record by operation of the ECF System.

<u>/s/ David H. Thompson</u>
David H. Thompson
