UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

Case No. 6:24-cv-00437-JDK

State of Texas, et al.,

    Plaintiffs,

v.

BlackRock, Inc., et al.,

    Defendants.

_____/

## [PROPOSED] AMICUS CURIAE BRIEF

1. To begin with, the irony of this case is hard to overstate. The first-named defendant, BlackRock, whose General Counsel is Christopher Meade which directly oversaw the implementation of the Dodd-Frank Act as General Counsel of the U.S. Department of Treasury.

2. That statute was one of the most complex and important financial reforms in U.S. history, requiring immense coordination, legal nuance, and intellectual rigor.

3. The complaint advanced by the Government here fundamentally fails to live up to the standard of care and constitutional precision that Dodd-Frank demands.

4. The government's theory here is effectively a poison pill doctrine misapplied, but what makes it worse is that they are asserting it in defense of corporations that they do not represent.

5. The plaintiff States are not corporate counsel, nor have they alleged any statutory authority authorizing them to assert the interests of the companies whose purported injuries form the basis of their claims.

6. Instead, the States bring this action *parens patriae*, purporting to represent the interests of their citizens, while simultaneously alleging injuries suffered not by those citizens, but by private corporations in which the States hold no proprietary or fiduciary interest.

7. Their theory hinges on the claim that these companies effectively constitute the entire coal sector, an assertion both factually overbroad and legally irrelevant, and that the resulting market effects somehow uniquely and directly impact just these 11 out of 50 States, as if the global supply chain selectively bypasses all others.

8. If the plaintiffs wish to argue that BlackRock, Vanguard, and State Street are exercising controlling influence through share ownership, they must demonstrate a causal mechanism (a legal path) by which these defendants are actually dictating output decisions. They fail to do so.

9. There is no showing of operational control, voting bloc dominance, or internal management directives being issued by these institutions.

10. To understand how control is properly analyzed, let's use a more familiar example, Apple Inc (a company I am currently in the process of lawfully acquiring due to their governance negligence).

11. According to Apple's own SEC filings, for December 31, 2019:

- BlackRock owned 6.3% of Apple's shares[1]

---

[1] https://d18rn0p25nwr6d.cloudfront.net/CIK-0000320193/65ae602e-af7f-43bc-a57b-6da45ab17575.pdf

- Vanguard owned 7.41%[2]

- Warren Buffett (via Berkshire Hathaway) owned 5.6%[3]

12. Combined, these three investors held 19.31% of Apple at the close of 2019.

13. So, does that mean they collectively control Apple, or that they could, through lawful means, implement governance tactics to exercise effective control over Apple's decision-making?

14. To answer that, we must examine Apple's Articles of Incorporation:

- Section V expressly states: *"There shall be no right with respect to shares of stock of this corporation to cumulative votes in the election of directors."*

15. Translation: Even collectively, these investors cannot elect directors or control the board through shareholder voting.

16. Moving to Apple's Bylaws, Section 2.1 reiterates:

*"The business and affairs of the Corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors."*

17. Meaning: All decision-making power rests with the board, not with shareholders, even large ones.

18. Apple continues to use over 30 pages of bylaws, shareholder policies, and risk disclosures to construct the illusion that shareholder rights are robust and participatory, when in reality, those rights are structurally neutered by its internal governance framework.

---

[2] https://d18rn0p25nwr6d.cloudfront.net/CIK-0000320193/d6c0fc52-72f9-4e58-a7ae-c45ce85d6482.pdf
[3] https://d18rn0p25nwr6d.cloudfront.net/CIK-0000320193/2b30e9df-2d53-467f-b6b5-2fe7a126764f.pdf

19. Behind the scenes, Apple shifted hundreds of billions - if not trillions - of dollars in manufacturing, procurement, and asset exposure overseas, reconfiguring its entire operational infrastructure around foreign jurisdictions at the expense of the U.S. market.

20. At the same time, in its SEC filings, Apple expressly disclaimed any control over global macroeconomic conditions, portraying itself as a passive observer of the very risks it was actively engineering.

21. This strategic maneuvering allowed Apple to hedge against the U.S. economy before COVID-19 was publicly acknowledged, gaining first-mover advantage through insider-level foresight and global supply chain leverage.

22. Even after the pandemic emerged, Apple continued to exploit foreign currency markets and offshore labor arbitrage as tools to maintain profit margins and isolate itself from domestic economic instability.

23. Simultaneously, Apple's board approved and executed massive share buyback programs (totaling hundreds of billions of dollars) to reduce the public float and consolidate internal control.

24. This had the effect of suppressing public ownership, inflating executive equity value, and entrenching board power, an arguably far more consequential distortion of capitalism than anything alleged against passive institutional investors like the Defendants.

25. Now imagine if the DOJ brought this same lawsuit against BlackRock, Vanguard and Warren Buffet for its Apple holdings instead of its coal investments.

26. It would fail on every single legal element.

27. BlackRock and Vanguard are not controlling shareholders in Apple, nor in the coal companies. They are fiduciaries for passive capital, acting on behalf of retirees, teachers, and pensioners.

28. **BlackRock, Vanguard and State Street exemplify why good-faith indemnification clauses exist in corporate governance**.

29. To adequately defend against this lawsuit by disclosing internal materials (such as ESG strategies, hedging positions, or portfolio risk assessments of the type referenced in this complaint) **would itself risk breaching Defendant's own fiduciary duties to their clients**.

30. Such disclosure would undermine the global trust that is central to BlackRock, State Street, and Vanguard's institutional model.

31. Forcing public disclosure of internal decision-making frameworks under litigation pressure would not only expose the company to reputational and structural harm, it would irreparably damage the very integrity on which its global fiduciary capacity is built.

32. In fact, BlackRock, Vanguard, and State Street are the reason American coal companies survived a decade of offshoring, deregulation, and capital flight.

33. They stabilized the domestic energy sector during a time when virtually no public or institutional capital was being directed toward coal, not during COVID, not during the ESG boom, and not during periods of political hostility to fossil fuels.

34. What makes this complaint even more troubling is the suggestion that these institutions were conspiring to control the coal market especially when they have been demonstrably meticulous in ensuring that their ownership stakes remain below the 30% threshold that would even trigger a controlling interest presumption under poison pill theory.

35. These firms are highly aware of their respective holdings and actively monitor one another in parallel to institutional investors like Berkshire Hathaway, Capital Group, or Fidelity for the express purpose of avoiding lawsuits just like this one.

36. And yet, the Plaintiffs penalize these firms not for wrongdoing, but for helping maintain economic stability when others fled. They did what no one else did: they deployed risk capital into U.S. coal markets when the public, and the private sector, were dumping their shares.

37. To now accuse them of anticompetitive collusion (without naming the SEC, Department of Treasury, or any independent financial regulatory agency capable of financially or structurally substantiating these claims) reveals the hollowness of the case.

38. This complaint, if allowed to proceed, risks forcing disclosure of internal strategic material that could compromise global credibility and fiduciary trust in institutions that stepped up when no one else would.

39. To accuse these institutions of destroying competition while companies like Apple are allowed to offshore labor, arbitrage currencies, and suppress shareholder power on the way to a $3 trillion valuation at the expense of both their shareholders and the public at large, is not just inconsistent, it's a mockery of the very document that enables these proceedings to take place.

40. To prove their claims, the government would need to show (using actual proxy voting records, not articles about proxy voting, the majority of which are publicly disclosed) that the defendant institutions jointly voted on specific matters that directly controlled company operations, and that the companies in question implemented those directives as a result.

41. Crucially, they would also need to demonstrate that those actions occurred over the objections (or without the participation) of other eligible voting shareholders or board members.

42. In other words, the government would have to establish that the defendants lawfully acquired effective operational control over these companies through shareholder voting and proxy mechanisms, such that BlackRock, Vanguard, and State Street functionally dictated corporate policy.

43. Not only would this be straightforward to prove if true (given the extensive public disclosure requirements under Dodd-Frank and related securities laws) but it would also be impossible to conceal.

44. If such coordinated control had actually occurred, the very companies named in the complaint would likely be bringing suit themselves, asserting breach of fiduciary duty, shareholder coercion, or anti-competitive manipulation.

45. That they have not only outlines the speculative nature of the government's theory, it also highlights the States lack of standing to assert claims on behalf of entities that are fully capable of speaking for themselves.

46. All of this also rests on the flawed assumption that proxy voting and shareholder proposals materially influence corporate operations in the first place which would be directly written in the respective company's corporate charters.

47. Based on extensive research into public companies the reality is that shareholder voting rarely translates into operational control. In most cases, the board remains insulated from shareholder pressure by design, making the causal link the government must prove not only tenuous, but structurally implausible.

48. Lastly, credit to Mr. Meade, who was evidently so effective during his tenure at the Treasury overseeing the implementation of Dodd-Frank that simply following the very rules he

helped draft has now led eleven separate Justice Department offices to implicate him under a framework he could likely recite from memory.

## THIS PROSECUTION IS A CONTRADICTION OF CORPORATE GOVERNANCE

1. It is the responsibility of the United States government to regulate interstate commerce, protect its borders, and safeguard the welfare of its citizens.

2. Within that framework, BlackRock, as a private asset manager, can promote the private interests of U.S. citizens without impeding or contradicting the government's ability to do the same in the public domain. In fact, BlackRock can operate globally, deploying capital in ways that align with long-term economic growth without undermining national sovereignty.

3. Moreover, the stability or decline of an entire industrial sector (such as coal) is not the responsibility of any single company, even one with a long-standing presence in the market. Publicly traded or not, no private entity is obligated to artificially sustain sector performance on behalf of state economies.

4. Quite the opposite: it is the state's responsibility to maintain sufficient internal capacity and economic resilience such that claims of injury from third-party market actors become moot.

5. Even if BlackRock had some degree of board influence over the companies in question, and hypothetically made decisions that diminished their value, that alone does not constitute illegality unless there was fraud, self-dealing, or misappropriation for personal gain.

6. Fiduciary discretion includes risk-taking, and not every failed outcome is actionable under law. Investing in, or providing funding to, a company that produces coal is not, in itself, a

cause of action worthy of litigation, certainly not one that should come at the expense of the investor.

7. Capital deployment into lawful industries, even controversial ones, does not constitute tortious conduct or regulatory violation merely because market forces or policy trends shift.

8. Contrast that with Apple, which using the governmental analogy where BlackRock is akin to the United States and Apple to a State like California, acts with far greater autonomy and far less accountability.

9. Apple has repeatedly demonstrated indifference to shareholder input, ignoring proxy votes, leveraging foreign commercial supply chains, and extracting public value during national crises, such as COVID-19, all while pricing consumer devices beyond reach for many Americans. And yet, despite its global influence and market saturation, Apple is not targeting BlackRock's clients in a way that would establish legal conflict in a private fiduciary sense (demanding civil litigation).

10. To be clear: under the governmental analogy, while Apple's actions may run counter to BlackRock's underlying purpose, namely, maximizing and stewarding long-term value, there is no adversarial legal basis for BlackRock to pursue Apple for violating laws enacted by the State of California. BlackRock is not a law enforcement agency. It does not exist to ensure compliance with state regulations or police the internal affairs of portfolio companies.

11. If BlackRock were a public, federal, or regional governmental entity explicitly charged with preserving coal infrastructure or defending the economic stability of the allegedly injured states, the litigation posture might be different. But that is not the case.

12. And while Apple may function as a kind of "state" within BlackRock's investment ecosystem, the relationship is not reciprocal. BlackRock is not to Apple what the United States is to its States. It is not sovereign over Apple; it is a fiduciary. It cannot compel Apple's conduct, restructure its governance, or unilaterally alter its market behavior. Nor should it be treated as if it bears that responsibility under law.

13. Why? Because BlackRock, a private, publicly traded company, like any individual investor can purchase shares in Apple, but cannot control Apple's conduct. Unlike the federal government's relationship to the States, BlackRock holds no governing authority over Apple.

14. Apple's articles of incorporation (its structural charter, akin to the Articles of Confederation) have been deliberately engineered to centralize control in the hands of the board.

15. This governance model is designed to maximize profit for insiders, often at the expense of external shareholders, even when those shareholders include institutional investors like BlackRock.

16. That imbalance traces back to structural shifts in the 1970s and 1980s, particularly in California, where corporate law became increasingly permissive for those with early access to legal and financial architecture.

17. Over time, corporate attorneys discovered that they could avoid accountability simply by invoking abstract legal terms like "fiduciary duty", which, while powerful in theory, became tools of obfuscation.

18. The public, often intimidated by legal jargon and credentials, was led to believe that these legal positions were infallible because they came from bar-admitted professionals whose authority was validated by academic institutions rather than practical transparency.

19. At face value, this may seem like a critique of a particular legal era. But it's deeper than that. It's about the contrast between today's insulated corporate environment and the foundational principles upon which the United States was built.

20. The founders of this country constructed a system that was intentionally minimalist and flexible, not because they lacked foresight, but because they trusted those who would interpret the system to do so with shared understanding, lived sacrifice, and mutual accountability.

21. They had just been severed from a government that no longer represented them, and their new framework reflected both deep distrust of concentrated power and deep trust in collective civic duty.

22. That trust was embedded in the structure of early governance: the individual who won the presidency would serve as President, and the runner-up would serve as Vice President.

23. The logic was simple, if both candidates earned the majority's confidence, they were likely capable leaders, even if politically opposed. The expectation was that they would engage in serious deliberation, resolve disagreements, and lead collaboratively before issuing commands to the lower ranks of government.

24. This was a time when drawing water required walking a quarter mile with a pail, and when a 14-year-old might be handed a rifle to defend his town. In such a world, trade policy and financial decisions weren't abstract, they carried real consequences. And so too, the role of government carried solemn weight.

25. In that spirit, the responsibility to sustain industry and economic resilience belongs first and foremost to the states themselves.

26. If these eleven states have formed a pact or coordinated strategy among themselves, it is their obligation to resolve their commercial grievances internally.

11

27. What they should not be doing is scapegoating a company, or its fiduciary investors, for potentially being the only actors willing to place a long-term bet on those industries survival.

28. A temporary sacrifice in shareholder returns to preserve enterprise value and American industrial capacity is not misconduct, it is fiduciary prudence.

29. Whereas, assuming arguendo that Apple misled the public and its investors, it is the responsibility of the government of California, not the federal government nor Apple's institutional investors, to intervene.

30. This is because Apple's alleged misconduct would constitute tortious interference with the very population California is obligated to regulate and protect: its residents, its workforce, and its consumer base.

31. California, as the state of incorporation, holds a much more direct and immediate interest in Apple's corporate conduct than any third-party investor, precisely because it serves as both the commercial registrar and regulatory authority for Apple.

32. That responsibility includes maintaining, verifying, and enforcing the terms of a corporation's charter, its Articles of Incorporation. These charter documents are the foundational instruments that give rise to a company's legal existence.

33. In Apple's case, its Article's assert that the company is authorized to engage in "any and all lawful business" under the California Corporations Code. That provision is valid under California law, but it necessarily imposes an oversight duty on the State itself.

34. California is therefore obligated to ensure that companies it charters, like Apple, do not exploit that broad corporate mandate in ways that violate national principles or international obligations, particularly where such conduct encroaches on foreign trade relationships with adversarial nations.

35. In that sense, California's failure to monitor and enforce compliance, despite Apple swearing fealty to the state's corporate code, raises not only state-level regulatory issues but also foundational questions of federalism, commerce, and constitutional balance.

36. Just as the federal government is tasked with regulating foreign commerce and protecting national interests under the Constitution (formerly the Articles of Confederation), California is supposed to act as a gatekeeper ensuring that the companies it charters do not breach those higher-order obligations through unchecked global conduct.

37. However, given California's inaction in enforcing its own corporate governance obligations, jurisdiction now properly shifts to the United States, which has the authority, and the duty, to address Apple's violations of the Commerce Clause under the U.S. Constitution.


**Respectfully submitted,**
*Amicus Curiae, pro se*

Robert A. Pietz
pietzreceipts@gmail.com
(754) 277-9578
Independence, MO 64056

Dated: May 1, 2025

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 1, 2025, I caused a true and correct copy of the **MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF AND [PROPOSED] AMICUS CURIAE BRIEF (EXHIBIT A)**, to be submitted via UPS to the Clerk of the United States District Court for the Eastern District of Texas for docketing. Upon docketing, notice and access will be provided to all counsel of record via the Court's CM/ECF electronic filing system, pursuant to Rule 5(b) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Robert A. Pietz
pietzreceipts@gmail.com
(754)-277-9578
Independence, MO 64056

Dated: May 1, 2025