# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## AT TYLER

STATE OF TEXAS, *et al*.

       Plaintiffs,

    v.

BLACKROCK, INC, *et al*.

       Defendants.

Case No. 6:24-cv-00437

## BRIEF OF POWER THE FUTURE
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

Matthew D. Hardin
DC. Bar No. 1032711
Hardin Law Office
101 Rainbow Drive #11506
Livingston, TX 77399
(202) 802-1948
Matt@MatthewHardin.com

*Counsel for Amicus Curiae*

**Table of Contents**

Page

Table of Authorities ................................................................................ ii
Statement of Identity, Interest in the Case,
   and Statement of Authority to File ...............................................3
Statement of Authorship and Financial Contributions .......................4
I.   INTRODUCTION ................................................................................4
II.  ARGUMENT ....................................................................................10

   A. BlackRock's Global Head of Sustainable Investing (2017-2020)
   Concurrently Led Efforts to Engineer a Specific Decarbonization
   Outcome……………………………………………………………..10

   1) BlackRock's Deese Simultaneously Led Advocacy Efforts While
   Serving as Head of Sustainable Investing……………………………11
   2) IRS Filings Indicate Deese, while a Key BlackRock Employee, used
   CAELP to Engineer "Net Zero."……………………………………..17

   B. BlackRock's Global Chief Operating Officer for its Corporate
   Governance & Responsible Investment Team also Directed Efforts to
   Engineer a Specific Decarbonization Outcome…………………………...22

   C) The Extent of BlackRock's Knowledge of its Officers "Outside"
   Activities is Possibly Determinative in the Matter Before this Court…...25

III. CONCLUSION ................................................................................26

**Table of Authorities**

Page(s)

**Cases:**

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ......................... 11

*Bell Atl. Corp. v. Twombly*,

    550 U.S. 544, 127 S. Ct. 1955,167 L. Ed. 2d 929 (2007) …………………10

*Lee v. City of L.A.*,

    250 F.3d 668, 688 (9th Cir. 2001)……………………………………………17

*Nazzal v. Wyeth, No. CV 23-10102-MWF*
    2024 U.S. Dist. LEXIS 125380 (C.D. Cal. July 16, 2024) ........................ 18

*Terwilliger v. Reyna*,
    4 F.4th 270 (5th Cir. 2021) ......................................................................... 11

**Rules:**

Fed. R. Civ. P. 12 (b) ......................................................................................... 18

Power the Future ("PTF") submits this *amicus curiae* brief in support of the Plaintiff States ("Plaintiffs") in the above-captioned case.

**Statement of Identity, Interest in the Case, and Statement of Authority to File**

PTF is a nonprofit organization incorporated in Delaware which advocates for sound energy and related security policies. As part of this mission, PTF conducts research into government policy and obtains access to public records under the federal Freedom of Information Act and similar state transparency laws, and assesses those and other such public records to discern and educate the public and to advocate for good government. PTF has no direct interest, financial or otherwise, in the outcome of the case, aside from its interest in sound and transparent government conducted with the support of an educated populace.

Because PTF lacks a direct interest in this case, but has intimate and firsthand knowledge of records reflecting the plausibility of Plaintiffs' allegations, PTF is in a unique position to help the Court understand the allegations in this case and assess the plausibility of the Plaintiffs' legal claims. Specifically, PTF seeks to comment on the plausibility of allegations that Defendant BlackRock engineered a particular decarbonization policy outcome as alleged by Plaintiffs. PTF's perspective is distinct and independent from that of the parties, and indispensable to a fulsome understanding of the allegations in the Complaint. It appears no other

party has yet raised the issues set forth in this brief, and the brief will therefore assist the Court in determining these issues.

PTF has sought leave to file this brief pursuant to a contemporaneously filed Motion for Leave to File as an *Amicus Curiae*.

### Statement of Authorship and Financial Contributions

No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *Amicus Curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

## I. INTRODUCTION

Eleven States have sued in this Court accusing BlackRock[1] of using its position as one of the world's largest institutional asset managers to engineer "decarbonization" policy outcomes imposing the Environment, Social and Governance ("ESG") agenda, described by one enthusiast specifically addressing its impact on coal investments as "divestment through value destruction" (*infra*), including in the form of the "Net Zero" energy policy agenda, creating "increased

---

[1] Other Defendants face similar allegations, but amicus has no knowledge bearing upon those other Defendants. This brief therefore confines itself to discussion of allegations against BlackRock.

energy prices for American consumers, and produc[ing] cartel-level profits for Defendants," misleading customers along the way, all in violation of the Clayton Act. ECF No. 50 at 7, ¶ 6. In support of their lawsuit, the States claim, *inter alia*, that BlackRock deceives consumers about its business and services in numerous ways including in its 2030 Net Zero Statement, in which BlackRock asserts that its "role in the [desired energy] transition is as a fiduciary to our clients. . . . to help them navigate investment risks and opportunities, **not to engineer a specific decarbonization outcome in the real economy**." *Id*. at 82, ¶214 (**emphasis** in original complaint, citations omitted). The States allege that "That bolded statement is false or deceptive because net zero by 2050 or sooner is a decarbonization outcome." *Id*. at 83, ¶ 215. The Plaintiffs further allege that "BlackRock misleads its clients by pursuing ESG policy aims while telling consumers and investors that it will not 'engineer a specific decarbonization outcome.'" *Id*. at ¶ 216. Defendant BlackRock disputes this. Defendant BlackRock Inc.'s Motion to Dismiss the Consumer-Protection Counts (XV–XXI) of the Amended Complaint. ECF Doc. No. 65, at p. 27.

PTF submits this brief, based on records and information in the public domain and in documents which PTF has reviewed, in support of the plausibility of the Plaintiffs' claims. As PTF details herein, BlackRock's Global Head of Sustainable Investing 2017-2020, Mr. Brian Deese, simultaneously worked through third-party

groups both as a corporate officer for an outside entity and through proxies, to instigate and direct the very "engineer[ing of] a specific decarbonization outcome" that Plaintiffs assert occurred and which BlackRock denies. Mr. Deese did so as a corporate officer for a tax-exempt organization which itself was created contemporaneously with his move from the White House staff to BlackRock, Inc. Further, as Plaintiffs' Complaint as amended suggests is typical of BlackRock in these matters (*infra*), Mr. Deese's work was obscured in public filings, in publications, and through the use of intermediaries.[2] Thus, Plaintiffs' allegations are plausible even if the facts alleged by Plaintiff are more complex than they would be in an ordinary case.

The plaintiff States' lawsuit essentially asks, about BlackRock's efforts to engineer decarbonization of the U.S. economy, "*which of your stories is the truth?*" The information presented below raises the related, next question, which is essential for analyzing the veracity of the allegations in the Complaint as amended: *what did BlackRock, Inc. know about its officials' (plural) activities to engineer decarbonization, and when did it know it*? PTF submits crucial context regarding the work by BlackRock's Global Head of Sustainable Investing to arrange for and help

---

[2] This is made further relevant by the States' citation to BlackRock's work behind the scenes to limit companies' political advocacy ("lobbying activities (direct and through trade associations)") and indeed, more specifically, to force further disclosures, as factors contributing to the alleged deceptions. Amended Complaint, ECF No. 50 at ¶¶ 212, 213. See also ¶ 216.

finance the effort to engineer a decarbonization policy outcome, as described in the Amended Complaint in this case (ECF No. 50). Similarly, records released by the New York Office of the Attorney General under that state's Freedom of Information Law ("FOIL"), show that prior to Deese's tenure a similarly highly placed BlackRock official, former Global Chief Operating Officer for BlackRock's Corporate Governance & Responsible Investment team, Chad Spitler, represented BlackRock as one of seven participating interests—one of them being law enforcement (the New York AG's Office) lobbying the Securities and Exchange Commission ("SEC") staff and Commissioners, expressly "to influence SEC staff to improve climate disclosure." "Climate disclosure" in this context means using federal law to impede disfavored, i.e., carbon-intensive, industries' access to capital, and is a major component of the campaign to decarbonize the U.S. economy.

These activities of BlackRock officials, at least in part by design, leave unanswered some questions highly relevant to the instant case, such that discovery should more thoroughly explore these plausible allegations. Based on the limited information available in the public domain, it is likely that the allegations can be more thoroughly developed in the crucible of the adversarial process.

PTF respectfully submits that it is at minimum plausible if not almost certainly assured that BlackRock, Inc. was aware of Messrs. Deese and Spitler's work to achieve decarbonization through an outside organization and proxies. It is

additionally plausible if not almost certainly assured that this work was performed as an extension of these officials' positions with BlackRock, Inc., inverting the fashionable concept of "philanthrocapitalism," or applying business strategies to a non-profit's operations, by instead leveraging a non-profit to advance a business's interests by entwining the latter's official(s) in the charity's leadership. Indeed, based on the information set forth herein, it would be implausible to argue that BlackRock was not aware of the activities of its senior employees in this area.

It is to Defendant BlackRock's benefit if it proves out that both Messrs. Deese and Spitler's activities were actually unsanctioned and somehow unknown to their superiors, although any benefit would be mitigated in that instance by BlackRock's failure to properly ascertain the activities of its own officials with market-impacting potential. Regardless of which of these scenarios proves to be the truth, the answer is of central importance to the resolution of the instant matter before this Court.

It is also plausible to believe that what BlackRock knew and when it knew is well-documented inside the company. BlackRock, like all regulated firms in its industry, is certain to have internal policies, limitations and parameters for senior officials' activities which pertain or could pertain to their work as fiduciaries for clients, as well as interpretations of Securities and Exchange Commission or other regulatory parameters on officials' outside activities. Further, BlackRock has its own responsibilities to ensure the collection, supervision, and disclosure of the

information detailing relevant outside activities. And of course, any correspondence between Messrs. Deese and Spitler and other BlackRock officials or others in their BlackRock capacities about the activities described herein, would confirm whether these officials' contemporaneous outside activities in question were internally considered an extension of their BlackRock work.

Similarly, it is plausible that any lack of documentation within BlackRock reflecting Messrs. Deese and/or Spitler seeking approval for or discussing their outside work engineering a policy of decarbonization, or documentation indicating a lack of knowledge by BlackRock, Inc., or even denying a request by Messrs. Deese and/or Spitler to engage in these activities, would be revealed in the adversarial process.

Regardless, Messrs. Deese's and Spitler's contemporaneous activities while serving in their BlackRock positions are central to the claims made in this case. That BlackRock's campaign described in this brief to impose decarbonization policies on the U.S. economy succeeded is immaterial at the pleadings stage, but will likely be explored further in discovery and at trial. For now, it is enough to say that it is plausible that senior BlackRock officials took a leading role in the campaign to engineer a decarbonization outcome, and on its face this decarbonization campaign was most likely undertaken as an extension of Mr. Deese's and/or Mr. Spitler's work for BlackRock, Inc.

## II. ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Based on the Plaintiffs' Complaint as amended and the context provided by available public records demonstrated below, PTF respectfully submits that it is more than plausible that BlackRock – or at least two highly-placed BlackRock officials – helped engineer the decarbonization at issue in this case, in their official capacities. Therefore, as the Fifth Circuit has explained, "Plaintiffs have met their burden of alleging a… violation sufficient to withstand the test of *Iqbal / Twombly*…" *Terwilliger v. Reyna*, 4 F.4th 270, 279 (5th Cir. 2021). Nevertheless, "if they press this litigation, they must offer tangible proof." *Id.*

## A. BlackRock's Global Head of Sustainable Investing (2017-2020) Concurrently Led Efforts to Engineer a Specific Decarbonization Outcome.

Notwithstanding BlackRock's public representations that its "funds will not buy, sell, vote, or otherwise use shares in publicly-traded equities to promote the ESG

agenda," ECF No. 50 at 70, ¶ 193, it most certainly did exercise significant influence in the policymaking world to advance those policies, which it was able to do only due to the company's position as one of the largest institutional investors. In exercising this influence, BlackRock's Global Head of Sustainable Investing and a predecessor official in a similar position were deeply involved in promoting the ESG policy agenda at the same time their employer insists that BlackRock was not promoting the ESG policy agenda.

1) **BlackRock's Deese Simultaneously Led Advocacy Efforts While Serving as Head of Sustainable Investing**.

In support of their lawsuit accusing BlackRock, along with Vanguard and State Street, of using its position as one of the world's largest institutional asset managers to engineer policy outcomes imposing the Environment, Social and Governance ("ESG") agenda, the states claim, *inter alia*:

> "214. In addition to the deceptive representations in its non-ESG-fund webpages and related prospectus documents and Statements of Additional Information, BlackRock has also made deceptive representations in its "2030 net zero statement," which is also available on BlackRock's website. In the 2030 Net Zero Statement, BlackRock asserts that its "role in the transition is as a fiduciary to our clients. . . . to help them navigate investment risks and opportunities, **not to engineer a specific decarbonization outcome in the real economy**."

215. That bolded statement is false or deceptive because net zero by 2050 or sooner *is* a decarbonization outcome…

216. …BlackRock misleads its clients by pursuing ESG policy aims while telling consumers and investors that it will not "engineer a specific decarbonization outcome.""

Amended Complaint at ¶¶ 214-216 (**bold** in original; citations omitted).

Adding context to the allegations in the Amended Complaint, other public and also non-public records indicate that BlackRock's Global Head of Sustainable Investing (from October 2017 – December 2020) Brian Deese was both directly and through intermediaries indirectly instrumental in instigating, arranging for, and directing the financing of, the "engineer[ing of] a specific decarbonization outcome" that BlackRock denies having pursued. Indeed, Mr. Deese's own bio on the MIT Center for Energy and Environmental Policy Research brags that that "Previously, Deese also served as the global head of sustainable investing at BlackRock, **where he worked to** drive greater focus on climate and sustainability risk in investment portfolios and **create investment strategies to help accelerate the low-carbon transition.**"[3] This sounds very much like "buying, selling, voting, or otherwise using shares in publicly-traded equities to promote the ESG agenda." The records cited, *infra*, show that that work did not stop at creating investment strategies.

---

[3] https://ceepr.mit.edu/people/deese/ (viewed December 20, 2024). (**emphasis added**).

During his BlackRock tenure and nearly if not perfectly coincident with his arrival at BlackRock, Mr. Deese contemporaneously sat on the three-member board of a non-profit advocacy organization called the Center for Applied Environmental Law and Policy[4] ("CAELP"[5]). CAELP was created that same year that Deese left the White House's staff and joined BlackRock (2017), with a $2 million grant from a foundation[6] dedicated to "climate" policy activism.[7] As discussed, *infra*, CAELPs top priority, as shown in the first Internal Revenue Service (IRS) form 990 it filed (for calendar year 2020), appears from its somewhat cryptic description to have been advancing the "law and policy" of the Net Zero carbon emissions agenda. IRS filings showing other grants in the millions of dollars to CAELP at that time and soon thereafter from funders other than Hewlett[8] further suggest that this was CAELP's mission in 2017 – 2019, as well.

---

[4] See CAELP IRS Form 990 for 2020, https://projects.propublica.org/nonprofits/organizations/841890106/202203549349301320/full (viewed December 15, 2024).

[5] For further background on CAELP, see, e.g., https://www.influencewatch.org/non-profit/center-for-applied-environmental-law-and-policy/.

[6] William + Flora Hewlett Foundation. See https://hewlett.org/grants/new-venture-fund-for-the-center-for-applied-environmental-law-and-policy/.

[7] https://hewlett.org/strategy/climate-and-energy/#:~:text=In%202013%2C%20we%20renewed%20our,for%20action%20on%20these%20policies. Hewlett had pledged $500 million 2013 through 2018 to support "climate" causes and, in 2018, its "single largest funding commitment made in the foundation's history, $600 million for our climate initiative from 2018 through 2023." (viewed December 18, 2024).

[8] The Wellspring Philanthropic Fund Inc. reported a gift of $3,900,000 to CAELP in the year ending November 30, 2020, notably for "Technical Analysis". https://projects.propublica.org/nonprofits/organizations/223692921/202102889349100120/IRS990PF (last visited on December 18, 2024). "The Wellspring Philanthropic Fund, formerly known as the Matan B'Seter Foundation, was created in 2001 as part of an elaborate and secretive

Mr. Deese appears to have been on CAELP's inaugural board of directors from its inception until he left BlackRock to rejoin President Biden's White House staff. Deese reported in his sworn federal form OGE-278, filed for his January 20, 2021 appointment as "Assistant to the President and Director of the [National Economic Council, or NEC], White House - Biden-Harris Administration," that his

---

network of grantmaking organizations funded by three hedge fund billionaires: Andrew Shechtel, David Gelbaum and C. Frederick Taylor. Philanthropy News Digest described their intent as to "disguise" donations and "avoid almost all public scrutiny."
https://www.influencewatch.org/non-profit/wellspring-philanthropic-fund/ "Matan B'Seter" is a Hebrew phrase meaning "anonymous gift."" *Id*. July 2019 emails between former California/Clinton/Obama EPA official Mary Nichols and Rockefeller Family Fund's Michael Northrup indicate that, whatever Wellspring's provenance, it is not from within the "green" ecosphere. "Apparently they are about to get a lot of money. Who is the donor and is there a hidden catch? … I'm hearing they are going to be serious climate donors."
https://govoversight.org/wp-content/uploads/2024/12/MNichols-and-RFF-Wellspring-about-to-get-a-lot-of-climate-money-who-is-donor-and-is-there-a-hidden-catch.pdf

The Wellspring spinoff called Sequoia Climate Fund reported giving $2,800,000 in the year beginning December 1, 2020 (the first 990 for Sequoia which is publicly available).
https://projects.propublica.org/nonprofits/organizations/854095972/202232879349101003/IRS990PF (last viewed December 18, 2024). Sequoia is a "donor to left-leaning climate advocacy groups that was created in 2020 as a spinoff from the Wellspring Philanthropic Fund."
https://www.influencewatch.org/non-profit/sequoia-climate-fund/ "A February 2023 report in *Inside Philanthropy* declared the Sequoia Climate Foundation to be a "new giant in climate change philanthropy" and revealed that its "benefactor appears to be C. Frederick Taylor, a low-profile hedge fund billionaire."" *Id*. Sequoia is the sole publicly identified funder of the University of Maryland Center for Global Sustainability. UMD CGS is where numerous Clinton-Gore and Obama "climate" hands were placed after those presidencies ended, to continue their climate activism. It is the co-director (with Rocky Mountain Institute) of the Bloomberg Philanthropies project "America's Pledge", created to keep the US in the Paris climate treaty. FOIA's documents reveal that UMCGS placed its Director, Nathan Hultman, as a "volunteer" (still paid, by Sequoia funding) in the State Department Office of the Special Envoy for Climate, working with Rick Duke, in a seemingly ad hoc position of "Foreign Affairs Officer" through the "Intergovernmental Personnel Act".

See also, 2018 Energy Foundation 990 (grant #322, $325,000 to NVF for CAELP),
https://projects.propublica.org/nonprofits/organizations/943126848/201943189349314669/IRS990ScheduleI; 2019 Heising Simons Foundation 990-PF (awarding $675,000 to NVF for CAELP).
https://projects.propublica.org/nonprofits/organizations/260799587/202043189349102989/IRS990PF.

service on the CAELP board began in May 2019.[9] The Wayback Machine (Archive.org) suggests this claim is based on the effective date of the IRS's grant of tax exempt status (which according to the IRS website was May 16, 2019); however, other records show Deese served as a director of CAELP prior thereto,[10] while it was operating as a fiscally-sponsored entity of another organization, the New Venture Fund[11] (although a board of directors is neither needed nor usual for fiscally sponsored entities[12]).

---

[9] https://legacy-assets.eenews.net/open_files/assets/2021/03/22/document_gw_07.pdf (viewed December 13, 2024).

[10] Archive.org captured the "Our Board" page twice, first on February 15, 2019 and again on June 22, 2024. As of the date of the first capture, February 15, 2019, CAELP's website already listed Deese as a member of the group's three-member Board of Directors. There are two other members of the board of directors and two Advisory Board members listed. https://web.archive.org/web/20190215072539/https://www.caelp.org/our-board/ (viewed December 13, 2024).

[11] IRS filings reveal that from its creation in 2017 until some point in 2020 CAELP was operating as a fiscally sponsored entity of the New Venture Fund, "a 501(c)(3) funding and fiscal sponsorship nonprofit that makes grants to left-of-center advocacy and organizing projects and provides incubation serves for other left-of-center organizations". https://www.influencewatch.org/non-profit/new-venture-fund/ NVF has been described in media outlets such as The Atlantic as the largest of the managed nonprofits of the "mothership" behind a network of Democratic dark money nonprofit groups (Emma Green, "The Massive Progressive Dark Money Group You've Never Heard Of," The Atlantic, November 2, 2021, https://www.theatlantic.com/politics/archive/2021/11/arabella-advisors-money-democrats/620553/), the "Democratic Dark Money Juggernaut" Arabella Advisors (Joe Schoffstall, Cameron Cawthorne, "Liberal dark money juggernaut raises $1.6 billion to flood left-wing groups with cash, tax forms reveal," FoxNews.com, November 26, 2021, https://www.foxnews.com/politics/dem-dark-money-juggernaut-raises-1-6-billion-flood-liberal-groups-cash-tax-forms). "Critics, including the New York Times, argue that New Venture Fund is a "dark money" organization, serving as a way for left-leaning foundations and donors to anonymously funnel money toward various political advocacy issues, such as attacking vulnerable Republicans or pushing environmental restrictions." https://www.influencewatch.org/non-profit/new-venture-fund/

[12] See, e.g., "Fiscally sponsored organizations do not need their own board of directors or human resources team." https://givebutter.com/blog/fiscal-sponsorship#

Because CAELP operated under this model, neither Mr. Deese nor CAELP were required to file an IRS form 990 or other information regarding expenditures for 2018 or 2019. However, CAELP's initial form 990 filing with the IRS (2020) shows its highest-paid consultant, at $232,500[13], was Gigaton Strategies, LLC. Gigaton Strategies was the limited liability company of Deese's former and soon-to-be White House "climate" colleague, Richard "Rick" Duke[14]. Records seen by PTF confirm that at that time Duke was instrumental in engineering, and public records confirm he then served as co-author of, the Net Zero America plan to decarbonize the U.S. economy (*infra*).

These public records reveal a remarkable train of coincidences that lend plausibility to the allegations in Plaintiffs' Amended Complaint: Deese joined BlackRock, and at or about the same time joined the inaugural three-member board of directors of a newly created CAELP. Meanwhile, CAELP's top priority was Net Zero decarbonization of the economy, and its most highly compensated consultant instigated the premise and basis for legislation seeking to decarbonize the U.S. economy. This naturally raises the issue of what BlackRock, Inc. knew about ostensibly outside activities of its very prominent officer Deese, and when did

---

[13] https://projects.propublica.org/nonprofits/organizations/841890106/202113189349301061/IRS990 (viewed December 13, 2024).

[14] See, e.g., CV at https://www.congress.gov/116/meeting/house/108842/witnesses/HHRG-116-IF18-Bio-DukeR-20190206.pdf.

BlackRock know it. Only by further exploration of these critical issues in discovery and at trial will this Court and the public ever become informed regarding BlackRock's role in, or instructions pertaining to, Mr. Deese's simultaneous service for CAELP.

### 2) IRS Filings Indicate Deese, while a Key BlackRock Employee, used CAELP to Engineer "Net Zero."

The general rule is that "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Nazzal v. Wyeth*, No. CV 23-10102-MWF, 2024 U.S. Dist. LEXIS 125380, at *4 (C.D. Cal. July 16, 2024), citing and quoting *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). However, "an exception to this general rule exists for… matters of public record." Based on the allegations in the Complaint as amended, and public IRS filings (and public records released under New York's FOIL) set forth below, PTF respectfully submits that it is more than plausible that a BlackRock employee used CAELP to engineer a net zero economy which necessarily impacted the market as described in the Amended Complaint.

CAELP's initial form 990 (for tax year 2020) shows the organization's biggest expense that year, while Deese directed the organization and also simultaneously served as a senior BlackRock officer, was $1,301,402, explained as "Analytics: Caelp Develops And Supports Analysis (E.G., Technical Assessments, Economic Research, And Modeling) To Understand Regulatory Priorities And Opportunities

And Support Effective Climate And Public Health Protections." (This is listed as being for "Programs consulting", the same description for the expense of paying Gigaton/Duke $232,500).[15] This public filing indicates that CAELP, led by BlackRock's Deese, spent between $1.3 and (if one includes the Duke/Gigaton payment) $1.53 million that year alone on work that meets the description of the decarbonization plan "Net Zero America,"[16] of which Duke is listed as a co-author (affiliation: Gigaton Strategies).

That plan was announced by Princeton University at the end of the year, specifically the day the 2020 presidential election was certified (December 14, 2020), as "the culmination of over two years of work [that] outlines feasible transitions to net-zero emissions in the U.S. with a new level of specificity and granularity."[17] Phrased otherwise, the NZA project sought to engineer a specific decarbonization outcome.

---

[15] Without Messrs. Deese and Duke and with NZA published, in 2021 that $1.3 million figure dropped precipitously, to $65,704, now dedicated to state-level work ("LEGAL AND POLICY RESEARCH AND ANALYSIS TO SUPPORT STATE-LEVEL REGULATORY PROTECTIONS AGAINST CLIMATE POLLUTION."). https://projects.propublica.org/nonprofits/organizations/841890106/202203549349301320/full (last visited February 10, 2025).
[16] Princeton University, *Net-Zero America: Potential Pathways, Infrastructure, and Impacts* (online at https://netzeroamerica.princeton.edu/) (accessed Dec. 12, 2024).
[17] https://www.evolved.energy/post/princeton-net-zero-america-project (viewed December 18, 2024). That is, the project began when inflation was at 2.4%.

The announcement was widely covered the next day in the *New York Times*, Axios, Bloomberg and elsewhere.[18] According to both Princeton[19] and the *Wall Street Journal*,[20] NZA was then used as the core of the Inflation Reduction Act[21], under which "[t]he federal government is spending billions, maybe trillions, of dollars to address climate change"[22] via decarbonizing the U.S. economy.[23]

Net Zero America stated it was a publication of Princeton University, Princeton's Andlinger Center, and its "High Meadows Environmental Institute, Carbon Mitigation Initiative."[24] In something of a sleight of hand which served to

---

[18] https://acee.princeton.edu/rapidswitch/projects/net-zero-america-project/news (last visited December 18, 2024).

[19] https://www.princeton.edu/news/2023/08/25/getting-net-zero-us-and-world

[20] https://www.wsj.com/articles/the-professor-helping-guide-billions-in-climate-spending-96d3d17c

[21] See, https://www.whitehouse.gov/cleanenergy/inflation-reduction-act-guidebook/

[22] https://www.wsj.com/articles/the-professor-helping-guide-billions-in-climate-spending-96d3d17c

[23] See, e.g., Josh Saul, "Goldman Sees Biden's Clean-Energy Law Costing US $1.2 Trillion: Bank's projection is more than three times government forecast," Bloomberg.com March 23, 2023, https://www.bloomberg.com/news/articles/2023-03-23/goldman-sees-biden-s-clean-energy-law-costing-us-1-2-trillion. See also, Sen. Joe Manchin, "Biden's Inflation Reduction Act Betrayal: Instead of implementing the law as intended, his administration subverts it for ideological ends," *Wall Street Journal*, March 29, 2023, https://www.wsj.com/articles/biden-inflation-reduction-act-betrayal-joe-manchin-debt-ceiling-budget-fossil-fuels-green-energy-dc37738e (last visited December 19, 2024). See also, "a Goldman Sachs report projects [the Inflation Reduction Act's] myriad green subsidies will cost $1.2 trillion—more than three times what the law's supporters claimed. The Congressional Budget Office forecast that the IRA's energy and climate provisions would cost $391 billion between 2022 and 2031, but this appears to be a huge under-estimate." Editorial, "The Real Cost of the Inflation Reduction Act Subsidies: $1.2 Trillion: Goldman Sachs says the uncapped tax credits will cost three times what Democrats claimed," *Wall Street Journal*, March 24, 2023, https://www.wsj.com/articles/inflation-reduction-act-subsidies-cost-goldman-sachs-report-5623cd29 (last visited December 19, 2024).

[24] https://netzeroamerica.princeton.edu/img/Princeton%20NZA%20FINAL%20REPORT%20SUMMARY%20(29Oct2021).pdf

obscure funding of the work through monies directed first to others among its own centers, "[f]or funding support," Princeton's NZA report thanked Princeton (twice, or specifically two separate funding centers), an Australian university and (without further explanation) two major integrated energy companies.[25] This avoided detailing, in fact, the funding that was first run through the other Princeton centers.

Princeton's obscurantism and that CAELP's IRS filings suggest it had a substantial role in underwriting NZA, however directly or indirectly this underwriting passed, take on added meaning in context with recent revelations by House Judiciary Committee, which recently released a report entitled "*Sustainability Shakedown: How A Climate Cartel Of Money Managers Colluded To Take Over The Board Of America's Largest Energy Company*"[26] Among other revelations, this report notes:

> The climate cartel colluded with the 'Big 3' asset managers to secure a 'critical mass' of votes for the ExxonMobil board 'refreshment.' **BlackRock stated that it could 'engage [ExxonMobil] in parallel' but told the climate cartel[27] that the 'notion of not [being] in the same room is key.'**

---

[25] "For funding support, the authors thank the Andlinger Center for Energy and the Environment, BP and the Carbon Mitigation Initiative within Princeton's High Meadows Environmental Institute, ExxonMobil, and the University of Queensland." *Id..* at PDF p. 5. Here, NZA touts its industry support as meaningful while shielding the ideological foundations' underwriting. 'Princeton would like to thank itself for funding this' places the elision in the proper light as the "tell" it is—and the origin of the effort which, Amicus PTF asserts is shown in non-public records ,was arranged for with Richard "Rick" Duke on or before December 12, 2018, with Duke driving key decisions such as the model that the authors use, which the authors adopted as the only way to produce this report "in the targeted amount of time". The elision is telling.

[26] https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2024-12/2024-12-13-Sustainability-Shakedown-Report.pdf.

[27] The report defines the "climate cartel": "The climate cartel is a cabal of financial institutions that broadly fall into five categories. First, its ranks include the world's largest institutional

After regular engagement from the climate cartel, BlackRock, State Street Global Advisors, and Vanguard all voted to remove and replace members of the ExxonMobil board."[28] (**emphasis** added) (citing to emails included as exhibits to the December 13, 2024 report).

PTF respectfully submits that this Court can consider the recent Congressional report[29] and the public IRS filings set forth herein in assessing the plausibility of the allegations in the Amended Complaint.

---

investors, such as the "Big Three" asset managers—BlackRock, Inc.,71 State Street Global Advisors,72 and The Vanguard Group73— which collectively manage $23.8 trillion in assets and together are the largest shareholder of 88% of all companies in the S&P 500.74 The Big Three also control over a quarter of the voting shares in the S&P 500.75 These institutional investors are often called "universal owners" because their portfolios are so vast and diversified that they include sizable shares in the whole U.S. economy." *Id.*, at 4.

[28] https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2024-12/2024-12-13-Sustainability-Shakedown-Report.pdf. See also "BlackRock emphasized that the "notion of not in the same room is key." *Id.* at 44, and FN 422.

[29] PTF notes that an April 2024 House-Senate Democrats' report emphasizes that emails showed that one of these parties, BP, hoped that funding this work would gain them access to those shaping policy, specifically, that it was "important because **the study had some alignment with the Biden-Harris Administration's climate policy agenda**. Specifically, a BP official noted that the study about to be released "clearly plays to Biden's green agenda" **and that principal researchers were "already advising Biden's transition team**." (emphases added) See https://www.budget.senate.gov/imo/media/doc/fossil_fuel_report1.pdf, p. 49. As a result, BP could "leverage the study with the USG [United States government].... BP admitted that, "[i]f the Presidential elections go the way it looks now, I would not be surprised to see some of our friends in senior government policymaking roles, as well!"" *Id.* (citations omitted). PTF suggests this raises the obvious question of why that claim, or other assertions in that report of influence on NZA and its effort to support "Biden's green agenda," would apply solely to BP and not the BlackRock/CAELP group discussed above. Off-target as that latter congressional effort is, BP's representative was partly correct, as the rest of the public record shows that the parties behind this project would have great involvement and influence in Biden administration and that NZA was in service of enacting the Biden team's Net Zero policies—led by BlackRock's Deese who then moved from the company and his leadership of CAELP to become Chair of National Economic Council. The Committee selectively released the emails it cites so we only know from context that the hopeful missives by BP employees were written when the election was near, and the NZA project was awaiting release. This further supports the appearance of reflecting no more than the eternal triumph of hope over experience among industry that they can ride the back of the tiger, which in this case is the climate industry that the same targeted energy companies have

**B. BlackRock's Global Chief Operating Officer for its Corporate Governance & Responsible Investment Team also Directed Efforts to Engineer a Specific Decarbonization Outcome.**

Similarly, PTF notes further evidence of the plausibility of the plaintiff States' claim that BlackRock, Inc. actively sought to decarbonize the U.S. economy in public records released by the New York Office of the Attorney General documenting BlackRock's role as an initial and integral voice urging regulators to compel or coerce a decarbonization outcome and working with elected law enforcement to do so. This further evidence reveals BlackRock's role as the institutional investor, joining with the New York Attorney General's Office, two public employee pension funds, the private-equity firm Rockefeller Financial Asset Management and the pressure group Ceres to convince the Securities and Exchange Commission to impose "climate risk" regulation, and work with appointees there on a strategy to ultimately prevail.

Specifically, a key component of the campaign to impose a decarbonization outcome through policy is the push for mandatory "climate risk disclosure" ("CRD"), principally though transforming the Securities and Exchange

---

sought to appease with, *inter alia*, such generous funding of academic research in service of politicians' desired plans. If assuming this position, *arguendo*, that it is at all reasonable to attribute NZA to industry participants which had for years funded Princeton centers, the same question should be put about the arriviste BlackRock/CAELP team—given the role played by BlackRock's practice-area head, his outside advocacy organization, and its highest-paid contractor in arranging for and helping design the proposal.

Commission into a "climate" regulator through its regulation of the capital markets. The effective goal of CRD is to coerce "confessions" in hydrocarbon energy-related interests' public filings that catastrophic man-made global warming is a serious problem of which their operations constitute a material part, that their reserves are in fact worth little to nothing and their previous filings and other statements constitute actionable misdeeds, possibly fraud.[30] The founder and chairman of the advisory board of Bloomberg New Energy Finance, specifically describing the impact on coal, called the ESG movement of which CRD is a leading component "divestment through value destruction".[31] CRD would have "immense consequences for our capital markets and economy as a whole."[32]

Imposition of such monumental agendas can take years, as did this one, which succeeded when the SEC adopted its 2024 rule "The Enhancement and Standardization of Climate-Related Disclosures for Investors," or the very "climate risk disclosure" BlackRock began lobbying for back in 2012 and to which it

---

[30] Chris Horner, "E&E Legal Letters Issue XIV: State, City Investment Officers the Next Stop for 'Climate Change' Industry & "Divestment through value destruction" Campaign," March 13, 2017, https://eelegal.org/ee-legal-letters-issue-xiv-state-city-investment-officers-the-next-stop-for-climate-change-industry-divestment-through-value-destruction-campaign/.
[31] "'I call this 'divestment through value destruction,'" Michael Liebreich, the founder and chairman of the advisory board of Bloomberg New Energy Finance, said while pointing up at a scary-looking graph of coal's recent precipitous decline." Katy Lederer, "The Climate Summit of Money," New Yorker, February 24, 2016, https://www.newyorker.com/business/currency/the-climate-summit-of-money.
[32] Press Release, "McHenry Slams SEC's Final Climate Disclosure Rule," U.S. House Financial Services Committee, March 6, 2024, https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=409174.

dedicated significant assets as documented, in part, *supra*. Years of headlines tell

the tale—"BlackRock ETF thrusts climate change into political sphere," (Financial

Times),[33] "Former Obama adviser warns of investment risks with warning" (E&E

News, reporting on BlackRock official Brian Deese),[34] "The Giant of

Shareholders, Quietly Stirring" (New York Times, picturing BlackRock's Chad

Spitler),[35] "BlackRock vows new pressure on climate, board diversity" (Reuters)[36].

This campaign to impose the rule requiring Climate Risk Disclosure did

succeed,[37] for a while, after having been launched by Defendant BlackRock, Inc.

more than a decade ago with the assistance of certain elected and appointed

---

[33] Steve Johnson, "BlackRock ETF thrusts climate change into political sphere," Financial Times, October 6, 2020, https://www.ft.com/content/112e536a-91db-426a-aef6-3106f0717972.
[34] Maya Earls, "Former Obama adviser warns of investment risks with warning" (E&E News, September 25, 2019, (no longer available online, including from the Wayback Machine, see, e.g., https://web.archive.org/web/20190926225903/https://www.eenews.net/cw/2019/09/25, https://web.archive.org/web/20190926225903/https://www.eenews.net/climatewire/2019/09/25/stories/1061166759).
[35] Susanne Craig, "The Giant of Shareholders, Quietly Stirring", New York Times, May 8, 2013, https://www.nytimes.com/2013/05/19/business/blackrock-a-shareholding-giant-is-quietly-stirring.html (Chad Spitler pictured)(see *infra*).
[36] Ross Kerber, "BlackRock vows new pressure on climate, board diversity", Reuters, March 13, 2017, https://www.reuters.com/article/business/exclusive-blackrock-vows-new-pressure-on-climate-board-diversity-idUSKBN16K0CP/.
[37] On March 6, 2024, the Securities and Exchange Commission ("SEC") adopted final rules to require registrants to disclose certain climate-related information in registration statements and annual reports, "The Enhancement and Standardization of Climate-Related Disclosures for Investors", 89 FR 21668 (https://www.sec.gov/files/rules/final/2024/33-11275.pdf). Numerous suits were immediately filed challenging the Rule, including three consolidated in the U.S. Court of Appeals for the Fifth Circuit, administratively stayed in *Liberty Energy Inc. v SEC*, 24-60109 (March 15, 2024). On April 4, 2024, the SEC announced that it would voluntarily stay its final climate disclosure rules pending judicial review, which will occur in the Eighth Circuit where the various cases were transferred by lottery. On March 27, 2025, the SEC voted to drop its defense of the rule. https://www.sec.gov/newsroom/press-releases/2025-58 (last visited May 3, 2025).

activists in law enforcement positions. Specifically, records released by the New York Office of the Attorney General under that state's Freedom of Information Law document the BlackRock/NY AG *et al.* lobbying of SEC staff and Commissioners, with representatives of the seven participating lobbying interests including BlackRock's Chad Spitler.[38] On October 24, 2012, a Ceres note to colleagues summarized, "We learned a lot about how to influence SEC staff to improve climate disclosure."[39]

## C. The Extent of BlackRock's Knowledge of its Officers "Outside" Activities is Possibly Determinative in the Matter Before this Court.

At base, the plaintiff States' lawsuit raises the question of "which time are you telling the truth?" Was BlackRock somehow unaware of the activities of its senior officials, or were its officials who simultaneously engaged in *sub rosa* engineering of decarbonization policies doing so as an extension of or sanctioned part of their compensated work for BlackRock on which they reported to the company? This new information raises the further question about these efforts to orchestrate coercive decarbonization of the U.S. economy: what did the rest of BlackRock's management know about the 'outside' work of its Head of Sustainable Investing, and its Global Chief Operating Officer for Corporate

---

[38] See emails and agendas at https://govoversight.org/wp-content/uploads/2025/01/BlackRock-NYOAG-SEC-CRD-Lobbying-screen-shots-copy.pptx.
[39] Id.

Governance & Responsible Investment? What role did BlackRock, Inc. play in its officials' advocacy directly relating to their BlackRock positions?

The answer to the question of *what knowledge or involvement in Deese's specific role with CAELP—from its 2017 founding through the end of his tenure on what appears to be its inaugural board of directors—and Net Zero America may be reasonably imputed to BlackRock, Inc.*, is surely found in the terms of Deese's employment with BlackRock, and otherwise his communications with the firm about CAELP, NZA, Richard "Rick" Duke, Duke's consultancy Gigaton Strategies, LLC, Wellspring Philanthropic Fund, Inc., and/or Sequoia Climate Fund. BlackRock's knowledge and/or sanctioning of Mr. Spitler's lobbying, trips to the Attorney General's office or Washington, D.C. also surely is reflected in BlackRock's own records.

Because public records reveal that Plaintiffs' allegations are imminently plausible, and because the ultimate answer to the questions raised in those public records can only be explored in discovery and the adversarial presentation of evidence, this Court should deny the Motion to Dismiss.

## III.   CONCLUSION

For these reasons stated above, this Court should consider and take judicial notice of the records cited herein when evaluating the Motion to Dismiss. The

plaintiff States' allegations are not only plausible, but far more plausible than any

alternative belief that Defendant BlackRock was unaware of what its highly

compensated employees appointed to senior positions were up to.

Respectfully submitted this the 8th day of May, 2025,

/s/ Matthew D. Hardin
Matthew D. Hardin, DC. Bar No. 1032711
101 Rainbow Drive # 11506
Livingston TX 77399
(202) 802-1948
Matt@MatthewHardin.com
*Counsel for Amicus Curiae*