## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et. al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BLACKROCK, INC., <br> STATE STREET CORP., <br> THE VANGUARD GROUP, INC., <br><br> *Defendants*. | Civil Action No. 6:24-cv-00437-JDK |

## STATEMENT OF INTEREST OF THE FEDERAL TRADE COMMISSION AND THE UNITED STATES OF AMERICA

CLARKE T. EDWARDS
*Acting Director, Office of Policy Planning*

DANIEL GUARNERA
*Director, Bureau of Competition*

ANUPAMA SAWKAR
*Act. Deputy Director, Office of Policy Planning*

KELSE MOEN
*Deputy Director, Bureau of Competition*

WILLIAM ADKINSON
*Attorney Advisor, Office of Policy Planning*

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: 202-779-6023
Facsimile: 202-326-2326
CA Bar No. 270936
E-mail: asawkar@ftc.gov

*Attorneys for the Federal Trade Commission*

ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
WILLIAM RINNER
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
*Policy Director*

ALICE A. WANG
G. CHARLES BELLER
*Counsels to the Assistant Attorney General*

U.S. Department of Justice,
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-532-4698
Facsimile: 202-514-0306
CT Bar No. 430642
E-mail: david.lawrence@usdoj.gov

*Attorneys for the United States of America*

## TABLE OF CONTENTS

INTEREST OF THE UNITED STATES ........................................................................ 1

BACKGROUND ....................................................................................................... 4

ARGUMENT ........................................................................................................... 6

    I.    Defendants and Amici Misstate the Legal Standards for Assessing Liability Under Section 7 of the Clayton Act and Distort the Risks Those Standards Pose to Procompetitive Asset Manager Behavior. ................................................................................................ 6

        A.   Defendants Improperly Expand the Narrow "Solely for Investment" Exception to Section 7 Liability. ........................................................................................ 8

        B.   The Clayton Act Prohibits the Anticompetitive Use of Minority Interest Acquisitions to Substantially Lessen Competition......................................................................... 13

        C.   The Clayton Act's Prohibition on the Anticompetitive Use of Stock Does Not Prevent Typical Asset Manager Behavior. ........................................................................ 17

    II.   Defendants Argue for Improper Limitations on Section 1 of the Sherman Act................. 21

        A.   Accepting an Offer to Participate in a Joint Plan Can Demonstrate Concerted Action. 21

        B.   Anticompetitive Output Restraint Can Occur Even If Overall Output Increases. ......... 26

CONCLUSION........................................................................................................ 27

CERTIFICATE OF SERVICE ..................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*American Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ............................................................................... 21, 25, 26

*Anaconda Co. v. Crane Co.*,
  411 F. Supp. 1210 (S.D.N.Y. 1975) ...................................................................11

*Associated Press v. United States*,
  326 U.S. 1 (1945) .................................................................................................. 26

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ............................................................................................... 6

*Burnet v. Clark*,
  287 U.S. 410 (1932) ............................................................................................. 13

*California v. American Stores Co.*,
  495 U.S. 271 (1990) ............................................................................................... 6

*Carbone v. Brown University*,
  621 F. Supp. 3d 878 (N.D. Ill. 2022) ................................................................ 10

*Chicago Professional Sports Ltd. Partnership v. NBA*,
  961 F.2d 667 (7th Cir. 1992) .............................................................................. 10

*Crane Co. v. Harsco Corp.*,
  509 F. Supp. 115 (D. Del. 1981) .........................................................................11

*Denver & Rio Grande Western Railroad Co. v. United States*,
  387 U.S. 485 (1967) ............................................................................................. 14

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ............................................................................................. 12

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................................................... 9

*FTC v. Cement Institute*
  333 U.S. 683 (1948) ............................................................................................. 22

*FTC v. Peabody Energy Corp.*,
   492 F. Supp. 3d 865 (E.D. Mo. 2020) ........................................................................ 1

*FTC v. Superior Court Trial Lawyers Ass'n*,
   493 U.S. 411 (1990) ...................................................................................................... 3

*Gainesville Utilities Department v. Florida Power & Light Co.*,
   573 F.2d 292 (5th Cir. 1978) ..................................................................................... 23

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) .................................................................................................... 25

*Group Life & Health Insurance Co. v. Royal Drug Co.*,
   440 U.S. 205 (1979) .................................................................................................... 10

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
   714 F. Supp. 3d 65 (E.D.N.Y. 2024) ....................................................................... 26

*In re Insurance Brokerage Antitrust Litigation*,
   618 F.3d 300 (3d Cir. 2010) ...................................................................................... 23

*In the Matter of TC Group*,
   No. 61-0197, 2007 WL 293866 (MSNET Jan. 24, 2007) ...................................... 16

*Interstate Circuit v. United States*,
   306 U.S. 208 (1939) .................................................................................. 21, 22, 23, 24

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004) ........................................................................................................ 12

*North Carolina State Board of Dental Examiners v. FTC*,
   574 U.S. 494 (2015) ...................................................................................................... 6

*North Texas Specialty Physicians v. FTC*,
   528 F.3d 346 (5th Cir. 2008) ..................................................................................... 24

*NCAA v. Board of Regents of the University of Oklahoma*,
   468 U.S. 85 (1984) ...................................................................................................... 25

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998) .................................................................................................... 20

*Ohio v. American Express Co.*,
   585 U.S. 529 (2018) .................................................................................................... 26

*PLS.Com, LLC v. National Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ................................................................................. 23

*Summit Health, Ltd. v. Pinhas*,
    500 U.S. 322 (1991) ................................................................................. 24, 25

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ................................................................................. 23

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ................................................................................. 23

*United States v. AT&T, Inc.*,
    916 F.3d 1029 (2019) ................................................................................. 7

*United States v. Baker Hughes*,
    908 F.2d 981 (D.C. Cir 1990) ................................................................................. 7

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ................................................................................. 13

*United States v. Cleveland Trust Co.*,
    513 F.2d 633 (6th Cir. 1975) ................................................................................. 15

*United States v. Cleveland Trust Co.*,
    392 F. Supp. 699 (N.D. Ohio 1974) ................................................................................. 15, 16

*United States v. Dairy Farmers of American, Inc.*,
    426 F.3d 850 (6th Cir. 2005) ................................................................................. 14

*United States v. E.I. Du Pont De Nemours and Company*,
    353 U.S. 586 (1957) ................................................................................. 9, 10, 13, 14, 16

*United States v. Foley*,
    598 F.2d 1323 (4th Cir. 1979) ................................................................................. 23, 24

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974) ................................................................................. 7

*United States v. ITT Continental Baking Co.*,
    420 U.S. 223 (1975) ................................................................................. 16

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942) ................................................................................. 22, 23, 24

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................................. 20

*United States v. MMR Corp. (LA)*,
    907 F.2d 489 (5th Cir. 1990) .................................................................. 23

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948) ............................................................................... 23

*United States v. Philadelphia National Bank*,
    374 U.S. 321 (1963) ............................................................................... 25

*United States v. Tracinda Investment Corp.*,
    477 F. Supp. 1093 (C.D. Cal. 1979) ........................................... 8, 10, 11

**Statutes:**

15 U.S.C. § 1 .......................................................................................... 21

15 U.S.C. § 18 ...................................................................... 8, 9, 10, 13, 15

28 U.S.C. § 517 ........................................................................................ 1


**Other Authorities:**

Executive Order No. 14,156,
    90 Fed. Reg. 8433 (Jan. 29, 2025) ........................................................... 2

Executive Order No. 14,261,
    90 Fed. Reg. 15517 (Apr. 8, 2025) .......................................................... 2

Federal Trade Commission, *Hearings on Competition and Consumer Protection in the 21st
    Century: FTC hearing #8: Common Ownership* (Dec. 6, 2018), https://www.ftc.gov/news-
    events/events/2018/12/ftc-hearing-8-common-ownership ...................................... 17

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW (4th ed. 2016) ........................... 10, 18

Securities and Exchange Commission, *Compliance and Disclosure Interpretations, Exchange
    Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting,
    Question 103.11 and Question 103.12* (February 11, 2025), https://www.sec.gov/rules-
    regulations/staff-guidance/compliance-disclosure-interpretations/exchange-act-sections-13d-
    13g-regulation-13d-g-beneficial-ownership-reporting ......................................... 15

U.S. Department of Justice and Federal Trade Commission,
    MERGER GUIDELINES (2023) ........................................................................ 7, 14

## INTEREST OF THE UNITED STATES

The Federal Trade Commission ("FTC" or "Commission") and the United States through the U.S. Department of Justice respectfully submit this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice "to attend to the interests of the United States in a suit pending in the United States." The FTC and the Antitrust Division of the U.S. Department of Justice (collectively, the "Agencies") enforce the federal antitrust laws, including Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 7 of the Clayton Act, 15 U.S.C. § 18.[1]

The Agencies have interests here in ensuring the correct application of the antitrust laws, including in America's energy markets. Doing so protects Americans from anticompetitive behavior that reduces the production of domestic energy, raises energy prices for consumers and businesses, and undermines America's energy dominance.[2] It also preserves competition for capital investments, providing Americans with broader and more efficient investment options. There should be no confusion: the antitrust laws allow passive fund investing, they allow shareholder advocacy for better corporate governance, and they allow active investing that doesn't harm competition. As discussed below, however, this case

---

[1] The Department of Justice also consulted with the Securities and Exchange Commission in the preparation of this brief in order to ensure that it reflects the interests of the United States.

[2] The Commission has recent experience in the products and markets at issue in this case, having secured a federal court injunction to prevent a joint venture between Arch Resources and Peabody Energy, the two largest coal companies in the markets Plaintiffs allege were harmed by Defendants' conduct. *See FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 901–02 (E.D. Mo. 2020).

alleges much more—the coordinated use of the power of horizontal shareholdings[3] to distort output and prices in energy markets.

The President has declared a national energy emergency. *See* Exec. Order No. 14,156, 90 Fed. Reg. 8433 (Jan. 29, 2025). Coal is vital to America's energy security and provides a reliable, cost-effective source of energy to support growing electrical demand for artificial intelligence and a resurgence in domestic manufacturing. *See* Exec. Order No. 14,261, 90 Fed. Reg. 15517 (Apr. 8, 2025). Competition in coal markets incentivizes companies to produce as much coal as the market demands. Allowing the marketplace to freely determine the intersection of supply and demand is thus critical to America's energy security and economic dynamism.

This case is about alleged anticompetitive conduct that increased energy prices for ordinary American consumers and businesses. This case is not about ordinary activity by asset managers such as passive index investing or even procompetitive activism. As alleged, the holders of large quantities of stock in competing companies agreed to use those shareholdings to reduce the output of U.S. coal to increase profits at the expense of American consumers and businesses. This case is about precisely the sort of conduct,

---

[3] The Complaint uses both "institutional investor" and "asset manager." *See, e.g.*, Am. Compl. ¶¶ 2, 8–9. Although there are distinctions between the two types of financial firms, this statement of interest uses the term "asset manager" throughout. Asset managers, such as Defendants, typically manage funds that hold stock on behalf of beneficial owners. As alleged in the Complaint, "Defendants, and their subsidiaries and affiliates, acting by and through the funds, trusts, and other investment vehicles that they manage and control, have acquired substantial shareholdings in . . . America's publicly-held coal companies." *Id.* ¶ 20. Accordingly, this statement refers to Defendants' "shareholdings" or "ownership" (or similar) in connection with the alleged exercise of stock owned directly by Defendants or managed on behalf of third-party beneficial owners.

including concerted efforts to reduce output, which have long been condemned under the antitrust laws.

A coalition of States alleges that large institutional asset managers used their substantial shareholdings in competing coal companies to influence the management of those companies to reduce the output of U.S. coal production below competitive levels, thereby increasing energy prices paid by American consumers and businesses, while generating supra-competitive profits for those investors. Am. Compl. ¶¶ 113–191, ECF No. 50. The State Plaintiffs claim Defendants BlackRock, State Street, and Vanguard conspired to reduce output in part to advance their associational commitments to climate goals and carbon reduction. *Id.* ¶¶ 152–54, 232–243. The State Plaintiffs further claim that Defendants, who manage hundreds of billions of dollars in coal-companies' stock, economically benefitted from this conduct as profits soared. *See* Am. Compl. ¶¶ 152–53, 232–243; Pls' Br. In Opp'n to Defs.' Mot. to Dismiss at 48, ECF No. 88. That this conduct may have furthered Defendants' climate objectives is not a defense under the antitrust laws because "social justifications proffered for [a] restraint of trade . . . do not make it any less unlawful." *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990). Carbon reduction is no more a defense to the conduct alleged here than it would be to price fixing among airlines that reduced the number of carbon-emitting flights.

The Agencies recognize that asset managers serve a crucial role in America's world-leading capital markets. The antitrust laws provide ample room for ordinary investment and corporate governance activity. This case, however, alleges not merely typical investor behavior, but the active, anticompetitive use of common shareholdings to reduce the production of American coal to the detriment of American consumers and businesses. There

3

are large and consequential differences between passive investing in broad-based indices and voting, buying or selling (or implicitly threatening to vote, buy or sell) specific stocks unless companies behave less competitively. *See* Am. Compl. ¶ 136. Similarly, advocating that companies have good governance structures and processes is different from pushing for specific operational or strategic decisions that reduce a company's competitive intensity. The law has long recognized these distinctions, and Defendants are alleged to have flouted them. Courts also must take great care to ensure that asset managers do not use their shareholdings in competing companies to engage in anticompetitive conduct that deprives firms of the capital needed to invest and expand.

This Statement of Interest explains the proper application of the antitrust laws to Plaintiffs' allegations, while also protecting the important role of investment and robust corporate governance to capital formation and economic growth. Specifically, it addresses: (1) the scope of the passive investor exemption under the Clayton Act, (2) the Clayton Act's concern with anticompetitive use of stock, (3) the Sherman Act's concern with anticompetitive coordination, and (4) how output can be suppressed below competitive levels even when output appears to be rising. In deciding these motions, the Agencies urge the Court to reject Defendants' multiple errors of law.

## BACKGROUND

The Complaint alleges that Defendants are three of the largest institutional asset managers in the world, each with trillions of dollars in assets under management. The Defendants are also three of the largest shareholders in all nine publicly held coal companies in the United States. Am. Compl. ¶ 20. Together, these competing companies produce nearly half of all U.S. coal, including 63 percent of South Powder River Basin coal. *Id.* ¶¶ 18, 100, 105. Each

Defendant has acquired and maintained significant stakes in each of the nine direct competitors through regular share purchases. *Id.* ¶¶ 21–57. Defendant BlackRock is the largest shareholder in six of the nine competing coal companies—with shares ranging from fourteen to sixteen percent in each firm—and is the second largest in the rest. *Id.* ¶ 20, Table 1. Collectively, Defendants own between 24 and 34 percent of seven of the nine coal companies, with smaller shares in the remaining two. *Id.* ¶¶ 4, 20.

The Complaint alleges that each Defendant publicly committed to use their common shareholdings in the coal companies to reduce carbon emissions by joining the Net Zero Asset Managers Initiative, which required members to pursue "decarbonisation goals" to reach net zero emissions by 2050 for all assets under their management. Am. Compl. ¶¶ 129–130. Plaintiffs allege that pursuant to this initiative, each Defendant took concrete steps to engage with the management of competing coal companies to obtain their commitment to limit carbon emissions by restricting the production of coal within the United States. *Id.* ¶¶ 150, 152–182. In addition, Defendants BlackRock and State Street for a time were members of Climate Action 100+, "an unprecedented global investor engagement initiative" committed to influencing corporate policies and actions, including compliance with specific coal output reduction goals. *Id.* ¶¶ 117–128. Defendants' actions allegedly resulted in industry-wide restrictions in coal output, even during periods of high prices, while at the same time increasing market-wide profits. *Id.* ¶¶ 152–154, 232–243. Plaintiffs allege that Defendants violated Section 1 of the Sherman Act by agreeing with one another to (1) use their shares to coerce coal companies to implement a coordinated reduction in coal output, and (2) share timely, competitively sensitive information to ensure that the coal companies complied with output reduction targets. *Id.* ¶¶ 253–263.

Plaintiffs also allege that Defendants' acquisition, holding, and use of their shares in competing coal companies has substantially lessened competition in violation of Section 7 of the Clayton Act. Am. Compl. ¶¶ 250–252. The breadth and depth of Defendants' holdings in competing coal companies allegedly gave them the access and ability to engage with management that ordinary shareholders do not possess. *Id.* ¶¶ 89–112. Where engagement was not sufficient to achieve their output restriction goals, Defendants allegedly voted against or withheld votes in favor of management, or threatened other actions such as divesting assets. *Id.* ¶¶ 152–191. According to the Complaint, these actions increased coal prices above competitive levels, leading American consumers to "pa[y] the price in higher utility bills and higher costs" while, at the same time, Defendants "reaped the rewards of higher returns, higher fees, and higher profits" on their holdings in coal companies. *Id.* ¶ 1.

## ARGUMENT

I.  **Defendants and Amici Misstate the Legal Standards for Assessing Liability Under Section 7 of the Clayton Act and Distort the Risks Those Standards Pose to Procompetitive Asset Manager Behavior.**

Antitrust law "is a central safeguard for the Nation's free market structures." *N. C. State Bd. of Dental Examin'rs v. FTC*, 574 U.S. 494, 502 (2015). Section 7 of the Clayton Act in particular was designed to prohibit stock acquisitions that may result in a substantial lessening of competition and was "directed primarily at the development of holding companies and at the secret acquisition of competitors through the purchase of all or parts of such competitors' stock." *Brown Shoe Co. v. United States*, 370 U.S. 294, 313–14 (1962).

Section 7 provides an "expansive definition of antitrust liability," *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990), enabling courts to tailor their analysis to the many competitive environments—and competitive risks—across our diverse economy. While many merger cases

6

begin with a focus on "statistics about the change in market concentration," plaintiffs can also instead satisfy their initial burden with any other "fact-specific showing" of illegality. *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *see* U.S. Dep't of Just. and Fed. Trade Comm'n, MERGER GUIDELINES § 1 at p. 4 (2023) ("2023 MERGER GUIDELINES") ("Merger review is ultimately a fact-specific exercise."). Under the burden-shifting framework developed by the courts, if the plaintiff makes an initial showing "based on a fact-specific analysis," then the court should consider whether "other pertinent factors . . . mandate[] a conclusion" that the law was not violated. 2023 MERGER GUIDELINES § 3 (quoting *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974) and *United States v. Baker Hughes*, 908 F.2d 981, 990 (D.C. Cir. 1990)). This analytical approach applies whatever the fact-specific basis plaintiffs present for demonstrating a violation.

In this case, Plaintiffs allege that Defendants accumulated shares in competing coal companies and used those shares to restrict the production of coal on an industry-wide basis, causing higher prices for consumers and industry at a time when inflation was already pushing prices upward. Defendants allegedly benefitted from higher returns on their stock holdings in coal companies, which were able to achieve supra-competitive profits by decreasing output and increasing prices. *E.g.*, Am. Compl. ¶ 1 (alleging Defendants reaped "higher returns, higher fees, and higher profits"). Defendants and amici argue this conduct is irrelevant, however, because the Section 7 "solely for investment" exception forbids examining how ostensibly passive, minority investors used their shareholdings at all. This interpretation is incorrect. Section 7 preserves the important role of asset managers while also permitting courts to protect markets from anticompetitive conduct. As explained below, Defendants attempt to mask allegations of illegal, anticompetitive behavior behind the veil of passive investing and good governance principles.

7

The allegations, however, go beyond governance to matters of business strategy and management. Defendants also claim that enforcing the law will adversely impact the important role asset managers play in our economy. To the contrary, passive fund investing can thrive without adopting these errors of law.

### A. Defendants Improperly Expand the Narrow "Solely for Investment" Exception to Section 7 Liability.

Defendants overstate the protections under Section 7 for acquisitions made "solely for investment," incorrectly claiming the statutory exception "gives bright-line protection to passive minority investors, without subjecting them to further analysis." Defs.' Joint Mot. to Dismiss Counts I-XVI and XVIII of the Am. Compl. and Req. for Oral Arg. at 25, 27, ECF No. 64 ("Defs.' Joint Mot. to Dismiss"). That exception reads in full:

> This section shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition.

15 U.S.C. § 18. Thus, by its express terms, this exemption only applies when a defendant both (1) purchases stock "solely for investment" *and* (2) does not use or attempt to use the stock to harm competition. 15 U.S.C. § 18; *see United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093, 1099 (C.D. Cal. 1979) (the "statute and the cases . . . support a 2-pronged test"). Accordingly, even initially passive investors can take themselves out of the exception by using or attempting to use their stock investments in multiple competitors to harm competition.

Section 7 thus creates a provisional carve-out for purchases made "solely for investment" that can be lost depending on how investors use those investments. As relevant here, Section 7's central text prohibits a stock acquisition where, in any relevant market, "the effect of such acquisition . . . or *of the use of such stock by the voting or granting of proxies or otherwise*[] may

be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18

(emphasis added). In the next statutory paragraph, the exception explains that Section 7 is not

violated when someone purchases stock "solely for investment and [is] *not using the same by*

*voting or otherwise*" to harm or attempt to harm competition. 15 U.S.C. § 18 (emphasis added).

These two statutory provisions must be read together. "[A] reviewing court should not

confine itself to examining a particular statutory provision in isolation. The meaning—or

ambiguity—of certain words or phrases may only become evident when placed in context." *FDA*

*v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). A person may violate Section

7 when the requisite effect on competition arises from either (i) the acquisition itself, or (ii) the

later *use* of acquired assets or stock. The "solely for investment" exception removes the statute's

scrutiny of the effect of the acquisition itself: If a defendant made an acquisition that was solely

for investment purposes at the time the acquisition was completed, courts may not analyze the

effect of that acquisition itself on competition. But, contrary to Defendants' claim, a defendant

does not enjoy absolute or perpetual immunity from Section 7 no matter how they behave after

the acquisition. A person may violate Section 7 by using, or attempting to use, the acquired stock

to cause anticompetitive effects. Accordingly, as the Supreme Court explained in *United States v.*

*E.I. du Pont de Nemours & Co.*, "[a]cquisitions solely for investment are excepted, *but only if,*

*and so long as*, the stock is not used by voting or otherwise to bring about, or in attempting to

bring about, the substantial lessening of competition." 353 U.S. 586, 589 (1957) (emphasis

added). "Even when the purchase is solely for investment, the plain language of § 7 contemplates

an action at any time the stock is used to bring about, or in attempting to bring about, the

substantial lessening of competition." *Id.* at 597–98.

9

By removing Section 7 liability for the acquisition of assets "solely for investment," the exception can be read as an "exemption" from Section 7 liability. *Tracinda*, 477 F. Supp. at 1098. And as with all express exemptions from the antitrust laws, it must be "narrowly construed." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979) ("that exemptions from the antitrust laws are to be narrowly construed . . . applies with equal force to express statutory exemptions"); *Chicago Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 671–72 (7th Cir. 1992) ("courts read exceptions to the antitrust laws narrowly, with beady eyes and green eyeshades"); *cf. Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 883, 888 (N.D. Ill. 2022) (noting that "courts are required to strictly construe Sherman Act exemptions," including the erstwhile "568 Exemption" for universities awarding need-based financial aid). Defendants flout this principle, however, stretching both prongs of the exception well beyond their plain text, let alone a narrow construction of them.

### i.    Defendants Misread "Solely"

Defendants misstate the requirement for an investment to be deemed made "solely for investment." 15 U.S.C § 18. Ignoring the plain meaning of "solely," they contend that this prong is met "when [the acquirer] seeks to earn a financial return from dividends or appreciation, rather than to control the company's day-to-day affairs." Defs.' Joint Mot. to Dismiss at 25. But such a financial purpose in acquiring stock is not sufficient for investors to avoid liability "where an apparently legitimate investment motive is accompanied by another motive." *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1204d (4th ed. 2016) (collecting cases); *du Pont*, 353 U.S. at 601–602. Accordingly, investments made to leverage holdings in competitors to harm the competitive process by shaping market-wide behavior are not solely for investment.

Relatedly, Defendants argue that they can satisfy the "solely for investment" prong if they did not intend to control the coal companies' internal affairs. Defs.' Joint Mot. to Dismiss at 25–27. But the lack of an intent to control is not dispositive; an investment is not "solely for investment" if an investor has an intent to use stock "to influence significantly *or* control management of the target firm." *Crane Co. v. Harsco Corp.*, 509 F. Supp. 115, 122–23 (D. Del. 1981) (emphasis added); *see also In the Matter of Golden Grain Macaroni Co.*, 78 F.T.C. 63, 73 (F.T.C. Jan 18, 1971). Thus, an acquisition is not made "solely for investment" if the acquirer intends to use shares to exercise an anticompetitive influence over competing firms, which in turn causes downstream anticompetitive effects such as output reductions.

Defendants' cases are inapposite. Defs.' Joint Mot. to Dismiss at 26. In denying a preliminary injunction, the *Anaconda* court relied heavily on a court-enforceable stipulation that the acquirer would "not attempt to use the stock or any influence gained thereby to lessen competition."[4] *Anaconda Co. v. Crane Co.*, 411 F. Supp. 1210, 1217–19 (S.D.N.Y. 1975). And in *Tracinda*, the court's analysis focused on an intent to control because the plaintiff there took the position "that defendants purchased this stock for control as opposed to investment." 477 F. Supp. at 1099 n.6. The *Tracinda* court nonetheless expressly recognized that "investment or control" were not "the only two possible purposes" for purchasing stock and that *du Pont* found the exception inapplicable when stock is used for commercial gain "based upon du Pont's use of its General Motors stock position to remain a major supplier to General Motors." *Id.* In this case, Plaintiff States allege that Defendants used their collective stock holdings to coordinate output

---

[4] The court further observed that "[i]t may well develop at trial that [the acquirer] has noninvestment motives not known to this Court or that Crane is attempting to use its shares to lessen competition." *Anaconda*, 411 F. Supp. at 1219. Granting Defendants' motion to dismiss would deny Plaintiffs such an opportunity.

reductions among competing coal companies on an industry-wide basis, which led to supra-competitive profits that yielded higher investment returns.

### ii.    Defendants Misread "Using"

Relying on a deportation case, Defendants assert that the term "using" in the "solely for investment" exception requires voting or some similar act. *See* Defs.' Joint Mot. to Dismiss at 28–30 (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004), which construed "use . . . physical force" to exclude "negligent or merely accidental conduct"). But the Clayton Act's language is not limited to affirmative use of shares by voting. Indeed, it broadly precludes "using the [shares] by voting *or otherwise*" to injure competition. 15. U.S.C § 18 (emphasis added). Partial ownership interests in competing firms can increase an investor's ability and incentive to influence competing companies' conduct. Thus, an investor violates Section 7 when it uses its holdings in competing firms, by voting or otherwise, to injure competition.

Defendants note that courts have often declined to apply the exception where minority shareholders used the shares to control or influence a "competitor, customer or supplier." Defs.' Joint Mot. to Dismiss 29. But the second prong of the exception is not limited to acquisitions by competitors, customers, or suppliers, nor has any court indicated such a limitation. Rather, "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 466-67 (1992). In reality, although competitors and market-adjacent participants are often the entities with the financial incentive and ability to exert anticompetitive influence, a single entity with holdings in multiple competitors can engage in similar anticompetitive behavior. Thus, blanket antitrust immunity for non-controlling investment activity is supported

12

neither by the text nor policy of Section 7, and there is no legitimate reason to depart from the plain meaning of "solely for investment" or "using" when construing Section 7.

### B. The Clayton Act Prohibits the Anticompetitive Use of Minority Interest Acquisitions to Substantially Lessen Competition.

A plaintiff can satisfy its initial burden with a showing that horizontal shareholdings purchased solely for investment were in fact *used to cause* a substantial lessening of competition in one or more relevant markets. As discussed above, the statutory text establishes liability when "the effect of . . . *the use* of such stock by voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). And the exception discussed above reinforces this approach. Accordingly, plaintiffs state a Section 7 claim against even an initially passive investor when they plausibly allege that the investor ceased to operate passively and affirmatively used horizontal shareholdings to cause a substantial lessening of competition.[5]

Although most Section 7 cases prospectively analyze the reasonably probable future effects—what may later occur—a claim focused on the use of stock examines what has occurred and should incorporate evidence of post-acquisition behavior and effect. The Supreme Court noted this distinction in *du Pont*, recognizing that Section 7 is most often used prospectively, but

---

[5] To be clear, parent companies and investors are generally not responsible for the acts of their subsidiaries or investments. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("a corporation and its stockholders are generally to be treated as separate entities") (citing *Burnet v. Clark*, 287 U.S. 410, 415 (1932)). The Section 7 claim here does not suggest parental liability for a violation of the law committed by its investments absent a showing of direct control and involvement sufficient to pierce the corporate veil. Rather, it alleges a Section 7 violation by Defendants themselves deriving from their acquisition and anticompetitive use of horizontal shareholdings. For the same reason, Plaintiffs' allegations, if proven, would not necessarily demonstrate liability on behalf of the coal companies who Defendants allegedly induced to lower output.

also that a suit may be brought "at any time when a threat of the prohibited effects is evident." 353 U.S. at 597–98; *see* p. 8–10, *supra* (discussing *du Pont*).

In claiming that Plaintiffs' allegations fail as a matter of law, Defendants raise a trio of arguments that misstate or misunderstand the Clayton Act. *First*, Defendants are wrong to suggest that the Clayton Act addresses only the acquisition or use of controlling stakes. *Denver & Rio Grande W. R.R. Co. v. United States*, 387 U.S. 485, 501 (1967) ("A company need not acquire control of another company in order to violate the Clayton Act."); *see also* 2023 MERGER GUIDELINES § 2.11 ("Partial acquisitions that do not result in control may nevertheless present significant competitive concerns."). *Du Pont* held that the acquisition of a minority stake may violate Section 7. 353 U.S. at 592. The size of the ownership interest need only be sufficient to exert an anticompetitive influence on the acquired company's decision-making. *Id.* For example, the *du Pont* Court found that a 23 percent holding was sufficient for du Pont to exercise an anticompetitive influence over General Motors' purchasing decisions, noting that "the potency of the influence" was enhanced due to diffusion of remaining shares. 353 U.S. at 605–07 & n.36; *see also Denver*, 387 U.S. at 504 (20 percent acquisition raised serious Section 7 concerns where there was "likely to be immediate and continuing cooperation between the companies"). When a partial owner can leverage its holding to control or influence business decisions at competing businesses, the relationship can substantially lessen competition. *See United States v. Dairy Farmers of Am.*, 426 F.3d 850, 862 (6th Cir. 2005); *see also* 2023 MERGER GUIDELINES § 2.11 (partial equity holdings can raise competitive concerns by "giving the partial owner the ability to influence the competitive conduct of the [partly owned] firm"). Whether an investor actually

14

used its minority stakes in competing companies to influence their businesses' decisions in a way that injured competition is a factual question.[6]

*Second*, Defendants incorrectly suggest that the Section 7 claim must be dismissed because they are institutional asset managers that neither participate in a relevant coal market nor control any company that participates in one. Defs.' Joint Mot. to Dismiss 39. Defendants stress that Section 7 actions challenging partial stock holdings generally involve "a partial acquisition of a competitor," *id*. at 39, or the exercise of "influence on a competitor, customer or supplier," *id*. at 36. This line of argumentation is a misdirection. Plaintiffs, in fact, do allege that the Defendants managed substantial shares of stock in competing firms, and used those shareholdings to exercise "influence on" business decisions of multiple "competitor[s]" *Id.* at 36; Am. Compl. ¶¶ 4–5.

Section 7 also expressly applies to anticompetitive acquisitions by any "person." 15 U.S.C. § 18. As a result, the Agencies have challenged partial stock acquisitions by different types of investors that threatened anticompetitive effects. In *United States v. Cleveland Trust Co.*, the Department of Justice sued a bank which held minority shares of 27 and 14 percent in competing companies through various fiduciary accounts. 392 F. Supp. 699, 701 (N.D. Ohio 1974) *aff'd*, 513 F.2d 633 (6th Cir. 1975). While the court dismissed the Section 7 claim as moot after one of the companies sold its competing operations, it did not question the validity of the

---

[6] *Cf.* SEC, Compliance and Disclosure Interpretations, Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting, Question 103.11 and Question 103.12 (February 11, 2025), https://www.sec.gov/rules-regulations/staff-guidance/compliance-disclosure-interpretations/exchange-act-sections-13d-13g-regulation-13d-g-beneficial-ownership-reporting (discussing differences between HSR passive investor exemption and 13G requirements, and explaining that "[t]he determination of whether a shareholder acquired or is holding the subject securities with a purpose or effect of 'changing or influencing' control of the issuer is based on all relevant facts and circumstances").

Section 7 claim and even noted that the dismissal "will not prevent the Government from challenging other possibly analogous situations resulting from defendant's trust activity." *Id*. at 708. And *In the Matter of TC Group* involved private equity firms Carlyle and Riverstone, which jointly held a 50 percent interest in Magellan. No. 61-0197, 2007 WL 293866 at *29 (MSNET Jan. 24, 2007). The FTC challenged their proposed acquisition of a 22.6 percent interest in Kinder Morgan, a company that competed with Magellan, because the acquisition would "have the effect of combining the two companies through partial common ownership." *Id.* (Analysis of Proposed Agreement Containing Consent Orders to Aid Public Comment). The competitive concerns were resolved through a consent decree which, *inter alia*, prohibited Carlyle and Riverstone "from exerting control or influence over Magellan as long as they hold an interest in or can influence KMI." *Id*. at 4–5.

*Third*, Defendants erroneously contend that Plaintiffs' Complaint is insufficient because it fails to identify "particular stock 'acquisitions,'" and "link [those acquisitions] to competitive harm." Defs.' Joint Mot. to Dismiss 37–38. Defendants misstate the inquiry required. Section 7's prohibitions extend to all situations in which stock holdings that resulted from stock acquisitions are wielded in an unlawful manner. *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 240 (1975) ("'acquisition' as used in § 7 of the Act means holding as well as obtaining assets"); *du Pont*, 353 U.S. at 597. The alleged anticompetitive effects need not be "link[ed]" to any discrete, single stock transaction; they are linked to Defendants' alleged use of the stock they had accumulated in competing coal companies. To plead a Section 7 claim, it is sufficient to allege that Defendants accumulated shares in competing coal companies *and* used those shares to push for reduction in the production of coal, causing substantial harm to competition.

### C.  The Clayton Act's Prohibition on the Anticompetitive Use of Stock Does Not Prevent Typical Asset Manager Behavior.

Asset managers play an invaluable role in the American economy. For example, index fund investing brings the benefits of market access to millions of Americans, and even passive asset managers play a critical role in corporate governance matters by conferring with directors and management on best practices for governance structures and oversight processes. And active investors, who are permitted broad latitude to force managerial and operational changes at individual companies, instill discipline and drive performance. The Clayton Act allows these beneficial practices.

The Agencies underscored the importance of protecting the critical role of asset managers in a 2017 U.S. Submission on Common Ownership to the Organization for Economic Co-operation and Development ("U.S. OECD Submission") and a subsequent conference.[7] The Submission discussed academic literature advocating for broad restrictions on institutional investors' and asset managers' ability to invest in competing companies. U.S. OECD Submission ¶¶ 11–14. The Submission recognized the limitations of "general relationships suggested by academic papers" and cautioned against adopting such proposals absent "compelling evidence of the anticompetitive effects of common ownership by institutional investors in concentrated industries." U.S. OECD Submission, ¶¶ 3, 15. It also cautioned against creating across-the-board limitations on common ownership given the potential for "unintended real-world costs on

---

[7] The Commission examined both the competitive concerns raised by common ownership and the potential for enforcement to interfere with the procompetitive activities of institutional investors and asset managers in a workshop. Fed. Trade Comm'n, *Hearings on Competition and Consumer Protection in the 21st Century: FTC hearing #8: Common Ownership* (Dec. 6, 2018), https://www.ftc.gov/news-events/events/2018/12/ftc-hearing-8-common-ownership.

businesses and consumers by making it more difficult to diversify risk." *Id.* ¶ 15. The Agencies

reaffirm that submission and the importance of index investing and corporate governance.

But the importance of index investing does not protect institutional investors and asset

managers that act to use their shares *in fact* to stifle competition among their commonly held

companies. Rather, the U.S. OECD Submission noted that the Agencies would consider

enforcement actions against institutional investors and asset managers "where sufficient evidence

exists that the effect of particular acquisitions may be substantially to lessen competition." *Id.* ¶

15. This scrutiny is what the Clayton Act demands. "No general warrant exists for treating an

institutional investor differently from other investors, and particularly not if the institutional

investor votes its shares or otherwise seeks to influence a corporation's decision making." Phillip

E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1204b (4th ed. 2016).

Defendants and amici are also wrong to suggest that permitting the Section 7 claim here

to proceed to discovery "would threaten the viability of index-based investing." Defs.' Joint Mot.

to Dismiss 32; *see also* Br. of Amicus Curiae the Securities Industry and Financial Markets

Association in Supp. of Defs.' Joint Mot. to Dismiss 7, ECF No. 74–1 (hereinafter "SIFMA

Br."); Br. of Amicus Curiae Investment Company Institute in Supp. of Defs.' Joint Motion to

Dismiss 23, ECF No. 76 (hereinafter "ICI Br."). For several reasons, the Clayton Act's

longstanding prohibitions on the use of horizontal shareholding to lessen competition should

pose no barrier to institutional investing and asset management activities.

*First*, passive investors fall squarely within Section 7's exemption unless they cease to be

passive and instead affirmatively use their stock to reduce rivalry among their commonly held

assets. Asset managers that lack control may avail themselves of the "solely for investment"

exemption if they *use* their investment holdings and market status to influence or change

18

governance structures and processes—for example, by conferring with the officers and directors on board size, compensation polices and public reporting practices—and such ordinary course conduct typically does not approach the theory of liability presented here. And asset managers that do not avail themselves of the passive exemption are free to seek to control or influence the strategic and day-to-day management and operation of an individual company. This brief focuses on a limited category of the use of multiple investment holdings: holders of competing companies that discourage competition among their investments in a manner that results in harm to consumers or businesses. The Agencies do not assert a position as to when an investor's acquisition of stock in competing firms alone—without evidence of subsequent anticompetitive use—would implicate Section 7. As explained in the U.S. OECD Submission, any enforcement or policy effort restricting merely the acquisition of investment assets would need to consider carefully the countervailing impacts on capital flows for competition in the relevant markets. U.S. OECD Submission ¶¶ 3, 15.

*Second*, Plaintiffs' theory implicates only those anticompetitive uses of holdings that in fact cause anticompetitive effects—such as facilitating parallel output reductions among competing coal companies, driving up Americans' energy prices. Most asset manager behavior will not affect market output, prices, quality, or other indicia of competition. Moreover, improving corporate governance often is competitively neutral or procompetitive, so uses of stock to improve the oversight and reporting practices generally benefits consumers and would not implicate the Clayton Act. In contrast, Plaintiffs allege that Defendants economically benefitted from using their substantial shares in competing coal companies to pressure the management of those companies to institute output-reduction targets "to advance climate goals," Am. Compl. ¶¶ 1, 4, 8, and to adopt disclosure policies that would permit Defendants to monitor

compliance with those reduction targets. *Id.* ¶ 94. These allegations, if true, could provide a basis for finding that these shareholder activities—as opposed to the mere acquisitions of the shares—caused a substantial lessening of competition in violation of Section 7.

*Third*, even asset manager activity that leads to output reductions or price increases does not violate the antitrust laws unless those reductions or increases are caused by harm to competition. Subject to applicable securities laws, an institutional investor or asset manager could advocate in favor of the business in which it owns or manages stock to exit one market in favor of another, more profitable market. It could even pressure the management of the firm to undertake such a transition. That transition would reduce output in the first market in service of achieving higher profits in another. But this advocacy and pressure *would not* violate the antitrust laws unless it resulted from a consummate reduction in competition—for example, if the investor also held shares in the company's competitor and thus would benefit from a rival's market exit. As such, antitrust plaintiffs must "allege and prove harm . . . to the competitive process, *i.e.*, to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (to be anticompetitive, the act "must harm the competitive *process* and thereby harm consumers"). Investor behavior motivated solely by the desire to improve an investment's value through competition on the merits does not implicate the Clayton Act.[8]

---

[8] Amici suggest that the threat of a broad remedial order would also impose serious harms. ICI Br. 21, ECF No. 76; *see also* SIFMA Br. 15, ECF No. 74–1. These concerns are irrelevant to the motion to dismiss because remedies are available that avoid implicating amici's concerns. These concerns are also premature—the appropriate scope of relief will be addressed later in the proceeding if a violation is found.

But that is not what Plaintiffs allege here. Plaintiffs allege that Defendants agreed to use their combined shares in competing coal companies to reduce production of coal in the United States, thereby driving down output and driving up prices. Am. Compl. ¶¶ 129–150. Plaintiffs further allege that Defendants *in fact* used their stakes in the competing companies to coerce the management of those companies to reduce production, purportedly in service of an "ESG agenda." *Id.* ¶¶ 155–191. This horizontal conduct allegedly drove up prices for consumers and businesses. That is precisely the sort of anticompetitive behavior the antitrust laws are designed to prevent.

## II.    Defendants Argue for Improper Limitations on Section 1 of the Sherman Act.

Section 1 of the Sherman Act prohibits every "contract," "combination," or "conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. A claim under Section 1 has two primary elements: (1) a "contract, combination, conspiracy"—i.e., "concerted action"; (2) that "unreasonably restrains trade." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186 (2010). Defendants take a cribbed view of both elements.

### A.    Accepting an Offer to Participate in a Joint Plan Can Demonstrate Concerted Action.

Concerted action encompasses any arrangement that "deprives the marketplace of independent centers of decisionmaking" and "thus of actual or potential competition." *Am. Needle*, 560 U.S. at 195. Defendants argue that Plaintiffs have not plausibly alleged an agreement either directly or through circumstantial evidence. *See* Joint Mot. to Dismiss at 9–19. But Plaintiffs argue they can establish concerted action under *Interstate Circuit v. United States*,

306 U.S. 208 (1939), *see* Pls.' Br. In Opp'n to Mot. to Dismiss at 39, ECF No. 88 ("Pls.'
Opp'n"), which is well-established precedent.

In *Interstate Circuit*, a manager of two movie theater companies sent identical letters to
eight major national film distributors, mentioning in the letter that the same letter was being sent
to all of them and asking the distributors to impose certain restrictions on secondary runs of
certain films. The distributors responded by imposing the restrictions. *Id.* at 217–18. Although
the Court first inferred the existence of an express agreement, it emphasized that such an express
agreement was "*not* a prerequisite to [finding] an unlawful conspiracy." 306 U.S. at 226
(emphasis added). The Court explained that "acceptance by competitors, without previous
agreement, of an invitation to participate in a plan . . . is sufficient to establish an unlawful
conspiracy under the Sherman Act." *Id.* at 227. Plaintiffs allege that is what took place here. Pls.'
Opp'n at 39–41.

This second way of showing concerted action under *Interstate Circuit* focuses on the
*nature* of the invitation—i.e., whether it contemplates concerted action—and competitors'
responsive actions demonstrating acceptance of the invitation: "It was enough that, knowing that
concerted action was contemplated and invited, the distributors gave their adherence to the
scheme and participated in it." 306 U.S. at 226–27; *see also FTC v. Cement Inst.*, 333 U.S. 683,
716 n.17 (1948) (explaining that it is sufficient "if there is evidence that persons, with knowledge
that concerted action was contemplated and invited, give adherence to and then participate in a
scheme").

The Supreme Court applied this same approach in *United States v. Masonite Corp.*, 316
U.S. 265, 274–76 (1942). It held that the "circumstances surrounding the making of [bilateral
settlement contracts]," including that each competitor was "aware" that "its contract was not an

isolated transaction but part of a larger arrangement," left "no room for doubt that all had an awareness of the general scope and purpose of the undertaking" sufficient to establish a broader, single conspiracy. *Id.* Put simply, "[i]t is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 142 (1948).

Many courts of appeals, including the Fifth Circuit, have applied *Interstate Circuit*. For instance, in *Gainesville Utilities Department v. Florida Power & Light Co.*, 573 F.2d 292 (5th Cir. 1978), the Fifth Circuit pointed to evidence of a "continuous exchange of letters between high executives" that showed "hopeful, if not expected, reciprocity" and led to "inferences [that] are irresistible" that concerted action was both contemplated and invited. *Id.* at 301; *see also United States v. MMR Corp. (LA)*, 907 F.2d 489, 495 (5th Cir. 1990) ("It is enough that the government shows that the defendants accepted an invitation to join in a conspiracy whose object was unlawfully restraining trade."). Other circuit courts have repeatedly applied similar analyses under *Interstate Circuit*.[9]

The Fourth Circuit's decision in *United States v. Foley*, 598 F.2d 1323 (4th Cir. 1979), is instructive. In *Foley*, the Fourth Circuit applied *Interstate Circuit* to uphold price-fixing

---

[9] *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331-32 (3d Cir. 2010) (considering whether, under *Interstate Circuit*, defendants' decisions "presuppose concerted action"); *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022) ("All that PLS must allege is that [the defendant] adhered to a common scheme.") (citing *Interstate Circuit*, 306 U.S. at 227); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935-36 (7th Cir. 2000) (citing *Interstate Circuit* and inferring agreement among competitors in part "from the nature of the proposals [made by an intermediary], from the manner in which they were made," and "from the substantial unanimity of action taken"); *see also United States v. Apple, Inc.*, 791 F.3d 290, 316 (2d Cir. 2015) ("Apple understood that its proposed Contracts were attractive to the Publisher Defendants only if they collectively shifted their relationships with Amazon to an agency model—which Apple knew would result in higher consumer-facing ebook prices.").

convictions in a case where competitors raised prices after a host announced to his competitor guests that, although he "did not care what the others did," he planned to increase prices. *Id.* at 1331–32. Each of the individual defendants at the dinner also subsequently "expressed an intention or gave the impression that his firm would adopt a similar change." *Id.* at 1332.

In *Foley*, the defendants made their commitments at the same dinner, but that fact is not necessary under *Interstate Circuit*. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227. Indeed, in *Masonite*, "the District Court found that, in negotiating and entering into the first agreements, each appellee, other than Masonite, acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others." 316 U.S. at 274–75. But "as the arrangement continued, each became familiar with its purpose and scope" and through their actions over the course of the year, the record "le[ft] no room for doubt that all had an awareness of the general scope and purpose of the undertaking," which sufficed to establish concerted action under Section 1. *Id.* at 275. The scope of permissible inferences from sequential public commitments that discuss industry-wide output reduction targets depends on their nature and surrounding facts and circumstances, which cannot readily be determined on the pleadings.

Further, it is irrelevant to the existence of concerted action that the alleged agreements at issue in this case focus on "climate" issues. In "a civil action under the Sherman Act, liability may be established by proof of either an unlawful purpose or an anticompetitive effect." *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 355 (5th Cir. 2008) (*quoting Summit Health, Ltd. v.*

24

*Pinhas*, 500 U.S. 322, 331 (1991)) (emphasis added). Indeed, it is "well settled that good motives will not validate an otherwise anticompetitive practice." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 n.23 (1984); *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 496 (1949) ("More than thirty years ago this Court said, . . . 'It is too late in the day to assert against statutes which forbid combinations of competing companies that a particular combination was induced by good intentions.'" (citation omitted)).[10] Plaintiffs have alleged that the NetZero Asset Managers Initiative and Climate Action 100+ initiative set forth a "common strategy" for influencing corporate behavior in the energy industry, including "'alignment metrics' that set specific target reductions for coal production." Am. Compl. ¶¶ 115–117, 119, 130. Plaintiffs have further alleged that "[b]y the end of 2021, . . . Defendants had committed to [this] common strategy of 'engaging' with management of competing firms in the coal industry to obtain their commitment to reduce carbon emissions substantially and requiring those firms to disclose their compliance with those commitments," *id.* ¶ 150, and that Defendants' agreement is memorialized in their public commitments to join the climate-change organizations' initiatives, public documents stating these organizations' goals, and Defendants' public commitments to align their own investment engagement activities with these goals. *Id.* ¶ 4; *id.* ¶¶ 116, 129–131 (Net Zero Asset Managers Initiative); *id.* ¶¶ 116–17, 119, 125–28 (Climate Action 100+). Such a common corporate engagement plan creating restrictions on the portfolio companies' separate and competing businesses could satisfy the concerted-action element by "depriv[ing] the marketplace of independent centers of decisionmaking" and "thus of actual or potential competition." *Am.*

---

[10] Nor can good intentions provide a defense to a violation of Section 7. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 371 (1963) (a merger violating Section 7 "is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial").

*Needle Inc. v. NFL*, 560 U.S. 183, 195 (2010) (citation omitted). Nor does it matter that the common plan was allegedly effectuated through their joint participation in the Net Zero Asset Managers Initiative and Climate Action 100+. *Cf. Associated Press v. United States*, 326 U.S. 1, 19 (1945) ("[A]rrangements or combinations designed to stifle competition cannot be immunized by adopting a membership device accomplishing that purpose.").

### B. Anticompetitive Output Restraint Can Occur Even If Overall Output Increases.

Defendants are also incorrect that, even if there were an agreement, Plaintiffs fail to allege harm to competition because "coal production rose during" the alleged agreement. Defs.' Joint Mot. to Dismiss at 19; *but see* Pls.' Opp'n at 50–51 (disputing the analysis of production output). Even assuming, arguendo, that output did increase overall, an agreement that restricts output growth would be anticompetitive. In "establishing anticompetitive effect," "[o]utput, prices, and quality are compared to the levels that might be observed but for the challenged restraints (a hypothetical scenario often referred to as the 'but-for world')." *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 83 (E.D.N.Y. 2024) (citing *Ohio v. Am. Express*, 585 U.S. 529, 547–48 (2018)). Therefore, the relevant question is not whether coal production rose, but whether production was lower than it would have been without Defendants' alleged agreement. If coal output grew more slowly due to Defendants' conduct while, at the same time, profits for these coal companies rose, then Defendants' restraint harmed competition.

## CONCLUSION

In deciding the motions to dismiss, the Court should reject Defendant's misstatements of law.

Dated: May 22, 2025                    Respectfully submitted,

/s/ *Anupama Sawkar*                    /s/ *David B. Lawrence*


CLARKE T. EDWARDS                     ABIGAIL A. SLATER
*Acting Director, Office of Policy Planning*    *Assistant Attorney General*

DANIEL GUARNERA                      ROGER P. ALFORD
*Director, Bureau of Competition*          *Principal Deputy Assistant Attorney General*

ANUPAMA SAWKAR                      MARK H. HAMER
*Act. Deputy Director, Office of Policy Planning*   WILLIAM RINNER
                                   *Deputy Assistant Attorneys General*
KELSE MOEN
*Deputy Director, Bureau of Competition*      DAVID B. LAWRENCE
                                   *Policy Director*
WILLIAM ADKINSON
*Attorney Advisor, Office of Policy Planning*    ALICE A. WANG
                                   G. CHARLES BELLER
Federal Trade Commission                *Counsels to the Assistant Attorney General*
600 Pennsylvania Avenue, NW
Washington, DC 20580                 U.S. Department of Justice,
Telephone: 202-779-6023              Antitrust Division
Facsimile: 202-326-2326              950 Pennsylvania Avenue, NW
CA Bar No. 270936                    Washington, DC 20530
E-mail: asawkar@ftc.gov              Telephone: 202-532-4698
                                   Facsimile: 202-514-0306
*Attorneys for the Federal Trade Commission*   CT Bar No. 430642
                                   E-mail: david.lawrence@usdoj.gov

                                   *Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2025, I caused the foregoing to be filed through this Court's CM/ECF filer system, which will serve a notice of electronic filing on all registered users, including counsel for all parties.

/s/ *David B. Lawrence*