UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

STATE OF TEXAS, *et al.*,

                         *Plaintiffs*,

v.

BLACKROCK, INC.,
STATE STREET CORPORATION,
THE VANGUARD GROUP, INC.,

                         *Defendants*.

CIVIL ACTION NO. 6:24-cv-00437-JDK

**REPLY IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

I.  Plaintiffs Fail to State a Claim Under Section 1 of the Sherman Act (Count II) ............... 3

    A.  Plaintiffs do not plausibly allege an agreement ...................................... 3

        1.  There is no "direct evidence" of the alleged conspiracy ............................ 3

        2.  There is no "indirect evidence" either ...................................... 9

    B.  The Complaint does not plead anticompetitive harm or *per se* liability .............. 14

II.  Plaintiffs Fail to State an Information-Sharing Claim Under Section 1 (Count III) ......... 17

III.  Plaintiffs Fail to State a Claim under Section 7 of the Clayton Act (Count I) ................. 19

    A.  Defendants fall within Section 7's safe harbor .................................... 19

        1.  Defendants purchased their stock solely for investment .......................... 20

        2.  Defendants did not "use" their shares to harm competition ................... 22

    B.  Plaintiffs fail to allege either an actual or potential substantial lessening of competition ................................................................ 25

IV.  Plaintiffs' State Antitrust Claims and LUPTA Claims Fall with the Federal Claims (Counts IV–XIV, XVIII) ................................................................ 28

V.  The Consumer-Protection Counts Fail to State a Claim (Counts XV–XXI) ................... 29

    A.  BlackRock's statements were not deceptive ..................................... 30

    B.  The statements were not material ....................................... 33

    C.  The State consumer-protection laws do not apply to securities-fraud claims ...... 35

    D.  The LUTPA claim fails for lack of egregious conduct ......................... 38

Conclusion ................................................................ 38

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*,
776 F.3d 321 (5th Cir. 2015) ............................................................7, 19

*In re Asbestos Sch. Litig.*,
46 F.3d 1284 (3d Cir. 1994)..................................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................10, 11

*Boswell v. Bimbo Bakeries USA, Inc.*,
570 F. Supp. 3d 89 (S.D.N.Y. 2021)......................................................30

*Bott v. Vistaprint USA Inc.*,
392 F. App'x 327 (5th Cir. 2010) .........................................................29

*In re BP p.l.c. Sec. Litig.*,
922 F. Supp. 2d 600 (S.D. Tex. 2013) .............................................23, 26

*Britton v. Farmers Ins. Grp.*,
721 P.2d 303 (Mont. 1986)..................................................................36

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ..................................................................9

*Crane Co. v. Harsco Corp.*,
509 F. Supp. 115 (D. Del. 1981)...........................................................21

*D & J Tire, Inc. v. Hercules Tire & Rubber Co.*,
598 F.3d 200 (5th Cir. 2010) ...............................................................34

*David B. Turner Builders LLC v. Weyerhaeuser Co.*,
603 F. Supp. 3d 459 (S.D. Miss. 2022)..................................................25

*Denver & Rio Grande W. R.R. Co. v. United States*,
387 U.S. 485 (1967)............................................................................22

*Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*,
2023 WL 4562031 (S.D.N.Y. July 14, 2023) ..........................................8

*Doe v. Boys Clubs of Greater Dall., Inc.*,
907 S.W.2d 472 (Tex. 1995)................................................................30

iii

*In re Elec. Books Antitrust Litig.*,
  859 F. Supp. 2d 671 (S.D.N.Y. 2012)....................................................................13

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  832 F.3d 1 (1st Cir. 2016)...........................................................................................8

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010).....................................................................31

*FDIC v. Munn*,
  804 F.2d 860 (5th Cir. 1986) ...................................................................................37

*Frizzell v. Cook*,
  790 S.W.2d 41 (Tex. App.—San Antonio 1990, writ denied)................................37

*FTC v. Colgate-Palmolive Co.*,
  380 U.S. 374 (1965).................................................................................................34

*FTC v. Peabody Energy Corp.*,
  492 F. Supp. 3d 865 (E.D. Mo. 2020).....................................................................15

*Gonzalez v. Kay*,
  577 F.3d 600 (5th Cir. 2009) ...................................................................................29

*Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*,
  476 F.2d 687 (2d Cir. 1973).....................................................................................21

*Hilsinger v. Zimmerman Steel Co.*,
  187 N.W. 493 (Iowa 1922) ......................................................................................38

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939)..........................................................................................4, 8, 9

*Jackson v. Kraft Heinz Foods Co.*,
  2022 WL 4591749 (N.D. Ill. Aug. 3, 2022) ...........................................................29

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ........................................................................14, 15

*Klein v. TD Ameritrade Holding Corp.*,
  2015 WL 13215666 (D. Neb. Oct. 23, 2015), *report and recommendation
  adopted in part on alternative grounds*, 172 F. Supp. 3d 1055 (D. Neb. 2016)......................36

*McGinity v. Procter & Gamble Co.*,
  69 F.4th 1093 (9th Cir. 2023) ..................................................................................31

*Meador v. Apple, Inc.*,
  911 F.3d 260 (5th Cir. 2018) ...................................................................................35

*State ex rel. Miller v. Hydro Mag, Ltd.*,
  436 N.W.2d 617 (Iowa 1989) ..................................................................................33

*State ex rel. Miller v. Pace*,
  677 N.W.2d 761 (Iowa 2004) ..................................................................................38

*State ex rel. Miller v. Vertrue, Inc.*,
    834 N.W.2d 12 (Iowa 2013) .................................................................................37

*Moore v. Trader Joe's Co.*,
    4 F.4th 874 (9th Cir. 2021) .................................................................................31

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
    2022 WL 4017895 (W.D.N.Y. Sept. 2, 2022) ..............................................10, 11

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................................................14

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans*
    *Archdiocesan Cemeteries*,
    56 F.4th 1026 (5th Cir. 2023) .............................................................................17

*In re Online Travel Co. Hotel Booking Antitrust Litig.*,
    997 F. Supp. 2d 526 (N.D. Tex. 2014) ................................................................10

*Pennington v. Singleton*,
    606 S.W.2d 682 (Tex. 1980) ................................................................................33

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ..............................................................................31

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*,
    784 F.2d 674 (5th Cir. 1986) ..............................................................................33

*Quality Env't Processes, Inc. v. I.P. Petroleum Co., Inc.*,
    144 So.3d 1011 (La. 2014) ..................................................................................38

*In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*,
    709 F. Supp. 3d 478 (M.D. Tenn. 2023).............................................................17

*Reyn's Pasta Bella, LLC v. Visa U.S.A.*,
    259 F. Supp. 2d 992 (N.D. Cal. 2003) ................................................................27

*Richardson v. Texas*,
    2023 WL 5662566 (E.D. Tex. Aug. 31, 2023) ....................................................33

*Robinson v. Walgreen Co.*,
    2022 WL 204360 (N.D. Ill. Jan. 24, 2022) .........................................................29

*Smith v. Cooper/T. Smith Corp.*,
    846 F.2d 325 (5th Cir. 1988) ..............................................................................35

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001) ..............................................................................14

*Stephenson v. Paine Webber Jackson & Curtis, Inc.*,
    839 F.2d 1095 (5th Cir. 1988) ............................................................................37

*In re Sulfuric Acid Antitrust Litig.*,
    703 F.3d 1004 (7th Cir. 2012) ............................................................................17

*Sutton v. Adams,*
 318 So.3d 776 (La. App. 4 Cir. 2018) ..................................................38

*In re TC Group,*
 2007 WL 293866 (F.T.C. Jan. 24, 2007) ..............................................28

*In re Treasury Sec. Auction Antitrust Litig.,*
 2021 WL 1226670 (S.D.N.Y. Mar. 31, 2021) ......................................18

*United States v. Cleveland Trust,*
 392 F. Supp. 699 (N.D. Ohio 1974)......................................................28

*United States v. E.I. du Pont de Nemours,*
 353 U.S. 586 (1957)........................................................................27, 28

*United States v. ITT Cont'l Baking Co.,*
 420 U.S. 223 (1975)..............................................................................27

*United States v. Masonite,*
 316 U.S. 265 (1942)................................................................................9

*United States v. Tracinda Inv. Corp.,*
 477 F. Supp. 1093 (C.D. Cal. 1979) ....................................................21

*Viazis v. Am. Ass'n of Orthodontists,*
 314 F.3d 758 (5th Cir. 2002) ...........................................................4, 11

*Walker v. Beaumont Indep. Sch. Dist.,*
 938 F.3d 724 (5th Cir. 2019) ...............................................................29

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.,*
 328 F. Supp. 3d 824 (N.D. Ill. 2018) ..............................................10, 11

*Yager v. Stroman,*
 2020 WL 2615759 (W.D. Tex. 2020) ...................................................14

**Statutes, Rules, and Regulations**

15 U.S.C. § 18...............................................................................22, 27

17 C.F.R. § 240.13d-1(b)(1)(i)...............................................................27

17 C.F.R. § 275.206(4)-6 .........................................................................6

88 Fed. Reg. 70436 (Oct. 11, 2023).......................................................32

89 Fed. Reg. 21668 (Mar. 28, 2024).......................................................13

California SB 253, Climate Corporate Data Accountability Act (Oct. 7, 2023) ...........................13

Commission Delegated Regulation (EU) 2023/2772 (July 31, 2023) ..........................................13

Iowa Code § 714.16(1)(i), (2)(a) ................................................................................37

La. R.S. § 51:712 .......................................................................................................36

La. R.S. § 51:1406 ................................................................................................34, 35

La. R.S. § 51:1406(1) ................................................................................................29

Mont. Code § 30-14-104 ...........................................................................................34

Mont. Code. § 30-10-107 ..........................................................................................36

Mont. Code. § 30-14-105(1) ......................................................................................36

Mont. Code. § 301 .....................................................................................................36

Mont. Code. § 305 .....................................................................................................36

Neb. Rev. Stat. § 59-1617 .........................................................................................36

Neb. Rev. Stat. § 87-304 ...........................................................................................36

Tex. Bus. & Com. Code § 17.46(c) ...........................................................................37

Tex. Bus. & Com. Code § 17.46(c)(1) .......................................................................37

## Other Authorities

D. Pridgen & J. Cuaresma, Consumer Protection and the Law § 4:26 ..........................35

Edward B. Rock & Daniel L. Rubinfeld, *Antitrust for Institutional Investors*, 82
    Antitrust L.J. 221 (2018) .....................................................................................14

L. Waks, 4 Tex. Prac. Guide Bus. Transactions § 17:2 ...............................................33

Order Instituting Administrative and Cease-and-Desist Proceedings, *In re Invesco
    Advisers, Inc.*, IAA Release No. 6770 (Nov. 8, 2024) ..........................................32

The Opposition confirms this is a case that makes no sense, factually or legally. Plaintiffs' case rests on three implausible premises: (1) although Defendants never communicated with each other, they nonetheless joined a conspiracy by briefly being members of the same trade group; (2) although Defendants never voted against the same coal-company directors, they somehow used shareholder proxy votes and engagement to influence coal-company output; and (3) even though coal demand has been declining for decades, it is plausible to assume the recent growth in coal production would have been greater but for Defendants' behavior. For their Complaint to survive, Plaintiffs must plausibly allege each of these premises. But none can withstand the slightest scrutiny; the Complaint and the material it incorporates demonstrate that each key assertion is implausible. And if this fatally flawed case is allowed to move forward, it will harm the capital and energy markets alike.

First, the Complaint's factual allegations do not support Plaintiffs' claim that each Defendant's involvement in certain industry groups is tantamount to a conspiracy. The Opposition infers that because Defendants joined certain climate-related trade groups, they must have also pressured coal companies to lower coal output. But there are no allegations that any Defendant ever discussed or supported any coal output limit, let alone agreed to one, whether through these groups or otherwise. Instead, Defendants participated in those groups only on terms that expressly disavowed any commitment to coordinate their votes or engagements—the purported means of the conspiracy. Plaintiffs cannot assert that particular documents created an anticompetitive agreement yet ask the Court to ignore what those documents said. The notion that mere membership in these industry organizations would be sufficient to allege a plot to reduce coal output would stand *Twombly* on its head.

1

Second, the conspiracy and Section 7 claims are equally implausible given the Complaint's failure to allege any connection between proxy voting or engagement and coal output. There is no allegation suggesting that Defendants' stewardship activities were anything but routine. Plaintiffs never allege that any Defendant met with a coal producer and told it to reduce output, or that BlackRock and State Street even met with a coal company on any topic. Nor is there any allegation that a Defendant voted for any proposal to reduce coal output or that Vanguard ever voted against coal-company management. BlackRock and State Street are alleged to have voted against certain directors, but there is no plausible allegation that they colluded to combine their voting power, they routinely split their votes, and none of the coal-company directors ever lost an election. Further, although the Complaint necessarily implicates the coal companies themselves in the alleged anticompetitive conduct (as only they could determine output), the Complaint does not correlate any Defendant's alleged meetings or votes to the output decisions the coal companies later made.

The Complaint's details debunk the refrain that Defendants altered coal-company output either by agreement or through their minority investment stakes. While the Complaint asserts that coal production declined during the alleged 2021–2024 conspiracy period, Plaintiffs' own chart shows that coal production actually rose. So, Plaintiffs now argue that less coal was mined in 2022 than in 2019—in other words, they concede that coal production rose during the period, just not enough. But Plaintiffs say nothing about market demand, productive capacity, or any other factor to explain why 2019 is a plausible benchmark for coal production under the economic conditions of 2022. Output had declined for decades, as Plaintiff Wyoming well understood when litigating another antitrust case in 2020. And the output data on which Plaintiffs so heavily rely shows no pattern at all. Several public companies increased production during the alleged conspiracy period,

several private companies cut production, and none of the data shows any tie whatsoever to anything Defendants did.

Plaintiffs treat their consumer-protection claims as an afterthought, failing to mount a serious defense of them. BlackRock's motion explains why its public statements were neither material nor deceptive. BlackRock's unrebutted arguments establish that there is no misrepresentation as a matter of law and that the statements do not materially change the information available to consumers. And as a threshold matter, none of the consumer-protection laws applies to securities sales.

Plaintiffs seek a radical extension of antitrust law that no court has ever recognized. They seek to punish Defendants for doing nothing more than engaging in the routine conduct of asset managers—voting shares and taking meetings with management. They offer no way to differentiate between votes and meetings that violate antitrust law from those that promote competition and good governance. Dismissal of all counts is warranted.[1]

## I.    Plaintiffs Fail to State a Claim Under Section 1 of the Sherman Act (Count II)

### A.    Plaintiffs do not plausibly allege an agreement

Plaintiffs assert a conspiracy to reduce coal output among Defendants who are not alleged to have ever spoken with each other about coal. To fill that gap, the Opposition misreads documents, misstates law, and conflates Defendants with coal companies, none of which plausibly alleges a collusive agreement.

#### 1.    There is no "direct evidence" of the alleged conspiracy

The Complaint alleges a single agreement: "to coerce [coal] companies to implement and adhere to a scheme of coordinated output reductions." Compl. ¶ 255. It alleges no facts constituting

---

[1] Parts I–IV concern Defendants' joint motion to dismiss, ECF No. 64, and BlackRock submits the arguments in Part V in support of its motion to dismiss the consumer-protection counts, ECF No. 65. Vanguard has filed a separate reply brief highlighting Vanguard-specific arguments. BlackRock and State Street incorporate their company-specific arguments into this reply brief.

direct evidence of conspiracy—evidence that "'explicitly refers to an understanding' between the alleged conspirators." *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002) (alteration marks omitted). It notes that Defendants joined certain trade groups (NZAM and CA100+) but stops short of saying that joining those groups was by itself participation in a conspiracy to cut coal production. Joint Br. 10. In their opposition, however, Plaintiffs now assert the opposite: that merely joining NZAM or CA100+ constitutes joining the alleged output-reduction scheme. Opp. 42. By that logic, *all* of the thousands of worldwide members of those groups—and tens of thousands of companies in which they invested—participated in a colossal and implausible "walking conspiracy" that spans the entire economy.[2] But the Complaint's allegations do not plausibly suggest that joining the groups amounts to an agreement among Defendants of any kind, and the terms on which Defendants joined the groups and reserved their independence refute that possibility. *See Viazis*, 314 F.3d at 764 ("[a] trade association … is not by its nature a 'walking conspiracy'").

Plaintiffs argue that they have alleged an agreement in the mold of *Interstate Circuit v. United States*, 306 U.S. 208 (1939). Opp. 39. But as the Government explains, to plead an *Interstate Circuit*–type agreement, a plaintiff must plausibly allege that: (1) someone extended the defendants "an invitation to participate in a plan" to reduce competition (*i.e.*, to cut coal production); (2) the defendants "accept[ed]" the invitation; and (3) the plan "contemplated" "concerted action." Gov't Br. 22 (quoting *Interstate Circuit*, 306 U.S. at 226–227). Plaintiffs allege none of that.

**First**, Plaintiffs do not allege that participation in NZAM or CA100+ was contingent on any investor seeking reductions in coal output. Plaintiffs admit, as they must, that trade groups are generally not suspect under the antitrust laws. Opp. 42; *see Viazis*, 314 F.3d at 764. Businesses join

---

[2] *See*, *e.g.*, *BlackRock Joins Climate Action 100+*, Climate Action 100+, https://bit.ly/4gEGPaG (last visited June 1, 2025) (cited in ¶ 117) (noting that over 370 investors joined CA100+).

trade associations for many innocuous reasons like staying abreast of industry developments, and "[a] member of a trade group or other similar organization does not necessarily endorse everything done by that organization or its members." *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1290 (3d Cir. 1994) (Alito, J.). Plaintiffs nonetheless assert that NZAM and CA100+ are different because they came with "strings" and "[t]heir entire purpose was to … coordinate efforts to coerce [coal] companies into reducing [coal] output." Opp. 42–43. But there is no well-pleaded allegation suggesting what these "strings" are, or that NZAM or CA100+ asked any Defendant to influence coal output. Plaintiffs likewise offer no citation to the Complaint for their rhetorical assertions that NZAM's "policy … requires signatories to make direct threats toward coal companies" and that the "entire point" of the groups "was to bind Defendants … to reduce … the burning of coal." Opp. 40, 42.

Plaintiffs instead focus mainly on one statement from each group, but those documents never mention coal. They refer only to a general goal of working toward lower greenhouse-gas emissions in the long run.[3] The NZAM statement even acknowledges that for some investments, "there are no technologically and/or financially viable alternatives to eliminate emissions."[4] In these cases, net zero may alternatively be achieved using "offsets" such as "invest[ing] in long-term carbon removal."[5] While Plaintiffs assert "[i]t should be obvious" that cutting coal is the only way to reach the groups' long-term goals, Opp. 41, that is a tell that they lack *direct* evidence of a coal-output conspiracy—and the speculation is also wrong, as a cursory review of the documents illustrates. It certainly was not a "necessary consequence" of achieving NZAM's objectives, Opp.

---

[3] *The Net Zero Asset Managers Initiative Commitment*, Net Zero Asset Managers, https://bit.ly/47vQcFi (last visited June 1, 2025) (cited in Compl. ¶ 130); BlackRock's *Climate Action 100+ Sign-On Statement* at 1, BlackRock (Jan. 6, 2000), https://tinyurl.com/2s486d5t (last visited June 1, 2025) (cited in ¶ 201). *See also* State Street Br. 4.

[4] NZAM statement, *supra* note 3.

[5] *Id.*

39, that coal companies would lower production, when NZAM's statement explicitly discussed other ways that net zero could be attained. And the statement of CA100+ (which Vanguard did not join, and so could not possibly be the site of the alleged conspiracy) discussed only a general goal to "transition to a lower carbon economy," without identifying specific interventions for any particular asset class.[6]

**Second,** even if the Complaint had plausibly alleged that NZAM or CA100+ asked any Defendant to reduce coal output, there would still be no plausible allegation any Defendant acceded to that request. To the contrary, Plaintiffs do not dispute that the very documents they claim constituted the purported "agreement" disavow any such assent. Though Plaintiffs suggest—without citing to any allegation in the Complaint—that "joining these groups requires non-optional commitments," Opp. 42, that is not what the documents say. NZAM recognized that any member's "commitment[ ]" to lowering emissions is subordinate to its "regulatory environments" and "legal duties to clients,"[7]—which include a fiduciary duty to vote securities in clients' best interests. *See* 17 C.F.R. § 275.206(4)-6. Joint Br. 11. And each Defendant issued a statement in connection with NZAM emphasizing that it would continue to act according to its fiduciary duties and the independent instructions of its clients. Joint Br. 11 & n.12.[8] Similarly, membership in CA100+ (which

---

[6] CA100+ statement, *supra* note 3.

[7] NZAM statement, *supra* note 3.

[8] *See* State Street Global Advisors, Net Zero Asset Managers Initiative, http://bit.ly/4ixmWm1 (last visited June 1, 2025) (cited in Compl. ¶ 144) (stating that State Street would reduce its carbon exposure only to the extent "our clients … instruct us to achieve that objective"); BlackRock's 2030 Net Zero Statement, BlackRock, https://bit.ly/40WjA6p (last visited June 1, 2025) (cited in ¶ 214) (stating BlackRock is a fiduciary to its clients and its role is to help them "navigate investment risks and opportunities, not to engineer a specific decarbonization outcome in the real economy"); Vanguard, Net Zero Asset Managers Initiative, https://bit.ly/3ZvO3ro (last visited June 1, 2025) (cited in ¶ 137) (stating that Vanguard's commitment to NZAM covered only 4% of assets, which were already being invested from "net zero commitments as part of the product design," or from an "existing philosophy and process used by the investment managers").

Vanguard never joined) could not be an agreement (even between BlackRock and State Street) because BlackRock conditioned its membership on a list of caveats twice as long as the CA100+ statement itself.[9] BlackRock, citing its "fiduciary and contractual duties" to clients, specifically refused to coordinate on its "proxy voting and engagement." *See* BlackRock Addendum ("BlackRock is not formally or informally agreeing to buy, sell, hold or vote our shares together with any other Climate Action 100+ signatory.").

Rather than grapple with these clear conditions, Plaintiffs dismiss it as "spin." Opp. 44. But these statements cannot be squared with Plaintiffs' conspiracy theory and appear in the very documents that supposedly constitute "direct evidence" of the agreement and are the terms on which Defendants chose to be associated with the groups.

With no support within the terms, Plaintiffs cite two documents to which Defendants never agreed. As the title of the first—"Network Partners' expectation of signatories with regard to fossil fuel investment policy"—suggests, it contains only the unilateral "expectation[s]" of certain third-party NZAM "network partners." Opp. 40.[10] There is no allegation that any Defendant agreed to these third-party expectations or was ever asked to do so. *See Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 333 (5th Cir. 2015) (trade association's "one-sided" statements insufficient to state a conspiracy claim). The second document—"Investment Expectations for Diversified Mining" (again from CA100+ and thus irrelevant to Vanguard)—is even

---

[9] CA100+ statement, *supra* note 3.

[10] *Net Zero Asset Managers Initiative: Network Partners' expectation of signatories with regard to fossil fuel investment policy* at 1, https://perma.cc/T235-DX9T (last visited June 1, 2025) (cited in Compl. ¶ 115). This document does not even invite coordinated action. It asks investors to "follow one of [five] positions below." The portion quoted by Plaintiffs, which says that "[f]inancial institutions" should "phase out financial support to coal across all their activities," is but one of the five options, and that option is not even relevant to asset managers like Defendants. Buying coal-company shares on the open market is not "financial support"—and even if it were, the Complaint alleges that Defendants did the opposite of "phas[ing] out" that support. Compl. ¶¶ 22–55.

further afield. It discusses emissions targets for eleven foreign companies not at issue in this case,[11] there is no allegation any Defendant saw the document, and it does not request any action by any Defendant. Joint Br. 12. The document states it is a "supporting resource … for institutional investors" and "do[es] not act or speak on behalf of … Climate Action 100+ signatories."[12] And even if it did recommend an action related to the foreign companies at issue, the "antitrust laws allow trade associations to make nonbinding recommendations about businesses and products." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 9 (1st Cir. 2016). These documents provide no factual support for a conspiracy to cut coal output.

**Third**, Plaintiffs fail to allege that any of NZAM's or CA100+'s alleged plans required "concerted action." Gov't Br. 22. In *Interstate Circuit*, there was concerted action because the conspiracy's "hub" sent a letter to each conspirator informing them the same letter was going to all the others and that "all" must go along, and each conspirator "knew that cooperation was essential to successful operation of the plan." 306 U.S. at 216 & n.3, 222. By contrast, there is no allegation that any Defendant's participation in NZAM or CA100+ was contingent on the others' participation. Joint Br. 11–12, 18. And Plaintiffs' own allegations establish that each acted independently: Vanguard never joined CA100+, and with one exception, Defendants joined and left the groups at different times, sometimes years apart. Compl. ¶¶ 127–128, 132, 143. Absent allegations that Defendants' participation in NZAM or CA100+ was contingent on the other Defendants' doing likewise, those groups cannot provide direct evidence of an agreement. *See Dinosaur Fin.*

---

[11] *Investor Expectations for Diversified Mining*, Climate Action 100+ at 37, (last visited June 1, 2025) https://bit.ly/3zqi1SR (cited in ¶ 115). The document clarifies that "ten companies," none at issue, count as "diversified miners," with one more company nearly qualifying as diversified. *Id.* at 14 n.4. *See* Companies, Climate Action 100+, (last visited June 1, 2025) https://www.climate-action100.org/whos-involved/companies/?search_companies&company_sector=diversified-mining).

[12] *Id.*

*Grp. LLC v. S&P Glob., Inc.*, 2023 WL 4562031, at *18 (S.D.N.Y. July 14, 2023) (dismissing conspiracy claim because agreements with the alleged "hub" were not "contingent on" other parties' agreements).

The Government's brief does not engage with any of these facts. Rather than analyze Plaintiffs' allegations, the Government cites cases that only illustrate what is not alleged here: someone's explicit proposal that everyone take part in a concrete, anticompetitive plan, and then everyone's assent to that plan. In *Interstate Circuit*, the letter instructed every conspirator what prices they and the others could charge. 306 U.S. at 216. In *United States v. Masonite*, the organizer explicitly discussed with each conspirator that it was entering an identical contract with the others to require a minimum price, and "as each contract was executed … sent copies to the companies which had previously executed similar contracts." 316 U.S. 265, 269 (1942); Gov't Br. 22–23. Other cases involved a "continuous exchange of letters between [the defendants'] high executives" or a dinner meeting where each defendant "expressed an intention or gave the impression that his firm would [raise prices]." Gov't Br. 23–24. None of these cases resembles the allegations here: vague, non-specific documents that never mention the supposed object of the conspiracy and disclaim rather than require joint conduct.

### 2.    There is no "indirect evidence" either

In addition to the Complaint's failure to plead invitation and acceptance, it does not plead parallel conduct in a manner that raises an inference of a conspiracy.

**Parallel conduct.** Parallel conduct is the bedrock indirect evidence of a conspiracy, but a plaintiff cannot plausibly allege the necessary parallelism just by identifying actions that were in some sense similar. After all, "[t]he fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel fashion." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 401 (2d Cir. 2024) (citation omitted). For

"allegations of parallel conduct" to state a claim, the alleged parallelism must "raise[ ] a suggestion" of a preceding agreement to engage in the parallel behavior. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). For instance, when four pharmaceutical companies curtailed discounts for particular drugs, this was not parallel conduct suggestive of a conspiracy because the actions "differ[ed] in their particulars, their timing, and their outcomes." *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. Sept. 2, 2022). Or similarly, two companies' product recalls did not "support a plausible inference of collusion" because they were issued at different times and "were not remotely parallel in magnitude." *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 835–36 (N.D. Ill. 2018).

The Complaint suffers from the same deficiency. Nowhere in the Opposition do Plaintiffs identify any parallel conduct that "would probably not result" absent a preceding agreement among Defendants to coerce coal production cuts. *In re Online Travel Co. Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 536 (N.D. Tex. 2014). Plaintiffs vaguely allege that Defendants took part in "voting" and "engagement." Opp. 44. But as Plaintiffs admit, all asset managers, Defendants and non-defendants included, have used voting and engagement for decades on behalf of their clients. *See* Opp. 3–4; BlackRock Br. 5–9. There is no allegation that Defendants' interactions with the coal companies changed after the alleged conspiracy began. And the Complaint lacks any allegation that Defendants acted in a parallel fashion suggesting a preceding agreement to cut coal output. To the contrary, it alleges Defendants' actions were entirely different. Only Vanguard allegedly met with any of the relevant coal companies, but Plaintiffs say nothing about what happened during those meetings and concede that output rose at those companies after the meetings. Compl. ¶¶ 157–158; *see* ECF No. 66 at 6. State Street and BlackRock occasionally voted against coal-company directors, but they never voted against any of the *same* directors. *See* Joint Br. 13 (citing Compl.

10

¶¶ 168–172, 174, 177).[13] This is not just a lack of parallelism; it is divergent and discordant conduct that "undermine[s], rather than support[s], the notion that the defendants engaged in parallel conduct." *Baxter*, 328 F. Supp. 3d at 837.

Plaintiffs' observation that Defendants joined NZAM within a month of each other (with two joining on the same day) does not cure this defect. Opp. 45. Joining a trade group is not an antitrust violation. *Viazis*, 314 F.3d at 764. And in any event, Defendants did not all join the same groups. Joint Br. 11 (citing ¶ 151). A single point of similarity in a sea of differences among how Defendants interacted with coal companies is not parallel conduct plausibly suggesting an agreement to reduce coal output. *See, e.g.*, *Mosaic Health*, 2022 WL 4017895, at *5 (parallel conduct not plausibly alleged when multiple Defendants canceled discounts within a three-week period, but their conduct diverged in other ways).

**Plus factors.** Even if Plaintiffs do allege parallel conduct, they do not allege "plus factors" raising a plausible inference that the alleged conduct arose from a preceding agreement. *Twombly*, 550 U.S. at 554–556.

Plaintiffs' plus-factor arguments are unavailing because they fail to address the parallel conduct on which the conspiracy claim is based. Plaintiffs argue the parallel conduct in question is Defendants' engaging with coal producers and voting shares. Opp. 44–45. But each Defendant had "obvious" and "natural" unilateral reasons to vote shares or conduct engagements on its own, absent any agreement with other asset managers. *Twombly*, 550 U.S. at 566, 567. Defendants and all other asset managers routinely take those actions on behalf of clients with respect to thousands

---

[13] Plaintiffs' assertion that Vanguard voted against Peabody directors in 2022, Opp. 11, 45 n.10, is a misreading of a document. *See* Vanguard Reply. This joins the two serious admitted errors at footnotes 3 and 4 of Plaintiffs' brief, each founded on a misreading of a document or a typo. *See also infra* note 21 (discussing another such error).

of companies in hundreds of industries and did so long before the supposed conspiracy began. Opp. 4–5. A plus factor, then, would be a factual circumstance suggesting that Defendants would be unlikely to vote their shares in or meet with coal companies *absent* a preceding agreement to coerce coal companies to cut production. No such plus factors are anywhere to be found.

Unable to plead any conduct by *Defendants* that would be unlikely absent a conspiracy, Plaintiffs argue that the *coal companies'* conduct is suggestive of an agreement among those companies to reduce output. Opp. 46–48 & n.11.[14] That is not the issue; it has nothing to do with whether Plaintiffs have pleaded a conspiracy against Defendants. Moreover, Plaintiffs' three purported plus factors for a coal-producer conspiracy collapse under the slightest scrutiny.

Plaintiffs first argue that with coal prices rising, the publicly traded coal companies "either reduced output or failed to increase output," which would be "irrational" absent a conspiracy, Opp. 46–47, but that is not what the Complaint alleges. Out of nine publicly traded coal producers, five cut production after 2020, and four increased production. Compl. ¶ 240. Two out of four *private* coal producers cut SPRB production after 2020. *Id.*; *see infra* 16. And even if Plaintiffs were correct about the coal producers' irrationality, this would not be a plus factor as to Defendants because—as Plaintiffs acknowledge—the relevant question is whether the alleged conduct "was not in the *alleged conspirators'* independent self-interest." Opp. 47 (emphasis added). For example, if all producers in a given industry abruptly cut production, that may indicate an agreement among those producers, because a firm that unilaterally cuts production would risk losing market share.

---

[14] While the Government notes that Plaintiffs' allegations "would not necessarily demonstrate" "a Section 7 violation" by "the coal companies," Gov't Br. 13 n.5, it conspicuously does not say the same about Section 1. Every theory of competitive harm asserted in this case ultimately must run though supposed decisions by coal-company management to reduce output in consort with Defendants. *See*, *e.g.*, Opp. 46 & n.11 (claiming the "coal companies" took "economically irrational actions").

*See In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 683–84 (S.D.N.Y. 2012). No such dynamic exists here, because an investor that hoped to advocate for reductions in coal production could do so on its own. There is no plausible explanation why it would be irrational for an investor to advocate production restraint unless other investors advocated it too. Joint Br. 18. Plaintiffs therefore still have no plausible explanation as to why *Defendants*' behavior conflicted with their individual interests and their discussion of the incentives of the *coal companies* does not suffice.

Plaintiffs' second plus factor, that "Defendants openly pushed the coal companies to disclose their intended future output," Opp. 47, also has no basis in the Complaint, *see infra* 17–19. Plaintiffs do not allege that any coal producer disclosed its production plans, much less that it did so at Defendants' behest.[15] And even if a Defendant individually asked a coal company to release information, this behavior would be consistent with the unilateral interests of each Defendant, whether or not it would be so for a coal company.

The last asserted plus factor, that Defendants had "a motive" to boost profits, is also inadequate. Opp. 48. It is an argument why coal companies might want to reduce output and boost prices; it does not explain why *index-fund investors* would want to do so. Only a minuscule fraction of Defendants' holdings are in coal companies.[16] Whatever hypothetical returns Defendants might

---

[15] Moreover, other bodies focused on investor protection were mandating issuers to disclose climate information at that time. Last year the SEC promulgated a rule asking "registrants to provide certain climate-related information." 89 Fed. Reg. 21668, 21668 (Mar. 28, 2024). The European Union too has demanded disclosures. *See also* Commission Delegated Regulation (EU) 2023/2772 (July 31, 2023); California SB 253, Climate Corporate Data Accountability Act (Oct. 7, 2023). The suggestion that Defendants were seeking disclosures on climate-related issues only because of an agreement with each other, and not because this was information relevant to investors or soon to be required by law, is totally implausible.

[16] *Compare* Compl. ¶ 19 (alleging Defendants beneficially own around $200 billion in coal-company shares), with Letter from F. William McNabb III (Feb. 27, 2015), https://bit.ly/4gxYeBB (last visited June 1, 2025) (cited in ¶ 155) (Vanguard alone has "more than $3 trillion in client assets under management").

gain from the alleged conspiracy, they would lose many times over on their vastly larger stakes in businesses that consume energy.[17] "[R]ational economic actors do not ordinarily conspire to injure themselves." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001). In any case, a motive to make higher profits "always exists" in every industry. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.8 (9th Cir. 2015).

### B.    The Complaint does not plead anticompetitive harm or *per se* liability

Plaintiffs must also plead harm to competition in the coal markets, and on this element too, the Opposition stakes different ground than the Complaint. The Complaint alleges that Defendants conspired to "reduce coal output." Compl. ¶ 5; *see also*, *e.g.*, ¶¶ 6, 8, 65, 102, 103, 115, 118, 119, 150, 152, 154, 183, 225, 232, 243. More specifically, Plaintiffs allege that the "cut [in] production" was anticompetitive because it happened even while prices rose. *Id.* at ¶ 229. These allegations are defeated by the Complaint itself. Per the Complaint's output figures, coal output *rose* from 2020 to 2022 during the alleged conspiracy. Joint Br. 20 (citing ¶¶ 228–229). And in no interval cited by Plaintiffs did output fall while prices were rising. *Id.* at 21 (citing ¶¶ 228–229). Plaintiffs now concede that the alleged conspiracy period saw an "increase in production," but try to sidestep that fatal concession by offering a new theory that production should have risen even more. Opp. 23. The Court should reject this unpleaded theory and rule "only … on [the] claims and theories of liability made in the pleadings." *Yager v. Stroman*, 2020 WL 2615759, at *10 (W.D. Tex. 2020).

Even if timely, Plaintiffs' new theory is unavailing. To plead that production did not rise enough, Plaintiffs must allege facts plausibly "establishing the competitive level." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010). Not only do Plaintiffs fail to make any

---

[17] *See* Edward B. Rock & Daniel L. Rubinfeld, *Antitrust for Institutional Investors*, 82 Antitrust L.J. 221, 236 (2018) (index funds would not benefit from "soft competition," including because they also own shares of the "customers" of the companies in which they invest).

*factual* allegation regarding that output level, but the allegations demonstrate that Plaintiffs' theory is implausible. Plaintiffs posit that by 2022, once the worst of COVID-19 was over, output should have equaled 2019 production levels. Anything below that, Plaintiffs assume, indicates a sinister plot. Opp. 12–14. But Plaintiffs ignore that coal production—battered by lower-priced natural gas, environmental laws, and exorbitant shipping costs—has been steadily declining for decades. Joint Br. 6–7 (citing Compl. ¶¶ 66, 68, 70, 73, 75). Plaintiff Wyoming thus observed in 2020 that "coal production … will be on a significantly reduced scale" going forward and "[t]he industry must contract." Joint Br. 6. And in 2019, Peabody Energy—whose North Antelope Rochelle Mine accounts for almost the entire fall in coal production between 2019 and 2022—reported a 30% decline in production over the prior eight years. *Id.* at 7; *see* Compl. ¶ 228.[18] Another mine had a 60% decline from 2010 to 2022.[19] Plaintiffs' bald assertion that 2022 production should have matched 2019 levels does not pass the "common sense" test. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).[20]

---

[18] *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 880 (E.D. Mo. 2020) (cited in Compl. ¶¶ 77–78, 83). Plaintiffs' theory is especially implausible because nearly the entire fall in output is attributable to production decisions by Peabody, which during this period was dominated by an activist investor. Judicially noticeable documents show that Elliott Investment Management owned a substantially greater stake in Peabody than is alleged for any Defendant. Demonstrating what using one's investments to control a company actually looks like, *see infra* 22–25, Elliott used its stake to install four new directors (including two Elliott employees). *See* Compl. ¶¶ 21–24; SEC Form 13F, https://www.sec.gov/Archives/edgar/data/1791786/000156761920010514/xsl-Form13F_X01/form13fInfoTable.xml (last visited June 1, 2025) (ownership); SEC Disclosure, https://www.sec.gov/Archives/edgar/data/1064728/000119312520025061/d800147dex101.htm (last visited June 1, 2025) (elections).

[19] *2022 Sustainability Report* at 6, Arch Coal, https://bit.ly/41RHlv9 (last visited June 1, 2025) (cited in Compl. ¶ 187).

[20] The Government argues that the "relevant question is not whether coal production rose, but whether production was lower than it would have been without Defendants' alleged agreement." Gov't Br. 26. Even assuming that is a valid theory, and that Plaintiffs had advanced it, Plaintiffs would need to plausibly allege *how much* production should have risen. *Jacobs*, 626 F.3d at 1339. The Government's brief does not engage with this issue.

Plaintiffs get no more traction by comparing publicly traded and privately held coal companies. Compl. ¶ 228; Opp. 20. Plaintiffs offer this comparison only for the SPRB submarket, asserting it proves that by 2022, "the publicly traded coal companies should have been able to reach their 2019 production numbers." Opp. 12. But their own comparison refutes this claim, since output fell at two of the four private companies. Compl. ¶ 228. Much of the observed difference between public and private companies, moreover, was because production fell more at the public ones from *2019 to 2020*—before the alleged conspiracy even began. *Id.* The Complaint data also reveals much more variation *within* each type of company than *between* the two types: from 2019 to 2022, the change in output at privately held mines ranged from a 40% drop to a 40% increase; and at public mines from a 30% drop to a 50% increase.

| Mine (Company) | Public/ Private | Output | | Percent Change |
| --- | --- | --- | --- | --- |
| | | 2019 | 2022 | |
| Coal Creek (Arch) | Public | 2.5 | 3.8 | 52% |
| Belle Ayr (Eagle) | Private | 10.2 | 14.3 | 40% |
| Eagle Butte (Eagle) | Private | 11.6 | 15.1 | 30% |
| Cordero Rojo (Navajo) | Private | 11.9 | 12.5 | 5% |
| Buckskin (Kiewit) | Private | 17.6 | 18.2 | 3% |
| Rawhide (Peabody) | Public | 10.1 | 10.3 | 2% |
| Caballo (Peabody) | Public | 12.6 | 12.1 | -4% |
| Wyodak (Black Hills) | Public | 3.7 | 3.5 | -5% |
| Antelope (Navajo) | Private | 23.2 | 21.7 | -6% |
| Black Thunder (Arch) | Public | 72.0 | 62.2 | -14% |
| North Antelope Rochelle (Peabody) | Public | 85.3 | 60.4 | -29% |
| Dry Fork (W. Fuels) | Private | 6.1 | 3.7 | -39% |



Change in Coal Output, 2019–2022

These haphazard production patterns do not plausibly imply competitive harm.[21]

Because they cannot show anticompetitive harm, Plaintiffs urge the Court to allow them to proceed on a *per se* theory, Opp. 49–50, but *per se* treatment applies only to purely horizontal restraints of trade. *See New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1035–36 (5th Cir. 2023). There is nothing horizontal about this alleged conspiracy. Defendants are not coal companies and do not make day-to-day decisions about coal production. Instead, Plaintiffs claim that Defendants used meetings, unsuccessful votes against directors, and public statements to "influence" coal production. That admittedly novel theory is inherently *vertical*, which cannot suffice for a *per se* claim. *Id.* And courts do not apply the *per se* rule to conduct that has not been tested and conclusively determined to be predictably anticompetitive. *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012). So, as here, when a complaint does not allege one of the specific categories of *per se* liability such as "a traditional straightforward price-fixing conspiracy," the rule of reason applies. *In re RealPage, Inc. Rental Software Antitrust Litig.(No. II)*, 709 F. Supp. 3d 478, 520 (M.D. Tenn. 2023).

## II. Plaintiffs Fail to State an Information-Sharing Claim Under Section 1 (Count III)

While the Complaint vaguely suggests that Defendants agreed to share information about *their own* activities, *see* Compl. ¶¶ 259–260, the Opposition invents a different information-sharing claim in which Defendants pressured coal companies to disclose details about *coal-company* production plans. Opp. 51–54. This newly concocted theory is not supported by any allegations.

Plaintiffs never identify any confidential data that any coal company disclosed, much less

---

[21] Compl. ¶ 228 (discussing North Antelope Rochelle, Black Thunder, Dry Forke, and Belle Ayr Mines). Plaintiffs wrongly say, at ¶ 228, that output fell at the public Wyodak Mine from 2020 to 2022. Plaintiffs' data source says in 2022 Wyodak produced 3.7 million tons of coal, not 3.5 million, meaning production held flat. *See Coal Data Browser*, Wyodak Mine, U.S. EIA (2022), at https://www.eia.gov/coal/data/browser/#/mine/4800083/?freq=A&pin= (last visited June 1, 2025).

disclosed because of Defendants' alleged pressure. The Opposition asserts a "scheme" that caused coal companies to disclose "future output plans" so that each coal company "knew how much their competitors would be mining." Opp. 53. The Opposition does not cite the Complaint for that allegation, *id.*, because the Complaint does not allege that any future output plan was disclosed by a coal company, much less claim that a coal company did so in response to Defendants' alleged pressure. Plaintiffs' "conclusory and undifferentiated allegations" that information was exchanged are no substitute for identifying "what information was shared and when it was shared." *In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *12 (S.D.N.Y. Mar. 31, 2021).

Nor do Plaintiffs identify any allegations suggesting an agreement to disclose confidential information. Plaintiffs point to the CA100+ "Investor Expectations for Diversified Mining" document that no Defendant agreed to or is even alleged to have seen, does not concern U.S. coal companies, describes itself as a nonbinding recommendation, and has no Vanguard connection whatsoever. *See supra* 7–8; Opp. 51. For Vanguard, Plaintiffs point to a unilateral statement about hypothetical proxy votes. Opp. 51–52. But they do not allege that Vanguard ever cast a proxy vote in favor of climate-related disclosures at a coal company, and in any event such a unilateral statement cannot establish an agreement. *Abraham*, 776 F.3d at 333 ("one-sided" statements do not establish conspiracy). Plaintiffs also cite Defendants' disclosures about *their own* activities, Opp. 52 (citing ¶¶ 133, 142, 144), but that is not information-sharing about *coal output*, the Opposition's new version of the information-sharing theory.[22]

Finally, even if Plaintiffs had pleaded an agreement to exchange information, the claim would be analyzed under the rule of reason, Opp. 52 (conceding same), and Plaintiffs fail to

---

[22] The Opposition asserts Vanguard "admit[ted] to meeting with directors to engage about setting targets." Opp. 52 (citing ¶ 139). This argument yet again distorts the underlying source, which says only that Vanguard engaged with companies to "understand how [they] set targets." ¶ 139.

plausibly allege that any agreement harmed competition, *see supra* 14–17.

### III.    Plaintiffs Fail to State a Claim under Section 7 of the Clayton Act (Count I)

Plaintiffs' Opposition confirms that their Complaint fails to state a Section 7 claim. The fundamental problem—which the Government's brief makes especially clear—is Plaintiffs' failure to plead facts showing that Defendants' investments fall outside the safe-harbor elements: a non-investment purpose and use of shares that lessens competition. Indeed, the allegations that the Government argues *could* establish a Section 7 claim are not actually alleged by Plaintiffs here. Namely, Plaintiffs do not allege Defendants acquired shares in the coal companies *with any other purpose* than investment, and they do not allege Defendants used their shares to reduce competition, merely that they performed the routine activities of an asset manager. Likewise, Plaintiffs fail to allege any connection between Defendants' acquisitions and any reduction in coal output. Recognizing this defect, both Plaintiffs and the Government focus on purported disputes about abstract legal principles, but they cannot paper over the Complaint's failure to plead *facts* giving rise to a claim.

### A.    Defendants fall within Section 7's safe harbor

All parties agree that an acquisition falls within the Section 7 safe harbor where an acquirer "(1) purchases stock 'solely for investment' and (2) does not use or attempt to use the stock to harm competition." Gov. Br. 8; *see also* Opp. 28, 32; Joint Br. 25. Plaintiffs have not pleaded facts that take Defendants' minority investments outside this exception. If the allegations in the Complaint—minority investments in an industry, ordinary-course voting and engagement related to those investments, and membership in an unrelated trade organization—are sufficient to take an acquisition outside the safe harbor, then vast swaths of ordinary investment activity will become newly subject to suit, defeating Congress's purpose in establishing the safe harbor.

### 1.    Defendants purchased their stock solely for investment

There is no dispute about what "solely for investment" means. The "solely for investment prong requires that the 'only' reason that the Defendant purchased the stock was to achieve passive growth." Opp. at 29; *see also* Joint Br. 25. By contrast, "investments made to leverage holdings in competitors to harm the competitive process by shaping market-wide behavior are not solely for investment." Gov't Br. 10. This agreement resolves the issue because the Complaint acknowledges coal-company shares were acquired solely as part of Defendants' index-driven "investment strategy" to invest in "practically all large, publicly owned companies," including the coal companies, "as a way to diversify their holdings and guarantee their clients stable returns." Opp. 3; *see also*, *e.g.*, Compl. ¶¶ 147, 194, 210. Plaintiffs well-pleaded allegations identify no other reason for Defendants' acquisitions of coal-company shares.

Instead, Plaintiffs raise a non sequitur: that acquisitions made after Defendants joined CA100+ or NZAM fall outside the investment-only exemption because those groups allegedly sought to reduce carbon emissions. Opp. 4–5, 29–30. But this argument fails Plaintiffs' and the Government's intent test. Plaintiffs never allege that Defendants acquired any shares in the coal companies *because of* their involvement in CA100+ or NZAM, which makes sense because, according to the Complaint, both groups supposedly direct members to not invest in carbon-intensive companies. *See* Opp. 6–7; Compl. ¶ 131. Likewise, Plaintiffs do not allege that Defendants acquired coal-company stock *for the purpose of* encouraging climate disclosures or voting against emission-increasing proposals, nor that the groups told investors to acquire more shares to get management's attention. The Complaint alleges the opposite: Defendants invested in coal-company stock before and after joining the groups for the same purpose, in order to track an underlying benchmark index and earn financial returns. *See* Opp. 3; *see also*, *e.g.*, Compl. ¶¶ 147, 194, 210. Because Defendants' memberships in the organizations did not change the *reason* Defendants

acquired coal company stock, the memberships are irrelevant to the "solely for investment" question. *See United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093, 1100 (C.D. Cal. 1979) (whether acquisition is solely for investment focuses on purchaser's intent); Gov't Br. 10–11 (same).

Given that there is no dispute over why Defendants acquired coal-company stock, Plaintiffs' main argument, Opp. 28–32—that investing to obtain "influence" rather than "control" is enough to step outside the safe harbor—is beside the point.[23] The Complaint does not allege Defendants' investments were made with either intention.

Critically, the investment-only cases that Plaintiffs (and the Government) cite all involve a factual predicate not present here: the acquirer is a competitor or supplier to the target. In those cases, intent to control (or influence) was relevant to whether the partial acquisitions were efforts to accomplish what would in effect be an anticompetitive merger by another name. For example, in *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 696–97 (2d Cir. 1973), the target was the acquirer's customer and the acquirer bought its stock to "exercis[e] influence or control" through a plan to replace the target's management and eventually acquire the rest of the company. In *Crane Co. v. Harsco Corp.*, 509 F. Supp. 115, 123 (D. Del. 1981), the target competed with and was a supplier to the buyer, which purchased a stake "sufficiently large that influence or control [was] a realistic possibility" for a strategic buyer (and larger than any alleged incremental acquisitions here).[24] The same is true of the others. Joint Br. 27. Neither Plaintiffs nor

---

[23] Plaintiffs' interpretation of "influence" is so expansive as to effectively moot the "use" prong of the safe harbor. Their reading is that *any* use of shares would take an investor out of the safe harbor. Defendants agree with the Government that alleging use alone is not enough; a plaintiff must allege shares "were in fact used to cause a substantial lessening of competition." Gov't Br. at 13.

[24] Plaintiffs' efforts to flip *Tracinda* fail. Opp. 30–31. There, the investor had acquired a quarter of a company and even had a contractual right to be consulted on its "material financial matters" and "any changes in top management." 477 F. Supp. at 1101. And although he had agreed to restrict his voting on some corporate matters, that restriction would last only three years. *Id.* at 1100. The court found all this to be consistent with an investment-only intent, for "[a]ny substantial investor, (continued…)

the Government cite a case holding that an institutional investor making incremental purchases and sales through index funds solely to generate returns for its clients falls outside the safe harbor.[25]

### 2.    Defendants did not "use" their shares to harm competition

There is also no dispute that when an acquirer buys shares solely for investment, there can be no liability unless it "us[es]" its shares "to bring about … the substantial lessening of competition." 15 U.S.C. § 18. All parties agree that this language requires (1) that the investor must "us[e]," *i.e.*, "actively employ," its shares in a way that (2) harms competition. Joint Br. 28; Opp. 32–33 & n.7, Gov't Br. 8, 12. This dooms Plaintiffs' Section 7 claim because the Complaint alleges neither.

Plaintiffs fail to plead active employment. They beat the "voting and engagements" drum, Opp. 32–36, but the suggestion that Defendants "used" either one to reduce coal-company output unravels on even cursory review of the allegations. *See* Joint Br. 28–30. Only Vanguard is alleged to have met with coal companies, and Plaintiffs not only plead no facts about what happened during those meetings, but admit that after most of them, the company *increased* production. Joint Br. 17–18; Compl. ¶¶ 157–158, 228–229. And there are no allegations that Vanguard ever voted against a coal-company management's recommendations, so it could not have used its shares in that way. BlackRock and State Street did occasionally disagree with management—often to vote *against* directors of companies that cut their coal production (but still voted *for* directors of companies that increased their output). Compl. ¶¶ 170–172, 177, 240. In any event, the directors that Defendants

---

acting reasonably, would want to be kept informed about the possible major financial and top management changes contemplated in any corporation where he has placed his money." *Id.* at 1101.

[25] Plaintiffs also cite *Denver & Rio Grande W. R.R. Co. v. United States*, 387 U.S. 485, 501 (1967), but it did not involve the Section 7 investment safe harbor at all; it addressed whether partial acquisitions that were *not* made solely for investment can violate Section 7.

voted against were still elected, belying any claim that their votes were "used" to lessen competition. *Id.* ¶¶ 168, 170–172, 177. And Plaintiffs now admit they do not allege that Defendants' votes against directors were connected with the coal companies' "refus[al] to cut production." Opp. 19. Meanwhile, the Complaint and its incorporated materials discussing coal companies' production decisions consistently explain why output was cut for macro reasons beginning decades ago. Compl. ¶¶ 185, 187; *see supra* 15. Plaintiffs again try to sweep these inconsistencies aside, but their theory does not fit with the facts their own Complaint cites, and it fails on the pleadings. *See In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 608 (S.D. Tex. 2013).

Even more unmoored from the Complaint is the suggestion that Defendants publicly threatened to divest their shares unless the coal companies cut production. Opp. 19. To start with, Plaintiffs nowhere allege that Vanguard ever threatened divestment, and as for State Street, Plaintiffs actually allege its "active managers … eschew divestment." Compl. ¶¶ 148–149. And Defendants could not credibly threaten to divest their coal investments, which are largely in third-party-designed index funds. *See, e.g.*, Compl. ¶¶ 147, 193–195. Virtually all of BlackRock's coal holdings are in index funds.[26] So much for Defendants' "using" their shares to threaten divestment.[27]

Plaintiffs argue that no case cited by Defendants identifies any "necessary condition" that constitutes using shares. Opp. 33. But Plaintiffs identify no cases holding that the facts alleged here amount to using stock to lessen competition, and to our knowledge there are none. Courts that have addressed the issue have determined that a minority shareholder uses its shares contrary to

---

[26] *BlackRock's 2020 Letter to Clients: Sustainability as BlackRock's New Standard for Investing*, BlackRock, https://bit.ly/3Bb9SlV (last visited June 1, 2025) (cited in ¶ 167); *see* Opp. 5 (claiming the antitrust violations began in 2020).

[27] This argument is particularly odd given that the States seek a remedy *requiring divestment*, Compl. pg. 107, one that risks gutting the coal companies of critical investment and more broadly destabilizing markets. *See* ICI Amicus Br., Dkt. #76, at 18; SIFMA Amicus Br., Dkt. #74, at 10.

the investment-only safe harbor when it seeks control over a competitor, customer, or supplier—facts not alleged here. Joint Br. 28–29. The Government argues the lack of such facts is not dispositive, Gov't Br. 12, but this misses the point—*no* facts alleged here plausibly suggest that Defendants used their shares to reduce competition, not even those present in other cases.

That Plaintiffs' legal theory finds no support in precedent is unsurprising, as their theory would gut the investment-only exception. As Plaintiffs acknowledge, every day, institutional investors cast proxy votes and engage with companies with an eye toward "improv[ing] the[ir] internal governance" in order to serve their clients, to whom they owe contractual and fiduciary duties. Opp. 5; *see* BlackRock Br. 5–6. Asset managers know when they invest that they will cast such votes, consistent with those duties. *See id.*; Joint Br. 26. Plaintiffs concede this activity is "innocuous." Opp. 4. These activities are no different than Defendants' alleged voting and engagements here.

That is why the Government's assertion that there is no conflict between this case and the investment-only exception rings hollow. Gov't Br. 18–19. The Government on the one hand admits that "passive investors fall squarely within Section 7's exemption unless they cease to be passive and affirmatively use their stock to reduce rivalry among their commonly held assets," but points to no well-pleaded facts suggesting there was such a use in this case. *Id*. In asserting that "Plaintiffs further allege that Defendants in fact used their stakes in the competing companies to coerce the management of those companies to reduce production, purportedly in service of an 'ESG agenda,'" they cite nothing more than the Complaint's allegations of routine voting and engagement, the very kind the Government describes as "invaluable." *Id.* at 17, 21 (citing Compl. ¶¶ 155–191). If the case nevertheless goes forward on the facts alleged here, no share purchased by an institutional investor would fall within the investment-only exception because institutional

24

investors vote their shares. The words of the statute would be rendered a nullity.

For the reasons discussed in the next section, the Complaint fails to plead not only that Defendants employed their shares to reduce competition, but also actual harm to competition.

**B.      Plaintiffs fail to allege either an actual or potential substantial lessening of competition**

Even if Plaintiffs had pleaded facts taking this case out of the investment safe harbor, Plaintiffs have not pleaded a substantive Section 7 violation because they fail to allege facts connecting any Defendant's acquisitions to a substantial lessening of competition. *See David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 466 (S.D. Miss. 2022). Plaintiffs argue that they need not show the actual use of stock to lessen competition, Opp. 36, but this is wrong given their concession that Defendants purchased shares for an investment purpose. As Plaintiffs admit, Opp. 34, they must allege facts suggesting Defendants acquired coal-company stock for non-investment purposes, or failing that, must allege facts showing actual (not potential) use to lessen competition. Having failed to plead the former, they must plead the latter, which they also fail to do. For the same reasons, Plaintiffs have not pleaded potential harm to competition in coal markets under Section 7 even if, contra the Complaint, Defendants' acquisitions were not solely for the purpose of investment. Joint Br. 30–33.

The Government acknowledges the risk associated with imposing broad restrictions on common ownership of competing companies by an institutional investor without "compelling evidence of [ ]anticompetitive effects." Gov't Br. 17. But neither it nor Plaintiffs can point to factual allegations that, if proven, would support anything like that here. Conceding that the theory in the Complaint is wrong, and that coal companies *increased* their production after Defendants joined the groups in 2020, Plaintiffs now assert that coal production should have increased even more, back to 2019 levels. Opp. 21–25. But the Complaint nowhere even asserts this theory, much less

explains why it is so, and as explained, *supra* 14–17, the actual data in the Complaint refute this new competitive-effects theory just as squarely as they do Plaintiffs' original one. For the same reason, the Government's references to the bare assertions that "Defendants used their collective stock holdings to coordinate output," or "use[d] [their] holdings in competing firms, by voting or otherwise, to injure competition," Gov't Br. 11, 12, do not suffice. Those are just statements of Plaintiffs' legal theory; there are no *facts* in the Complaint that render those theories plausible. The Government agrees that at the pleading stage, a plaintiff must "plausibly allege that the investor … affirmatively used" shares to lessen competition, requiring "a showing" that shares "were in fact used" that "should incorporate evidence of post-acquisition behavior and effect." Gov't Br. 13. "[C]onclusory allegations [and] unwarranted factual inferences" are not enough. *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d at 608.[28]

Lacking any plausible direct evidence of competitive harm, Plaintiffs suggest that harm to competition can be "indirectly" inferred by the size of Defendants' stakes (1% to 15%) in the coal companies.[29] Inviting the Court to make policy, they invent a new rule that anything more than a 5% stake in a company is competitively suspect. Opp. 25–26. This argument unmasks that despite Plaintiffs' protests, Opp. 4, this lawsuit would fundamentally change the index-fund business

---

[28] Plaintiffs also make a handful of other arguments we have already addressed. They argue that Defendants violate Section 7 simply by holding shares "while committed" to reducing coal output through their membership in NZAM or (for BlackRock and State Street) CA100+. Opp. 2, 5, 18; *see also* Gov't Br. 21. The Complaint's details refute that joining those groups entailed a commitment to lower coal output; *see* supra 3–9. Plaintiffs also point to Defendants' votes and engagements, Opp. 18–20, but fail to plausibly connect either to any coal company's output decisions. *See supra* 10. Separate from any vote or engagement, Plaintiffs cite the coal-output data, Opp. 20–25, but their shifting argument relies on an implausible understanding of the coal market contradicted by the Complaint itself. *See supra* 14–17. Accordingly, even if the safe harbor does not apply these allegations do not plausibly suggest a potential for lessening of competition.

[29] Plaintiffs gloss over the vast disparities in Defendants' ownership percentages in different coal companies, *e.g.*, State Street owned as little as 1% and no more than 6% of the coal companies at issue, further cutting against an inference of harm to competition. State Street Br. 2; Compl. ¶ 20.

model on which American investors rely and how the industry is regulated. Plaintiffs' "indirect" argument has nothing to do with coal: it would imply that asset managers harm competition across all sectors of the economy. That argument is baseless. Plaintiffs draw their 5% threshold from inapposite SEC regulations saying that holding a share above 5% in a company can be consistent with having neither "the purpose nor … the effect of changing or influencing the control of the [corporation]." 17 C.F.R. § 240.13d-1(b)(1)(i). Plaintiffs' argument also ignores that courts have consistently found ownership shares less than 25% presumptively noncontrolling. Joint Br. 27.[30]

Finally, Plaintiffs' Section 7 claim also fails to connect the alleged lessening of competition to any specific share acquisition. Joint Br. 30–33. Plaintiffs argue that they do not need to do so, notwithstanding the plain text of Section 7 that prohibits "acquir[ing]" stock with anticompetitive effect. 15 U.S.C. § 18. Instead, citing *United States v. E.I. du Pont de Nemours*, 353 U.S. 586 (1957), Plaintiffs argue that they can challenge Defendants' acquisitions based on subsequent events—here, membership in NZAM or CA100+—even if the acquisitions themselves were benign at the time. Opp. 36–38. But unlike Plaintiffs, the Government challenged a specific transaction in *du Pont*—du Pont's acquisition of a 23% stake in General Motors. *Du Pont*, 353 U.S. at 598–99. The same is true in every other Section 7 case cited.[31] Moreover, the Supreme Court was clear that du Pont's acquisition of General Motors stock violated Section 7 at the time it was made

---

[30] Plaintiffs invite the Court to add Defendants' shares together should the Court accept their implausible conspiracy claims. Opp. 27. But each Defendant's acquisitions must reduce competition for Plaintiffs to state a claim. *See Reyn's Pasta Bella, LLC v. Visa U.S.A.*, 259 F. Supp. 2d 992, 1003–04 (N.D. Cal. 2003) (banks' investment in Visa and Mastercard was "not sufficient to state a claim under section 7" based on alleged conspiracy between Visa and Mastercard).

[31] The same is also true of *United States v. ITT Cont'l Baking Co.,* 420 U.S. 223 (1975), cited by the Government. Gov't Br. 16. That case involved how to calculate daily penalties for a violation of an FTC consent decree that barred the defendant from acquiring certain companies going forward, not a Section 7 claim. 420 U.S. at 225. And the Court simply observed that an improper acquisition, there in the context of a consent decree, could be challenged after the fact if the defendant continued to hold the stock. *Id.* at 240.

as an incipient threat to competition, which ripened into actual anticompetitive effects by the time of the government's suit. *Du Pont*, 353 U.S. at 605, 607 ("The fire that was kindled in 1917 continues to smolder … it remains hot, and, from past performance, is likely at any time to blaze."). Plaintiffs allege nothing like that here. Rather, they assert Defendants' acquisitions became Section 7 violations only because they later joined NZAM and CA100+. Opp. 37–38. Neither the text of Section 7 nor any case interpreting it supports the theory that a statute prohibiting "acquisition[s]" can be enforced without pleading a challenged acquisition.

Plaintiffs abandon any argument that *du Pont* or the other partial-acquisition cases cited in the Complaint are anything like the theory asserted here against asset managers who are institutional investors and not competitors or suppliers. Joint Br. 29. Although the Government cites *United States v. Cleveland Trust* and *In re TC Group* on this issue, those cases confirm Defendants' point. In *Cleveland Trust*, the Government brought a Section 7 challenge to a banking trust that acquired shares in two competitors, but the claim was dismissed as moot before the Court reached the merits. 392 F. Supp. 699, 707–08 (N.D. Ohio 1974). Regardless, the claim was not like this one—the Government challenged the acquisitions because the trust planned to elect directors of both companies to influence their competitive decisionmaking, *id.* at 702, which is not alleged here. *In re TC Group* is not on point for the same reason. The FTC's challenge was based on the fact that the partial acquisition gave the buyer, who had board seats and veto rights on a key competitor, the right to elect a board member and access to non-public information. 2007 WL 293866, at *27 (F.T.C. Jan. 24, 2007). And, like in *Cleveland Trust*, these allegations were never tested in court; the case was settled. *Id.*

## IV.    Plaintiffs' State Antitrust Claims and LUPTA Claims Fall with the Federal Claims (Counts IV–XIV, XVIII)

Plaintiffs confirm that there are no independent grounds to sustain their state antitrust

claims. Opp. 54. They also concede that their only theory under the Louisiana Unfair Trade Prac-

tice Act (other than the deception claim against BlackRock, addressed below) runs through the

same antitrust allegations. Opp. 67. Nor do they dispute that a LUTPA claim premised on an anti-

trust violation must be dismissed if the allegations fail to state an antitrust claim. Joint Br. 35.

Thus, these state-law claims should be dismissed. State Street is also exempt from LUTPA because

it is affiliated with a federally insured financial institution. *See* La. R.S. § 51:1406(1); State Street

Br. 5–6. By ignoring this argument, Plaintiffs abandon the LUTPA claim against State Street.

## V.    The Consumer-Protection Counts Fail to State a Claim (Counts XV–XXI)

Plaintiffs' discussion of the consumer-protection claims against BlackRock misunderstands

the task at hand. In their Complaint, they assert that a handful of sentences strewn across hundreds

of pages of BlackRock documents were deceptive. BlackRock's motion to dismiss showed—rely-

ing only on Complaint materials—that, as a matter of law, these sentences were neither material

nor deceptive. Rather than respond to BlackRock's arguments, Plaintiffs instead argue they gave

Defendants "notice" of and "clearly illustrate[d]" their claim. *See, e.g.*, Opp. 60, 67. That is no

answer. "[C]laims may be dismissed under Rule 12(b)(6) on the basis of a dispositive issue of

law." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (internal quotation

marks omitted). When the claim is that a written document was deceptive, courts often conclude,

simply by reading the document, that the plaintiff is wrong. Courts thus routinely hold "as a matter

of law" that a supposedly deceptive statement was really "not deceptive." *Gonzalez v. Kay*, 577

F.3d 600, 606 (5th Cir. 2009).[32] BlackRock's motion explains why the statements here fit that

---

[32] *See, e.g., Bott v. Vistaprint USA Inc.*, 392 F. App'x 327, 327 (5th Cir. 2010) (affirming dismissal because certain "webpages were not deceptive as a matter of law," as revealed by "the webpages themselves"); *Jackson v. Kraft Heinz Foods Co.*, 2022 WL 4591749, at *4 (N.D. Ill. Aug. 3, 2022) (dismissing Iowa consumer-protection claims because a "[p]roduct's labeling [wa]s not false, misleading, or deceptive as a matter of law"); *Robinson v. Walgreen Co.*, 2022 WL 204360, at *7 (N.D. (continued…)

mold. Plaintiffs ignore those case-ending arguments; accordingly, the claims fail.

**A.     BlackRock's statements were not deceptive**

**1. "ESG investment strategy."** Plaintiffs ignore multiple flaws in their lead consumer-protection theory, which concerns BlackRock's statement that four index funds do not use an "ESG investment strategy." According to the Complaint, this statement was deceptive because BlackRock considered ESG issues when engaging with companies and casting proxy votes. But there are no facts plausibly demonstrating such deception. To the contrary, the only facts available show Plaintiffs' interpretation is utterly without foundation: (1) BlackRock included this statement on a part of its website concerned exclusively with its funds' holdings; (2) the statement is immediately followed by a sentence which elaborates that ESG considerations do not affect the funds' "investable universe" or their "investment objective," a phrase the webpage defines to mean the fund's composition; and (3) the next sentence says, "For more information regarding [each] fund's investment strategy, please see the fund's prospectus," a document that uses the phrase "investment strategy" to mean the fund's choices of investments—for example, by equating "investment strategy" with "indexing strategy." BlackRock Br. 14–16. The pages do not purport to give a description of BlackRock's voting or engagement activity—which is left for the locations prescribed by the granular SEC regulations on fund disclosures. *See infra* 31. Plaintiffs' brief is silent about this critical context—but considering context is required to determine whether a statement is deceptive. *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 480 (Tex. 1995); BlackRock Br. 12 n.23.

It is no answer to point to other statements describing proxy voting as an "investment

---

Ill. Jan. 24, 2022) (a product's packaging was "not a deceptive act" under Texas's consumer-protection law); *Boswell v. Bimbo Bakeries USA, Inc.*, 570 F. Supp. 3d 89, 96 (S.D.N.Y. 2021) (finding defendant's "labeling and marketing, when viewed as a whole, ... are not deceptive") (citation omitted).

strategy." Opp. 55–56. At most this shows that the phrase "investment strategy" might be ambig-uous.[33] Under textbook consumer-protection law, however, "ambiguous" is not "misleading," and a deception claim should be dismissed when "ambiguity can be resolved by" context. BlackRock Br. 17 (quoting *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1098–99 (9th Cir. 2023)).

Plaintiffs' (contradictory) responses do not save this claim. Plaintiffs argue that BlackRock's disclosures confirm ESG considerations factor into its proxy voting or engagement. Opp. 55–56. But Plaintiffs know about, and can cite, these disclosures only because they are re-peated in over a dozen public documents, including in prospectus supplements as required by the SEC. *See* BlackRock Br. 8–9, 20–21, 26 (citing SEC form N-PX). And contra Plaintiffs, Opp. 59, those other disclosures are readily available. It is not hard to "locate and understand," *id.*, for ex-ample, BlackRock's disclosure—in a searchable PDF on its website called "2024 Global Voting Spotlight"—that BlackRock "engages with companies to better understand their approach to … material climate-related risks" and "supported four out of the 161 shareholder proposals on climate and natural capital" issues.[34]

There is no refuge for Plaintiffs in *Plotkin v. IP Axess Inc.*, which stands for the noncontro-versial proposition that a general disclaimer about risk does not save specific misleading state-ments. 407 F.3d 690, 697 (5th Cir. 2005). That is wholly consistent with "the general principle that deceptive advertising claims should take into account all the information available to consumers." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021); *see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 400 (S.D.N.Y. 2010) (dismissing complaint because plaintiff had

---

[33] *But see* Opp. 3 ("[Defendants'] investment strategies are the same. They invest their trillions of dollars under management in practically all large, publicly owned companies.").

[34] *See 2024 Global Voting Spotlight, Voting in our clients' long-term financial interests* at 57, BlackRock (2024), https://bit.ly/3Z1M0sW (cited in ¶ 206).

"concede[d] the existence of statements that disclose the information" allegedly omitted). Here, BlackRock's disclosures unquestionably state how climate-related issues are incorporated in its stewardship policies; those disclosures in fact put Plaintiffs on notice. Nothing is concealed.

Federal securities law is in accord that the statements were not deceptive. The SEC has determined that it would be misleading to label funds like the four here, which do not use ESG criteria to pick stocks, as ESG. 88 Fed. Reg. 70436, 70437–70440 (Oct. 11, 2023). Plaintiffs' answer—that the SEC rule addresses the use of "ESG" terms in fund names, while the statement here appeared in marketing materials, Opp. 57—misses the point. The SEC's *reasoning* was that this label would be "materially misleading or deceptive." *Id.* at 70436. That cannot be squared with Plaintiffs' theory that BlackRock's funds really use an "ESG Strategy." And the SEC's *Invesco* action confirms that this conflict is not just a technicality about naming conventions. Invesco said its passive funds "incorporat[e] ESG considerations into" their "investment decision making" process, in part because the funds "appl[ied] ESG factors" when voting some of their stockholdings.[35] The SEC did not believe this minimal consideration constituted "incorporating ESG." And to boot, it declared that Invesco's ETFs "did not follow an ESG strategy."[36] No asset manager, after *Invesco*, could think it safe to say its non-ESG funds followed an ESG strategy.

**2. Other statements.** Although the Complaint alleges that a grab-bag of other statements were also deceptive, Plaintiffs now throw in the towel. Their only response is that "[f]or each of these statements, the Amended Complaint lays out not only the statement and where it appeared, but also what makes it misleading." Opp. 60 (emphasis omitted). But BlackRock's motion shows statement-by-statement why these allegations do not hang together, and Plaintiffs ignore these

---

[35] Order Instituting Administrative and Cease-and-Desist Proceedings, *In re Invesco Advisers, Inc.*, IAA Release No. 6770, ¶¶ 2, 10, 18 (Nov. 8, 2024).

[36] *Id.* ¶ 16.

arguments. BlackRock Br. 23–28. For example, the Complaint faults BlackRock for citing "global ambitions to achieve a [global-warming scenario] of 1.5°C," because in their view this scenario is "highly unlikely based on present commitments." Compl. ¶¶ 208–209. As BlackRock explained in its motion, however, its view that this scenario was relevant to corporate planning—voiced in a heavily regulated SEC filing, no less—is "an expression of opinion" "not actionable" under consumer-protection law. BlackRock Br. 24 (quoting *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 678–80 (5th Cir. 1986)). Plaintiffs waive this too.

The Opposition is silent to the reasons Plaintiffs' deception obligations fail, with one narrow exception: Plaintiffs passingly address BlackRock's disclosure that it does not require companies to "meet specific emissions standards" or "engineer a specific decarbonization outcome in the real economy." Opp. 60–61. These statements are not deceptive because while Plaintiffs allege BlackRock has encouraged some companies to set their own emissions targets, it does not allege BlackRock has ever dictated to a company a particular target to set. BlackRock Br. 27–28. Plaintiffs yet again overlook this response and ignore the rest. This "constitutes abandonment of the challenged claim." *Richardson v. Texas*, 2023 WL 5662566, at *3 n.4 (E.D. Tex. Aug. 31, 2023).

## B.    The statements were not material

Plaintiffs had to plead that BlackRock's statements were material. They concede this is true under the Nebraska laws. Opp. 61. They deny it for the other States, ignoring the Texas Supreme Court's explanation that "[m]isrepresentations" are "actionable" under the DTPA "so long as they are of a *material* fact" and the Supreme Court of Iowa's explanation that "under the Consumer Fraud Act, it is necessary to show a misrepresentation of any *material* fact." *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex. 1980); *State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 622 (Iowa 1989) (emphases added); *see also* BlackRock Br. 28; L. Waks, 4 Tex. Prac. Guide Bus. Transactions § 17:2 ("A material misrepresentation is an element common to causes of action for

DTPA."). That is unsurprising; all "the States' consumer-protection statutes are generally modeled after the Federal Trade Commission Act," Opp. 58, n.14, which requires materiality, *see FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 386–87 (1965). For example, because Louisiana's consumer-protection law "shall not apply to … [a]ny conduct which complies with [the FTC Act]," La. R.S. § 51:1406, the law cannot be enforced against non-material representations. *See also* Mont. Code § 30-14-104. And while some subsections of these state laws do not mention "materiality" explicitly, neither does the FTC Act.

None of BlackRock's statements was material. The Complaint attempts to suggest only that BlackRock's "ESG strategy" disclosure was so. BlackRock Br. 28–29. It was not. In the securities context, "[i]nformation is material only if its disclosure would alter the 'total mix' of facts available to the investor and if there is a substantial likelihood that a reasonable shareholder would consider it important to the investment decision." *D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 208 (5th Cir. 2010) (citation omitted); BlackRock Br. 28. Plaintiffs do not question this standard. But neither do they explain how BlackRock's statement about "ESG strategy" could have plausibly affected the information available to investors, given BlackRock's numerous disclosures that explicitly discuss its proxy voting and engagement policies. BlackRock Br. 28. As the Opposition proclaims in its opening paragraph, BlackRock has discussed its voting and engagement philosophy "openly," Opp. 1—even down to the vote. Given this abundant information, BlackRock's statement about "ESG strategy," however it is interpreted, could not have plausibly changed the mix of information available.

Plaintiffs' responses are irrelevant. They argue at length that a consumer might care about a fund's ESG voting policies. Opp. 62. But that sidesteps the issue—whether the challenged statements, even if misleading, alter the mix of information available to investors about BlackRock's

34

stewardship activities. It likewise is no answer, *id.* 62–63, that BlackRock's assertions are material because they are express. The only assertions expressly discussing BlackRock's voting and engagement disclosures clearly say BlackRock considers ESG factors. It is Plaintiffs who rest their deception claims on implausible inferences.

### C.    The State consumer-protection laws do not apply to securities-fraud claims

In any case, none of the state laws applies to securities-fraud claims. Plaintiffs do not cite a single case from Louisiana, Montana, Nebraska, or Texas applying a consumer-protection statute to the sale of a security. And the only Iowa case Plaintiffs muster did not discuss the issue. To the contrary, of the "many cases [that] have discussed the issue of whether the sale of securities or other investment opportunities is within the scope of state consumer protection laws, … only a few have concluded that securities transactions are covered." D. Pridgen & J. Cuaresma, Consumer Protection and the Law § 4:26. Because none of the States' high courts has extended the consumer-protection laws beyond the default to cover securities transactions, federalism counsels against doing so. *See Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018) ("If guidance from state cases is lacking, it is not for us to adopt innovative theories of recovery under state law.") (internal quotation marks omitted).

**Louisiana**. The Unfair Trade Practices Act exempts "actions or transactions subject to … the commissioner of financial institutions," La. R.S. § 51:1406, and thus "specifically exempts securities transactions," *Smith v. Cooper/T. Smith Corp.*, 846 F.2d 325, 328–29 (5th Cir. 1988). Plaintiffs respond that BlackRock's statements "may not be governed by state securities laws directly" because some of them "pertain to [BlackRock's] business as a whole, rather than in relation to the sale of a particular security." Opp. 66. This distinction is meaningless. Louisiana's securities law condemns the "sell[ing] [of] a security by means of *any* … untrue statement." La. R. S. § 51:712 (emphasis added). Does Louisiana mean to argue that a business does not commit

35

securities fraud when it lies about its company-wide earnings?

**Montana**. The Montana Consumer Protection Act (MCPA) exempts "actions or transactions permitted under laws administered by … the state auditor," the official who enforces the Montana Securities Act. Mont. Code. §§ 30-14-105(1), 30-10-107, 301, 305. Because the Securities Act is the provision under which securities transactions are "permitted" in Montana, the MCPA does not apply to claims based on securities transactions. Plaintiffs' hyper-literal response is that the Securities Act does not "permit" deception, so the exemption does not cover claims based on deception. But this interpretation would read the exemption out of the statute—it would kick in only when there is no MCPA violation to begin with. The Montana Supreme Court has naturally rejected this reading, holding that the MCPA "may not be applied with respect to insurance company practices" (which are also under the auditor's jurisdiction). *Britton v. Farmers Ins. Grp.*, 721 P.2d 303, 323–24 (Mont. 1986).

**Nebraska**. Plaintiffs forfeit a dispositive argument why the **Uniform Deceptive Trade Practices Act** does not apply: the law covers only misrepresentations related to "goods" and "services," terms that under Nebraska law do not include securities. *See* BlackRock Br. 31–32. Plaintiffs do not respond. Separately, the UDTPA does not apply because it exempts "conduct in compliance with … a statute administered by[ ] a federal, state, or local government agency." Neb. Rev. Stat. § 87-304. Plaintiffs again respond with their overly literal parsing, this time of the word "compliance." But the only court to have interpreted the UDTPA exemption joined *Britton* in rejecting that reading. *See Klein v. TD Ameritrade Holding Corp.*, 2015 WL 13215666, at *12 (D. Neb. Oct. 23, 2015), *report and recommendation adopted in part on alternative grounds*, 172 F. Supp. 3d 1055 (D. Neb. 2016). As for the **Consumer Protection Act**, that law exempts transactions "regulated under laws administered by … any other regulatory body or officer." Neb. Rev.

Stat. § 59-1617. Plaintiffs' only response, that "not all of BlackRock's alleged misrepresentations pertain to securities regulated by another entity," Opp. 65, bewilders: every BlackRock fund is regulated by the SEC.

**Texas.** The DPTA does not apply to securities transactions because courts interpreting the DPTA must, "to the extent possible[,] … be guided by … interpretations given by … federal courts to [the FTC Act]," TEX. BUS. & COM. CODE § 17.46(c)(1), and the FTC Act "has been interpreted to preclude coverage of securities claims" to avoid trampling on the SEC's domain. *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1101 (5th Cir. 1988); *see* BlackRock Br. 11 nn.20–21. Plaintiffs wrongly say that "BlackRock provides no statutory or case support" for this argument. Opp. 64. The support is Section 17.46(c)(1). Plaintiffs also rely on *Frizzell v. Cook*, 790 S.W.2d 41 (Tex. App.—San Antonio 1990, writ denied), but it gets them nowhere. *Frizzell*, which concerned the sale of a service related to a securities transaction, rejected the argument that DTPA claims related to securities were impliedly preempted by the Texas Securities Act. *Id.* at 42, 47. BlackRock's argument is not based on the Securities Act. It is based on Section 17.46(c) and the FTC Act, provisions not raised in *Frizzell*. While the DTPA's predecessor statute exempted securities claims through a provision not in the current DTPA, Opp. 63–64, that is of no moment because the DTPA's drafters instead added a different clause, Section 17.46(c), with the same effect.

**Iowa**. The Iowa Consumer Fraud Act (ICFA) does not apply to securities fraud because it too is "generally modeled after the Federal Trade Commission Act." Opp. 58, n.14; *see, e.g.*, *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34–37 (Iowa 2013) (relying heavily on the FTC Act when interpreting the ICFA). Though the ICFA covers some transactions "in connection with" "securities," Iowa Code § 714.16(1)(i), (2)(a), it does not follow that the law covers claims of fraud in the sale of an SEC-registered security. *Cf. FDIC v. Munn*, 804 F.2d 860, 863–66 (5th Cir. 1986)

(distinguishing, in a case under the DTPA's private right of action, between fraud claims based on the sale of "intangible chattels such as stocks" (not allowed) and those based on services "in connection with the sale of an intangible" (allowed)). The Supreme Court of Iowa would adopt the same distinction to avoid straying from the FTC Act and cannibalizing Iowa's Securities Act.[37]

### D.   The LUTPA claim fails for lack of egregious conduct

The LUTPA claim fails for the additional reason that Plaintiffs do not allege the "egregious" conduct needed to state a claim. *See* BlackRock Br. 32–33; *Quality Env't Processes, Inc. v. I.P. Petroleum Co., Inc.*, 144 So.3d 1011, 1025 (La. 2014). Plaintiffs argue that the "egregiousness" standard applies only to "unfairness" claims and not "deception" claims, Opp. 66, but that is not what the Louisiana Supreme Court has said, *Quality Env't Processes*, 144 So.3d at 1025 ("Only egregious actions involving elements of fraud, misrepresentation, [or] deception … will be sanctioned.") (citation and alteration marks omitted); *see also Sutton v. Adams*, 318 So.3d 776, 782 (La. App. 4 Cir. 2018) (in a LUPTA "misrepresentations" case, requiring a showing that "the alleged conduct … is immoral, unethical, oppressive, or substantially injurious"). Egregiousness is a high bar that (at minimum) requires an intent to harm the competition. BlackRock Br. 32–33. Absent allegations that BlackRock wrote its statements with any intent to harm competition, the LUTPA claim fails.[38]

### CONCLUSION

Plaintiffs' claims should be dismissed with prejudice.

---

[37] While *State ex rel. Miller v. Pace*, 677 N.W.2d 761, 772 (Iowa 2004), considered an ICFA claim based on a security, the defendant had apparently not contested the law's application to securities, so *Miller* "can hardly be deemed a precedent upon the question." *Hilsinger v. Zimmerman Steel Co.*, 187 N.W. 493, 495 (Iowa 1922).

[38] To the extent the LUTPA claim is predicated on the coal-company allegations, it fails along with the antitrust claims. *See supra* 28–29.

Dated: June 2, 2025                              */s/ Gregg Costa*

                                        Gregg Costa
                                          State Bar No. 24028160
                                          GCosta@gibsondunn.com
                                        Prerak Shah
                                          State Bar No. 24075053
                                          PShah@gibsondunn.com
                                        GIBSON, DUNN & CRUTCHER LLP
                                        811 Main St., Suite 3000
                                        Houston, TX 77002
                                        Telephone: (346) 718-6600

                                        Rachel Brass (*pro hac vice*)
                                          RBrass@gibsondunn.com
                                          California Bar No. 219301
                                        GIBSON, DUNN & CRUTCHER LLP
                                        555 Mission Street, Ste 3000
                                        San Francisco, CA 94105-0921
                                        Telephone: (415) 393-8306

                                        Thomas Mueller (*pro hac vice*)
                                          DC Bar No. 434459
                                          Thomas.mueller@wilmerhale.com
                                        Jennifer Milici (*pro hac vice*)
                                          DC Bar No. 987096
                                          Jennifer.milici@wilmerhale.com
                                        Perry Lange (*pro hac vice*)
                                          DC Bar No. 494339
                                          Perry.lange@wilmerhale.com
                                        John O'Toole (*pro hac vice*)
                                          DC Bar No. 241862
                                          John.o'toole@wilmerhale.com
                                        WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                        2100 Pennsylvania Avenue, NW
                                        Washington DC 20037
                                        Telephone: (202) 663-6000
                                        Facsimile: (202) 663-6363

David Gringer (*pro hac vice*)
  New York Bar No. 4879029
  David.gringer@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Lauren Ige (*pro hac vice*)
  California Bar No. 343644
  Lauren.ige@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Telephone: (213) 443-5395
Facsimile: (213) 443-5400

*Attorneys for Defendant BlackRock, Inc.*

`

*/s/ Jason M. Powers*
Jason M. Powers
  Texas Bar No. 24007867
  jpowers@velaw.com
Stacey Neumann Vu
  Texas Bar No. 24047047
  svu@velaw.com
VINSON & ELKINS LLP
845 Texas Avenue
Suite 4700
Houston, TX 77002
Phone: (713) 758-2222

George M. Kryder
  Texas Bar No. 11742900
  gkryder@velaw.com
Megan Cloud
  Texas Bar No. 24116207
  mcloud@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, TX  75201-2975
Phone (214) 220-7719

Stephen M. Medlock (*pro hac vice*)
  DC Bar No. 995636
  smedlock@velaw.com
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone: (202) 639-6578

Mackenzie G. Newman (*pro hac vice*)
  NY Bar No. 5710785
  mnewman@velaw.com
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0000

*Attorneys for Defendant State Street Corporation*

*/s/ Robert D. Wick*
Robert D. Wick (*pro hac vice*)
  DC Bar No. 440817
  rwick@cov.com
John S. Playforth (*pro hac vice*)
  MA Bar No. 675766
  jplayforth@cov.com
Shadman Zaman (*pro hac vice*)
  NY Bar No. 5418199
  szaman@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000

Bradley C. Weber
  State Bar No. 21042470
  brad.weber@troutman.com
Chase T. Cobb
  State Bar No. 24116208
  chase.cobb@troutman.com
TROUTMAN PEPPER LOCKE LLP
2200 Ross Avenue, Suite 280
Dallas, Texas 75201
Tel: (214) 740-8497
Fax: (214) 756-8497

*Attorneys for Defendant The Vanguard Group, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was filed electronically and served on all counsel of record by the Court's CM/ECF system on June 2, 2025.

Dated: June 2, 2025                    */s/ Gregg Costa*

                                       Gregg Costa