1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                    TYLER DIVISION

3

4   STATE OF TEXAS, ET AL.,        )
                                   )
5            Plaintiffs,           )   CASE NO. 6:24cv437
                                   )
6        -vs-                      )
                                   )
7   BLACKROCK, INC., ET AL.,       )   Tyler, Texas
                                   )   9:31 a.m.
8            Defendant.            )   June 9, 2025

9

10

11

12

13

14

15                TRANSCRIPT OF MOTIONS HEARING
16        BEFORE THE HONORABLE JEREMY D. KERNODLE
               UNITED STATES DISTRICT JUDGE
17

18

19

20

21

22

23

24

25

1                       A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4    BRIAN W. BARNES
     JOHN D. RAMER
5    COOPER & KIRK, PLLC
     1523 New Hampshire Ave., N.W.
6    Washington, DC 20036

7          ATTORNEYS For PLAINTIFFS STATES OF
           TEXAS AND MONTANA
8

9    AUSTIN KINGHORN
     DEPUTY ATTORNEY GENERAL FOR CIVIL LITIGATION
10   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
     P.O. Box 12548, MC-066
11   Austin, TX 78711-2548

12         ATTORNEY FOR PLAINTIFF STATE OF TEXAS

13
     FOR THE GOVERNMENT:
14
     DAVID B. LAWRENCE
15   COUNSEL TO THE ASSISTANT ATTORNEY GENERAL
     U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION
16   950 Pennsylvania Avenue, NW
     Washington, DC 20530
17
           ATTORNEY FOR THE UNITED STATES OF AMERICA
18

19   CLARKE T. EDWARDS
     ACTING DIRECTOR, OFFICE OF POLICY PLANNING
20   FEDERAL TRADE COMMISSION
     600 Pennsylvania Avenue, NW
21   Washington, DC 20580

22         ATTORNEY FOR THE FEDERAL TRADE COMMISSION

23

24

25

```
 1   FOR THE DEFENDANTS:

 2   GREGG COSTA
     PRERAK SHAH
 3   GIBSON, DUNN & CRUTCHER LLP
     811 Main St., Suite 3000
 4   Houston, TX 77002

 5   RACHEL BRASS
     GIBSON, DUNN & CRUTCHER LLP
 6   555 Mission Street, Suite 3000
     San Francisco, CA 94105-0921
 7
     PERRY LANGE
 8   WILMER CUTLER PICKERING
     HALE AND DORR LLP
 9   2100 Pennsylvania Avenue, NW
     Washington, DC 20037
10
          ATTORNEYS FOR DEFENDANT BLACKROCK, INC.
11

12   ROBERT D. WICK
     COVINGTON & BURLING LLP
13   One CityCenter
     850 Tenth Street, NW
14   Washington, DC 20001-4956

15   BRADLEY C. WEBER
     TROUTMAN PEPPER LOCKE LLP
16   2200 Ross Avenue, Suite 280
     Dallas, TX 75201
17
          ATTORNEYS FOR DEFENDANT THE VANGUARD GROUP, INC.
18

19   JASON M. POWERS
     VINSON & ELKINS LLP
20   845 Texas Avenue
     Suite 4700
21   Houston, TX 77002

22   MACKENZIE G. NEWMAN
     VINSON & ELKINS LLP
23   1114 Avenue of the Americas
     32nd Floor
24   New York, NY 10036

25        ATTORNEYS FOR DEFENDANT STATE STREET CORPORATION
```

```
 1              P R O C E E D I N G S

 2              (Call To Order Of The Court.)

 3              THE COURT:  Thank you, and please be seated.

 4              Good morning.  This is 6:24cv437, State of Texas

 5   vs. BlackRock.

 6              I will take appearances.

 7              MR. BARNES:  Good morning, Your Honor.  I am Brian

 8   Barnes.  I represent the Plaintiff States of Texas and

 9   Montana.

10              THE COURT:  Okay.

11              MR. BARNES:  I am going to be presenting argument

12   for the Plaintiff States.  With me at counsel's table is my

13   colleague John Ramer from the law firm of Cooper & Kirk.

14              MR. RAMER:  Good morning.

15              THE COURT:  Okay.

16              MR. BARNES:  We also have in the gallery Austin

17   Kinghorn, who is the head of civil litigation for the Texas

18   Attorney General's Office.

19              THE COURT:  Okay.

20              And for Defendants?

21              MR. COSTA:  Good morning, Your Honor.  Gregg Costa

22   from Gibson Dunn for BlackRock.  I am joined by my Gibson

23   Dunn colleagues Rachel Brass and Prerak Shah, as well as

24   Perry Lange from Wilmer Hale.

25              THE COURT:  Okay.
```

1          MR. WICK:  Good morning, Your Honor.  Robert Wick

2    from Covington & Burling for Vanguard.

3          MR. WEBER:  Your Honor, Brad Weber from Troutman

4    Pepper Locke in Dallas also for Vanguard.

5          THE COURT:  Okay.

6          MR. POWERS:  Your Honor, Jason Powers and Mackenzie

7    Newman from Vinson & Elkins for State Street Corporation.

8          THE COURT:  Okay.  Great.  Thank you.

9          Anyone else?

10         MR. LAWRENCE:  Your Honor, David Lawrence from the

11   Antitrust Division of the United States on behalf of the

12   United States.

13         MR. EDWARDS:  Clarke Edwards from the Federal Trade

14   Commission.

15         THE COURT:  Okay.  Good morning.

16         Okay.  Well, we are here for Defendants' motion.  I

17   thought -- you may have a plan on how you would like to

18   proceed.  What would be most helpful for me is to kind of go

19   claim by claim.

20         So let's start with the Clayton Act claim.  I can

21   hear from Defendants, and then I would like to hear from

22   Plaintiffs.

23         MR. COSTA:  Good morning again, Your Honor.  Gregg

24   Costa from Gibson Dunn representing BlackRock, and I will be

25   arguing the Joint Motion to Dismiss the Antitrust Claims that

1    was filed on behalf of all the Defendants.

2         And just for clarity, you mentioned starting with

3    the Clayton Act claim, which I am happy to do.  So you want

4    to do that one, then let the other side go --

5         THE COURT:  I mean, if you really want to start

6    with Sherman, that's fine.  But, yeah, I would like to go

7    claim by claim and hear from each side for each claim

8    first.

9         MR. COSTA:  Okay.  And just to give you a little

10   bit more of a roadmap too, I will be arguing the joint motion

11   on the antitrust claims.

12        THE COURT:  Okay.

13        MR. COSTA:  Mr. Wick from Covington will be arguing

14   Vanguard's separate motion on antitrust.  Mr. Powers will be

15   arguing the State Street motion on antitrust.  And then my

16   colleague, Ms. Brass, will be arguing the consumer-protection

17   claim.

18        THE COURT:  Okay.  Thank you.

19        MR. COSTA:  The antitrust claims in this case are

20   unprecedented, they are unsound, and they are unsupported.

21        The claims are unprecedented because in well over a

22   century of antitrust law, no claims looking anything like

23   these have ever been brought, much less succeeded.

24        For Section 1, the conspiracy claim, no case has

25   ever alleged that Defendants conspired to reduce output in a

1    market, not where they compete, but one in which they merely

2    oversee investments.

3            And for the Clayton Act claim, Section 7, no case

4    has ever alleged that institutional investors, by acquiring

5    minority shares in companies across the entire economy, may

6    lessen competition.

7            The claims are unsound because they defy economic

8    reality.  The Complaint ignores that the coal market has been

9    declining for decades for a host of reasons, well before this

10   alleged conspiracy, including environmental regulations and

11   the increased availability of cheap natural gas, especially

12   in the last couple decades due to the fracking boom that we

13   are all familiar with here in Texas.

14           The Complaint focuses on the profits of the coal

15   companies while it ignores that the Defendants as asset

16   managers receive only a negligible -- they have no direct

17   stake in the profits of those companies, and receive only a

18   negligible management fee percentage off the amounts their

19   clients have invested in all funds of which the coal

20   companies are a tiny fraction.

21           And those index funds have far greater investments

22   in companies that consume electricity, as opposed to the coal

23   companies.

24           And these claims are unsupported because the

25   details needed to allege antitrust liability are either

1  entirely absent from the Complaint or actually reject

2  antitrust liability.

3          Here is just some of the gaping holes in the

4  Complaint.

5          There is no allegation that the Defendants ever

6  communicated with each other about anything, much less that

7  they had agreements with each other about coal output.

8          There is no allegation that the trade associations

9  had any requirements about coal output.

10         And there is no allegation that the Defendants took

11 specific actions that reduced coal output.

12         And what about the coal companies?  They would have

13 to be essential players in these antitrust claims that the

14 States fantasize about, but nowhere in 100 pages plus of the

15 Complaint is there anything, not even a peep about what the

16 coal companies supposedly did to harm competition.

17         In sum, Your Honor, the who, what, where, when, and

18 how of these antitrust claims are nowhere to be found.  And

19 the details that are before the Court from the State's

20 Complaint reject the State's novel theories.

21         The central premise of the Complaint is that a

22 decline in coal coincided with the Defendants joining the

23 trade associations, yet coal actually rose significantly

24 during that time period, one of the only times in decades

25 that that has happened.

1          THE COURT:  You are talking about the production of

2     coal?

3          MR. COSTA:  Correct, Your Honor.

4          THE COURT:  Okay.

5          MR. COSTA:  And then there are the supposed

6     mechanisms for the suppression of coal output that wasn't

7     actually suppressed, voting and engagement.

8          Again, the allegations rejects their claims.  Those

9     allegations from their own Complaint show that output -- show

10    that voting and engagement were independent actions the

11    Defendants took that in no way matched up to output

12    decisions.

13         It is remarkable when the allegations from the

14    Plaintiffs' own Complaint take the legs out from under the

15    claims they are alleging.  But that is exactly what we have

16    here.  The claims just don't add up.

17         And when antitrust claims don't make sense, Twombly

18    says they have to be rejected at the pleading stage.  Because

19    allowing implausible antitrust claims to get past the

20    pleading stage, imposes exorbitant discovery costs on the

21    Defendants.

22         Here, it would also do that on the coal companies

23    who currently aren't parties to this case.

24         And the Clayton Act claim, in particular, would

25    raise doubts about longstanding practices of institutional

1    investors engaging in everyday governance decisions that have

2    long been understood to be accepted by the Clayton Act's safe

3    harbor for investment-only activity.

4            So I will turn, Your Honor, to the Clayton Act

5    claim since you asked to start with that.

6            Again, it is an unprecedented claim.  All of the

7    case law on Section 7 of involving partial acquisitions is

8    talking about partial acquisitions of competitors, of

9    suppliers, and of customers.

10           There is nothing like this type of claim where all

11   that is happening is index fund investing in companies across

12   an industry and, in fact, across the entire economy.

13           THE COURT:  Are all of the funds at issue index

14   funds?

15           MR. BARNES:  Just about -- for BlackRock only has

16   index fund investing with coal companies, Your Honor.

17   BlackRock stopped investing in coal companies in their

18   discretionary funds before -- before the conduct in this

19   case.

20           And I think it is largely the case for the other

21   funds, you know, well over 90 percent is index fund

22   investing.

23           So by and large these are not discretionary

24   decisions.  They are invested across the energy sector.  They

25   are invested across the entire economy.

1          And so I think for Section 7 it just takes

2  application of the text of the statute to the allegations

3  here to show why dismissal is warranted under the safe

4  harbor.

5          The first part of the safe harbor focuses on

6  whether the stock was purchased for investment only.  The key

7  is it is focused on the purchase, and there is no allegation

8  here that the stock in these coal companies was acquired for

9  any reason other than investment.

10          The Complaint acknowledges why the Defendants were

11  acquiring these -- the stock in the coal companies as part of

12  their index fund investing, as part of their diversified

13  investment.

14          I would direct the Court to paragraphs 147, 194,

15  and 210 of the Complaint that recognize we were doing this

16  well before we joined the trade associations, buying shares

17  in coal company, which is dictated when you have index

18  funding, really by just two factors.

19          One, the make-up of those index funds, which are

20  determined by other folks like Standard and Poor's.

21          And, two, whether clients are buying or selling

22  those particular index funds.

23          That is all that is in -- changing the amount of

24  shares that are being purchased.

25          And, in fact, the Complaint shows for some of these

12

1  coal companies, our purchases went down after joining the

2  trade associations.  Again, because the only basis for

3  acquiring these shares was as part of the funds that are

4  invested across sectors or within the energy sector across

5  different companies.

6          The fact that the Plaintiffs acknowledge, they

7  admit that our investment before 2020 was being done solely

8  for investment, ends the inquiry.  Because they allege that

9  we did nothing different after joining the trade

10 associations.  We had the same reasons -- the same reason for

11 purchasing shares that we did before.

12         THE COURT:  Nothing different with respect to

13 acquisitions, right?

14         MR. COSTA:  Correct.

15         THE COURT:  But not necessarily with using the

16 shares, is what they would say?

17         MR. COSTA:  Well, even on using shares, they don't

18 allege anything that we did different.  Right?  All they

19 challenge is voting and engagement, which, of course, we have

20 done.  We vote our shares before joining the trade

21 associations.  We voted our shares after.  We vote our shares

22 in all kinds of industries, not just the coal industry.  In

23 companies that sell candy or sell toilet paper, we vote our

24 shares.

25         So they don't allege anything different after we

1    join these trade associations in terms of either the reason

2    for acquiring the shares or the use of the shares.

3           And so I am happy to go to that second part of

4    using the shares.

5           THE COURT:  Well, and let me ask, whose burden is

6    it to establish whether the safe harbor applies?  I mean, I

7    know we are at the pleading stage, but just generally.

8           MR. COSTA:  Right.  It is Plaintiffs' burden --

9           THE COURT:  Okay.

10          MR. COSTA:  -- with allegations.  There is case law

11   that says that.  I think the Tracinda case.  Also, just the

12   structure and text of the statute.

13          This isn't a provision that is part of a separate

14   subsection like you might expect when there is an exception

15   where the Defendant bears the burden.  It is part of the

16   heartland of the Section 7 statute.  So it is their burden to

17   show that this is not protected by the safe harbor.

18          THE COURT:  Okay.

19          MR. COSTA:  So, again, it is a pretty

20   straightforward analysis.  The first part, acquiring the

21   shares, was solely for investment, driven by these funds that

22   preexisted joining the trade associations.  No allegation

23   whatsoever that we changed our pattern of investing after

24   joining those associations.

25          And then, as Your Honor pointed out, the second

1  part looks at use, but there is a couple of important things.

2  One, they have to show we used the shares to

3  achieve anticompetitive purposes, and that there was an

4  actual substantial lessening of competition.  Right?

5  Once you are in a situation where the shares were

6  acquired only for investment, they actually -- it is not

7  enough to show potential harm; they have to show actual harm.

8  And they can do neither one of those things.

9  As I said in response to your question on the use

10  part, they have identified nothing that says we used the

11  shares any differently than we did before joining the trade

12  associations, or that we use them any differently than we do

13  in a host of other industries.

14  And I would -- I think here the Government, the

15  Federal Government's brief, DOJ and FTC's brief, is helpful.

16  It says:  Passive investors fall squarely within

17  Section 7's exemption unless they cease to be passive and

18  instead affirmatively use their stock to reduce rivalry among

19  their commonly held assets.

20  We embrace that view of the safe harbor, and on the

21  allegations here, it supports dismissal.

22  THE COURT:  So you do agree with that position,

23  that a passive investor could potentially violate Section 7?

24  MR. COSTA:  At a theoretical level, we do.  That is

25  why we disagree with the opposing side's argument that we

1    think institutional investors have blanket immunity.

2            Institutional investors are acquiring the shares

3    solely for investment.  But then the use, there could be a

4    scenario in which there was use in a manner that tried to

5    exert control through putting the investor's own people on

6    the board, through engaging in certain proxy fights like you

7    see in the case law.  That is what is happening in the

8    Section 7 case law.

9            Now, it never involves institutional investors

10   because it is highly implausible that you would have that

11   situation.  But, certainly, theoretically, we recognize that

12   the use of the shares could put even an institutional

13   investor outside the safe harbor.

14           But, again, absolutely nothing like that here,

15   Your Honor.  Everyday activity, the same voting and

16   engagement we were doing before, the same voting and

17   engagement we do in other industries, the -- you know, if you

18   look at the voting they challenge, they challenge the fact

19   that State Street and BlackRock, but never Vanguard, voted

20   against certain management-backed directors of coal company.

21           But there is zero allegation that those were in any

22   way tied to output decisions, that they were tied to an

23   attempt to reduce output at the coal companies.

24           For example, there were votes against directors at

25   CONSOL and at Warrior.  And after those votes, output was

1    going up at those companies.  Right?  There is just no

2    matching at all between those voting decisions and output

3    decisions at the coal companies.

4         THE COURT:  Well, what about the statements, these

5    are in the allegations, that when the Defendants voted

6    against certain board members, they would make the statement,

7    which I don't have in front of me -- oh, here it is, that:

8    The company does not meet our aspirations of having adequate

9    climate risk disclosures against all pillars of TCFD.

10        Wouldn't that be -- if I am inferring -- granting

11   any inference in favor of the Plaintiff that could support

12   that allegation that they were using the shares in that way?

13        MR. COSTA:  Those statements reflect only

14   unhappiness with disclosures, not with any particular targets

15   or amounts.  And the reason the inference you speculate about

16   wouldn't be appropriate or reasonable is because when you

17   look at what actually happened, how was the voting occurring,

18   again, we were voting against, in isolated instances, certain

19   coal company-backed directors, and yet it was not matched in

20   any way to output decisions.

21        So, again, if this was really an attempt by voting

22   against disclosures to reduce output, why is it that when we

23   voted against the directors at CONSOL and at Warrior, you

24   actually saw output going up?  There is just no actual

25   conduct that matches that inference or that theory.

1    When you look at the engagement, which again that

2  was only Vanguard engaged with any coal company during this

3  period, they engage with Arch Coal, and after that, Arch

4  Coal's output goes up.  It actually had the largest increase

5  in output among the public companies.

6    So when you look at the actual conduct, is there

7  any way to show that these voting or engagement decisions

8  somehow reduced output or even attempted to do that?  And

9  there is absolutely nothing in the Complaint.  There is no

10  support in the Complaint for that.

11    There is no allegation that we were engaging more

12  with coal companies than all of the other businesses we

13  oversee investments in.  There is no allegation that we were

14  voting against directors in the coal industry more than we

15  were in other -- all of the other industries we oversee

16  investments in.

17    There is just no meat on the bones of this

18  Complaint to show any use that was out of the ordinary course

19  of what institutional investors are doing every day.

20    And the second piece of use is it has to show a

21  substantial lessening of competition.  And that is where

22  their story just crumbles based on the data in their own

23  Complaint.

24    The premise of the lawsuit was that coal output was

25  declining during the time that these trade associations were

1    joined by some of the Defendants.  And yet their own data

2    shows that there was a remarkable increase during that period

3    in coal output.

4           For South Powder River Basin, the increase was 28

5    percent over the time period when the Defendants were part of

6    these organizations.

7           For thermal coal, it was 15 percent increase.

8           So now they backpedal, realizing the data undercuts

9    their theory there, and they say, well, but output would have

10   grown even more but for this conduct we are challenging.

11          A couple of big problems with that, Your Honor.

12   They have to show a plausible level at which output would

13   have been, absent the conduct they challenge.  You can't just

14   have a conclusory statement of, oh, it would have been higher

15   than it was.

16          I would point the Court to the Jacobs decision from

17   the Eleventh Circuit in that regard, and there is nothing

18   plausible at all about their claim that output in 2022 should

19   have been as high as it was three years earlier in 2019.

20          First of all, we have this well-recognized decline

21   in coal output over decades.  Right?  And so we know that

22   Arch Coal, for example, it is in the Complaint, 60 percent

23   reduction in coal output going back to 2010.

24          Peabody says from 2011 through 2019 there was a 40

25   percent decline -- this is all before the conduct they

1    challenge -- a 40 percent decline in their output.

2         Wyoming, one of the Plaintiff States here, filed an

3    amicus brief in the FTC case involving Arch Coal that talks

4    at length about the long-term reduction in the coal market.

5         So no basis at all for this conclusory assertion

6    that output should have been the same in 2022 as it was in

7    2019, and that is just directly at odds with the economics

8    underlying the coal industry for many decades.

9         The second problem -- so how they try to fix that,

10   they say, well, we are going to compare private and public

11   coal companies.  Right?  And that shows that these public

12   coal companies where you had stock and were taking certain

13   actions was not achieving output at competitive levels.

14        But, again, their data doesn't support that

15   whatsoever.  We put the chart in our reply brief showing that

16   for two of the four private mines, output declined from 2019

17   to 2022, again, showing it is implausible to have this

18   assumption that output should have stayed steady in the wake

19   of historic decline in the coal industry.

20        And, you know, among private coal producers, it was

21   a mix; some up, some down.  And there is no way to find any

22   consistent pattern that would say there is any noticeable

23   difference between public and private coal output.

24        THE COURT:  What about the increase in price?  How

25   would you explain that using the Complaint?

1          MR. COSTA:  So you identify what they put as

2    another fundamental theory of their case.  They say, oh,

3    well, price was going up when output was going down, which

4    you wouldn't expect in a normal competitive market.

5          Once again, it is not just they don't support their

6    allegations, it is that their allegations, the data in their

7    own Complaint rejects what they are saying.

8          If you look at any annual interval, in every

9    time -- every time price moved in the same way you would

10   expect with output.  Right?  From 2019 to 2020, price went

11   down, output went down.  And then the next year price goes

12   up, output overall goes up.

13         So in every single year, the pattern was exactly

14   what you would expect in a well-functioning, competitive

15   market.

16         So that argument they are trying to make is

17   completely inconsistent and implausible, again, under the own

18   data they have in their own Complaint that shows on any

19   annual basis, if you look at it in that interval, price and

20   output worked the way you would expect.

21         So that is another premise of their argument that

22   falls by the wayside under any scrutiny.  And, again, that

23   scrutiny coming, as it must, at the Rule 12 stage from their

24   own Complaint.  Their own Complaint rejects their claims.

25         So in terms of the Clayton Act claim, I am happy to

1   answer any other questions the Court has, but that is -- you

2   know, our point is --

3          THE COURT:  Okay.

4          MR. COSTA:  -- under the text in the allegations,

5   these investments were solely -- these acquisitions were

6   solely for investment.  There is no use they have identified

7   that was out of the ordinary or that in any way was an

8   attempt to substantially lessen competition, and any idea

9   that competition was lessened is completely rejected by the

10  data in the Plaintiffs' own Complaint.

11         THE COURT:  Let me go back to your referencing the

12  DOJ brief, and you are saying that it is theoretically

13  possible for institutional investors to be liable under

14  Section 7.

15         I am having trouble understanding how that would

16  work with index funds.  I mean, I thought your position was

17  that there had to be some link between the acquisition and

18  any improper use.

19         But is it possible that an institutional investor

20  who has acquired shares in a market because they are tracking

21  an index could then use the shares improperly and commit an

22  antitrust violation?

23         MR. COSTA:  As I said, it is very difficult to see

24  how it could work with an index fund investor, but

25  theoretically, there could be scenarios where there was a

significant enough ownership interest and then a use to, like
I said, put -- control the company by putting people on the
board, by seeking certain information.  But there is nothing
like that here.

THE COURT:  Yeah, yeah, I understand.

Okay.  Any other Defendants wish to speak on the
Clayton Act claim?

MR. WICK:  Good morning, Your Honor.  Robert Wick
for Vanguard, and I will be very brief.

I just want to highlight the complete absence of
any allegations in this Complaint that Vanguard ever used its
shares to coerce or pressure a coal company to cut its
production.

The Plaintiffs describe two types of conduct that
they say could constitute the use of shares to pressure a
coal company to cut production.

The first is voting against coal company directors.
They failed to plead a single instance of Vanguard ever doing
that.  They don't say that Vanguard ever voted against a coal
company director.  They don't say that Vanguard ever voted
contrary to the recommendations of coal company management.

And if Your Honor looks at the judicially
noticeable SEC records of Vanguard's proxy voting history,
those votes -- those records confirm that in every single
instance in which the Complaint talks about a proxy vote,

1   Vanguard voted for the coal company director or with the

2   recommendation of coal company management.  So that is the

3   polar opposite of using shares to pressure coal companies to

4   cut production.

5           The other example of use of shares that the

6   Complaint talks about is engagement with coal companies, by

7   which they mean having a meeting with a coal company.

8           As an initial matter, meeting with the companies in

9   which an asset manager invests its client's money is the

10  bread and butter of what asset managers are supposed to do.

11  They are supposed to get to know the companies, understand

12  the companies, and know what their business strategies are.

13          The Complaint alleges that Vanguard had a total of

14  four meetings with the coal companies that participate in the

15  relevant markets.

16          What the Complaint does not say and what it

17  couldn't say is that at any of those four meetings Vanguard

18  told any of those four coal producers that they should cut

19  production.  The Complaint doesn't allege Vanguard told

20  companies to cut production.  It doesn't allege that they

21  pressured those four coal companies to cut production.  It

22  doesn't say Vanguard so much as suggested that they cut

23  production.

24          All we have is that meetings happened.  That is the

25  routine bread-and-butter behavior of asset managers.  And the

1    Government's brief says very clearly that is consistent with

2    the safe harbor under the Clayton Act.

3          The Government's brief says at page 18 to 19:

4    Asset managers may avail themselves of the "solely for

5    investment" exemption if they use their investment holdings

6    and market status to influence or change governance

7    structures and processes; for example, by conferring with the

8    officers and directors on board size, compensation policies,

9    and public reporting practices, and such ordinary course

10   conduct does not approach the theory of liability presented

11   here.

12         The Government adds at page 19:  Improving

13   corporate governance often is competitively neutral or

14   pro-competitive, so uses of stock to improve the oversight

15   and reporting practices of companies generally benefits

16   consumers and would not implicate the Clayton Act.

17         There is no allegation in this Complaint that

18   Vanguard did anything beyond that.

19         Thank you, Your Honor.

20         THE COURT:  What do I do with the statements by

21   Vanguard that are highlighted in paragraphs 138 and -39 about

22   achieving the Paris Agreement targets, reducing coal

23   production, engaging with companies in carbon-intensive

24   industries, and their boards?

25         MR. WICK:  So if I am recalling paragraphs -- I can

1    hop over there and grab the Complaint.  If I am recalling

2    what paragraphs 138 and 139 are about, I think that is a

3    description of Vanguard's proxy voting policy, unless I am

4    having a memory fail there.

5           And when you -- oh, no.  I am on the wrong

6    document.

7           Okay.  So that is a stewardship document.  That is

8    a document in -- that is a public statement in which Vanguard

9    set forth some information about what will -- what its

10   expectations are about what companies should disclose.

11          It is fully consistent with the governance behavior

12   that the Government says is consistent with the safe harbor.

13   Because all Vanguard says in that document is, if climate

14   issues pose a material risk to your company, you should

15   disclose the material risk, and you should disclose your

16   plans for doing it.

17          If you look beyond the truncated sound bites quoted

18   in the Complaint, at the actual contents of that document,

19   which we submitted, I want to say as ECF 66-7, what it says

20   is, if climate is a material risk to your company, disclose

21   what your plans are for addressing that material

22   risk -- disclose the risk and disclose your plans for

23   addressing it.

24          Vanguard is quite clear in that document it is not

25   going to tell any company what its plan should be, but

1  whatever its plan or contingency plan should be, it should

2  disclose it.

3          The Government says engaging with companies on

4  reporting practices and oversight is consistent with the safe

5  harbor, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          Anyone else?

8          MR. POWERS:  Your Honor, Jason Powers here for

9  State Street.

10          And I don't want to belabor points, but I think

11  addressing some of these use issues on the Clayton Act, I may

12  be able to avoid getting up again on Sherman Act, so I will

13  try to get through it quickly.

14          I think on the law points, I think Judge Costa has

15  explained the issue.

16          There is one piece of the Government's brief that I

17  want to highlight for the Court's consideration, and that is

18  in the Statement of Interest at 13.

19          We agree with the agencies that asset managers can

20  only lose Section 7 protection when they actually use their

21  stock ownership to harm competition.  And that is the

22  language that Judge Costa highlighted.

23          In addition, the DOJ and FTC's brief talks about

24  the fact that in order to state a Section 7 claim, that

25  plausible allegation standard of Twombly applies to the use

1    element as well.

2         And the DOJ and FTC point us to the fact that this

3    needs to be a factual inquiry.  At 13 of the Statement of

4    Interest they say that:  A claim should be focused on the use

5    of stock that examines what has occurred and should

6    incorporate evidence of post-acquisition behavior and effect.

7         So this is really a question of, do you have the

8    facts?  Are there fact allegations that show there has been a

9    use by the asset manager?

10        So let's look at the Complaint and what it says

11   about State Street and whether State Street actually used

12   their shares.

13        Well, the two mechanisms, as Mr. Wick pointed out,

14   the two mechanisms at issue here are the questions of

15   meetings and engagements -- and we can set that aside for

16   State Street because there are no allegations that State

17   Street took meetings or engagements with anyone that affected

18   coal output at all.

19        So the only other mechanism that we could be

20   talking about is proxy voting.  So that is the question that

21   the Court would need to answer on a Defendant-by-Defendant

22   basis, is there a factual allegation that State Street

23   engaged in voting that affected how coal producers acted?

24   Producers like who?  Producers like Arch Resources.

25        Plaintiffs tell us that in 2021 Arch increased its

1   coal production by 19 percent year over year, 11 million tons

2   more coal.  And then in 2022, Arch increased its production

3   again, another 9 percent year over year.  The same 11 million

4   gain.  Another five million tons of coal on top of that.

5       So under Plaintiffs' theory of the world,

6   environmentalists should be furious with Arch.  They are not

7   just refusing to cut production, they are growing production

8   faster than any public or private producer in the

9   marketplace.

10      And did State Street punish Arch for that?

11  Plaintiffs say no.  Plaintiffs don't allege State Street took

12  any action against Arch, no votes against directors, no votes

13  on pay packages.  Nothing.

14      Hallador Energy Company increases its production by

15  16 percent over '21 and '22.  Plaintiffs say State Street did

16  nothing about that either.

17      So was State Street using its votes to punish

18  anyone?  Plaintiffs tell us to look at NACCO Natural

19  Resources.

20      Plaintiffs allege that State Street withheld or

21  cast votes against NACCO directors for three years in a row,

22  in '21 and '22 and '23.

23      And you know what else happened in those three

24  years in a row, NACCO cuts production three years in a row

25  for a total reduction of 17.6 percent over those three years.

1          Plaintiffs tell us to look at Warrior

2   Metallurgical.  Again, three years in a row State Street

3   withholds or casts votes against Warrior's directors.  Was

4   that because Warrior was cutting production?  No.  Plaintiffs

5   tell us that Warrior -- they cut production in '20, they cut

6   production again in '21, held steady in '22.  A total

7   production in output of 25 percent.

8          If the theory is that State Street is using its

9   votes as an enforcement tool to punish those who grow

10  production and reward those who cut production, the theory

11  doesn't work because the Complaint tells us State Street

12  wasn't actually doing that.

13         Now, the Court asked a good question, what if the

14  Defendant said the reason for their voting strategy had to do

15  with the TCFD climate disclosures?

16         As to State Street, that claim appears in paragraph

17  177 of the Complaint.  Oddly enough, it appears in quotation

18  marks with no citation or attribution.  There is no

19  indication of who said that, if anyone.

20         But, again, what of it?  If we are actually,

21  according to the Complaint, voting for the directors of the

22  companies who increase their output and voting against the

23  companies who reduce their output, well, whatever our voting

24  strategy is must not be anticompetitive.

25         And to the extent TCFD has some explicatory factor

1    here, TCFD does not actually call for emissions reductions.

2    You know, this is -- you know, TCFD is just a disclosure

3    document, doesn't say anything about a goal to meet any kind

4    of emissions guideline.

5         So to the extent that is part of the voting

6    strategy, it is just not affecting coal output in this

7    industry.  And there is no allegation of State Street going

8    after producers who raise output.  There were five companies

9    that increased production in '21 versus 2020.  We didn't cast

10   votes against any of them.

11        So this is something that is unfortunately kind of

12   a consistent pattern in the brief.  You know, for example, in

13   the brief, Plaintiffs say that State Street was judging

14   companies using a scoring system called the R-factor.  And

15   the brief says that State Street would use carbon emissions

16   to set the R-factor and then threaten to divest companies who

17   have low R-factors.  That is at page 8 of the opposition

18   brief.

19        And then you go back to look at the Complaint,

20   paragraph 166.  It says nothing about R-factor being based on

21   emissions.  It is not.  Nothing in the Complaint says that

22   R-factors are used to decide what shares to hold.

23        And, in fact, the Complaint cites three different

24   State Street officers saying there is no reason why we would

25   let climate considerations cause us to divest shares because

1   we like to engage with companies, not divest.  And, besides,

2   we are 95 percent index fund investing.  We don't really have

3   that option.

4           So at State Street we have to ask, why are we

5   here?

6           THE COURT:  What is the purpose of the R-factor

7   agenda if it would not affect State Street's acquisitions?

8           MR. POWERS:  So it does have an ability to

9   communicate to our clients, Your Honor.  We are a company

10  that represents a lot of different asset owners who have all

11  kinds of different considerations that drive what they do.

12  And, certainly, there is a small percentage of our business

13  that involves active management funds.

14          But we have got clients who want to know, am I in a

15  complete index fund?  Am I in a narrow index fund?  You know,

16  that might have, for example, a mining index fund.  Lots of

17  different funds that are defined by third parties.

18          And we have got clients who want to know, give me a

19  sense of the companies that I am invested in because of the

20  of indexes that I have chosen to invest in, and give me data

21  that I can use to understand what I am holding.

22          That is not going to guide decisions that we make,

23  but it might guide decisions that our clients make about

24  which funds they want to choose to be in.

25          It is an information-gathering tool, an information

1   dissemination tool.  It is not something that we use to make

2   decisions or tell the companies what they should be doing.

3             THE COURT:  Okay.

4             MR. POWERS:  In any event, for most of the coal

5   companies at issue here, we are not a top-three shareholder.

6   There is really not much reason how we could use our shares

7   in a way that would cause them to listen to us.

8             Most of the companies are not top three.  Our

9   biggest share is in Arch.  Arch, of course, is the one that

10  grew faster than anybody private or public.

11            So as far as we are concerned, there is nothing in

12  this Complaint that tells you why State Street is here or

13  what it is doing to coal producers that would have any impact

14  on the market.

15            THE COURT:  Okay.  Thank you.

16            MR. POWERS:  Thank you, Your Honor.

17            THE COURT:  All right.  Let me hear from

18  Plaintiffs.

19            MR. BARNES:  Well, good morning, Your Honor, and

20  may it please the Court.  Brian Barnes for the Plaintiff

21  States.

22            Just by way of a roadmap for the Court, what I

23  propose to do, if this is acceptable, is to start by just

24  talking about my understanding of the legal standard under

25  Section 7 and how an index fund manager could become liable

1    under Section 7, and then I will turn to the factual

2    allegations in the Complaint.

3         I would submit to the Court that the Defendants

4    are, in a number of ways, grossly mischaracterizing the

5    allegations in the Complaint, and I want to cite chapter and

6    verse to explain why.

7         THE COURT:  Okay.

8         MR. BARNES:  But let me start with the law.

9         So in order to establish liability under Section 7,

10   as I understand it, and this is, I would submit, consistent

11   with the Areeda and Hovenkamp treatise, which I didn't hear

12   my friends say anything about, even though that is a treatise

13   that has been cited 57 times by the United States Supreme

14   Court.  It is an enormously influential authority on

15   antitrust law, as the Court is well aware.

16        In order to establish substantive liability under

17   Section 7, there are basically two paths.

18        The first, and really both paths start in this

19   place, is we need to establish substantive liability under

20   one of those first two paragraphs in Section 7.

21        And in order to do that, we have pretty good

22   guidance from the U.S. Supreme Court in the DuPont case.

23   What the Supreme Court has said is that it is our burden to

24   show reasonable probability of a lessening of competition

25   whether or not that lessening of competition has actually

1    occurred.

2            And so to get through that threshold showing, we

3    just need to show a reasonable probability of a lessening of

4    competition, and we think we have that here in spades.

5            The Defendants individually, and certainly

6    collectively, have enough of a stake in the publicly traded

7    coal companies in order to influence management's decision.

8            When management gets a call from one of the

9    largest, if not the largest, shareholder in the company,

10   management listens.  They pick up the phone.  And jawboning

11   by these Defendants as to decisions about market strategy,

12   just very clearly have the potential to influence output

13   decisions at the coal companies.

14           And I just want to emphasize in the DuPont case,

15   Your Honor, the Supreme Court says this is a prophylactic

16   rule that we have in Section 7.  It is a rule that is

17   intended to prevent anticompetitive behavior in its

18   incipiency, and so we have clearly gotten over that threshold

19   showing that we need to make.

20           Then the question becomes the exception in the

21   third paragraph of Section 7 and whether the Defendants can

22   successfully invoke that here at the Motion to Dismiss stage.

23           And I would respectfully disagree with my learned

24   colleagues on the other side about who bears the burden as to

25   that -- as to that exception.

1            And, again, I point the Court to the Areeda and

2    Hovenkamp treatise which goes our way on this issue.  We

3    think it is actually the Defendants that have the burden to

4    establish that that exception applies.

5            And I would also point the Court, there is -- it is

6    not cited in any of the briefing, there is a U.S. Supreme

7    Court decision decided in the last couple of months, the

8    Cornell case, that talks about basically how to interpret a

9    statute to assess whether it is on the plaintiff or the

10   defendant to bear that burden.

11           When, as we have in Section 7, there is a provision

12   that is separate -- that is sort of separately set out that

13   creates an exception to liability, the Supreme Court in the

14   Cornell case says that is a reason to think that this ought

15   to be treated as an affirmative defense.

16           So that is certainly how we see it and how the

17   leading antitrust treatise sees the application of that

18   exception.

19           There are two ways that the Defendants could

20   establish the applicability of the exception.

21           So the first is the "solely for investment"

22   language that, you know -- or there are two ways that we can

23   prevail here, basically.  It is on the Defendants to

24   establish both of these elements in order to avoid liability

25   under the exception.

1        So the first is this "solely for investment"

2    provision.  And, you know, I understood my friends on the

3    other side to be saying, well, if we can show that we would

4    have bought these shares anyway even without trying to

5    influence output in the coal markets, then we fit within that

6    "solely for investment" language.

7        And we respectfully disagree with that.  You know,

8    what I would point the Court to and really emphasize here is

9    the word "solely."  And, you know, the Defendants are trying

10   to read that word out of the statute, and it is there for a

11   very good reason.

12       And if we step back and think about the underlying

13   antitrust policy that is motivating Section 7 here, we can

14   see why that word "solely" appears in the text of the

15   statute, which is that it doesn't make sense to have an

16   exception to the general policy of forbidding anticompetitive

17   conduct in situations where you have a Defendant who has a

18   declared purpose and intent in making its acquisition and

19   leveraging the shares that it acquires to basically use those

20   shares to achieve some anticompetitive purpose.

21       And so --

22       THE COURT:  And that is true even for an index fund

23   where the --

24       MR. BARNES:  I think it is true --

25       THE COURT:  -- where the acquisition is provided by

1    the index?

2         MR. BARNES:  I think it is true for an index fund,

3    Your Honor.  Just sort of stepping back and thinking about,

4    you know, you have got this index fund, and they have an

5    openly -- just take what, I would submit, is an easy

6    hypothetical.

7         If you have an index fund that has just an openly

8    declared intent to leverage its shares to, you know, achieve

9    price fixing across an industry, I don't think the fact that

10   the index fund is acquiring its shares pursuant to -- you

11   know, an index ought to make a difference to that analysis

12   because we have this antitrust policy that says we are going

13   to have competitive markets.

14        And the fact that the index fund's acquisitions may

15   be driven by, you know, which securities appear in the index,

16   I don't think it should make a difference to the

17   interpretation of an application of the law.

18        Now, that said, that is not this case.  And, you

19   know, at one point Mr. Costa said, well, BlackRock stopped

20   investing in its discretionary funds, its actively managed

21   funds before the relevant conduct came up in this case.

22        That is not my understanding of the facts,

23   Your Honor.  And, you know, I think the other side's brief

24   refers to a BlackRock document that shows that they

25   didn't -- BlackRock didn't stop active investing in the coal

1    industry until mid-2020.  It joined Climate Action 100 in

2    January of 2020.

3              And so, you know, that is an important point

4    because I think we have all three of these Defendants, even

5    setting aside the index funds, all three of these Defendants

6    during the relevant period investing -- investing in the coal

7    industry and then leveraging those shares to influence output

8    decisions at these companies.

9              So that is the -- that is the "solely for

10   investment" part of the exception.

11             If the Defendants can satisfy that "solely for

12   investment" part of the exception, then they have got to also

13   show that they didn't use their shares in order to achieve

14   some anticompetitive purpose.

15             And, here again, Your Honor, it is important to

16   keep in mind sort of the principal binding authority on this

17   Court, which is the Supreme Court's decision in DuPont.

18             And, you know, there, the facts of the case

19   involved shares that had been acquired in, like, 1917, 1918,

20   1919.  It is a case that is being litigated in the 1940s.

21             And the Supreme Court says it doesn't matter that

22   the shares were acquired decades prior.  What is critical is

23   that these shares are being used at the time of the suit in

24   order to achieve an anticompetitive effect in this other

25   market.

1       And so, you know, for that reason, we have got

2   the -- the "solely for investment exception" doesn't apply.

3       Let me say a few things about the facts here, if I

4   could, unless the Court has questions about the law.  Because

5   I heard my friends on the other side make a number of

6   representations about what's in the Complaint that I just

7   don't think is accurate.

8       So, you know, the first thing I'd say is the other

9   side, they claim that we don't allege that they did anything

10  different after they joined these organizations.

11      And as to -- as to BlackRock, I point the Court to

12  paragraph 202 of the Complaint.  And there we quote from an

13  internal Climate Action 100 Steering Committee set of meeting

14  minutes.

15      And the meeting minutes say:  BlackRock understands

16  that by joining Climate Action 100, it is expected to shift

17  its voting to support climate resolutions.

18      And then I would also point the Court a couple of

19  paragraphs down from there, paragraph 204, where we allege

20  that BlackRock's proxy voting pattern actually changed after

21  it joined Climate Action 100.

22      Similarly, as to Vanguard on this point, paragraphs

23  180 and 181 of the Complaint allege that after Vanguard

24  joined the Net Zero Asset Managers Initiative, that it issued

25  a new set of guidance about how it would vote its proxy -- it

1   would cast its proxy votes.

2          And that proxy statement, the new policy on proxy

3   voting that Vanguard issued that we talk about there, it

4   says, okay, going forward we are going to -- you know, we are

5   going to vote in favor of shareholder initiatives that

6   propose, you know, more disclosures about Scope 3 emissions.

7          And then it also says that we are going to

8   potentially vote against members of the board if a company

9   hasn't disclosed, quote, business strategies and the context

10  of the anticipated changes in market activity in line with

11  the Paris Agreement.

12         And so there, too, we see one of these Defendants

13  changing its practices after joining these relevant

14  organizations.

15         There was also discussion at the top of the

16  argument about the difference between the 2020 output figures

17  and the 2019 output figures and which of those ought to be

18  treated as the baseline for purposes of the Court's analysis.

19         And I can come back to this when we talk about the

20  Section 1 claim, but for purposes of the Section 7 claim, let

21  me just emphasize, you know, BlackRock joined Climate Action

22  100 in January of 2020.  State Street joined Climate Action

23  100 in November of 2020.  And so it makes no sense to use

24  2020 as our baseline for purposes of the Section 7 claim.

25         THE COURT:  But even using 2019, what is your

1    response to their argument that output did not go down?

2            MR. BARNES:  So I have three responses on that,

3    Your Honor.

4            So the first is, we are going way outside the

5    Complaint in, you know, looking back to output figures that,

6    you know, long predate the allegations in the Complaint.

7            Second, the principal authority that the Defendants

8    cite for this proposition is this brief that the State of

9    Wyoming filed, I think it was in 2020 in another case.  And I

10   would encourage the Court to look at that brief and

11   specifically the fact section of the brief.

12           And if the Court does that, what it will find is

13   that the discussion there says there is huge overcapacity in

14   the South Powder River Basin market for coal, huge

15   overcapacity.

16           And so, far from supporting the other side's sort

17   of theory of why this case ought to be dismissed, it only

18   underscores the mystery of why, you know, you see over a

19   period when the privately owned coal companies are boosting

20   output between 2019 and 2022, collectively the privately

21   owned companies boosted output of the South Powder River

22   Basin coal by I think it was 16 and a half percent.

23           Over that same period, you have got the publicly

24   owned coal companies collectively slashing output by roughly

25   19 percent.

1          And the fact that there is huge overcapacity

2    because in prior years going back before anything that we

3    talk about in the Complaint the industry was producing more

4    South Powder River Basin coal, it is all the more mysterious

5    why these publicly owned coal companies didn't boost output

6    at a time when there was huge, record-breaking profitability

7    for the industry.

8          And so this fact, the fact that we have this, you

9    know, long-term decline in coal output, that goes our way

10   because it just -- it doesn't make any sense that, you know,

11   when they have got the facilities, they have got the

12   reserves, we know that because, you know, in prior years they

13   were producing more, it doesn't make any sense that they

14   didn't -- they didn't boost output during a season when there

15   were really high prices and really high profits for the

16   industry.

17         Let me see.

18         Oh, the Defendants also said during their argument,

19   that there is no allegation that any of their votes on the

20   directors had anything to do with output decisions at these

21   companies, that they actually tried to pressure these

22   companies to reduce output.

23         And, there, you know, I think an important

24   paragraph in the Complaint to look at is paragraph 168.  And,

25   there, we quote this letter that Vanguard sent to the CEOs of

1    all the companies it invests in, including these coal

2    companies.

3            And it says in the letter, BlackRock is, quote,

4    asking companies to set short-, medium-, and long-term

5    targets for greenhouse gas reductions.

6            And as we allege in the Complaint, greenhouse gas

7    reductions, what that means in the context of the coal

8    industry is reducing output.

9            I would also on this point, point the Court to

10   Exhibit 7 of Vanguard's Motion to Dismiss.  It is a document

11   we quote in paragraph 139 of the Complaint.

12           And, there, Vanguard says:  Vanguard's investment

13   stewardship team has engaged with companies in

14   carbon-intensive industries and their boards and has

15   discussed how they oversee climate change risks.  Where

16   climate change is a material risk, Vanguard seeks to

17   understand how companies set targets in alignment with the

18   goals of the Paris Agreement.

19           And, you know, that is -- you know, I don't have

20   transcripts of these meetings.  In the cases of State Street

21   and BlackRock, I don't even have the dates of the meetings or

22   who was there.

23           But this isn't a fraud case where I have got to get

24   over Rule 9(b).  And what we do have is these Defendants

25   saying over and over again, as we document in the Complaint,

1   that, hey, we have a policy of engaging with carbon-intensive

2   industries and pushing them to bring their businesses into

3   accord with the goals of the Paris Agreement.

4            And, you know, I would submit to the Court, you

5   know, we are here on a Motion to Dismiss.  The Court has got

6   to draw factual inferences in our favor.  It is plausible to

7   think that the Defendants did what they publicly said they

8   were going to do.  And I don't think we need to establish

9   much more than that in order to get over the Motion to

10  Dismiss as to the Section 7 claim.

11           Let me say a word in response to my friends from

12  Vanguard and State Street as to their -- the specific points

13  that they made.

14           Vanguard's counsel said, well, we didn't use our

15  shares to vote against any of these individual, you know,

16  management at any of these companies.  And so there is no

17  allegation of use here.

18           But as I just pointed out from Exhibit 7 to their

19  own Motion to Dismiss, what that exhibit shows is that they

20  had a declared policy of basically leveraging their shares to

21  try to push, quote, carbon-intensive industries to set

22  targets in alignment with the Paris Agreement.

23           And so, you know, that is a clear use of stock.

24  You don't have to vote your shares in order to use your

25  shares.  And we know that from the text of the statute.

1   Because what the text of the statute says is that -- it uses

2   this word "otherwise"; by proxy voting or otherwise.

3          And plainly jawboning management at a company to

4   try to convince them to reduce output, is a way of using --

5   using one's shares.

6          We know that from DuPont too.  DuPont -- in the

7   DuPont case, DuPont didn't vote its shares in General Motors,

8   but nevertheless, it used its shares in a way that was

9   anticompetitive and that violated Section 7.

10          Turning to State Street, Your Honor.  State

11   Street's counsel said that, well, there are no allegations in

12   the Complaint that we engaged in any meetings or engagements

13   with coal companies.

14          And it is true, I can't tell you because it is not

15   in the public domain and we haven't had discovery, I can't

16   tell you when those engagements occurred.  But I point the

17   Court to Exhibit 3 to State Street's Motion to Dismiss.

18          They say in Exhibit 3, quote, Climate Action 100's

19   three central goals, improving governance of climate change,

20   reducing emissions, and strengthening climate-related

21   disclosure, are consistent with what we have been advocating

22   for through company engagements and proxy voting.

23          And so do I know exactly what was said at these

24   meetings?  No.  But, again, we see State Street with a

25   declared policy and purpose of -- you know, of leveraging its

1    shares in this way.

2           Paragraph 145 of the Complaint, Your Honor, State

3    Street -- we quote from this State Street Net Zero Asset

4    Manager Signatory Disclosure document.  It is a document that

5    State Street issued a few months after signing onto that Net

6    Zero Asset Managers Initiative.

7           And in the document, State Street says it, quote,

8    believes engagement and stewardship efforts to be the most

9    effective tool to achieve long-term progress on energy

10   transition.

11          And so, again, Your Honor, it is plausible to think

12   that State Street did what it said it was going to do in

13   connection with these organizations.

14          THE COURT:  What is your response to Mr. Powers'

15   argument about the use of the R-factor program, that it was

16   an information-gathering tool?

17          MR. BARNES:  Well, you know, Your Honor, we think

18   information gathering is an important feature of the

19   anticompetitive conduct that is going on here.

20          And the reason I say that is all of these

21   disclosures, these public disclosures that the Defendants

22   pressured the industry to make, including through the

23   R-factor score that State Street used, these are essential

24   tools for enforcing the agreement.

25          You know, you can look at a disclosure from a

1    competitor about, okay, here is how much CO2 emissions we

2    anticipate being responsible for 10 years from now.  And as a

3    coal company, you can look at that projection and say, well,

4    we know how much our competitor is projecting to produce.

5          And so, you know, far from being a defense, I would

6    submit that the function of -- you know, that

7    information-sharing element of, you know, what some of the

8    pressure campaign here did, you know, that was an important

9    part of what the other side did to achieve the

10   anticompetitive effects that we see.

11         THE COURT:  Okay.

12         MR. BARNES:  Unless the Court has other questions,

13   I will --

14         THE COURT:  Okay.  Thank you.

15         MR. BARNES:  -- sit down.

16         THE COURT:  Did the United States wish to be heard

17   on this claim?

18         MR. LAWRENCE:  Yes, Your Honor.

19         THE COURT:  Okay.

20         MR. LAWRENCE:  Thank you.  David Lawrence on behalf

21   of both the United States and the Federal Trade Commission.

22         The gravamen of our interest at this point relates

23   to the Clayton 7 claims.  Maybe I will just take a few

24   minutes to go over some of the legal issues.

25         THE COURT:  Okay.

1          MR. LAWRENCE:  Our agencies have focused on common

2    ownership issues for many years, including in this 2017 OECD

3    submission that got some attention in the other briefs.  So

4    we sincerely appreciate the Court's receipt of our Statement

5    of Interest and hearing from us in argument today.

6          We have come, I think at this point in the briefing

7    and argument, to a lot of agreement on some of the legal

8    issues that were emphasized in our Statement of Interest.

9          But I do think some really important disagreements

10   remain, in that Defendants, I think at this point in the

11   argument, are still asking the Court to interpret the passive

12   investor exemption in a way that would expand it beyond how

13   Congress wrote it and beyond how any other court has yet

14   applied it.

15         Before I get into that, I just want to mention some

16   of the really important areas where it does seem like we have

17   relative agreement.

18         Everyone here seems to agree that the exemption

19   does not protect anticompetitive use of stock, including use

20   that occurs well after the stock was initially acquired.

21         We think that is an important proposition in order

22   to protect competition from anticompetitive uses that arise

23   long after an initially passive investment.

24         I also have not heard a dispute, although counsel

25   will let me know, as to whether the Clayton Act reaches

1    acquisitions that are short of control.  There was some

2    suggestion of that in the earlier briefing.  But the question

3    in the Clayton Act isn't control.  It is causation.  It is

4    effects.

5         And there are a number of cases that stand for the

6    proposition that influence, use of stock to influence, short

7    of control, can violate the Clayton Act.  We think Rio Grande

8    in the Supreme Court settled that question.  It is also

9    covered I think in some detail in the Dairy Farmers case.

10        Okay.  So on to the important areas of dispute.

11        What I am hearing from Defendant seems to suggest

12   that the Court should apply a particularly exacting pleading

13   standard or otherwise expansively interpret the passive

14   investor exemption in order to avoid chilling beneficial

15   index fund or asset manager behavior.

16        That is wrong on the law, and it is wrong on the

17   policy.  On the law, you have precedent, Your Honor, here in

18   the Fifth Circuit, the Marucci case, that, quote, antitrust

19   claims do not necessitate a higher pleading standard.  That

20   is at 373.  So we are in Twombly plausibility here.

21        Also, applying an expansive view of the passive

22   investor exemption specifically would contradict a

23   longstanding principle in antitrust law.  Antitrust

24   exemptions are to be construed narrowly.

25        You see that principle applied across all manner of

1    exemptions across the antitrust laws.  Royal Drug in the

2    Supreme Court, the Pro. Sports Partnership case in the

3    Seventh Circuit cited in our briefs stand for this

4    proposition that antitrust exemptions should be construed

5    narrowly.

6         On the policy, I take Defendants' suggestion to be

7    that a heightened pleading standard is necessary in order to

8    permit beneficial asset manager behavior, index fund

9    investing, and the like.  There is sort of a parade of

10   horribles in the briefs that spells out of what could

11   happen.

12        But they have the policy analysis backwards.

13   Applying a heightened standard is not necessary to protect

14   beneficial behavior because the law, as written, only reaches

15   harmful anticompetitive use of stock.

16        And that is a proposition that has been a little

17   bit missing from the discussion this morning about use.

18   There is a suggestion that if the uses alleged by Plaintiffs

19   here are covered by the Clayton Act, then all similar uses

20   could be discouraged.

21        There is a content element written into the

22   statute.  The use has to be anticompetitive.  And so when

23   counsel for Defendants talk about what changed before and

24   after, there was governance, there was voting.  Before, there

25   was governance and voting after.  The content of the use is

1    alleged to have become anticompetitive.

2        When I think about the beneficial uses in the

3    parade of horribles, I don't hear anything anticompetitive

4    that would meet this content test.

5        When these firms advocate for more efficient

6    operations, they benefit competition.

7        When they push for more effective managers in

8    senior roles, they benefit competition.

9        When they push for better governance structures at

10   these companies, they benefit competition.

11       None of these asset manager behaviors implicate the

12   content test for anticompetitive behavior.

13       The uses of stock that lessen competition, and we

14   think these are rare, are situations where an asset manager

15   or index fund investor is actually going in and asking its

16   portfolio companies to pull their punches in the marketplace,

17   behave less competitively.

18       Things like the allegations here.  Encouraging

19   asset -- asset managers encouraging industrywide output

20   reductions.  Encouraging supply not to meet demand.

21       It is actually a strange and unusual thing for an

22   investor to do.  Because normally investors, whether it is me

23   as a personal investor or a fund that is working on my

24   behalf, they want their investments to be more competitive,

25   not less.

1    When we think about the policy issue, we have a

2 different concern, which is what could happen if this use

3 element didn't apply to the kinds of uses that change

4 behavior?

5    Your Honor has talked about index fund investors.

6 We can imagine the situation where there is a single index

7 fund firm that winds up purely in an index strategy with 30

8 or 40 percent of the entire economy.  Even if it is 20 or 15

9 percent, something that enables them to have influence.

10    And they intentionally go out and deploy a strategy

11 of asset management to encourage all of the wireless

12 companies not to give as many free phones.  To encourage

13 airlines not to run as many flights.  To encourage coal

14 companies to reduce output.

15    Each of these would be encouraging industrywide

16 pulling of punches, would increase the profitability of those

17 investments.  And we think it is critically necessary that

18 the harms to consumers that would result be prevented by

19 application of the passive investor exemption as it is

20 written with this content-focused test on harm to

21 competition.

22    Okay.  Another area of I think continuing

23 disagreement is the importance of voting, as opposed to other

24 uses of stock.  There is a lot of emphasis on voting in some

25 of the briefs, particularly for some of the firms.

1          The statute very clearly says voting or otherwise.

2     And we think the sorts of shareholder engagement that are

3     alleged here ought to be considered as part of the otherwise.

4          Our brief points to the Dairy Farmers case.  I

5     mentioned it earlier.  It actually is a very interesting

6     passage at 859 to 860 about what happens in DuPont after the

7     Supreme Court decision where there is initially a resolution

8     where the voting rights and the shares are chastened, are

9     removed.

10          And the determination is subsequently made, well,

11     yeah, but there is still forms of influence short of voting.

12     And the Dairy Farmers case concludes that the key inquiry --

13     and I am going to sound like a broken record -- is the effect

14     on competition regardless of the cost.

15          That inquiry, focused on competition, which is

16     where our Merger Guidelines center this inquiry, really

17     important under the antitrust laws, could we focus on form --

18     on function, not form.

19          What are the actual effects?  As the shape of our

20     economy changes, as the shapes of firms change, as specific

21     behaviors change, the antitrust laws persist because they are

22     flexible.  They aren't applying a formalistic test.  And so

23     something like a formalistic test focused on index fund

24     investors as opposed to other kinds of investors would risk

25     depriving the act of the sort of flexibility it needs.

1          One other Clayton 7 dispute, I think, that we just

2     wanted to respond to is on the aggregation of separate

3     purchases for a Clayton Act claim.

4          So there is a suggestion in Defendants' briefing

5     and still in the reply brief that Plaintiffs have an

6     obligation to identify, like, the specific stock acquisitions

7     and then tie those to the use and then tie those to the

8     effect, both sort of aggregating all of the holdings.

9          I will say it is a little bit hard to conceptualize

10    that in the context of the passive investor exemption where

11    Congress is obviously very much thinking about the use of

12    your assets.  And, of course, assets could be acquired

13    seriatim.  But that is how I understand the argument.

14         We cite in our brief ITT Continental Baking for the

15    proposition that a Section 7 violation reaches not just

16    acquisition but holding, so that continuing holding of assets

17    could be the whole bushel of assets acquired over time.

18         Defendants push back to say that ITT Continental

19    only interpreted the word "acquisition" as it is used in an

20    FTC consent decree.

21         That is true ITT is about an FTC consent decree.

22    But if you look at pages 241 to -43 of that opinion, the

23    decree interpretation itself is based on a pretty thorough

24    analysis of the word "acquire" in the Clayton Act.  So you

25    have very strong discussion tied directly to the Clayton Act

1    in ITT Continental.  So we don't think that is a sufficient

2    basis to turn that case aside.

3           Unless there is further questions for us, I just

4    want to reiterate how much we appreciate your hearing our

5    views and encourage the Court not to adopt expansive readings

6    of the law here.

7           THE COURT:  Okay.  Thank you.

8           All right.  Let's turn to the Sherman Act.  And it

9    might make sense just to take both of those counts together.

10   That would be Counts I and II -- I'm sorry, II and III.

11          MR. COSTA:  Yes, Your Honor.

12          A few points, if I may, of rebuttal on the

13   Section 7?

14          THE COURT:  Okay.  Briefly.

15          MR. COSTA:  Yes.

16          I would say everything we heard we did not hear

17   specific uses that were related to reducing coal.  Most of

18   what I heard from the Plaintiffs were quoting various

19   statements.  A number of those were out of context.

20          I will just give you one example.  He cited a

21   statement from the brief:  BlackRock understands that by

22   joining Climate Action, it is expected to shift its voting to

23   support climate resolutions.

24          You will recall the Plaintiffs' counsel stating

25   that.  That is not a BlackRock statement.  That was someone

1    in the industry speculating.  And, again, there is no actual

2    conduct they can point to.

3            To show how unmoored their allegations are from the

4    factual support in the Complaint, he alleges and he cites a

5    number of statements about Vanguard and voting.

6            But as Mr. Wick said, Vanguard never voted against

7    an industry -- a company-backed coal director during this

8    period.

9            He talks about State Street and BlackRock jawboning

10    through meetings with the coal companies.  There is not a

11    single allegation that State Street or BlackRock met with the

12    coal company during this period.  So there is no specific

13    uses whatsoever.  The facts have to matter.

14            We are not asking for a heightened pleading

15    standard.  We are asking for the Twombly standard, which is

16    plausibility based on factual allegations, not conclusory

17    allegations.

18            And I didn't hearing anything from DOJ's counsel

19    identifying what those specific uses are that were aimed at

20    reducing output.

21            And we have heard no attempt from Plaintiffs in the

22    Complaint or today to tie voting and engagement decisions to

23    reductions in output.

24            So I am happy to discuss that further, but I will

25    move on to the conspiracy claims.

1          And, you know, antitrust conspiracy, this is

2     exactly what Twombly was discussing, that there has to be

3     plausibility.  And this -- you know, the concern in Twombly

4     was allegations that are merely possible but not plausible

5     shouldn't get past the pleading stage.

6          Here, it is hard to see how this alleged conspiracy

7     is even possible, let alone plausible.

8          So let's start with direct evidence.  Right?  They

9     need to allege facts showing an agreement between these

10    Defendants.  And it is not a close call on direct evidence.

11         Direct evidence means just that.  There can't be

12    any inference.  You have to have an express agreement.  It is

13    typically smoking gun-type evidence like an audio recording

14    of the conspirators, something from a whistleblower, an

15    admission from one of the conspirators.  Nothing at all like

16    that here.  And that lack of direct evidence of an express

17    agreement is really game over on the direct evidence inquiry.

18         They try to find that direct evidence in the

19    joining of the trade associations.  But, again, there is

20    nothing in those statements that is committing any Defendant

21    to a reduction in coal output, nor is there any allegation

22    that the Defendants had an agreement to join those

23    organizations, as opposed to making that decision

24    unilaterally.  Nothing says that one Defendant joining those

25    groups was contingent on another doing so.

1              And we know, for example, that Vanguard never

2      joined Climate Action.  And Vanguard leaves net zero in 2022

3      and the other Defendants stay in it, at least for that year.

4              So there is absolutely nothing here that would

5      support the idea that joining the trade associations is

6      direct evidence of an agreement.

7              There is robust case law from the Fifth Circuit

8      saying that joining trade groups in and of itself is not an

9      antitrust violation.  I point the Court to the Viazis case.

10     I point the Court to the American Quarter Horse case from

11     2015.

12             THE COURT:  Can it be evidence of indirect -- I

13     mean, can it be indirect evidence, evidence of parallel

14     conduct?

15             MR. COSTA:  I am going to get to the indirect.

16             THE COURT:  Okay.

17             MR. COSTA:  And theoretically it could be, but the

18     important thing with parallel conduct is the parallel conduct

19     only gives rise to an inference of conspiracy when it is

20     conduct that would be suspicious if undertaken unilaterally.

21     And there is nothing suspicious about unilaterally joining a

22     trade association.  It happens all the time across the

23     economy.

24             But just to go back in cleaning up on direct

25     evidence.  If merely joining the trade association was an

1   antitrust violation, the scope of that would be breathtaking

2   because you had hundreds of asset managers joining these

3   associations.  They invest in thousands of companies.

4          Again, they don't want to think about the fact, but

5   the conspiracy would have to have the coal companies as

6   members of it on their theory.

7          And so you would, according to the Plaintiffs, you

8   would basically have a global conspiracy across the economy

9   of thousand -- tens of thousands of actors.  That just can't

10  make sense, and that is why it is not the law.

11         Again, here, I think the DOJ/FTC brief, the law it

12  cites shows why the Complaint is actually deficient when you

13  look at the allegations and don't just look at the legal

14  standards.

15         The main Section 1 case they cite is the Interstate

16  Circuit case, so a Texas antitrust case from the 1930s

17  involving movie theaters.  And it had three features that led

18  the Court to find an agreement.  Not a single one of those

19  three features is present here.

20         First, there was a letter, words on a piece of

21  paper with an anticompetitive plan to set minimum prices for

22  first-run movies to eliminate double features -- I'm sorry,

23  for second-run movies and to eliminate double features for

24  second-run movies.

25         So, first, you had in plain writing an express plan

1    of anticompetitive conduct.  Again, nothing like that here in

2    any document from the Defendants or the trade associations.

3          Second, you had conduct showing acceptance of that

4    anticompetitive plan.  And, again, as we have already spoken

5    about in the Clayton Act context, there is no action here,

6    there is no conduct of the Defendants, there is no voting or

7    engagement that are tied to output decisions that are

8    consistent with any plan to reduce coal output.

9          And then the third thing you had in Interstate

10   Circuit is the necessity of joint conduct.  Right?  That

11   letter said we need everyone to participate, or it is not

12   going to work.  And, again, there is nothing inherent to this

13   alleged scheme that requires joint conduct.

14         So on all three counts, the allegations here are a

15   universe apart from what you had in Interstate Circuit, and

16   so the law that DOJ is relying on shows what is deficient

17   here.  No factual allegations that support a conspiracy.

18         And now turning to the circumstantial or indirect

19   evidence that Your Honor asked the question about.

20         There is a well-established framework for

21   evaluating allegations of conspiracy based on indirect

22   evidence.  Twombly talks about that.  The Fifth Circuit talks

23   about it in American Quarter Horse.  You look at parallel

24   conduct and plus factors.

25         But, as I mentioned, the overriding concern has to

1    be identifying conduct that would be suspicious if undertaken

2    unilaterally because that is what gives rise to the idea that

3    there might be joint conduct.  And that suspicious conduct is

4    entirely missing here.

5         The Plaintiffs don't check a single box in the

6    indirect evidence test.

7         So let's talk first about parallel conduct.  Right?

8    So joining the organizations, first of all, nothing

9    suspicious about that.  Right?  It is not something that

10   doesn't make acceptance to do unilaterally.

11        Second, it is not coordinated.  There is no

12   allegation that joining the trade groups was contingent on

13   another Defendant doing so.

14        And, again, we have Vanguard only joining one.  We

15   have Vanguard exiting net zero while the other Defendants

16   stay in it in 2022.  So no parallel conduct in joining the

17   organizations.

18        Nor is there parallel conduct in voting.  Right?

19   Vanguard never once votes against a management-backed

20   director during the alleged conspiracy.

21        State Street and BlackRock do on occasions.  But

22   never, not once, do they vote against the same

23   management-backed director.

24        How can you find parallel conduct in voting when

25   there is not a single occasion of two or more of the

1    Defendants joining together to oppose the same --

2          THE COURT:  Does the parallel conduct have to be

3    that specific?  Like voting against a particular director

4    versus just voting against directors who would, you know,

5    support the coal companies versus the goals that the Climate

6    Action groups want to pursue?

7          MR. COSTA:  Well, I think -- again, you are talking

8    about using indirect evidence.  I do think there has to be

9    quite a bit of similarity.

10         And even the independent -- so, again, you would

11   expect conspirators to make the same voting decisions.  And

12   not once, not once did that happen.  So I do think that is an

13   incredibly telling piece of evidence that refutes the notion

14   that there is some conspiracy.

15         And they don't even try to allege that the

16   disparate votes, the divergent votes of the Defendants were

17   somehow part of a consistent pattern related to coal output.

18         For one thing, the votes were unsuccessful.  And,

19   as we said, they don't match in any way coal output

20   decisions.

21         The independent votes that State Street and

22   BlackRock made on occasions against management-backed

23   directors were often made when coal output was increasing --

24   I'm sorry, when coal output was decreasing, which is what

25   they say we were against.  Right?  So it is not tied in any

1    way to what they claim the purpose of the conspiracy was.

2              And then when you get to engagement, you only have

3    one Defendant whoever engaged during the alleged period,

4    Vanguard.  And, again, that wasn't correlated in any way with

5    output decisions.  Right?  We know they engaged with Arch

6    Coal, and the following year Arch Coal's production went up.

7              So no parallel conduct in joining the groups, in

8    voting, or in engagement.

9              What, instead, the allegations in Plaintiffs' own

10   Complaint show is disparate conduct.  And there is also no

11   plus factors.  And this gets to some of what I mentioned at

12   the outset.

13             There is no economic rationale for why these

14   Defendants would want to drive down coal output.  It doesn't

15   make economic sense.  Right?  They have far more investments

16   in other industries.  They don't want to pay

17   super-competitive profits for the other investments they

18   have, those companies that are energy consumers.

19             It is unclear how there is a mechanism for reducing

20   the coal output, and there is no allegation that joining

21   these organizations, that voting shares, that engaging on

22   rare occasions with companies as happened is somehow

23   suspicious if done independently.

24             It is the type of activity that happens every day

25   with institutional investors, Your Honor.  There is just no

1    plus factors that would show that this is suspicious, that

2    this is irrational if done independently, and that alone

3    defeats any argument for a conspiracy here.

4         So, again, under the Twombly standard, it is about

5    meeting specific factual allegations, not conclusory

6    statements.  And so it is not heightened.  It is the normal

7    standard that you apply every day to all of your cases, but

8    it does have special force in the antitrust context because

9    Twombly tells you exactly how to view this indirect evidence.

10   And it is utterly lacking here.

11        So that alone requires dismissal of the Section 1

12   claim on the supposed conspiracy to reduce output.

13        Now, there is an independent ground for dismissing

14   that claim as well, which is the lack of meaningful

15   allegations, factual allegations of anticompetitive harm.

16        And because we are in a rule of reason case,

17   because they allege vertical restraints, the rule of reason

18   governs, we know that they have to plausibly allege

19   anticompetitive effects.

20        And we have already talked about this in terms of

21   Section 7, that there is no plausible allegation of

22   anticompetitive harm.

23        Their theory about coal output reducing during the

24   alleged conspiracy is blown out of the water by their own

25   data, right, that showed that from 2020 to 2022 coal output

1    actually increased.

2         So this is where they come in and now change course

3    and say, well, look at the 2019 numbers.  But, again, as I

4    have already mentioned, that is not plausible in light of the

5    overall decline in coal.  It doesn't make sense that there

6    would be this three-year period where coal output actually

7    sustained at the same level.  And it is not supported by

8    their comparison between public and private coal output

9    during that period.

10        So, for those reasons, the Section 1 claim focused

11   on coal output reduction should be dismissed.

12        And then I will briefly mention the

13   information-sharing claim, the second conspiracy claim.

14        And this one, you know, the second verse of the

15   conspiracy claim has the same problems as the first verse.

16   There is no detailed allegations to support it.

17        Now, again, just like with the first conspiracy,

18   they are basically changing their allegations.  The

19   Complaint, which is what you have to look at, suggests that

20   there was information sharing among the Defendants

21   themselves.

22        And in their briefing, they really move away from

23   that to saying that there was a conspiracy among the

24   Defendants to induce the coal companies to divulge

25   information.  But, again, there is nothing saying there was

1    an agreement about that.

2              Again, there is not even -- I said this at the very

3    outset, there is not even an allegation that any of the

4    Defendants had a meeting to discuss anything, let alone

5    information sharing, let alone output reduction.

6              There is no identification of what information was

7    shared.  The Complaint just doesn't say what information the

8    coal companies shared.  And there is no allegation of how any

9    supposed information sharing affected output.

10             Again, the Complaint doesn't say because there is

11   this huge missing link in all of these allegations, which is

12   they don't discuss anything that the coal companies did to

13   make this anticompetitive conduct supposedly happen.

14             So both conspiracy claims are implausible under

15   Twombly standard, under a direct evidence theory, under an

16   indirect evidence theory, there is no -- and there is also no

17   allegation of plausible output reduction.

18             So we would ask for a dismissal with prejudice of

19   those claims, Your Honor.

20             THE COURT:  Okay.  Thank you.

21             Any other Defendants wish to be heard on these two

22   counts?

23             MR. WICK:  Just a brief word about Vanguard,

24   Your Honor.

25             The Plaintiffs rely on three main allegations to

try to connect Vanguard to the alleged conspiracy.  None of
those allegations have any force.

The first, again, is proxy votes.  They say that
the Defendants cast proxy votes to pressure coal companies to
cut production.

As you have heard a few times already, Vanguard's
voting record is the polar opposite of what you would expect
if Vanguard was conspiring with other asset managers to
coerce cuts in coal production.  The voting record of
Vanguard cannot be reconciled with the Plaintiffs' conspiracy
theory.

The second set of allegations relates to membership
in two climate organizations, Climate Action 100+ and NZAM.

As to Climate Action 100+, everybody agrees
Vanguard never joined that organization.  The Complaint says
that Climate Action 100+ was the hub of a purported
hub-and-spoke conspiracy.  That is paragraph 125.

Well, Vanguard never had anything to do with the
alleged hub of the alleged conspiracy.  That can't be
reconciled with the Plaintiffs' theory that Vanguard was
conspiring.

As to NZAM, the allegation is that Vanguard joined
it in 2021 and then withdrew from it in 2022.  So, again,
Vanguard is out of step with the other two Defendants, and it
is behaving inconsistently with the conspiracy story that the

1    Plaintiffs are telling in their briefs.

2            And third and finally, we have these engagements or

3    meetings with coal companies.  And I have already mentioned

4    that there are four of them as to Vanguard, and there are no

5    allegations that at any of those four meetings Vanguard

6    pressured anybody or told anybody to cut its output of coal.

7            More broadly, whatever else you might think about

8    those meetings, they are unilateral meetings.  Nobody is

9    alleging that Vanguard met with those four companies because

10   State Street told it to do that or because BlackRock told it

11   to do that.

12           There are good unilateral reasons for an asset

13   manager to meet with the companies in which it has invested

14   its client's money.  That is what Twombly calls, quote,

15   routine market conduct, close quote.

16           And Twombly says that where the allegation is that

17   the defendant engaged in something that is routine market

18   conduct or that is only natural anyway, it doesn't generate

19   any plausible inference that the defendant was conspiring.

20           Now, there was reference earlier today to two

21   documents.  There were quotations or characterizations of two

22   Vanguard documents.

23           Whatever else you might want to say about those

24   documents, they are unilateral statements by Vanguard of

25   Vanguard's disclosure preferences.  And there were good,

1   unilateral reasons for Vanguard to favor disclosures.  Any

2   asset manager would want as much disclosure of material risk

3   confronting a company as it could get.

4        In fact, the SEC has mandated that companies

5   disclose all material risks facing a company.  So if Vanguard

6   is making unilateral public statements, we want you to make

7   disclosures where climate poses a material risk to your

8   business, that is entirely consistent with unilateral

9   behavior.  It is no basis for inferring participation in a

10  broad antitrust conspiracy.

11       But as to the two documents in particular, the

12  first one they quote relates -- is quoted in paragraphs 180

13  and 181 of the Complaint, and that is Vanguard's proxy voting

14  policy.

15       All that proxy voting policy -- they quote it

16  saying:  Vanguard will vote in favor of disclosure proposals

17  that call on companies to disclose Scope 1, 2, and 3

18  emissions.

19       Well, so what?  How is calling for disclosure of

20  your emissions, whatever they may be, whether high or low,

21  why is that grounds for inferring participation in an

22  antitrust conspiracy?  It is not even an anticompetitive use

23  of shares, just a call for disclosures.

24       Beyond that, Your Honor, if you look at what the

25  document actually says, beyond the truncated and slightly

1    out-of-context sound bites you get in the Complaint, what it

2    says is, if the above criteria are met, a fund is likely to

3    support the following types of disclosure proposals.

4          They leave out all of the criteria surrounding when

5    Vanguard will vote in favor of those disclosure proposals.

6    And when you look at how Vanguard applied those criteria and

7    how it applied that voting policy, it never voted against

8    coal company management.

9          Just making a public statement about what kinds of

10   disclosure proposals you may vote for subject to certain

11   criteria, is not even anticompetitive use of shares, much

12   less reason to infer participation in some sort of grand

13   conspiracy to coerce coal companies to cut production.

14         The other document that they talk about is the one

15   that Your Honor mentioned earlier.  It is at paragraphs 138

16   and 139 of the Complaint.  It is a stewardship insights

17   document that, again, discusses Vanguard's preferences for

18   disclosures by companies confronting material risks whether

19   they relate --

20         THE COURT:  But the document that you were quoting

21   from before this, what was that document?  And is that an

22   exhibit to your motion?

23         MR. WICK:  It is not an exhibit to our motion.  It

24   is cited in paragraphs 180 and 181 of the Complaint.  I don't

25   remember the footnote number that gives you the specific

1    cite.

2              But the document is cited to a publicly available

3    website.  It is Proxy Voting Policy for U.S. Portfolio

4    Companies, March 22.  And what I was quoting -- and where it

5    says, "if the above criteria are met," that is the sentence

6    right in front of the sentence they quote from page 11 of the

7    document.

8              And the criteria include where climate-related

9    risks are material.  No, that one was not submitted to

10   Your Honor.

11             THE COURT:  Okay.

12             MR. WICK:  This one was submitted to Your Honor.

13   It is the one in paragraphs 138 and 139.  And that is ECF

14   66-8.

15             Again, it is a unilateral document, and there were

16   good unilateral reasons for issuing it.  So whatever else you

17   might think about it, it is not grounds for inferring

18   participation in an antitrust conspiracy.

19             All that document says -- it does not say, as it

20   was characterized to say, you have to disclose plans to meet

21   the Paris Climate goals.  It doesn't say that.

22             What it says is, we believe that companies should

23   disclose their plans and the rationale for that approach.

24   That is page 3 of the document, or ECF page 4.

25             And then it goes on to say, if you have plans to

1    meet the Paris Climate Accords, then you need to disclose

2    what they are and disclose timelines.  It doesn't say you

3    have to have a plan to meet the Paris Climate Accord.  It

4    says you need to disclose your plan, whatever it is.

5           And, finally, when it comes to how Vanguard is

6    going to apply this policy, it says on page -- well, it is

7    page 5 of the ECF.

8           It says:  When evaluating shareholder proposals,

9    including those related to climate risks, we will evaluate

10   them on a case-by-case basis.  When evaluating these

11   proposals, we weigh whether the topic is material to the

12   company, whether it addresses a governance decision, or

13   encroaches on operational or strategic actions.

14          Vanguard is not dictating to companies what their

15   output needs to be.  It is telling them what its disclosure

16   preferences are.  That is not even an anticompetitive use of

17   Vanguard's shares, it is -- much less grounds for inferring

18   participation in an antitrust conspiracy.

19          How Vanguard applied these public statements

20   matters.  They want to say that you can make anticompetitive

21   use of your shares without actually voting against a

22   director.

23          Well, maybe theoretically that is true.  But where

24   you have abstract public statements of disclosure

25   preferences, you need to look at how they were applied before

1      you can find an anticompetitive use of shares.

2              And, here, they were never applied in any

3      heavy-handed way to pressure a coal company.  In fact,

4      Vanguard was essentially a rubber stamp for coal company

5      management.

6              Thank you, Your Honor.

7              THE COURT:  Okay.  Thank you.

8              Anything from State Street?

9              MR. POWERS:  Yes, Your Honor.

10             I primarily rise to address the question that you

11     asked about State Street and BlackRock's voting, and the

12     question was, you know, must the parallel conduct go down to

13     the specific vote, the specific director, for the specific

14     year?

15             I think the answer is to look at Twombly.  And as

16     Justice Souter wrote to us in Twombly:  The alleged

17     parallelism has to be one of the kind that would raise a

18     suggestion of a preceding agreement.

19             And so the question you would ask yourself is, does

20     State Street voting against a particular director at NACCO

21     Natural Resources and BlackRock voting against a different

22     director at NACCO Natural Resources suggest there must have

23     been some preceding agreement to use votes to get production

24     cut?  Well, obviously not.

25             Because if BlackRock is voting against a production

1    cutter and State Street is voting against a production

2    cutter, those are the people we should be giving high fives

3    to under the theory.

4         We should be saying, NACCO Natural Resources, you

5    are the poster child for what we are trying to accomplish,

6    cut production in the Powder River Basin.  And yet we are

7    rewarding Arch for increasing production in the Powder River

8    Basin while punishing NACCO, who is doing supposedly what

9    this conspiracy would be about.  That is the exact opposite

10   of what Justice Souter tells us to look for in the parallel

11   conduct.

12        On the issue of the State Street documents and the

13   State Street information-gathering notion that Mr. Barnes

14   raised, and this goes to the third count, the count about

15   information exchange, I want to remind the Court, there has

16   been no allegation whatsoever that any coal producer

17   announced ahead of time what its production was going to be

18   from any particular plant or announced an output goal, and

19   that somehow anybody else responded to any of those

20   disclosures.

21        This idea that there is an information exchange is

22   simply not mapped out in any way.  And with the R-factor, in

23   particular -- keep in mind the R-factor motion was a broad

24   ESG calculation, right, Environmental, Social, and Governance

25   issues, talking about whether or not these companies were

1    giving enough information to shareholders for proxy voting

2    purposes and that sort of thing.

3         It is not alleged either in the Complaint or

4    otherwise to be any kind of measure of the emissions or the

5    output from coal companies.

6         And whatever our voting policy is, whether it is

7    R-factor, whether it is TCFD, whatever kind of disclosure

8    scheme one would say is driving our voting policy, if State

9    Street is voting for companies that grow production and

10   voting against companies that cut production, we are not

11   serving the conspiracy that has been alleged.

12        The last thing I will point out on this is just for

13   the Section 1 theory, both on the information exchange and on

14   the overall conspiracy theory, remember, it is a plausibility

15   standard.  And the question here is, did the asset managers

16   have some kind of goal to control price or output for the

17   entire coal market?

18        Is it plausible to say that we would have tried to

19   accomplish that by going to a group of public companies who

20   don't control enough of the market to control price, who

21   don't control enough of the market to actually limit what the

22   production would be for the overall market?

23        And then asset managers, who don't own controlling

24   stakes in any of these companies, they would be the ones who

25   would influence these coal companies rather than the coal

1    companies listening to their majority shareholders, and that

2    they would be told, look, we want you to slow -- we need to

3    cut production?  No.  You can just slow it down.  Take it off

4    the gas.  What is the alleged scheme here?

5          And you have got the participants behaving in

6    different ways.  Arch is increasing its production.  NACCO is

7    decreasing its production.  Where is the pattern that

8    suggests there is some kind of conspiracy going on?

9          This is not a Complaint that says asset managers

10   have led a coal conspiracy.  It is an argument that it would

11   be bad if they did.  Well, hypotheticals are not antitrust

12   violations.  This Complaint does not state a conspiracy

13   claim.

14          THE COURT:  Okay.

15          Let's take a 10-minute break, and then I will hear

16   from the Plaintiffs and the Government, if the Government

17   wishes to speak, on the Sherman Act claims.  And then I think

18   BlackRock has a separate motion on the DTPA claim, and I

19   think that that will be it.  So, hopefully, we will conclude by

20   noon.

21          But let's break for 10 minutes.

22          (Recess was taken at this time.)

23          THE COURT:  You may be seated.

24          Mr. Barnes.

25          MR. WICK:  Your Honor, may I take 15 seconds to

1    correct something that I said?

2            THE COURT:  Okay.  You may.

3            MR. WICK:  In my rhetorical zeal, I at one point

4    characterized Vanguard as a rubber stamp for coal company

5    management.  That was rhetorical excess.  I would not want

6    the news media --

7            THE COURT:  Okay.

8            MR. WICK:  -- to report that Vanguard was a rubber

9    stamp for coal company management.

10           THE COURT:  So noted.  Thank you.

11           MR. WICK:  Thank you.

12           THE COURT:  All right.  Mr. Barnes.

13           MR. BARNES:  Thank you, Your Honor.

14           As to the Section 1 claims, I think the first thing

15   that it might be useful to do is just step back and remember

16   what the nature of the inquiry is here.  The ultimate

17   question that the Court has to decide is whether it is

18   plausible that there was an agreement or a conspiracy among

19   Defendants.  That is the ultimate question.

20           And, you know, there is this important distinction

21   between direct and indirect evidence in the law, and I am

22   going to talk about that.  But the ultimate question the

23   Court has to decide is whether it is plausible under the

24   facts that we have alleged that there is a conspiracy.

25           And I don't think the Court needs to look much

1    beyond the text of the Net Zero Asset Managers Commitment.

2    That is a commitment that all three of these Defendants

3    signed onto.

4            And what they all signed is a document that says,

5    quote, my organization commits across all assets under

6    management to implement a stewardship and engagement strategy

7    with a clear escalation and voting policy that is consistent

8    with our ambition for all assets under management to achieve

9    net zero emissions by 2050 or sooner.

10           And then the document goes on, this is -- all three

11   of the Defendants have signed the same document.  The

12   document goes on to say:  We recognize collaborative investor

13   initiatives, including Climate Action 100.  We will

14   collaborate with each other and other investors via such

15   initiatives to deliver on these commitments.

16           THE COURT:  So is it your position that all of the

17   signatories of that document are members of the conspiracy?

18           MR. BARNES:  No, the signatories that were not

19   investors in coal companies are not participants in the

20   conspiracy.

21           And that is an important distinction.  Because, you

22   know, it would be a very different case if we were trying to

23   bring these kinds of claims against an asset manager that

24   didn't have, you know, a position in these companies that

25   they could leverage to try to influence management's output

1    decisions.

2            So, again --

3            THE COURT:  Are there signatories -- I know this

4    probably is outside your Complaint, but signatories with

5    positions in these coal companies that are not Defendants in

6    this room?

7            MR. BARNES:  I don't know the answer to that for

8    certain, Your Honor.  I strongly suspect the answer is yes,

9    but I don't know for a fact.

10           THE COURT:  Okay.

11           MR. BARNES:  But this is just an extraordinary

12   text, Your Honor.  I mean, whether we characterize it as

13   direct evidence or indirect, to have all three Defendants

14   signing onto a document that says we will collaborate with

15   each other.

16           And, again, the question is, is it plausible that

17   there is an agreement among these Defendants?  We will

18   collaborate with each other?

19           And I would also point the Court to Exhibit 3 to

20   State Street's Motion to Dismiss.  And this is the press

21   release that State Street issued when it joined Climate

22   Action 100, and there is a line in that press release where

23   State Street says, quote, we are excited about this

24   opportunity to work closely with other asset managers and

25   asset owners to scale our impact on climate risks.  We are

1    excited about this opportunity to work closely with other

2    asset managers.

3              And the question before the Court is whether it is

4    plausible there is an agreement among these Defendants.

5              Indirect evidence.  I heard my friends on the other

6    side say, well, there is no -- there is no joint behavior

7    here.  There is no coordination among the various Defendants.

8              But, you know, these agreements and the Net Zero

9    Asset Managers Commitment itself, I mean, it just shows in

10   spades that these Defendants did have, you know, joint

11   coordinated behavior.

12             Two of the three Defendants joined the Net Zero

13   Asset Managers group on the same day.  So that is parallel

14   conduct in spades.

15             I heard my friends on the other side say, well,

16   there was nothing suspicious about us independently choosing

17   to join these groups.  These were just unilateral decisions

18   to join.

19             Obviously, at the beginning of any kind of

20   conspiracy in restraint of trade each participant in the

21   conspiracy unilaterally decides to join with the others.  But

22   that doesn't change the legal analysis.  It is not a defense

23   when Defendants get together and unilaterally decide to work

24   together.

25             In terms of the idea that there is nothing

1    suspicious about the fact pattern that we have here, that

2    there is nothing economically irrational about what anyone

3    did, you know, it is important there to really focus in on

4    the responses of the public versus the private coal

5    companies.

6            And, there, I would submit, we do have very

7    suspicious behavior.  Why is it that we see this 16 and a

8    half percent rise in production and output on the part of the

9    privately held coal companies at a time when there is a 19

10   percent reduction in output by the coal companies that the

11   Defendants were invested in and during a period when there

12   was record profitability when the coal industry was

13   generating huge profit as a result of the surge in prices?

14           That is the kind of suspicious economically

15   irrational behavior that is supportive of a Section 1 claim.

16   But it is also important to remember that we don't need that

17   particular factor.  That is just a plus factor for purposes

18   of trying to assess whether it is plausible that there was a

19   conspiracy.

20           There are other ways of establishing the

21   plausibility of a conspiracy including a written agreement

22   where the Defendants all commit to work with each other.

23           THE COURT:  What is the economic incentive of these

24   Defendants to engage in this behavior?

25           MR. BARNES:  So a few answers to that, Your Honor.

1          So the first is, it is important to remember that

2     not all costs associated with higher energy prices are borne

3     by the Defendants or other companies that the Defendants are

4     invested in.

5          So if you think about a retiree who is paying for

6     air conditioning in Beaumont, that person -- you know, the

7     cost of increased electricity prices comes out of that

8     person's pocket.  It doesn't come out of any investment --

9     other investment that the Defendants have.  So that is one

10    point.

11         A second point is it is important to look at this

12    economic situation from the perspective of the Defendants and

13    from the perspective of what the Defendants have said.

14         What the Defendants have said is climate change is

15    this huge problem.  The businesses that these coal companies

16    are operating have negative externalities for the rest of the

17    economy, and so it might well be from the Defendants'

18    perspective that far from, you know, there being increased

19    costs associated with this anticompetitive behavior, maybe,

20    you know, other businesses that the Defendants are invested

21    in, particularly, you know, green energy, alternative fuels,

22    things of that sort, are going to benefit.

23         And so, you know, that is another reason to think

24    that the Defendants are wrong when they say that it would be

25    economically irrational for them to engage in this behavior.

1           And then a third point I would make on this,

2    Your Honor, is it is also important to take the Defendants at

3    their word when they are saying that at least part of what is

4    motivating this behavior is a genuine public concern about

5    the environment and about, you know, the future of our

6    planet.

7           And the important thing to keep in mind there,

8    Your Honor, is the Supreme Court's decision in Philadelphia

9    National Bank -- there are a lot of Supreme Court cases that

10   say this -- that, you know, a genuine, public-spirited, you

11   know, desire to improve the world is not a justification or a

12   defense for engaging in anticompetitive behavior.

13          And so even if this was done out of some kind of

14   public-spirited desire to suppress output in the coal

15   industry for the good of the planet, that wouldn't be a

16   defense to engaging in an anticompetitive conspiracy in

17   violation of Section 1.

18          I also want to just emphasize, Your Honor, you

19   know, we see in the briefing from the other side and we heard

20   again today this characterization of Climate Action 100 and

21   the Net Zero Asset Managers Initiative as -- they are trade

22   associations.  This is just like participating in any other

23   trade association.

24          But I am not aware of any case where a court has

25   just said, oh, this is just a participation in a trade

1    association, no problem, where the participants in the trade

2    associations sign onto an agreement where they say we are

3    committing to, you know, leverage our investments in a way

4    that necessarily has -- will have the consequence of meaning

5    that we are going to try to convince members of this

6    particular industry to reduce their output.

7         That is what makes this so extraordinary and so

8    different from the kind of ordinary behavior by asset

9    managers that the other side says is implicated by the legal

10   theories that we are presenting here.

11        We don't normally have, in a trade association or

12   any other context, asset managers publicly committing to

13   engage in this type of anticompetitive behavior.

14        My friend on the other side suggested that this

15   should be a rule of reason analysis as opposed to a per se

16   analysis.

17        We respectfully disagree with that.  Under the

18   Supreme Court's decision in Leegin, it is a per se violation

19   of Section 1 to engage in a horizontal conspiracy to restrict

20   output.  And that is what we think we have here.

21        Obviously, the Defendants are not themselves coal

22   companies, but they are the largest investors in coal

23   companies.

24        And so functionally this is not different from a

25   situation where, you know, the largest owners in Ford,

1    Chrysler, and General Motors get together and agree, well, we

2    are all going to agree that we are going to produce no more

3    than a certain number of pickup trucks next year.

4         That is the essence of a horizontal agreement to

5    restrict output, which is a per se violation of the antitrust

6    laws.

7         I also want to say another word, if I could, about

8    the choice of 2020 as a baseline versus 2019 as a baseline.

9    Because I think here the analysis is somewhat different as

10   between the Section 1 claim and the Section 7 claim.

11        What I said about Section 7 I think is also -- is

12   fully applicable to Section 1.  So as to both of the claims,

13   you have to start with 2019 because the unlawful conduct

14   alleged in the Complaint starts in January of 2020 when

15   BlackRock joins Climate Action 100.

16        And so that is a fully sufficient reason to treat

17   2019 as the baseline.  You know, obviously, you have got to

18   go back as your baseline to a year that didn't include

19   unlawful activity by any of the Defendants.

20        But put that point to one side, and there is

21   something else that we all know happened in 2020, which is

22   that the economy shut down because of the Pandemic.

23        And for the Defendants to try to basically seize

24   hold of the -- kind of the bottom of economic activity in

25   this country and say, well, that is the starting point and

1    then output went up, I would submit it is just not an

2    economically plausible way of analyzing this situation.

3        But even if the Court isn't sure about that, this

4    is the kind of thing that is really a factual dispute, that,

5    you know, I am sure as this case moves forward, we will hear

6    other arguments and other rationales from the Defendants for

7    why they think, you know, 2020 is the right place to start

8    for the analysis.

9        But we are here on a Motion to Dismiss, and our

10   side has offered a plausible reason to treat 2019 as the

11   starting point for the analysis.  And I would submit it is an

12   eminently -- it is more than plausible.  We are clearly

13   right, given the effects of the Pandemic and what those had

14   on the overall economy.

15       There was a suggestion that, well, the Defendants

16   didn't communicate with each other, and so that somehow

17   defeats our Section 1 claim.  And a couple of responses to

18   that.

19       First, communication among the Defendants isn't

20   necessary.  In other words, if the Court looks at the

21   Interstate Circuit case, the movie theaters in that case,

22   they weren't directly communicating with each other.  They

23   were communicating indirectly via the distributor of the

24   movies.

25       But even apart from that legal point, the Complaint

1    clearly alleges that the Defendants did communicate with each

2    other.

3        We don't know exactly the details of how they -- or

4    whether they communicated in private, but they publicly all

5    signed onto the same commitment.  These are public statements

6    that the Complaint documents painstakingly by these

7    Defendants.

8        And so that is communication that is more than

9    sufficient to, you know, satisfy the plausibility pleading

10   standard.

11       Let me say a couple of words about the argument

12   from Mr. Wick, counsel for Vanguard.  Mr. Wick emphasized

13   that, you know, Vanguard never voted against management at

14   any of these companies.

15       And I just want to direct the Court to paragraph

16   156 of our Complaint, and there we quote a Vanguard employee

17   or a Vanguard document where Vanguard says, quote, we have

18   found through hundreds of direct discussions every year that

19   we are frequently able to accomplish as much or more through

20   dialogue as we are through voting.

21       So voting is a last resort for these Defendants.

22   Typically, they are working in the background to try to -- it

23   is normally in a non-objectionable way to try to influence

24   governance decisions and things of that sort.  It is only

25   when there is a real disagreement that it spills out into the

1   public domain in the form of voting.

2          So voting is not an essential piece of what is

3   necessary for us to show in order to demonstrate that these

4   Defendants, all of them, participated in this conspiracy.

5          There was also an argument from Mr. Wick that the

6   documents we have directed the Court to from Vanguard, they

7   just show disclosure requests on the part of Vanguard, that

8   it wasn't Vanguard trying to pressure anyone to conform their

9   behavior to -- in a way that would be in accordance with the

10  Paris Agreement.

11         And I would just urge the Court to look at the

12  underlying documents here because I think we have the correct

13  characterization of the documents.  And it is important to

14  look at those documents through the lens of and from the

15  perspective of somebody who is in management at a coal

16  company, and how do you interpret what Vanguard is saying in

17  these documents when you are deciding whether to increase

18  output.

19         Vanguard is sending a clear message through these

20  public statements about what it wants the coal companies to

21  do.

22         State Street's counsel made an argument that there

23  was no -- there hadn't been any output -- specific output

24  projection disclosures by the coal companies, and that is

25  somehow necessary for us to allege -- plausibly allege that

1    there is a conspiracy here.

2           But we allege in the Complaint, and this is true,

3    that if you look at the emissions projections of a coal

4    company, somebody who is producing thermal coal, those

5    Scope 3 emissions projections, you can back out of those

6    numbers, you know, an inference about future projected

7    output.

8           And as I said earlier, and I don't think I heard a

9    response from the other side, those kinds of information

10   disclosure steps are very important to this overall scheme.

11          Because, you know, one coal company needs to know

12   how much its competitors are projecting to emit and then to

13   be able to verify that they are making good on their part in

14   this as we think about the enforcement of the output

15   reduction scheme.

16          So, with that, unless the Court has questions for

17   me, I will take a seat.

18          THE COURT:   Okay.   Thank you.

19          MR. LAWRENCE:   Just three things very quickly on

20   this, Your Honor.

21          First, on the Interstate Circuit legal theory,

22   another of these issues with a little bit of agree and a

23   little bit of disagree.

24          So we agree with the standard under Interstate

25   Circuit as described at page 4 of the reply brief, that the

1  sorts of -- that the sorts of joint action in Interstate

2  Circuit needs to be a plan that, quote, contemplated

3  concerted action.

4          You know, this comes up a lot.  So the verb is

5  important, the plan contemplates concerted action.

6          At page 8 of their reply, they object that the

7  alleged plans here didn't, quote, require concerted action.

8  And then later in that same paragraph, that they weren't

9  contingent on other Defendants doing likewise.

10         We would submit that a plan that contemplates joint

11 action doesn't necessarily require or mandate concerted

12 action, that there is a slippage in the degree of enforcement

13 there, that it could pose risk for other Section 1 cases if

14 this Court were to raise the bar to that required level.

15         Two quick economic points -- and, of course, if

16 this went to discovery, you would be hearing from expert

17 economists.  You wouldn't have to trust the word of lawyers.

18         But a couple of things that have come up.

19         So, one, I heard an argument from State Street's

20 counsel that there was not a sufficient share of coal

21 companies implicated here to have an effect on output and

22 price in the market.  Of course, that is an economic point.

23         The allegations here are for Powder River, I think

24 it is over 50 percent share.  For all coal, it is close to

25 that number.  Our merger guidelines set at 30 percent a

1    threshold where we presume market power.  And so a holding

2    that -- you know, that the shares alleged here it is not

3    sufficient to constrain output would be the sort of economic

4    proposition that could pose issues elsewhere.

5         THE COURT:  Okay.

6         MR. LAWRENCE:  And then also there is an assertion

7    that -- sort of there is no economic mechanism there could be

8    a conspiracy here among the asset managers that does not

9    include the coal companies themselves such that the coal

10   companies would have to be Defendants or be implicated in a

11   Section 1 conspiracy.

12        We don't agree with that.  We think it is possible

13   for there to be a Section 1 agreement among asset managers

14   that lessens competition among coal companies without

15   actually implicating the coal companies in Section 1

16   liability.

17        Let me just draw that out for a second.  So this is

18   the difference between concerted action and what we sometimes

19   call "conscious parallelism."  It is a wordy term.  It is in

20   our Merger Guidelines in the Coordinated Effects section.

21        When two gas stations across the street from each

22   other, if one of the owners walks across the street and says,

23   hey, why don't we raise the price 10 cents, those people go

24   to jail.  All right.  That is price fixing, per se unlawful.

25        On the other hand, if one of them decides Tuesday

morning, like, hey, I'm just going to move my price up 10

cents.  Kind of look across the street.  Peer through the

window.  They peer through the window.  The walk out and do

the same.

          The price can kind of rise up, and you achieve

something close to that coordinated outcome that is so

harmful to consumers but without an actual agreement.  That

is what this term "conscious parallelism" refers to.

          That is not unlawful, and that is stated in our

Merger Guidelines, that part of the reason -- this is why we

do merger control is to avoid markets where there is going to

be a lot of that behavior.

          What you would probably hear from economists is

that the likelihood of that kind of conscious parallelism can

depend on the extent to which the gas stations across the

street or the companies have a way of learning what else is

going on in the market or, you know, having behaviors to

respond to, and also can depend on the existence of

punishment mechanisms.  So if the one gas station undercuts

the other, can it be punished?

          And so this is where the behavior of asset managers

could fit in.  Again, I just want to be careful here because

the economists would work through all of these details.  But

asset managers who are engaging in meetings with competing

companies in order to advocate for particular strategies,

1    maybe to complain if one of the companies is deviating, maybe

2    there is a thread of use of voting for a deviation from that

3    kind of conscious parallelism.

4            You could have circumstances where the concertive

5    action among the asset managers leads to conscious

6    parallelism, increases the conscious parallelism, but doesn't

7    lead to the coal companies themselves being liable.

8            That is all I have on that if there are no

9    questions.

10           THE COURT:  Okay.  Thank you.

11           MR. LAWRENCE:  Thank you, Your Honor.

12           THE COURT:  Okay.  Do you want a few seconds for

13   rebuttal, and then we can talk about your DTPA claim?

14           MR. COSTA:  Yes, Your Honor.  Thank you.  My

15   colleague will be doing the DTPA, but a few points.

16           You know, the DOJ discussion, again, was at a

17   theoretical level.  You could have this, you could have

18   that --

19           THE COURT:  I understand.

20           MR. COSTA:  -- enforcement mechanisms.

21           There is nothing here that says BlackRock or State

22   Street ever actually had meetings, let alone had some way to

23   enforce a supposed conspiracy.

24           There is just nothing here.  Parallel conduct that

25   is suspicious, that doesn't make sense, acting alone, none of

1    that is here.

2          And I do want to talk because the Plaintiffs rely a

3    lot on the statements.  And the net zero statement has a

4    clear condition that says the participants' legal duties

5    remains their prime decision-making factor.  And, here, that

6    would necessarily include our fiduciary duty to our

7    clients.

8          There is a question that you had about the scope of

9    the Plaintiffs' argument.  There are a number of asset

10   managers who are participants in net zero who signed on, not

11   just the three Defendants, who have coal company investments.

12         And here is the thing, their theory wouldn't be

13   limited to coal because there is nothing specific they

14   pointed to in net zero about coal output.

15         So on their very weak, bare-bones allegations that

16   is purely conclusory about some agreement, if it is dependent

17   on these statements from the trade groups, it would encompass

18   all sectors of the economy that have emissions.  Right?

19         It just doesn't make sense that there is this

20   global conspiracy that has no coordinated activity, right,

21   when we are not voting together; we are not engaging with the

22   same companies.

23         That is why it is so important for them to have to

24   identify some coordinated activity, some parallelism.  And

25   they are unable to do that on either voting or engagement.

1   Right?

2           You would think if the parties were working

3   together, they would be voting the same way.  But there is

4   absolutely no instance in which any two of the Defendants

5   voted against the same management-backed director.

6           At the end of the day, I know there is a lot of

7   arguments here on the antitrust claims, Your Honor.  At the

8   end of the day, the big picture under Twombly is, are there

9   allegations, factual allegations that make these claims

10  plausible?  And you just can't get away in thinking about

11  that from the fact that coal output was rising during the

12  period where they say there was this agreement to suppress

13  coal.

14          It just doesn't pass the smell test.  They have

15  identified no way in which the mechanism of the conspiracy

16  worked.  And if ever there was a case that failed Twombly's

17  plausibility standard, it is this one.

18          So we would ask for dismissal with prejudice of the

19  antitrust claims, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          MR. COSTA:  And now -- oh, Mr. Wick.

22          MR. WICK:  One minute, Your Honor?

23          THE COURT:  Okay.

24          MR. WICK:  Mr. Barnes relies on this Interstate

25  Circuit theory of conspiracy which requires two things.

1          It requires an invitation to join in a common

2   anticompetitive scheme.  Mr. Costa explained why we don't

3   have that invitation here.

4          And the second thing it requires, and the

5   Government agrees with this, I think at page 22 of its brief,

6   is it requires responsive actions demonstrating acceptance of

7   the invitation.  That is language from Interstate Circuit.

8          And as to all three Defendants, and I am going to

9   focus on Vanguard, you just don't have that acceptance.  The

10  Complaint identifies where it thinks Vanguard accepted the

11  purported invitation to join in an anticompetitive plan.

12         And that is in paragraph 142 where it cites the

13  statement Vanguard made in connection with joining NZAM.  And

14  that statement is just one long apology for the fact that

15  Vanguard couldn't and wouldn't alter its behavior for NZAM.

16         And Vanguard explained -- and that document was

17  submitted to the Court at ECF 66-5.  And Vanguard says why

18  they can't and won't alter their behavior for NZAM.

19         It is because, quote, we remain clear that our duty

20  to maximize returns for the investors in our products is our

21  central objective.

22         And so what Vanguard does is it just counts up the

23  percentage of assets under management that are already

24  subject to preexisting client mandates to consider climate

25  goals as part of the investment philosophy of the fund.

1          And when it counts up what is already being done,

2    pre-joining NZAM, it finds that four percent of assets under

3    management were already subject to client mandates to

4    consider climate issues.

5          And so it reports four percent of total asset

6    managements will be managed in line with climate goals.  The

7    other 96 percent won't be.

8          This document, in addition to addressing percentage

9    of assets under management that were and will continue to be

10   managed in line with client instructions, also says that

11   Vanguard stewardship and engagement policy is to understand

12   material risks that face companies and get companies to

13   disclose them.

14         The acceptance prong of the Interstate Circuit test

15   is important.  If you don't require acceptance, then NZAM

16   really does become a walking conspiracy.  And every single

17   asset manager that joined it, under Mr. Barnes's view, has

18   committed a felony antitrust violation just by joining.

19         So you have to find acceptance, and acceptance

20   doesn't exist with respect to Vanguard.

21         Thank you.

22         THE COURT:  Okay.  Thank you.

23         MR. POWERS:  Your Honor, I don't mean to try your

24   patience, but just one minute on these issues, the two

25   documents about State Street that were mentioned in

1    Mr. Barnes's remarks.

2            Mr. Barnes referred to the NZAM Commitment.  And,

3    of course, State Street's comment on its NZAM Commitment is

4    Exhibit 2 to our Motion to Dismiss cited by Plaintiffs in the

5    Amended Complaint.

6            It is very clear that we are -- whatever our

7    participation in NZAM will be, it is only applicable to those

8    investments in our funds that are climate-focused funds or

9    where the client has told us they have adopted a net zero

10   pledge and want us to deliver investments that satisfy that

11   pledge.

12           We say very specifically in that document, we will

13   not force net zero type theories on any client, and we will

14   not divest companies that fail to meet net zero goals.  That

15   is simply not something that we engage in.

16           And then Exhibit 3 to our Motion to Dismiss,

17   Mr. Barnes cited, the language about how we are supposedly

18   excited to work with asset managers in the Climate Action 100

19   group.

20           And I would urge the Court to read that letter.

21   There is no mention of coal in that letter.  There is no

22   mention of reducing fossil-fuel usage in that letter.

23           What is there?  There is a statement that says that

24   we hope that joining this group will make it easier for us to

25   understand information we can give to our investors so that

1    they can understand the risks, the climate risks, and

2    opportunities in their portfolios.

3         So that if our asset owners want to reduce the

4    climate risk in their portfolios, we can give them whatever

5    investments they want.

6         If that's an investment in a green technology,

7    fine, we can get them in an index fund that associates with

8    green innovation technologies.

9         And if they don't want to be in the climate fund --

10   or a fossil-fuel fund, fine, we won't put them in a

11   fossil-fuel fund.

12        But there is nothing in that statement about using

13   leverage to shut down coal or anyone else.  And if Plaintiffs

14   are saying this is the smoking gun, this letter is somehow an

15   indication of a conspiracy to cause a one-time two-dollar

16   bump in one type of coal in one basin from one state, I can't

17   understand what the secret word in that letter must be that

18   shows what that conspiracy is.

19        Mr. Barnes also said that if you can force

20   companies to disclose their Scope 3 emissions projections,

21   then you would be able to back out what their production

22   plans must be.

23        If that is the case, then the Complaint ought to

24   say that.  The Complaint must allege that that happened.

25   What company issued a projection of its Scope 3 emissions?

1    When did they do it?  Did anyone else react in response?

2            Frequently, in information-exchange cases, a

3    plaintiff comes in and they say, this kind of information was

4    disclosed, that kind of information can be decoded by

5    producers, and producers are making decisions based on what

6    they saw.  And they show the pattern emerge.

7            None of that is in the Plaintiffs' Complaint.  This

8    is just a hypothetical.  This is not an actual, plausible set

9    of facts that says people exchanged information and prices

10   went up.  It is just an idea.

11           THE COURT:  Okay.

12           MR. POWERS:  Thank you, Your Honor.

13           MR. BARNES:  May I be heard for 30 seconds,

14   Your Honor?

15           THE COURT:  Okay.  I do have a pretty hard stop at

16   noon, so if we don't get to the DTPA claim, we don't get to

17   it, but go ahead.

18           MR. BARNES:  I just want to respond to two points

19   that were new in the rebuttal there.

20           So, first, it just can't be that one can immunize

21   themselves from a violation of the antitrust laws by just

22   slapping a disclaimer onto what is on its face an agreement

23   among the Defendants.  So that is one point.

24           The second point I wanted to make is the Net Zero

25   Asset Managers Commitment by its terms, it distinguishes

1    between certain steps the Defendants agreed to take as to

2    assets that were dedicated to this net zero goal, and other

3    steps that the Defendants indicated that they were committed

4    to as to, quote, across all assets under management.

5          There is a little bit of sleight of hand on the

6    other side that Your Honor just heard where they are talking

7    about, well, it is only four percent of our assets.  Well,

8    that is -- you know, that is relevant to some of the

9    commitments they have made as to the Net Zero Asset Managers

10   Commitment, but there are other commitments they have made as

11   to all assets under management.

12         So I just wanted to clear that point up.

13         THE COURT:  Okay.  Thank you.

14         Okay.  I can give you two or three minutes.

15         MS. BRASS:  Good morning, Your Honor.  Rachel Brass

16   from Gibson Dunn.

17         As the Court knows, in addition to the antitrust

18   claims, five states filed consumer-protection claims.  Like

19   the antitrust claims, they are an overreach for three

20   cost-cutting reasons addressed at length in our brief.

21         Because we are very short on time today, I will

22   focus on the cleanest and simplest for Your Honor.  The most

23   direct basis for dismissal is that the States' claims are

24   brought under consumer-protection laws that simply cannot be

25   applied as a matter of law to the securities and investment

1   activities at issue here.

2          This is explicit as a manner of Montana, Louisiana,

3   and Nebraska law, and those can be quickly set aside.

4          And under the specific statutes of each state which

5   expressly adopt federal court constructions of the FTC Act,

6   the same is true for Texas and Iowa.

7          For Texas, for example, you want to look at Texas

8   Business and Commercial Code, Section 1746(c)(1), which

9   expressly ties interpretation of the DTPA to federal courts'

10  interpretation of the FTC Act.

11         And, in turn, you want to look at the Fifth

12  Circuit's decision in Stephenson vs. Paine and Webber at 839

13  F.2d 1095 from 1988 where the court is explicit.  It has been

14  interpreted, the FTC Act, quote, to preclude coverage of

15  securities claims.

16         In the 27 years since, no state court and no

17  federal court in any of the states at issue here has adopted

18  a contrary interpretation.  There is nothing misleading or

19  deceptive, much less material, in any statement otherwise

20  made.

21         Our briefs are incredibly thorough on that point,

22  but there is a simple way for someone short on time to get

23  rid of these consumer-protection claims, and that is simply

24  that, as a matter of law, there is no viable action.

25         THE COURT:  Okay.  Thank you.

1          MS. BRASS:  Unless there is questions, I will sit

2     down.

3          THE COURT:  Thank you.

4          MR. BARNES:  I will be very brief, Your Honor.

5          Let me just focus on Texas for a moment, and I'd

6     urge the Court to look at the Frizzell case, as Frizzell

7     walks through the predecessor to the TDPA (sic) included an

8     express carveout for claims involving securities

9     transactions.  When the Texas State Legislature enacted the

10    TDPA (sic), it eliminated that carveout.

11         And I would just note, we are all good textualists

12    here, there are other enumerated carveouts, as we point out

13    in our briefs, not including claims like Your Honor has

14    before it in this case.

15         And so I think the Frizzell case largely disposes

16    of the principal point that my friend on the other side made,

17    as least as to Texas.

18         Unless the Court has questions about the

19    consumer-protection claims, I will rest on my briefs

20    otherwise.

21         THE COURT:  Okay.

22         All right.  One minute.

23         MS. BRASS:  Your Honor, Frizzell explains why

24    dismissal is warranted.  Because at the exact same time that

25    the exception that was eliminated that my friend on behalf of

1     the States mentioned, the clause I mentioned was added to the

2     statute, 1746(c)(1).  And Frizzell tells us we look at the

3     statute as a whole, taking into account all changes made at

4     the same time.

5            And so at the same time it was added to expressly

6     follow federal court decisions interpreting the FTC Act.  The

7     law of the Fifth Circuit there is very clear, and the law of

8     the Fifth Circuit is also clear that it is not the job of

9     this Court to expand state law claims where the law is

10    ambiguous, and no state has ever recognized a cause of

11    action --

12            THE COURT:  Okay.  Thank you.

13            MS. BRASS:  -- like that contemplated here.

14            THE COURT:  Well, let me assure everyone, I have

15    your briefs, which are very thorough.  The arguments have

16    been very well done.  I have read through the vast majority

17    of them, including many of the articles cited.  So if you

18    walk away worrying that something was unsaid, I have your

19    argument.  Okay?

20            So I will take this matter under advisement.

21            I do want to disclose, in the spirit of

22    transparency, that, like many Americans, I own shares in

23    three Vanguard ETF index funds:  The Vanguard S&P 500 ETF,

24    the Vanguard Small-Cap Value ETF, and the Vanguard Value

25    Index Fund.

1           As well as shares in BlackRock's iShares Core S&P

2    Small-Cap ETF.

3           Now, my understanding of the Codes of Conduct for

4    Judges is that recusal is not required in that scenario, and

5    I would cite Advisory Opinion No. 106:  Where ownership

6    interest in a mutual fund does not give rise to ownership

7    interest in the company managing the fund -- which, of

8    course, are the parties in this case -- unless the outcome of

9    the proceeding could substantially affect the value of the

10   interest.

11          Now, my understanding of the facts so far is that

12   the outcome of this proceeding would not substantially affect

13   the value of my interest in this case -- or the value of my

14   interest in those funds.

15          But I am disclosing that all to you, and I would

16   ask that if you disagree, that you would please get something

17   on file within the next, I would say, 14 days.  Okay?

18          Okay.  Well, thank you again for the excellent

19   briefing and arguments.

20          And we are adjourned.

21          (Hearing adjourned at 12:00 p.m.)

22

23

24

25

1                        <u>CERTIFICATION</u>

2

3              I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    <u>/s/ Shea Sloan</u>                              June 12, 2025
     SHEA SLOAN, CSR, RPR
10   FEDERAL OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25