# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

STATE OF TEXAS, et al.,                          §
                                                 §
    Plaintiffs,                §
                                                 §
v.                                               §     Case No. 6:24-cv-437-JDK
                                                 §
BLACKROCK, INC.,                                 §
STATE STREET CORPORATION,                        §
VANGUARD GROUP, INC.,                            §
                                                 §
    Defendants.                §

## MEMORANDUM OPINION AND ORDER
## ON MOTIONS TO DISMISS

"Federal antitrust law is a central safeguard for the Nation's free market structures." *North Carolina State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 502 (2015). Indeed, antitrust laws "are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). Thus, antitrust law does not yield to the prevailing social policy of the day. *See NCAA v. Alston*, 594 U.S. 69, 94–95 (2021); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 371 (1963).

This case brings these principles into focus. Plaintiffs allege that Defendants BlackRock, Inc.; State Street Corporation; and Vanguard Group, Inc., "acquired substantial stockholdings in every significant publicly held coal producer in the United States" and agreed to use their holdings to influence these companies and

artificially depress the output of coal.  Docket No. 50 ¶¶ 1, 3–4.  Defendants allegedly did so in the name of "environmental stewardship" and "concern for the climate."  *Id.* ¶ 7.  The result, Plaintiffs assert, is that "Defendants have reaped the rewards of higher returns, higher fees, and higher profits, while American consumers have paid the price in higher utility bills and higher costs."  *Id.* ¶ 1.  Plaintiffs allege violations of both state and federal antitrust laws, *id.* ¶¶ 250–309, and they seek damages, injunctive relief, civil penalties, and restitution, among other forms of relief.  *Id.* at 107–10.  Plaintiffs further allege that BlackRock separately violated state consumer protection laws by advertising certain funds as not following an "ESG investment strategy" while using the funds to pursue an ESG agenda through engagements and proxy voting.  *See id.* ¶¶ 197–207, 310–42.

Defendants move to dismiss the action under Federal Rule of Civil Procedure 12(b)(6).  Docket Nos. 64; 66; 67.  Defendants argue that they are mere passive investors that cannot be liable under the Clayton Act based on their acquisition of stock.  Docket No. 64 at 8–9.  They further argue that Plaintiffs fail to allege any plausible agreement among Defendants to unlawfully harm competition in violation of the Sherman Act.  *Id.* at 8.  And they argue that Plaintiffs fail to allege any plausible harm to competition, as necessary under both statutes.  *Id.* at 8–9.  BlackRock also separately moves to dismiss the consumer protection claims, contending that the governing statutes exempt securities transactions and that Plaintiffs fail to state a claim in any event.  Docket No. 65.

As explained below, the Court largely denies Defendants' motions. At this stage in the proceeding, the Court must assume that Plaintiffs' allegations are true. *See Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017). And here, Plaintiffs have alleged that Defendants acquired significant amounts of stock in coal companies and then used their market power to pressure the companies to decrease coal production. Plaintiffs' allegations, moreover, are not vague and conclusory but include dozens of specific examples of Defendants' conduct supporting their theory.

For example, Defendants allegedly joined certain "climate initiatives" in which they publicly committed to use their stock to "take necessary action on climate change" and "reduce greenhouse gas emissions." Docket No. 50 ¶ 117. These commitments allegedly included striving for "all assets under management to achieve net zero emissions"—meaning "coal production declines towards zero"—and "immediately ceasing all financial or other support to coal companies[]" expanding production. *Id.* ¶¶ 115, 120, 131. Defendants allegedly affirmed these commitments through public statements, such as BlackRock's "asking companies to set short-, medium-, and long-term targets for greenhouse gas reductions," Vanguard's asking companies with significant coal exposure how they "set targets in alignment" with the Paris Agreement and the Glasgow Climate Pact, and State Street's creating ESG scores for companies and telling them that their score "will soon effectively be as important as [their] credit rating." *Id.* ¶¶ 139, 166, 168. Defendants then allegedly followed through on those commitments by voting against directors at the coal

3

companies for failing to have "adequate climate risk disclosures" or through engagements with coal company leadership. *Id.* ¶¶ 157–58, 160, 168–72, 174, 177.

All of that adequately states a violation of the Clayton Act. Defendants claim that they are entitled to the statutory safe harbor for passive investors. But the safe harbor is unavailable to investors who, as Defendants allegedly did, use their stock through proxy voting or otherwise to bring about or attempt to bring about the substantial lessening of competition.

Plaintiffs have also plausibly stated claims under the Sherman Act. Plaintiffs have identified enough circumstantial evidence to suggest that Defendants agreed to collectively pressure coal companies to reduce the output of coal in the relevant markets and disclose future output information. Defendants allegedly engaged in parallel conduct, such as BlackRock's and Vanguard's joining one of the climate initiatives on the exact same day, with State Street's joining just a few weeks later. *Id.* ¶¶ 132, 137, 143. And Plaintiffs allege plus factors suggestive of an agreement, such as Defendants' shared moral imperative to combat climate change. *See id.* ¶¶ 7, 115–51. Plaintiffs further claim that Defendants' actions decreased output and increased prices in the relevant coal markets between 2019 and 2022. Indeed, the relevant coal companies collectively decreased output by about 18–19% while the average market price increased by about 21–25%. *See id.* ¶¶ 228–29.

Finally, Plaintiffs have sufficiently alleged consumer protection claims against BlackRock under the laws of Texas, Montana, Iowa, and Nebraska. The remaining state laws do not apply, and those claims are thus dismissed.

4

Accordingly, Defendants' motions to dismiss Counts I–XVII and XXI are **DENIED**. The motions are **GRANTED** as to Counts XVIII, XIX, and XX, which are **DISMISSED**.

## I. BACKGROUND

On January 16, 2025, Plaintiff States of Texas, Alabama, Arkansas, Indiana, Iowa, Kansas, Missouri, Montana, Nebraska, Louisiana, Oklahoma, West Virginia, and Wyoming filed a 110-page amended complaint alleging violations of the Clayton Act, Sherman Act, nine States' antitrust laws, and five States' consumer protection laws. Docket No. 50. Plaintiffs allege that Defendants have waged "war on competition" by leveraging their stockholdings to "artificially constrain[] the supply of coal" and "increase[] energy prices for American consumers." *Id.* ¶¶ 5–6. Plaintiffs therefore bring this case in their respective sovereign capacities and as *parens patriae* on behalf of the citizens, general welfare, and economies of their respective states. *Id.* ¶ 10.

Defendants are three of the largest institutional investors in the world with billions of dollars invested in coal. *Id.* ¶¶ 3, 19. Each owns stock in nine publicly traded domestic coal producers (collectively, the "Coal Companies"): Peabody Energy, Arch Resources, NACCO Industries, CONSOL Energy, Alpha Metallurgical Resources, Vistra Energy, Hallador Energy, Warrior Met Coal, and Black Hills Corporation. *Id.* ¶¶ 4, 20. Defendants collectively own between 24.94%–34.19% in seven of the Coal Companies—along with 10.85% and 8.30% in the remaining two. *Id.* BlackRock is the first- or second-largest shareholder in the Coal Companies. *Id.* ¶ 20. Vanguard is the first- or second-largest shareholder in all but two of the Coal

Companies.  *Id.*  And State Street is a top five shareholder in all but two of the Coal Companies.  *Id.*

Plaintiffs' central claims are that Defendants agreed to use their stockholdings in the Coal Companies to constrain coal output in violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act.  *Id.* ¶ 6.  The Section 7 claim covers the alleged use and acquisition of Defendants' stock.  *Id.* ¶¶ 3, 251.  The Section 1 claim covers the alleged agreement among Defendants to work together.  *Id.* ¶¶ 4, 254–57.

Plaintiffs allege that Defendants' actions have caused anticompetitive effects in two specific coal markets:  South Powder River Basin coal ("SPRB coal") and thermal coal.  *Id.* ¶ 59.  Plaintiffs further allege the relevant product and geographic markets, and Defendants do not contest the market definitions at this stage.  *See id.* ¶¶ 59–88.  Plaintiffs contend that between 2019 and 2022, the market price for both types of coal increased substantially while the Coal Companies' collective output decreased substantially.  *Id.* ¶¶ 228–29.  Privately held coal companies in the SPRB coal market, on the other hand, collectively increased output in response to the increased market price.  *Id.* ¶ 228.

Plaintiffs allege that Defendants' efforts to bring about industry-wide output reduction are to blame for the increased prices and lower production.  *Id.* ¶ 232.  Defendants allegedly joined climate initiatives where they committed to implement a strategy "with a clear escalation and voting policy" to accomplish the goal "for all assets under management to achieve net zero emissions by 2050 or sooner."  *Id.* ¶ 115 (quoting *The Net Zero Asset Managers Commitment*, NET ZERO ASSET MANAGERS

INITIATIVE, https://bit.ly/40QKYTn).  This included "immediately ceasing all financial or other support to coal companies[]" seeking to expand production.  *Id.* ¶ 131 (quoting *Net Zero Asset Managers Initiative:  Network Partners' Expectation of Signatories With Regard to Fossil Fuel Investment Policy*, THE NET ZERO ASSET MANAGERS INITIATIVE, https://bit.ly/4gqJOmN).  Each Defendant allegedly publicly affirmed these goals, such as BlackRock's "asking companies to set short-, medium-, and long-term targets for greenhouse gas reductions."  *Id.* ¶ 168 (quoting *Larry Fink's 2022 Letter to CEOs: The Power of Capitalism*, BLACKROCK (2022), https://bit.ly/40WwRfb).  And each Defendant allegedly exercised their influence accordingly, such as BlackRock's and State Street's allegedly voting against several of the Coal Companies' board of directors for not "having adequate climate risk disclosures," *id.* ¶¶ 169, 177, or Vanguard's allegedly engaging with several of the Coal Companies' leadership to convey its expectation that coal output be reduced, *see id.* ¶¶ 157–60.

Five Plaintiff States further allege that BlackRock specifically violated their respective consumer protection laws.  *Id.* ¶¶ 310–42.  The primary thrust of these claims is that BlackRock allegedly deceived consumers by marketing particular investment funds as not following an "ESG investment strategy" when, in reality, BlackRock still leveraged the power of shares held in those funds to advance an ESG agenda.  *Id.* ¶¶ 192–224.

Defendants seek dismissal of all claims under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  Docket Nos. 64; 65; 66; 67.

The Federal Trade Commission ("FTC") and the United States of America, acting through the U.S. Department of Justice's Antitrust Division (collectively, the "Government"), filed a joint statement of interest supporting Plaintiffs. Docket No. 99. Several *amicus* briefs were also filed. Docket Nos. 74-1; 76; 90; 93.[1]

The Court heard oral argument on the motions on June 9, 2025. Docket No. 111 (hereinafter, "Hearing Tr."); *see also* Docket No. 108. The Court granted the Government leave to participate at oral argument. Docket No. 107.

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Such motions "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted). In deciding a Rule 12(b)(6) motion, a court accepts "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Thurman v. Med. Transp. Mgmt., Inc.*, 982 F.3d 953, 955 (5th Cir. 2020) (citation omitted). Such "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and must "make relief plausible, not merely conceivable, when taken as true," *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[1] The pending motions for leave to file as *amicus curiae* (Docket Nos. 89; 92) are granted. The *amicus* briefs (Docket Nos. 90; 93) are accepted as filed.

Antitrust claims need not satisfy "a higher pleading standard." *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 373 (5th Cir. 2014). An antitrust plaintiff, like every plaintiff, "need only plead 'enough facts to state a claim to relief that is plausible on its face.'" *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).

## III. DEFENDANTS' JOINT MOTION TO DISMISS

Defendants' joint motion seeks the dismissal of all claims against all Defendants. Docket No. 64. Count I alleges that Defendants unlawfully acquired and used stock in violation of Section 7 of the Clayton Act. Docket No. 50 ¶¶ 250–52. Counts II and III allege that Defendants entered into unlawful agreements in violation of Section 1 of the Sherman Act. *Id.* ¶¶ 253–63. And Counts IV–XIV allege that Defendants violated nine States' antitrust laws on the same grounds as the federal antitrust claims. *Id.* ¶¶ 264–309.[2]

The Court addresses each claim in turn.

### A. Clayton Act

Section 7 of the Clayton Act provides in relevant part,

> No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . where . . . the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition . . . .

---

[2] Count XVIII alleges that Defendants violated the Louisiana Unfair Trade Practices Act. *Id.* ¶¶ 325–27. Defendants' joint motion seeks dismissal of this claim. Docket No. 64 at 35. The Court addresses that claim with BlackRock's motion to dismiss below. *See infra* Part IV.A.1.

15 U.S.C. § 18.   Interpreting Section 7, the Supreme Court has held "that any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of [Section 7] whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce." *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 592 (1957); *see also Denver & Rio Grande W. R.R. Co. v. United States*, 387 U.S. 485, 501 (1967) (holding that "Section 7 proscribes acquisition of 'any part' of a company's stock where the effect 'may be substantially to lessen competition'").

The Supreme Court has also held that Section 7 is prophylactic: it "is designed to arrest in its incipiency" any "substantial lessening of competition" caused by stock acquisitions.   *E. I. du Pont*, 353 U.S. at 589; *see also Denver*, 387 U.S. at 504 (explaining that Section 7 requires an acquisition "against the public interest" to "be stopped in its incipiency"); PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1203e (5th ed. 2022) (noting that "the prophylactic purpose of § 7 seems to call for intervention whenever an anticompetitive effect becomes probable").   For stock acquisitions, "incipiency" means "not the time the stock was acquired, but any time when the acquisition threatens to ripen into a prohibited effect." *E. I. du Pont*, 353 U.S. at 597.

Section 7 liability is limited, however, by a safe harbor provision:

> This section shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition.

15 U.S.C. § 18.  Accordingly, an otherwise unlawful stock acquisition is exempted from liability if it is (1) acquired solely for investment and (2) not used to bring about, or attempt to bring about, the substantial lessening of competition.  *See E. I. du Pont*, 353 U.S. at 589 ("Acquisitions solely for investment are excepted, but only if, and so long as, the stock is not used by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition."); *cf. also* ANTONIN SCALIA & BRYAN GARNER, READING LAW 116 (2012) (conjunctive/disjunctive canon).

The safe harbor, however, does not permanently immunize a passive investor. "Even when the purchase is solely for investment, the plain language of [Section 7] contemplates an action at any time the stock is used to bring about, or in attempting to bring about, the substantial lessening of competition." *E. I. du Pont*, 353 U.S. at 597–98.  A plaintiff may "bring[] the action at any time when a threat of the prohibited effects is evident." *Id.* at 598.

Defendants here argue that Plaintiffs' Section 7 claim fails for two reasons: (1) Plaintiffs fail to sufficiently allege the requisite "lessening of competition" in the coal market; and (2) Section 7's safe harbor forecloses the claim.  *See* Docket No. 64 at 25.  The Court addresses each argument below.

### 1. Substantive Violation

Defendants first argue that Plaintiffs fail to allege an affirmative violation under Section 7.  Specifically, Defendants assert that Plaintiffs fail "to plausibly allege any harm to competition resulting from the challenged acquisitions." *Id.* at 30. The Court disagrees.

**a.**

To plausibly state a claim under Section 7, Plaintiffs must allege that the effect of Defendants' acquisition or use of stock is reasonably likely to substantially lessen competition.  *See* 15 U.S.C. § 18; *E. I. du Pont*, 353 U.S. at 592.  Plaintiffs do so here.

Plaintiffs must first allege an acquisition.  Although Defendants have acquired shares in the Coal Companies over several years, *see* Docket No. 50 ¶¶ 21–56, Section 7 is not limited to any particular acquisition.  Rather, "acquisition" as used in Section 7 includes Defendants' entire ownership interest in the Coal Companies regardless of when the shares were acquired.  *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 240 (1975) ("We need not go beyond the Clayton Act itself to conclude that 'acquisition' as used in [Section 7] of the Act means holding as well as obtaining assets."); *see also E. I. du Pont*, 353 U.S. at 597–99 (holding that Section 7 claims may be brought "at any time" a violation arises, even several years after the initial acquisition).  This is because "acquisition" means "both the purchase of rights in another company *and the retention of those rights*."  *ITT Cont'l Baking*, 420 U.S. at 241 (emphasis added).

Plaintiffs therefore properly allege the total shares held in the Coal Companies by Defendants "at the time of the suit."  *See E. I. du Pont*, 353 U.S. at 598; Docket No. 50 ¶¶ 20–56.  BlackRock is either the first- or second-largest shareholder in every Coal Company.  Docket No. 50 ¶ 20.  Vanguard is generally the first-, second-, or third-largest shareholder.  *Id.*  And State Street is mostly the third-, fourth-, or fifth-largest shareholder.  *Id.*  Defendants collectively own between 24.94%–34.19% of each

Coal Company—with the exception of 8.30% in one company and 10.85% in another. *Id.*

Plaintiffs next must allege that the effect of Defendants' acquisition or use of their stock in the Coal Companies is reasonably likely to substantially lessen competition. Plaintiffs adequately do so for three cumulative reasons: (1) Defendants possess enough stock to plausibly influence the Coal Companies' behavior; (2) Defendants' alleged conduct suggests that they acquired and used their stock in a way that appears reasonably likely to reduce coal output; and (3) Plaintiffs plausibly allege that Defendants have already substantially lessened competition.

1. Influence.  Defendants' shares plausibly provide them with the ability to influence the Coal Companies.  "A company need not acquire control of another company in order to violate the Clayton Act." *Denver*, 387 U.S. at 501. Indeed, minority shareholders can violate Section 7. *See E. I. du Pont*, 353 U.S. at 605–07; 15 U.S.C. § 18 (covering the acquisition of "the whole *or any part* of the stock or other share capital" (emphasis added)); *cf. Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491 (5th Cir. 1984) ("A defendant need not have a market share approaching monopoly proportions to be within the reach of section seven."). In fact, the Supreme Court has held that a 23% shareholder had sufficient influence to exercise anticompetitive influence in violation of Section 7. *See E. I. du Pont*, 353 U.S. at 605–07; *cf. also Phila. Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."). And Defendants'

collective ownership here exceeds 23% in all but two of the Coal Companies. Docket No. 50 ¶ 20. Defendants' influence, moreover, is enhanced because they are generally the largest shareholders in the Coal Companies. *Id.*; *see also E. I. du Pont*, 353 U.S. at 607 n.36 (explaining that the "potency of the influence of du Pont's 23% stock interest is greater . . . because of the diffusion of the remaining shares"). As the Government explains, the "size of the ownership interest need only be sufficient to exert an anticompetitive influence on the acquired company's decision-making." Docket No. 99 at 14. Suffice to say, Defendants' influence over the Coal Companies is such that it "may" lead to the substantial lessening of competition if used improperly. *See* 15 U.S.C. § 18.

2. Conduct.    Defendants' alleged conduct suggests that they acquired and subsequently used their stock in a way that is reasonably likely to reduce coal output in the relevant markets. *See E. I. du Pont*, 353 U.S. at 592. This conduct, according to Plaintiffs, includes (i) joining climate initiatives, (ii) making public statements, and (iii) proxy voting or otherwise engaging with the Coal Companies.

*First*, the climate initiatives. All three Defendants joined the Net Zero Asset Managers Initiative ("NZAM") in 2021. Docket No. 50 ¶ 129. NZAM signatories committed to "[i]mplement a stewardship and engagement strategy, with a clear escalation and voting policy, that is consistent with our ambition for all assets under management to achieve net zero emissions by 2050 or sooner." *Id.* ¶ 115 (quoting *The Net Zero Asset Managers Commitment*, *supra*). Plaintiffs allege the signatories' further commitment to "decarbonisation goals" necessarily means cutting coal

production because "there is no realistic path for a coal company to cut coal emissions other than by cutting production." *Id.* ¶¶ 115, 130.  NZAM made clear its "expectation of signatories" who invested in coal:  signatories were to "immediately cease[] all financial or other support to coal companies[] that are building new coal infrastructure or investing in new or additional thermal coal expansion, mining, production, utilization (i.e., combustion), retrofitting, or acquiring of coal assets." *Id.* ¶ 131 (quoting *Network Partners' Expectation of Signatories With Regard to Fossil Fuel Investment Policy*, *supra*).

BlackRock and State Street also joined Climate Action 100+ ("CA100") in 2020. *Id.* ¶ 126.  CA100 describes itself as "an unprecedented global investor engagement initiative" that works to ensure corporate greenhouse gas emitters "take necessary action on climate change."  *Id.* ¶ 117 (quoting *BlackRock Joins Climate Action 100+ to Ensure Largest Corporate Emitters Act on Climate Crisis*, CLIMATE ACTION 100+ (Jan. 9, 2020), https://bit.ly/4gEGPaG).  CA100 signatories committed to engaging with companies to ensure they (1) "take action to reduce greenhouse gas emissions . . . in line with the overarching goals of the Paris Agreement"; (2) "implement a strong governance framework which clearly articulates the board's accountability and oversight of climate change risks and opportunities"; and (3) "provid[e] enhanced corporate disclosure in line with the recommendations of the Task Force on Climate-related Financial Disclosures (TCFD)."  *Id.* (quoting *BlackRock Joins Climate Action 100+*, *supra*) (cleaned up).  And CA100 candidly states that achieving "net zero" emissions means that "coal production declines

towards zero." *Id.* ¶ 120 (quoting CLIMATE ACTION 100+, INVESTOR EXPECTATIONS FOR DIVERSIFIED MINING at 2 (2023), https://bit.ly/3zqi1SR).

By joining these climate initiatives, Plaintiffs allege, Defendants sent a strong public message to all companies they are invested in:  carbon output must decrease. And for the Coal Companies, that necessarily means producing less coal.  *Id.* ¶ 115 (alleging "that there is no realistic path for a coal company to cut coal emissions other than by cutting production").

*Second*, Defendants' public statements only reinforced that message.  For example, BlackRock allegedly "ask[ed] companies to set short-, medium-, and long-term targets for greenhouse gas reductions." *Id.* ¶ 168 (quoting *Larry Fink's 2022 Letter to CEOs:  The Power of Capitalism*, *supra*).  State Street launched an "R-Factor" which allegedly generates a "unique ESG score[]" for companies to inform State Street's investment decisions and further stated that "a company's ESG score will soon effectively be as important as its credit rating."  *Id.* ¶ 166 (quoting *CEO's Letter on Our 2020 Proxy Agenda*, STATE STREET GLOB. ADVISORS (Jan. 28, 2020), https://bit.ly/40XxDbY).  According to Plaintiffs, State Street also claimed it would "take appropriate voting action against board members" of companies with unsatisfactory ESG scores.  *Id.* (quoting *CEO's Letter on Our 2020 Proxy Agenda*, *supra*).  And Vanguard allegedly stated that it seeks to "understand how companies set targets in alignment with" the goals of the Paris Agreement and the Glasgow Climate Pact.  *Id.* ¶ 139 (quoting VANGUARD, VANGUARD INVESTMENT STEWARDSHIP INSIGHTS:  VANGUARD'S EXPECTATIONS FOR COMPANIES WITH SIGNIFICANT COAL

EXPOSURE at 2 (Dec. 2021), https://bit.ly/3TzJ9Wr).  Vanguard further asserted that there is "compelling scientific consensus, expert perspective, and global recognition that achieving the Paris Agreement targets will require that companies reduce thermal coal production."  VANGUARD INVESTMENT STEWARDSHIP INSIGHTS, *supra* at 3 (cited at Docket No. 50 ¶¶ 138–41).  Thus, as Plaintiffs allege in the amended complaint, Defendants publicly joined climate initiatives seeking to reduce coal output and then publicly proclaimed their intent to follow through with the initiatives' goals.

*Third*, Defendants allegedly followed through on their word and used their shares to reduce the output of coal.  For example, according to the amended complaint, BlackRock voted against (or withheld votes for) several board directors at the Coal Companies.  Docket No. 50 ¶¶ 168–72, 174.  BlackRock allegedly justified its votes with climate-related statements like, "the [Coal] Company does not meet our aspirations of having adequate climate risk disclosures against all 4 pillars of TCFD" and "does not meet our aspirations of having adequate climate-related metrics and targets."  *Id.* ¶ 168.  And State Street similarly voted against (or withheld votes for) several board directors at the Coal Companies.  *Id.* ¶ 177.  State Street likewise justified its votes by "voting against directors at companies in several major indices where companies failed to provide sufficient disclosures in line with the TCFD framework."  *Id.*  Vanguard too allegedly announced it would vote against the relevant committee chair in cases where the company had not disclosed its business strategy accounting for "changes in market activity in line with the Paris Agreement

or subsequent agreements." *Id.* ¶ 181 (quoting *Proxy Voting Policy for U.S. Portfolio Companies*, VANGUARD (Mar. 1, 2022), https://bit.ly/3BkzooD).  Vanguard, moreover, publicly disclosed that it "engaged" with management of at least four of the Coal Companies between 2021 and 2023.  *Id.* ¶¶ 157–58, 160.  For context, Plaintiffs allege that Vanguard's past engagements with company leaders of foreign coal companies have involved Vanguard obtaining assurances from the coal companies that they "expected to reduce the company's exposure to thermal coal."  *Id.* ¶ 157 (quoting VANGUARD, INVESTMENT STEWARDSHIP: 2021 ANNUAL REPORT at 36 (Apr. 5, 2022), https://bit.ly/4gorIlz).

Thus, to summarize, Defendants publicly joined climate initiatives and pledged their assets to climate-based goals that necessarily result in the reduction of coal output, publicly proclaimed their intent to further these goals, and then used proxy votes or otherwise engaged with the Coal Companies in furtherance of those climate-based goals.  Taken as true, these allegations plausibly state that Defendants' acquisition and use of stocks, by proxy voting or otherwise, is reasonably likely to have the effect of substantially lessening competition by decreasing output of coal and creating supracompetitive prices.  *Cf. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) ("Supracompetitive pricing entails a restriction in output.").

3. Competitive Harm.  Plaintiffs do more than allege that Defendants "may" have substantially lessened competition.  Plaintiffs plausibly allege that Defendants' acquisition and use of stock has *already* harmed competition in the relevant markets.

*Cf. Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (explaining that a plaintiff can show anticompetitive effect with "[d]irect evidence" such as "reduced output, increased prices, or decreased quality in the relevant market").

Take, for example, the thermal coal market. Plaintiffs allege that between 2019 and 2022, the average market price for thermal coal increased by 25.5%. Docket No. 50 ¶ 229. Rather than capitalize on the price surge, however, the Coal Companies producing thermal coal collectively decreased output by 19.2% over the same period, according to Plaintiffs. *Id.*

So too for the SPRB coal market. Plaintiffs allege that between 2019 and 2022, the average market price for SPRB coal increased by 21.2%. *Id.* ¶ 228. Again, instead of increasing output, the Coal Companies producing SPRB coal collectively decreased output by 18.2% over the same period. *See id.* As Plaintiffs observe, the Coal Companies' alleged response stands in stark contrast to the privately-held coal companies producing SPRB coal, which collectively increased production by 6.1%. *See id.*

Plaintiffs therefore plausibly allege anticompetitive harm by stating that coal prices increased while output decreased as a result of Defendants' conduct. *See Am. Express*, 585 U.S. at 542; *cf. also Brooke Grp.*, 509 U.S. at 237 (holding that a jury "may not infer competitive injury" based only on increasing prices when at the same time "output is *expanding*" because "rising prices are equally consistent with growing product demand" (emphasis added)).

19

\*     \*     \*

Plaintiffs allege that Defendants possessed sufficient shares to plausibly influence the Coal Companies, Defendants acquired and used those shares in a way that is reasonably likely to have the effect of substantially lessening competition, and Defendants' acquisition and use of the shares has already substantially lessened competition. The Clayton Act's text requires no more to plausibly state a claim under Section 7. *See* 15 U.S.C. § 18; *E. I. du Pont*, 353 U.S. at 607 ("We repeat, that the test of a violation of [Section 7] is whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints.").

### b.

Defendants' arguments to the contrary do not alter the Court's conclusion.

Defendants first argue that the Section 7 claim fails because Plaintiffs do not connect the alleged competitive harm to any "specific share acquisition." Docket No. 103 at 27–28; *see also* Docket No. 64 at 30–33. Defendants point to *E. I. du Pont* where, they say, the Section 7 challenge was tied to "a specific transaction"—the "acquisition of a 23% stake in General Motors." Docket No. 103 at 27. But nothing in *E.I. du Pont* suggests that the Section 7 claim was tied to a specific transaction. In fact, it appears that the du Pont Company acquired the 23% stake through *multiple* stock acquisitions. *See E. I. du Pont*, 353 U.S. at 600 (referring to the "*first* block of General Motors stock" acquired by the du Pont Company (emphasis added)); *id.* at 602 (noting that after the first acquisition, two years passed "before du Pont's *total purchases* of General Motors stock brought its percentage to 23%" (emphasis added)).

20

But rather than focus on the apparently several acquisitions, the Supreme Court considered the du Pont Company's entire 23% stake when evaluating the Section 7 claim. *See id.* at 602–07. This is also consistent with the Government's interpretation of Section 7. *See* Docket No. 99 at 16 (explaining that "alleged anticompetitive effects need not be linked to any discrete, single stock transaction" (cleaned up)). Accordingly, the Court sees no reason why Plaintiffs here may not rely on Defendants' entire stockholdings in alleging a Section 7 violation. *See also ITT Cont'l Baking*, 420 U.S. at 240 (interpreting "acquisition" as used in Section 7 to include "*holding* as well as obtaining assets" (emphasis added)).

Defendants next argue that the "'lawfulness of an acquisition [under Section 7] turns on the purchaser's potential for creating, enhancing, or facilitating the exercise of market power' by a market participant." Docket No. 64 at 31–32 (quoting *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988)). Defendants suggest that Section 7 violations are limited to conduct like "one competitor purchas[ing] another outright" or "one competitor buy[ing] a supplier of a critical input to foreclose competitors' access to that input." *See id.* at 32 (citing *Domed Stadium*, 732 F.2d at 491–93; and then *Illumina Inc. v. FTC*, 88 F.4th 1036, 1053–54 (5th Cir. 2024)). Defendants seem to be arguing that a total acquisition or merger is a prerequisite to Section 7 liability. But the text of Section 7 plainly includes partial stock acquisitions. *See* 15 U.S.C. § 18 (covering acquisitions in "the whole *or any part*" of stock in a company (emphasis added)). Certainly, nothing in the text limits the statute's reach to Defendants' cited examples. And in any event, courts have held

21

that acquisitions may substantially lessen competition in violation of Section 7 when they lead to supracompetitive prices, *see Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1216 (11th Cir. 2012), or when a partial owner gains the necessary leverage to influence a company in a way that could lead to anticompetitive effects, *see United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 862 (6th Cir. 2005). That is what Plaintiffs allege here—that Defendants' acquisitions and use of partial stock in the Coal Companies provided them with the leverage necessary to successfully decrease coal output, leading to supracompetitive prices.

The Government similarly rejects Defendants' suggestion that partial acquisitions by institutional asset managers fall outside the scope of Section 7. Rather, the Government explains that the Department of Justice and FTC have long "challenged partial stock acquisitions by different types of investors that threatened anticompetitive effects," regardless of the acquisition's particular nature. *See* Docket No. 99 at 15. For example, the Department of Justice brought a suit under Section 7 against a bank that acquired minority stockholdings of 27% and 14% in two substantial competitors in a particular industry. *See United States v. Cleveland Tr. Co.*, 392 F. Supp. 699, 701 (N.D. Ohio 1974), *aff'd*, 513 F.2d 633 (6th Cir. 1975). And when two private equity firms sought to jointly acquire a 22.6% interest in a company despite already owning 50% of that company's competitor, the FTC challenged the acquisition because "it [was] likely that [the private equity firms] would reduce competition." *See In re TC Group, LLC*, 2007 WL 293866, at *29 (F.T.C. Jan. 24, 2007). Section 7 is concerned with whether an acquisition will harm competition, not

the acquisition's particular form. *Cf. Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."); *Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422, 427 (5th Cir. 1981) ("[A]ntitrust law is concerned not with superficial technical appearances, but with practical economic substance.").

Defendants also contest Plaintiffs' characterization of competitive harm to the relevant coal markets. As described above, Plaintiffs rely on data between 2019 and 2022 to allege competitive harm to the relevant markets. Defendants, however, argue that 2020 is the proper starting point. *See* Docket No. 64 at 19–23, 30. Output in the relevant coal markets decreased significantly between 2019 and 2020 due at least in part to COVID-19—as all parties agree. *Id.* at 21; Docket No. 88 at 20–21. So by starting in 2020 and ending with 2022, as Defendants prefer, overall output increases in the relevant coal markets. *See* Docket No. 64 at 20; Docket No. 50 ¶¶ 228–29.

But Plaintiffs offer a plausible theory for why 2019 is the appropriate starting point. They observe that the country needed far less energy in 2020 due to COVID-19 lockdowns. Docket No. 88 at 21. The 2019 data thus provides the necessary baseline of a "well-functioning" coal market. *Id.* With that baseline, Plaintiffs allege, the 2022 data is far more suspect—coal prices were skyrocketing, privately-owned coal companies were collectively increasing production beyond their 2019 levels to capitalize, but the Coal Companies were collectively lagging far behind their 2019 production. *See id.* at 21–22; Docket No. 50 ¶¶ 228–29. And Defendants do not argue

23

that the Coal Companies were incapable of reaching or exceeding their 2019 output levels in 2022. Thus, even for the few Coal Companies whose coal output was trending upwards by 2022, *see* Docket No. 50 ¶¶ 228–29, it remains plausible that their coal output would have been even higher but for Defendants' alleged violation of Section 7, *see In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 83 (E.D.N.Y. 2024) (explaining that in "establishing anticompetitive effect," "[o]utput, prices, and quality are compared to the levels that might be observed but for the challenged restraints (a hypothetical scenario often referred to as the 'but-for world')" (citing *Am. Express*, 585 U.S. at 547–48)). Further, in any event, determining the proper starting point for analyzing the relevant coal markets is a factual dispute that the Court will not resolve at this stage.

### 2. Safe Harbor

Defendants next argue that dismissal of Plaintiffs' claim is proper because the "safe harbor gives bright-line protection to passive minority investors, without subjecting them to further analysis." Docket No. 64 at 25. Defendants later acknowledged that a passive investor could violate Section 7 and that "the use of the shares could put even an institutional investor outside the safe harbor." Hearing Tr. 14:22–15:13.

All parties therefore agree that the safe harbor protects Defendants only if the stock (1) is acquired solely for investment and (2) is not used to bring about, or attempt to bring about, the substantial lessening of competition. *See E. I. du Pont*, 353 U.S. at 589. In applying the safe harbor, the Court is cognizant of the "well settled" principle that "exemptions from the antitrust laws are to be narrowly

construed"—including "express statutory exemptions." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979). As explained below, the Court need only discuss the second prong here.

To "use" stock under Section 7 means to "purposely employ" it. *See E. I. du Pont*, 353 U.S. at 606 (finding a violation of Section 7 where a company "purposely employed its stock" to substantially lessen competition). The parties prefer to say it means to "actively employ" stock. Docket No. 64 at 28; Docket No. 88 at 32; *cf. Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (interpreting "use" to mean "active employment" in another statute). Neither definition helps Defendants here.

The same allegations stating a substantive violation of Section 7 demonstrate that Defendants used their stock to bring about the substantial lessening of competition. According to the amended complaint, Defendants joined climate initiatives and committed to goals that would reduce the output of coal, made public statements supporting and furthering the goals, and then used their stock by proxy voting or engaging directly with the Coal Companies to achieve the goals. *See supra* Part III.A.1.a. And, as already explained, Plaintiffs' allegations plausibly demonstrate that Defendants did substantially lessen competition by causing the Coal Companies to restrict output and thus increase market price in the relevant coal markets. *See supra* Part III.A.1.a. Or at the very least, Defendants' conduct plausibly shows an *attempt* to do so. Defendants, in other words, actively and purposefully "us[ed] the [stock] by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." *See* 15 U.S.C. § 18.

Assuming Plaintiffs' allegations are true, as required at this stage of the proceeding, the Court concludes that the safe harbor offers no protection to Defendants.

Defendants offer no persuasive counterargument. Defendants first suggest that a partial shareholder is "using" stock to lessen competition only where it does something drastic like demand board representation, threaten to buy more shares to install its own directors, or purchase partial stock with the goal of total acquisition. *See* Docket No. 64 at 29 (citing *Am. Crystal Sugar Co. v. Cuban-Am. Sugar Co.*, 152 F. Supp. 387, 394 (S.D.N.Y. 1957), *aff'd*, 259 F.2d 524 (2d Cir. 1958); and then *Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co., Inc.*, 476 F.2d 687, 695–97 (2d Cir. 1973)). But the term "using" in the safe harbor is not so limited. The text contemplates "using" stock to include "voting *or otherwise*," meaning it covers *any* use that brings about, or attempts to bring about, the substantial lessening of competition. *See* 15 U.S.C. § 18 (emphasis added). The fact that the allegations here look different than other partial stock acquisition cases is therefore not dispositive. And to the extent Defendants argue that "using" stock requires a minority shareholder to seek "control" over a company, Docket No. 103 at 23–24, that is also incorrect, *see Denver*, 387 U.S. at 501; *see also* Docket No. 99 ("Partial acquisitions that do not result in control may nevertheless present significant competitive concerns." (quoting U.S. DEP'T OF JUST. & FED. TRADE COMM'N, MERGER GUIDELINES § 2.11 (2023))).

Defendants next argue that allowing Plaintiffs' Section 7 claim to proceed will "gut" the safe harbor and render it "a nullity" because all "institutional investors cast

proxy votes and engage with companies with an eye toward improving their internal governance."  Docket No. 103 at 24–25 (cleaned up).  But there is no basis in the statute "for treating an institutional investor differently from other investors." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1204b.  And if an institutional investor casts proxy votes, engages with companies, or otherwise uses its stock without substantially lessening competition or attempting to do the same, Section 7's safe harbor applies.  *See* 15 U.S.C. § 18.  If, however, an institutional investor takes these actions to substantially lessen competition, then, the safe harbor does not apply.  The Government makes clear that passive asset managers may still engage in "typical asset manager behavior" such as "conferring with directors and management on best practices for governance structures and oversight processes."  Docket No. 99 at 17. The problem arises when "holders of competing companies . . . discourage competition among their investments in a manner that results in harm to consumers or businesses."  *Id.* at 19.  And here, Plaintiffs have alleged much more than an institutional investor merely casting proxy votes to improve corporate governance. Plaintiffs claim that Defendants joined climate initiatives where investors committed their assets to climate-based goals that naturally lead to decreased coal output, made public statements consistent with those goals, and proxy-voted or otherwise engaged with the Coal Companies to achieve those goals.  *See supra* Part III.A.1.a; Docket No. 50 ¶¶ 113–81.  That is not "typical asset manager behavior."

Defendants also refer to Plaintiffs' Section 7 theory—so-called horizontal shareholding—as "unprecedented," "outlandish," and "legally defective."  Docket

No. 64 at 2, 24–25.  Horizontal shareholding "occurs when a relatively small number of investors, typically institutional, acquire large overlapping share interests in two or more firms."  AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1203c.  As far as the Court is aware, no court has addressed whether horizontal shareholding can ever violate Section 7.  But the text of Section 7 does not foreclose such a theory.  Indeed, the Government endorses horizontal shareholding as a legitimate theory of Section 7 liability where it threatens competition because it naturally follows from the statutory text.  *See* Docket No. 99 at 13.  As the Government interprets Section 7, a "plaintiff can satisfy its initial burden with a showing that horizontal shareholdings purchased solely for investment were in fact *used to cause* a substantial lessening of competition in one or more relevant markets."  *Id.*  And serious academic scholarship seems to agree.  *See, e.g.*, AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1203c ("[H]orizontal shareholding is reachable under § 7 where the threat to competition is present."); *see generally* Fiona S. Morton & Herbert Hovenkamp, *Horizontal Shareholding and Antitrust Policy*, 127 YALE L.J. 2026 (2018); Einer Elhauge, *Horizontal Shareholding*, 129 HARV. L. REV. 1267 (2016).

Finally, concerns about Plaintiffs' theory from *amici* appear overstated. Permitting Plaintiffs' "common ownership" theory to move forward, they say, will have far-ranging impacts on capital markets, most notably for mutual funds and exchange-traded funds.  *See* Docket No. 74-1 at 2–3; Docket No. 76 at 2–3.  But as the Court explained above, it is not Defendants' mere common ownership of competitors within a single industry that allegedly violates Section 7; rather, it is their alleged

acquisition and use of the stock to bring about, or attempt to bring about, a substantial lessening of competition that is unlawful. And even if *amici*'s concerns were valid, that would be no reason to dismiss Plaintiffs' claim. If the "special characteristics of [a] particular industry" require it to "be exempt from the usual operation of the antitrust laws," then "that appeal is properly addressed to Congress" and not the judiciary. *Alston*, 594 U.S. at 96 (cleaned up) ("[Congress] has modified the antitrust laws for certain industries in the past, and it may do so again in the future."). Until then, the Court will continue applying the text of Section 7 as written.

*    *    *

In sum, it is plausible that Defendants did what they publicly said they were going to do: use their stock to decrease the output of coal. Plaintiffs may ultimately be unable to prove this claim. Defendants may, for example, establish at a later stage that the safe harbor applies to one or all of them. But for now, Plaintiffs have sufficiently stated a plausible Section 7 claim against Defendants.

Accordingly, Defendants' motion to dismiss Count I is **DENIED**.

## B. Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. A plaintiff bringing a Section 1 claim must allege that the defendants "(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (quoting *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015)).

Plaintiffs here allege two violations of Section 1.  In Count II, Plaintiffs allege that Defendants unlawfully agreed to use their respective acquired shares in the Coal Companies to coerce those companies into implementing and adhering to a scheme of coordinated output reductions of SPRB coal and thermal coal.  Docket No. 50 ¶¶ 253–57.  In Count III, Plaintiffs allege that the overarching output-reduction conspiracy included an agreement among Defendants to compel the Coal Companies to disclose coal output information, constituting an unlawful information exchange.  *Id.* ¶¶ 258–63.  Counts II and III are each addressed in turn.

## 1. Output Reduction Conspiracy

Defendants move to dismiss Count II on two grounds:  (a) Plaintiffs have not plausibly alleged an agreement,[3] and (b) Plaintiffs have not alleged anticompetitive harm.  Docket No. 64 at 9–23.  As explained below, the Court disagrees.

### a. Conspiracy

To state a conspiracy under Section 1 of the Sherman Act, a plaintiff must allege that the defendants "engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 373–74 (5th Cir. 2014) (quoting *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008)).  The "crucial question" is whether the defendants' conduct "stem[s] from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at

---

[3]  "Conspiracy" and "agreement" are used interchangeably when referring to the first element of a Section 1 claim.  *See Willis-Knighton*, 49 F.4th at 525 (using "conspiracy" and "agreement" interchangeably for a Section 1 claim).

553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)); *see also Willis-Knighton*, 49 F.4th at 526 ("[T]acit agreements are still agreements.").

A conspiracy can be alleged in two ways: "by direct evidence, and by indirect or circumstantial evidence." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024); *see also Golden Bridge*, 547 F.3d at 271 ("Concerted action may be shown by either direct or circumstantial evidence."). Direct evidence is that which "explicitly refers to an understanding between the alleged conspirators." *Golden Bridge*, 547 F.3d at 271. Circumstantial evidence is that which "tends to exclude the possibility of independent action." *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)).

A plaintiff relying only on circumstantial evidence of a conspiracy must allege more than parallel conduct or conscious parallelism. *Twombly*, 550 U.S. at 556–57; *Golden Bridge*, 547 F.3d at 271. Parallel conduct may "get[] the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557. There must be allegations which "tend[] to exclude the possibility that [the defendants] were acting independently." *Monsanto*, 465 U.S. at 764; *Viazis*, 314 F.3d at 763 ("[A]n antitrust plaintiff must present evidence tending to exclude the possibility of independent conduct."). Such "factual enhancements" are sometimes referred to as "plus factors."

*See Royal Drug Co., Inc. v. Grp. Life & Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir. 1984); *City of Pontiac Police*, 92 F.4th at 391.

Plus factors come in many flavors. Courts have considered plus factors such as a common motive to conspire; actions that would be against the defendants' self-interest if they were acting independently, but consistent with their self-interest if they were acting in concert; opportunities to conspire; market concentration and structure conducive to collusion; pretextual explanations for anticompetitive conduct; sharing of price information; signaling among competitors; and other traditional facts suggestive of conspiracy. *See City of Pontiac Police*, 92 F.4th at 391; *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022), *aff'd*, 2025 WL 832801 (5th Cir. Mar. 17, 2025); *Acad. of Allergy & Asthma in Primary Care & United Biologics, LLC v. Superior Healthplan, Inc.*, 2022 WL 18076843, at *13 (W.D. Tex. July 14, 2022), *report and recommendation adopted*, 2022 WL 18034365 (W.D. Tex. Oct. 18, 2022).

Plaintiffs here lack direct evidence of a conspiracy. Direct evidence includes evidence like a recorded phone call where competitors agree to fix prices or an admission by a conspirator's employee that the defendants met and explicitly agreed to raise prices. *City of Pontiac Police*, 92 F.4th at 391. The only "direct evidence" proposed by Plaintiffs is Defendants' decisions to join NZAM and CA100. *See* Docket No. 88 at 39–44. While becoming a signatory to these climate initiatives announces a commitment to the public, it is not necessarily a commitment by Defendants *to each other*—at least as alleged in the amended complaint. In other words, becoming a

32

signatory does not "explicitly refer to an understanding" between Defendants specifically. *See Golden Bridge*, 547 F.3d at 271. And even Plaintiffs agree that not all signatories were members of the alleged conspiracy. *See* Hearing Tr. 78:16–79:10.

Plaintiffs do, however, plausibly allege the existence of a conspiracy among Defendants based on circumstantial evidence. This is a close call. But Plaintiffs' burden is not higher merely because their allegations rely entirely on circumstantial evidence. *See City of Pontiac Police*, 92 F.4th at 391 ("The gun need not be smoking, however, if Plaintiffs allege sufficient indirect, circumstantial evidence."). Plaintiffs allege both parallel conduct and plus factors suggestive of an agreement by Defendants to pressure the Coal Companies to reduce output.

### i.

Start with parallel conduct. *First*, all Defendants became signatories of NZAM where they each committed to pursue "net zero emissions by 2050 or sooner" for "all assets under management" using a "clear escalation and voting policy," Docket No. 50 ¶ 115 (quoting *The Net Zero Asset Managers Commitment*, *supra*), and were expected to "immediately cease[] all financial or other support to coal companies[]" seeking to expand production, *id.* ¶ 131 (quoting *Network Partners' Expectation of Signatories With Regard to Fossil Fuel Investment Policy*, *supra*). Indeed, BlackRock and Vanguard joined on the *exact same day*, with State Street joining only a few weeks behind. *Id.* ¶¶ 132, 137, 143. BlackRock and State Street also became signatories of CA100 in 2020 where they committed to, among other things, "[t]ake action to reduce greenhouse gas emissions . . . in line with the overarching goals of the Paris

33

Agreement." *Id.* ¶ 117 (quoting *BlackRock Joins Climate Action 100+, supra*). Therefore, all Defendants publicly joined climate initiatives promoting goals that naturally resulted in the reduction of coal output. *See id.* ¶¶ 115–25, 130–31. These allegations alone are strong evidence of "a conscious commitment to a common scheme designed to achieve an unlawful objective." *See Marucci Sports*, 751 F.3d at 374 (quoting *Golden Bridge*, 547 F.3d at 271). *Second*, as explained above, all Defendants confirmed these climate-based goals through public statements. *See supra* Part III.A.1.a; Docket No. 50 ¶¶ 138–39, 166, 168. And all used their influence to act in furtherance of the climate-based initiatives by either proxy voting, *id.* ¶¶ 168–72, 174, 177, or engaging directly with the Coal Companies' leadership, *id.* ¶¶ 157–58, 160, or both.

Thus, Plaintiffs sufficiently allege that Defendants engaged in parallel conduct. But the allegations go beyond mere parallel conduct. Three alleged plus factors enhance Defendants' parallel conduct and push this claim across "the line between possibility and plausibility." *See Twombly*, 550 U.S. at 557.

*First*, Defendants undoubtedly shared a moral "motive to conspire." *See JSW Steel*, 586 F. Supp. 3d at 596. It's not a stretch to infer that Defendants believed they were morally compelled to fight "climate change" and "global temperature increases" because they joined climate initiatives that committed to taking necessary action on climate change, reducing coal emissions, and limiting global warming.[4] *See, e.g.*,

---

[4] Notably, no inference is needed for State Street. In a public announcement after joining CA100, State Street explicitly identified the growing threat of climate change as its reason for joining. *See Insights: Why We're Joining Climate Action 100+*, STATE STREET GLOB. ADVISORS (Nov. 30, 2020), https://bit.ly/3MUJuz9 (cited at Docket No. 50 ¶ 128).

Docket No. 50 ¶¶ 115–18, 130–31.  But even well-intentioned moral motives are no excuse for antitrust violations.  *See Alston*, 594 U.S. at 95 ("The social justifications proffered for [a] restraint of trade do not make it any less unlawful." (cleaned up)); *Phila. Nat'l Bank*, 374 U.S. at 371 (holding that a Section 7 violation "is not saved because, on some ultimate social reckoning of social or economic debits and credits, it may be deemed beneficial").

*Second*, Plaintiffs allege that Defendants also had an economic motive to conspire.  *See JSW Steel*, 586 F. Supp. 3d at 596.  Defendants have billions of dollars invested in the Coal Companies, Docket No. 50 ¶¶ 19–56, and the Coal Companies allegedly profited tremendously in 2022 when coal prices skyrocketed while output did not, *see id.* ¶ 240.  Plaintiffs allege that this has resulted in "higher returns, higher fees, and higher profits" for Defendants.  *Id.* ¶ 1.  And whether Defendants were driven primarily by morals or economics, the motive to conspire is plain:  the likelihood of successfully leveraging their influence over the Coal Companies only increased as each Defendant agreed to do so.  With three of the largest institutional investors in the world allegedly working together—and with about 25%–35% collective ownership in most of the Coal Companies—the alleged conspiracy was far more likely to succeed.

And *third*, Defendants allegedly agreed to pressure the Coal Companies to disclose competitive information pertaining to their future output.  *Id.* ¶¶ 121–22, 139–41, 168–74, 177, 259.  These allegations form the basis of Plaintiffs' second Sherman Act claim and are discussed in more detail below.  *See infra* Part III.B.2.

But the allegations double as a plus factor here because "an agreement to exchange supply and production information may, under appropriate circumstances, serve as circumstantial evidence of an agreement to restrict supply and raise prices." *In re Coordinated Pretrial Procs. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 462 (9th Cir. 1990).

### ii.

Defendants' arguments that Plaintiffs failed to allege a conspiracy are unpersuasive. Defendants first contend that NZAM or CA100 are more like permissible "trade associations" than evidence of a conspiracy. *See* Docket No. 64 at 10–12; Docket No. 103 at 4–9, 11. It is true that a "trade association" is "not by its nature a 'walking conspiracy.'" *Viazis*, 314 F.3d at 764 (quoting *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988)). In *Consolidated Metal*, for example, a trade association granted licenses to put its logo on products as an indicator that the product satisfied certain quality standards. 846 F.2d at 286. The Fifth Circuit held this was not a per se violation of Section 1 because the trade association operated "without constraining others to follow its recommendations." *Id.* at 292. Manufacturers remained free to sell products without the trade association's certification, and consumers remained free to buy them. *Id.* In other words, competition was not suppressed.

NZAM and CA100 are noticeably different. First, both climate initiatives *did* seek commitments from their signatories. NZAM signatories *committed* to "[i]mplement a stewardship and engagement strategy, with a clear escalation and

voting policy, that is consistent with our ambition for all assets under management to achieve net zero emissions by 2050 or sooner." Docket No. 50 ¶ 115 (quoting *The Net Zero Asset Managers Commitment*, *supra*). This meant suppressing coal production. *Id.* And CA100 signatories *committed* to "[t]ake action to reduce greenhouse gas emissions" in accordance with the goals of the Paris Agreement, implement stronger accountability and oversight of "climate change risks and opportunities," and "[e]nhance corporate disclosure in line with the recommendations of" TCFD. *Id.* ¶ 117 (quoting *BlackRock Joins Climate Action 100+*, *supra*). This also meant suppressing coal production. *Id.* ¶ 118–20. Second, NZAM and CA100 advocate for climate-based goals that threaten the entire coal industry, not just particular products within an industry that fail to meet certain quality standards. *See Consol. Metal*, 846 F.2d at 292. While the Court is not suggesting that NZAM or CA100 were themselves the venue of an illegal agreement, neither were they mere "trade associations" as Defendants claim.

Defendants next argue that their participation in the alleged conspiracy differed both in the degree in which they participated and the way in which they participated—and thus that they did not engage in parallel conduct. As to the degree, several Defendants argue that their alleged participation is less than others. *See* Docket No. 64 at 13 (noting that only Vanguard allegedly held routine meetings with four of the Coal Companies); Docket No. 66 at 3–4 (noting that Vanguard did not join CA100 and is not alleged to have exercised proxy votes against the Coal Companies); Docket No. 67 at 4–5 (arguing that the State Street allegations show only its "limited

participation" in the climate initiatives). But Defendants are wrong to suggest that every defendant in an antitrust conspiracy must be an equal participant to be liable. *See MM Steel*, 806 F.3d at 844 (holding that an antitrust plaintiff need not prove that a defendant "orchestrated the plan" because "parties who knowingly join an antitrust conspiracy, like any conspiracy, are liable to the same extent as other conspirators").

As to the way in which they participated, Defendants also argue that their alleged participation lacks parallelism because it is not identical. *See* Docket No. 64 at 13–14 (arguing that Defendants' proxy votes were not identical as to each individual director); *id.* at 10–11 (noting that Defendants mostly joined and left the climate initiatives at different times). But parallel conduct "need not be exactly simultaneous and identical in order to give rise to an inference of agreement." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015) (citation omitted); *see also Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); *Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *1 (9th Cir. July 21, 2023) ("Parallel pricing need not be identical so long as it is similar and reasonably contemporaneous."). What matters is that each Defendant is alleged to have taken *similar* actions with the *same* goal: pressure the Coal Companies to reduce output. *See SD3*, 801 F.3d at 429 ("[P]arallel conduct must produce parallel results.").

Lastly, Defendants throughout their briefing seek to distance themselves from the climate initiatives' statements or otherwise soften their impact. *See, e.g.*, Docket

38

No. 64 at 12 (stating that "while the Complaint cites a CA100+-authored document stating that achieving net-zero emissions would require a decrease in coal production, Defendants did not join this statement"); *id.* at 11 (pointing to other statements where Defendants said they would continue acting independently according to their fiduciary duties and clients' preferences).  But such arguments are merely contesting Plaintiffs' allegations.  The scope of Defendants' commitments to the climate initiatives and whether they acted in accordance with those commitments are disputed fact issues that the Court need not resolve at this stage.

*    *    *

Accordingly, Plaintiffs' allegations include parallel conduct and plus factors that plausibly allege an agreement among Defendants to pressure the Coal Companies to reduce coal output in the relevant markets.

### b.  Restraint of Trade

Plaintiffs must next allege that Defendants restrained trade in violation of Section 1.  *See Willis-Knighton*, 49 F.4th at 525.

"[T]he phrase 'restraint of trade' is best read to mean 'undue restraint.'"  *Am. Express*, 585 U.S. at 540 (quoting *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59–60 (1911)).  Accordingly, Section 1 is understood "to outlaw only *unreasonable* restraints."  *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

"Restraints can be unreasonable in one of two ways."  *Id.*  Some restraints are unreasonable *per se*.  *Id.*  These are typically "horizontal" restraints—agreements between competitors—and "always or almost always tend to restrict competition and

39

decrease output." *Id.* (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)).  In other words, a restraint is unlawful *per se* where it "so obviously threaten[s] to reduce output and raise prices that [it] might be condemned as unlawful *per se* or rejected after only a quick look." *Alston*, 594 U.S. at 89.

"Restraints that are not unreasonable *per se* are judged under the 'rule of reason.'" *Am. Express*, 585 U.S. at 541.  Indeed, courts should presume that the rule of reason analysis applies.  *See Alston*, 594 U.S. at 81.  "The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Am. Express*, 585 U.S. at 541 (cleaned up).  It "distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

To satisfy the rule of reason, a plaintiff must show that "the agreement caused anticompetitive effects or 'created the potential for anticompetitive effects.'" *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 310 (5th Cir. 1997)). "Anticompetitive effects are those that harm consumers.  Think increased prices, decreased output, or lower quality goods." *Id.* at 493.  A plaintiff can show anticompetitive effect either "directly or indirectly." *Am. Express*, 585 U.S. at 542. Direct evidence "would be proof of actual detrimental effects on competition." *Id.*

40

(cleaned up).  "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition."  *Id.*

Plaintiffs here do not allege a restraint that is unlawful *per se*.  To be sure, a horizontal agreement among competitors to reduce output within their industry is unlawful *per se*.  *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 (1984) ("[W]hen there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." (cleaned up)).  But the alleged conspiracy here is not that.  Rather, Plaintiffs allege a horizontal agreement among investors to pressure competitors in *another industry* to reduce output.  As Defendants point out—and Plaintiffs do not contest—this restraint is "the first of its kind."  Docket No. 64 at 23.  And because "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue," *Leegin*, 551 U.S. at 886, the Court declines to apply it here.

Plaintiffs' alleged conspiracy fares better under the rule of reason.  Plaintiffs allege that between 2019 and 2022, the average market price for thermal coal and SPRB coal increased by 25.5% and 21.2% respectively.  Docket No. 50 ¶¶ 228–29.  During that time, the average output produced by the Coal Companies decreased by 19.2% and 18.2% respectively.  *See id.*  Increased prices and decreased output are precisely the "anticompetitive effects" harming consumers that Plaintiffs must allege.  *See Impax Labs.*, 994 F.3d at 493; *cf. also Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x 410, 412 (5th Cir. 2007) (dismissing a Sherman Act claim where plaintiff

failed to allege "rise in the price" above a competitive level or "decrease in supply" in the relevant market).  And while the alleged restraint's structure is unique, Plaintiffs plausibly allege that its purpose and effect is not:  it is a "concerted attempt to reduce output" in violation of the rule of reason.  *See Consol. Metal*, 846 F.2d at 293; *see also Bd. of Regents of Univ. of Okla.*, 468 U.S. at 107 ("A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law.").  And, as explained above, Plaintiffs plausibly allege that Defendants' conspiracy and conduct have "caused" these "anticompetitive effects."  *See Impax Labs.*, 994 F.3d at 492; *see supra* Parts III.A.1.a, III.B.1.a.  That is all Plaintiffs must do at this stage.

Defendants' principal argument to the contrary is, again, to argue that 2020 is the proper starting point for analyzing the relevant coal market data.  *See* Docket No. 64 at 19–20; Docket No. 103 at 14–15.  For the same reasons discussed in the Clayton Act analysis above, *see supra* Part III.A.1.b, the Court accepts the 2019 data as the proper starting point to analyze the market data, at least at the pleadings stage.

Defendants also argue that coal output has been declining for decades, and thus there is no reason to conclude that 2022 output levels should have returned to 2019 output levels.  Docket No. 103 at 15; *see also* Docket No. 64 at 21.  Perhaps.  But perhaps not.  Questions involving liability—such as whether and to what extent Defendants' alleged agreement caused the alleged anticompetitive harm—are weighty economics questions that the Court will not resolve at this stage.  *Cf. Sanger*

*Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 734 (5th Cir. 2015) ("The liability issues that arise in antitrust litigation often involve 'complicated legal, factual, and technical (particularly economic) questions.'" (quoting MANUAL FOR COMPLEX LITIGATION (Fourth) § 30 (2004)).  What matters here is that Plaintiffs plausibly alleged anticompetitive harm.  And in any event, Defendants' reliance on the natural decline of coal fails to explain why the 2022 market prices drastically increased and why the Coal Companies opted not to capitalize by increasing output when they were allegedly capable of doing so.  *See Am. Express*, 585 U.S. at 547–48 (explaining that a plaintiff establishing anticompetitive effect may offer evidence that price is "higher than the price one would expect to find in a competitive market"); *In re Payment Card*, 714 F. Supp. 3d at 83.

*    *    *

Plaintiffs may ultimately be unable to prove that Defendants entered into an agreement to pressure the Coal Companies that led to anticompetitive effects in the relevant coal markets.  But at this stage, Plaintiffs' Section 1 claim is plausibly alleged.

Accordingly, Defendants' motion to dismiss is **DENIED** as to Count II.

## 2. Information Sharing Conspiracy

Defendants also move to dismiss Count III for failure to allege an anticompetitive information-sharing scheme.  Docket No. 64 at 23–24; Docket No. 103 at 17–19.  The Court concludes that Count III is adequately alleged.

An agreement to exchange competitive information can constitute a Section 1 violation.  *See United States v. Container Corp. of Am.*, 393 U.S. 333, 334–35 (1969).

43

An information-sharing claim is "closely related but analytically distinct" from most Section 1 claims. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.). While it is "based on § 1 of the Sherman Act," the alleged "violation lies in the information exchange itself." *Id.* Although "[t]he exchange of price data and other information among competitors" is not "a *per se* violation of the Sherman Act," courts apply the rule of reason to "divin[e] the procompetitive or anticompetitive effects" of the agreement. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also Todd*, 275 F.3d at 198 (applying the rule of reason to an information-sharing claim). And while most information-exchange cases involve price data, exchanging output or supply information may also restrain trade in violation of Section 1. *See In re Coordinated Pretrial Procs.*, 906 F.2d at 462 ("[P]roduction and supply data dissemination cannot be treated as categorically different from price information exchanges."); *Gypsum*, 438 U.S. at 441 n.16 (discussing exchanges pertaining to "price data *and other information*" (emphasis added)).

As with any Section 1 claim, Plaintiffs must allege that Defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market. *See Willis-Knighton*, 49 F.4th at 525. Again, only the first two elements are contested at this stage. *See* Docket No. 64 at 17–19.

### a.

Plaintiffs first allege a conspiracy by stating that Defendants agreed to pressure the Coal Companies to disclose "timely, competitive-sensitive information" related to coal output. Docket No. 50 ¶ 259. Because Plaintiffs state that this

agreement was "part of" the broader alleged conspiracy to reduce coal output, *see id.*, the conspiracy is plausibly supported by the same alleged parallel conduct and plus factors discussed above, *see supra* Part III.B.1.a.   In addition, the following allegations pertain specifically to the information-exchange conspiracy.

Plaintiffs allege that CA100 signatories, which include BlackRock and State Street, sought commitments from the Coal Companies to disclose their "planned thermal coal production factored into its short, medium, and long-term targets" and "Scope 3, category 11 emissions."  *See* Docket No. 50 ¶¶ 121–22 (quoting and citing INVESTOR EXPECTATIONS FOR DIVERSIFIED MINING, *supra* at 37–38).  BlackRock also allegedly "ask[ed] companies to set short-, medium-, and long-term targets for greenhouse gas reductions."  *Id.* ¶ 168 (quoting *Larry Fink's 2022 Letter to CEOs: The Power of Capitalism*, *supra*).   And Vanguard, Plaintiffs say, sought "clear disclosures" from coal producers including an "[e]xplanation of how thermal coal remains relevant . . . over 10, 20, and 30, years," as well as required "[e]ffective disclosure[s]" from thermal coal producers of their compliance with these targets "to allow the market to accurately price securities."  *Id.* ¶¶ 139–40 (quoting VANGUARD'S EXPECTATIONS FOR COMPANIES WITH SIGNIFICANT COAL EXPOSURE, *supra* at 2–3). Moreover, Plaintiffs allege that BlackRock and State Street explicitly voted against several directors of the Coal Companies for lack of adequate climate-related disclosures.  *See id.* ¶¶ 168–174, 177.  And Plaintiffs say that Vanguard met with coal producers about setting targets and "announced that it would discipline management

that failed to meet its demands" when voting on shareholding proposals and directors. *Id.* ¶¶ 139, 141.

These allegations, in conjunction with the allegations supporting the first Section 1 claim, are sufficient to allege an agreement among Defendants to pressure the Coal Companies to disclose competitive information related to coal output.

### b.

Plaintiffs also sufficiently state that Defendants' alleged agreement restrained trade in violation of the rule of reason. *See Todd*, 275 F.3d at 198. A prominent factor in the Court's analysis is "the nature of the information exchanged." *Gypsum*, 438 U.S. at 441 n.16. The exchange of current or future information is the most likely to generate anticompetitive effects. *See id.* ("Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not *per se* unlawful have consistently been held to violate the Sherman Act."); *Todd*, 275 F.3d at 211 ("[E]xchanges of future price information are considered especially anticompetitive.").

Plaintiffs here allege that the nature of Defendants' agreement involved future coal output information. *See* Docket No. 50 ¶¶ 121–22, 139–40. The climate disclosures allegedly sought by Defendants would effectively allow the Coal Companies to learn of each other's planned coal production. *See id.* ¶ 122. For example, Plaintiffs say that Defendants demanded "Scope 3, category 11 emissions" disclosures which "reflect the total lifetime carbon emissions that would be generated by the consumption of that coal." *Id.*; *see also id.* ¶ 180. The result of that, Plaintiffs

46

say, is that the Coal Companies could calculate each other's future output targets. *See id.* ¶ 122. Thus, because the Coal Companies can discern each other's future coal production because of Defendants' alleged agreement, Plaintiffs have plausibly alleged a restraint of trade that creates potential for (and has allegedly already caused) anticompetitive effects. *See Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 397–98 (1921) (explaining that the exchange of future production and supply information "could readily evolve an attractive basis for cooperative, even if unexpressed, 'harmony' with respect to future prices"); *Impax Labs.*, 994 F.3d at 492; *see also supra* Part III.B.1.b.

*    *    *

Accordingly, Defendants' motion to dismiss Count III is **DENIED**.

### C. State Antitrust Claims

Texas, Montana, Indiana, Iowa, Kansas, Louisiana, Nebraska, Oklahoma, and West Virginia allege violations of their respective state antitrust laws. Docket No. 50 ¶¶ 264–309. At this stage, all parties agree that these claims should rise or fall with the federal antitrust claims. Docket No. 64 at 33; Docket No. 88 at 54. This is because these States' antitrust laws are interpreted in parallel with federal antitrust law. *See* Docket No. 64 at 33–34 (collecting cases).

Accordingly, because Plaintiffs have alleged plausible claims against Defendants under federal antitrust law, Defendants' motion to dismiss is similarly **DENIED** with respect to the States' antitrust claims (Counts IV–XIV).

## IV. BLACKROCK'S MOTION TO DISMISS

BlackRock moves to dismiss the consumer protection law violations brought by Texas, Montana, Iowa, Louisiana, and Nebraska.  Docket No. 65.  These claims arise primarily out of four investment funds that BlackRock allegedly marketed as not pursuing an "ESG investment strategy."  Docket No. 50 ¶¶ 192–93.  Plaintiffs argue that such marketing was deceptive and misrepresentative because these funds own shares in the Coal Companies and BlackRock used its power from these shares— through proxy voting, engaging with companies, or otherwise—to advance an ESG agenda.  *Id.* ¶¶ 192–224.

BlackRock raises two issues that the Court must address:  (A) whether the state consumer protection laws exclude claims based on the marketing of securities; and (B) whether the States sufficiently alleged that BlackRock made deceptive and material misrepresentations in marketing these securities.  *See* Docket No. 65 at 4.  The Court discusses each issue in turn.

### A. Applicability of State Consumer Protection Laws to Securities

BlackRock argues that none of the States' laws applies to the marketing and sale of securities.  *Id.* at 30–32.  As explained below, the Court agrees that Louisiana's law and one of the Nebraska statutes do not apply here.  As for the rest, the Court concludes that nothing precludes their application to the transactions at issue.

### 1. Louisiana

The Louisiana Unfair Trade Practices Act ("LUTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  LA. REV. STAT. § 51:1405(A).  But the statute exempts "transactions subject to the jurisdiction of

48

. . . the commissioner of financial institutions." *Id.* § 51:1406(1). And under Louisiana law, "the commissioner of financial institutions . . . has authority to regulate securities transactions." *Smith v. Cooper/T. Smith Corp.*, 846 F.2d 325, 328 (5th Cir. 1988), *vacated then reinstated in relevant part*, 886 F.2d 755 (5th Cir. 1989). Accordingly, the Fifth Circuit has made clear that LUTPA "specifically exempts securities transactions." *Id.* at 328–29; *see also Feiber v. Cassidy*, 723 So.2d 1101, 1107 (La. Ct. App. 1998) ("LUTPA does not apply to securities transactions.").

Accordingly, Plaintiffs here cannot bring a claim under LUTPA based on allegedly deceptive statements related to BlackRock's sale of securities. And they do not contest this conclusion. *See* Docket No. 88 at 66. Instead, Plaintiffs argue "it would be premature to dismiss [the LUTPA] claim in its entirety" because some of BlackRock's alleged misrepresentations "pertain to its business as a whole, rather than in relation to the sale of a particular security." *Id.* But LUTPA does not exist to police all misrepresentations any company might make. It exists to police *transactions*. *See* LA. REV. STAT. § 51:1405(A) (prohibiting unfair or deceptive acts or practices in "trade or commerce"). And the only transactions challenged in Plaintiffs' allegations pertain to the sale of securities. *See* Docket No. 50 ¶ 224 (alleging BlackRock "materially misrepresented the characteristics of the *exchange trade funds*, *mutual funds*, and *other financial products* that it marketed to investors" and "induced investors to *purchase investment funds* they would not otherwise have purchased" (emphases added)).

49

The Court further notes that, apart from the deceptive-statement-based allegations pertaining to BlackRock, Plaintiffs also allege that all Defendants violated LUTPA based on the antitrust-related allegations. *See* Docket No. 50 ¶¶ 325–27; Docket No. 88 at 67. Plaintiffs' briefing on this claim is sparse. *See* Docket No. 88 at 67. Notably, Plaintiffs cite no case where an antitrust violation was the basis of a LUTPA claim. And the Court need not entertain such an underdeveloped theory.

Accordingly, Defendants' joint motion and BlackRock's motion are **GRANTED** on this ground, and Count XVIII is **DISMISSED**.

### 2. Montana

The Montana Consumer Protection Act ("MCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE § 30-14-103. But the statute exempts "actions or transactions permitted under laws administered by . . . the state auditor." *Id.* § 30-14-105(1). Under Montana law, the state auditor is "the ex officio securities commissioner" tasked with administering securities regulation. *Id.* § 30-10-107(1); *see also id.* §§ 30-10-301, -307. The parties cite no authority addressing whether the MCPA exempts securities transactions, and the Court finds none.

BlackRock argues that because securities transactions are "permitted" under Montana law, the MCPA does not apply to any claim based on a securities transaction. Docket No. 103 at 36. Montana law, however, prohibits "any untrue statement of a material fact" made "in connection with the offer, sale, or purchase of

50

any security." MONT. CODE § 30-10-301(1)(b). Thus, the specific actions or transactions challenged by Plaintiffs are not "permitted" under Montana law.

BlackRock contends that such an interpretation "would read the exemption out of the statute." Docket No. 103 at 36. But the state auditor may permit a certain practice that could be the subject of an MCPA claim, *see, e.g.*, MONT. CODE § 30-10-301(5) (describing a type of investment advisory contract that is *not* prohibited under securities law), and the exemption would make clear that such practice is not covered by the MCPA. BlackRock's interpretation, moreover, is too broad and would exempt from the statute entire categories of transactions even if the transactions are the result of fraud and deceit. BlackRock also fails to deal adequately with the statute's use of the single term "permitted," which stands in contrast to other statutes exempting transactions "permitted, prohibited, or regulated" under other laws. *E.g.*, NEB. REV. STAT. § 59-1617. If the Montana Legislature meant to entirely remove securities transactions from the MCPA, it would have used additional language like Nebraska or sweeping language like Louisiana. *See* LA. REV. STAT. § 51:1406(1).

Accordingly, Plaintiffs' MCPA claim is not barred by the statute's exception clause.

### 3. Nebraska

BlackRock moves to dismiss several claims brought under Nebraska law. Docket No. 65 at 31–32. Counts XIX and XX allege violations of the Nebraska Consumer Protection Act ("NCPA"). Docket No. 50 ¶¶ 328–39. And Count XXI alleges a violation of the Nebraska Uniform Deceptive Trade Practices Act ("NDTPA"). *Id.* ¶¶ 340–42. Each is addressed in turn.

**NCPA Claims.** The NCPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602. But the NCPA exempts "actions or transactions otherwise permitted, prohibited, or regulated under laws administered by . . . any other regulatory body or officer acting under statutory authority of this state or the United States." *Id.* § 59-1617. Again, with no cited authority from the parties addressing whether the NCPA exempts securities transactions, the Court looks to the text. *See In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019).

The plain text of the NCPA excludes a claim based on a securities transaction. The NCPA broadly exempts "actions or transactions" that are "regulated" by either Nebraska or federal law. And securities transactions are regulated both by Nebraska's Director of Banking and Finance pursuant to the Securities Act of Nebraska, *see* NEB. REV. STAT. §§ 8-1101, 8-1102, 8-1116, and federally by the Securities and Exchange Commission, *see* 15 U.S.C. §§ 78b, 78d. Accordingly, Plaintiffs' allegations based only on statements related to securities transactions cannot support an NCPA claim.

BlackRock's motion on this ground is thus **GRANTED**, and Counts XIX and XX are **DISMISSED**.

**NDTPA Claim.** The NDTPA "prohibits a broad panoply of deceptive trade practices." *Weisenberger v. Ameritas Mut. Holding Co.*, 597 F. Supp. 3d 1351, 1370 (D. Neb. 2022) (citation omitted); *see also* NEB. REV. STAT. §§ 87-301, *et seq.* The NDTPA exempts "[c]onduct in compliance with the orders or rules of, or a statute

administered by, a federal, state, or local governmental agency." NEB. REV. STAT. § 87-304(a)(1). Again, the Court need not look beyond the statute's text to resolve whether the exemption bars Plaintiffs' claim. *See DeBerry*, 945 F.3d at 947.

The NDTPA plainly exempts conduct "in compliance" with applicable state or federal law. Thus, conduct *not* "in compliance" with such law is within the scope of the NDTPA. *Cf.* SCALIA & GARNER, READING LAW 107 (negative-implication canon). And because "any untrue statement of a material fact" made "in connection with the offer, sale, or purchase of any security" is not in compliance with Nebraska law, *see* NEB. REV. STAT. § 8-1102(1)(b), Plaintiffs' allegations pertaining to BlackRock's misrepresentations regarding the sale of securities are not exempted from liability under the NDTPA.

Accordingly, Plaintiffs' NDTPA claim is not barred by the statute's exception clause.

### 4. Iowa

The Iowa Consumer Fraud Act ("ICFA") prohibits

> The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes, whether or not a person has in fact been misled, deceived, or damaged . . . .

IOWA CODE § 714.16(2)(a). The ICFA does not include any exemption purporting to exclude misrepresentations related to securities or other financial products. Rather, "merchandise" is statutorily defined to include "intangibles, securities, bonds,

debentures, [and] stocks." *Id.* § 714.16(1)(e). Indeed, the Supreme Court of Iowa has applied the ICFA to a claim involving the sale of securities where the violator made "representations [that] were false" and "failed to share material information with potential investors." *State ex rel. Miller v. Pace*, 677 N.W.2d 761, 772 (Iowa 2004). Plaintiffs' claim, which similarly involves alleged misrepresentations by BlackRock in the sale of securities, is therefore covered by the ICFA.

BlackRock, however, maintains that the ICFA excludes securities transactions. Docket No. 65 at 32. BlackRock argues that Iowa has "peg[ged]" the ICFA to the FTC Act because the Supreme Court of Iowa has previously relied heavily on the FTC Act in a case applying the ICFA. *See id.* at 11 n.21, 32; Docket No. 103 at 37 (citing *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34–37 (Iowa 2013)). And thus, because the "FTC Act has been interpreted to preclude coverage of securities claims," *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1101 (5th Cir. 1988), then BlackRock argues the same must be true for the ICFA. But the Court will not adopt such an interpretation simply because the Supreme Court of Iowa heavily relied on the FTC Act once, especially when such an interpretation overlooks both the statutory text and the Supreme Court of Iowa's prior application of the ICFA.

Accordingly, Plaintiffs' ICFA claim is not barred merely because it involves the sale of securities.

### 5. Texas

The Texas Deceptive Trade Practices and Consumer Protection Act ("TDTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade

or commerce." TEX. BUS. & COM. CODE § 17.46(a). The TDTPA provides that its remedies "are in addition to any other procedures or remedies provided for in any other law," *id.* § 17.43, and that its provisions "shall be liberally construed and applied to promote its underlying purposes" such as "to protect consumers against false, misleading, and deceptive business practices," *id.* § 17.44(a). The TDTPA's exemptions do not reference securities transactions. *See id.* § 17.49 (enumerating TDTPA exemptions); *Frizzell v. Cook*, 790 S.W.2d 41, 44 (Tex. App.—San Antonio 1990, writ denied) ("The only exemptions intended by the Legislature are those delineated in section 17.49, which *do not* exempt securities transactions."). The TDTPA by its terms thus applies to Plaintiffs' claim based on alleged misrepresentations by BlackRock in the sale of securities in Texas.

BlackRock nevertheless argues that the TDTPA excludes securities transactions for the same reason they're excluded in Iowa: "Texas . . . peg[s] [its] consumer-protection laws to the FTC Act, which 'has been interpreted to preclude coverage of securities claims.'" Docket No. 65 at 32 (quoting *Stephenson*, 839 F.2d at 1101). But again, that argument fails. It is true that "in construing [§ 17.46(a)] . . . courts to the extent possible will be guided by [§ 17.46(b)] and the interpretations given by the Federal Trade Commission and federal courts to [the FTC Act]." TEX. BUS. & COM. CODE § 17.46(c)(1). But it does not follow that the scope of conduct exempted under the TDTPA must be identical to conduct exempted by the FTC Act. After all, the Texas Legislature explicitly enumerated acts it chose to

exempt from the TDTPA, and it did not include securities transactions.  *See id.* § 17.49.

Accordingly, Plaintiffs' TDTPA claim is not barred.

### B. Plausibility of the States' Claims

BlackRock seeks to dismiss the remaining claims, arguing that Plaintiffs failed to plausibly allege that BlackRock's statements were (1) deceptive or (2) material. Docket No. 65 at 11.  The Court addresses each ground in turn.

### 1. Deceptive

Plaintiffs may allege a plausible claim under each of the remaining consumer protection claims if BlackRock made misleading, deceptive, misrepresentative, or false statements in selling financial products.  *See WLW Realty Partners, LLC v. Cont'l Partners VIII, LLC*, 360 P.3d 1112, 1118 (Mont. 2015) (explaining that "in order for a representation to be actionable under the MCPA, it must have been *untrue when made*"); NEB. REV. STAT. § 87-302(5), (8); IOWA CODE § 714.16(2)(a); TEX. BUS. & COM. CODE  § 17.46(b)(5), (7), (9).    To  determine  whether  BlackRock's  alleged misrepresentations are actionable, the Court may consider the amended complaint, the entire documents cited by the amended complaint, and documents filed publicly with the Securities and Exchange Commission.  *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996).

The primary alleged misrepresentation is a disclaimer included by BlackRock in marketing each of the four, what Plaintiffs call, "non-ESG funds":

> **This fund does not seek to follow a sustainable, impact or ESG investment strategy.**  The metrics do not change the fund's investment objective or constrain the

56

> fund's investable universe, and there is no indication that
> a sustainable, impact or ESG investment strategy will be
> adopted by the fund.  For more information regarding the
> fund's investment strategy, please see the fund's
> prospectus.

*See* Docket No. 50 ¶¶ 193–94; Docket No. 65 at 15.  Plaintiffs allege that "a reasonable consumer would understand that an 'investment strategy' includes things like engagements and proxy voting."  Docket No. 50 ¶ 196.  Therefore, Plaintiffs allege that the disclaimer is false, misleading, or deceptive because it is inconsistent with BlackRock's commitments to NZAM, CA100, and its use of ESG engagements and proxy voting.  *Id.* ¶¶ 197–207.  For example, and as already discussed, NZAM signatories allegedly committed to an "engagement strategy, with a clear escalation and voting policy," for "*all assets under management* to achieve net zero emissions by 2050 or sooner."  *Id.* ¶ 197 (quoting *The Net Zero Asset Managers Commitment*, *supra*).  Thus, Plaintiffs allege that BlackRock deceptively marketed the funds as not following an ESG strategy and then proceeded to use the power gained from them to pursue ESG-based goals through engagements and proxy voting.  *See id.* ¶¶ 197–207.

At this stage, Plaintiffs plausibly allege that BlackRock's disclaimer was false or misleading in violation of the several consumer protection laws.  Notably, Plaintiffs allege several industry examples where the term "investment strategy" is broadly used to include activities like engagements and proxy voting—including an example from BlackRock itself.  *See id.* ¶ 196.  Thus, based on the allegations, a reasonable consumer could believe that "investment strategy" is not inherently limited to picking stocks, but also includes engagements and proxy voting.  Therefore, the disclaimer

could "mislead[] those consumers who invested their savings into non-ESG funds because they do *not* wish to support ESG causes, do *not* believe that promoting climate causes enhances shareholder value, or do *not* believe that investment decisions should be driven by social policy or ideology." *Id.* ¶ 224.

BlackRock offers three arguments for why the statements about "investment strategy" were not deceptive as a matter of law. Docket No. 65 at 13–23. All fail.

*First*, BlackRock argues that the context around the "investment-strategy" statements—both around the statements and in the prospectus referenced by the statements—clarify that BlackRock means only that "the fund does not pick stocks based on environmental considerations." *Id.* at 15. But the surrounding context does not clear the ambiguity because the phrases "investment objective" or "investable universe" do not plainly exclude ESG engagement or proxy voting from the meaning of "investment strategy." And the prospectus offers no help because it neither defines "investment strategy" nor clarifies that the phrase refers only to picking stocks. Thus, this is not a case where the lack of clarity is explained by referring to another unambiguous source. *See, e.g.*, *Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 396 (Tex. App.—Dallas 2012, no pet.) (rejecting a TDTPA claim because some documents' "lack of clarity" did "not rise to the level of being misleading" where the documents "pointed beyond themselves" to clarify the terms); *Tolbert ex rel. Tolbert v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 657 F.3d 262, 270 (5th Cir. 2011) (finding ambiguous language did "not rise to the level of a

misrepresentation" because "the reference to" another document "adequately informs a reasonable person" how to resolve the ambiguity).

*Second*, BlackRock argues that it cannot label the four funds as "ESG" funds based only on its investment stewardship activity without running afoul of SEC regulations requiring "at least 80 percent of the value of [the fund's] assets" to be "in accordance with the investment focus that the fund's name suggests." *See* Investment Company Names, 88 Fed. Reg. 70436, 70436 (Oct. 11, 2023). Because 80% of the four funds' assets are not focused on ESG, BlackRock says Plaintiffs' consumer-protection claims effectively place it "between the Scylla and Charybdis of federal and state enforcement." *See* Docket No. 65 at 18–19. But this Odyssean dilemma is a myth of BlackRock's own creation. Plaintiffs are not claiming that BlackRock should have labeled the four funds as "ESG" funds. Plaintiffs are saying that BlackRock should *not* have suggested that the funds were *non*-ESG funds by affirmatively stating that they do not follow an "ESG investment strategy" when, in fact, BlackRock allegedly pursued ESG-based goals with the funds through engagements and proxy voting. *See* Docket No. 50 ¶¶ 197–207; Docket No. 88 at 57. Thus, BlackRock could avoid both federal and state enforcement by not suggesting that the funds are either "ESG" or "non-ESG" funds or by not pursuing ESG goals through engagements and proxy voting.

*Third*, BlackRock argues that it could not have misled any consumer because its public statements disclosing its stewardship strategy and proxy voting records were thoroughly disclosed in the public sphere. Docket No. 65 at 20–23. In other

words, BlackRock suggests that consumers could have done their own research to clarify the alleged misrepresentation. But BlackRock cites no case applying any of these consumer protection statutes imposing such a burden on consumers. And even if such a burden existed, the Court cannot conclude based only on the pleadings that these claims should be dismissed as a matter of law.

Accordingly, Plaintiffs sufficiently allege that BlackRock made misleading, deceptive, misrepresentative, or false statements while selling financial products in violation of the remaining consumer protection claims.

### 2. Material

BlackRock argues that Plaintiffs failed to claim that the alleged misrepresentations were material. Docket No. 65 at 28–30. Plaintiffs contest whether materiality is a necessary element to most of the remaining consumer protection claims. Docket No. 88 at 61. Assuming without deciding that materiality needed to be alleged, the Court finds that Plaintiffs did so here.

BlackRock offers the following definition of "material information" in the investment context: "[i]nformation is material only if its disclosure would alter the 'total mix' of facts available to the investor and if there is a substantial likelihood that a reasonable shareholder would consider it important to the investment decision." Docket No. 65 at 28 (quoting *D&J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 208 (5th Cir. 2010) (applying Louisiana law)); *see also Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir. 1992). Plaintiffs do not contest this articulation of materiality. *See* Docket No. 88 at 61–63.

Plaintiffs plausibly state that BlackRock's alleged misrepresentations were material. Plaintiffs allege that BlackRock "materially misrepresented" the nature of these "non-ESG funds" and "induced investors to purchase investment funds they would not otherwise have purchased." Docket No. 50 ¶ 224. As Plaintiffs say, an investor may avoid ESG-based funds either "because of a political disagreement" or "because of a belief that ESG priorities will diminish the fund's performance, or both." Docket No. 88 at 62; *see also* Docket No. 50 ¶ 224. And it is plausible that an alleged misrepresentation pertaining to a fund's ESG involvement is important to a reasonable shareholder and may alter their decision to invest in the fund. *See D&J Tire*, 598 F.3d at 208.

\*　　\*　　\*

Accordingly, BlackRock's motion to dismiss is **DENIED** as to Counts XV, XVI, XVII, and XXI.

## V. CONCLUSION

To summarize, Defendants' joint motion to dismiss (Docket No. 64) and BlackRock's motion to dismiss (Docket No. 65) are both **GRANTED IN PART** and **DENIED IN PART**. The motions to dismiss Counts I–XVII and XXI are **DENIED**. The motions are **GRANTED** as to Counts XVIII, XIX, and XX, which are **DISMISSED**.

So **ORDERED** and **SIGNED** this **1st**  day of **August, 2025.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE