# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br>By Attorney General Ken Paxton,<br><br>STATE OF ALABAMA,<br>By Attorney General Steve Marshall,<br><br>STATE OF ARKANSAS,<br>By Attorney General Tim Griffin,<br><br>STATE OF INDIANA,<br>By Attorney General Todd Rokita,<br><br>STATE OF IOWA,<br>By Attorney General Brenna Bird,<br><br>STATE OF KANSAS,<br>By Attorney General Kris W. Kobach,<br><br>STATE OF MISSOURI,<br>By Attorney General Andrew Bailey,<br><br>STATE OF MONTANA,<br>By Attorney General Austin Knudsen,<br><br>STATE OF NEBRASKA,<br>By Attorney General Michael T. Hilgers,<br><br>STATE OF LOUISIANA,<br>By Attorney General Liz Murrill,<br><br>STATE OF OKLAHOMA,<br>By Attorney General Gentner Drummond,<br><br>STATE OF WEST VIRGINIA,<br>By Attorney General Patrick Morrisey,<br><br>and<br><br>STATE OF WYOMING,<br>By Attorney General Bridget Hill,<br><br>Plaintiffs, | Civil Action No. 6:24-cv-00437-JDK<br><br>**JURY TRIAL DEMANDED** |

v.

BLACKROCK, INC.,
50 Hudson Yards,
New York, NY 10001,

STATE STREET CORPORATION,
One Congress Street,
Boston, MA 02114,

and

THE VANGUARD GROUP, INC.,
100 Vanguard Blvd.,
Malvern, PA 19355,

                   Defendants.

**SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

                                                                            **Page**

INTRODUCTION ...................................................................................................1

PARTIES .................................................................................................................5

    Plaintiff ..............................................................................................................5

    Defendants .........................................................................................................5

JURISDICTION, VENUE, AND COMMERCE.....................................................5

DEFENDANTS HAVE EACH ACQUIRED SUBSTANTIAL PERCENTAGES
OF THE OUSTANDING SHARES OF U.S. COAL COMPANIES .......................6

    Defendants own 30.43% of Peabody Energy ......................................................8

    Defendants own 34.19% of Arch Resources.......................................................8

    Defendants own 10.85% of NACCO Industries...................................................9

    Defendants own 28.97% of CONSOL Energy ...................................................10

    Defendants own 29.7% of Alpha Metallurgical Resources ..............................11

    Defendants own 24.94% of Vistra Energy........................................................11

    Defendants own 8.3% of Hallador Energy .......................................................12

    Defendants own 31.62% of Warrior Met Coal ................................................13

    Defendants own 32.87% of Black Hills Corporation .......................................13

THE RELEVANT MARKETS ...............................................................................14

    The Specific Characteristics of Coal Determine Its Uses .................................16

    The Relevant Product Markets .........................................................................18

        *There is a Relevant Product Market for South Powder River Basin Coal*..................18

        *There is a Relevant Product Market for Thermal Coal* ...............................24

    The Relevant Geographic Markets ...................................................................26

DEFENDANTS' ACQUISITIONS OF STOCK POSE A SUBSTANTIAL
THREAT TO COMPETITION IN THE RELEVANT MARKETS ...........................27

DEFENDANTS AGREED TO A COMMON STRATEGY TO REDUCE OUTPUT .................39

    Climate Action 100+ Presents Compelling Evidence of Defendants' Agreement
    to Seek Coordinated Reductions in Coal Production........................................41

    Defendants' Participation in the Net Zero Asset Managers Initiative is
    Compelling Evidence of Defendants' Agreement to Seek Coordinated
    Reductions in Coal Production ........................................................................45

DEFENDANTS HAVE USED THE STOCK THEY ACQUIRED TO SUBSTANTIALLY
REDUCE COMPETITION IN THE RELEVANT COAL MARKETS ...........................52

    Vanguard's Public Statements..........................................................................53

    BlackRock's Public Statements ........................................................................56

    State Street's Public Statements........................................................................57

    BlackRock's Actions to Enforce Output Restrictions.......................................59

i

State Street's Actions to Enforce Output Restrictions ...................................................62

Vanguard's Actions to Enforce Output Restrictions ...................................................63

DEFENDANTS' PRESSURE ON THE COAL COMPANIES' MANAGEMENT
RESULTED IN OUTPUT REDUCTIONS AND CLIMATE DISCLOSURES ..........................64

DEFENDANT BLACKROCK DECEIVED ITS CUSTOMERS IN
PURSUIT OF DEFENDANTS' OUTPUT REDUCTION SCHEME ...................................66

DEFENDANTS' ACQUISITION OF STOCK HAS SUBSTANTIALLY
LESSENED COMPETITION ...................................................................................82

DEFENDANTS' ACQUISITIONS AND USE OF SHARES HAVE RESULTED
IN COAL PRODUCTION BEING REDUCED IN RESPONSE TO RISING PRICES,
RESULTING IN CARTEL-LEVEL REVENUES AND PROFITS. ........................................85

NEBRASKA SPECIFIC HARMS ...........................................................................89

IOWA-SPECIFIC HARMS ...................................................................................90

LACK OF COUNTERVAILING FACTORS ...................................................9093

CAUSES OF ACTION ...................................................................................9194

PRAYER FOR RELIEF ...................................................................................107110

ii

## INTRODUCTION

1.      For the past four years, America's coal producers have been responding not to the price signals of the free market, but to the commands of Larry Fink, BlackRock's Chairman and CEO, and his fellow asset managers.  As demand for the electricity Americans need to heat their homes and power their businesses has gone up, the supply of the coal used to generate that electricity has been artificially depressed—and the price has skyrocketed.  Defendants have reaped the rewards of higher returns, higher fees, and higher profits, while American consumers have paid the price in higher utility bills and higher costs.

2.      Over a century ago, Congress enacted Section 7 of the Clayton Act to prohibit any acquisition of stock where "the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.  Congress recognized that when an investor brings "under one control the competing companies whose stock it has thus acquired," it achieves what is in substance a mere "incorporated form of the old-fashioned trust." H.Rep. No. 627, 63rd Cong., Second Sess., at 17 (May 6, 1914). Such anticompetitive ownership blocks are "an abomination," and the federal antitrust laws absolutely prohibit them. *Id.*

3.      Defendants are three of the largest institutional investors in the world.  Each Defendant has individually acquired substantial stockholdings in every significant publicly held coal producer in the United States.  Each has thereby acquired the power to influence the policies of these competing companies and bring about a substantial lessening of competition in the markets for coal.  And each has used its power to affect a substantial reduction in competition in coal markets. Considered alone and in isolation, each Defendant's acquisition and use of shareholdings in the domestic coal producers has violated Section 7 of the Clayton Act.

1

4.     But Defendants have not just acted alone and in isolation. In 2021, they went further.  In that year, Defendants each publicly announced their commitment to use their shares to pressure the management of all the portfolio companies in which they held assets to align with net-zero goals.  Those goals included reducing carbon emissions from coal by over 50%.  Rather than individually wield their shareholdings to reduce coal output, therefore, Defendants effectively formed a syndicate and agreed to use their collective holdings of publicly traded coal companies to induce industry-wide output reductions. To be sure, earlier this year BlackRock and State Street publicly proclaimed that they withdrew from one of the organizations that they previously used to coordinate their anticompetitive conduct, Climate Action 100+.  But formal withdrawal from that one organization does not change the reality that Defendants' holdings threaten to substantially reduce competition in violation of Section 7 of the Clayton Act. Nor does it negate the ongoing and future threat of Defendants' coordinated anticompetitive conduct or absolve Defendants of their legal liability for past violations.  Below is a table showing Defendants' collective ownership stake in the publicly traded domestic coal producers (hereinafter, the "Coal Companies"), of which Arch Resources and Peabody Energy are by far the largest—responsible for, respectively, 17.2% and 13.2% of all coal produced in the United States:

| | |
|---|---|
| Peabody Energy | 30.43% |
| Arch Resources | 34.19% |
| NACCO Industries | 10.85% |
| CONSOL Energy | 28.97% |
| Alpha Metallurgical Resources | 29.7% |
| Vistra Energy | 24.94% |
| Hallador Energy | 8.3% |

2

| Warrior Met Coal | 31.62% |
| Black Hills Corporation | 32.87% |

5.      Defendants have immense influence over these companies on their own, but collectively Defendants possess a power to coerce management that is all but irresistible. Defendants have used that collective power—by proxy voting and otherwise—to pressure the major coal producers to reduce production of coal, and in particular production of the thermal coal used to generate the electricity that powers American homes and businesses. The publicly traded coal producers have responded to Defendants' influence by reducing their output, even as coal prices have risen significantly. At the same time, privately held coal producers in which Defendants have no ownership stake have been unable to increase their production sufficiently to meet demand and capture greater market share. Some of these producers are smaller firms that lack the proven reserves, the financial wherewithal, and production capacity that they would need to raise production; still others are unable to obtain financing from banks and financial institutions that have been pressured to cut off the funding that the coal industry would need to expand capacity and raise output. Defendants are directly restraining competition between the companies whose shares they have acquired, but their war on competition has consequences for the entire industry.

6.      Defendants have leveraged their holdings and voting of shares to facilitate an output reduction scheme, which has artificially constrained the supply of coal, significantly diminished competition in the markets for coal, increased energy prices for American consumers, and produced cartel-level profits for Defendants. Defendants' acquisition and use of their shareholdings thus violated both Section 7 of the Clayton Act and State antitrust laws, while Defendants' formation of an output-reduction syndicate that yielded supra-competitive profits for themselves and their portfolios violated Section 1 of the Sherman Act and State antitrust laws.

7.      Defendants have publicly defended their anticompetitive scheme with appeals to environmental stewardship.  But acquiring shares of common stock, "the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial."  *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 371 (1963).  The nation's antitrust laws "reflect[] a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978).   Defendants' belief that concern for the climate confers a license to suppress competition is "mistaken.  The antitrust laws don't permit [the enforcers of America's antitrust laws] to turn a blind eye to an illegal deal just because the parties commit to some unrelated social benefit."[1]   Under the antitrust laws, full and open competition must dictate domestic coal production.

8.      In addition to joining with the other two major institutional asset managers to bring about a reduction in the output of coal, Defendant BlackRock went further—actively deceiving investors about the nature of its funds.  Rather than inform investors that it would use their shareholdings to advance climate goals, BlackRock consistently and uniformly represented its non-ESG funds would be dedicated solely to enhancing shareholder value.  But as detailed below, BlackRock routinely violated its pledge to investors, using *all* its holdings to advance its climate goals and—as most relevant here—promote the objectives of its output-reduction syndicate.

9.      The American consumer is entitled to enjoy the fruits of free markets, vigorous competition, and (in the case of BlackRock) honest investment managers.  Competitive markets—not the dictates of far-flung asset managers—should determine the price Americans pay for

---

[1] Lina Khan, *ESG Won't Stop the FTC: Our job is to prevent illegal mergers, not to make the world a better place*, WALL ST. J. (Dec. 21, 2022), https://on.wsj.com/3MLPk5W.

electricity.    The Plaintiff States accordingly seek injunctive relief to put an end to Defendants' illegal practices and restore free and open competition to the coal markets, as well as damages, restitution, and civil penalties.

## PARTIES

### Plaintiffs

10.    Plaintiff States of Texas, Alabama, Arkansas, Indiana, Iowa, Kansas, Missouri, Montana, Nebraska, West Virginia, and Wyoming (collectively, "Plaintiff States"), by and through their respective Attorneys General, bring this action in their respective sovereign capacities, and as *parens patriae* on behalf of the citizens, general welfare, and economy of their respective states under their statutory, equitable, or common law powers, and pursuant to Sections 4C and 16 of the Clayton Act, 15 U.S.C. §§ 15C & 26.

### Defendants

11.    Defendant BlackRock, Inc. ("BlackRock") is a Delaware Corporation, with its principal place of business located at 50 Hudson Yards, New York, New York 10001.

12.    Defendant State Street Corporation ("State Street") is a Massachusetts Corporation with its principal place of business at One Congress Street, Boston, Massachusetts 02114.

13.    The Vanguard Group, Inc. ("Vanguard") is a Pennsylvania Corporation, with its principal place of business at 100 Vanguard Blvd., Malvern, Pennsylvania 19355.

## JURISDICTION, VENUE, AND COMMERCE

14.    Plaintiff States bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18 and 26.

15.    This Court possesses jurisdiction over the subject matter of this action under 15 U.S.C. § 4, 28 U.S.C. §1331, and 28 U.S.C. § 1337.  This Court has jurisdiction over Plaintiff

5

States' non-federal claims under 28 U.S.C. § 1367(a), as well as under principles of supplemental jurisdiction.

16.    This Court has personal jurisdiction over Defendants, each of which has minimum contacts with the United States, pursuant to 15 U.S.C. § 22; venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) & (c), because Defendants are subject to personal jurisdiction in, and thus reside in, this District, and 15 U.S.C. § 22, because Defendants transact business and are found within this District.

17.    Defendants sell the financial products that they have used to accomplish their scheme throughout the United States and across state lines.  Defendants are engaged in, and their activities substantially affect, interstate trade and commerce throughout the United States.  Defendants' acquisitions and use of stock have significantly lessened competition in the markets for coal throughout the United States, including sales of coal made to direct purchasers in this District.  Defendants provide a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, in the each of the Plaintiff States, and across state lines.

**DEFENDANTS HAVE EACH ACQUIRED SUBSTANTIAL PERCENTAGES OF THE OUSTANDING SHARES OF U.S. COAL COMPANIES**

18.    Among coal producers responsible for more than 5 million tons of coal in 2022, eight are publicly held: Peabody Energy; Arch Resources; NACCO Natural Resources; CONSOL Energy; Alpha Metallurgical Resources; Vistra; Hallador Energy Company; and Warrior Met Coal.[2]  These eight firms are responsible for approximately 46% of total domestic coal production

---

[2] *Annual Coal Report 2022* at tbl. 10, U.S., EIA (Oct. 2023), https://bit.ly/3MMAjkl.

6

and significant shares of the domestic production of thermal coal and, along with the Black Hills Corporation, of South Powder River Basin ("SPRB") coal.

19.     As explained below, Defendants are three of the largest investors in global coal production.  As of February 15, 2022, BlackRock's total investment in coal was $108.787 billion; Vanguard's, $101.119 billion; and State Street's, $35.736 billion.[3]

20.     Defendants, and their subsidiaries and affiliates, acting by and through the funds, trusts, and other investment vehicles that they manage and control, have acquired substantial shareholdings in, and have become the three largest shareholders of America's publicly-held coal companies.  See below Table 1.  BlackRock is the largest shareholder of six of the nine publicly-traded coal companies (hereinafter, "the Coal Companies"), and the second largest of the remaining three.[4]  Vanguard is the largest shareholder of Vistra Energy, the second largest shareholder of six Coal Companies, and the third and fifth holder of, respectively, NACCO Industries and Hallador.  State Street is smaller, but only in comparison to BlackRock and Vanguard; it is among the top five shareholders of all but two of the Coal Companies.

| Table 1:  Defendants' Ownership Interests in the Coal Companies (as of June 30, 2024) Percentage Ownership (Shareholder Rank) | | | | |
|---|---|---|---|---|
| | BlackRock | Vanguard | State Street | Total |
| Peabody Energy | 13.62% (1) | 11.18% (2) | 5.63% (4) | **30.43%** |
| Arch Resources | 15.01% (1) | 12.81% (2) | 6.37% (3) | **34.19%** |
| NACCO Industries | 5.88% (2) | 3.63% (3) | 1.34% (8) | **10.85%** |
| CONSOL Energy | 14.15% (1) | 8.94% (2) | 5.88% (5) | **28.97%** |
| Alpha Metallurgical Resources | 14.58% (1) | 9.58% (2) | 5.54% (3) | **29.70%** |
| Vistra Energy | 7.91% (2) | 12.57% (1) | 4.46% (4) | **24.94%** |
| Hallador Energy | 4.09% (2) | 3.01% (5) | 1.2% (11) | **8.30%** |
| Warrior Met Coal | 14.04% (1) | 11.38% (2) | 6.2% (3) | **31.62%** |
| Black Hills Corp. | 15.56% (1) | 12.04% (2) | 5.27% (3) | **32.87%** |

---

[3] *Investors in Coal Top 24*, URGEWALD (Feb. 15, 2022), https://bit.ly/3MLSiHC.

[4] Unless otherwise noted, current 13F data was obtained from *Search 13F Filings*, https://bit.ly/4daI3HI (last visited Sept. 16, 2024).

**Defendants own 30.43% of Peabody Energy**

21.    As of June 30, 2024 Defendants owned 38,314,525 shares of Peabody Energy common stock, representing 30.43% of the company's outstanding shares.

22.    Defendant Vanguard owned 14,073,850 shares of Peabody Energy's common stock as of June 30, 2024, representing 11.18% of the company's outstanding shares.  As of December 31, 2020, Vanguard had reported owning only 3,221,900 shares of Peabody Energy.  Vanguard thus acquired 10,851,950 shares of Peabody Energy between December 2020 and June 2024.

23.    Defendant BlackRock owned 17,149,187 shares of Peabody Energy's common stock as of June 30, 2024, representing 13.62% of the company's outstanding shares.  As of December 31, 2020, BlackRock had reported owning 4,901,754 shares of Peabody Energy. BlackRock thus acquired 12,247,433 shares of Peabody Energy between December 2020 and June 2024.

24.    Defendant State Street owned 7,091,488 shares of Peabody Energy's common stock on June 30, 2024, representing 5.63% of the company's outstanding shares.  As of December 31, 2020, State Street had held 1,730,727 shares of Peabody Energy.  State Street thus reported acquiring 5,360,761 shares of Peabody Energy's common stock between December 2020 and June 2024.

**Defendants own 34.19% of Arch Resources**

25.    As of June 30, 2024, Defendants owned 6,183,333 shares of Arch Resources' Class A common stock,[5] representing 34.19% of the company's outstanding shares.

---

[5] "Arch Resources has two classes of stock, Class A Common Stock and Class B Common Stock. The two classes of common stock have identical terms, except that Class B Stock is not listed on any national securities exchange." *Investor FAQ*, ARCH, https://bit.ly/47qhEEt (last visited Sept. 16, 2024).

8

26.     Defendant Vanguard owned 2,316,930 shares of Arch Resources' Class A common stock on June 30, 2024, representing 12.81% of the company's outstanding shares.  On December 31, 2020, Vanguard reported owning 1,407,442 shares of Arch Resources.  Vanguard thus acquired 909,488 shares between December 2020 and June 2024.

27.     Defendant BlackRock owned 2,713,914 shares of Arch Resources' Class A common stock as of June 30, 2024, representing 15.01% of the company's outstanding shares.  As of December 31, 2020, BlackRock reported owning 1,111,103 shares of Arch Resources.  BlackRock thus acquired 1,602,811 shares between December 2020 and June 2024.

28.     Defendant State Street held 1,152,489 shares of Arch Resources' Class A common stock on June 30, 2024, representing 6.37% of the company's outstanding shares.  As of December 31, 2020, State Street reported owning 1,203,281 shares of Arch Resources.  State Street thus sold 50,792 shares of Arch Resources Class A common stock between December 2020 and June 2024.

**Defendants own 10.85% of NACCO Industries**

29.     As of June 30, 2024, Defendants held 627,992 shares of NACCO's Class A common stock, representing 10.85% of the company's publicly-held outstanding shares.  NACCO's Class B common stock is not publicly traded.  Each share of Class B Common Stock is entitled to ten votes; otherwise, Class A and Class B common stock are equal in respect of rights to dividends and any other distributions in cash, stock, or property of the Company.[6]

30.     Defendant Vanguard owned 209,995 shares of NACCO's common stock as of June 30, 2024, representing 3.63% of the company's outstanding shares.  Vanguard reported owning 231,908 shares of NACCO's common stock as of December 31, 2020.

---

[6] *Common Stock FAQs*, NACCO, https://bit.ly/4dcPhL8 (last visited Sept. 16, 2024).

31.     Defendant BlackRock held 340,484 shares of NACCO's common stock as of June 30, 2024, representing 5.88% of the company's outstanding shares.  On December 31, 2020, BlackRock had owned 268,719 shares of NACCO's common stock.  BlackRock thus acquired 71,765 shares of NACCO's common stock between December 2020 and June 2024.

32.     Defendant State Street held 77,513 shares of NACCO's common stock as of June 30, 2024, representing 1.34% of the company's outstanding shares.  State Street reported owning 80,522 shares of NACCO's common stock as of December 30, 2020.

**Defendants own 28.97% of CONSOL Energy**

33.     As of June 30, 2024, Defendants held 8,517,992 shares of CONSOL Energy's common stock, representing 28.97% of the company's outstanding shares.

34.     Defendant Vanguard held 2,628,383 shares of CONSOL Energy's common stock as of June 30, 2024, representing 8.94% of the company's outstanding shares.  As of December 31, 2020, Vanguard reported owning 1,444,540 shares of CONSOL Energy's common stock. Vanguard thus acquired 1,183,843 shares of CONSOL Energy between December 2020 and June 2024.

35.     Defendant BlackRock held 4,159,982 shares of CONSOL Energy's common stock as of June 30, 2024, representing 14.15% of the company's outstanding shares.  On December 31, 2020, BlackRock had reported owning 4,491,811 shares of CONSOL Energy's common stock.

36.     Defendant State Street held 1,729,627 shares of CONSOL Energy's common stock as of June 30, 2024, representing 5.88% of the company's outstanding shares.   As of December 31, 2020, State Street reported owning 780,949 shares of CONSOL Energy.  State Street thus acquired 948,678 shares of CONSOL Energy's common stock between December 2020 and June 2024.

**Defendants own 29.7% of Alpha Metallurgical Resources**

37.     As of June 30, 2024, Defendants held 3,866,622 shares of Alpha Metallurgical Resources' common stock, representing 29.7% of the company's outstanding shares.

38.     Defendant Vanguard held 1,247,439 shares of Alpha Metallurgical Resources' common stock as of June 30, 2024, representing 9.58% of the company's outstanding shares.  As of December 31, 2020, Vanguard reported owning 843,983 shares of Contura Energy Inc.'s common stock.[7]  Vanguard thus acquired 403,456 shares of Alpha Metallurgical Resources between December 2020 and June 2024.

39.     Defendant BlackRock held 1,897,483 shares of Alpha Metallurgical Resources' common stock as of June 30, 2024, representing 14.58% of the company's outstanding shares.  BlackRock reported owning 1,465,696 shares of Contura Energy, Inc., on December 31, 2020.  BlackRock thus acquired 431,787 shares of Alpha Metallurgical Resources' common stock between December 2020 and June 2024.

40.     Defendant State Street held 721,700 shares of Alpha Metallurgical Resources' common stock as of June 30, 2024, representing 5.54% of the company's outstanding shares.  State Street did not report owning any shares of Contura Energy Inc. on December 31, 2020.  State Street thus acquired 721,700 shares of Alpha Metallurgical Resources' common stock between December 2020 and June 2024.

**Defendants own 24.94% of Vistra Energy**

41.     As of June 30, 2024, Defendants held 85,652,222 shares of Vistra's common stock, representing 24.94% of the company's outstanding shares.

---

[7] On February 1, 2021, Contura Energy changed its corporate name to Alpha Metallurgical Resources, and its ticker symbol changed from "CTRA" to "AMR" effective on February 4, 2021.

42.    Defendant Vanguard held 43,173,721 shares of Vistra's common stock as of June 30, 2024, representing 12.57% of the company's outstanding shares.  On December 31, 2020, Vanguard reported owning 46,057,648 shares of Vistra's common stock.

43.    Defendant BlackRock held 27,160,648 shares of Vistra's common stock as of June 30, 2024, representing 7.91% of the company's outstanding shares.  On December 30, 2020, BlackRock reported owning 28,579,182 shares of Vistra's common stock.

44.    Defendant State Street held 15,317,853 shares of Vistra's common stock as of June 30, 2024, representing 4.46% of the company's outstanding shares.  On December 31, 2020, State Street reported owning 9,290,171 shares of Vistra's common stock.  State Street thus acquired 6,027,682 shares of Vistra's common stock between December 2020 and June 2024.

**Defendants own 8.3% of Hallador Energy**

45.    As of June 30, 2024, Defendants held 3,540,921 shares of Hallador Energy's common stock, representing 8.3% of the company's outstanding shares.

46.    Defendant Vanguard held 1,281,063 shares of Hallador Energy's common stock as of June 30, 2024, representing 3.01% of the company's outstanding shares.  On December 31, 2020, Vanguard reported owning 704,524 shares of Hallador Energy's common stock.  Vanguard thus acquired 576,539 shares of Hallador Energy's common stock between December 2020 and June 2024.

47.    Defendant BlackRock held 1,742,499 shares of Hallador Energy's common stock as of June 30, 2024, representing 4.09% of the company's outstanding shares.  On December 31, 2020, BlackRock reported owning 101,138 shares of Hallador Energy's common stock.  BlackRock thus acquired 1,641,361 shares of Hallador Energy's common stock between December 2020 and June 2024.

12

48.     Defendant State Street held 517,359 shares of Hallador Energy's common stock as of June 30, 2024, representing 1.2% of the company's outstanding shares.  State Street reported not owning any shares of Hallador Energy as of December 31, 2020.  State Street thus acquired 517,359 shares of Halldor Energy's common stock between December 2020 and June 2024.

**Defendants own 31.62% of Warrior Met Coal**

49.     As of June 30, 2024, Defendants held 16,543,426 shares of Warrior Met Coal's common stock, representing 31.62% of the company's outstanding shares.

50.     Defendant Vanguard held 5,952,261 shares of Warrior Met Coal's common stock as of June 30, 2024, representing 11.38% of the company's outstanding shares.  As of December 31, 2020, Vanguard reported owning 5,224,538 shares of Warrior Met Coal common stock. Vanguard thus acquired 727,723 shares of Warrior Met Coal's common stock between December 2020 and June 2024.

51.     Defendant BlackRock held 7,345,650 shares of Warrior Met Coal's common stock as of June 30, 2024, representing 14.04% of the company's outstanding shares.  BlackRock reported holdings of 7,184,086 shares of Warrior Met Coal's common stock as of December 31, 2020.  BlackRock thus acquired 161,564 shares of Warrior Met Coal's common stock between December 2020 and June 2024.

52.     Defendant State Street held 3,245,515 shares of Warrior Met Coal's common stock as of June 30, 2024, representing 6.2% of the company's outstanding shares.  On December 31, 2020, State Street reported owning 3,725,752 shares of Warrior Met Coal.

**Defendants own 32.87% of Black Hills Corporation**

53.     As of June 30, 2024, Defendants held 22,925,181 shares of Black Hills Corporation common stock, representing 32.87% of the company's outstanding shares.

13

54.     Defendant Vanguard held 8,394,948 shares of Black Hills Corporation common stock as of June 30, 2024, representing 12.04% of the company's outstanding shares.  On December 31, 2020, Vanguard reported owning 6,576,633 shares of Black Hills Corporation's common stock.  Vanguard thus acquired 1,818,315 shares of Black Hills Corporation's common stock between December 2020 and June 2024.

55.     Defendant BlackRock held 10,851,268 shares of Black Hills Corporation common stock as of June 30, 2024, representing 15.56% of the company's outstanding shares.  As of December 31, 2020, BlackRock reported owning 8,581,943 shares of Black Hills Corporation's common stock.  BlackRock thus acquired 2,269,325 shares of Black Hill Corporation common stock between December 2020 and June 2024.

56.     Defendant State Street held 3,678,965 shares of Black Hills Corporation common stock as of June 30, 2024, representing 5.27% of the company's outstanding shares.  As of December 31, 2020, State Street reported owning 5,538,442 shares of Black Hill Corporation's common stock.

57.     Defendants' acquisitions have made each of them a substantial shareholder in each of the nation's major coal miners.  This concentrated ownership of horizontal competitors poses a significant threat to competition in the markets for coal.  It is precisely these types of threat to competition that Section 7 was enacted to thwart "in their incipiency."  *United States v. DuPont*, 353 U.S. 586, 597 (1957).

THE RELEVANT MARKETS

58.     There are clear and readily defined coal markets—the markets in which Defendants' acquisitions of shares have threatened to impair and have in fact impaired competition.

14

59.    As detailed further below, there are two relevant product markets for coal.  They are:

a.    The market for **South Powder River Basin Coal**, which is the preferred coal for power plants as its inherent properties ease regulatory compliance and enhance operational efficiency.  Defendants own 30.43%, 34.19%, and 32.87% of the three publicly traded companies that produce South Powder River Basin Coal.  Those companies control 63.5% of the market in South Powder River Basin Coal.

b.    The market for **Thermal Coal**, which is burned to generate steam to produce electricity or for process heating purposes.  Defendants own between 8.3% and 34.19% of the eight publicly traded companies listed above that produce Thermal Coal.  These companies control 46% of the market in Thermal Coal.

60.    As detailed further below, there are multiple potentially relevant geographic markets for coal.  They are:

a.    The South Powder River Basin—the sole source for South Powder River Basin coal and thus the only place purchasers can obtain such coal.

b.    The United States—the domestic coal market cannot source coal from abroad without incurring significant transportation costs.

c.    The locations where South Power River Basin coal is consumed—nearly all such coal is burned at the 150 power plants located throughout the United States.

15

61.    Six of those plants are located in the State of Texas: the Welsh Power Plant, located in Cason, TX[8]; the Fayette Power Project, located in La Grange, TX[9]; Harrington Generating Station, located near Amarillo, TX[10]; Tolk Station, located in Muleshoe, TX[11]; W.A. Parish Generating Station, located near Thompsons, TX[12]; and the Limestone Power Plant, located in Jewett, TX.[13]

**The Specific Characteristics of Coal Determine Its Uses**

62.    Consumers of coal are constrained in the types of coal they can consume given the nature of their industrial processes, the design specification of their facilities and equipment, and the characteristics of the coal suited to those processes.   Both the classification of, and the definitions of the relevant markets for coal depend on its characteristics and its point of origin.

63.    Heat value, sulfur content, ash, moisture content, and volatility are important variables in the marketing and use of coal.   *Heat value* refers to the coal's energy content and depends on the carbon content of the coal; it is measured in British Thermal Units.   *Sulfur content* determines the amount of sulfur dioxide that will be produced in combustion and affects the ability of coal-fueled power plants to comply with applicable federal and state emissions standards. *Ash*

---

[8] *Welsh Power Plant Environmental Retrofit Project*, S.W. ELECTRIC POWER CO. (Oct. 24, 2018), https://bit.ly/3Zx5SpN.

[9] *Power plant profile: Fayette Power Project, US*, POWER TECH. (last updated July 21, 2024), https://bit.ly/3ziQanJ.

[10] Dr. Robert Peltier, PE, *Xcel Energy's Harrington Generating Station Earns Powder River Basin Coal Users' Group Award*, POWER (July 1, 2015), https://bit.ly/4db5D6Y.

[11] *Power plant profile: Tolk Power Station, US*, POWER TECH. (July 21, 2024), https://bit.ly/4eoDISa.

[12] *About: WA Parish Generating Station*, DBPEDIA, https://bit.ly/3XKLSyL (last visited Sept. 17, 2024).

[13] *Limestone Power Plant, Texas*, CTR. FOR LAND USE INTERPRETATION, https://bit.ly/3zuRAvd (last visited Sept. 17, 2024).

*content* is an important characteristic because it impacts boiler performance, and because of the added costs to the electric generating plants that must handle and dispose of ash following combustion. A high *moisture content* will decrease heat value and increase the weight of the coal, making it a less efficient source of energy and more expensive to transport. *Volatility and other characteristics*, including fluidity and swelling capacity, are particularly important for users of the metallurgical coal that is used to produce coke.

64.     Coal is generally classified into four categories: lignite, subbituminous, bituminous, and anthracite. These classifications reflect the amount of carbon the coal contains and the amount of heat energy it can produce.

a.     Anthracitic coal contains >86% carbon and has a high heat value. It is mined in northeastern Pennsylvania, and accounted for less than 1% of the coal mined in the United States in 2022. It is primarily used in the metallurgy and steel-making industries.[14]

b.     Bituminous coal contains 45%-86% carbon and is the most abundant class of coal found in the United States, accounting for about 46% of total U.S. production in 2022. It is used to generate electricity and is an important raw material for making coke for the iron and steel industry. The top five bituminous producing states and their percentage share of total U.S. bituminous production in 2022 were: West Virginia, 31%; Illinois, 14%; Pennsylvania, 14%; Kentucky, 11%; and Indiana, 9%.[15]

c.     Subbituminous coal contains 35%–45% carbon and has a lower heat value than bituminous coal. In 2022, subbituminous coal accounted for approximately 46% of total U.S. coal production. The five subbituminous producing states and their percentage share of total U.S.

---

[14] *Coal Explained*, EIA (last updated Oct. 24, 2023), https://bit.ly/3TAcosi.

[15] *Id.*

17

subbituminous production in 2022 were: Wyoming, 89%; Montana, 8%; New Mexico, 2%; Colorado, 2%; and Alaska, <1%.[16]  South Powder River Basin coal is subbituminous coal.[17]  Its friable nature makes it well suited for modern pulverized coal power plants.

        d.     Lignite contains 25%–35% carbon and has the lowest energy content of all coal ranks.  Lignite is crumbly and has high moisture content, which contributes to its low heating value.  In 2022, five states produced lignite, which accounted for 8% of total U.S. coal production: they were: North Dakota, 56%; Texas, 36%; Mississippi, 7%; Louisiana, 1%; and Montana, <1%.[18]  Most lignite is used as thermal coal. Due to its high moisture content and low BTU value, shipping lignite long distances is not feasible. Consequently, it is burned near where it is mined.[19]

### The Relevant Product Markets

65.    Defendants have sought and continue to seek to reduce the production of coal across the board.  Because of the market-wide impact of their holdings, Defendants' acquisitions of stock and their use of those shares has significantly lessened competition across all coal markets. Plaintiff States have nevertheless identified the following relevant antitrust product and geographic markets in which Defendants' acquisitions may have the effect of significantly lessening competition and indeed have substantially lessened competition.

### *There is a Relevant Product Market for South Powder River Basin Coal*

66.    The Powder River Basin ("PRB") is in northeast Wyoming and southeast Montana. The PRB is the largest coal producing basin in the United States, responsible for approximately

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *AP-42: Compilation of Air Pollutant Emissions Factors from Stationary Sources*, EPA (last updated Aug. 15, 2024), https://bit.ly/47wKhzP.

260 million tons of production in 2022, representing 43.5% of the total national coal production in 2022. The PRB is divided into a northern region, the North Powder River Basin ("NPRB"), and a southern region, the South Powder River Basin ("SPRB"). SPRB coal is a relevant market for assessing the effect of Defendants' anticompetitive acquisitions because, among other things, SPRB coal has a lower sulfur and sodium content than other forms of coal, which both aids with regulatory compliance and confers other operational benefits on power generation plants that make it preferable to potential substitutes.

67.    Fifteen mines operate in the Powder River Basin, with most of the active mining taking place at the 12 mines located in the SPRB in the drainages of the Cheyenne River. Almost all the coal deposits in the Powder River Basin are owned by the federal government. New entry would thus require not only large capital investments in mine equipment, but also obtaining numerous federal and state regulatory approvals.

68.    The coal in the NPRB has different characteristics from the coal in the SPRB, which places them into different product markets. Specifically, coal from the SPRB has lower sodium and sulfur content than NPRB coal. The lower emissions that result from its lower sulfur content mean that SPRB coal, compared to NPRB coal, more readily complies with environmental regulations and confers other operational benefits. Power generators also consider the lower sodium content in the ash produced by the combustion of SPRB coal, compared to NPRB coal, to be a desirable property.

69.    SPRB coal is likewise distinguishable from coal mined elsewhere in the United States (e.g., the Illinois Basin, the Uinta Basin located in Utah and Colorado, and coal mined in the Appalachian region) based on several factors that are important to electric power producers, including, but not limited to:

19

a.     **Low cost of production:** SPRB coal is relatively close to the earth's surface and thus is extracted from surface mines, which generally face lower costs than underground mines.  SPRB coal beds are relatively thick, which also reduces the cost of extraction compared to thinner beds.  The difference in cost is reflected in the sales price of the coal.  Measured in dollars per million British Thermal Units ($/mmBTU) at the mine mouth, SPRB coal is the lowest priced coal in the United States.  For example, the United States Energy Information Administration ("EIA") releases weekly information regarding the spot price of different coals, broken down by coal region.  According to the EIA, for the week ending January 12, 2024, on a $/mmBTU basis, the spot price of Central Appalachian coal ($3.24) was more than four times the price of SPRB coal ($.79), and such price differences have been persistent over time.

b.     **Heat content:** SPRB mines yield sub-bituminous coal with a heat content that typically ranges from 7,710 to 9,410 BTU per pound.  Electric power generators typically seek to purchase coal with BTU values that fall within a specific range for which their units are designed to operate most cost-effectively, and many electric power generators are designed to operate within this range.

c.     **Low sulfur content:** SPRB coal typically has relatively low sulfur content, and thus when burned produces less sulfur dioxide than higher-sulfur coals.

d.     **Low sodium content:** SPRB coal is also relatively low in sodium compared to other coals mined in the United States.

70.     Due to this unique combination of SPRB coal characteristics, coal mined in other basins and in other countries does not meaningfully constrain the price of SPRB coal in the large portions of the United States where SPRB coal can be shipped economically.  Power plant generation units that burn SPRB coal rarely switch to coal from a different basin, since doing so

20

would have negative implications for coal purchasing costs, environmental compliance, and the efficiency of power generation. Not only is SPRB coal the lowest-cost coal produced in the United States, but environmental restrictions may prevent SPRB-burning power plants from burning coal with higher proportions of certain pollutants (such as sulfur). In some cases, plant owners may be entirely foreclosed from burning another type of coal because the plant only has regulatory approval to burn SPRB coal. Moreover, many power plants that burn SPRB coal can face substantial switching costs if they attempt to switch to other coals, which could include installation of additional pollution-control equipment.

71.     Industry and public recognition confirm that SPRB coal differs from non-SPRB coals. Public sources of information, including analysis of commodity prices, routinely differentiate between SPRB coal and other types of coal. Likewise, market participants and industry analysts regularly discuss supply and demand conditions for SPRB coal separately from supply and demand for other types of coal.

72.     SPRB coal prices are typically determined through direct interactions between SPRB coal producers and customers, involving a request-for-proposal ("RFP") process in which customers solicit bids from multiple suppliers of SPRB coal. Customers typically issue an RFP specifying the quantity of coal that they desire to contract for and the time period in which the coal will be delivered (often one year or two years). Based on responses to the RFP, a customer will negotiate a supply contract with one or more suppliers. While customers can also purchase SPRB coal by placing a bid on the Over-The-Counter ("OTC") spot market, due to their reliance on regular supplies of large amounts of coal for their coal-fired power plants, most customers prefer to contract with suppliers for most of their SPRB coal purchases rather than rely exclusively or

21

primarily on OTC purchases.  SPRB coal customers value the security of supply provided by a contract, and OTC prices are typically higher than individually-negotiated contract prices.

73.    Due to the widespread use of RFPs, SPRB coal producers typically know the identity of customers seeking to purchase SPRB coal and can customize their bids based on a customer's circumstances.  For example, SPRB coal producers can take into account the location of the customer's power plants, which affects both the plants' regulatory requirements and the shipping costs the customer will incur.  SPRB coal purchasers generally negotiate shipping costs directly with railroads, without the involvement of SPRB coal producers, and greater distances typically result in greater shipping costs.  Shipping costs are significant compared to the price of SPRB coal at the mine mouth; in many cases, shipping costs account for 50% or more of a customer's delivered cost.

74.    Power generation units designed to burn SPRB coal cannot readily replace SPRB coal with natural gas, wind, sun, or nuclear fuels.  Owners of such units cannot practicably construct new facilities that use alternative fuels in response to a small-but-significant increase in the price of SPRB coal because it is expensive and time-consuming to construct new facilities powered by natural gas, renewables, or nuclear fuels.

75.    Some power plants that rely on SPRB coal are owned by utilities that can also supply electricity to end customers by (i) generating it from power plants designed to use fuels other than SPRB coal, and (ii) purchasing power "wholesale" from other power generators.  Yet, if SPRB coal prices were to increase by a small-but-significant amount, such utilities are unlikely to reduce their purchases of SPRB coal by enough to render the price increase unprofitable for a hypothetical monopolist, for several reasons, including:

22

      a.     Coal-fired power plants are expensive to construct (modern plants can cost more than $1 billion), and once a power plant operator has made such a significant investment, it has strong incentives to operate its plant, even if the price of coal increases by a small-but-significant amount;

      b.     Electricity producers often rely on coal-fired power units to run continuously to reliably supply power despite variable conditions (such as weather, natural gas pipeline constraints, and electricity grid congestion) that can render alternative power sources unreliable or unavailable;

      c.     Coal-fired power units are usually run continuously to optimize emission controls and minimize pollution in compliance with applicable regulations and permits. Boiler flame stability plays a critical role during coal combustion in reducing nitrogen dioxide, a "criteria" pollutant under the Clean Air Act, 42 U.S.C. § 7408; 40 CFR § 50.11; and,

      a.     A small-but-significant increase in SPRB coal producers' prices would have only a minor impact on a power generator's cost of producing electricity, due to the high transportation costs of SPRB coal and other factors.  Indeed, as the district court found in *Federal Trade Commission v. Peabody Energy Corporation*, "SPRB coal customers are … different from customers in many other industries" to the extent that they "are *legally obligated* to provide electricity to their customers" and "cannot simply choose to not reach a deal but rather must generate electricity—including from SPRB coal, if their EGUs are designed to burn it—in order to meet those obligations."  492 F.Supp.3d 865, 892 (E.D. Mo. 2020) (cleaned up).

      76.     The foregoing paragraphs establish that a hypothetical monopolist of the SPRB coal product market would profit from a small but significant and non-transitory increase in price, and that there is thus a distinct product market for SPRB coal.

23

77.    **Moreover,** although the price of natural gas has some impact on the price of coal, the existence of competition with natural gas producers does not undercut the existence of an SPRB coal market.  SPRB coal has distinct customers with distinct needs because these customers have "SPRB-fueled power plants, which are long-lived, expensive, and configured for SPRB coal's distinct characteristics." *FTC v. Peabody Energy,* 492 F. Supp. 3d at 898.  As the Court determined in *FTC v. Peabody Energy*, in upholding the FTC's SPRB product market definition, there is "little doubt that SPRB coal providers compete … among themselves in a market for SPRB coal."  Id. at 896.  The same holds true for the Thermal Coal product market.

78.    Although the price of renewable energy may have some impact on the price of SPRB or Thermal Coal, the existence of such price competition does not suggest that renewable energy sources are in the same product market.  Renewable energy sources are intermittent and non-dispatchable, "meaning they only generate energy when wind is blowing or the sun is shining, which is out of a utility's control." *Id*. at 879.  As the Court found in *FTC v. Peabody Energy*, "this constraint makes renewable fuels imperfect replacements for fossil fuels like coal." *Id*.

### *There is a Relevant Product Market for Thermal Coal*

79.    Of the 594.2 million tons of coal produced during 2022, 532.3 million tons were sold in the market for thermal coal.  Of those 532.3 million tons of coal marketed as thermal coal, 39.5 million tons were exported, representing 45.9% of total U.S. coal exports, while 492.8 tons were sold to domestic U.S. customers.

80.    Thermal coal is burned to generate steam for the production of electricity or for process heating purposes or is used as a direct source of process heat for various industrial uses.

81.    Thermal coal is used in the industry to refer to all coal that is not classified as metallurgical coal.  Metallurgical coal must have a sufficiently high heat, low ash, and low sulfur content to form a coke that can be used in a blast furnace.  Metallurgical coal is significantly purer

24

and has a significantly higher energy density and carbon content than thermal coal. Thermal coal, which lacks the energy density, high carbon content, and high purity that is needed for the production of coke, is not a substitute for metallurgical coal. The cost of metallurgical coal is thus significantly higher than the cost of thermal coal and the price of thermal coal is not significantly constrained by the price for metallurgical coal.

82.    Unlike the Coal Companies, which have multi-billion-dollar market capitalizations and substantial proven reserves, privately-held thermal coal producers are often smaller, family-owned mines. These smaller market participants would, in response to a sudden price increase, lack the capacity and the capital that they would need to increase production significantly. And even those privately-held firms that possess the proven reserves and have been granted the regulatory approvals that would permit them to increase capacity would find it difficult to obtain the financing they would need to increase their output, for banks have been under increasing pressure, including from Defendants, to deny funding to coal miners and other fossil fuel companies.[20]

---

[20] *See, e.g.*, Jordan Stutts, *Banks face pressure to stop financing use of coal in steel production*, AM. BANKER (Dec. 8. 2023), https://bit.ly/4gFWF4I; Environmental and Social Policy Framework at 16, CITI (July 2024), http://citi.us/4gEBlN2 (announcing that "Citi will not provide project-related financing for new thermal coal mines or significant expansion of existing mines, and has set targets to phase out our financing of mining companies deriving ≥25% of their revenue from thermal coal mining …. Approval for any transaction for a coal mining company requires escalation for review of the company's transition away from coal."); Press Release, JPMorganChase, JPMorgan Chase Expands Commitment to Low-Carbon Economy and Clean Energy Transition to Advance Sustainable Development Goals (Feb. 25, 2020), https://bit.ly/3XJGQkM (announcing commitment to "[n]ot providing lending, capital markets or advisory services to companies deriving the majority of their revenues from the extraction of coal, and by 2024, phasing out remaining credit exposure to such companies.").

83.    A small but significant and non-transitory increase in price would not cause the operators of power plants designed to burn thermal coal to switch away to alternative sources of fuel.

a.    Both the substantial costs that would have to be incurred to design and construct a new power plant, and the substantial time that would be required to bring that plant into operation, mean that an operator of a coal-fired power plant has strong incentives to continue to operate its plant even if the price of coal increases by a small-but-significant amount;

b.    The substantial costs that would be incurred to redesign a coal-fired power plant to use an alternative fuel source mean that an operator of a coal-fired power plant has strong incentives to continue to operate its plant even if the price of coal increases by a small-but-significant amount;

c.    Finally, electric power generators are legally obligated to provide electricity to their customers, and therefore, if they cannot reach a deal with their suppliers of coal, they must still obtain the coal they need to generate that electricity. *Peabody Energy Corp.*, 492 F.Supp.3d 865, 892 (E.D. Mo. 2020).

84.    The foregoing paragraphs establish that a hypothetical monopolist of the Thermal Coal product market would profit from a small but significant and non-transitory increase in price, and that there is thus a distinct product market for Thermal Coal.

**The Relevant Geographic Markets**

85.    The SPRB constitutes not only a relevant product market, but a relevant geographic production market.  The suppliers of SPRB coal are located exclusively within the Southern Powder River Basin, and this is the region in which purchasers of SPRB coal can seek alternative suppliers of SPRB coal.

86.     The United States also constitutes a relevant geographic market in which to analyze the competitive effects of Defendants' acquisitions on SPRB coal.  SPRB coal is not sold in any significant quantities outside the United States, and even if it were, due to high transportation costs, SPRB coal customers could not defeat a price increase by purchasing SPRB coal outside of the United States and reimporting it.

87.     The United States also constitutes a relevant geographic market in which to analyze the competitive effects of Defendants' acquisitions of thermal coal.  While thermal coal is sold in significant quantities outside of the United States, due to the high transportation costs, consumers of thermal coal could not defeat a price increase by purchasing coal abroad and importing it to the United States.

88.     Alternatively, relevant geographic markets could be defined based on the locations at which SPRB coal is consumed.  All or nearly all SPRB coal consumed is burned at fewer than 150 power plants; the majority is consumed by power plants located in the central United States and upper Midwest, within the states of Arkansas, Illinois, Indiana, Iowa, Kansas, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Oklahoma, South Dakota, Texas, Wisconsin, and Wyoming.  Defendants' conduct substantially lessens competition for the sale of SPRB coal within a relevant geographic market consisting of one or more of the locations at which SPRB coal is consumed.

### DEFENDANTS' ACQUISITIONS OF STOCK POSE A SUBSTANTIAL THREAT TO COMPETITION IN THE RELEVANT MARKETS

89.     Defendants' acquisitions of stock have given each of them the power to influence the management of their portfolio Coal Companies.

90.     When a shareholder who holds 15%, 12%, 8%, or even 3% of a company's outstanding shares speaks, management listens.  The SEC has drawn a bright line at 5%, requiring investors to file a Schedule 13D declaring whether they intend to actively exercise influence over a company's management no later than 10 days after their ownership interest exceeds that level.[21] The financial news is replete, however, with stories of activist investors who hold as little as 1% or 2% of a company's shares successfully seeking seats on the company's board of directors, or demanding that management cut costs or chart a new course for the business.  For example:

        a.     In 2023, activist investor Carl Icahn succeeded in getting a nominee elected to the board of directors of gene-sequencing giant Illumina and knocking the company's chairman off the board; Icahn owned 1.4% of the company's shares.[22]

        b.     In 2021, Engine No. 1 waged a six-month campaign to change Exxon Mobil's "role in a zero-carbon world," ending in a proxy fight that resulted in its obtaining three seats on the company's board of directors; Engine No.1 owned a mere 0.02% of Exxon's outstanding shares, but its campaign succeeded largely through votes from BlackRock, State Street, and Vanguard.[23]

---

[21] *See* 17 CFR § 240.13d-1(e)(2).

[22] Josh Nathan-Kazis, *Icahn vs. Illumina Is a Split Decision: CEO Survives, Chairman Is Out*, WALL ST. J. (last updated May 25, 2023), https://bit.ly/3zpMnF9; Bhanvi Satija & Svea Herbst-Bayliss, *Icahn launches proxy fight at Illumina, seeks board seats*, REUTERS (March 13, 2023), https://reut.rs/4d8uI2z.

[23] Pippa Stevens, *Activist firm Engine No. 1 claims third Exxon board seat*, CNBC (June 2, 2021), https://cnb.cx/4eoQRKR; *see also* Matt Phillips, *Exxon's Board Defeat Signals the Rise of Social-Good Activists*, N.Y. TIMES (June 9, 2021), https://bit.ly/4fUwcPM.

28

  c.  In 2017, Nelson Peltz's Trian Fund won a seat on the board of directors of Proctor & Gamble after a hotly contested proxy fight; Trian owned roughly 1.5% of the company's shares.[24]

  d.  In 2017, Third Point successfully lobbied the board of directors of Nestle to increase the company's dividends and buybacks, and to sell off its skin health unit and its U.S. ice cream business.  Third Point had acquired 40 million shares of the company, representing 1.3% of the company's outstanding 3.09 billion shares.[25]

  e.  In 2014, Starboard Value launched a proxy fight that resulted in the replacement of the entire board of directors of Darden Restaurants; Starboard held an 8.8% stake in the company.[26]

  91.  Even an "unsuccessful" proxy campaign can ultimately influence the board of directors to adopt the policy or pursue the course of action for which a significant shareholder was advocating.  For example, in 2015, Nelson Peltz, whose Trian Fund controlled 2.7% of DuPont's stock, waged an unsuccessful proxy campaign for four seats on the board of directors in an effort to influence the company to split itself up into separate businesses.[27]  But within a year, DuPont

---

[24] *The Ultimate Guide to Shareholder Activism and Proxy Contests*, IRWIN (last visited Sept. 17, 2024).

[25] Swati Goyal, *Long-Term Returns of Dan Loeb's Activist Targets*, YAHOO FIN. (Aug. 22, 2023), https://yhoo.it/4gwcyuG; *Nestle SA Shares Outstanding 2010-2023*, MACROTRENDS, https://bit.ly/3N9rilL (last visited Sept. 17, 2024).

[26] Julie Jargon, *Starboard Succeeds in Replacing Entire Darden Board*, WALL. ST. J. (last updated Oct. 10, 2024), https://on.wsj.com/3TxhQvL.

[27] Tom Hals, *DuPont wins board proxy fights against activist investor Peltz*, REUTERS (May 13, 2015), https://reut.rs/3ZpswAn.

had replaced its CEO and agreed to merge with Dow Chemical to create a conglomerate that would be broken up into three companies.[28]

92.    The power to influence a single company's output or pricing decisions would ordinarily pose only an insignificant risk to competition.  In a properly functioning market, when one company cuts output, its competitors will increase production in order to capture that new market share.  Every competitor will, in other words, vigorously compete to maximize its profits, thereby making the output reduction of a single competitor unprofitable.

93.    The dynamic changes when a single owner obtains a significant ownership percentage of multiple competitors across a single market with only a handful of competitors.  When a shareholder is among the largest shareholders not only of nearly *every* major company in an industry but also of the banks and investment firms that finance that industry, that shareholder has the power to influence the *entire* industry.  Quite simply, "[w]hen BlackRock Chairman Larry Fink speaks, the investment world tends to listen."[29]  Congress enacted Section 7 of the Clayton Act to address the threat to competition that attends when such a single shareholder acquires directly or indirectly the stock of multiple horizontal competitors.

94.    Each Defendant's ownership of the Coal Companies creates the sort of anticompetitive arrangement that Section 7 forbids.  Each Defendant's substantial shareholdings enable it to, among other things, (a) access sensitive business information, (b) coerce management to adopt specific coal production targets, (c) force management to adopt disclosure policies that would permit Defendants to monitor their compliance with those targets, (d) seek the appointment

---

[28] Jeff Mordock, *A wildly different DuPont a year after Peltz defeat*, DEL. ONLINE (April 29, 2016), https://bit.ly/4e4xOWJ.

[29] Anderson Lee & Hayden Higgins, *3 Ways BlackRock Can Do Better on Sustainable Finance*, WORLD RES. INST. (Mar. 3, 2022), https://bit.ly/3ZvcPHY.

or removal of members of the boards of directors of these companies to further Defendants' production and disclosure goals, (e) present and obtain approval of shareholder proposals to reduce coal production, and (f) otherwise influence corporate policies adopted by the firms in which Defendants have acquired substantial common ownership stakes. Such practices limit competition between the competing firms.

95.    This power to influence management means that Defendants' partial acquisitions of the shares of these horizontal competitors in the coal industry pose a similar risk to competition as an outright merger of those competing coal producers. When competing firms are effectively brought under common control, those firms—though competitors in name—experience significantly reduced incentives to compete against one another, especially when their common shareholders are active in corporate governance and actively voting for changes in management.

96.    The Justice Department and Federal Trade Commission's 2010 and 2023 Merger Guidelines, the federal courts, and leading antitrust scholars all agree that partial acquisitions of stock across competing firms must satisfy the same legal standards as mergers and acquisitions of those firms. *See, e.g., DuPont*, 353 U.S. at 586 (DuPont's partial acquisition of a 23% interest in General Motors in 1917-1919 violated Section 7 because of the incentive it created in 1949 for General Motors to purchase finishes and fabrics from DuPont).[30]  Indeed, the 2023 Merger Guidelines advise using the Herfindahl-Hirschman Index ("HHI") to measure the effect of such acquisitions on market concentration. *See Merger Guidelines: U.S. Department of Justice and the Federal Trade Commission* at Guidelines 1 & 11 (Dec. 18, 2023), https://bit.ly/3BgNlE4 ("2023

---

[30] *See also Dan River, Inc. v. Unitex, Ltd.*, 624 F.2d 1216, 1225 (4th Cir. 1980) (20% block "frequently is regarded as control"); *Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 695–97 (2d Cir. 1973) (19% stock ownership sufficient to influence acquired firm's policy); *Am. Crystal Sugar Co. v. Cuban-Am. Sugar Co.*, 259 F.2d 524, 526–28 (2d Cir. 1958) (condemning 23% acquisition).

Merger Guidelines"). "To be sure, control or steps toward control or toward total ownership are tested in the usual manner to see whether there is a reasonable probability of a substantial lessening of competition," while "[t]esting for the prohibited effect is much more subtle … when control is neither attained nor contemplated." DONALD F. TURNER & PHILLIP AREEDA, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶1203a (1978). As set forth below, Defendants have attained and exercised a degree of control over the Coal Companies that has been more than sufficient for Defendants to set and enforce common policies that substantially reduce competition across the entire coal industry.

97.     Market concentration is ordinarily measured using the Herfindahl-Hirschman Index. The HHI for a relevant market is calculated by squaring the percentage market shares of each producer that sells the relevant product within the relevant geographic market and totaling those figures. The post-acquisition HHI and the change in HHI—post-acquisition compared to pre-acquisition—are used to determine whether an acquisition of shares is likely to significantly restrain competition and therefore raises competitive concerns. An acquisition is presumed likely to create or enhance market power—and is thus presumptively illegal—when the post-transaction market's HHI exceeds 1,800 and the transaction increased the HHI by more than 100 points. The same structural presumption applies when a merger transaction or joint venture creates a firm with a market share greater than 30% and a change in the HHI greater than 100 points.

98.     HHI is typically applied to acquisitions that result in complete control, to what has been described as "a special case of a 'partial' investment of 100 percent that gives the acquiring firm complete control."[31] While the antitrust enforcers have made clear that partial acquisitions

---

[31] Daniel P. O'Brien & Steven C. Salop, *Competitive Effects of Partial Ownership: Financial Interest and Corporate Control*, 67 ANTITRUST L.J. 559, 563 (2000).

are subject to the same legal standard as any other acquisition,[32] Defendants' partial acquisitions do not confer "complete control," and will therefore require a more nuanced assessment of the degree of control or influence that these partial owners exercise over management and how this influence translates into competitive effects. Thus, unlike most merger analysis, a central part of the analysis of partial ownership is an assessment of which owners have what type of control over the corporation and how this control translates into management decisions. HHI thus offers a rough approximation of the effect that substantial partial acquisitions have on markets.

99.     *SPRB Market Concentration.* There are 12 mines currently operating in the SPRB. In 2022, they produced a total of approximately 240 million tons of coal, representing 40.4% of total U.S. coal production, 45.1% of U.S. thermal coal production, and 100% of U.S. SPRB coal production.[33] As measured by the HHI, and without accounting for the effects of Defendants' stock acquisitions, the SPRB market would have had a concentration of 2,360.6.

100.     Defendants have acquired shares that represent between 30.43% and 34.19% of the stock of the three companies that control six of these 12 mines. See below Table 2. These six mines were responsible for approximately 63% of the SPRB coal produced in 2022.

---

[32] 2023 Merger Guidelines at 28; *See also DuPont*, 353 U.S. at 592 ("[A]ny acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of [Section 7 of the Clayton Act] whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce.").

[33] The three mines operating in the NPRB were responsible for approximately 20 million short tons of production. They are: 1) the Spring Creek mine, which is owned by Navajo Transitional Energy Company, and produced 11.56 million short tons; 2) the Robsebud Mine, which is owned by the Westmoreland Coal Company, and produced 6.97 million short tons; and the Absaloka Mine, which is also owned by the Westmoreland Coal Company, and produced 1.8 million short tons. Both of these companies are privately held.

| Table 2: SPRB Coal Market Shares and HHI Calculations | | | | |
|---|---|---|---|---|
| Mine/Parent Company | Defendants' Ownership | 2022 Output (million tons) | Percentage of SPRB Market | HHI Calculation |
| Black Thunder Mine<br>Arch Coal | 34.19% | 62.2 | 27.8% | 773 |
| Coal Creek Mine<br>Arch Coal | 34.19% | 3.8[34] | | |
| North Antelope Rochelle Mine<br>Peabody Energy | 30.43% | 60.4 | 34.8% | 1212 |
| Rawhide Mine<br>Peabody Energy | 30.43% | 10.3 | | |
| Caballo Mine<br>Peabody Energy | 30.43% | 12.1 | | |
| Wyodak Mine<br>Black Hills Mining | 31.62% | 3.5[35] | 1.5% | 2 |
| Belle Ayr Mine<br>Eagle Specialty Materials | Privately Held | 14.3 | 12.4% | 154 |
| Eagle Butte Mine<br>Eagle Specialty Materials | Privately Held | 15.1 | | |
| Antelope Mine<br>Navajo Transitional Energy Company | Privately Held | 21.7 | 14.4% | 207 |
| Cordero Rojo Mine<br>Navajo Transitional Energy Company | Privately Held | 12.5 | | |
| Buckskin Mine<br>Kiewit Corporation | Privately Held | 18.2 | 7.6% | 59 |
| Dry Fork Mine<br>Western Fuels Association | Privately Held | 3.7[36] | 1.5% | 2 |
| Total | | 237.8 | 100% | 2409 |

101.    Were these three coal-producing firms formally to merge, create a joint venture, or otherwise come under common control, it would result in a market concentration of approximately 4,524—an increase in the HHI of 2,115. Such a transaction would be presumptively unlawful. The

---

[34] *Arch Resources, Inc.: 2023 Annual Report* at 15, ARCH (2023), https://bit.ly/4dbI5yQ.

[35] Most recent data is for 2021. *See* Concise Guide to Wyoming Coal, WYO. MINING ASS'N (2022), https://bit.ly/3BbWE8A.

[36] *Id.*

34

market share of that firm or joint venture would also be 64%—far higher than the 30% required to apply the structural presumption under the Merger Guidelines.

102.    The effect on competition is no different when Defendants use their substantial stock acquisitions to coordinate a reduction in the production of SPRB coal by these three firms. And as demonstrated below, this is exactly what Defendants have used their shares to accomplish, with precisely the effects on competition that the economic models undergirding the HHI would predict.

103.    Defendants' reduction of competition is particularly acute because one of the privately held coal producers in which Defendants have no ownership stake does not supply its coal to the open market.  The Dry Fork Mine is operated by a cooperative organization of power plant owners known as the Western Fuels Association and is a vertically-integrated company that has fully committed its SPRB production to supplying its own captive power plant.

104.    The other three producers are Navajo Transitional Energy Company, LLC, Eagle Specialty Materials, and Kiewit Corporation.  These companies lack the financial resources and the capacity to increase their output at sufficient scale to offset the decreased output by the coal producers in which Defendants have an ownership stake.

105.    *The National Market for Thermal Coal.* The Coal Companies are collectively responsible for 240.8 million tons of the nation's total output of 523.3 million tons of thermal coal, or 46% of the national output.  The HHI generated by these eight companies standing alone would be 521.96.

35

| TABLE 3: Thermal Coal Market Shares | | | | | |
|---|---|---|---|---|---|
| 2022 Rank | Mining Company | Defendants' Ownership Percentage | 2022 Output (million tons) | Percentage of National Market | HHI |
| 1 | Peabody Energy | 30.43% | 99.5 | 19.0% | 295.84 |
| 2 | Arch Resources | 34.19% | 70.6 | 13.5% | 174.24 |
| 7 | NACCO Industries | 10.85% | 28.9 | 5.5% | 24.01 |
| 8 | CONSOL Energy | 28.97% | 22.4 | 4.3% | 16.81 |
| 11 | Alpha Metallurgical Resources | 29.70% | 3.6 | 0.7% | 7.29 |
| 13 | Vistra Energy | 24.93% | 9.3 | 1.8% | 2.56 |
| 18 | Hallador Energy | 8.30% | 6.5 | 1.2% | 1.21 |
| 20 | Warrior Met Coal[37] | 31.62% | 0 | 0% | 0 |
| Total | | | 240.8 | 46.00% | 521.96 |

106.     Were the Coal Companies to merge or form a joint venture, the combined firm would yield an HHI for the thermal coal market of 2,116.0—an increase of 1,594.  Such a transaction would be presumptively unlawful.  The market share of that firm or joint venture would also be 46%—again far higher than the 30% required to apply the structural presumption.

107.     The effect on competition is no different when Defendants use their substantial stock acquisitions to control these eight firms and induce them to implement a common policy concerning price or output.  And as demonstrated below, that is exactly what Defendants have used their shares to accomplish, with precisely the effects on competition that the economic models undergirding the HHI would predict.

108.     Defendants' acquisition of substantial shares in the Coal Companies also significantly increases the risk of coordination between the Coal Companies in each of the relevant markets.  As major shareholders in the dominant competitors in the relevant markets, Defendants have direct access to the management of each of those competing firms and thus the ability to transmit information across competitors. And Defendants in fact used that privileged access to

---

[37] Warrior Met Coal produces only metallurgical coal.

36

communicate their output reduction scheme to each of the Coal Companies and then to monitor
and police compliance with the scheme.  By acquiring substantial partial interests in these
competitors in the coal industry, Defendants made collusion possible—a possibility that has in fact
been realized.

109.    Defendants' acquisitions of the stock of the Coal Companies also significantly
increases the risk of substantially lessening competition by diminishing the incentive for
management of those firms to compete to win market share from each other. It creates a contrary
incentive for management to maximize the aggregate profits of the entire industry—not of their
individual firms—and thus the overall profits of their common owners.  As the academic literature
explains, when a shareholder owns stock in a single firm, maximizing the profits of that firm
maximizes the profits of that shareholder; but when that shareholder owns stock in all the firms
that compete in an industry, maximizing the profits *of the entire industry* maximizes the profits of
the shareholder.[38]  Thus, when management knows their firm is owned by so-called "horizontal
shareholders"—i.e., by shareholders who own shares in the competing firms across an industry—
management has an incentive to maximize the profits of the industry.  In other words, the incentive
is to operate as a cartel.

110.    For the same reasons, Defendants' acquisitions and holding of the stock of the Coal
Companies significantly increases the risk that competition will be substantially lessened by
removing the incentives these firms would otherwise have to disrupt efforts by their competitors
to coordinate.

---

[38] *See, e.g.*, Einer Elhauge, *Horizontal Shareholding*, 129 HARV. L. REV. 1267, 1269
(2016); Fiona Scott Morton & Herbert Hovenkamp, *Horizontal Shareholding and Antitrust Policy*,
127 YALE L.J. 2026, 2031 (2018).

37

111.    In addition, Defendants' acquisitions and holding of the stock of the Coal Companies significantly increase the risk that competition will be substantially lessened by decreasing the incentive for management of those firms to compete with alternative fuel sources. Defendants own substantial interests not only in domestic thermal coal producers but in competitors to thermal coal like natural gas and alternative energy.  Indeed, BlackRock alone has invested $170 billion in U.S. energy companies—including oil and gas producers, alternative energy producers, and pipeline operators.[39]  Vanguard, BlackRock, and State Street are the three largest shareholders of Exxon Mobil, owning 988 million shares or 22% of the outstanding shares[40]; of Chevron, 413 million shares, or 22.4%[41]; of Devon Energy, 170 million shares, or 27%;[42] of First Solar, 29 million shares, or 27%[43]; and NextEra Energy, 454 million shares, or 22%.[44]  For each of these companies, Vanguard is the largest shareholder, followed closely by BlackRock, with State Street coming in third.  These companies—and by extension their shareholders, including Defendants—would all benefit from eliminating lower-cost alternative energy sources.  On that dimension, too, Defendants' common ownership thus creates an incentive

---

[39] *Energy investing: Setting the record straight*, BLACKROCK, https://bit.ly/4eu7Onw (last visited Sept. 17, 2024).

[40] *Exxon Mobil Corporation Common Stock (XOM) Institutional Holdings*, NASDAQ, https://bit.ly/47CZVtG (last visited Sept. 17, 2024).

[41] *Chevron Corporation Common Stock (CVX) Institutional Holdings,* NASDAQ, https://bit.ly/3XKPAZf (last visited Sept. 17, 2024).

[42] *Devon Energy Corporation Common Stock (DVN) Institutional Holdings,* NASDAQ, https://bit.ly/4e68rUf (last visited Sept. 17, 2024).

[43] *First Solar, Inc. Common Stock (FSLR) Institutional Holdings*, NASDAQ, https://bit.ly/4gHO41F (last visited Sept. 17, 2024).

[44] *NextEra Energy, Inc. Common Stock (NEE) Institutional Holdings*, NASDAQ, https://bit.ly/4gqzFXp (last visited Sept. 17, 2024).

for the Coal Companies not to compete aggressively against more expensive alternative forms of energy.

112.    For all these reasons, it is likely that Defendants' acquisitions of the stock of the Coal Companies, standing alone, poses a risk to competition in the domestic coal markets sufficient to warrant their prohibition under Section 7 of the Clayton Act.  But as set forth below, this threat to competition is not just hypothetical or merely probable—it has actually come to pass. Defendants have, in fact, already used their shares, by proxy voting and otherwise, to bring about the substantial lessening in competition in the domestic coal markets that Section 7 forbids. The most compelling proof that Defendants' acquisitions may substantially lessen competition, in other words, is that Defendants' acquisitions have already done so.

**DEFENDANTS AGREED TO A COMMON STRATEGY TO REDUCE OUTPUT**

113.    While common ownership of horizontal competitors poses an inherent threat to competition, the Congress that enacted Section 7 of the Clayton Act recognized that, so long as even a large shareholder remains passive and does not seek to use its shares to influence management, then the threat that shareholder poses to competition remains hypothetical.

114.    Section 7 accordingly does "not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition." 15 U.S.C. § 18.  Should a shareholder abandon a passive investment strategy, however, and seek to bring about a substantial lessening of competition, then that shareholder no longer enjoys this safe harbor.

115.    In 2021, Defendants each publicly announced their commitment to "[i]mplement a stewardship and engagement strategy, with a clear escalation and voting policy, that is consistent with our ambition for all assets under management to achieve net zero emissions by 2050 or

39

sooner."[45]  The organization that Defendants joined made clear that for assets to be in line with net zero, they must align with the International Energy Agency Roadmap to Net Zero,[46] which required the $CO_2$ emissions from coal to drop over 58% between 2020 and 2030.[47]  Given that there is no realistic path for a coal company to cut coal emissions other than by cutting production, Defendants announced their intent to adopt a strategy consistent with net zero and "with a clear escalation and voting policy" to push the coal companies in their portfolio to cut output by more than half by 2030. BlackRock and State Street also joined Climate Action 100+, which expressly stated its view that "the IEA's NZE requir[es] a reduction of 50% in thermal coal production by 2030 versus 2021."[48] There are few, if any, acts likelier to substantially lessen competition than an industry-wide output reduction scheme organized and policed by shareholders with the ability to monitor compliance and the power to discipline the management of any individual company that deviates from the restrictions Defendants set.

116.    Defendants BlackRock, State Street, and Vanguard announced their common commitment to this scheme by joining the Net Zero Asset Managers Initiative; Defendants BlackRock and State Street further committed themselves to achieving these aims by becoming signatories to Climate Action 100+.  Defendants' open participation in these initiatives provides substantial evidence of a horizontal agreement among Defendants to use their common ownership

---

[45] *The Net Zero Asset Managers Commitment*, NET ZERO ASSET MANAGERS INITIATIVE (last visited Nov. 20, 2024), https://bit.ly/40QKYTn.

[46] *Net Zero Asset Managers initiative: Network Partner's expectation of signatories with regard to fossil fuel investment policy*, NET ZERO ASSET MANAGERS INITIATIVE (last visited Nov. 20, 2024), https://bit.ly/4gqJOmN.

[47] *Net Zero by 2050: A Roadmap for the Global Energy Sector* at 199 tbl. A.4, INT'L ENERGY AGENCY (2021), https://bit.ly/3UZLCtU.

[48] *Investor Expectations for Diversified Mining* at 37, CLIMATE ACTION 100+ (last visited Nov. 20, 2024), https://bit.ly/3zqi1SR.

of the Coal Companies to set and enforce output restrictions on coal that have impacted the entire industry.

**Climate Action 100+ Presents Compelling Evidence of
Defendants' Agreement to Seek Coordinated Reductions in Coal Production**

117.    Climate Action 100+ ("CA 100+") is "an unprecedented global investor engagement initiative" that targets companies in the energy industry and other sectors to ensure they "take necessary action on climate change."[49]  Signatories to CA 100+ commit to influencing corporate policies and ensuring that firms: (1) "[t]ake action to reduce greenhouse gas emissions across the value chain in line with the overarching goals of the Paris Agreement"; (2) "[i]mplement a strong governance framework which clearly articulates the board's accountability and oversight of climate change risks and opportunities"; and, (3) monitor compliance with carbon output reduction targets by "[p]rovid[ing] enhanced corporate disclosure in line with the recommendations of the Task Force on Climate-related Financial Disclosures (TCFD)."[50]

118.    CA 100+ has not been vague or evasive about its intentions for the coal industry. As explained in CA 100+'s "Investor Expectations for Diversified Mining," "[a]s the most emission-intensive fossil fuel, [coal's] reduction is prioritised in climate modelling with the IEA's NZE requiring a reduction of 50% in thermal coal production by 2030 versus 2021, and 91% by 2050."[51]  These benchmark reductions are aligned with limiting global temperature increases to 1.5ºC.

---

[49] *Black Rock Joins Clime Action 100+ to Ensure Largest Corporate Emitters Act on Climate Crisis*, CLIMATE ACTION 100+ (Jan. 9, 2020), https://bit.ly/4gEGPaG.

[50] *Id.*

[51] *Investor Expectations for Diversified Mining, supra*, n.48 at 37.

119.    CA 100+ and its members openly committed to working together to induce these dramatic reductions in the production of coal. CA 100+ established "alignment metrics" that set specific target reductions for coal production. These metrics require medium term reductions in thermal coal production of 50% between 2021 and 2030, Alignment Metric 5.v.e, and 91% between 2021 and 2050, Alignment metric 5.v.d.[52]

120.    CA 100+ candidly admitted that its members were not going to reach their "decarbonization" goal without reducing coal production—especially the production of thermal coal—by the mining industry: "[T]he mining sector and its value chains will also need to decarbonise. For some commodities, this means reducing production. In net zero scenarios, coal production declines towards zero, with thermal coal declining faster than metallurgical coal."[53] Anne Simpson, CA 100+'s investor representative for North America explained in 2021, "[w]e're not going to get to net zero by *just* bringing down the supply of oil, gas and coal."[54] Bringing down the supply is the *sine qua non* of the CA 100+ agenda.

121.    CA100+ members agreed to work with the coal companies in which they had invested to obtain commitments to disclose their "planned thermal coal production factored into its short, medium, and long-term targets (expressed in unit Mt or TJ) and either a % or absolute change from a stated base year value."[55]

---

[52] *Investor Expectations for Diversified Mining* at 38, CLIMATE ACTION 100+ (Oct. 2023), https://bit.ly/4eqKE1b.

[53] *Investor Expectations for Diversified Mining* at 2, CLIMATE ACTION 100+ (Sept. 2023), https://bit.ly/3zqi1SR.

[54] *To Drive Meaningful Corporate Decarbonisation*, CLIMATE ACTION 100+ (Oct. 27, 2021), https://bit.ly/47xgPdd (emphasis added).

[55] *Investor Expectations for Diversified Mining, supra*, n.48 at 38.

122.    CA 100+ members agreed to work to obtain commitments from the companies in which they have acquired shares to disclose their Scope 3, category 11 emissions.[56]  In the case of thermal coal, disclosures of Scope 3, category 11 emissions would reflect the total lifetime carbon emissions that would be generated by the consumption of that coal.[57]  When a company knows the total lifetime carbon emissions that the thermal coal a company plans to produce will cause, it knows the total amount of thermal coal that competitor is planning to produce. These disclosures would thus alert a company's competitors to the company's future production targets and enable Defendants and the companies' competitors to police the disclosing company's ongoing compliance with those targets.

123.    CA 100+ members agreed to use their shareholdings to pressure companies to meet these "decarbonization" goals.  Mindy Lubber, CA 100+'s investor network representative for North America detailed how CA 100+ members will identify leading competitors in an industry, with the expectation that other competing firms will follow suit and follow the same practices: "Fundamentally companies compete, and when one company in a sector takes action, the others usually follow."[58]

124.    Resistance by management was futile because, as Ms. Lubbers continued, "[i]f companies aren't willing or able to respond to the challenge of moving towards a net zero transition, we will look for new leadership. … There may be board directors who don't feel compelled or have the expertise to get this transition done – but they must then make way for those

---

[56] *Id.* at 37.

[57] As applied to thermal coal, Scope 3, Category 11 emissions reflect the emissions that result when that fuel is consumed in a power plant. *See Category 11: Use of Sold Products*, GHG PROTOCOL, https://bit.ly/3XybmOu.

[58] *To Drive Meaningful Corporate Decarbonisation, supra*, n.54.

43

that do.  This is concentering [sic] minds in boardrooms and across the investor community and is a new, welcome dynamic to engagement and stewardship."[59]

125.    CA 100+ provided its signatories with a roadmap for using their shareholdings in coal producers to influence corporate governance at each of these firms to ensure that each of these companies would simultaneously be reducing their output of coal to achieve the same level of output reduction and would report on their ongoing compliance with these targets to their common shareholders.  CA 100+ signatories were agreeing, in effect, to organize and police an output reduction cartel, to play the role of the hub in a hub-and-spoke reduction arrangement.

126.    In 2020, Defendant BlackRock and Defendant State Street became signatories to Climate Action 100+ ("CA 100+").

127.    Defendant BlackRock became a signatory of CA 100+ on January 9, 2020.[60]

128.    Defendant State Street announced that it had joined CA 100+ on November 30, 2020, formally committing itself to the initiative's central goals of "improving governance of climate change, reducing emissions, and strengthening climate-related disclosure."[61]  State Street simultaneously announced that it would continue to advocate for those goals "through company engagement[], [State Street's] thought leadership, and proxy voting."[62]

---

[59] *Id.*

[60] *Id.*

[61] *Insights: Why We're Joining Climate Action 100+*, STATE ST. GLOB. ADVISORS (Nov. 30, 2020), https://bit.ly/3MUJuz9.

[62] *Id.*

**Defendants' Participation in the Net Zero Asset Managers Initiative is Compelling Evidence of Defendants' Agreement to Seek Coordinated Reductions in Coal Production**

129.    In 2021, BlackRock, Vanguard, and State Street also became signatories to the Net Zero Asset Managers Initiative.

130.    Signatories to the Net Zero Asset Managers Initiative committed to achieving the same goals that the signatories to CA 100+ agreed to pursue—namely net zero greenhouse gas emissions by 2050 and achieving "decarbonisation goals" consistent with reaching net zero emissions by 2050 (or sooner) across all assets under management.[63]

131.    As with CA 100+, signatories to the Net Zero Asset Managers Initiative commit to setting interim reduction targets to be achieved by 2030.  These targets are to be consistent with limiting global warming to 1.5ºC by 2050 and embrace the same International Energy Agency Roadmap to Net Zero that is the basis for the 2030 and 2050 reduction targets discussed above.[64] The signatories to the Net Zero Asset Managers Initiative specifically commit to phasing out coal investments: "Notably, this includes immediately ceasing all financial or other support to coal companies* [sic] that are building new coal infrastructure or investing in new or additional thermal coal expansion, mining, production, utilization (i.e., combustion), retrofitting, or acquiring of coal assets."[65]

---

[63] *The Net Zero Asset Managers Commitment*, THE NET ZERO ASSET MANAGERS INITIATIVE, https://bit.ly/47vQcFi (last visited Sept. 17, 2024).

[64] *Net Zero Asset Managers initiative: Network Partner's expectation of signatories with regard to fossil fuel investment policy*, THE NET ZERO ASSET MANAGERS INITIATIVE, https://bit.ly/4gqJOmN (last visited Sept. 17, 2024)

[65] *Id.*

45

*BlackRock*

132.    On March 29, 2021, Defendant BlackRock became a signatory to the Net Zero Asset Managers Initiative ("NZAM").[66]

133.    As part of its commitment to NZAM, BlackRock published its initial target disclosure on May 1, 2022.[67]  That disclosure revealed that BlackRock had committed to manage 77% of its $7.3 trillion of assets under management in compliance with its commitment to NZAM, and anticipated that "at least 75% of BlackRock corporate and sovereign assets managed on behalf of clients [would] be invested in issuers with science-based targets or equivalent."[68]

134.    BlackRock further explained that it "expect[ed] to remain long-term investors in carbon-intensive sectors like traditional energy," and had adopted a strategy of "engag[ing] with companies." [69]  In 2020, it first focused on 440 public companies that contributed 60% of Scope 1 and Scope 2 greenhouse gas emissions,[70] and then, in 2021, it expanded that universe to 1,000 carbon-intensive public companies responsible for 90% of those emissions.

135.    After joining NZAM, Defendant BlackRock, acting through the subsidiaries, affiliates, and investment trusts it manages and over which it exercises control, acquired even more shares in, and greater influence over, the Coal Companies.

---

[66] *BlackRock*, THE NET ZERO ASSET MANAGERS INITIATIVE, https://bit.ly/3ZtnBOU (last visited Sept. 17, 2024)

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] Scope 1 emissions are direct greenhouse emissions that occur from sources that are controlled or owned by an organization (e.g., emissions associated with fuel combustion in boilers, furnaces, vehicles). Scope 2 emissions are indirect greenhouse gas emissions associated with the purchase of electricity, steam, heat, or cooling. Although Scope 2 emissions physically occur at the generation facility where the power is generated, they are accounted for in the greenhouse gas emissions inventory of the organization that ultimately uses that power.

136.    Defendant BlackRock was not reluctant to use that growing influence. It further announced that it would discipline management that failed to satisfy its demands, both when voting on shareholder proposals and by voting to remove management: "[w]here we do not see enough progress for these issuers, and in particular where we see a lack of alignment combined with a lack of engagement, we may not support management in our voting for the holdings our clients have in index portfolios, and we will also flag these holdings for targeted review and engagement in our discretionary active portfolios where we believe they may present a risk to performance."[71] BlackRock also helped lead a "workstream on Managed Phaseout of High-emitting Assets" that called for the "early retirement of high-emitting assets" such as coal mines.[72]

*Vanguard*

137.    Defendant Vanguard became a signatory to the Net Zero Asset Managers Initiative on March 29, 2021.[73]

138.    In December 2021, Vanguard published a report outlining its "expectations for companies with significant coal exposure."[74]  The report stated that "shareholder proponents have used the proxy voting system to," among other things, "ask companies to shutter or divest their coal assets, or persuade financial institutions to stop providing financial services to the thermal coal industry and the entities that extract thermal coal from the ground."[75]

---

[71] *BlackRock*, *supra,* n. 66.

[72] *The Managed Phaseout of High-Emitting Assets* at 2, 10, GLASGOW FIN. ALL. FOR NET ZERO (2022), https://bit.ly/3AReMEI.

[73] *Vanguard*, THE NET ZERO ASSET MANAGERS INITIATIVE (Dec. 4, 2022), https://bit.ly/3ZvO3ro.

[74] *Vanguard Investment Stewardship Insights: Vanguard's expectations for companies with significant coal exposure* at 1, VANGUARD (Dec. 2021), https://bit.ly/3TzJ9Wr.

[75] *Id.*

139.    "Vanguard's Investment Stewardship team," the report continued, "has engaged with companies in carbon-intensive industries, and their boards, over the last several years and has discussed," among other things, "shifts in supply and demand…,"[76] and seeking to "understand how companies set targets in alignment with these goals" of the Paris Agreement and the Glasgow Climate Pact.[77]    Specifically, Vanguard sought "clear disclosures" from management of firms in the coal industry, including an "[e]xplanation of how thermal coal remains relevant for a company's customer base and the market it serves over 10, 20, and 30, years."[78]

140.    Defendant Vanguard also announced that it would require "[e]ffective disclosure[s]" by those firms operating in the thermal coal industry of their compliance with these targets "to allow the market to accurately price securities."[79]

141.    Defendant Vanguard also announced that it would discipline management that failed to meet its demands, both when voting on shareholder proposals and by voting "against directors who, in our assessment, have failed to effectively identify, monitor, and manage material risks and business practices that fall under their purview based on committee responsibilities."[80]

142.    As part of its commitment to the Net Zero Asset Managers Initiative, Defendant Vanguard published its initial target disclosure on May 1, 2022.[81]    The disclosure revealed that Vanguard had committed to managing $290 billion of its assets in line with net zero targets and had established a target of having each of its investment strategies have at least 50% of its market

---

[76] *Id.* at 2.

[77] *Id.*

[78] *Id.* at 2–3.

[79] *Id.* at 3.

[80] *Id.* at 4.

[81] *Vanguard, supra,* n.73.

48

value invested in companies with targets that are consistent with a net zero glidepath by 2030. Defendant Vanguard stated that it had committed to "meaningful engagement with portfolio companies on climate risk across both [its] actively managed and index-based products …" and that its "investment stewardship team will continue to engage with companies about their commitments" to meet emission reduction goals.[82]

<em>State Street</em>

143.    Defendant State Street became a signatory to the Net Zero Asset Managers Initiative on April 20, 2021.[83]

144.    As part of its commitment to the Net Zero Asset Managers Initiative, Defendant State Street published its commitment statement and initial target disclosure on May 1, 2022.[84] The Commitment Statement pledged State Street to obtaining a 50% reduction in financed Scope 1 and 2 carbon emissions (i.e., emissions for which a firm is directly and indirectly responsible) intensity by 2030 from the companies in which it invests, relative to their 2019 baseline, and "90% of financed emissions in carbon-intensive industries in the client portfolios in our Net Zero Target Assets… to be coming from companies [that are] achieving net zero, []aligned to net zero or [are] subject to engagement and stewardship actions."[85]

---

[82] *Id.*

[83] *State Street Global Advisors*, NET ZERO ASSET MANAGERS INITIATIVE, https://bit.ly/3Zu3bFz (last visited Sept. 18, 2024).

[84]  *Id.*

[85]  *Id.*

145.    State Street announced, as its specific "[p]olicy on coal and other fossil fuel investments," that it "believe[s] engagement and stewardship efforts to be the most effective tool to achieve long-term progress on energy transition."[86]

146.    On April 11, 2022, State Street's EMEA Head of Investment Strategy & Research, and Carlo Maximilian Funk, EMEA Head of ESG Investment Strategy, published on the State Street website a statement on "Index and Active for Climate Investing," describing the strategies used by State Street's active and index managers to achieve reductions in hydrocarbon output.

147.    State Street's index fund managers, on the one hand, leverage their long-term relationships to engage with management to achieve emissions reductions by those firms whose shares are held by those index funds: "Index managers, by their nature, are providers of long-term capital and have been shareholders in some companies for decades. Given their size and long investment horizon, index managers are uniquely positioned to engage with companies on their transition to Net Zero."[87]

148.    State Street's active managers, on the other hand, eschew divestment, on the grounds that this strategy would "shelter companies from being positively influenced by shareholders in the context of climate change.":

> Fundamentally, we believe divestment is not sufficient to create genuine climate impact by itself. With divestment, investors lose their impact to bring about positive and lasting change via voting and engagement. Instead, companies can be bought by investors who lack a clear climate strategy, or they can go into the hands of private owners with no market scrutiny. Fear of large-scale divestment from institutional investors and other public market participants could lead companies to spin off their high-emitting

---

[86] *State Street Global Advisors*, NET ZERO ASSET MANAGERS INITIATIVE, (Jan. 26, 2024), https://bit.ly/3XFbTOP.

[87] *Index and Active for Climate Investing*, SSGA (Apr. 11, 2022), https://bit.ly/3MQzwig.

50

> divisions or go private (a practice we refer to as 'brown spinning'). This concerns us because the ultimate effect in some cases could be to shelter companies from being positively influenced by shareholders in the context of climate change. Divestment is also a point-in-time approach that usually does not account for the direction of development.[88]

149. Instead, State Street's active fund managers elected to pursue a strategy of engaging with management to achieve reduction targets, as "[n]umerous academic studies find that engagement is a more effective strategy than divestment. For investors who are interested in realizing climate-related outcomes through stewardship activity, both index and active managers' asset stewardship programs can provide an avenue for influence with companies across countries and sectors."[89] For example, State Street used engagement to urge HSBC to "align its financing activities with the Paris agreement," and HSBC agreed to "phase out financing of coal-fired power and thermal coal mining"[90] in order to avoid a "shareholder revolt."[91]

150. By the end of 2021, therefore, Defendants had committed to a common strategy of "engaging" with management of competing firms in the coal industry to obtain their commitment to reduce carbon emissions substantially and requiring those firms to disclose their compliance with those commitments. Because achievement of these emissions targets could only be accomplished through reductions in coal production, Defendants were effectively demanding reductions in output, as confirmed by Vanguard's strategy of "ask[ing] companies to shutter or divest their coal assets."[92]

---

[88] *Id.*

[89] *Id.*

[90] *Stewardship Activity Report*, 7, STATE ST. (2021), https://bit.ly/3ADSV3K.

[91] Dan Ennis, *State Street Doubles Down on ESG Pledge, While HSBC's Comes under Scrutiny*, BANKINGDIVE (last updated Mar. 11, 2021), https://bit.ly/3V4jnui.

[92] *Vanguard Investment Stewardship Insights*, *supra*, n.74 at 1.

151.    On December 7, 2022, Vanguard announced that it had "decided to withdraw from NZAM so that we can provide the clarity our investors desire about the role of index funds and about how we think about material risks, including climate-related risks—and to make clear that Vanguard speaks independently on matters of importance to our investors."[93]    Vanguard nevertheless committed to "continu[ing] to interact with companies held by Vanguard funds to understand how they address material risks, including climate risk, in the interests of long-term investors" and to "publicly report[ing] on our efforts with respect to climate risk, grounded in our deep commitment to our investors and their financial well-being." *Id.*

### DEFENDANTS HAVE USED THE STOCK THEY ACQUIRED TO SUBSTANTIALLY REDUCE COMPETITION IN THE RELEVANT COAL MARKETS

152.    As their commitments to Climate Action 100+ and the Net Zero Asset Managers Initiative make clear, Defendants did not acquire and have not used these shares solely for passive investment purposes.  Defendants openly committed to wielding the substantial power of the shares they control to recalibrate carbon production and competition to reduce overall coal production and thereby increase market-wide profits above competitive levels.  Defendants have used their shares—by engagement, by proxy voting, and otherwise—to bring about a lessening in carbon emissions by reducing the output of SPRB, thermal, and metallurgical coal. These efforts have imposed a significant restraint on competition in domestic coal markets.

---

[93] *An update on Vanguard's engagement with the Net Zero Asset Managers initiative (NZAM),* VANGUARD (Dec. 7, 2022), https://bit.ly/3XMIOlJ.

153.    Although Defendants are not majority shareholders in these firms, such "large minority shareholders … have more influence than their formal, minority, equity share."[94] These "passive investors are not passive owners but they engage in active discussions with companies' board and management, with a view to influence the companies' long-term strategy."[95] They can achieve this because "large shareholders have a privileged access to the companies' management and can, therefore, share their views and have the opportunity to shape the companies' management's incentives accordingly."[96]

154.    As the public statements by each of Defendants demonstrate, Defendants have leveraged the stock they acquired in the Coal Companies to engage with management behind closed doors and bring about a policy of reducing coal production, the effect of which may be— indeed, has been—substantially to lessen competition in domestic coal markets. Below are some examples for each Defendant—first of public statements, then of concrete actions to enforce Defendants' output-reduction agreement.

### Vanguard's Public Statements

155.    In a letter sent to board members of Vanguard funds' largest portfolio holdings, Vanguard's then-chairman and chief executive, F. William McNabb III, stated that Vanguard seeks active interactions with firms in which Vanguard acquires shares: "In the past, some have

---

[94] Annex 5 to the Commission Decision, Assessment of the Effects of Common Shareholding on Market Shares and Concentration Measures at 7, § 3 *in* MERGER PROCEDURE REGULATION (EC) 139/2004, EUROPEAN COMM'N (Mar. 27, 2017).

[95] *Id.* at 7, § 3, ¶ 19.

[96] *Id.* at 7, § 3.1, ¶ 21.

mistakenly assumed that our predominantly passive management style suggests a passive attitude with respect to corporate governance. Nothing could be further from the truth."[97]

156.    Glenn H. Booraem, controller of the Vanguard Group's funds and a Vanguard principal, explained that "[w]e believe that engagement is where the action is. We have found through hundreds of direct discussions every year that we are frequently able to accomplish as much—or more—through dialogue as we are through voting. Importantly, through engagement, we are able to put issues on the table for discussion that aren't on the proxy ballot. We believe that our active engagement on all manner of issues demonstrates that passive investors don't need to be passive owners. [...] The bottom line is that we believe that the vast majority of boards and management teams are appropriately focused on the same long-term value objectives as we are."[98]

157.    Vanguard has disclosed that, in 2021, it engaged with management at Arch Resources and Vistra Corp.[99] Vanguard also disclosed, as an example of its engagements with management of coal producing companies, the specific details of its engagement with the Indian conglomerate Adani Group concerning its development of the Carmichael Coal Mine in Queensland, Australia. Vanguard reported that it had obtained assurances from "company leaders" that they "expected to reduce the company's exposure to thermal coal," and Vanguard also informed management that it "plan[ned] to monitor developments at the company as it begins

---

[97] Letter from F. William McNabb III, Vanguard's Chairman and CEO, to the independent leaders of the boards of directors of the Vanguard funds' largest portfolio holdings (Feb. 27, 2015), https://bit.ly/4gxYeBB.

[98] *Passive investors, not passive owners*, VANGUARD (June 20, 2013), https://bit.ly/3TAdSCC.

[99] *Investment Stewardship: 2021 Annual Report*, VANGUARD (2021), https://bit.ly/4gorIlz.

exporting coal from the Carmichael mine" and "to engage with company leaders to gauge the progress it makes on its energy transition plans …."[100]

158.    Defendant Vanguard has disclosed that, in 2022, it engaged with management at CONSOL Energy.[101]  In the same year, Vanguard also disclosed, as an example of its engagements with management of coal producing companies, the specific details of its engagements with two South African coal mining companies, Exxaro Resources and Thungela Resources.  Although "both companies expressed confidence in the strong fundamentals of coal demand over the next 10 to 15 years as well as a determination to generate value from the favorable commodity price cycle to create value for shareholders," Vanguard nevertheless sought to "understand the actions that boards take to identify, understand, and mitigate material risks related to the expected transition away from thermal coal in order to support the long term value of Vanguard-advised funds' investments in these companies."[102]  Vanguard further "encouraged closer alignment of climate related disclosures with the TCFD recommendations to enhance consistency and comparability of both companies' reporting.  Exxaro stated it would review its climate reporting during 2023.  Thungela had previously committed to issuing a fully compliant TCFD report in 2023."[103]

159.    The TCFD identifies "core elements of recommended climate-related financial disclosures" across the four categories or pillars of governance, strategy, risk management, and

---

[100] *Id.* at 36.

[101] *Investment Stewardship: 2022 Annual Report*, VANGUARD (2022), https://bit.ly/4gorIlz.

[102] *Id.* at 31.

[103] *Id.* at 31.

55

metrics and targets, with the most central being metrics and targets.[104] The TCFD's recommendations for disclosure include "the targets used by the [reporting entity] to manage climate-related risks and opportunities and performance against targets."[105]

160.    Vanguard has disclosed that, in 2023, it engaged with management at Alpha Metallurgical Resources.[106]

**BlackRock's Public Statements**

161.    BlackRock's chairman and chief executive Larry Fink confirmed that "[w]e are an active voice, we work with companies, but we need to work for the long-term interest[.]"[107] BlackRock's head of Asia Pacific corporate governance and responsible investment, Pru Bennett, likewise acknowledged that "[w]e actively engage, we vote all our proxies.  We're not just voting but have a lot of engagement with companies[.]"[108]

162.    BlackRock engages in the same sort of behind-the-scenes effort as does Vanguard to force companies to "adjust their approach" to fit with the goal of reducing coal production. Indeed, Blackrock "typically only vote[s] against management when direct engagement has failed."[109] This "engagement encompasses a range of activities from brief conversations to a series

---

[104] *Final Report: Recommendations of the Task Force on Climate-related Financial Disclosures* at v, TCFD (2017), https://bit.ly/3Zh6HCS (cleaned up).

[105] *Implementing the Recommendations of the Task Force on Climate-Related Financial Disclosures* at 15, TCFD (2021), https://bit.ly/4eNpCK4 (emphasis added).

[106] *Quarterly Engagement Report*, VANGUARD (2023), https://bit.ly/3B6ISUx.

[107] David Benoit, *BlackRock's Larry Fink: typical activists are too short-term*, WALL. ST. J. (Jan. 16, 2014), https://bit.ly/3ZspRGc.

[108] Vanessa Desloires, *BlackRock, Vanguard, State Street are not passive on corporate governance*, SYDNEY MORNING HERALD (Nov. 1, 2016), https://bit.ly/3Xzl1Eu.

[109] Fiona M. Scott Morton, *Horizontal Shareholding: A Summary of the Argument*, COMPETITION POL'Y INT'L ANTITRUST CHRON. (Jan. 2018) (alteration in original),

of one-on-one meetings with companies."[110]  "When [BlackRock] engage[s] successfully and companies adjust their approach, most observers are never aware of that engagement."[111]

### State Street's Public Statements

163.    State Street also uses the substantial shares it has acquired to gain access to management and uses the threat of voting against management to gain "sufficient leverage" to ensure that its views "are given due consideration."[112]  As State Street Global Advisors' head of corporate governance, Rakhi Kumar, has stated, "Our size, experience and long-term outlook provide us with corporate access and allow us to establish and maintain an open and constructive dialogue with company management and boards.  The option of exercising our substantial voting rights in opposition to management provides us with sufficient leverage and ensures our views and client interests are given due consideration."[113]

164.    State Street Global Advisors' president and CEO, Ronald P. O'Hanley, agreed with the conclusions of a 2016 study that "investors' interests are unquestionably being represented aggressively by passive fund[s] [… and that] long-term ownership requirement actually enhances influence and perspective."[114]  He further explained the means through which such influence is achieved: "The most effective way to create meaningful change is to build a thoughtful

---

https://bit.ly/44ZkVsR (quoting text from the Blackrock website in 2013); *see also* Jose Azar et al., *Anti-Competitive Effects of Common Ownership*, 72 J. FIN. 1, 36 (2018) (noting that unless direct engagement fails, Blackrock generally does not vote against management).

[110] *Id.*

[111] *Id.*

[112] Mike Scott, *Passive investment, active ownership*, FIN. TIMES (Apr. 6, 2014), https://on.ft.com/4esBpxp.

[113] *Id.*

[114] Ronald P. O'Hanley, *Passive managers take to shareholder activism*, PENSIONS & INVESTMENTS (Mar. 7, 2016), https://bit.ly/4gtt1j6.

engagement program with a focus on sector, thematic or market-specific issues that can scale across multiple companies… [h]owever, they must also be prepared to use their voting power to reinforce value priorities with clearly articulated rationales if engagement falls short."[115]

165.    State Street has also used its voting powers in line with its former CA 100+ commitment and current NZAM commitment.  In 2023, State Street voted for a proposal pushing commodity and mining company Glencore to clarify how its coal holdings align with the Paris Agreement.[116]  It also has tried to force net-zero in underwriting and financing, which would prevent the Coal Companies from expanding their output, such as by voting for a 2023 proposal asking Berkshire Hathaway to disclose a plan to reduce its GHG emissions of "its underwriting, insuring, and investment activities" to align with net zero.[117]

166.    Like BlackRock, State Street's CEO has threatened other CEOs with voting action if their companies fail to align with ESG, stating that "a company's ESG score will soon effectively be as important as its credit rating" and that State Street will "take appropriate voting action against board members" that are ESG "laggards based on their R-Factor scores and that cannot articulate how they plan to improve their score."[118]  The "R-factor" is a "unique ESG score[]" generated by State Street.[119]  Coal companies are obvious candidates to be classified as "ESG Laggards" or "Underperformers" given the general incompatibility of coal with net-zero objectives.

---

[115] *Id.*

[116] *See Notice of the 2023 Annual General Meeting* at 15, GLENCORE (May 3, 2023), https://bit.ly/3Oh2fgP.

[117] *Proxy Statement to Section 14(a) of the Securities Exchange Act of 1934* at 15–16, SEC (May 6, 2023), https://bit.ly/40UEhj6.

[118] *CEO's Letter on our 2020 Proxy* Agenda, STATE ST. GLOB. ADVISORS (Jan. 28, 2020), https://bit.ly/40XxDbY (emphasis omitted).

[119] *Id.*

58

**BlackRock's Actions to Enforce the Carbon Output Restrictions**

167.  BlackRock has used the power conferred by its substantial shareholdings to influence and to coerce management at each of the Coal Companies to reduce their output of carbon and, by extension, of coal.  BlackRock's substantial shareholdings give it access to corporate boards and an ability to "engage" with management that ordinary shareholders simply do not possess.  And should the velvet glove of engagement fail, the iron fist emerges.  BlackRock can, and has, voted against management that has failed to yield to its demand.  And, as BlackRock made clear in 2021, the threat that it might divest its holdings and drive down the price of a company's shares remains always in the background.[120]  Another threat is voting out directors/forcing changes in senior management.  To date, engagement and the use of its shares by proxy voting—with some high-profile votes to make examples of companies or officers—has proven adequate to the task of bringing about a coordinated reduction in the output of coal.  Below are examples of how Defendants' have used active engagement and proxy voting to achieve the output reduction goals they had set for the coal industry.

168.  At the beginning of 2022, BlackRock CEO Larry Fink specifically said that BlackRock is "asking companies to set short-, medium-, and long-term targets for greenhouse gas reductions."[121]  BlackRock's votes were in accord.  In 2022, Defendant BlackRock voted against Directors John P. Jumper, John S. Dalrymple, III, Richard de J. Osborne, and Dennis W. LaBarre, of NACCO, "as the Company does not meet our aspirations of having adequate climate risk disclosures against all 4 pillars of TCFD" and "does not meet our aspirations of having adequate

---

[120] *BlackRock's 2020 Letter to Clients: Sustainability as BlackRock's New Standard for Investing*, BLACKROCK (2020), https://bit.ly/3Bb9SlV.

[121] *Larry Fink's 2022 Letter to CEOs: The Power of Capitalism*, BLACKROCK (2022), https://bit.ly/40WwRfb.

climate-related metrics and targets." In 2023, it again voted against Directors Jumper and LaBarre for the same reasons.

169. Also in 2022, Defendant BlackRock voted against Director James N. Chapman, of Arch Resources, "as the Company does not meet our aspirations of having adequate climate risk disclosures against all 4 pillars of TCFD." In 2023, it voted against Holly Keller Koeppel, "the Chair of the ESG and Nominating Committee as [Arch Resources] does not meet our aspirations of having adequate climate-related metrics and targets."

170. In 2021, Defendant BlackRock voted against Directors Andrea E. Bertone, William H. Champion, and Joe W. Laymon, at Peabody Energy, "as the Company does not meet our expectations of having adequate climate risk disclosures against all 4 pillars of TCFD." It voted against Director Bertone in 2022, "as the Company does not meet our aspirations of having adequate climate risk disclosures against all 4 pillars of TCFD." And did so again, and for essentially the same reasons, in 2023.

171. In 2021, Defendant BlackRock voted against Director Sophie Bergeron of CONSOL Energy's Health, Safety, and Environmental Committee "as the company does not meet our expectations of having adequate climate-related metrics and targets and TCFD aligned reporting." The following year, BlackRock withheld its votes[122] from Directors William P. Powell, Joseph P. Platt, and Edwin S. Roberson three long-tenured members of CONSOL Energy's Health, Safety, and Environmental Committee, "as the Company does not meet our aspirations of having adequate climate risk disclosures against all 4 pillars of TCFD." Then, in 2023, it withheld votes for William P. Powell, John T. Mills, and Joseph P. Platt for the same climate-related reasons.

---

[122] When voting for the election of directors, Consol Energy shareholders have the choice of voting only either "for" or "withhold."

172.    In 2021, Defendant BlackRock withheld its votes[123] from Director Stephen Williams of Warrior Met Coal "as shareholders would benefit from greater disclosure on how the company is considering climate-related risk" and "from TCFD-aligned reporting."  Then, in 2022, it again withheld votes from Director Williams because "[t]he Company does not meet our aspirations of having adequate climate risk disclosures against all 4 pillars of TCFD.  The company does not meet our aspirations of having adequate climate-related metrics and targets."  It voted against Director Williams in 2023, on the ground that "[g]reater climate-related disclosure, including disclosure aligned with all four pillars of TCFD, would enable investors to better assess climate related risks and opportunities."

173.    BlackRock has also admitted that "BlackRock Investment Stewardship (BIS) has engaged with management representatives [of Warrior Met Coal] over the past several years to discuss a range of environmental, social, and governance (ESG) issues that we believe have material impacts on the company's financial performance and can help drive long-term shareholder value creation."[124]

174.    In 2021, Defendant BlackRock withheld its votes[125] for Steven R. Mills, a long-tenured board member of Black Hills Corporation, "as the Company does not meet our expectations of having adequate climate risk disclosures against all 4 pillars of TCFD."

---

[123] Prior to 2023, when voting for the election of directors, Warrior Met Coal shareholders had the choice of voting only either "for" or "withhold."

[124] *Vote Bulletin: Warrior Met Coal, Inc.*, BLACKROCK (May 2, 2022), https://bit.ly/3zkSDht.

[125] When voting for the election of directors, Black Hills Corporation shareholders have the choice of voting only either "for" or "withhold."

**State Street's Actions to Enforce the Output Restrictions**

175.    In November 2020, Defendant State Street became the first to announce that it would use its substantial shareholdings in the coal industry "through company engagement[], [State Street's] thought leadership, and proxy voting" to achieve its specific goals.[126]

176.    In June 2023, Defendant State Street announced that, "[s]tarting in the 2022 proxy season, we began taking voting action against companies in the S&P 500, S&P/TSX Composite, FTSE 350, STOXX 600, and ASX 100 indices if companies fail to provide sufficient disclosure regarding climate-related risks and opportunities related to that company, or board oversight of climate-related risks and opportunities in accordance with the TCFD framework."[127]

177.    Specifically, Defendant State Street "began voting against directors at companies in several major indices where companies failed to provide sufficient disclosures in line with the TCFD framework."   State Street subsequently voted against Peabody Energy Director Stephen E. Gorman in 2023.[128]   It withheld its vote for Warrior Met Coal Director Gareth N. Turner in 2021, withheld its vote for Stephen D. Williams in 2021 and 2022, and voted against him in 2023.   It voted against the compensation package of the executive officers of CONSOL Energy in 2022.   In 2021, State Street withheld votes for NACCO Directors John P. Jumper, Alred M. Rankin, Jr., Matthew M. Rankin, and Roger F. Rankin; for Directors John P. Jumper, Alred M. Rankin, Jr., Matthew M. Rankin, Roger F. Rankin, Dennis W. LeBarre, Richard Osborne, and Britton T. Tapplin in 2022; and voted against Directors Jumper, LeBarre, and Alfred M. Rankin Junior in

---

[126]   State Street Global Advisors, *Why We're Joining Climate Action 100+*, YAHOO FIN. (Dec. 12, 2020), https://yhoo.it/4gwAttW.

[127] *TCFD Report* at 26, STATE ST. GLOB. ADVISORS (2022), https://bit.ly/47EyD63.

[128] *Proxy Voting Records,* STATE ST. GLOB. ADVISORS, https://bit.ly/4gJea4n (last visited Sept. 18, 2024).

2023.   Finally, in 2023, State Street withheld its vote for two directors of Alpha Metallurgical Resources: Kenneth S. Courtis and Michael J. Quillen. "In 2022, [Defendant State Street] also conducted thematic engagement campaigns on such topics as climate transition plans, the social risks related to climate transition plans, managing methane emissions, and deforestation-related risks."[129]  Defendant State Street further announced that "[s]tarting in 2023, we have expanded this voting action to the following additional markets: the ASX200, TOPIX 100, Hang Seng, and Straits Times indices."[130]

**Vanguard's Actions to Enforce the Output Restrictions**

178.    In December 2021, Defendant Vanguard, upon becoming a signatory of the Net Zero Asset Managers Initiative, acknowledged that signatories to that initiative had "used the proxy voting system to," among other things, "*ask companies to shutter or divest their coal assets*, or persuade financial institutions to stop providing financial services to the thermal coal industry and the entities that extract thermal coal from the ground."[131]

179.    After joining the Net Zero Asset Managers Initiative, Vanguard adopted a revised proxy voting policy for U.S. portfolio companies. This policy took effect on March 1, 2022.

180.    In that proxy voting policy, Vanguard announced that its funds would likely support those shareholder proposals that require disclosure pursuant to frameworks endorsed by Vanguard's Investment Stewardship program.[132]  Vanguard specifically announced it would likely

---

[129] *2022 TCFD Report* at 8, STATE ST. GLOB. ADVISORS (June 2023), https://bit.ly/47EyD63.

[130] *Id*. at 23.

[131] *Vanguard Investment Stewardship Insights*, *supra*, n.74 at 1 (emphasis added).

[132] *Proxy voting policy for U.S. portfolio companies* at 11, VANGUARD (Mar. 1, 2022), https://bit.ly/3BkzooD.

support proposals that request "disclosure related to companies' Scope 1 and Scope 2 emissions data, and Scope 3 where climate-related risks are material," and "[g]oals for target-setting for relevant greenhouse gas emissions."[133]

181.    Vanguard further announced that it would vote against the relevant committee chair in cases where the company has not "disclosed business strategies including reasonable risk mitigation plans in the context of the anticipated regulatory requirements and changes in market activity in line with the Paris Agreement or subsequent agreements."[134]

\* \* \*

182.    Defendants colluded to suppress competition in the coal markets identified and achieve their desired output reduction goals. They did so by sharing information concerning their output production targets for the jointly owned Coal Companies, by engaging in joint efforts to obtain that adherence, and by sharing the degree of the success or failure of those efforts. This collusion was unlawful and actionable.

**DEFENDANTS' PRESSURE ON THE COAL COMPANIES' MANAGEMENT RESULTED IN OUTPUT REDUCTIONS AND CLIMATE DISCLOSURES**

183.    Defendants' pressure campaign also had its intended effect, as the Coal companies repeatedly conceded that they were complying with Defendant's wishes in investor calls and elsewhere.

184.    In the second quarter of 2021, Arch Coal President and CEO Paul Lang told investors that Arch Coal generated a gross margin of nearly $40 million with "thermal coal assets, while at the same time making significant progress shrinking [its] operating footprint."

---

[133] *Id.*

[134] *Id.* at 5–6.

185.    In the fourth quarter of 2021, Black Hills President and CEO Linn Evans told investors that "initiatives wrapped within the ESG blanket have always been a key focus for us, and we're continuing to critically evaluate our business through that lens. This, of course, includes analyzing ESG risks and opportunities and then weaving them into our strategy and decision-making."

186.    In its second quarter 2022 earnings call, Black Hills President and CEO Linn Evans noted that Black Hills is "excited about the tangible progress we've already delivered in our emissions reduction and other ESG goals . . ."

187.    In its 2022 *Arch Sustainability Report,* Arch Coal stated that, since 2020, "Arch subsidiaries have reduced their annual thermal coal production by nearly 60% . . ." The report also states that "Arch has taken a strategic, ESG-driven pivot . . . away from domestic power and thermal markets . . ."

188.    In its 2022 *Task Force on Climate-Related Financial Disclosure Report*, Black Hills stated that "Management of ESG includes our CEO, senior leadership team, an executive ESG Steering Committee chaired by the director of corporate planning, sustainability & ESG, and a cross-functional sustainability working group."

189.    In the second quarter of 2022, Peabody President and CEO James Grech told investors that Peabody had taken steps to strengthen our commitments and to reposition ourselves to better support the ESG targets of our stakeholders. This includes a commitment to setting targets and developing programs to enhance our position as a champion of ESG practices.

190.    In the first quarter of 2023, Peabody President and CEO James Grech told investors that he observed demand growing in [] thermal…markets [even though] the constraints to supply growth that have been there are still there . . . access to new capital permitting ESG pressures . . ."

65

Instead of increasing production to meet demand, Peabody was more concerned with "maintaining financial strength . . . [and] champion[ing] ESG practices."

191.    In the third quarter of 2023, Arch Coal President and CEO Paul Lang acknowledged that "global investment in new and existing mine capacity has been extremely muted in the last several years due to . . . a host of [] ESG related concerns."

### DEFENDANT BLACKROCK DECEIVED ITS CUSTOMERS IN PURSUIT OF DEFENDANTS' OUTPUT REDUCTION SCHEME

192.    Like the other Defendants, Defendant BlackRock sells two types of investment funds. First, those that are branded "ESG" or "sustainable" funds ("ESG Funds"). And, second, investment funds that are marketed without such labeling but instead with materials that explicitly state ESG criteria will not change that fund's investment objective or constrain the range of companies in which that fund may invest ("non-ESG funds").

193.    BlackRock's non-ESG funds are marketed in a way that would lead a reasonable consumer to conclude that these funds will not buy, sell, vote, or otherwise use shares in publicly-traded equities to promote the ESG agenda. For example, BlackRock's iShares Russell 2000 ETF—which has over $70.8 billion in assets as of August 30, 2024, and holds 3,452,470 shares of Peabody Energy, 470,631 shares of Arch Resources, 294,043 shares of Alpha Metallurgical, 101,518 shares of NACCO, 785,183 shares of Consol Energy, 691,815 shares of Hallador, 1,385,312 shares of Warrior Met Coal, and 1,879,182 shares of Black Hills Corp—is marketed exclusively as an ETF that "seeks to track the investment results of an index composed of small-capitalization U.S. equities."[135] BlackRock has marketed this ETF to consumers, and markets it to consumers today,

---

[135] *iShares Russell 2000 ETF*, BLACKROCK, https://bit.ly/3B6PaUj (last visited Sept. 18, 2024).

66

as a **"fund [that] does not seek to follow a sustainable, impact or ESG investment strategy."**[136] While the investor fact sheet for the fund does provide ESG metrics about the fund to consumers, those marketing materials assure consumers, and have assured customers since at least March of 2021,[137] that these "metrics do not change the fund's investment objective or constrain the fund's investable universe, and there is no indication that a sustainable, impact or ESG investment strategy will be adopted by the fund."[138] Nothing in the fund's prospectus, moreover, to which the Fact Sheet refers investors, suggests or has suggested in the relevant period that the shareholdings will be used to advance an ESG agenda.[139]

194.   BlackRock's iShares Total U.S. Stock Market Index Fund—which has $3.6 billion in assets as of August 30, 2024, including 8,602 shares of Peabody Energy, 1,196 shares of Arch Resources, 532 shares of NACCO Industries, 1,855 shares of CONSOL Energy, 727 shares of Alpha Metallurgical Resources, 1,749 shares of Hallador, 22,564 shares of VISTRA, 3,308 shares of Warrior Met Coal, and 4,232 shares of Black Hills Corp—has likewise been marketed to consumers since at least May of 2021,[140] and is being marketed to consumers today, as a **"fund [that] does not seek to follow a sustainable, impact or ESG investment strategy."**[141] Again, while the investor fact sheet for the fund does provide ESG metrics about the fund to consumers, the marketing materials expressly avow that these "metrics do not change the fund's investment

---

[136] *Id.*

[137] *iShares Russell 2000 ETF*, ɪSHARES (Mar. 31, 2021), https://bit.ly/4e6Kzjf.

[138] *iShares Russell 3000 ETF,* BLACKROCK, https://bit.ly/41mA6wX (last visited Nov. 25, 2024).

[139] *2024 Prospectus*, BLACKROCK (Aug. 1, 2024), https://bit.ly/3XOdAL2.

[140] *iShares Total U.S. Stock Market Index Fund*, BLACKROCK (May 7, 2021), https://bit.ly/4etkvyy.

[141] *iShares Total U.S. Stock Market Index Fund*, BLACKROCK (Sept. 17, 2024), https://bit.ly/4gsGXtE.

objective or constrain the fund's investable universe, and there is no indication that a sustainable, impact or ESG investment strategy will be adopted by the fund."[142]   Nothing in the fund's prospectus, moreover, to which the Fact Sheet refers investors, suggests or has suggested in the relevant period that the shareholdings will be used to advance an ESG agenda.[143]

195.   The same representations have been made in the marketing materials for:

a.   BlackRock's iShares Russell 3000 ETF, which has $13.7 billion in assets, including 30,699 shares of Peabody Energy, 5,008 shares of Arch Resources, 3,038 shares of Alpha Metallurgical Resources, 8,160 shares of CONSOL Energy, 10,167 shares of Halldor Energy, 14,628 shares of Warrior Met Coal, 92,474 shares of VISTRA, and 17,666 shares of Black Hills Corp.[144]

b.   BlackRock's iShares Core S&P Mid-Cap ETF, which holds over 2.1 million shares of Black Hills Corporation.[145]

196.   BlackRock's representations in paragraphs 193 and 194 above are false or misleading for several reasons. To begin, a reasonable consumer would understand that an "investment strategy" includes things like engagements and proxy voting. Thus, when BlackRock conducts ESG engagements leveraging the power of its shares, it is engaging in an ESG investment strategy that includes the purportedly non-ESG funds that are described in paragraphs 193 through 195 above. To illustrate:

a.   Michelle Edkins, Managing Director in BlackRock's Investment Stewardship team, admitted in an article titled "The Significance of ESG Engagement" that ESG

---

[142] *Id.*

[143] *Prospectus*, BLACKROCK, https://bit.ly/3B6Qfvb (last visited Sept. 18, 2024).

[144] *iShares Russell 3000 ETF, supra,* n.138.

[145] *iShares Core S&P Mid-Cap ETF*, BLACKROCK (Sept. 17, 2024), https://bit.ly/4gouEP7.

"engagement" fits within "investment strategy": "The key is to make conscious decisions about whether, and where, engagement fits into the investment strategy."[146]

   b. The United Nations Principles of Responsible Investment (UNPRI) similarly stated that, "In Europe alone, engagement (and exercising voting rights) is the third most popular responsible investment strategy."[147] BlackRock is a signatory to UNPRI.

   c. The Harvard Business School Online blog stated, in a page titled "7 ESG Investment Strategies to Consider," that the Number 5 Investment Strategy is "Shareholder action, also referred to as engagement, [which] is when investors use their power to encourage the companies they invest in to pursue material ESG opportunities."[148]

  197. Further, BlackRock's representations in paragraphs 193 and 194 above are contradicted by BlackRock's climate commitments to groups like NZAM and CA100+, which involve implementing a sustainable, impact, or ESG investment strategy *across all BlackRock assets*—even those implicating BlackRock's non-ESG funds. For example, as part of its ongoing NZAM membership, BlackRock has committed to *comprehensively* "[i]mplement a stewardship and engagement strategy, with a clear escalation and voting policy, that is consistent with [the] ambition for *all assets under management* to achieve net zero emissions by 2050 or sooner."[149] These commitments are non-waivable, as "the [NZAM] commitment also ensures that several important actions – such as stewardship and policy advocacy – are *comprehensively*

---

[146] Michelle Edkins, *The Significance of ESG Engagement* at 4, ENGAGEMENT STRATEGIES (2015), https://bit.ly/3Oic4ex.

[147] *How ESG Engagement Creates Value for Investors and Companies* at 5, PRI (2018), https://bit.ly/4fy6RLR.

[148] *7 ESG Investment Strategies to Consider*, HARV. BUS. SCH. ONLINE (Sep. 15, 2022), https://bit.ly/3Z1gs6R.

[149] *Commitment*, NET ZERO ASSET MANAGERS (last visited Nov. 20, 2024), https://bit.ly/3ZgqVMU (emphasis added).

*implemented.*"[150] BlackRock's NZAM commitment also includes a pledge to "[w]ork in partnership with asset owner clients on decarbonisation goals, consistent with an ambition to reach net zero emissions by 2050 or sooner *across all assets under management,*" and to "[r]eview [its] interim target at least every five years, with a view to ratcheting up the proportion of AUM covered until *100% of assets are included.*"[151]

198.    In line with its NZAM commitments, BlackRock's 2021 TCFD report admits that "[s]ustainability, including climate-related issues – from the integration of ESG factors into the firm's investment processes, *to sustainable investment strategies and investment stewardship priorities* – is a critical component of the firm's *overall business strategy* and the objectives of senior management over which the Board has oversight."[152]

199.    BlackRock's 2022 TCFD report likewise admits that "[s]ustainability, including climate-related issues[,] is a *critical component of the firm's overall business strategy* and the objectives of senior management over which the Board has oversight."[153] That same report also states that the "Investment Subcommittee" of the Global Executive Committee "[o]versees *ESG integration in BlackRock's firmwide processes.*"[154]

200.    These admissions in BlackRock's TCFD reports, together with BlackRock's NZAM commitment to "comprehensively" advance the net-zero agenda "across all assets under

---

[150] *FAQ*, NET ZERO ASSET MANAGERS (last visited Nov. 20, 2024), https://bit.ly/3V0Tiw4 (emphasis added).

[151] *Commitment*, *supra*, n.149 (emphasis added).

[152] *2021 TCFD Report* at 11, BLACKROCK (2021), https://bit.ly/3V1XLyJ (emphasis added).

[153] *2022 TCFD Report* at 11, BLACKROCK (2022), https://bit.ly/4hWgNQO (emphasis added).

[154] *Id.* (emphasis added).

70

management," make BlackRock's representations that its purportedly non-ESG funds do "not seek to follow a sustainable, impact or ESG investment strategy" and that "there is no indication" that such a strategy will be adopted by those funds false or misleading.

201.    BlackRock's representations regarding its non-ESG funds are false or misleading for the additional reason of BlackRock's commitments to CA100+. By joining CA100+, BlackRock committed to "secure commitments from the boards and senior management [of the companies in which BlackRock's funds hold shares] to . . . . *[t]ake action to reduce greenhouse gas emissions across their value chain*, consistent with the Paris Agreement's goal of limiting global average temperature increase to well below 2 degrees Celsius above pre-industrial levels."[155] BlackRock further committed to use "a range of *engagement approaches to ensure fulfillment* of [these] goals."[156]

202.    When BlackRock joined CA100+ in 2020, it announced that it would continue to "independently" decide how to "prioritize engagements" and "vote proxies."[157] That announcement was likewise false or misleading: shortly after BlackRock joined, the CA100+ Steering Committee's own meeting minutes independently confirmed that "BlackRock understands that by joining CA100+, *it is expected to shift its voting to support climate resolutions*."[158] Further, emails from the climate-activist group Ceres indicate that BlackRock's "large asset owner[]" clients were pressuring BlackRock to "align [its] voting with CA100+" or

---

[155] *Climate Action 100+ Sign-on Statement* at 1, BLACKROCK (Jan. 6, 2020), https://bit.ly/4hU3MqN.

[156] *Id.* (emphasis added).

[157] Letter from BlackRock to Climate Action 100+ Steering Committee (Jan. 6, 2020), https://bit.ly/4fxKkP2.

[158] *CA100+ Steering Committee Meeting Minutes* at CERES0001262, p. 460 (March 26, 2020), https://bit.ly/4fWkPqr (emphasis added).

else "risk losing clients and revenue."[159] In fact, a top official at Ceres clarified that this loss of clients and revenue was "not just an idle possibility," since "US-based asset owners with whom Ceres is working ha[d] recently *signaled this possibility to BlackRock*."[160] These material facts, which BlackRock failed to disclose to consumers, show that BlackRock's public representations that it would continue to conduct engagements and vote proxies "independently" after joining CA100+ were false or misleading.

203.    Second, BlackRock's representations in paragraphs 193 and 194 above are false or misleading because they are contradicted by BlackRock's persistent use of proxy votes to reduce greenhouse gas emissions in line with BlackRock's sustainability and climate commitments.

204.    Shortly after BlackRock joined CA100+, an email from a top official at Ceres cautioned that BlackRock could suffer "billions of dollars in lost revenue" if it did not "dramatically change" its proxy voting.[161] In fact, after joining CA100+ and NZAM in 2020 and 2021, BlackRock did "dramatically change" its proxy voting by increasing its support for climate proposals that are in line with the net zero agenda. For example, BlackRock voted for only about 6% of environmental proposals in the 2019-20 proxy season, but it voted for *64%* of environmental proposals in the 2020-21 proxy season.[162] Similarly, BlackRock voted against 55 directors on climate-related issues in the 2019-20 proxy season, but it voted against *255* directors on climate-

---

[159] *Id.* at CERES0027685 p. 480 (Feb. 2, 2020); *Id.* at CERES0014474 p. 486.

[160] *Id.* at CERES0014474 p. 486 (emphasis added).

[161] *Id.*

[162] *Compare Investment Stewardship Annual Report* at 17, BLACKROCK (2020), https://bit.ly/4fYfz5A *with Pursuing long-term value for our clients: BlackRock Investment Stewardship* at 15, BLACKROCK (2021), https://bit.ly/3ZdDbxJ.

related issues in the 2020-21 proxy season.[163] This dramatic change in BlackRock's voting patterns contradicts BlackRock's public representations that it would continue to make engagement and voting decisions "independently" despite its climate commitments.

205. Further, BlackRock's own publicly available voting records confirm that BlackRock has repeatedly used proxy votes to advance its ESG commitments to reduce greenhouse gas emissions in line with a net zero agenda. For example:

a. **Whitehaven Coal.** At the October 2021 meeting for Whitehaven Coal, BlackRock voted against all directors up for election because the company's disclosures did not "include GHG reductions targets or alignment with a global aspiration of net zero GHG emissions by 2050."[164]

b. **Exxon.** BlackRock voted against Exxon's directors based upon "Exxon's failure to have clear, long-term greenhouse gas reduction targets."[165]

c. **NewMarket Corp.** BlackRock voted for a 2023 shareholder proposal asking NewMarket Corporation to "publish their GHG emissions, and set short-, medium- and long-term emission reduction targets to align business activities with net zero emissions by 2050 in line with the Paris Climate Agreement."[166]

d. **Travelers Companies.** BlackRock voted for a proposal for The Travelers Companies, Inc., to address "if and how it intends to measure, disclose, and reduce the GHG

---

[163] *Compare Investment Stewardship Annual Report*, *supra*, n.162 at 13 *with BlackRock Investment Stewardship*, *supra*, n.162 at 14.

[164] *Vote Bulletin: Whitehaven Coal* at 2, BLACKROCK (Oct. 27, 2021), https://bit.ly/3ASAFni.

[165] *Our Approach to Sustainability* at 11, BLACKROCK (2020), https://bit.ly/3Zgu7rS.

[166] *Form DEF 14A Proxy Statement* at 48, SEC (Mar. 10, 2023), https://bit.ly/4fVFYBb (proposal 6); *Proxy Voting Search*, BLACKROCK (last visited Nov. 20, 2024), https://bit.ly/3V0UIXA (search NewMarket; click on April 27, 2023; proposal 6).

emissions associated with its underwriting, insuring, and investment activities, in alignment with the Paris Agreement's 1.5ºC goal, requiring net zero emissions."[167]

      e.   **Berkshire Hathaway.** BlackRock supported a 2023 shareholder proposal for Berkshire Hathaway to "issue a report . . . addressing if and how it intends to measure, disclose, and reduce the GHG emissions associated with its underwriting, insuring, and investment activities in alignment with the Paris Agreement's 1.5°C goal, requiring net zero emissions."[168]

206.    Moreover, BlackRock continues to focus on using engagements to advance its climate agenda. BlackRock reportedly conducted over 1,250 engagements with portfolio companies regarding climate and natural capital in 2023-24,[169] and over 1,600 such engagements in 2022-23.[170]

207.    As seen above, BlackRock has repeatedly used proxy votes and engagements to promote a comprehensive ESG agenda that is focused on sustainability and emissions reductions in conformity with BlackRock's climate commitments. These practices contradict BlackRock's public representations that it would "independently" decide how to vote proxies and conduct engagements, and that its non-ESG funds, including the funds described in paragraphs 193 through 195 above, do "not seek to follow a sustainable, impact or ESG investment strategy."

208.    BlackRock has also made several material false or misleading statements in the publicly available prospectus documents for its non-ESG funds. For example, for each of the non-

---

[167] *Notice of 2022 Annual Meeting of Shareholders & Proxy Statement* at 72 (Apr. 8, 2022), https://bit.ly/4fybkOv (proposal 5); *Proxy Voting Search*, *supra*, n.166 (search Travelers; click on May 25, 2022; proposal 5).

[168] *Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934* at 15, SEC (Mar. 17, 2023), https://bit.ly/4fyaL7t (proposal 6); *Proxy Voting Search*, *supra*, n.166 (search Berkshire Hathaway; click on May 6, 2023; proposal 6).

[169] *2024 Global Voting Spotlight* at 17, BLACKROCK (2024), https://bit.ly/3Z1M0sW.

[170] *2023 Global Voting Spotlight* at 3, 33, BLACKROCK (2023), https://bit.ly/3Z0rdWH.

ESG funds listed in paragraphs 193 through 195 of this Complaint, the prospectus-related Statement of Additional Information sets out BlackRock's approach to assessing climate-related issues. BlackRock advises consumers in relevant part: "We seek to understand, from company disclosures and engagement, the strategies companies have in place to **manage material risks to, and opportunities for, their long-term business model** associated with a range of climate-related scenarios, including a scenario in which global warming is limited to well below 2°C, considering global ambitions to achieve a limit of 1.5°C. As one of many shareholders, and typically a minority one, **BlackRock does not tell companies what to do**. It is the role of the board and management to set and implement a company's long-term strategy to deliver long-term financial returns."[171]

209.    The statements in the preceding paragraph are false or deceptive in three ways. First, BlackRock's interest is not limited to "material risks" because by joining CA100+ and NZAM, BlackRock pledged to force companies to disclose targets for net zero emissions for environmental and political reasons (limiting global warming to well below 2°C, with an ambition to achieve 1.5°C), without regard to materiality to the particular company's financial performance. Second, BlackRock does not disclose to investors that the "scenario in which global warming is limited to well below 2°C, considering global ambitions to achieve a limit of 1.5°C" is highly unlikely based on present commitments of countries, and the requirement for companies to

---

[171] *Statement of Additional Information* at A-10, ɪSHARES TRUST (Aug. 1, 2024), https://bit.ly/3ATzljY (emphasis added). This statement of additional information applies to the following purportedly non-ESG funds: iShares Russell 2000 ETF; iShares Russell 3000 ETF; and iShares Core S&P Mid-Cap ETF. Similar language is found in the Statement of Additional Information for the iShares Total U.S. Stock Market Index Fund. *See Statement of Additional Information* at B10–B11, BLACKROCK (Nov. 28, 2023), https://bit.ly/4eHrTX4 (footnote omitted) ("Specifically, we look for companies to disclose strategies they have in place that mitigate and are resilient to any material risks to their long-term business model associated with a range of climate-related scenarios, including a scenario in which global warming is limited to well below 2°C, considering global ambitions to achieve a limit of 1.5°C. It is, of course, up to each company to define their own strategy: that is not the role of BlackRock or other investors.").

disclose this scenario is thus intended to serve political rather than financial-reporting ends. Third, BlackRock fails to disclose that it has joined organizations, such as CA100+ and NZAM, to actively drive the global transition to net zero.

210.    In addition to the deceptive representations in paragraph 208 above, the prospectus documents for BlackRock's non-ESG funds, including the ETFs listed in paragraphs 193 and 195, previously represented that "[t]he global aspiration to achieve a net-zero global economy by 2050 **is reflective of aggregated efforts; governments representing over 90% of GDP have committed to move to net-zero over the coming decades**. In determining how to vote on behalf of clients who have authorized us to do so, we look to companies only to address issues within their control and **do not anticipate that they will address matters that are the domain of public policy**."[172] This representation, which BlackRock continues to make for the iShares Total U.S. Stock Market Index Fund,[173] is used to support BlackRock's statement that it looks to companies to disclose emissions plans for various scenarios "including a scenario in which global warming is limited to well below 2°C, considering global ambitions to achieve a limit of 1.5°C."[174]

211.    BlackRock's statement regarding "over 90% of GDP" is false or deceptive. On information and belief, it is based on statistics such as those compiled by the Net Zero Tracker showing a combined total GDP of "149 countries including the EU and Taiwan," which have "some variation of a net zero target."[175] Elsewhere, the Net Zero Tracker states that 151 countries have a net zero target. However, BlackRock does not disclose in its prospectus that such a

---

[172] *See, e.g.*, *Statement of Additional Information* at A-10 n.7, ISHARES TRUST (last revised Oct. 13, 2023), https://bit.ly/4fCY0Z4 (emphasis added).

[173] *Statement of Additional Information, supra*, n.171 at B11 n.7.

[174] *Statement of Additional Information*, *supra*, n.171 at A-10; *Statement of Additional Information*, *supra*, n.171 at B11 n.7.

[175] *Net Zero Stocktake 2023* at 4, NET ZERO TRACKER (June 2023), https://bit.ly/4fXeTgR.

"commitment" to a target includes non-binding pledges and policy documents,[176] and that among the countries with a net zero "commitment," only 15% of those commitments are enshrined in law.[177] Nor does BlackRock disclose that most governments are not following through on their commitments. For example, a United Nations website discloses the following regarding government pledges: "[C]ommitments made by governments to date fall far short of what is required. Current national climate plans – for 195 Parties to the Paris Agreement taken together – would lead to a sizable increase of almost 9% in global greenhouse gas emissions by 2030, compared to 2010 levels. . . ."[178] And the Climate Action Tracker, which assesses each country's climate policies and targets, finds that not a single country in the world is aligned with the 1.5°C goal as of November 2023.[179]

212.    Furthermore, the second bolded statement in the prospectus document quoted in paragraph 210 of this Complaint is also deceptive because it does not disclose BlackRock's involvement in limiting or otherwise changing companies' political lobbying activities to conform to the commitments that BlackRock made to groups like CA100+ and NZAM and that it seeks to impose onto portfolio companies. For example, in 2020, BlackRock voted in favor of a shareholder proposal for Chevron Corporation to report on climate lobbying.[180] The proposal asked the board to report on "if, and how, Chevron's lobbying activities (direct and through trade associations)

---

[176] *See id.*; *see also Net Zero Tracker Codebook* at 4–5, Net Zero Tracker (last visited Nov. 20, 2024), https://bit.ly/492dq6A.

[177] *Net Zero Stocktake 2023*, *supra*, n.175 at 16.

[178] *Climate Action*, UNITED NATIONS (last visited Nov. 20, 2024), https://bit.ly/4fyfl5x.

[179] *Countries*, CLIMATE ACTION TRACKER (last visited Nov. 20, 2024), https://bit.ly/3ZdGtkq.

[180] *Proxy Voting Search*, *supra*, n.166 (search Chevron; click on May 27, 2020; proposal 6).

align with the goal of limiting average global warming to well below 2 degrees Celsius (the Paris Climate Agreement's goal). The report should also address the risks presented by any misaligned lobbying and the company's plans, if any, to mitigate these risks."[181] Chevron management opposed this proposal, stating that, "Your Board is confident that the Company's lobbying and political activities – and association memberships – are aligned with Chevron's goals and the long-term interests of our stockholders."[182] At the time of the meeting, BlackRock funds owned 6.7% of Chevron stock.[183]

213.    Given BlackRock's shareholder activism relating to changing companies' lobbying activities to align with the Paris Agreement—which is not even law in the United States—BlackRock's statement that it "do[es] not anticipate that [portfolio companies] will address matters that are the domain of public policy" is false or deceptive.

214.    In addition to the deceptive representations in its non-ESG-fund webpages and related prospectus documents and Statements of Additional Information, BlackRock has also made deceptive representations in its "2030 net zero statement," which is also available on BlackRock's website.[184] In the 2030 Net Zero Statement, BlackRock asserts that its "role in the transition is as a fiduciary to our clients. . . . to help them navigate investment risks and opportunities, **not to engineer a specific decarbonization outcome in the real economy**."[185]

---

[181] *Chevron Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934* at 78, SEC (Mar. 30, 2020), https://bit.ly/4eE4ZzN (proposal 6).

[182] *Id.* at 79.

[183] *Id.* at 71.

[184] *BlackRock's 2030 Net Zero Statement*, BLACKROCK (last visited Nov. 20, 2024), https://bit.ly/40WjA6p.

[185] *Id*. (emphasis added).

78

215.    That bolded statement is false or deceptive because net zero by 2050 or sooner *is* a decarbonization outcome. As a member of NZAM, BlackRock has committed to "an ambition to reach net zero emissions by 2050 or sooner across all assets under management."[186] And when BlackRock joined CA100+, it specifically committed to "support the Paris Agreement," which involves "limiting global average temperature increase to well below 2 degrees Celsius above pre-industrial levels."[187] Yet BlackRock did not disclose these commitments when making contrary representations to investors and consumers.

216.    Again, as it relates to one of the highly publicized controversies in the investing world, BlackRock says one thing and does another. It tells consumers that it is merely helping companies "navigate investment risks and opportunities," but it has also committed to achieve specific emissions-reduction targets. Consumers and investors rely on published statements like the 2030 Net Zero Statement to understand how BlackRock will manage their investments. But BlackRock misleads its clients by pursuing ESG policy aims while telling consumers and investors that it will not "engineer a specific decarbonization outcome."

217.    Finally, in addition to the deceptive statements that are discussed in paragraphs 193 through 216 above, BlackRock has made deceptive representations in its webpage entitled "Energy investing: setting the record straight."[188] This public-facing webpage, which BlackRock posted in December 2022 in response to growing scrutiny from states and consumers, provides information to consumers and others about BlackRock's products and services after "BlackRock [was] accused

---

[186] *Commitment*, *supra*, n.149.

[187]    *Climate Action 100+ Sign-on Statement, supra*, n.155 at 1.

[188] *Energy Investing: Setting the Record Straight*, BLACKROCK (last visited Nov. 25, 2024), https://bit.ly/4i0Aff2.

of 'boycotting' oil and gas companies."[189] The "setting the record straight" webpage also includes a link to BlackRock's "September 7th response to the letter from U.S. state Attorneys' General."[190]

218.    In its response letter to the Attorneys General, BlackRock represents that its **"engagement and voting around climate risk does not require that companies meet specific emissions standards."**[191] The same letter also represents that BlackRock does not **"dictate to companies what specific emission targets they should meet or what type of political lobbying they should pursue,"** and that BlackRock's **"role is to help [clients] navigate investment risks and opportunities, not to engineer a specific decarbonization outcome in the real economy."**[192]

219.    The representations quoted in paragraph 218 of this Complaint are false or deceptive. BlackRock CEO Larry Fink specifically said at the beginning of 2022 (nine months before sending the response letter to the Attorneys General) that BlackRock is "asking companies to set short-, medium-, and long-term targets for greenhouse gas reductions."[193]

220.    BlackRock also states in the Climate Focus Universe document, which is dated 2023, that: "As outlined in BIS' market-specific voting guidelines, when corporate disclosures do not sufficiently enable investors to assess risk through the Task Force on Climate-related Financial Disclosure (TCFD) framework — including in relation to governance, strategy, and risk management — or companies have not provided scope 1 and 2 emissions disclosures and

---

[189] *Id.*

[190] *Id.*; Dalia Blass, BlackRock Senior Managing Director, letter to Attorneys General of the States re Attorneys General Letter (Aug. 4, 2022), https://bit.ly/4eB2oq9.

[191] *Response to Attorneys General Letter, supra*, n.190 at 9 (emphasis added).

[192] *Id.* at 5, 7–8 (alteration in original) (emphasis added).

[193] *Larry Fink's 2022 Letter to CEOs, supra*, n.121.

80

meaningful short-, medium-, and long-term targets, *we are increasingly unlikely to support director(s) we consider responsible for climate risk oversight*."[194]

221.    Being "increasingly unlikely to support director(s)" for failing to provide "meaningful short-, medium-, and long-term targets" is highly relevant to whether BlackRock is imposing targets, since voting on directors is the primary mechanism BlackRock has, as an asset manager with trillions under management, to force companies to act. Therefore, BlackRock's public statements, both from before and after the response letter to Attorneys General, show that the representations in that letter are false or deceptive.

222.    BlackRock's recent votes on emissions targets and political lobbying, described in paragraphs 205 and 216 above, also show that its statements quoted in paragraph 218 of this Complaint are false or deceptive.

223.    Furthermore, as alleged above 167-174, contrary to how it explains its products to the public, Defendant BlackRock has consistently used the influence that comes from *all* of its shareholdings in the Coal Companies to coerce those companies to achieve the output reduction targets set by the Net Zero Asset Managers Initiative and by Climate Action 100+ and voted *all* of the shares held by all of its funds to promote the aims of its climate-driven scheme to reduce output.

224.    Defendant BlackRock has thus materially misrepresented the characteristics of the exchange trade funds, mutual funds, and other financial products that it marketed to investors as not being governed by ESG principles—misleading those consumers who invested their savings into non-ESG funds because they do *not* wish to support ESG causes, do *not* believe that promoting climate causes enhances shareholder value, or do *not* believe that investment decisions should be

---

[194] *BlackRock Investment Stewardship: Climate Focus Universe*, BLACKROCK (2023), https://bit.ly/3AQSQto (emphasis added) (Consumers could access this document by visiting https://bit.ly/3Z29s9A and then clicking on the link "Our Climate Focus Universe.").

driven by social policy or ideology. Blackrock's deceptive statements about its supposedly "non-ESG" funds thus induced investors to purchase investment funds they would not otherwise have purchased.

### DEFENDANTS' ACQUISITION OF STOCK HAS SUBSTANTIALLY LESSENED COMPETITION

225.    Defendants' sharing of information, their communications with management, and their voting of their shares have had the intended effect of artificially reducing coal production and constraining supply. Defendants' acquisitions of shares enabled Defendants to substantially lessen competition in domestic coal markets. The companies in which Defendants have ownership stakes generally reduced production in the relevant coal markets—dramatically increasing the price of coal—all as privately held coal companies in which Defendants have no ownership stake scrambled to increase production and capture larger market shares (though their efforts could not nearly match the magnitude of the publicly-trade companies' reduction in production).

226.    This dynamic is particularly clear in the SPRB market. See Table 4. Between 2019 and 2022, the total production of SPRB coal declined by 28.8 million tons. The three SPRB coal producing companies in which Defendants acquired shares were responsible for *nearly all* of this reduction, and then some: they reduced their production by a total of 33.8 million tons.

227.    The four privately held SPRB coal producing companies, in contrast, increased their output by 5 million tons. Their net production increased even though the Dry Fork Mine, a non-profit operated by the Western Fuels Association to provide coal exclusively to local power generation facilities operated by the Association, reduced its output by 2.3 million tons. The two mines owned by privately-held Eagle Specialty Materials—which compete directly with the mines owned by the publicly-held miners—increased their production from a combined 21.8 million tons in 2019 to 29.4 million tons in 2022. That is a 34.9% increase.

82

228.    The output decisions of the three publicly traded miners cannot be explained as a rational response to free-market forces because the price signals were to increase production. From 2019 through 2022, the market price for SPRB coal increased by 21.2%. The privately-held companies responded to that signal by increasing output. It was only the publicly held companies—the companies whose shares Defendants acquired—that cut production.

| Table 4: SPRB Output, by Mine, in Millions of Tons: 2019-2022 | | | | | | |
|---|---|---|---|---|---|---|
| Mine/Parent Company | Defendants' Ownership | 2019 | 2020 | 2021 | 2022 | Change 2019-2022 |
| Average Open Market Price SPRB (Wyoming) Coal | * | $12.48 | $12.94 | $12.84 | $15.13 | +$2.65 +21.2% |
| Black Thunder Mine Arch Coal | 23.6% | 72.0 | 50.2 | 59.4 | 62.2 | -9.8 |
| Coal Creek Mine Arch Coal | 23.6% | 2.5 | 2.1 | 2.0 | 3.8 | +1.3 |
| North Antelope Rochelle Mine Peabody Energy | 19.7% | 85.3 | 66.1 | 62.8 | 60.4 | -24.9 |
| Rawhide Mine Peabody Energy | 19.7% | 10.1 | 9.5 | 11.6 | 10.3 | +.2 |
| Caballo Mine Peabody Energy | 19.7% | 12.6 | 11.6 | 13.9 | 12.1 | -.5 |
| Wyodak Mine Black Hills Mining | 32.2% | 3.7 | 3.7 | 3.7 | 3.5 | -.2 |
| Belle Ayr Mine Eagle Specialty Materials | Privately Held | 10.2 | 11.2 | 14.4 | 14.3 | +4.1 |
| Eagle Butte Mine Eagle Specialty Materials | Privately Held | 11.6 | 12.3 | 13.5 | 15.1 | +3.5 |
| Antelope Mine Navajo Transitional Energy Co | Privately Held | 23.2 | 19.8 | 21.7 | 21.7 | -1.5 |
| Cordero Rojo Mine Navajo Transitional Energy Co | Privately Held | 11.9 | 9.8 | 12.9 | 12.5 | +.6 |
| Buckskin Mine Kiewit Corporation | Privately Held | 17.6 | 9.7 | 10.6 | 18.2 | +.6 |
| Dry Fork Mine Western Fuels Association | Privately Held | 6.1 | 3.9 | 3.7 | 3.7 | -.2.4 |
| Total | | 266.8 | 209.9 | 230.2 | 237.8 | -29.0 |

229.    *Thermal Coal.* With respect to thermal coal, the data establish that Defendants' acquisitions and holdings of shares in the Coal Companies have significantly suppressed

83

competition.  From 2019 to 2022, the price per ton of thermal coal rose by $7.03 per ton—from $27.54 per ton to $34.57 per ton.  That is a *25.52% increase*.  In response to this *rise* in the price for thermal coal, the Coal Companies that produce thermal coal *cut* production by 56.7 million tons—from 295.2 million tons to 238.5 million tons.  That is a *19.2% decrease*.

| Table 5: Thermal Coal Output in Millions of Tons: 2019-2022 | | | | | | |
|---|---|---|---|---|---|---|
| Mining Company | Defendants' Ownership Percentage | 2019 | 2020 | 2021 | 2022 | 2019-2022 Change |
| Average Net Selling Price (Per Metric Ton) | * | $27.54 | $24.93 | $25.85 | $34.57 | +$7.03 +34.57% |
| Peabody Energy | 19.7 | 135.9 | 103.6 | 105.4 | 101.2 | -34.7 -25.5% |
| Arch Resources | 23.6 | 74.6 | 54.8 | 65.2 | 70.6 | -4.0 -5.36 |
| NACCO Industries | 9.9 | 34.6 | 31.0 | 30.8 | 28.5 | -6.1 -17.6% |
| CONSOL Energy | 28.1 | 18.3 | 12.9 | 13.0 | 22.4 | -4.6 -24.9 |
| Alpha Metallurgical Resources | 30.1 | 11.2 | 2.0 | 0 | 0 | -11.2 -100% |
| Vistra Energy | 24.7 | 12.4 | 13.1 | 10.8 | 9.3 | -3.1 -25% |
| Hallador Energy | 9.6 | 8.2 | 5.6 | 5.7 | 6.5 | -1.7 -20.7% |
| | Total | 295.2 | 223 | ~~130~~230.9 | 238.5 | -19.2% |

230.  *Metallurgical Coal.*  The effect that Defendants' efforts have had on the market for metallurgical coal confirms that the substantial lessening of competition in the markets for SPRB and thermal coal can be traced to Defendants use of their shares to bring about a coordinate reduction in the output of carbon emissions and the production of the coal that contributes to such emissions.  From 2019 to 2022, according to the Energy Information Agency, the average price per ton of metallurgical coal rose by $122.9 per ton—from $139.78 per ton to $262.72 per ton.  In response to rising prices, the four publicly-traded coal companies for which metallurgical coal

production data are available increased output, but did so by only 600,000 tons—from 29.4 million tons to 30 million tons. That is a *mere 2% increase in output in response to an 88% increase in price.*  The production of metallurgical coal thus increased by far less than the massive increase in price would elicit in a competitive market.

231.    Available data establish that Defendants' acquisitions and holdings of shares in the Coal Companies have also suppressed competition in the market for metallurgical coal.  As noted above, see above at 119, however, as signatories to CA100+, Defendants committed to obtaining a 30% reduction in metallurgical coal by 2030, but to a 50% reduction in the production of thermal coal, including SPRB coal.  That the economic distortions have been far more pronounced in the markets for thermal and SPRB coal than for metallurgical coal is entirely consistent with Defendants' focus on reducing thermal coal production and doing so quickly.

### DEFENDANTS' ACQUISITIONS AND USE OF SHARES HAVE RESULTED IN COAL PRODUCTION BEING REDUCED IN RESPONSE TO RISING PRICES, RESULTING IN CARTEL-LEVEL REVENUES AND PROFITS.

232.    The result of Defendants' efforts to bring about industry-wide output reductions have been precisely what the antitrust laws exist to prevent—increased prices, lower production, surging revenues for producers, and massive supra-competitive profits for producers.

233.    From 2019 through 2022, Peabody Energy's production fell by 34.7 million tons or 25.5%.  During the same period, its revenues rose by $358.5 million and its profits soared by $1.593 billion, or 853.9%.

234.    Over the same period, Arch Resources' production fell by 9.4 million tons, or 11.7%, while its revenues rose by $1.448 billion, and its profits soared by $1.097 billion, or 469.2%.

235.    Over the same period, NACCO Natural Resources' production fell by 6.1 million tons, or 17.6%, while its profits increased $4.189 million, or 12%.

236.    Over the same period, CONSOL Energy's production fell by 3.2 million tons, or 11.8%, while its revenues rose by $685.3 million, and its profits increased by $423.1 million, or 214.7%.

237.    Over the same period, Alpha Metallurgical Resources' production fell by 6.4 million tons, or 28.7%, while its revenues rose by $1.843 billion, and its profits increased by $1.223.8 billion, or 342.7%.

238.    Over the same period, Hallador Energy's production fell by 1.7 million tons, or 20.7%.  Its revenues also fell by 35.9 million, while its profits increased by $112.6 million, or 237%.

239.    Over the same period, Warrior Met Coal's production fell by 2.0 million tons, or 25.8%, while its revenues rose by $471.6 million, or 38%, and its profits increased by $418 million, or 109%.

240.    The Black Hills Corporation does not separately report the operating results for the wholly-owned subsidiary that operates its coal mining operation.

| Table 6: Output, Revenues, and Profits by Firm, 2019-2022 | | | | | | |
|---|---|---|---|---|---|---|
| **Firm** | | 2019 | 2020 | 2021 | 2022 | 2019-2022 Change |
| **Peabody Energy** | Output (millions of tons) | 135.9 | 104 | 105.4 | 101.2 | -34.7 -25.5% |
| | Revenues (millions of dollars) | 4,623.4 | 2,881.1 | 3,318.3 | 4,981.9 | +358.5 +7.75% |
| | Profits (millions of dollars) | (211.3) | (1,728.3) | 432.2 | 1,381.6 | +1,592.9 853.9% |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Arch Resources** | Output (millions of tons) | 80.2 | 54.8 | 65.2 | 70.8 | -9.4 -11.7% |
| | Revenues (millions of dollars) | 2,294.4 | 1,467.6 | 2,208.1 | 3,742.6 | +1,448.2 |
| | Profits (millions of dollars) | 233.8 | (344.6) | 339.4 | 1,330.9 | +1,097.1 +469.2% |
| **NACCO Natural Resources[195]** | Output (millions of tons) | 34.6 | 31.0 | 30.8 | 28.5 | -6.1 -17.6% |
| | Revenues (millions of dollars) | n.a | n.a. | n.a. | n.a. | n.a. |
| | Profits (millions of dollars) | 34.120 | 25.436 | 45.784 | 38.309 | +4.189 +12.27% |
| **CONSOL Energy[196]** | Output (millions of tons) | 27.3 | 18.8 | 24.0 | 24.1 | -3.2 -11.8% |
| | Revenues (millions of dollars) | 1,288.5 | 771.4 | 1,085.1 | 1,973.8 | +685.3 +53.2% |
| | Profits (millions of dollars) | 197.1 | 16.2 | 94.2 | 620.2 | +423.1 +214.7% |
| **Alpha Metallurgical Resources[197]** | Output (millions of tons) | 22.3 | 13.9 | 15.8 | 15.9 | -6.4 -28.7% |
| | Revenues (millions of dollars) | 2,258.6 | 1,416.2 | 2,258.7 | 4,101.6 | +1,843.0 +81.6% |

[195] Results are for NACCO's Coal Mining segment alone. NACCO provides output and operating profit data for both its consolidated and unconsolidated mines; the firm does not, however, provide revenue data for its unconsolidated mines. As those unconsolidated mines accounted for the bulk of NACCO's output (25.2 vs. 3.2 million tons in 2022; 27.8 vs. 3.0 million tons in 2021; 28.5 vs. 2.5 million tons in 2020; and 32.0 vs. 2.6 million tons in 2019), the revenue data for the consolidated mines ($95.2 million, $82.8 million in 2021; 72.088 million in 2020; and 68.701 million in 2019) do not include the bulk of the Company's coal-related revenues.

[196] Revenue and net income figures are for the Company's Pennsylvania Mining Complex Segment and exclude revenues from operation of its CONSOL Marine Terminal Segment.

[197] Data reflect operating income.

87

| | Income (millions of dollars) | 357.1 | (170.7) | 359.2 | 1,580.9 | +1,223.8 +342.7% |
|---|---|---|---|---|---|---|
| **Vistra Energy** | Output (millions of tons) | 12.4 | 13.1 | 10.8 | 9.3 | -3.1 -25% |
| | Vistra operates coal mines in Texas to provide fuel for its electricity generation facilities. It does not break out revenue or income data related specifically to that production in its financial reports. | | | | | |
| **Hallador Energy Company[198]** | Output (millions of tons) | 8.2 | 5.6 | 5.7 | 6.5 | -1.7 -20.7% |
| | Revenues (millions of dollars) | 317.4 | 242.1 | 243.9 | 289.4 | -35.9 -11% |
| | Profits (millions of dollars) | (82.2) | (8.9) | (6.0) | 30.4 | +112.6 +237.0% |
| **Warrior Met Coal[199]** | Output (millions of tons) | 7.683 | 7.132 | 5.084 | 5.699 | -2.0 -25.8% |
| | Revenues (millions of dollars) | 1,236.0 | 761.8 | 1,028.3 | 1,707.6 | +471.6 +38% |
| | Income (millions of dollars) | 383.4 | (27.1) | 243.8 | 801.4 | +418 +109% |

241.    Although both the economic contraction caused by the COVID-19 pandemic and the disruptions to the global energy supply from the war in Ukraine produced rapid shifts in demand in 2020 and 2021, the anticompetitive effects of Defendants' conduct has nonetheless been pronounced and unmistakable: Defendants have blocked their portfolio Coal Companies from responding to market forces—a response that would have lowered energy prices for all Americans.

---

[198] Revenue data reflect Hallador's coal sales; income (loss) is operating income (loss).

[199] Revenue figures reflect Warrior Met Coal's sales and exclude "other revenues"; income is operating income.

242.    Defendants' causal role is evident, for example, from the different responses to the fluctuations in the price for SPRB coal exhibited by the publicly held companies—whose shares Defendants acquired and who cut their output during a period of rising prices—and the privately held companies, who raised their output during a period of rising prices.  And the fact that the distortions are more pronounced in the markets for thermal coal than in the market for metallurgical coal reflects Defendants' particular focus on reducing the production of thermal coal.

243.    In sum, the data demonstrates that publicly held domestic coal producers were not responding to the laws of supply and demand.  They were instead answering to Defendants, who acquired substantial shareholdings in each of these companies, possessed the power and the will to reduce the companies' production of coal, and made public commitments to vote management out of office if they failed to reduce coal production and publicly disclose both reduction targets and the data establishing compliance with those targets.  What happened next was economically predictable: Defendants' acquisition of shares in the Coal Companies caused a substantial reduction in competition between those firms.

### NEBRASKA-SPECIFIC HARMS
#### (On Behalf of Plaintiff State of Nebraska)

244.    Plaintiff State of Nebraska has sustained or will sustain injury because of Defendants' unlawful activities.

245.    Coal is the biggest source of energy for Nebraska's electrical grid. For example, in 2023, coal generated 45% of Nebraska's in-state energy. Most of the coal consumed in Nebraska, approximately 90%, is used for electricity generation.

246.    Nebraska has unique energy needs. Despite being a smaller state, Nebraska is the third largest state consumer of electricity, most of which goes to its industrial sector, particularly

89

agriculture. Likewise, due to its weather, industrial needs, and population size, Nebraska is one of the top state consumers of energy per capita.

247.    Nebraska does not produce any coal, nor does it have significant coal reserves. Nebraska thus relies on outside sources to power its electrical grid.

248.    Conduct that seeks to restrict, reduce, or otherwise lessen the production of coal will affect the cost and quality of energy generation in Nebraska, including electricity that is critical for winter heat, summer cooling, and fueling Nebraska's robust energy-intensive agricultural industry.

### IOWA-SPECIFIC HARMS
#### (On Behalf of Plaintiff State of Iowa)

249.    Plaintiff State of Iowa alleges the following Iowa-specific facts.[200]

250.    Iowa has sustained and will sustain injury because of Defendants' unlawful activities.

251.    Iowa ranks seventh in "total energy consumption per capita." *Id.* That is in part due to its large industrial and agricultural sector.

252.    Iowa does not have any operating coal mines and does not produce any coal. Iowa thus relies on outside sources for the SPRB coal that powers its electrical grid.

253.    Coal is the second largest source of energy for Iowa's electrical grid. In 2023, coal generated 23.5% of Iowa's in-state electricity generation and 21.5% in 2024.

---

[200] All data set forth in this section can be accessed at the *Iowa State Profile and Energy Estimates: Profile Overview*, U.S. ENERGY INFO. ADMIN., https://bit.ly/42fhhfA (last visited Jan. 5, 2026).

254.   There are eight coal-fueled electric generation facilities currently in operation in Iowa.[201]

a.      The Walter Scott Jr. Energy Center in Pottwattamie County is owned by the MidAmerican Energy Company. It has an active generating capacity of 1650 megawatts.  Between 2022 and 2024, it consumed between 3.2 million and 3.8 million short tonnes of SPRB coal for electric generation annually.

b.      The Louisa Generating Station in Louisa County is owned by MidAmerican Energy, Central Iowa Power Cooperative, Alliant Energy, Waverly Municipal Electric Utility, City of Geneseo and Eldridge City Utilities.  It has an active generating capacity of 811.9 megawatts.  Between 2022 and 2024, it consumed between 1.7 million and 2.2 million short tonnes of SPRB coal for electric generation annually.

c.      The Ottumwa Generating Station in Wapello County is owned by the MidAmerican Energy Company (52%) and Interstate Power and Light (48%).  It has an active generating capacity of 725.9 megawatts.  Between 2022 and 2024, it consumed between 1.2 million and 2.2 million short tonnes of SPRB coal for electric generation annually.

d.      The George Neal Energy Center in Woodbury County is owned by the MidAmerican Energy Company (72%) and Interstate Power and Light (28%).  It has an active generating capacity of 584.1 megawatts.  Between 2022 and 2024, it consumed between 970,00 and 1.4 million short tonnes of SPRB coal for electric generation annually.

e.      The Muscatine Generating Station in Muscatine County is owned by the Board of Water, Electric, and Communications Trustees of the City of Muscatine, Iowa.  It has an

---

[201] Plant specific consumption data are derived from Energy Information Administration's EIA-923 Monthly Generation and Fuel Consumption Time Series Files for 2022, 2023, and 2024.

91

active generating capacity of 275.5 megawatts.  Between 2022 and 2024, it consumed between 398,000 and 719,000 short tonnes of SPRB coal for electric generation annually.

f.      The Archer Daniels Midland Cedar Rapids Power Plant in Linn County is owned by Archer Daniels Midland.  It has an active generating capacity of 256.1 megawatts. Between 2022 and 2024, it consumed between 1 million and 1.04 million short tonnes of SPRB coal for electric generation annually.

g.      The Archer Daniels Midland Clinton Power Plant in Clinton County is owned by Archer Daniels Midland.  It has an active generating capacity of 180 megawatts. Between 2022 and 2024, it consumed between 926,000 and 1 million short tonnes of SPRB coal for electric generation annually.

255.    Overall, coal plants in Iowa consumed 27.982 million short tonnes of SPRB coal to generate electricity for Iowa consumers between 2022 and 2024: 10.550 million short tonnes in 2022; 9.297 million in 2023; and 8.135 million in 2024.[202]

256.    During the relevant period, Defendants' efforts to reduce the output of SPRB coal resulted in the price per short-ton of SPRB coal being routinely set at levels $2 to $5 above the competitive market price level.

257.    As a result of Defendants' conduct, Iowa consumers had to pay tens of millions of dollars more for electricity than they would have had to pay had Iowa utilities been able to acquire SPRB coal at prices determined in a free and competitive market.

---

[202] These aggregate coal consumption data are taken from Table 26 of the Annual Coal Report published by the U.S. Energy Information Agency for 2022, 2023, and 2024.  For all uses, i.e., electric, industrial, commercial and institutional (Iowa does not report using any metallurgical coal), Iowa consumed 10.339 million short tonnes in 2022, 11.441 million short tones in 2023, and 13.003 million short tonnes in 2022.

258.    Defendants' conduct has harmed, and will continue to harm, Iowa's economy not only by increasing the costs of heating, cooling, and powering Iowa residences and businesses, but also by substantially inflating the costs incurred to fuel the energy-intensive industrial and agricultural sector that is key to the Iowa economy.

259.    In 2022, other industrial users of coal consumed 2.362 million short tonnes of thermal coal in 2022; they consumed 2.128 million short tonnes in 2023; and, finally, 2.17 million short tonnes in 2024.[203]

### LACK OF COUNTERVAILING FACTORS

~~249.~~260.    Defendants cannot demonstrate any cognizable efficiencies to rebut the strong presumption and actual evidence that their acquisition of substantial shares in competitors both could substantially lessen competition and has actually lessened competition. While a merger might have the potential to create substantial economies of scale or other efficiencies, Defendants' acquisition of common shares does not create common management or any of the other bases for obtaining the efficiencies that make some mergers socially valuable.  Defendants' ability to control the production of competitors may be less direct than if Defendants had acquired these companies outright. But the potential for countervailing economic efficiencies is zero.

---

[203] The aggregate coal consumption data for "other industrial" uses are taken from Table 26 of the Annual Coal Report published by the U.S. Energy Information Agency for 2022, 2023, and 2024.

**CAUSES OF ACTION**

**COUNT I**
**Acquisitions of Stock in Violation of**
**Section 7 of the Clayton Act, 15 U.S.C. § 18**
**(On Behalf Of All Plaintiff States)**

~~250.~~261.    Plaintiff States repeat and reallege every preceding allegation as if fully set forth herein.

~~251.~~262.    The acquisition and holding of shares by Defendants—as well as Defendants' use of such stock by voting, by granting of proxies, and otherwise—may have had, have in fact had, continue to have, and may in the future have, the effect of substantially lessening competition in the relevant product and geographic markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

~~252.~~263.    At all times material herein, Defendants' activities have occurred in and affected interstate commerce.

**COUNT II**
**Unlawful Agreement Between Defendants**
**to Restrain Trade in Violation of**
**Section I of the Sherman Act, 15 U.S.C. § 1**
**(On Behalf Of All Plaintiff States)**

~~253.~~264.    Plaintiff States repeat and reallege every preceding allegation as if fully set forth herein.

~~254.~~265.    The agreement and conduct alleged herein constitute a per se violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 (as amended), or, in the alternative, cause significant anticompetitive effects that are not outweighed by any procompetitive benefits.

~~255.~~266.    In 2021, Defendants, by and through their officers, directors, employees or other representatives, entered into an unlawful agreement in restraint of trade and commerce in

94

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by agreeing to use the shares they have
acquired in the Coal Companies to coerce those companies to implement and adhere to a scheme
of coordinated output reductions of SPRB Coal and Thermal Coal.

256.267.     Defendants subsequently used the shares they acquired in the coal
companies to coerce those companies to reduce their collective output of coal.  They have done so
by using those shares to gain access to, obtain information from, and coerce the management of
the Coal Companies to agree to reduce their companies' level of output.  They have voted their
shares both to coerce compliance with their demands and to threaten removal of management that
proved reluctant to cooperate with this output reduction scheme.

257.268.     Defendants' combination and conspiracy unreasonably restrained trade.
There is no legitimate justification for, or procompetitive benefits caused by, Defendants'
unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could
have been achieved by less restrictive means.

**COUNT III**
**Conspiracy to Exchange and Share Competitors' Information**
**in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(On Behalf Of All Plaintiff States)**

258.269.     Plaintiff States repeat and reallege every preceding allegation as if fully set
forth herein.

259.270.     In the Spring of 2021, Defendants joined a conspiracy to restrain trade by
depressing the output of Thermal Coal and SPRB Coal. As part of this conspiracy, Defendants
have engaged in a continuing agreement to share timely, competitive-sensitive information
concerning their respective efforts to coerce individual coal companies to agree to meet specific
output reduction targets, to identify those coal companies that had agreed to meet those specific

95

targets, and to identify those coal companies that they were continuing to pressure to agree to meet those targets.

260.271.    The information shared by Defendants in their annual proxy voting reports and elsewhere was not historical, but rather concerned current output and both intermediate and long-term production targets.

261.272.    The information shared by Defendants was neither aggregated nor anonymized, but identified the specific commitments made by specific competitors, and the compliance of those specific competitors with their output reduction targets.

262.273.    Defendants' exchange and sharing of information created both the opportunity and the incentive for the Coal Companies to obtain supra-competitive profits by reducing their output rather than seeking to expand their market share through vigorous competition.

263.274.    Defendants' agreement to exchange and share information has had the effect of (1) reducing output and suppressing competition in the relevant markets for Thermal Coal and SPRB Coal and (2) increasing the price for Thermal Coal and SPRB Coal substantially above competitive market levels.

## COUNT IV
## STATE LAW ANTITRUST CLAIMS
### (On Behalf Of Plaintiff State Of Texas)

264.275.    Plaintiff State of Texas repeats and realleges every preceding allegation as if fully set forth herein.

265.276.    The aforementioned practices by Defendants were and are in violation of TEX. BUS. & COM. CODE § 15.01 *et seq.*, *id.* §§15.05(a) & 15.05(d).

**COUNT V**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf Of Plaintiff State Of Montana)**

266.277.    Plaintiff State of Montana repeats and realleges every preceding allegation as if fully set forth herein.

267.278.    The Attorney General of the State of Montana is authorized to bring this action on behalf of the people of the State of Montana pursuant to MONT. CODE ANN. §§ 30-14-220 & 30-14-222.

268.279.    MONT. CODE ANN. § 30-14-205 states that "[i]t is unlawful for a person or group of persons, directly or indirectly … to enter an agreement for the purpose of fixing the price or regulating the production of an article of commerce" or "for the purpose of creating or carrying out any restriction in trade, to … limit productions  … ".

269.280.    Defendants have each entered into an agreement for the purpose of regulating the production of thermal coal, metallurgical coal, and SPRB coal, and for the purpose of carrying out restrictions in trade to limit the production of thermal coal, SPRB coal, and metallurgical coal, in violation of MONT. CODE ANN. § 30-14-205.

**COUNT VI**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf Of Plaintiff State Of Indiana)**

270.281.    Plaintiff State of Indiana repeats and realleges every preceding allegation as if fully set forth herein.

271.282.    The aforementioned practices by Defendants were and are in violation of the Indiana Antitrust Act, IND. CODE § 24-1-2-1.

97

**COUNT VII**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf Of Plaintiff State Of Iowa)**

272.283.    ~~The acts alleged in the Complaint constitute schemes, contracts, or combinations in restraint of trade or commerce or are otherwise illegal under I~~ND. C~~ODE § 24-1-2-1.~~ Plaintiff State of Iowa repeats and realleges every preceding allegation as if fully set forth herein.

~~273.    Plaintiff State of Iowa also alleges the following Iowa-specific facts.²⁰⁴~~

~~274.    Plaintiff State of Iowa has sustained or will sustain injury because of Defendants' unlawful activities.~~

284.    ~~Despite being a smaller state,~~ The alleged practices by Defendants were in violation of the Iowa Competition Law, Iowa Code, Chapter 553.

275.285.    Iowa ranks seventh in "total energy consumption per capita."   That is in part due to its large industrial and agricultural sector~~, which includes agriculture~~.

~~276.    Coal is the second largest source of energy supporting Iowa's high energy consumption per capita. Coal accounted for 23% of the state's electricity generation in 2023, and five of Iowa's ten largest power plants (ranked by generating capacity) are coal-fired.~~

~~277.    Iowa does not produce any coal, nor does it have any operating coal mines. Iowa thus relies on outside sources for the coal that powers its electrical grid. Most of the coal consumed in Iowa comes from Wyoming with a small amount sourced from Illinois, Kentucky~~Defendants sought to~~, and~~ ~~Montana.~~

278.286.    ~~Conduct that seeks to~~did, restrict, reduce, or otherwise lessen the production of coal ~~will~~and affect the cost and quality of energy generation in Iowa, including electricity that

---

²⁰⁴ ~~All data set forth in this section can be accessed at the~~ *Iowa State Profile and Energy Estimates: Profile Overview*~~, U.S. E~~NERGY I~~NFO. A~~DMIN.~~, https://bit.ly/42fhhfA (last visited Jan. 14, 2025).~~

is critical for winter heat, summer cooling, and fueling Iowa's robust energy-intensive agricultural industry that is key to the flourishing of the State's economy.

287.    Plaintiff State of Iowa has sustained and will sustain injury in its quasi-sovereign capacity because of Defendants' unlawful activities.

288.    Iowa has quasi-sovereign interests, including but not limited to its interest in preventing antitrust violations, ensuring that its citizens are not denied the benefits of lower-priced electricity that would result from Defendants' adherence to fair marketplace regulations and from their abstention from interference with the operation of the free market, that is distinct from and diverges from the interest of private litigants.

279.289.    Defendants have each entered into an agreement to restrain trade or commerce in the relevant markets of Thermal Coal and South Powder River Basin Coal.  In addition to violating federal law, Defendants' conduct as alleged herein violates the Iowa Competition Law, Iowa Code, Chapter 553, including §section 553.4. ThisThat Section prohibits "[a] contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code, Ch. 553 § 553.4.

280.    Defendants have each entered into an agreement to restrain trade or commerce in the relevant markets of Thermal Coal and South Powder River Basin Coal.

281.    Defendants' anticompetitive conduct has and will continue to directly and indirectly affect the people of Iowa through increased prices for and reduced quantity of South Powder River Basin Coal and Thermal Coal in Iowa and across the nation.

282.290.    Iowans will suffer injury or have suffered and will continue to suffer injury in the form of reduced quantity and supracompetitive prices for South Powder River Basin Coal and Thermal Coal because of Defendants' anticompetitive conduct.

99

291.    Iowa seeks an injunction, divestiture of profits, and damages resulting from these practices pursuant to Iowa Code section 553.12, and civil penalties pursuant to Iowa Code section 553.13.

**COUNT VIII**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf Of Plaintiff State Of Kansas)**

283.292.    Plaintiff State of Kansas repeats and realleges every preceding allegation as if fully set forth therein.

284.293.    The aforementioned practices by Defendants were and are in violation of the Kansas Restraint of Trade Act, KAN. STAT. ANN. § 50-101 *et seq.*, *id.* §§ 50-101 & 50-112.

285.294.    The Attorney General of the State of Kansas is authorized to bring this action and seeks relief on behalf of the State and as *parens patriae* on behalf of its residents, pursuant to KAN. STAT. ANN. §§ 50-103 & 50-109.

**COUNT IX**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf of Plaintiff State Of Louisiana)**

286.295.    Plaintiff State of Louisiana repeats and realleges every preceding allegation as if fully set forth herein

287.296.    L.A. R.S. § 51:122(A) states "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal." Defendants have entered into illegal agreements for the purpose of regulating and restricting the trade of, as well as limiting the production of, thermal coal, SPRB coal, and metallurgical coal in violation of L.A. R.S. § 51:122, *et seq*.

100

288.297.    L.A. R.S. § 51:125 states "[n]o corporation...shall acquire directly or indirectly, the whole or any part of the shares of another corporation...where the effect of the acquisition...[m]ay be to restrain commerce in any section or community..." *Id.*

289.298.    Defendants have unlawfully entered agreements in restraint of trade and commerce by agreeing to use the acquired shares in the Coal Companies to coerce those companies to implement output reductions of SPRB Coal and Thermal Coal in violation of L.A. R.S. § 51:125.

290.299.    Defendants used their acquired shares in the Coal Companies via unlawful voting and management coercion to reduce their collective output of coal in violation of L.A. R.S. § 51:125.

**COUNT X**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf Of Plaintiff State Of Nebraska)**

291.300.    Plaintiff State of Nebraska realleges every preceding allegation as if fully set forth herein.

292.301.    At all times described herein, Defendants conducted and continues to conduct "trade and commerce" within the meaning of the Nebraska Consumer Protection Act. NEB. REV. STAT. § 59-1602(2).

293.302.    In addition to violating federal law, Defendants' conduct as alleged herein constitutes unreasonable restraints of trade in violation of NEB. REV. STAT. § 59-1603.

294.303.    Defendants' anticompetitive conduct has and will continue to directly and indirectly affect the people of the State of Nebraska through increased prices for and reduced quantity of South Powder River Basin Coal and Thermal Coal in Nebraska and across the nation.

101

295.304.    The people of the State of Nebraska have suffered injury and/or will continue to suffer injury in the form of reduced quantity and supracompetitive prices for South Powder River Basin Coal and Thermal Coal because of Defendants' anticompetitive conduct.

**COUNT XI**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf Of Plaintiff State Of Nebraska)**

296.305.    Plaintiff State of Nebraska realleges every preceding allegation as if fully set forth herein.

297.306.    In addition to violating federal law, Defendants' conduct as alleged herein constitute unreasonable restraints of trade in violation of the Junkin Act. NEB. REV. STAT. § 59-801.

298.307.    Defendants' anticompetitive conduct has and will continue to restrain trade or commerce within Nebraska resulting in increased prices for and reduced quantity of South Powder River Basin Coal and Thermal Coal.

299.308.    The people of Nebraska of the State of Nebraska have suffered injury and/or will continue to suffer injury in the form of reduced quantity and supracompetitive prices for South Powder River Basin Coal and Thermal Coal because of Defendants' anticompetitive conduct.

**COUNT XII**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf of Plaintiff State of Nebraska)**

300.309.    Plaintiff State of Nebraska realleges every preceding allegation as if fully set forth herein.

301.310.    In addition to violating federal law, Defendants' acquisitions and holding of shares as described in the preceding paragraphs may have had, have in fact had, continue to have,

102

and may in the future have, the effect of substantially lessening competition in the relevant product and geographic markets alleged herein.

~~302.~~311.    Defendants' acquisition and holding of these shares has harmed and is likely to continue to harm the State of Nebraska by:

a.    Eliminating current and future head-to-head competition between coal producers;

b.    Increasing the likelihood of or facilitating coordinated interaction between Defendants in the relevant markets; and

c.    Increasing the likelihood that Defendants will exercise unilateral market power to reduce quantity of South Powder River Basin Coal and Thermal Coal.

**COUNT XIII**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf Of Plaintiff State Of Oklahoma)**

~~303.~~312.    Plaintiff State of Oklahoma repeats and realleges every preceding allegation as if fully set forth herein.

~~304.~~313.    Gentner Drummond is the duly elected Attorney General for the State of Oklahoma. Being the chief law enforcement officer of the state, General Drummond is empowered to "bring an action in the name of the state, as parens patriae on behalf of natural persons residing in the state for appropriate injunctive or other equitable relief and to secure monetary damages for injury sustained by such natural persons to their business or property by reason of any violation of [the Oklahoma Antitrust Reform Act.]" OKLA. STAT. tit. 79, § 205(A)(1).

~~305.~~314.    The aforementioned practices of the Defendants were in violation of the Oklahoma Antitrust Reform Act. OKLA. STAT. tit. 79, § 201, *et seq.*

103

**COUNT XIV**
**STATE LAW ANTITRUST CLAIMS**
**(On Behalf Of Plaintiff State Of West Virginia)**

~~306.~~315. Plaintiff State of West Virginia repeats and realleges every preceding allegation as if fully set forth herein.

~~307.~~316. Defendants' acts violate the West Virginia Antitrust Act, *see* W. VA. CODE § 47–18–1 *et seq.* These violations substantially affected the State of West Virginia and had impacts within the State of West Virginia.

~~308.~~317. Plaintiff State of West Virginia is entitled to all appropriate relief (including, but not limited to, injunctive relief), as well as civil penalties under W. VA. CODE § 47–18–1 *et seq.*

~~309.~~318. Plaintiff State of West Virginia also is entitled to recover its costs and attorney fees under W. VA. CODE § 47–18–8.

**COUNT XV**
**STATE LAW DECEPTIVE TRADE PRACTICES CLAIMS**
**(On Behalf Of Plaintiff State Of Texas Against Defendant BlackRock)**

~~310.~~319. Plaintiff State of Texas repeats and realleges every preceding allegation as if fully set forth herein.

~~311.~~320. At all times described herein, Defendant BlackRock has engaged in conduct which constitutes "trade" and "commerce" as defined in Section 17.45(6) of the TEX. BUS. & COM. CODE.

~~312.~~321. Plaintiff State of Texas has reason to believe that Defendant BlackRock has engaged in, and will continue to engage in, the unlawful practices set forth herein, has caused and will cause adverse effects to legitimate business enterprises which lawfully conduct trade and commerce in this State, and will cause damage to the State of Texas and to persons in the State of

104

Texas. Therefore, the Consumer Protection Division of the Office of the Attorney General of the State of Texas believes and is of the opinion that this matter is in the public interest.

313.322.    Through its false, deceptive, or misleading acts, Defendant BlackRock has violated Section 17.46(a) of the TEX. BUS. & COM. CODE, including by engaging in conduct specifically defined to be false, deceptive, or misleading by Section 17.46(b) such as:

   a) Representing that its financial products and services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have in violation of Section 17.46(b)(5);

   b) Representing that its financial products and services are of a particular standard, quality, or grade, if they are of another, in violation of Section 17.46(b)(7);

   c) Advertising goods or services with the intent not to sell them as advertised, in violation of Section 17.46(b)(9); and

   d) Failing to disclose information concerning goods or services which was known at the time of the transaction with the intent to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed, in violation of Section 17.46(b)(24).

314.323.    By means of the foregoing unlawful acts and practices, BlackRock has acquired money or other property from persons to whom such money or property should be restored.

### COUNT XVI
### STATE LAW DECEPTIVE TRADE PRACTICES CLAIMS
**(On Behalf Of Plaintiff State Of Montana Against Defendant BlackRock)**

~~315.~~324.    The Plaintiff State of Montana repeats and realleges each and every preceding allegation as if fully set forth herein, specifically including, but not limited to, the allegations set forth paragraphs 192-224, of this Complaint. The foregoing acts and practices by BlackRock were and are in willful violation of Montana's Unfair Trade Practices and Consumer Protection Act, MONT. CODE ANN. § 30 14-101 *et seq.*, *id.* §§ 30-14-103, 142(2).

~~316.~~325.    The Attorney General of the State of Montana is authorized to bring this action on behalf of the people of the State of Montana pursuant to MONT. CODE ANN. § 30-14-111 & 30-14-142(2).

~~317.~~326.    BlackRock has engaged in and is engaging in trade and commerce within the meaning of Mont. Code Ann. § 30-14-102(8) and unfair methods of competition and unfair or deceptive acts or practices within the meaning of MONT. CODE ANN. § 30-14-103 and *Rohrer v. Knudson*, 203 P.3d 759 (Mont. 2009).

~~318.~~327.    BlackRock's unlawful conduct was willful, and Plaintiff State of Montana is entitled to all legal and equitable relief pursuant to, without limitation, MONT. CODE ANN. §§ 30-14-111(4); 30-14-131; *id.*30-14-142(2).

### COUNT XVII
### STATE LAW CONSUMER FRAUD CLAIMS
**(On Behalf Of Plaintiff State Of Iowa Against Defendant BlackRock)**

~~319.~~328.    Plaintiff State of Iowa repeats and realleges every preceding allegation as if fully set forth herein.

106

320.329.    Defendant BlackRock's conduct constitutes unlawful, acts, and practices as alleged herein constitute deceptive and/or unfair practices in violation of the Iowa Consumer Fraud Act., Iowa Code §, 714.16 (2)(a).

321.330.    Iowa Code §Section 714.16(2)(*a*) of the Iowa Code prohibits:

> "The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes, whether or not a person has in fact been misled, deceived, or damaged . . ."

322.331.    Defendants' anticompetitive conduct constitutes an unfair practice that is unlawful under the Iowa Consumer Fraud Act as it causes "substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code § 714.16(*i*).

323.332.    Through its false, deceptive, or misleading acts, Defendant BlackRock has violated the Iowa Consumer Fraud Act, including by engaging in conduct that is unlawful under Sectionsection 714.16(2)(*a*) such as:

a)    Representing that its financial products and services have sponsorship, approval characteristics, ingredients, uses, benefits, or quantitates which they do not have; approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

b)    Representing that its financial products and services are of a particular

b)    standard, quality, or grade, when they are of another;

c)    Advertising goods or services with the intent not to sell them as advertised; and

107

d)      Failing to disclose material information concerning goods or services which was known at the time of the transaction with the intent that the consumer rely on the omission to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

324.333.      By means of the foregoing unlawful acts and practices, BlackRock has acquired money or other property from persons to whom such money or property should be restored.

334.    Pursuant to Iowa Code section 714.16(7), the State of Iowa seeks disgorgement, restitution, and other equitable relief for these violations. In addition, pursuant to Iowa Code section 714.16(11), the Attorney General seeks reasonable fees and costs for the investigation and litigation.

## COUNT XVIII
### STATE LAW DECEPTIVE TRADE PRACTICES CLAIMS
#### (On Behalf Of Plaintiff State Of Louisiana)[205]

325.335.      The Plaintiff State of Louisiana repeats and realleges every preceding allegation as if fully set forth herein.

326.336.      At all times relevant and described herein, Defendants have engaged in conduct constituting "trade" and/or "commerce" as defined in L.A. R.S. § 51:1402(10).

327.337.      Defendants have engaged in, and will continue to engage in, practices declared unlawful by the Louisiana Unfair Trade Practices Act, adversely impacting and occasioning damages to the citizens and economy of the State of Louisiana in violation of L.A. R.S. §§ 51:1403 and 51:1405.

## COUNT XIX

---

[205] The Court granted Defendant's motion to dismiss this Count. Mem. Op., ECF 113 (Aug. 1, 2025). It is realleged here in order to avoid any waiver of the right to appeal the dismissal.

**STATE LAW CONSUMER PROTECTION CLAIM**
**(On Behalf Of Plaintiff State Of Nebraska Against Defendant BlackRock)** [206]

~~328.~~338.     Plaintiff State of Nebraska repeats and realleges every preceding allegation as if fully set forth herein.

~~329.~~339.     At all times described herein, Defendant BlackRock conducted and continues to conduct "trade and commerce" within the meaning of the Nebraska Consumer Protection Act. NEB. REV. STAT. § 59-1601(2).

~~330.~~340.     The Nebraska Consumer Protection Act prohibits "unfair . . . acts or practices in the conduct of any trade or commerce." ~~Neb. Rev. Stat.~~*Id.* § 59-1602.

~~331.~~341.     An act or practice is unfair if it offends public policy as established within some common law, statutory, or other established concept of unfairness, or is immoral, unethical oppressive, unscrupulous, or causes substantial injury to consumers.

~~332.~~342.     Defendant BlackRock engaged in unfair acts or practices in violation of the Consumer Protection Act, NEB. REV. STAT. § 59-1602, by, without limitation:

a.     Representing, expressly or by implication, that its financial products and services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, that they do not have;

b.     Representing, expressly or by implication, that its financial products and services are of a particular standard, quality, or grade, if they are of another;

c.     Advertising its financial products and services with the intent not to sell them as advertised.

---

[206] The Court granted Defendant's motion to dismiss this Count. Mem. Op., ECF 113 (Aug. 1, 2025). It is realleged here in order to avoid any waiver of the right to appeal the dismissal.

333.343.    Defendant BlackRock's actions constitute unfair acts or practices in the conduct of any trade or commerce in violation of NEB. REV. STAT. § 59-1602. Each and every act constitutes a separate and independent violation of the Nebraska Consumer Protection Act. NEB. REV. STAT. § 59-1602.

### COUNT XX
### STATE LAW CONSUMER PROTECTION CLAIM
### (On Behalf Of Plaintiff State Of Nebraska Against Defendant BlackRock)[207]

334.344.    Plaintiff State of Nebraska repeats and realleges every preceding allegation as if fully set forth herein.

335.345.    At all times described herein, Defendant BlackRock, conducted and continues to conduct "trade and commerce" within the meaning of the Nebraska Consumer Protection Act. NEB. REV. STAT. § 59-1602(2).

336.346.    The Nebraska Consumer Protection Act prohibits "deceptive acts or practices in the conduct of any trade or commerce."

337.347.    An act or practice is deceptive if it possesses the tendency or capacity to mislead or creates the likelihood of confusion.

338.348.    Defendant BlackRock engaged in deceptive acts or practices in violation of the Consumer Protection Act, NEB. REV. STAT. § 59-1602, by, without limitation:

    a.    Representing, expressly or by implication, that its financial products and services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, that they do not have;

---

[207] The Court granted Defendant's motion to dismiss this Count. Mem. Op., ECF 113 (Aug. 1, 2025). It is realleged here in order to avoid any waiver of the right to appeal the dismissal.

b.      Representing, expressly or by implication, that its financial products and services are of a particular standard, quality or grade, if they are of another;

c.      Advertising its financial products and services with the intent not to sell them as advertised.

339.349.      Defendant BlackRock's actions constitute deceptive acts or practices in the conduct of any trade or commerce in violation of NEB. REV. STAT. § 59-1602. Each and every act constitutes a separate and independent violation of the Nebraska Consumer Protection Act. NEB. REV. STAT. § 59-1602.

**COUNT XXI**
**STATE LAW DECEPTIVE TRADE PRACTICES CLAIM**
**(On Behalf Of Plaintiff State Of Nebraska Against Defendant BlackRock)**

340.350.      The State of Nebraska repeats and realleges the facts above and incorporates them herein by reference.

341.351.      Section 87-302(a) of the Nebraska Uniform Deceptive Trade Practice Act specifies multiple practices, which when conducted during business, constitute a deceptive trade practice. NEB. REV. STAT. § 87-302(a).

342.352.      Defendant BlackRock engaged in deceptive trade practices in violation of NEB. REV. STAT. § 87-302 by, without limitation:

a.  Representing, expressly or by implication, that its financial products and services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities;

b.  Representing, expressly or by implication, that its financial products and services are of a particular standard, quality or grade, if they are of another;

c.  Advertising goods or services with the intent not to sell them as advertised.

**PRAYER FOR RELIEF**

111

WHEREFORE, the Plaintiff's Attorney General requests that the Court:

a) Adjudge and decree that Defendants' acquisitions of shares of the Coal Companies have violated Section 7 of the Clayton Act, 15 U.S.C. § 18;

b) Adjudge, decree, and award damages on the ground that the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c) Order such injunctive relief as is necessary, including but not limited to divestiture, to restrain Defendants from using the stock they have acquired in the Coal Companies by the voting or granting of proxies or otherwise to restrain output and limit competition in the relevant markets identified above, or from engaging in any other practices with the same purpose and effect as the challenged practices;

d) Order any such other equitable relief as may be necessary and appropriate to restore competitive conditions in the markets affected by Defendants' unlawful acquisitions and unlawful conduct;

e) Enjoin and restrain, pursuant to Section 15.20(b) of the TEX. BUS. &COM. CODE, Defendants and their officers, directors, partners, agents, and employees, and all persons acting or claiming to act on their behalf or in concert with them, from engaging in conduct that violates Texas's antitrust laws;

f) Enjoin and restrain, pursuant to the Texas DTPA and/or other Texas State laws, Defendant BlackRock and its officers, directors, partners, agents, and employees, and all persons acting or claiming to act on its behalf or in concert with it, from continuing to engage in any false, deceptive, or misleading acts or practices and from adopting in the future any acts or practice having a similar purpose or effect to the false, deceptive, or misleading actions set forth above;

g) Order Defendants to pay civil fines pursuant to § 15.20(a) of the TEX. BUS. &COM. CODE;

h) Order Defendant BlackRock to pay civil penalties of up to $10,000.00 per violation for each and every violation of the DTPA as authorized by TEX. BUS. & COM. CODE § 17.47(c)(1);

i) Award Plaintiff State of Texas its costs of suit pursuant to § 15.20(b) of the TEX. BUS. &COM. CODE;

j) Order injunctive and all other available legal and equitable relief pursuant to MONT. CODE ANN. § 30-14-201 *et seq.*;

k) Order payment of Plaintiff State of Montana's costs and attorney fees pursuant to MONT. CODE ANN. § 30-14-131;

l) Order injunctive and all other available equitable relief pursuant to IND. CODE §§ 24-1-2-1 *et seq.,* and 24-5-0.5-4(c)(1);

m) Order injunctive relief to prevent or restrain conduct prohibited under Iowa Code § 553.4, and to remove the ~~conduct's~~conduct's effect by injunction, divestiture, divorcement, or

112

dissolution of domestic enterprises' right to do business in the state of Iowa, compelling the forfeiture or restraint of the issuance of a certificate of incorporation, permit to transact business, license, or franchise, or granting other equitable relief, that is available under Iowa Code §. 553.12(1);

n)  Order Defendants to pay Iowa damages pursuant to Iowa Code § 553.12, and civil penalties pursuant to Iowa Code § 553.13.

n)o)        Order Defendants to pay Iowa the necessary costs of bringing suit, as provided under Iowa Code § 553.12(4);

o)p)        Order injunctive relief to prohibit BlackRock from continuing the practices or engaging in the practices or doing any acts in furtherance of the practices prohibited by Iowa Code §. 714.16, and issue any orders or judgments necessary to prevent the use or employment by BlackRock of any practices prohibited under Iowa Code § 714.16;

q)  Order BlackRock to pay restitution and/or disgorgement or provide any other appropriate equitable relief pursuant to Iowa Code § 714.16(7).

p)r)Order BlackRock to pay civil penalties under Iowa Code § 714.16(7);

q)s)        Order BlackRock to pay reasonable attorneys' fees under Iowa Code § 714.16(11);

r)t) Order injunctive and all other available equitable relief pursuant to KAN. STAT. ANN. § 50-103;

s)u)        Order Defendants to pay damages and civil penalties pursuant to KAN. STAT. ANN. § 50-103;

t)v)Order injunctive relief to restrain, enjoin and prohibit Defendants from engaging in any activity in violation of the Louisiana Monopolies statutes, L.A. R.S. § 51:121, *et seq.*, including, but not limited to, the unfair methods of competition and unfair or deceptive acts or practices alleged herein;

u)w)        Order injunctive relief and other equitable relief, pursuant to L.A. R.S. § 51:1401 restraining, enjoining and prohibiting Defendants from engaging in any acts that violate LUTPA, including, but not limited to, the unfair methods of competition and unfair or deceptive acts or practices alleged herein;

v)x)        Order that Defendants pay restitution under LUTPA (L.A. R.S. § 51:1408) to all consumers who have incurred a loss due to the conduct of Defendants through any manner deemed practicable by the Court;

w)y)        Order Defendants to pay all civil penalties allowed pursuant to L.A. R.S. § 51:1407 & L.A. R.S. § 51:1722, for each and every willful violation of LUTPA;

x)z)        Order Defendants to pay attorneys' fees and costs pursuant to L.A. R.S. § 51:1409 for violations of LUTPA;

y)aa)        Adjudge and Decree that Defendants' conduct violates the Nebraska Consumer Protection Act, the Junkin Act, and Nebraska's Uniform Deceptive Trade Practices Act.

z)bb)  Plaintiff State of Nebraska seeks all remedies available under the Consumer Protection Act, the Junkin Act, and Nebraska's Uniform Deceptive Trade Practices Act, including, without limitation, the following:

  a. Enjoining and restraining Defendants from engaging in conduct that violates the Nebraska Consumer Protection Act, the Junkin Act, and Nebraska's Uniform Deceptive Trade Practices Act. NEB. REV. STAT. §§ 59-1608 and 87-303.05.

  b. Ordering Defendants to divest themselves of the stock or assets that may substantially lessen competition as authorized under NEB. REV. STAT. § 59-1606(3).

  c. Order Defendants to pay civil penalties for each violation of NEB. REV. STAT. § 59-1603, as authorized under NEB. REV. STAT. § 59-1614.

  d. Order Defendant BlackRock to pay civil penalties for each violation of Neb. Rev. Stat. § 59-1602, as authorized under NEB. REV. STAT. § 59-1614.

  e. Order Defendant BlackRock to pay civil penalties for each violation of Neb. Rev. Stat. § 87-302, as authorized under NEB. REV. STAT. § 59-87-803.11

  f. Order Defendants to pay *parens patriae* damages, including treble damages, for injuries personally suffered by Nebraska citizens based on Defendants' violations of the Nebraska antitrust laws. NEB. REV. STAT. § 84-212.

  g. Order Defendant BlackRock to pay restitution to persons harmed by Defendant's violations of the Consumer Protection Act and the Uniform Deceptive Trade Practices Act. NEB. REV. STAT. §§ 59-1608 and 87-303.05.

  h. Order Defendants to pay restitution to persons harmed by Defendants' antitrust violations of the Consumer Protection Act. NEB. REV. STAT. § 59-1608

  i. Order Defendants to pay costs and reasonable attorneys' fees under NEB. REV. STAT. §§ 59-1607(1) and 87-303.05

  j. Order any additional relief the Court finds just and proper.

aa)cc)  Order injunctive and all other available equitable and legal relief available pursuant to OKLA. STAT., tit. 79, § 205(A)(1);

bb)dd)  Order Defendants to pay Oklahoma the cost of suit, including a reasonable attorney fee, pursuant to OKLA. STAT., tit. 79, § 205(A)(1);

ee)ee)  Order injunctive and all other available legal and equitable relief pursuant to W. VA CODE § 47-18-1 et seq.;

dd)ff)  Award Plaintiff an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action;

ee)gg)  Order any additional relief the Court finds just and proper.

Dated: January ~~16, 2025~~ 5, 2026                    Respectfully submitted,

**Deleted Cells**

~~/s/ David H. Thompson~~
~~David H. Thompson~~
~~D.C. Bar No. 450503~~
~~Brian W. Barnes~~
~~(Pro hac vice)~~
~~Harold S. Reeves~~
~~(Pro hac vice)~~
~~COOPER & KIRK, PLLC~~
~~1523 New Hampshire Ave., N.W.~~
~~Washington, D.C., 20036~~
~~Telephone: (202) 220-9600~~
~~Facsimile: (202) 220-9601~~
~~dthompson@cooperkirk.com~~
~~bbarnes@cooperkirk.com~~
~~hreeves@cooperkirk.com~~

~~Counsel for Plaintiffs States of Texas and Montana~~

~~The Buzbee Law Firm~~

~~By: /s/ Anthony G. Buzbee~~
~~Anthony G. Buzbee~~
~~State Bar No. 24001820~~
~~Christopher J. Leavitt~~
~~State Bar No. 24053318~~

~~The Buzbee Law Firm~~
JP Morgan Chase Tower
~~600 Travis Street, Suite 7500~~
~~Houston, Texas 77002~~
~~Tel: (713) 223-5393~~
~~Fax: (713) 223-5909~~
~~tbuzbee@txattorneys.com~~
~~cleavitt@txattorneys.com~~
~~www.txattorneys.com~~

~~Counsel for Plaintiff State of Texas~~

~~KEN PAXTON~~
~~Attorney General of Texas~~

~~BRENT WEBSTER~~
~~First Assistant Attorney General~~

~~RALPH MOLINA~~
~~Deputy First Assistant Attorney General~~

JAMES LLOYD
Deputy Attorney General for Civil Litigation

/s/ ~~Ryan Baasch~~ David H. Thompson
~~RYAN BAASCH~~
~~Associate Deputy Attorney General~~
~~for Civil Litigation~~
~~Texas~~ David H. Thompson
DC ~~Bar. No.: 24129238.~~ 450503
    (Pro hac vice)
Peter A. Patterson
    (Pro hac vice)
Harold S. Reeves
    (Pro hac vice)
Brian W. Barnes
    (Pro hac vice)
Clark L. Hildabrand
    (Pro hac vice)
John Ramer
    (Pro hac vice)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
ppatterson@cooperkirk.com
hreeves@cooperkirk.com
childabrand@cooperkirk.com
jramer@cooperkirk.com

115

*Counsel for Plaintiffs States of Texas and Montana*

**FOR PLAINTIFF STATE OF ALABAMA**

STEVE MARSHALL
Attorney General of Alabama

*/s/ Robert M. Overing*
Robert M. Overing
Deputy Solicitor General
    (Pro hac vice)
OFFICE OF THE ATTORNEY GENERAL OF
~~TEXAS~~ALABAMA
~~P.O. Box 12548, MC-066~~
~~Austin, Texas 78711-2548~~
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (~~512) 463-2012~~334) 242-7300
Fax: (~~512) 320-0911~~334) 353-8400
~~James.Lloyd@oag.texas~~Robert.Overing@Alabama
AG.gov
~~Ryan.Baasch@oag.texas.gov~~

*Counsel for Plaintiff State of Alabama*

**FOR PLAINTIFF STATE OF INDIANA**

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA
    Attorney No. 18857-49

*/s/ Scott L. Barnhart*
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Complex Litigation
    (Pro hac vice)
OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-6309
Fax: (317) 232-7979
Email: Scott.Barnhart@atg.in.gov

**FOR PLAINTIFF STATE OF TEXAS**

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
RALPH MOLINA
Deputy First Assistant Attorney
General
*/s/ Austin Kinghorn*
Austin Kinghorn
Deputy Attorney General for Civil
Litigation

Texas Bar No.: 24072184
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Telephone: (512) 463-2012
Fax: (512) 320-0911
Austin.Kinghorn@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**FOR PLAINTIFF STATE OF ARKANSAS**

TIM GRIFFIN
Arkansas Attorney General

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson

116

Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-2007
autumn.patterson@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

**FOR PLAINTIFF STATE OF
IOWA**

BRENNA BIRD
Attorney General of Iowa

*/s/ Eric H. Wessan*
Eric H. Wessan
Solicitor General
PATRICK C. VALENCIA
Deputy Solicitor General
     (Pro hac vice)
OFFICE OF THE ATTORNEY
GENERAL OF IOWA
1305 E. Walnut Street
Des Moines, Iowa 50319
Telephone: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**FOR PLAINTIFF STATE OF
LOUISIANA**

LIZ MURRILL
ATTORNEY GENERAL

*/s/ Patrick Voelker*
Patrick Voelker, LA Bar #38926
     (Pro hac vice)
John Kelley, LA Bar #35506
     (Pro hac vice)
Michael Dupree, LA Bar #26870
     (Pro hac vice)

Jesse Moore, Atty. No. 37654-49
Deputy Attorney General
     (Pro hac vice)
OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956
Fax: (317) 232-7979
Email:  Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of ~~Texas~~Indiana*

**FOR PLAINTIFF STATE OF KANSAS**

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Anthony J. Powell*
Anthony J. Powell
Solicitor General
Erin B. Gaide
Assistant Attorney General
120 SW 10th Avenue
Topeka, KS 66612-1597
Tel: (785) 296-7109
abhishek.kambli@ag.ks.gov
anthony.powell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

**FOR PLAINTIFF STATE OF MISSOURI**

CATHERINE L. HANAWAY
ATTORNEY GENERAL

*/s/ William James Seidleck*
William James Seidleck
     (Pro hac vice)
Principal Deputy Solicitor General
Missouri Attorney General's Office
Old Post Office Building
815 Olive St. Suite 200
St. Louis, MO 63101

117

Assistant Attorneys General
Public Protection Division
Complex Litigation Section
1885 North 3rd Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
voelkerp@ag.louisiana.gov
kelleyj@ag.louisiana.gov
dupreem@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

**FOR PLAINTIFF STATE OF MONTANA**

AUSTIN KNUDSEN
Montana Attorney General

*/s/ Brent Mead*
Brent Mead
    (Pro hac vice)
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894
Brent.Mead2@mt.gov
Anna.Schneider@mt.gov

*Counsel for Plaintiff State of Montana*

**FOR PLAINTIFF STATE OF OKLAHOMA**

GENTNER DRUMMOND
    ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II
Solicitor General
    (Pro hac vice forthcoming)
Office of the Attorney General of Oklahoma

Tel: (573) 301-5359
Fax. (573) 751-0774
Email: william.seidleck@ago.mo.gov

*Attorneys for Plaintiff State of Missouri*

**FOR PLAINTIFF STATE OF NEBRASKA**

MICHAEL T. HILGERS
Attorney General of Nebraska

*/s/ Eric J. Hamilton*
Eric J. Hamilton
Solicitor General
ZACHARY B. POHLMAN
Assistant Solicitor General
    (Pro hac vice)
NEBRASKA DEPARTMENT OF JUSTICE
2115 State Capitol
Lincoln, Nebraska 68509
Telephone: (402) 471-2683
Fax: (402) 471-3297
eric.hamilton@nebraska.gov
zachary.pohlman@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

**FOR PLAINTIFF STATE OF WEST VIRGINIA**

JOHN B. MCCUSKY
Attorney General

*/s/ Michael R. Williams*
Michael R. Williams
Solicitor General
    (Pro hac vice)
OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25301
Telephone: (304) 558-2021
michael.r.williams@wvago.gov
Douglas L Davis
WV Attorney General's Office

118

313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

**FOR PLAINTIFF STATE OF WYOMING**

KEITH G. KAUTZ
Wyoming Attorney General

*/s/ Ryan Schelhaas*
Ryan Schelhaas
Chief Deputy Attorney General
   (Pro hac vice)
109 State Capitol
Cheyenne, Wyoming 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

(Pro hac vice)
P.O. Box 1789
State Capitol, Building 6
1900 Kanawha Blvd. East, Ste 401
Charleston, WV 25326
304-558-8986
Fax: 304-558-0184
Email: douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

119

**CERTIFICATE OF SERVICE**

I hereby certify on this 5th day of January 2025, a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's ECF System. Notice of this filing will be sent to all counsel of record by operation of the ECF System.

/s/ David FOR PLAINTIFF STATE OF ALABAMA

STEVE MARSHALL
Attorney General of Alabama

/s/ Robert M. Overing
ROBERT M. OVERING
Deputy Solicitor General
 (Pro hac vice)

OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Robert.Overing@AlabamaAG.gov

Counsel for Plaintiff State of Alabama

**FOR PLAINTIFF STATE OF ARKANSAS**

TIM GRIFFIN
Arkansas Attorney General

*/s/ Dylan L. Jacobs*
DYLAN L. JACOBS
Deputy Solicitor General

OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-2007
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

**FOR PLAINTIFF STATE OF INDIANA**

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA
    Attorney No. 18857-49

*/s/ Scott L. Barnhart*
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Complex Litigation
    (Pro hac vice)

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-6309
Fax: (317) 232-7979
Email:  Scott.Barnhart@atg.in.gov

*/s/ Jessee Moore*
Jessee Moore, Atty. No. 37654-49
Deputy Attorney General
    (Pro hac vice)

121

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956
Fax: (317) 232-7979
Email:  Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

**FOR PLAINTIFF STATE OF IOWA**

BRENNA BIRD
Attorney General of Iowa

*/s/ Eric H. WessanThompson*
ERICDavid H. WESSANThompson

Solicitor General

PATRICK C. VALENCIA
Deputy Solicitor General
    (Pro hac vice)

OFFICE OF THE ATTORNEY GENERAL OF IOWA
1305 E. Walnut Street
Des Moines, Iowa 50319
Telephone: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

122

**FOR PLAINTIFF STATE OF KANSAS**

*/s/ Kris W. Kobach*
KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS
Anthony J. Powell
Solicitor General
Erin B. Gaide
Assistant Attorney General
120 SW 10th Avenue
Topeka, KS 66612-1597
Tel: (785) 296-7109
abhishek.kambli@ag.ks.gov
anthony.powell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

**FOR PLAINTIFF STATE OF LOUISIANA**

LIZ MURRILL
ATTORNEY GENERAL

*/s/ Patrick Voelker*
Patrick Voelker, LA Bar #38926
———— (Pro hac vice forthcoming)
John Kelley, LA Bar #35506
———— (Pro hac vice forthcoming)
Michael Dupree, LA Bar #26870
———— (Pro hac vice forthcoming)
Assistant Attorneys General
Public Protection Division
Complex Litigation Section
1885 North 3rd Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
voelkerp@ag.louisiana.gov
kelleyj@ag.louisiana.gov
dupreem@ag.louisiana.gov

123

**FOR PLAINTIFF STATE OF MISSOURI**

*/s/ Andrew Bailey*
ANDREW BAILEY
Attorney General of Missouri
Missouri Attorney General's Office
815 Olive St. Suite 200
St. Louis, MO 63101
Tel: (573) 751-1800
Fax: (573) 751-0774
Email: DianaHaines@ago.mo.gov

Caleb Rutledge
Office of The Missouri Attorney General
   (Pro hac vice)
207 West High Street
Jefferson City, MO 65102
573-751-0812
Email: caleb.rutledge@ago.mo.gov

*Attorneys for Plaintiff State of Missouri*

**FOR PLAINTIFF STATE OF MONTANA**

AUSTIN KNUDSEN
Montana Attorney General

*/s/ Brent Mead*
Brent Mead
   (Pro hac vice)
Anna Schneider
Montana Attorney General's Office
P.O. Box 200151
Helena, MT 59620-0151
Phone: (406) 444-4500
Fax: (406) 442-1894
Brent.Mead2@mt.gov
Anna.Schneider@mt.gov

*Counsel for Plaintiff State of Montana*

**FOR PLAINTIFF STATE OF NEBRASKA**

124

MICHAEL T. HILGERS
Attorney General of Nebraska

ERIC J. HAMILTON
Solicitor General

/s/ Zachary B. Pohlman
ZACHARY B. POHLMAN
Assistant Solicitor General
    (Pro hac vice)

NEBRASKA DEPARTMENT OF JUSTICE
2115 State Capitol
Lincoln, Nebraska 68509
Telephone: (402) 471-2683
Fax: (402) 471-3297
eric.hamilton@nebraska.gov
zachary.pohlman@nebraska.gov

*Counsel for Plaintiff State of Nebraska*


**FOR PLAINTIFF STATE OF OKLAHOMA**

GENTNER DRUMMOND
    ATTORNEY GENERAL

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II
Solicitor General
    (Pro hac vice forthcoming)
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*


**FOR PLAINTIFF STATE OF WEST VIRGINIA**

PATRICK MORRISEY
Attorney General

125

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS
Solicitor General
    (Pro hac vice)
OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25301
Telephone: (304) 558-2021
michael.r.williams@wvago.gov

Douglas L Davis
WV Attorney General's Office
    (Pro hac vice)
P.O. Box 1789
State Capitol, Building 6
1900 Kanawha Blvd. East, Ste 401
Charleston, WV 25326
304-558-8986
Fax: 304-558-0184
Email: douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*
**FOR PLAINTIFF STATE OF WYOMING**

BRIDGET HILL
Wyoming Attorney General

*/s/ Ryan Schelhaas*
RYAN SCHELHAAS
Chief Deputy Attorney General
    (Pro hac vice)
109 State Capitol
Cheyenne, Wyoming 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

126